1 | HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
2 | jhueston@hueston.com
Moez M. Kaba, State Bar No. 257456
3 | mkaba@hueston.com
Sourabh Mishra, State Bar No. 305185
4 | smishra@hueston.com
Michael H. Todisco, State Bar No. 315814
5 | mtodisco@hueston.com
523 West 6th Street, Suite 400
6 | Los Angeles, CA 90014
Telephone:  (213) 788-4340
7 | Facsimile:   (888) 775-0898

8 | Attorneys for Defendant Elon Musk

9

10 | **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

11

12

13 | VERNON UNSWORTH,

| Case No. 2:18-cv-08048

14 |          Plaintiff,

| Judge: Hon. Stephen V. Wilson

15 |     vs.

| **DEFENDANT ELON MUSK'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF VERNON UNSWORTH'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

16 | ELON MUSK,

17 |          Defendant.

18 | 

| Date:      April 1, 2019
Time:      1:30 p.m.
Place:     Courtroom 10A

19

20 | 

| Complaint Filed:   Sept. 17, 2018
Trial Date:           None set

21

22

23

24

25

26

27

28

5450851

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 1, 2019, at 1:30 p.m., or as soon thereafter as may be heard, in Courtroom 10A (10th Floor) of the above-entitled Court, located in the First Street Courthouse, 350 W. 1st Street, Los Angeles, California 90012, Defendant Elon Musk will and hereby does move the Court for an Order dismissing Plaintiff Vernon Unsworth's Complaint.  This Motion is based on this Notice of Motion, the Memorandum of Point and Authorities filed herewith, the pleadings and papers filed in this action, and such other matters as may be presented to the Court at the time of the hearing.

Elon Musk makes this Motion on the grounds that the statements identified in Vernon Unsworth's complaint are not actionable.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on December 18, 2018.

Dated:  December 26, 2018          HUESTON HENNIGAN LLP


By:  /s/ Moez M. Kaba

Moez M. Kaba
Attorneys for Defendant Elon Musk

5450851

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.    INTRODUCTION & BACKGROUND ................................................ 1

II.   LEGAL STANDARD ..................................................................... 5

III.  ARGUMENT ................................................................................. 5

      A.   Unsworth must prove that the reasonable reader would believe Musk possessed private facts implicating Unsworth as a pedophile ........................................................................ 6

      B.   In context, Musk's statements cannot reasonably be read as asserting underlying knowledge that Unsworth was a pedophile ........................................................................ 8

           1.   Statements on unmoderated Internet forums are presumptively opinion ................................................ 8

           2.   Musk's statements were made in the midst of a back-and-forth argument and in direct response to personal and legal attacks ........................................ 10

           3.   Musk disclosed the basis for his personal opinion: Thailand's documented problems with sex tourism ................. 13

           4.   Musk's over-the-top insults are not statements of fact ............. 15

           5.   Musk's colloquial statements are not reasonably interpreted as statements of facts ................................ 17

           6.   Musk's expressions of uncertainty show that his statements did not have a concrete factual foundation and were therefore opinion ........................................ 18

           7.   Readers did not interpret Musk's statements as factual assertions ........................................................ 20

      C.   Musk's Statements are Not Sufficiently Factual to be Susceptible of Being Proved True or False ........................................ 22

IV.   CONCLUSION .............................................................................. 25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adelson v. Harris,*
973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd,* 876 F.3d 413 (2d Cir. 2017)................................................................................................ 15

*Art of Living Found. v. Does,*
2011 WL 2441898 (N.D. Cal. June 15, 2011) .............................. 23

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................... 5

*Brahms v. Carver,*
33 F. Supp. 3d 192 (E.D.N.Y. 2014)............................................. 8

*Brian v. Richardson,*
87 N.Y.2d 46 (1995)..................................................................... 20

*Brown v. Elec. Arts, Inc.,*
724 F.3d 1235 (9th Cir. 2013)........................................................ 5

*Buckley v. Littell,*
539 F.2d 882 (2d Cir. 1976) ......................................................... 23

*Carr v. Warden,*
159 Cal. App. 3d 1166 (1984)................................................. 13, 14

*Chaker v. Mateo,*
209 Cal. App. 4th 1138 (2012)........................................... 9, 10, 16

*Clifford v. Trump,*
2018 WL 4997419 (C.D. Cal. Oct. 15, 2018) ....................... passim

*ComputerXpress, Inc. v. Jackson,*
93 Cal. App. 4th 993 (2001) ........................................................ 17

*Considering Homeschooling v. Morningstar Educ. Network,*
2008 WL 11413459 (C.D. Cal. Aug. 6, 2008)................................ 4

*Doe v. Cahill,*
884 A.2d 451 (Del. 2005)................................................... 9, 21, 22

*Dreamstone Ent. v. Maysalward Inc.,*
2014 WL 4181026 (C.D. Cal. Aug. 18, 2014)........................ 23, 24

*Dworkin v. Hustler Mag. Inc.,*
867 F.2d 1188 (9th Cir. 1989)...................................................... 15

*Feld v. Conway,*
16 F. Supp. 3d 1 (D. Mass. 2014)................................................ 20

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

<u>Page(s)</u>

3

*Finkel v. Dauber*,
4
  906 N.Y.S.2d 697 (Sup. Ct. 2010) ................................................................ 17

*Gardner v. Martino*,
5
  563 F.3d 981 (9th Cir. 2009).............................................................. 3, 5, 6, 25

6
*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ..................................................................................... 6
7

8
*Global Telemedia Int'l, Inc. v. Doe 1*,
  132 F. Supp. 2d 1261 (C.D. Cal. 2001)..................................................passim

9
*Gregory v. McDonnell Douglas Corp.*,
  552 P.2d 425 (Cal. 1976)............................................................................ 8
10

*Harrell v. George*,
11
  2012 WL 3647941 (E.D. Cal. Aug. 22, 2012) ............................................ 15

12
*Higher Balance, LLC v. Quantum Future Group*,
  2008 WL 5281487 (D. Or. Dec. 18, 2008) ................................................ 23
13

*Hustler Mag., Inc. v. Falwell*,
14
  485 U.S. 46 (1988) .................................................................................. 7, 25

15
*Info. Control Corp. v. Genesis One Computer Corp.*,
  611 F.2d 781 (9th Cir. 1980)....................................................... 4, 11, 12, 13
16

*Jacobus v. Trump*,
17
  51 N.Y.S.3d 330 (N.Y. Sup. Ct.), aff'd, 64 N.Y.S.3d 889 (N.Y.
  App. Div. 2017)........................................................................ 10, 11, 12, 16
18

19
*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005)..............................................................passim

20
*Koch v. Goldway*,
  817 F.2d 507 (9th Cir. 1987) ................................................................. 8, 22
21

22
*Krinsky v. Doe 6*,
  159 Cal. App. 4th 1154 (2008)..............................................................passim

23
*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014)...................................................................... 7
24

*Lieberman v. Fieger*,
25
  338 F.3d 1076 (9th Cir. 2003) .................................................................... 24

26
*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005)........................................................................ 5
27

28
*Mattel, Inc. v. MCA Recs.*,
  28 F. Supp. 2d 1120 (C.D. Cal. 1998)................................................... 23, 24

- iii -

5450851

<u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*McCabe v. Rattiner*,
    814 F.2d 839 (1st Cir. 1987) ........................................................................ 23

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990) ........................................................................... 11, 13, 16

*Mirage Ent., Inc. v. FEG Entretenimientos S.A.*,
    326 F. Supp. 3d 26 (S.D.N.Y. 2018) ............................................................ 6

*Nicosia v. De Rooy*,
    72 F. Supp. 2d 1093 (N.D. Cal. 1999) ..................................... 12, 13, 15, 23

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ................................................................... 16

*Oracle Am., Inc. v. Google Inc.*,
    2016 WL 1252794 (N.D. Cal. Mar. 25, 2016) ............................................. 9

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ................................................................ 13, 22

*People v. Paniagua*,
    209 Cal. App. 4th 499 (2012) .................................................................... 14

*Phantom Touring, Inc. v. Affiliated Pub.*,
    953 F.2d 724 (1st Cir. 1992) ...................................................................... 23

*Price v. Stossel*,
    620 F.3d 992 (9th Cir. 2010) ..................................................................... 13

*Price v. Viking Penguin, Inc.*,
    881 F.2d 1426 (8th Cir. 1989) ................................................................... 23

*RainSoft v. MacFarland*,
    2018 WL 4696737 (D.R.I. Sept. 30, 2018) ................................................ 10

*Redmond v. Gawker Media, LLC*,
    2012 WL 3243507 (Cal. Ct. App. Aug. 10, 2012) ................................. 21, 22

*Rocker Mgmt. LLC v. John Does*,
    2003 WL 22149380 (N.D. Cal. May 29, 2003) ........................................... 17

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
    925 N.Y.S.2d 407 (2011) ............................................................................ 9

*SI03, Inc. v. Bodybuilding.com, LLC*,
    2008 WL 11348458 (D. Idaho May 1, 2008) .............................................. 16

*Standing Committee on Discipline of U.S. Dist. Ct for C.D. Cal. v. Yagman*,
    55 F.3d 1430 (9th Cir. 1995) .............................................................. 3, 6, 19

TABLE OF AUTHORITIES (cont.)

Page(s)

*Steam Press Holdings, Inc. v. Haw. Teamsters, Allied Workers Union, Loc. 996,*
302 F.3d 998 (9th Cir. 2002) .......................................................................... 11

*Stolatis v. Hernandez,*
77 N.Y.S.3d 473 (2018) .............................................................................. 24

*Summit Bank v. Rogers,*
206 Cal. App. 4th 669 (2012) ............................................................... 4, 9, 17

*Tipping v. Martin,*
2016 WL 397088 (N.D. Tex. Feb. 2, 2016) ......................................... 7, 20

*Torain v. Liu,*
2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007), aff'd, 279 F. App'x
46 (2d Cir. 2008) ........................................................................... 4, 6, 7, 11

*Troy Group, Inc. v. Tilson,*
364 F. Supp. 2d 1149 (C.D. Cal. 2005) ............................................... 6

*Underwager v. Channel 9 Austl.,*
69 F.3d 361 (9th Cir. 1995) ............................................................... 8, 22, 25

*United States v. Bradbury,*
111 F. Supp. 3d 918 (N.D. Ind. 2015) ............................................... 10

*United States v. Donnelly,*
2005 WL 1575270 (N.D. Cal. June 30, 2005) ............................... 14

*United States v. Durham,*
902 F.3d 1180 (10th Cir. 2018) ....................................................... 14

*Wallace v. Geckosystems Int'l Corp.,*
2013 WL 4054147 (Del. Super. Ct. July 31, 2013) .................. 7, 16

*ZL Techs., Inc. v. Gartner, Inc.,*
709 F. Supp. 2d 789 (N.D. Cal. 2010), aff'd. 433 F. App'x 547
(9th Cir. 2011) ............................................................................... 5

**Rules**

Fed. R. Civ. Proc. 12(b)(6) .......................................................... 5

**Other Authorities**

Ashley Wong, *Elon Musk Is Sending a Team to Thailand to Help with Cave Rescue*, USA TODAY (July 6, 2018) ................................... 1

Lyrissa Barnett Lidsky et al., *Of Reasonable Readers and Unreasonable Speakers: Libel Law in a Networked World,*
23 Va. J. Soc. Pol'y & L. 155 (2016) ....................................... 15

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

<u>Page(s)</u>

3

Restatement (Second) Torts § 566 ................................................................. 16

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION & BACKGROUND

In June and July 2018, Elon Musk and numerous others at SpaceX, the Boring Company, and Tesla, sought to help rescue twelve boys who were trapped in one of Thailand's caves.  (Compl. ¶¶ 23-25.)  Many individuals, including representatives of the Thai government, other officials, and members of the public, confronting the prospects of an unfathomable tragedy, looked to Musk—who is known for pioneering revolutionary transportation technologies at his companies Tesla, SpaceX, and the Boring Company—for help.

Within hours of being in communication with Thai officials, Musk directed Tesla, SpaceX, and the Boring Company (which specializes in tunneling and construction) engineers to develop potential solutions to provide assistance to the rescue.[1]  And soon after, Musk sent the first of what would be several engineers to Chiang Rai.  Dozens of engineers, and Musk himself, doubled down on their work, sacrificing their familial obligations and cancelling vacations, so that they could help the cave rescue efforts.[2]  The team worked countless hours each day for days on end, deploying the knowledge they had gained through years of developing unprecedented transportation systems.  Aware of the time constraints, the team developed a groundbreaking miniature submarine that could carry the children to safety.  The development efforts included not just developing rescue equipment but also providing resources for pumping water in order to provide additional capacity to keep up with oncoming rains (including delivering ground sump pumps, Tesla Powerwalls, and securing extremely high capacity pumps in Europe), and surveying in order to increase air flow into the cave and drain water out (including delivering

---

[1] Justin Wise, *Elon Musk Sends Engineers to Help Thai Cave Rescue Mission*, THE HILL (July 6, 2018).
[2] Chelsea Gohd, *Elon Musk Sends SpaceX Engineers to Aid Soccer Team Trapped in Thai Cave*, SPACE.COM (July 6, 2018).

(Continued...)

- 1 -

1   underwater surveying equipment and arranging for sonar scanners and a 3D laser
2   tracker).[3]

3        In developing their rescue vehicle, Musk communicated directly with Richard
4   Stanton who co-led the dive rescue team and provided Musk with details and
5   specifications.  (Declaration of Moez M. Kaba, filed herewith, ("Kaba Decl.") Ex. 1
6   (E-mail exchange between Musk and Stanton.).)  Other members of Musk's team
7   communicated with divers and other military officials on the ground, and
8   incorporated their feedback in designing the rescue equipment.  Stanton explicitly
9   urged Musk to "continu[e] with the development of this system" as "it may well be
10  used."  (*Id.*)

11       In addition to other SpaceX, Tesla, and the Boring Company employees who
12  traveled to Thailand, Musk himself put his professional and personal obligations on
13  hold to travel to Thailand to speak to rescuers on the ground and help in any way
14  possible.  As reported in the Thai press, Musk was greeted at the airport by the Thai
15  Prime Minister who asked him to provide equipment "that could help Thailand in the
16  future."[4] Members of the Thai Army and Navy also greeted Musk and his team at the
17  airport and invited them to the cave rescue site.

18       On July 10, the children were rescued.  In reaction, Musk tweeted: "Great
19  news that they made it out safely. Congratulations to an outstanding rescue team!"
20  Although it was ultimately not used in the rescue operation, the mini-submarine
21  developed by Musk and his team of volunteers was given to the Thai Navy SEAL
22  team for use in future rescue missions.  SpaceX engineers spent additional time in
23  Thailand training members of the Thai Navy to use the mini-submarine.[5]

24

---

25  [3] Ashley Wong, *Elon Musk Sends an 'Escape Pod' to Help in Thailand Cave Rescue*,
26  USA TODAY (July 9, 2018).
    [4] Wasamon Audjarint & Kornrawee Panyasuppakun, *PM: Musk 'Keen to Invest in
27  Thailand'*, THE NATION (July 11, 2018).
28  [5] Muktita Suhartono & Julia Jacobs, *Thai Navy May Put Elon Musk's Mini-
    Submarine to Use. One Day.*, THE NEW YORK TIMES (July 12, 2018).

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

Musk and engineers from his companies were singularly focused on assisting the rescue efforts in any way they could.  Yet, Plaintiff Vernon Unsworth decided to gratuitously attack them and insult their contributions.  Unsworth appeared on CNN and, for reasons unknown, decided to pick a fight with Musk in spectacularly public fashion.  (Complaint, ¶ 71.)  Despite having never met Musk, Unsworth began striking at Musk and his colleagues.  (*Id.*)  Unsworth called Musk's efforts a "PR stunt" that had "absolutely no chance of working."  (*Id.*)  He also advised Musk to "stick his submarine where it hurts."  (*Id.*)

Contrary to Unsworth's assertions, the Thai Government appreciated Musk's and his team's help.  The Prime Minister of Thailand wrote to Musk to "convey [his] deep appreciation to [Musk] and [his] engineering team for [their] expeditious and extraordinary efforts in constructing the Space-X mini-submarine "Wild Boar" to assist the rescue operation…"  (Kaba Decl., Ex. 2 (Letter from Prime Minister to Musk).)  The Prime Minister commented that he was "particularly touched" that Musk "personally travelled to Thailand to deliver the 'Wild Boar' Space-X mini-sub, which was made possible through [his] expertise and the cooperation with various experts involved with this highly complicated and urgent rescue operation." (*Id.*)

Similarly, the Royal Thai Army Special Forces commended Musk and SpaceX's efforts, writing:

> I would like to express to you and all the SpaceX members my sincerest appreciation and gratitude for your support during the "Operation Wild Boars."  You will be in our memory and our hearts that once you are one who made the impossible mission possible.  From what you did really give us hope and made us believe in humanity.  We will be very pleased to welcome you as our guest when you come to visit Thailand again.  Thank you so much from our hearts.

(Kaba Decl., Ex. 3 (Letter from Royal Thai Army Special Forces to Musk).)  The Royal Thai Army further issued a Special Warfare Command Certificate to Musk and his team in recognition of their assistance.  (Kaba Decl., Ex. 4 (Royal Thai Army

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1   Certificate).)

2          These facts did not deter Unsworth from berating Musk and the selfless work

3   of the engineering team he had assembled.  Shocked by Unsworth's indefensible and

4   baseless attacks, Musk answered to defend himself and the efforts of SpaceX, Tesla,

5   and the Boring Company employees who had given up their days and nights to help

6   find a solution. (Complaint, Ex. B, p. 28.)  Musk took to Twitter—a social

7   networking website infamous for invective and hyperbole—to respond.  (*Id.*)  Musk,

8   unaware even of Unsworth's name, tweeted that he had never met the "dude" from

9   CNN, but was nonetheless determined to prove him wrong.  (*Id.* ¶ 75.)  He vowed to

10  demonstrate that his submarine could navigate the caves "no problemo."  (*Id.* ¶ 76.)

11  And just like Unsworth did, Musk tacked on a gratuitous barb.  (*Id.*)  Referencing

12  Thailand's documented reputation, Musk said that Unsworth was "sus" for being a

13  "British expat guy who lives in Thailand."  (*Id.* ¶ 73.)  Later, referring back to these

14  suspicions, Musk dubbed Unsworth "pedo guy."  (*Id.* ¶ 76.)

15         The public knew from the outset that Musk's insults were not intended to be

16  statements of fact; indeed many wondered aloud why Unsworth attacked Musk's

17  efforts in the first place.  Unsworth himself claims that Musk was criticized for

18  making accusations "*without any evidence*."  (*Id.* ¶ 80 (emphasis added).)

19         Musk moved on and decided to end the war of words.  He deleted his prior

20  tweets about Unsworth and publicly apologized.  (*Id.*)  Musk tweeted that his initial

21  remarks had been impulsive—"spoken in anger"—and that Unsworth's offensive

22  comments did "not justify" Musk's outburst.  (*Id.*)

23         Then Unsworth's lawyer entered the fray.  (*Id.* ¶ 82.)  Like Musk, Unsworth's

24  lawyer also chose to communicate on the rough-and-tumble Twitter platform,

25  chiding Musk and telling him to "check his mail before tweeting."  (*Id.* ¶ 87.)  To

26  this public tweet, Unsworth's lawyer attached a picture of a demand letter that he

27  allegedly sent Musk days earlier.  (*Id.* Ex. H, p. 40.)  In that letter, Unsworth's

28  lawyer escalated the rhetoric and used words Musk never did.  He claimed that Musk

- 4 -

1    had accused Unsworth of engaging in "sexual exploitation of Thai children." (*Id.*)[6]

2          Unsworth and his team's efforts to the stir the pot worked.  Media coverage

3    reached a fever pitch, with numerous outlets reaching out to Musk for comment on

4    Unsworth's lawyer's Twitter jabs.

5          Musk did not respond publicly.  Instead, he sent an "[o]ff the record" e-mail

6    responding to BuzzFeed's inquiry and chewing out the journalist.  (*Id.* Ex. K, p. 56.)

7    As part of his insults, Musk included a hyperlink to a Google search of "Chiang Rai

8    child trafficking." (*Id.*)  Musk theorized that Chiang Rai "isn't where you go for

9    caves, it's where you go for something else." (*Id.*)  Culminating this long wind up,

10   Musk caricatured Unsworth as having a "child bride who was about 12 years old."

11   (*Id.* ¶ 88.)  Musk closed by answering Unsworth's lawyer's threat: "I hope he

12   fucking sues me." (*Id.*)

13         Even though Musk designated the e-mail as "[o]ff the record," the BuzzFeed

14   journalist decided to publish it anyways.  (*Id.* Ex. K, p. 55.)  The journalist described

15   Musk's bombast as "evidenceless criticism" of Unsworth.  (*Id.* p. 55-56.). While

16   many readers criticized Musk for lodging what they understood to be groundless

17   accusations (and criticized Unsworth for disparaging Musk and his team's efforts to

18   help), not a single reader seemed to construe Musk's statements literally. (*See, e.g.*,

19   *id.* Ex. J, pp. 49-50.)

20         Shortly thereafter Unsworth filed this lawsuit, claiming that Musk's statements

21   were defamatory.  Musk now moves to dismiss.

22         This motion boils down to a single question: Accepting Unsworth's well-

23   pleaded allegations as true, would a reasonable reader believe that Musk's statements

24   were supported by objective facts or were instead "nonactionable opinion"? *Gardner*

25

26

27   [6] To further publicize the dispute, Unsworth's lawyer "tagged" journalists from
     BuzzFeed (@RMac18), TechCrunch (@yoda), and FemaleOneZero
28   (@TijenOnaran).  *See* L. Lin Wood (@LLinWood), Twitter (Aug. 29, 2018),
     https://twitter.com/llinwood/status/1034761900100407296?lang=en.

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1    *v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009); *see also id.* (explaining that the

2    "threshold question" in any "defamation claim is whether a reasonable factfinder

3    could conclude that the contested statements implies an assertion of objective fact").

4        A statement is one of objective fact only if the reasonable reader would

5    believe that the speaker possesses underlying information to support it.  *See, e.g.*,

6    *Standing Committee on Discipline of U.S. Dist. Ct for C.D. Cal. v. Yagman*, 55 F.3d

7    1430, 1441 (9th Cir. 1995) (explaining that a statement "is not actionable" unless the

8    speaker is "claiming to be in possession of objectively verifiable facts").  Here, the

9    reasonable reader would not have believed that Musk—without having ever met

10   Unsworth, in the midst of a schoolyard spat on social media, and from 8,000 miles

11   afar—was conveying that he was in possession of private knowledge that Unsworth

12   was sexually attracted to children or engaged in sex acts with children.  *See Torain v.*

13   *Liu*, 2007 WL 2331073, at *3 (S.D.N.Y. Aug. 16, 2007), aff'd, 279 F. App'x 46 (2d

14   Cir. 2008) (framing the inquiry in a similar defamation case as whether "an informed

15   listener would think that defendant was accusing plaintiff of being a pedophile based

16   on some undisclosed information known only to him").  Musk's statements were thus

17   necessarily just imaginative attacks; even if offensive, such speculative insults are by

18   their nature opinion and protected by the First Amendment.

19       Context drives the inquiry into whether the reasonable reader would infer

20   Musk to possess a factual basis for his claims.  *See Knievel v. ESPN*, 393 F.3d 1068,

21   1075 (9th Cir. 2005).  The reasonable reader doesn't take everything literally: he can

22   spot "lusty and imaginative expressions of contempt," *Considering Homeschooling*

23   *v. Morningstar Educ. Network*, 2008 WL 11413459, at *3 (C.D. Cal. Aug. 6, 2008)

24   (citation omitted); he knows that disputing parties are very likely to include

25   unsubstantiated charges against one another, *Info. Control Corp. v. Genesis One*

26   *Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980); he recognizes that there is a set

27   of "short-hand phrases and language [that is] not generally found in fact-based

28   documents," *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1264 (C.D.

- 6 -

DEFENDANT ELON MUSK'S MOTION TO DISMISS

1  Cal. 2001); and he expects internet speakers to "play fast and loose with facts,"

2  *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696 (2012) (citation omitted).

3     Unsworth's complaint demonstrates that the reasonable reader would not—and

4  indeed did not—make such a leap.  The reasonable reader was aware: Musk and

5  Unsworth never met (Compl. Ex. B, p. 28.); Unsworth disparaged Musk out of the

6  blue and over the public airwaves (*id.* ¶ 71.); and Musk hit back with vituperative

7  internet insults trading on Thailand's reputation (*id.* Ex. D, p. 32.).  And actual

8  readers—as revealed by comments in exhibits attached to Unsworth's Complaint—

9  contemporaneously recognized Musk's comments for what they were: over-the-top

10 insults not driven by first-hand knowledge.  (*Id.* Ex. J, p. 49.)

11     In short, the reasonable reader would distinguish Musk's statements from

12 those in which factual information about child sex abuse is conveyed.  Musk's off-

13 the-cuff tweets and e-mails differed in kind from, for example, a Boston Globe

14 Spotlight exposé, a university press conference, or a criminal complaint.

15     For these reasons and as set forth below, Unsworth's suit should be dismissed.

16 **II.    LEGAL STANDARD**

17     A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss is a challenge to

18 the sufficiency of the pleadings set forth in the complaint.  *Ashcroft v. Iqbal*, 556

19 U.S. 662, 678 (2009).  Although a Court must accept well-pleaded factual allegations

20 as true, a court is not required to "accept any unreasonable inferences or assume the

21 truth of legal conclusions."  *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir.

22 2013) (citation omitted). [7]

23     If the plaintiff fails this standard and "it is clear that the complaint could not be

24 saved by any amendment," he need not be given leave to amend.  *Livid Holdings Ltd.*

25

26 _____

27 [7] For purposes of this motion to dismiss, Musk therefore assumes the truth of the allegations in the complaint and is not asking the court to consider his state of mind

28 or any information known to him.  *See Flowers v. Carville*, 310 F.3 1118, 1131 (9th Cir. 2002) (discussing the actual malice standard).

*v. Salomon Smith Barney, Inc*., 416 F.3d 940, 946 (9th Cir. 2005); *see also ZL Techs., Inc. v. Gartner, Inc*., 709 F. Supp. 2d 789, 801 (N.D. Cal. 2010), aff'd. 433 F. App'x 547 (9th Cir. 2011) (dismissing defamation claim against non-actionable statements with prejudice and collecting cases that did the same).

## III.    ARGUMENT

The "threshold question" in any "defamation claim is whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact." *Gardner*, 563 F.3d at 987 (citations omitted). This inquiry "is a question of law" susceptible to Rule 12(b)(6) challenge. *Id.* at 986. Here, even accepting Unsworth's allegations as true, no reasonable factfinder would conclude that Musk's statements were assertions of objective fact.

### A.    Unsworth must prove that the reasonable reader would believe Musk possessed private facts implicating Unsworth as a pedophile

Only false statements *of fact* can be defamatory. *See, e.g.*, *Gardner*, 563 F.3d at 986. This is because "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). No matter how "pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* It is the plaintiff's burden to make this showing: in a defamation case, "to survive a motion to dismiss, a plaintiff must establish both that the words about which they complain are reasonably capable of sustaining a defamatory meaning, and that they are not mere comment within the ambit of the First Amendment." *Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005) (citations omitted).

A statement of fact is one that is reasonably understood to be supported by underlying and undisclosed first-hand information. *See, e.g.*, *Yagman*, 55 F.3d at 1441 (explaining that a statement "is not actionable" unless the speaker is "claiming to be in possession of objectively verifiable facts"); *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018) (finding a statement

DEFENDANT ELON MUSK'S MOTION TO DISMISS

1  non-actionable because the speaker "did not imply that she knows certain facts,

2  unknown to the audience, which supported her opinion" (citation and alteration

3  omitted)).  This requirement makes sense: if a reader would not think a statement

4  was backed by objective, verifiable fact, then the statement can be nothing other than

5  "an interpretation, a theory, conjecture, or surmise." *Yagman*, 55 F.3d at 1441.

6      Courts have consistently held imaginative insults—no matter how repugnant—

7  are nonactionable so long as a reasonable reader would not believe them to be

8  backed by objective fact.  *See, e.g.*, *Torain*, 2007 WL 2331073, at *1 (statement that

9  plaintiff was a "sick racist pedophile" was nonactionable because "no reasonable

10  person would have believed that defendant was conveying a fact about plaintiff—*i.e.*,

11  that plaintiff was engaging in acts of pedophilia"); *Krinsky v. Doe 6*, 159 Cal. App.

12  4th 1154 (2008) (statement that plaintiff "has poor feminine hygiene" was not

13  defamatory because "nothing in this [statement] suggested that the author was

14  imparting knowledge of actual facts to the reader"); *Tipping v. Martin*, 2016 WL

15  397088, *2-3 (N.D. Tex. Feb. 2, 2016) (statement that plaintiff was a "whore" and

16  "journalist slut" was nonactionable because the audience would not have believed the

17  speaker to have had "any knowledge concerning [the plaintiff's] personal life or the

18  quality of her work as a journalist"); *cf. Hustler Mag., Inc. v. Falwell*, 485 U.S. 46,

19  48 (1988) (noting that a cartoon depicting plaintiff as having "a drunken incestuous

20  rendezvous" was "doubtless gross and repugnant" but "could not reasonably have

21  been interpreted as stating actual facts").

22      The question here is thus a narrow one: Did Musk's statements signal that he

23  was in possession of additional undisclosed facts about Unsworth showing that

24  Unsworth was sexually attracted to children or had engaged in sex acts with

25  children?  *See Torain*, 2007 WL 2331073, at *3 (framing the inquiry in a similar

26  defamation case as whether "an informed listener would think that defendant was

27  accusing plaintiff of being a pedophile based on some undisclosed information

28  known only to him").

- 9 -

1  Although Unsworth attempts to make this essential showing by pleading it in

2  his Complaint,[8] he cannot plead "legal conclusions."  *See Leite v. Crane Co.*, 749

3  F.3d 1117, 1121 (9th Cir. 2014).  And as demonstrated below, the "facts" alleged in

4  Unsworth's Complaint fall short of "plausibly" establishing his legal theory.  *Id.*

5      **B.    In context, Musk's statements cannot reasonably be read as**
       **asserting underlying knowledge that Unsworth was a pedophile**
6

7  To determine whether a statement is factual, courts consider "the totality of the

8  circumstances in which it was made."  *Underwager v. Channel 9 Austl.*, 69 F.3d 361,

9  366 (9th Cir. 1995).  This inquiry is driven by "context."  *Knievel*, 393 F.3d at 1075.

10  "What constitutes a statement of fact in one context may be treated as a statement of

11  opinion in another, in light of the nature and content of the communication taken as a

12  whole."  *Gregory v. McDonnell Douglas Corp.*, 552 P.2d 425, 428 (Cal. 1976).

13  Context is therefore "paramount" and can alone "be dispositive."  *Knievel*, 393

14  F.3d at 1075; *accord Koch v. Goldway,* 817 F.2d 507, 509 (9th Cir. 1987) ("Context

15  does resolve the matter."); *see also Brahms v. Carver*, 33 F. Supp. 3d 192, 198

16  (E.D.N.Y. 2014) ("The upshot is that context is key.").

17  Such is the case here.  Considering the "totality of the circumstances,"

18  *Underwager*, 69 F.3d at 366, Musk's statements check nearly all the boxes that

19  courts consider when making similar fact-versus-opinion determinations.  His

20  statements are: (1) cast on a turbulent internet forum (Compl. ¶ 73); (2) part and

21  parcel of a personal and legal dispute (*id.*); (3) presented as personal commentary

22  about disclosed facts (*id.* ¶ 76); (4) intended as acerbic insults (*id.* ¶ 80); (5) full of

23  informalities (*id.* ¶ 76); (6) couched in terms conveying uncertainty (*id.* ¶ 83); and

24  (7) interpreted as opinion by those who received the statement (*id.* at Ex. J, p. 49-50).

25      1.    *Statements on unmoderated Internet forums are presumptively*

26

27  _____
   [8] Compl. ¶ 139 (alleging that Musk "conveyed to the world that he was in possession
28  of undisclosed false and defamatory facts proving Mr. Unsworth to be guilty of the
   accusations Musk lodged against him").

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1  *opinion*

2     Musk's statements—all made online through Twitter and e-mail—receive a

3  presumption of First Amendment protection.  Internet speech is unique.  "Unlike

4  many traditional media, there are no controls on [internet] postings."  *Global*

5  *Telemedia* , 132 F. Supp. 2d at 1264.  "The low barrier to speaking online allows

6  anyone with an Internet connection to publish his thoughts, free from the editorial

7  constraints that serve as gatekeepers for most traditional media of disseminating

8  information."  *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407 (2011).

9     Reasonable readers discount internet speech accordingly.  They "expect to see

10  strongly worded opinions rather than objective facts."  *Summit Bank*, 206 Cal. App.

11  4th at 697.  And they know that "online discussions" are "more like a vehicle for

12  emotional catharsis than a forum for the rapid exchange of information."  *Krinsky*,

13  159 Cal. App. 4th at 1163; *see also Summit Bank*, 206 Cal. App. 4th at 696

14  (explaining that "any reader" familiar with internet culture knows that posters "play

15  fast and loose with facts" (citations omitted)).

16     A statement made on an unmoderated internet forum therefore comes with a

17  heavy thumb on the scale favoring opinion.  *See Summit Bank*, 206 Cal. App. 4th at

18  696 (explaining that the reader "should be predisposed to view [such statements]

19  with a certain amount of skepticism, and with an understanding that they will likely

20  present one-sided viewpoints rather than assertions of provable facts"); *Doe v.*

21  *Cahill*, 884 A.2d 451, 465 (Del. 2005) (explaining that internet forums are "vehicles

22  for the expression of opinions; by their very nature, they are not a source of facts or

23  data upon which a reasonable person would rely").

24     The presumption is particularly strong here because Twitter was the

25  gravitational center of this war of words.  It is where Musk first responded to

26  Unsworth's criticisms and where Unsworth's lawyer reinvigorated the dispute by

27  tweeting directly at Musk.  (Compl. ¶¶ 73, 87.)

28     Twitter facilitates the exchange of unfiltered opinion.  It allows its users to

- 11 -

5450851

1  communicate directly with one another through "tweets"—messages of 140-

2  characters or less—that are not pre-screened by any moderator.  *See Oracle Am., Inc.*

3  *v. Google Inc.*, 2016 WL 1252794, at *5 (N.D. Cal. Mar. 25, 2016).  As courts

4  recognize, this format breeds informality and incivility.  *See United States v.*

5  *Bradbury*, 111 F. Supp. 3d 918, 921 (N.D. Ind. 2015) (recognizing Twitter as a place

6  where "a lot of people spout off"); *Jacobus v. Trump*, 51 N.Y.S.3d 330 (N.Y. Sup.

7  Ct.), aff'd, 64 N.Y.S.3d 889 (N.Y. App. Div. 2017) ("The informal nature of

8  conversation on Twitter tends to encourage people to talk more freely about others,

9  including the spreading of rumors and potential falsehoods." (citation omitted)).

10       Twitter participants therefore expect to read opinions, not facts.  *See RainSoft*

11  *v. MacFarland*, 2018 WL 4696737, at *5 (D.R.I. Sept. 30, 2018) (noting that

12  "Twitter meltdowns" are an example of the "non-literal commentary [that has]

13  become an integral part of social discourse" (citation omitted)).

14       Applying this heavy presumption, courts routinely find that statements of

15  apparent fact assume the character of opinion when posted on unmoderated internet

16  forums generally and on Twitter specifically.  *See, e.g.*, *Clifford v. Trump*, 2018 WL

17  4997419, at *8 (C.D. Cal. Oct. 15, 2018) (treating as "rhetorical hyperbole" a tweet

18  accusing the plaintiff of lying and calling her a "total con job"); *Chaker v. Mateo*,

19  209 Cal. App. 4th 1138, 1142 (2012)  (treating as opinion statements on internet

20  message board that the plaintiff is a "deadbeat dad," "may be taking steroids," "is

21  into illegal activities," and "picks up street walkers and homeless drug addicts");

22  *Jacobus*, 51 N.Y.S.3d at 334 (treating as opinion tweets that plaintiff had "begged"

23  for a job and had twice been rejected); *Krinsky*, 159 Cal. App. 4th at 1159 (treating

24  as opinion statements that corporation's leaders are "crooks" and that its president

25  had "fake medical degree").

26              2.    *Musk's statements were made in the midst of a back-and-forth*
                      *argument and in direct response to personal and legal attacks*
27

28       When a statement is made in a "heated and volatile setting, even seemingly

- 12 -

1   'factual' statements take on an appearance more closely resembling opinion than
2   objective fact." *Steam Press Holdings, Inc. v. Haw. Teamsters, Allied Workers*
3   *Union, Loc. 996*, 302 F.3d 998, 1006 (9th Cir. 2002).  In that setting, the reasonable
4   reader will "anticipate efforts by the parties to persuade others to their positions by
5   use of epithets, fiery rhetoric or hyperbole, (and thus) language which generally
6   might be considered as statements of fact may well assume the character of
7   statements of opinion." *Info. Control Corp.,* 611 F.2d at 784 (citation omitted).

8           A statement is particularly likely to be considered opinion when made in direct
9   response to a personal slight.  In *Torain v. Liu*, for example, the defendant called the
10  plaintiff a "racist pedophile" after the plaintiff had disparaged the defendant's family
11  during a television interview.  2007 WL 2331073, at *1.  The court acknowledged
12  that "pedophile" could potentially signify a factual assertion that "plaintiff was
13  engaging in acts of pedophilia." *Id.* at *3.  But because the defendant's statements
14  were "made in direct response to what he considered to be plaintiff's outrageous and
15  offensive on-air comments," they "were clearly statements of opinion." *Id.* at *2.
16  Likewise, in *Jacobus*, the defendant's tweet contained the facially factual assertion
17  that he had refused to hire the plaintiff even after she "begged" him for a job.  51
18  N.Y.S.3d at 342.  That too was considered opinion because it "followed plaintiff's
19  negative commentary about [the defendant]," which "signals to readers that plaintiff
20  and [defendant] were engaged in a petty quarrel." *Id.*

21          This presumption is amplified when legal threats have been made.  In that
22  setting, reasonable readers know that the speaker is representing just "one side in a
23  controversy," so "they are properly warned to expect that the opinions expressed may
24  rest on passion rather than factual foundation." *Milkovich v. Lorain J. Co.*, 497 U.S.
25  1, 33 n.8 (1990) (Brennan, J., dissenting).  Thus, statements made in a legal dispute
26  by one side about the other are likely to disparage the opponent and are "***highly***
27  ***unlikely*** to be understood by their audience as statements of fact." *Info. Control*
28  *Corp.*, 611 F.2d at 784 (emphasis added); *see also Clifford*, 2018 WL 4997419, at *8

- 13 -

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1  (holding that defendant's comments were mere "rhetorical hyperbole" when made

2  after the plaintiff had "present[ed] herself as [the defendant's] political adversary"

3  and the defendant's "tweet served as a public rejoinder to [the] allegations made by

4  Plaintiff"); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1101 (N.D. Cal. 1999)

5  (explaining that defendant's statements made on her "personal web-site, and through

6  internet discussion groups, as part of a heated debate concerning a bitter legal dispute

7  [in which the plaintiff] has fully engaged" are more likely to be opinion than fact).

8       The reasonable reader of Musk's statements would have known that they were

9  mere "epithets, fiery rhetoric or hyperbole." *Info. Control Corp.*, 611 F.2d at 784.

10 Unsworth set the tone with a crass personal attack, telling Musk to "stick his

11 submarine where it hurts." (Compl. ¶ 71.) Unsworth attacked both Musk's

12 professional reputation and his personal motives for providing humanitarian aid.

13      Musk fought fire with fire. He tweeted insults in direct response to

14 Unsworth's unflattering public comments—a point specifically pleaded by

15 Unsworth. (*Id.* ¶ 72 (alleging Musk made his statements because he was "angered by

16 Mr. Unsworth's criticism of [him] in the CNN Interview").) The reasonable reader

17 would understand that this was a "petty quarrel." *Jacobus*, 51 N.Y.S.3d at 341.

18      Musk's e-mails to BuzzFeed are likewise a direct rejoinder to Unsworth. They

19 came after Unsworth's lawyer took to Twitter to publish an open letter threatening to

20 sue Musk. (Compl. ¶ 87.) Unsworth's lawyer in fact "tagged" @elonmusk and

21 several journalists in the tweet, ensuring that each would receive direct notice of the

22 message. (*Id.* ¶ 87 & Ex. 1 at 2; *supra* note 6.) Unsworth's lawyer then suggested to

23 Musk that he "check his mail before tweeting" and made it publicly known that he

24 was "in the process of preparing a civil complaint." (*Id.* Ex. H, p. 40.) It was this

25 goading by Unsworth's counsel that caused the BuzzFeed journalist to e-mail Musk

26 for comment. (*Id.* Ex. K, p. 53.)

27      Only *after* these public provocations did Musk respond to BuzzFeed with the

28 allegedly defamatory e-mails. (*Id.* ¶¶ 87-92.) But by then, the litigation lines had

- 14 -

5450851

been drawn.  The reasonable reader would know that Musk's statements might "include unsubstantiated charges" and "rest on passion rather than factual foundation," *Milkovich*, 497 U.S. at 33 n.8 (Brennan, J., dissenting), and is therefore "***highly unlikely***" to have considered them "statements of fact." *Info. Control Corp.*, 611 F.2d at 784.  This is particularly so because Unsworth was not standing on the sideline.  He had his lawyer provoke Musk through Twitter—a tactic that resulted in significant media attention and prompted further comment from Musk.  *See Nicosia*, 72 F. Supp. 2d at 1101 (statements were opinion when made in a "heated debate concerning a bitter legal dispute" in which the plaintiff was "fully engaged").

              3.     *Musk disclosed the basis for his personal opinion: Thailand's documented problems with sex tourism*

    "[A] speaker who outlines the factual basis for his conclusion is protected by the First Amendment." *Price v. Stossel*, 620 F.3d 992, 1004 (9th Cir. 2010).  This is because if "the author presents the factual basis for his statement, [it] can only be read as his personal conclusion about the information presented, *not as a statement of fact*." *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) (citation omitted).  In *Carr v. Warden*, for example, members of a city planning commission filed a defamation suit against an activist who said the commission's vote had been "bought." 159 Cal. App. 3d 1166, 1168 (1984).  The activist, however, explained his basis for this charge was a sudden change in the commission's position.  *Id.* ("otherwise, how could you explain a 3-3 vote at one meeting on an issue and then at the very next meeting a 6-1 vote?").  Despite the accusation of impropriety, this statement was non-actionable because it "disclose[d] the precise facts on which [it] was based." *Id.* at 1170.

    The same is true here.  Musk disclosed the basis for his opinion: he said that Unsworth was "sus" for being a "British expat guy who lives in Thailand." (Compl. ¶ 73.) *See, e.g.*, *United States v. Durham*, 902 F.3d 1180, 1261 (10th Cir. 2018) (citing congressional committee report that identifies Thailand as a country

1  "experiencing significant problems with sex tourism").

2      The reasonable reader would make this connection.  *See People v. Paniagua*,

3  209 Cal. App. 4th 499, 521 (2012) (reasoning that the "prosecution did not [need to]

4  explicitly tell the jury that defendant may have gone to Thailand to have sex with

5  children" because that "was implicit in the mere mention of Thailand" (alterations

6  omitted)).  Musk's later statements all build on this theme.  (*E.g.*, Compl. ¶ 88.)

7      But while the reasonable reader would infer this point from the combined

8  effect of Musk's statements, there is no need for inference: Musk makes the point

9  explicitly.  In Musk's e-mail to the BuzzFeed reporter, Musk wrote:

10  He may claim to know how to cave dive, but he wasn't on the cave dive rescue team and most of the actual dive team
    refused to hang out with him. I wonder why ...

11  https://www.google.com/search?q=chiang+rai+child+trafficking&ie=UTF-8&oe=UTF-8&hl=en-us&client=safari

12  (*Id*. Ex. K., p. 56.)  In other words, Musk asked why was he "suspicious" of

13  Unsworth?  He answers the question with a hyperlink, sharing a Google search of

14  "Chiang Rai child trafficking."  (*Id.*)[9]

15      Musk made no reference to inside information or first-hand facts as the basis

16  for his opinion.  And the hyperlink posted by Musk signaled to the reader that his

17  comments were mere opinion.  *See, e.g.*, *Nicosia*, 72 F. Supp. 2d at 1103 (reasoning

18  that the presence of hyperlink meant that the plaintiff "adequately disclosed the facts

19  underlying her conclusion" and that her statements were therefore opinion).

20          4.    *Musk's over-the-top insults are not statements of fact*

21

22  ────────────────

23  [9] Hyperlinks are the "twenty-first century equivalent of the footnote for purposes of
    attribution in defamation law, because [they have] become a well-recognized means
    for an author [on] the Internet to attribute a source."  *Adelson v. Harris*, 973 F. Supp.

24  2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).  "Hyperlinking
    signals that an author has relied on underlying facts, which are themselves subject to

25  multiple interpretations, and invites the reader to test the reasonableness of the
    author's interpretation rather than accept it as gospel."  Lyrissa Barnett Lidsky et al.,

26  *Of Reasonable Readers and Unreasonable Speakers: Libel Law in a Networked
    World*, 23 Va. J. Soc. Pol'y & L. 155, 165 (2016).

27  Despite the importance of hyperlinks in internet defamation analysis, Unsworth
    omitted it from his quotation of Musk's e-mail in the body of his Complaint.

28  (*Compare* Compl. ¶ 88 with *id*. Ex. K, p. 56.)

- 16 -
DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1    Insults receive bright-line protection under the First Amendment.  Therefore
2  "vigorous epithets" and "lusty and imaginative expressions of contempt" cannot
3  form the basis of a defamation claim.  *Harrell v. George*, 2012 WL 3647941, at \*7
4  (E.D. Cal. Aug. 22, 2012) (alterations and citations omitted).

5    The more colorful the invective, the more likely the reader is to understand
6  that it is opinion.  Courts trust that "the outrageous and the outlandish will be
7  recognized for what they are."  *Dworkin v. Hustler Mag. Inc*., 867 F.2d 1188, 1194
8  (9th Cir. 1989); *see also id.* ("Ludicrous statements are much less insidious and
9  debilitating than falsities that bear the ring of truth."); *Clifford*, 2018 WL 4997419, at
10  \*8 ("As the United States Supreme Court has held, a published statement that is
11  'pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage'
12  cannot constitute a defamatory statement." (quoting *Milkovich*, 497 U.S. at 32));
13  *Ollman v. Evans*, 750 F.2d 970, 983 n.25 (D.C. Cir. 1984) ("'[T]here are some
14  statements that are in form statements of opinion, or even of fact, which cannot
15  reasonably be understood to be meant literally and seriously and are obviously mere
16  vituperation and abuse.'" (quoting Restatement (Second) Torts § 566)).

17    Internet insults are particularly likely to be construed as opinion.  *See SI03,*
18  *Inc. v. Bodybuilding.com, LLC*, 2008 WL 11348458, at \*10 (D. Idaho May 1, 2008)
19  ("[I]n the context of Internet postings and the casual dialogue that typically
20  accompanies such 'cyber-smackdowns,' name-calling, hyperbole, and, generally,
21  juvenile behavior is not unusual; indeed, it is not only expected at times, but often
22  encouraged."); *Jacobus*, 51 N.Y.S.3d at 339 (noting that insults "on social media
23  have been held to warrant an understanding that the statements contained therein are
24  vigorous expressions of personal opinion, rather than the rigorous and
25  comprehensive presentation of factual matter" (citation omitted)).

26    Courts therefore routinely find that over-the-top accusations on the internet—
27  including ones of ostensible fact—are merely insulting opinion.  *See, e.g.*, *Chaker*,
28  209 Cal. App. 4th at 1149 (internet accusation that plaintiff "picks up street walkers

5450851

1  and homeless drug addicts and is a dead beat dad" would be "interpreted by the

2  average Internet reader as [nothing] more than . . . insulting name calling," mere

3  "embellishments" meant to convey that the plaintiff is "a dishonest and scary

4  person"); *Wallace v. Geckosystems Int'l Corp.*, 2013 WL 4054147, at *7-8 (Del.

5  Super. Ct. July 31, 2013) (internet accusation that plaintiff committed acts of incest

6  merely "amount to a scathing personal attack"); *Finkel v. Dauber*, 906 N.Y.S.2d 697

7  (Sup. Ct. 2010) (internet accusation that plaintiff, among other things, had "sex with

8  a horse" and "contracted AIDS from a male prostitute" could "only be read as puerile

9  attempts by adolescents to outdo each other").

10       Musk's statements fall comfortably within this rule.  They utilize the same sort

11  of "imaginative" and "non-literal" insults that courts deem opinion.  *Knievel*, 393

12  F.3d at 1074.  The reasonable reader would understand that Musk's over-the-top

13  assertions—for example, that Unsworth was a "pedo guy" and had "a 12-year old

14  child bride" (Compl. ¶ 116)—were "obviously . . . intended as a means of ridiculing"

15  Unsworth.  *Krinsky*, 159 Cal. App. 4th at 1177.

16                  5.    *Musk's colloquial statements are not reasonably interpreted as*

17                        *statements of facts*

18       Statements that lack the "formality and polish typically found in documents []

19  which a reader would expect to find facts" are treated instead as opinion.

20  *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1012 (2001) (citation

21  omitted).  To make this determination, courts scrutinize semantics.  The less polish a

22  statement has, the less likely it is to be factual.  *See Summit Bank*, 206 Cal. App. 4th

23  at 699 (finding that a defendant's failure to "use proper spelling or grammar" showed

24  that his statement was intended to be a "free-flowing diatribe" and not a statement of

25  fact); *Global Telemedia*, 132 F. Supp. 2d at 1267 (finding that statements were ones

26  of opinion because they were full of "short-hand phrases and language not generally

27  found in fact-based documents, such as corporate press releases or SEC filings");

28  *Rocker Mgmt. LLC v. John Does*, 2003 WL 22149380, at *3 (N.D. Cal. May 29,

1    2003) (explaining that because a defendant did "not use proper spelling, grammar or

2    capitalization," that would "suggest to the reader that his messages are statements of

3    opinion rather than fact").

4         Musk's statements were "written with a great deal of linguistic informality."

5    *Global Telemedia*, 132 F. Supp. 2d at 1269.

6         • Musk frequently employed colloquialisms.  (*See, e.g.*, Compl. ¶ 76

7              (stating the submarine would work "no problemo"); *id.* ¶ 92 (stating that

8              it's "total bs" that the submarine wouldn't work); *id.* ¶ 75 (referring to

9              Unsworth as "this dude").)

10        • Musk used shorthand. (*Id.* ¶¶ 73-74 (stating that Unsworth is "sus," "an

11             abbreviated form of 'suspicious'"); *id.* ¶¶ 76-77 (referring to Unsworth

12             as "pedo guy," a "shorthand phrase for the term pedophile"); *id.* ¶ 79

13             ("Bet ya a signed dollar it's true.").)

14        • Musk used curse words. (*Id.* ¶ 88 (calling the BuzzFeed reporter a

15             "fucking asshole"); *id.* ("I fucking hope he sues me.").)

16        • Musk's statements have typos.  (*Id.* ¶ 76 ("We will make one of the

17             mini-sub/pod going [sic] all the way to Cave 5.").)

18        • Musk wrote in fragments. (*Id.* ¶ 92 ("Never saw Unsworth at any

19             point."); *id.* ("Was told he was banned from the site.").)

20        This informal style "alert[s] a reasonable reader to the fact that these

21   observations are probably not written by someone with authority or firm factual

22   foundations for his beliefs." *Global Telemedia*, 132 F. Supp. 2d at 1269.

23        Compare this to Musk's measured approach when apologizing for his

24   statements.  There, Musk writes in complete sentences and with a restrained and

25   professional tone.  (Compl. ¶ 80 ("[H]is actions against me do not justify my actions

26   against him, and for that I apologize to Mr. Unsworth and to the companies I

27   represent as leader.  The fault is mine and mine alone.").)  The reasonable reader

28   would know which statement to take seriously and which to discount.

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

6.   *Musk's expressions of uncertainty show that his statements did not have a concrete factual foundation and were therefore opinion*

Unless a speaker is "claiming to be in possession of objectively verifiable facts," his statement is necessarily just "an interpretation, a theory, conjecture, or surmise" and "is not actionable." *Yagman*, 55 F.3d at 1441.

Not only did Musk never claim to be in possession of such facts, but he was open that he did not and could not have such facts in his possession:

- Musk stated that he did not meet Unsworth when they were in Thailand. (Compl. ¶ 73 ("Never saw [Unsworth] . . . at any point when we were in the caves."); *id.* ¶ 92 ("Never saw Unsworth at any point.").)  From then on, Musk and Unsworth were separated by 8,000 miles and an ocean.

- Musk demonstrated a lack of familiarity with Unsworth, referring to him with generic placeholders.  (*Id.* ¶ 73 (referring to Unsworth as the "British expat guy who lives in Thailand"); *id.* ¶ 75 (referring to Unsworth as "this dude").)

- Musk made clear on numerous occasions that his suspicions were just unverified theories.  His statements are flatly inconsistent with the notion that he possessed first-hand information about Unsworth.  (*Id.* ¶ 79 ("Bet ya a signed dollar it's true."); *id.* ¶ 83 ("You don't think it's strange he hasn't sued me?"); *id.* ¶ 88 ("[M]ost of the actual dive team refused to hang out with him.  I wonder why . . .").)

- Musk publicly disavowed his Twitters statements.  He deleted the offending tweets, "apologize[d] to Mr. Unsworth," and admitted he overreacted.  (*Id.* ¶ 80.)

- Musk's Buzzfeed comments over e-mails were expressly not meant to be relied on as fact, as Musk designated his diatribe "off the record." (*Id*. Ex. K., p. 55.)

1    This context shows that Musk's statements would not have been interpreted as

2    statements of literal fact.  *See Tipping*, 2016 WL 397088, at *5 (granting defendant's

3    motion to dismiss where there were "no allegations that [the defendant] had any

4    knowledge about Plaintiff before encountering her for the first time at the [event

5    where he allegedly defamed her], much less any knowledge concerning her personal

6    life or the quality of her [professional] work").

7    At most, Musk told others to investigate for themselves.  (Compl. ¶ 88 ("I

8    suggest that you call people you know in Thailand, find out what's actually going.");

9    *id*. Ex. J, p. 47 ("'Did you investigate at all?' [Musk] said in a follow-up tweet to [a

10   Twitter user].  'I'm guessing answer is no. Why?'").)  Such suggestions—even if

11   unreasonable—are not defamatory.  *See Brian v. Richardson*, 87 N.Y.2d 46, 53

12   (1995) (explaining that when "the purpose of defendant's article was to advocate an

13   independent governmental investigation," the "reasonable reader would understand

14   the statements defendant made about plaintiff as mere *allegations* to be investigated

15   rather than as *facts*").

16               7.    *Readers did not interpret Musk's statements as factual assertions*

17   Good evidence of how a "reasonable reader" would view Musk's statements is

18   how readers actually did.  Those who read and commented on Musk's comments

19   uniformly treated them as opinion.  The reasonable reader interprets an internet post

20   alongside its comments.  *Global Telemedia*, 132 F. Supp. 2d at 1268 (explaining that

21   the "reasonable reader" would interpret the statement in question by "looking at the

22   hundreds and thousands of postings about the company from a wide variety of

23   posters"); *Feld v. Conway*, 16 F. Supp. 3d 1, 4 (D. Mass. 2014) ("The tweet cannot

24   be read in isolation, but in the context of the entire discussion."); *see also Knievel*,

25   393 F.3d at 1076 ("Just as a reader must absorb a printed statement in the context of

26   the media in which it appears, a computer user necessarily views web pages in the

27   context of the links through which the user accessed those pages.").

28   Therefore when a statement is published alongside commentary doubting its

- 21 -

5450851

veracity, that statement is more likely to be viewed as opinion.  *See Cahill*, 884 A.2d at 467 (finding that a statement was opinion in part because "a[t] least one reader of the blog quickly reached the conclusion that Doe's comments were no more than unfounded and unconvincing opinion"); *Redmond v. Gawker Media, LLC*, 2012 WL 3243507, at *6 (Cal. Ct. App. Aug. 10, 2012) (noting that a statement was treated as opinion by readers "[a]s shown by the comments posted" below the article).  Even limited to the cherrypicked information included in Unsworth's Complaint, it's clear that ***none*** of Musk's statements were treated as fact by those who encountered them:

- Twitter user @yoda wrote to Musk: "one other thing, elon.  your dedication to facts and truth would have been wonderful if applied to that time when you called someone a pedo."  (Compl.  Ex. I, p. 42.)  @yoda also communicated his incredulity when he tweeted: "what i think is especially strange here is that you're wondering why [Unsworth] hasn't sued you while the rest of us are wondering why you did something so egregious that he could sue you for in the first place."  (*Id*. Ex. J, p. 47.)

- As pleaded by Unsworth, the public criticized Musk for making an "accusation of pedophilia against Mr. Unsworth without any evidence."  (*Id*. ¶ 80.)

- BuzzFeed news titled its article about Musk's tweets: "Elon Musk Has Revisited His *Baseless* Pedophile Claims."  (*Id*. Ex. J, p. 44 (emphasis added).)  The article further characterized Musk's tweets as "groundless."  (*Id.*)  It also notes that the public generally understood Musk's statements to be unfounded insults, since Musk "fac[ed] widespread condemnation" after the tweets.  (*Id.*)

- User comments on the BuzzFeed article were uniformly critical of Musk.  But none appear to have interpreted Musk's comments as statements of fact.  (*Id.* at p. 49 ("Social media is destroying society!");

5450851

1      *id.* (describing comments as "mind-bendingly stupid"); *id.* (noting that

2      this isn't the first time an executive had made "idiotic comments").)

3      • BuzzFeed described Musk's e-mail as lodging "evidenceless criticism of

4        the rescuer." (*Id*. Ex. K, p. 55.)

5      Determining the views of the reasonable reader is simplified when *actual*

6    readers react. *Cahill*, 884 A.2d at 467; *Redmond*, 2012 WL 3243507, at *6. While

7    readers were disappointed in Musk or offended by him, none took his statements as

8    true. "Context does resolve the matter." *Koch,* 817 F.2d at 509. Musk's

9    statements—when examined in context—were non-actionable opinion.

10      **C.    Musk's Statements are Not Sufficiently Factual to be Susceptible of
          Being Proved True or False**

11

12      Even if context here is not dispositive on its own, Musk's statements constitute

13   nonactionable opinion because they are not "sufficiently factual to be susceptible of

14   being proved true or false." *Underwager*, 69 F.3d at 366. The determination of

15   whether a statement can be "proved true or false" must account for the context in

16   which the statement is made; "the fact that [a] literal interpretation could be proven

17   true or false is immaterial." *Knievel*, 393 F.3d at 1078. Here, an assessment of

18   Musk's statements in context reveals that they are not sufficiently factual to be

19   susceptible of being proved true or false.

20      *First*, Musk's conclusions about Unsworth were "inherently subjective"

21   because they were based on his personal judgment and assessment of the fact that

22   Unsworth was a British expat who lived in Thailand. *Partington*, 56 F.3d at 1157-58

23   ("assessments . . . [that] are inherently subjective . . . [are] not susceptible of being

24   proved true or false"); *Dreamstone Ent. v. Maysalward Inc.*, 2014 WL 4181026, at

25   *8 (C.D. Cal. Aug. 18, 2014) (opinion of party's "subjective state of mind [] is less

26   susceptible to being proven true or false"); *Mattel, Inc. v. MCA Recs.*, 28 F. Supp. 2d

27   1120, 1161 (C.D. Cal. 1998) (speaker's "judgment" is not "susceptible to an

28   objective determination of truth or falsehood").

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1    In fact, a district court in this circuit considering similar subject matter rejected
2    a defamation claim on these grounds.  The court held that when the defendant stated
3    she thought the plaintiff corporation was "a front for pedophilia," that statement was
4    "not susceptible to empirical testing" because the proof of truth or falsity required an
5    assessment of what the facts looked like *to the defendant*.  *Higher Balance, LLC v.*
6    *Quantum Future Group*, 2008 WL 5281487, at *9-10 (D. Or. Dec. 18, 2008).  The
7    same is true here.  *See Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1443 (8th Cir.
8    1989) (explaining that what constitutes "'suspicious' is a matter of opinion").

9    *Second*, Musk's claims that Unsworth is "sus" or a "pedo guy" are, at most,
10   conclusions that are "too loose and hyperbolic" to be proved true or false.  *Art of*
11   *Living Found. v. Does*, 2011 WL 2441898, at *8 (N.D. Cal. June 15, 2011) (finding
12   defendant's conclusion that plaintiff must be a "front-end name for a group of
13   fraudulent NGOs" that are committing "large-scale organized fraud according to the
14   laws of several countries" cannot be proven true or false).

15   The "lack of precision" in terms like "sus" and "pedo guy" make them
16   "incapable of being proven true or false."  *McCabe v. Rattiner*, 814 F.2d 839, 841-42
17   (1st Cir. 1987) (finding "scam" to be insufficiently precise); *Buckley v. Littell*, 539
18   F.2d 882, 893 (2d Cir. 1976) ("[T]he use of 'fascist,' 'fellow traveler' and 'radical
19   right' as political labels in Wild Tongues cannot be regarded as having been proved
20   to be statements of fact.").  And the Ninth Circuit holds that informal terms such as
21   "pimp"—much like "sus" and "pedo guy"—cannot be proven true or false because
22   they are nothing more than "sophomoric slang."  *Knievel*, 393 F.3d at 1078.  This is
23   especially true when made, as here, in the context of a website like Twitter that is rife
24   with sophomoric commentary (*Knievel*, 393 F.3d at 1078 (reading "pimp" in context
25   of the "satirical, risqué, and sophomoric slang found on the rest of the site")) and as
26   part of a "stream of [] rhetoric" (*Lieberman v. Fieger*, 338 F.3d 1076, 1080 (9th Cir.
27   2003)).

28   Musk's later comments that Unsworth alleges are defamatory (Compl. ¶¶ 80,

- 24 -

DEFENDANT ELON MUSK'S MOTION TO DISMISS

83, 88) are nothing more than a continuation of the same ongoing stream of rhetoric that began with his "sus" and "pedo guy" comments, and therefore are similarly not susceptible to an objective determination of truth or falsehood.  In *Mattel*, the court found that the claims of a "crime," "heist," and "theft" could not be proven true or false because they were made at a time "where the audience would anticipate efforts by the parties to persuade others to their positions by use of epit[hets], fiery rhetoric, or hyperbole."  28 F. Supp. 2d at 1161 (citations omitted).  Here, Musk's later comments were all published with reference to his earlier comments that had created an ongoing public debate (Compl. ¶¶ 79-80, 83)—a public debate engaged in and stoked by Unsworth and his team.  (*See id.* ¶¶ 82-87.)  The fiery context in which Musk's later comments were made therefore make them insusceptible to an objective determination of truth or falsehood.  *See Stolatis v. Hernandez*, 77 N.Y.S.3d 473 (2018) ("[V]iewing the entire series of posts as a whole, as we must, we conclude that the posts constituted an expression of protected opinion.").

     *Finally*, Unsworth also alleges that Musk's statement that Unsworth made an "utterly false" claim about Musk is defamatory because it "false[ly] accuses Mr. Unsworth of being a liar."  (Compl. ¶¶ 92-93.)  But "lying" is not by itself defamatory because it applies to a "spectrum of untruths including 'white lies,' 'partial truths,' 'misinterpretation,' and 'deception.'"  *Underwager*, 69 F.3d at 367.  Where "plaintiff fail[s] to show that the challenged statement implied a verifiable assertion of perjury, [] the statement [is] protected under the First Amendment."  *Gardner*, 563 F.3d at 987; *Clifford*, 2018 WL 4997419, at *7-8 (rejecting plaintiff's claim that defendant's assertions that she had lied was defamatory).  Here, the Complaint does not allege that Musk's accusation that Unsworth's claim was "utterly false" is a "verifiable assertion of perjury" (Compl. ¶¶ 92, 125-26) and thus Unsworth cannot show that Musk's "utterly false" comment is actionable.

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851

1   | Dated:  December 26, 2018                    HUESTON HENNIGAN LLP

2

3   |                                                 By:  /s/ John C. Hueston

4   |                                                      John C. Hueston
                                                          Attorneys for Defendant Elon Musk
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT ELON MUSK'S MOTION TO DISMISS

5450851