**HUESTON HENNIGAN LLP**
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Sourabh Mishra, State Bar No. 305185
smishra@hueston.com
Michael H. Todisco, State Bar No. 315814
mtodisco@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898

Attorneys for Defendant Elon Musk

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>Plaintiff,<br><br>vs.<br><br>ELON MUSK,<br><br>Defendant. | Case No. 2:18-cv-08048<br><br>Judge: Hon. Stephen V. Wilson<br><br>**DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF VERNON UNSWORTH'S COMPLAINT**<br><br>Date:     April 1, 2019<br>Time:    1:30 p.m.<br>Place:    Courtroom 10A<br><br>Complaint Filed:   Sept. 17, 2018<br>Trial Date:          None set |

5510994

# TABLE OF CONTENTS

Page

I.    INTRODUCTION & SUMMARY ................................................................. 1

II.   BACKGROUND ...................................................................................... 4

III.  ARGUMENT ......................................................................................... 8

      A.   Unsworth Ignores The Controlling Legal Standard............................. 8

      B.   Unsworth Mischaracterizes and Misapplies *Milkovich* ...................... 11

      C.   Unsworth's Proffered Legal Standard is Unsupported and
           Incorrect ..................................................................................... 14

      D.   Applying the Correct Legal Standard, Unsworth Fails to
           Carry His Burden to Allege Actionable Defamation........................... 18

IV.   CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013) ......................................................... 4, 19

*Brian v. Richardson*,
    87 N.Y.2d 46 (N.Y. Ct. App. 1995) ............................................................ 8, 16

*Bryant v. Cox Enterprises, Inc.*,
    715 S.E.2d 458 (Ga. App. 2011) ..................................................................... 4

*Cahill v. Edalat*,
    2017 WL 2608857 (C.D. Cal. Feb. 15, 2017) ......................................... 22, 23

*Clifford v. Trump*,
    339 F. Supp. 3d 915 (C.D. Cal. 2018) ............................... 14, 15, 18, 20

*ComputerXpress, Inc. v. Jackson*,
    93 Cal. App. 4th 993 (2001) ........................................................................ 21

*Dickinson v. Cosby*,
    17 Cal. App. 5th 655 (2017) ........................................................................ 18

*Dupuis v. City of Hamtramck*,
    502 F. Supp. 2d 654 (E.D. Mich. 2007) ....................................................... 16

*Dworkin v. Hustler Mag. Inc.*,
    867 F.2d 1188 (9th Cir. 1989) ..................................................................... 20

*Faltas v. State Newspaper*,
    928 F. Supp. 637 (D.S.C.) ........................................................................... 11

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ..................................................................... 12

*Feld v. Conway*,
    16 F. Supp. 3d 1 (D. Mass. 2014) ..................................................... 10, 17, 18

*Finkel v. Dauber*,
    906 N.Y.S.2d 697 (Sup. Ct. 2010) ............................................................. 4, 8

<u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*Greenbelt Co-op. Pub. Ass'n v. Bresler*,
   398 U.S. 6 (1970) ....................................................................................... 7

*Gregory v. McDonnell Douglas Corp.*,
   552 P.2d 425 (Cal. 1976)............................................................................ 17

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993).................................................................. passim

*Hill v. Cosby,*
   665 F. App'x 169 (3d Cir. 2016) ................................................................ 19

*Hunter v. Hartman*,
   545 N.W.2d 699 (Minn. Ct. App. 1996) ..................................................... 10

*Info. Control Corp. v. Genesis One Computer Corp.*,
   611 F.2d 781 (9th Cir. 1980)............................................................ 13, 19, 22

*Jacobus v. Trump*,
   51 N.Y.S.3d 330 (N.Y. Sup. Ct.).............................................................. 21

*Kanaga v. Gannett Co.*,
   687 A.2d 173 (Del. 1996)........................................................................... 12

*Koch v. Goldway*,
   817 F.2d 507 (9th Cir. 1987)...................................................................... 17

*Krinsky v. Doe 6*,
   159 Cal. App. 4th 1154 (2008)........................................................ 4, 5, 8, 10

*Leidholdt v. L.F.P. Inc*,
   860 F.2d 890 (9th Cir. 1988)...................................................................... 19

*Letter Carriers v. Austin*,
   418 U.S. 264 (1974) ................................................................................. 14

*Longbehn v. Schroenrock*,
   727 N.W.2d 153 (Minn. 2007).................................................................... 14

*Mattel, Inc. v. MCA Records, Inc.*,
   28 F. Supp. 2d 1120 (C.D. Cal. 1998)......................................................... 14

MUSK'S REPLY ISO MOTION TO DISMISS

5510994

1

## TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

*Maxon v. Ottawa Pub. Co.*,

4

    929 N.E.2d 666 (3d Dist. 2010) ..................................................................... 22

5

*McKee v. Cosby*,

6

    874 F.3d 54 (1st Cir. 2017) ................................................................. 19, 20

7

*Milkovich v. Lorain Journal*,

    497 U.S. 1 (1991) .............................................................................. passim

8

9

*Moldea v. New York Times*,

    15 F.3d 1137 (D.C. Cir. 1994) ........................................................................ 5

10

*Moldea v. New York Times*,

11

    22 F.3d 310 (D.C. Cir. 1994) ......................................................................... 6

12

*Partington v. Bugliosi*,

13

    56 F.3d 1147 (9th Cir. 1995) ........................................................................ 23

14

*People v. Paniagua*,

15

    209 Cal. App. 4th 499 (2012) ....................................................................... 19

16

*PG Inn, Inc. v. Gatward*,

17

    2014 WL 108412 (Cal. App. 2014) ................................................................. 9

18

*Phantom Touring, Inc. v. Affiliated Publications*,

19

    953 F.2d 724 (1st Cir. 1992) ....................................................... 10, 11, 15, 16

20

*Price v. Stossel*,

    620 F.3d 992 (9th Cir. 2010) ........................................................................ 15

21

22

*Redmond v. Gawker Media, LLC*,

    2012 WL 3243507 (Cal. Ct. App. Aug. 10, 2012) ......................................... 23

23

*Riley v. Harr*,

24

    292 F.3d 282 (1st Cir. 2002) ..................................................................... 3, 5

25

*Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal.*

26

    *v. Yagman*,

    55 F.3d 1430 (9th Cir. 1995) ................................................................... 5, 15

27

28

*Torain v. Liu*,

    2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007) ......................................... passim

- iv -

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

<u>Page(s)</u>

3

*Torain v. Liu,*

4
    279 F. App'x 46 (2d Cir. 2008) ........................................................................ 19

5

*Troy Group, Inc. v. Tilson,*

6
    364 F. Supp. 2d 1149 (C.D. Cal. 2005) ...................................................... 7, 17

7

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) .................................................................................. 18

8

*Underwager v. Channel 9 Austl.,*

9
    69 F.3d 361 (9th Cir. 1995) ....................................................................... 6, 17

10

*Unelko Corp. v. Rooney,*

11
    912 F.2d 1049 (9th Cir. 1990) ................................................................. 12, 13

12

*Wallace v. Geckosystems Int'l Corp.,*

13
    2013 WL 4054147 (Del. Super. Ct. July 31, 2013) ..................................... 4, 8

14

**<u>Other Authorities</u>**

15

50 Am. Jur. 2d Libel and Slander § 115 ...................................................................... 8

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.      INTRODUCTION & SUMMARY OF FACTS**

2          This dispute began when Unsworth decided to publicly launch false and

3  inflammatory attacks against Musk and his team of volunteer engineers who were

4  helping the Thai government, at the government's request, to address an intractable

5  national tragedy.  Musk and his team deployed their time, skills and resources to help

6  in any way they could—efforts later called "expeditious and extraordinary" by

7  Thailand's Prime Minister.[1]  Only after Unsworth's actions did Musk respond in

8  kind.  Unsworth, now casting himself a "hero" ignores all this (and the First

9  Amendment) in his effort to prevail.

10         On June 24, 2018, twelve Thai boys and their soccer coach were trapped in a

11  Thai cave after a flash flood.  Initial, frantic efforts to rescue the team were

12  abandoned because of rising waters and the death of a Thai rescue diver.

13         Given this unparalleled engineering challenge, hundreds of people online and

14  on the ground asked Musk if he could help.  Musk responded that he believed the

15  Thai government already had the matter "under control."[2]  Nevertheless, concerned

16  about the fate of these young men as circumstances turned more dire, and knowing

17  that some of the world's best engineers worked with him, Musk publicly committed

18  to help in any way he could.  In the days that followed, the Thai rescue efforts

19  remained stalled, and representatives of the Thai government and other officials

20  called upon Musk.

21         Musk immediately got to work and publicly shared what he was doing so that

22  others who were "closer to the problem" could consider it.[3]  Musk and fellow

23  engineers from Tesla, SpaceX, and the Boring Company, began developing a range

24

25  [1] Mtn., Kaba Decl. Ex. 2 (letter from the Prime Minister of the Kingdom of Thailand
26  to Elon Musk, dated July 26, 2018).

27  [2] Elon Musk (@elonmusk), Twitter (July 4, 2019),
    https://twitter.com/elonmusk/status/1014509856777293825.

28  [3] Elon Musk (@elonmusk), Twitter (July 6, 2019),
    https://twitter.com/elonmusk/status/1015355758471532549.

5510994

of solutions that could be used to save the team.  On or about July 6, the first batch of Musk's colleagues went to Chiang Rai, Thailand.  As the engineers were evaluating conditions on the ground, Musk and others were feverishly, and at significant cost, applying their knowledge of transportation systems to come up with a solution.  By July 7, Musk had received preliminary feedback from the teams in Thailand, and began creating something that no one had before: a child-sized mini-submarine made out of rocket parts.  At the same time, the co-leader of the rescue team, with whom Musk was in regular contact, specifically implored Musk to "continu[e] with the development" of his system.[4] All the while, Musk applauded the "extremely talented dive team" and "continue[d] to be amazed by the bravery, resilience & tenacity of [the] kids and diving team in Thailand.  Human character at its best."[5]

In addition to the hyper-accelerated design and construction of the mini-submarine, Musk and his team provided resources for pumping water to help drain the rainfall and surveyed the area in an effort to increase airflow into the cave.  Musk arranged to provide valuable equipment to the rescue team, including ground sump pumps, Tesla Powerwalls, underwater surveying equipment, sonar scanners, and a 3D laser tracker.

By July 9, Musk himself put aside his personal and professional commitments and traveled to Thailand.  The country's most senior officials, including the Prime Minister and members of the Army and Navy, greeted Musk and escorted him to the cave rescue site.

By July 10, the children were rescued.  Although the mini-submarine was ultimately not necessary because conditions had changed, SpaceX engineers

---

[4] Mtn., Kaba Decl. Ex. 1 (e-mail exchange between Richard Stanton and Elon Musk, dated July 7-8, 2018).

[5] Elon Musk (@elonmusk), Twitter (July 7, 2019), https://twitter.com/elonmusk/status/1015835053807394816; Elon Musk (@elonmusk), Twitter (July 7, 2019), https://twitter.com/elonmusk/status/1015665633504063488.

5510994

remained in Thailand to train the Thai Navy on how to use it should it be needed in the future.



The mini-submarine remains in Thailand to this day.[6]  The Thai Prime Minister,[7] the Royal Thai Special Forces,[8] and the Royal Thai Army[9] all formally honored Musk and his team for their efforts.[10]  Musk, however, reserved his accolades for the rescue team.

While Musk and his team were relieved that they were able to help the mission and returned to their professional obligations, Unsworth had something quite different in mind.  On July 13, with no provocation, Unsworth went on international television to attack Musk and the other Tesla, SpaceX, and the Boring Company

---

[6] *See* Muktita Suhartono & Julia Jacobs*, Thai Navy May Put Elon Musk's Mini-Submarine to Use. One Day.*, New York Times (July 12, 2018)*.*

[7] Mtn., Kaba Decl. Ex. 2 (letter from the Prime Minister of the Kingdom of Thailand to Elon Musk, dated July 26, 2018).

[8] Mtn. Kaba Decl. Ex. 3 (letter from Lieutenant General in the Royal Thai Army Special Forces, to Elon Musk, dated July 20, 2018).

[9] Mtn., Kaba Decl. Ex. 4 ("Royal Thai Army Special Warfare Command Certificate" awarded by the Royal Thai Army, to Elon Musk, dated October 9, 2018).

[10] *See* Jamie Fullerton, *Bangkok Mall Opens Thai Rescue Display*, The Guardian (Aug. 31, 2018) (depicting Musk and submarine in exhibit commemorating the rescue).

(Continued...)

5510994

1  engineers.  The only possible explanation for Unsworth's baseless attacks is that he

2  was angered by Musk's humanitarian efforts and craved public adoration for himself.

3  In a CNN interview, Unsworth falsely characterized Musk and his team's

4  unprecedented efforts as "just a PR stunt" and told Musk to "stick his submarine

5  where it hurts."[11]  In fact, the Thai Prime Minister commended Musk for his

6  "extraordinary efforts" and one of the leaders of the rescue said Musk's submarine

7  could be "a viable alternative in future underwater rescue scenarios."  (Compl. Ex. K.

8  at pp. 60-61.)  Likewise, Unsworth falsely claimed that Musk was "asked to leave"

9  the dive site, when in fact Musk was invited to the site by Thai military officials who

10  eagerly escorted him around the terrain.  Unsworth was also savvy in his insults,

11  hurling them in a way to have maximum public impact, and they did.  Unsworth's

12  comments were widely covered in the press and amplified globally.

13       Musk was justifiably offended that a stranger would disparage his team's

14  humanitarian efforts and tireless work.  On July 15, Musk took to Twitter and

15  responded to Unsworth in kind.   He did so only after explaining that he had never

16  met Unsworth and had no idea who he was.  In the weeks that followed, Unsworth's

17  counsel tweeted at Musk and three reporters, tauntingly telling Musk to check his

18  mail for a legal threat.  More words were exchanged, and this suit followed.

19  **II.    LEGAL BACKGROUND**

20       Musk's motion lays out the correct legal standard and dutifully applies it to the

21  complaint as pleaded.  As succinctly explained by the First Circuit, "even a provably

22  false statement is not actionable if it is plain that the speaker is expressing a

23  subjective view, an interpretation, a theory, conjecture, or surmise, rather than

24  claiming to be in possession of objectively verifiable facts."  *Riley v. Harr*, 292 F.3d

25  282, 289 (1st Cir. 2002) (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227

26

27  [11] *See* CNN, *Caver Calls Elon Musk's Submarine a 'PR Stunt,'*

28  https://money.cnn.com/video/technology/2018/07/15/vernon-unsworth.cnnmoney/index.html ["CNN Video"].

- 4 -

5510994

(7th Cir. 1993)).  Applying this rule, Unsworth's complaint fails because he cannot show "that the reasonable reader would believe Musk possessed private facts implicating Unsworth as a pedophile."  (Dkt. No. 30 ("Mtn.") at 8.)  The reasonable reader knew, among other things, that Musk's statements were all in direct response to Unsworth's groundless attack on Musk's and his team's efforts, made without having met Unsworth, cast on unmoderated internet mediums, and made in reference to well-known, disclosed tropes about Thailand.  The totality of the circumstances shows that Musk's statements were imaginative and non-literal insults.  Indeed, courts have dismissed defamation claims based on statements that the plaintiff was "a sick pedophile loser,"[12] had "poor feminine hygiene,"[13] had "sex with a horse" and "contracted AIDS from a male prostitute," [14] and committed acts of incest.[15]

In contrast to Musk's proper statement of the law, Unsworth proposes this Court apply an incorrect standard to his claim. Unsworth stakes his claim on *Milkovich v. Lorain Journal*, a case that Unsworth seems to believe can defeat any defamation defense.  As courts have explained in other cases in which Unsworth's counsel has been involved, that reliance is unwarranted.[16]

Unsworth faults Musk for citing *Milkovich* "only twice."  There was reason for that: *Milkovich* has little to do with this case.  *Milkovich* teaches how to analyze a

---

[12] *Torain v. Liu,* 2007 WL 2331073, at *2 (S.D.N.Y. Aug. 16, 2007), aff'd, 279 F. App'x 46 (2d Cir. 2008) (hereinafter, "*Torain I*").

[13] *Krinsky v. Doe 6*, 159 Cal. App. 4th 1154 (2008).

[14] *Finkel v. Dauber*, 906 N.Y.S.2d 697 (Sup. Ct. 2010)

[15] *Wallace v. Geckosystems Int'l Corp.*, 2013 WL 4054147, at *7-8 (Del. Super. Ct. July 31, 2013).

[16] Unsworth's counsel has been told by courts that *Milkovich* doesn't say what he insists it does.  *See Bryant v. Cox Enterprises, Inc.*, 715 S.E.2d 458, 466 n.29 (Ga. App. 2011) (affirming dismissal of case brought by Unsworth's counsel and questioning Unsworth's counsel's "hyper-technical reading of the second level of falsity as set forth in *Milkovich*").  Likewise, Unsworth's counsel has been told that *Milkovich* isn't as pivotal of a decision as he seems to believe.  *Adelson v. Harris*, 973 F. Supp. 2d 467, 488 n.17 (S.D.N.Y. 2013), *aff'd,* 876 F.3d 413 (2d Cir. 2017) (granting Anti-SLAPP motion against case brought by Unsworth's counsel and explaining that "*Milkovich* [has] had little impact on the law").

statement of ostensible opinion that is really a statement of fact (*e.g.*, "I think Jones is an alcoholic").  This case, however, involves a statement of ostensible fact that is really nonactionable opinion (*e.g.*, "Jones is a sociopath").  As recognized in *Milkovich* itself, these mirror scenarios involve different doctrines. 497 U.S. 1, 16-17 (1991).

Unsworth claims that the motion does not "unearth a single case" holding that the reasonable reader must believe a speaker possesses a factual basis substantiating an allegedly defamatory statement.  (Opp. at 7.)  Again, Unsworth is wrong.  Musk's motion cited case after case dismissing defamation claims because the reasonable reader would not have believed the speaker to be "imparting knowledge of actual facts to the reader"—despite the speaker having made otherwise provably false statements in those cases.[17]  (Mtn. at 9 (quoting *Krinsky*, 159 Cal. App. 4th at 1177; *Riley*, 292 F.3d at 289 ("[E]ven a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." (citation omitted).)

Unsworth also argues that an opinion based on disclosed facts is defamatory "if the disclosed basis is false or incomplete."  (Opp. at 8.)  That summary skips the most important part of the rule—to be actionable, a disclosed basis must be false or incomplete *and itself defamatory.  See Standing Comm. on Discipline of U.S. Dist. Ct. for C.D. Cal. v. Yagman,* 55 F.3d 1430, 1439 (9th Cir. 1995) ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning.").

Unsworth next fashions his own proposed standard, which establishes a whole new world where defamation is broad and the First Amendment is limited.  For

---

[17] For purposes of Musk's motion to dismiss, Musk accepts the complaint's allegations as true, including that the statements at issue were false.

MUSK'S REPLY ISO MOTION TO DISMISS

example, he repeatedly cites *Moldea v. New York Times Co.*, a case that applied *Milkovich* to find the New York Times liable for writing that a book contained "sloppy journalism." 15 F.3d 1137, 1145 (D.C. Cir. 1994).

That opinion remained good law for all of three months. After a petition for rehearing, the court "confess[ed] error" about its "misguided" opinion. *Moldea v. New York Times Co.*, 22 F.3d 310, 311, 314 (D.C. Cir. 1994). That original opinion had "[u]nfortunately" concluded that under *Milkovich* "context was irrelevant," when in fact "*Milkovich* did not disavow the importance of context." *Id.* Reflecting on its mistake, the court said it learned a valuable lesson: the "First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* at 317 (citations omitted).

Other opinions cheered by Unsworth are equally wrong. Courts have said many things about defamation. The cases upon which Unsworth relies are those that have reached incorrect results based on thin reasoning and do real harm to free speech. This Circuit, however, has more robust protections for First Amendment activity than Unsworth lets on.

Unsworth takes similar liberties with the motion's arguments, caricaturing them to appear unreasonable. He claims, for example, that "Musk asks this Court to openly sanction one-sided Twitter warfare, where *no one* is safe because *nobody* can be held accountable and *all* reputations are at grave risk." (Opp. at 8 (emphasis added).) Anyone who read Musk's motion knows that is not what he argued. Instead, Musk showed that modern caselaw recognizes a *presumption* that statements made on unmoderated internet forums, like Twitter, are nonactionable opinion. *See Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696 (2012) (explaining that the reader "should be ***predisposed*** to view [such statements] with a certain amount of skepticism, and with an understanding that they will ***likely*** present one-sided viewpoints rather than assertions of provable facts"). And Unsworth also ignores that this factor is just one of *seven* that *together*—the "totality of circumstances"—

- 7 -

5510994

reveal that Musk's statements were nonactionable opinion and therefore protected by the First Amendment. *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995).

In short, Unsworth's opposition was a response to a motion Musk did not file. When applying the actual pleaded facts to the actual law tested against Musk's actual arguments, Unsworth's complaint fails and Musk's motion to dismiss should be granted.

## III.   ARGUMENT

### A.   Unsworth Ignores The Controlling Legal Standard

Unsworth bears the burden to "prove that the reasonable reader would believe Musk possessed private facts implicating Unsworth as a pedophile." (Mtn. at 8; *see also Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005) ("[T]o survive a motion to dismiss, a plaintiff must establish both that the words about which they complain are reasonably capable of sustaining a defamatory meaning, and that they are not mere comment within the ambit of the First Amendment." (citations omitted).)

The Supreme Court has repeatedly held that a statement cannot be actionable unless the reasonable reader would think that the speaker is "stating actual facts." *Milkovich*, 497 U.S. at 20 (quoting *Falwell*, 485 U.S. at 50). In so doing, the Supreme Court has protected speech that is not "reasonably believable." *Falwell*, 485 U.S. at 57. For example, the Court rejected a defamation claim based on a statement describing the plaintiff's negotiating proposals as "blackmail." *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970). Among the reasons for rejecting this claim was that "no one in the city [where the statement was published] or anywhere else thought [the plaintiff] had been charged with a crime." *Id.*

Building on the Supreme Court's principles, lower courts have crystalized this standard: "[E]ven a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or

- 8 -

5510994

surmise, rather than claiming to be in possession of objectively verifiable facts[.]" *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 250 (1st Cir. 2000); *Haynes*, 8 F.3d at 1227 (citing *Milkovich*); *see also* 50 Am. Jur. 2d Libel and Slander § 115 ("The kind of language used may signal to readers that a writer is not purporting to state or imply ***actual, known facts***. The ad hominem nature of abusive epithets, vulgarities, and profanities ***easily identifies*** it as rhetorical hyperbole which, as a matter of law, cannot reasonably be understood as a statement of fact.").

Courts routinely dismiss statements of ostensible fact if the reasonable reader would not think the allegedly defamatory statement is backed by actual facts.  This is true even if a statement contains specific statements of provable (or disprovable) fact. *See, e.g.*, *Torain I*, 2007 WL 2331073, at *1 (statement that plaintiff was a "sick racist pedophile" was nonactionable because "no reasonable person would have believed that defendant was conveying a fact about plaintiff"); *Brian v. Richardson*, 660 N.E.2d 1126, 1131 (N.Y. Ct. App. 1995) (statement was not actionable where its "predominant tone . . . was rife with rumor, speculation and seemingly tenuous inferences, furnish[ing] clues to the reasonable reader that [the article] was something less than serious, objective reportage"); *Krinsky*, 159 Cal. App. 4th at 1177 (statement that plaintiff "has poor feminine hygiene" was not defamatory because "nothing in this [statement] suggested that the author was imparting knowledge of actual facts to the reader");  *Geckosystems*, 2013 WL 4054147, at *7-8 (internet accusation that plaintiff committed acts of incest were not actionable because "[n]o ordinary reader would interpret the vitriol . . . seriously, as if they were based upon a factual foundation"); *Finkel*, 906 N.Y.S.2d at 702 (internet accusation that plaintiff, among other things, had "sex with a horse" and "contracted AIDS from a male prostitute" were not defamatory because the "reasonable reader, given the overall context of the posts, simply would not believe [them]").

But this Court need not return to First Amendment first principles; it can rely on the rule from *Torain*—a case that Unsworth incorrectly claims is distinguishable

- 9 -

on the facts but for which he does not contest the legal standard. *See* 2007 WL 2331073, at \*3.  There, after a "war of words" between plaintiff and defendant, the defendant called the plaintiff a "racist pedophile." *Id.*  The court analyzed, as a matter of law, whether "considering the over-all context and the circumstances in which defendant's statements were made," if the "reasonable person would have believed that defendant was conveying a fact about plaintiff—i.e., that plaintiff was engaging in acts of pedophilia." *Id.*  It concluded that the plaintiff had not met that standard, since the context was such that "an informed listener would [not] think that defendant was accusing plaintiff of being a pedophile *based on some information known only to him.*" *Id.* (emphasis added).

In fact, Unsworth understood that he was required to prove that the reasonable reader would believe Musk possessed private facts implicating Unsworth as a pedophile. *He pleaded as much in his complaint.*  (Compl. ¶ 139 (alleging that Musk "conveyed to the world that he was in possession of undisclosed false and defamatory facts proving Mr. Unsworth to be guilty of the accusations Musk lodged against him").)  Now faced with a convincing argument that he cannot plausibly plead facts to support that allegation, Unsworth resorts to heckling—calling that standard "preposterous" and "disingenuous at best." (Opp. at 1, 13.)  But despite criticizing this standard, Unsworth cites cases proving that it is foundational. (*See, e.g.*, Opp. at 20 (citing cases that found a statement to be defamatory when "the defendant touted his first-hand knowledge" and when the defendant "claimed to know where the plaintiff lived").[18]

---

[18] The facts of *PG Inn, Inc. v. Gatward*, 2014 WL 108412 (Cal. App. 2014) support Musk's motion.  The defendant in that case was an environmental remediation expert hired by the plaintiff motel to fix its mold problem.  Even though the defendant eliminated the mold, he went on Yelp, explained his credentials, said extensive remediation efforts had failed, and claimed that "the mold problem still exists." *Id.* at \*1.  The court reasoned that the defendant's statements were not mere "Internet rants" since he portrayed himself as "an environmental expert with first-hand knowledge of conditions at the Inn." *Id.* at \*5.  In contrast, Musk made clear he was
(Continued...)

## B.  Unsworth Mischaracterizes and Misapplies *Milkovich*

Unsworth's next move is to argue that Musk's motion "is controlled by the majority opinion in the Supreme Court of the United States' case of *Milkovich v. Lorain Journal*."  (Opp. at 1.)   He then faults Musk for citing "*Milkovich* only twice," each time citing "openly" to Justices Brennan and Marshall's dissent.  (*Id.*)  Unsworth's *Milkovich* analysis has three flaws.

First, *Milkovich* does not "control" this case.  *Milkovich* is narrow.  It held that even statements couched as opinions may be unprotected if they imply a defamatory factual assertion.  *Milkovich*, 497 U.S. at 19 ("Simply couching such statements in terms of opinion does not dispel these implications….").  And it offers, as example, an often-quoted illustration: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to [that] conclusion.'"  *Milkovich*, 497 U.S. at 18-19.

*Milkovich* involves the inverse scenario to that which is presented here: statements that may look like fact but are understood as nonactionable opinion.  Such statements are governed by the legal rules and cases outlined above.  *Milkovich* itself recognizes this separate line of cases.  *Id.* at 16-17 (describing cases establishing the "constitutional limits on the *type* of the speech which may be the subject of state defamation actions," which provides protection for "rhetorical hyperbole" and "vigorous epithets").  Indeed, "*Milkovich* did not depart from the multi-factored analysis that had been employed for some time by lower courts seeking to distinguish between actionable fact and nonactionable opinion."  *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 727 (1st Cir. 1992).

---

not delivering objective, inside information.  As shown in the motion, in the cases far more analogous to the facts here, the relevant statements were found to be nonactionable.  *See, e.g., Krinsky*, 159 Cal. App. 4th at 1154; *Feld v. Conway*, 16 F. Supp. 3d 1, 4 (D. Mass. 2014).

5510994

1       Second, Unsworth mistakenly believes that the *Milkovich* "majority forecloses

2   [Musk's] requests for relief." (Opp. at 1.)  But to the extent the *Milkovich* majority

3   supports either party, it supports Musk.  As courts have recognized, critical to

4   *Milkovich*'s reasoning was that the reasonable reader would have believed the

5   speaker to have possessed first-hand facts. While Unsworth mines the *Milkovich*

6   opinion for helpful-sounding language, the case's full context shows why the rule

7   identified in Musk's motion is correct:

8           In *Milkovich,* the author of the article indicated that he had

9           been at the sports event in question and had seen the

10          altercation that was at issue.   He had also personally

        observed the plaintiff's testimony in an initial administrative

11          and later judicial hearing.  In fact, the columnist described

12          himself as perhaps the only disinterested person to observe

        the match and, at least, the initial testimony.  In other words,

13          the writer presented himself as uniquely situated to report on

14          factual events.

15  *Faltas v. State Newspaper*, 928 F. Supp. 637, 647–48 (D.S.C.), *aff'd,* 155 F.3d 557

16  (4th Cir. 1998).  Given these facts, "a reader reasonably could have understood the

17  reporter in *Milkovich* to be suggesting that *he* was *singularly capable* of evaluating

18  the plaintiffs' conduct."  *Phantom Touring*, 953 F.2d at 730–31 (emphasis added)*.*

19      Given the facts of *Milkovich*, courts often cite it to show the importance of

20  first-hand knowledge by the speaker.  As the Seventh Circuit explained in *Haynes*:

21  "A statement of fact is not shielded from an action for defamation by being prefaced

22  with the words 'in my opinion,' but if it is plain that the speaker is expressing a

23  subjective view, an interpretation, a theory, conjecture, or surmise, rather than

24  claiming to be in possession of objectively verifiable facts, the statement is not

25  actionable."  8 F.3d at 1227 (citing *Milkovich*, 497 U.S. at 17-21).

26      Unsworth's response to *Haynes* is unconvincing.   He seems to suggest that the

27  Seventh Circuit's opinion results from a scrivener's error—claiming that the Seventh

28  Circuit "erroneously cited to *Milkovich*'s majority for the dissent's proposition."

(Opp. at 13.)  By arguing—in a footnote no less—that the rule in *Haynes* "is not the law" because it conflates *Milkovich*'s dissent with its majority, Unsworth pits himself against at least *50* federal courts.  Likely far more.[19]

Third, Unsworth draws a false distinction between the *Milkovich* majority and dissent.  This artificial dichotomy provides Unsworth what he believes is his big gotcha moment, writing in bold italics on the first page of his opposition that "Musk openly cites to *Milkovich*'s ***dissent***."  (Opp. at 1.)  Setting aside for now what Musk's citations actually said, Unsworth misses the bigger point: the *Milkovich* majority and dissent agreed on the legal standard, disagreeing only on its application to the facts.

As both the dissent and later courts have recognized, any disagreement between the two opinions was fact-bound.  *Id.* ("I part company with the Court at the point where it applies these general rules to the statements at issue in this case."); *see also, e.g.*, *id.* at 25 ("*As the majority recognizes*, the kind of language used and the context in which it is used may signal readers that an author is not purporting to state or imply actual, known facts." (emphasis added)); *Kanaga v. Gannett Co.*, 687 A.2d 173, 179 (Del. 1996) ("Justice Brennan . . . did not dispute the majority's articulation of the legal standard, but he disagreed on the application of that standard to the facts of that case.")  Because the underlying standard in both opinions is the same, the dissent is often cited as authoritative.  *See, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013) (citing the *Milkovich* dissent as precedential since it was "agreeing with majority"); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 n.2 (9th Cir. 1990) (citing the *Milkovich* dissent when describing the "the threshold question in defamation suits").

---

[19] Based on counsel's review, it appears that at least 54 federal decisions directly quote *Haynes* for its "claiming to be in possession of objectively verifiable facts" language.   This count does not include indirect citations (cases quoting the cases that quote *Haynes*) or cases that don't quote *Haynes*'s language verbatim.

5510994

1    Moreover, Unsworth's criticism that Musk's motion "untenabl[y] reli[ed] on
2  the *Milkovich* dissent" misses the mark.  (Opp. at 1.)  Musk cited the *Milkovich*
3  dissent for the non-controversial proposition that a reasonable reader understands
4  that parties to a pre-existing dispute are more likely to make statements that "rest
5  [more] on passion rather than factual foundation."  *Milkovich*, 497 U.S. at 33 n.8
6  (Brennan, J., dissenting).  Justice Brennan himself cited a *Ninth Circuit* opinion for
7  that proposition.  *Id.* (citing *Info. Control Corp. v. Genesis One Computer Corp.*, 611
8  F.2d 781, 784 (9th Cir. 1980)).  Dozens of other cases say the same.  (*See, e.g.*, Mtn.
9  at 12-15 (citing cases).) Yet Unsworth made this non-issue the primary frame of his
10 opposition.  (*See* Opp. at 1, 7-8, 13, 19.)

11    **C.    Unsworth's Proffered Legal Standard is Unsupported and Incorrect**

12    Understanding that the correct legal standard identified and applied in Musk's
13 motion defeats Unsworth's defamation claim, Unsworth instead offers his own legal
14 standard:

15        It is not the law that opinions communicating that a crime
16        occurred are protected "unless" they imply the existence of
         undisclosed facts; to the contrary, statements asserted to be
17        opinion are unprotected "unless" the writer discloses the
18        underlying basis for a defamatory opinion, and "even if" the
         basis is disclosed, opinions remain unprotected if that basis
19        is false or incomplete.

20
21 (Opp. at 2.)  Unsworth cites no cases supporting his sweeping new defamation test.
22 Indeed, every important part of Unsworth's proposed rule is wrong.

23    Unsworth first sows confusion by developing a special interpretive rule for
24 "opinions communicating a crime," thus making the doctrine of defamation per se a
25 centerpiece of his opposition.  (*See, e.g.*, Opp. at 9 ("Indeed, perhaps the clearest
26 example of libel per se is an accusation of a crime." (citation and alteration omitted));
27 *id.* at 20 (summarizing a case in which "an anonymous internet posting on website
28 that petitioners were 'bribed' was defamatory *per se*").)

- 14 -

5510994

1   The defamation per se doctrine has no application to this motion.  That

2   doctrine is narrow.  It relieves a defamation plaintiff of proving actual damages as an

3   element of his claim when a defamatory statement communicates certain inherently

4   damaging things—including involvement in a criminal activity.  *Clifford v. Trump*,

5   339 F. Supp. 3d 915, 925 (C.D. Cal. 2018).  Because Musk did not move to dismiss

6   based on Unsworth's failure to plead damages, defamation per se is irrelevant.  *Id.*

7   Unsworth seeks to transform defamation per se from a rule of damages into a

8   canon of interpretation.   Similar attempts have consistently been rejected. *See*

9   *Torain I*, 2007 WL 2331073, at *3 (rejecting the argument that "if you call someone

10   a pedophile, it's defamatory, period, if it's not true")[20]; *Clifford*, 339 F. Supp. 3d at

11   919 (rejecting argument that a "tweet was defamation *per se* because it charged [the

12   plaintiff] with committing a serious crime," since the tweet in context would have

13   been understood as a "hyperbolic statement"); *Mattel, Inc. v. MCA Records, Inc.*, 28

14   F. Supp. 2d 1120, 1160–61 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002)

15   (rejecting plaintiff's argument that "statements amount to libel per se" because the

16   defendant "merely employed hyperbole"). And for reason.  A rule that speakers

17   cannot use language invoking criminal behavior—even as hyperbole or insult—

18   would be an unconstitutionally blunt instrument.  *See Torain*, 2007 WL 2331073, at

19   *3 ("[P]ure opinions are immune from all defamation claims, even claims of *per se*

20   defamation."); *see also Nat. Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 272

21

22

23

_____

24   [20] One of the cases Unsworth cites—*Longbehn v. Schroenrock*, 727 N.W.2d 153
    (Minn. 2007)—did apply this sort of simplistic reasoning.  There, the defendant

25   called the plaintiff "'Pat the Pedophile' because of his relationship with [an] 18-year-
    old woman."  *Id.* at 157.  Even though the jury found that this statement "did not

26   accuse [plaintiff] of actually being a pedophile," the court reversed because it
    thought that "in almost every circumstance a reasonable listener would believe that
    calling a person a pedophile imputes serious sexual misconduct or criminal activity

27   to that person.  It is, therefore, defamatory per se."  *Id.* at 159.  This opinion
    misapplies the defamation per se doctrine and cannot be squared with better-reasoned

28   federal cases, including from this Circuit.

5510994

1  (1974) (protecting speech that "might well be deemed actionable per se in some state
2  jurisdictions").

3      Unsworth next argues that "statements asserted to be opinion are unprotected
4  'unless' the writer discloses the underlying basis for a defamatory opinion." (Opp. at
5  2.)  Again, Unsworth is wrong.  It's true that "a speaker who outlines the factual
6  basis for his conclusion is protected by the First Amendment." *Price v. Stossel*, 620
7  F.3d 992, 1004 (9th Cir. 2010).  But that's not the only way a statement receives
8  constitutional protection.  As the Supreme Court has explained, the First Amendment
9  protects not just opinions based on disclosed facts, but also "imaginative
10 expressions," "rhetorical hyperbole," "vigorous epithets," and so on. *Milkovich*, 497
11 U.S. at 20; *see also, e.g., Clifford*, 339 F. Supp.3d at 927 (holding that a tweet stating
12 that plaintiff had fabricated the commission of a crime—and that did not disclose any
13 basis for that statement—was "rhetorical hyperbole").   These protections are time
14 honored; experience has shown they've "traditionally added much to the discourse of
15 our Nation." *Milkovich*, 497 U.S. at 20.

16     Unsworth then argues that "even if the basis is disclosed, opinions remain
17 unprotected if that basis is false or incomplete." (Opp. at 1.)  As noted above,
18 Unsworth's statement of the rule is misleadingly incomplete.  To be actionable, a
19 disclosed basis must be false or incomplete *and itself defamatory.  See Yagman,* 55
20 F.3d at 1439 ("A statement of opinion based on fully disclosed facts can be punished
21 only if the stated facts are themselves false and demeaning.")

22     Without a case that supports his standard, Unsworth turns again to *Milkovich*,
23 which held that a statement was defamatory because the context did not "negate the
24 impression that the writer was seriously maintaining that petitioner committed the
25 crime of perjury." (Opp. at 16 (quoting 497 U.S. at 21).  But Unsworth ignores that
26 the speaker in *Milkovich* was "seriously maintaining" his statement because, as later
27 courts have explained, he gave the impression that he was communicating first-hand
28 knowledge. *See Phantom Touring*, 953 F.2d at 730-31 ("[A] reader reasonably could

- 16 -

1  have understood the reporter in *Milkovich* to be suggesting that he was singularly

2  capable of evaluating the plaintiffs' conduct.").

3      Unsworth instead asserts that the relevant question is whether the reasonable

4  reader thinks the speaker subjectively believes his accusation, even if it is clear to the

5  reader that the accusation is pure "conjecture." (Opp. at 1, 3, 13.)  Thus, according to

6  Unsworth, "[i]t is not necessary that anyone believe [allegedly defamatory

7  statements] to be true, since the fact that such words are in circulation at all must be

8  to some extent injurious to [a plaintiff's] reputation."  (*Id.* (citation and alterations

9  omitted).)

10     Musk prevails under even this standard, since the reasonable reader would not

11 have thought Musk was "seriously maintaining" that Unsworth was sexually

12 attracted to children or engaged in sex acts with children.[21]  (*See also infra* Part II.D.)

13 But for the reasons explained above, Unsworth's rule is also inconsistent with

14 precedent.  *Compare* Opp. at 3 ("It is not necessary that ***anyone*** believe [allegedly

15 defamatory statements] to be true." (emphasis added)), *with Dupuis v. City of*

16 *Hamtramck,* 502 F. Supp. 2d 654, 658 (E.D. Mich. 2007) (explaining that Supreme

17 Court precedent requires that if a statement is not "reasonably believable"—

18 including if it would be understood as a "crude or meanspirited" insult—then "there

19 is no defamation"), and *Torain*, 2007 WL 2331073, at *1 n.1 (finding that defendants

20 statements were nonactionable even though his public statements showed that "he

21 *truly believed plaintiff's remarks* were genuine threats"), and *Brian*, 87 N.Y.2d at 53

22 (holding that a statement was not actionable when the "reasonable reader would

23

24

---

25 [21] That was, in fact, the point of Musk's motion.  *In context*, Musk's statements are
26 reasonably interpreted as hyperbole, invective, taunting, and the like. (*See, e.g.*, Mtn.
   at 14 ("The reasonable reader of Musk's statements would have known that they
27 were mere epithets, fiery rhetoric or hyperbole."); *id.* at 18 ("Musk's statements . . .
   utilize the same sort of imaginative and non-literal insults that courts deem
28 opinion.").  They would not be interpreted as a sincere accusation that "Unsworth is
   raping children."  (Opp. at 15.)

1  understand the statements defendant made about plaintiff *as mere allegations* to be

2  investigated rather than as facts").

3  **D.  Applying the Correct Legal Standard, Unsworth Fails to Carry His**
   **Burden to Allege Actionable Defamation**

4

5  Unsworth does not carry his burden to show that the reasonable reader would

6  believe Musk possessed private facts implicating Unsworth as a pedophile.  *See Troy*

7  *Group*, 364 F. Supp. 2d at 1152.

8  Unsworth's analysis fails to consider the importance of context.  "What

9  constitutes a statement of fact in one context may be treated as a statement of opinion

10 in another, in light of the nature and content of the communication taken as a whole."

11 *Gregory v. McDonnell Douglas Corp*., 552 P.2d 425, 428 (Cal. 1976).  Thus, context

12 is "paramount" and can alone "be dispositive." *Knievel*, 393 F.3d at 1075; *Koch v.*

13 *Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) ("Context does resolve the matter.").  To

14 determine whether a statement is factual, courts consider "the totality of the

15 circumstances in which it was made." *Underwager*, 69 F.3d at 366.

16 The surrounding context—the "totality of the circumstances"—

17 overwhelmingly supports Musk.  Rather than consider these relevant circumstances

18 *together*, Unsworth instead approaches these factors with tunnel vision—trying to

19 pick them off one at a time.[22]  Even those arguments fail.

20 1. *Internet as Context*:  Unsworth argues that Musk seeks "absolute immunity"

21 for Twitter posts.  (Opp. at 17.)  Not so.  Instead, citing on-point precedent, Musk

22 argues that statements made on certain unmoderated internet fora are *presumptively*

23

24 [22] Similarly, Unsworth contends that Musk's statements "must be analyzed
   separately . . . because they were made in very different contexts."  (Opp. at 15.)

25 This argument ignores the "totality" approach, and would be particularly
   inappropriate in a case where each statement in the dispute was part of an ongoing

26 public battle.  *See, e.g.*, *Torain*, 2007 WL 2331073, at *3 (noting that the "extensive
   media coverage surrounding plaintiff's comments makes it impossible that an

27 informed listener would think that defendant was accusing plaintiff of being a
   pedophile")**;**  *Feld*, 16 F. Supp. 3d at 4 ("The tweet cannot be read in isolation, but in

28 the context of the entire discussion.").

- 18 -

5510994

nonactionable opinion.  (Mtn. at 11-12 (quoting *Summit Bank*, 206 Cal. App. 4th at 696 (explaining that the reader "should be ***predisposed*** to view [such statements] with a certain amount of skepticism, and with an understanding that they will ***likely*** present one-sided viewpoints rather than assertions of provable facts" (emphasis added)).

Since the reasonable reader is reasonable, she can tell the difference between a Twitter insult (nonactionable opinion) and an official press release issued through Twitter (potentially actionable fact).  Just like she can distinguish between tweets that are sometimes "official statements" of the U.S. Government and at other times mere "rhetorical hyperbole" by a high-ranking government official, even when sent from the same Twitter account.[23]

2. *Back-and-Forth Dispute*: Unsworth argues that this case does not involve a "back and forth argument." (Opp. at 18.)  He reaches that conclusion by obscuring the real facts.  He takes no responsibility for attacking Musk.  (Opp. at 18 ("[Unsworth] responded with colorful but well-founded criticisms—none of which were the kind of personal attacks leveled by Musk.").)  And he entirely ignores that his counsel reignited the dispute through his behavior on Twitter. (Mtn. at 5 n.6.)

Unsworth cites only one opinion—*Dickinson v. Cosby*, 17 Cal. App. 5th 655, 691 (2017)—for his claim that statements made in these circumstances wouldn't be recognized as opinion.  That opinion is both incorrect and non-binding.  It found that a defamation claim against Bill Cosby could move forward based on *statements by his lawyer* that categorically denied a rape claim against Cosby.  *Id.* at 461 ("Janice Dickinson's story accusing Bill Cosby of rape is a lie.").  Two federal courts have rightly turned to the Constitution to reject similar defamation claims filed against

---

[23] *Compare Trump v. Hawaii,* 138 S. Ct. 2392, 2438 n.1 (2018) (Sotomayor, J., dissenting) ("According to the White House, President Trump's statements on Twitter are 'official statements.'"), *with Clifford v. Trump*, 2018 WL 4997419, at *8 (treating as "rhetorical hyperbole" a tweet from President Trump accusing the plaintiff of lying and calling her a "total con job").

MUSK'S REPLY ISO MOTION TO DISMISS

5510994

1  Cosby.  *See Hill v. Cosby,* 665 F. App'x 169, 177 (3d Cir. 2016); *McKee v. Cosby*,

2  874 F.3d 54, 63 (1st Cir. 2017); *see also Leidholdt v. L.F.P. Inc*, 860 F.2d 890, 893

3  (9th Cir. 1988) ("The distinction between alleged fact and opinion is a question of

4  federal law.")

5        Indeed, by the time of the BuzzFeed emails—after Unsworth's counsel stirred

6  the pot with sarcastic legal threats[24]—Musk's statements were "***highly unlikely*** to be

7  understood by their audience as statements of fact."  *Info. Control Corp.*, 611 F.2d at

8  784 (emphasis added).

9        3. *Disclosed Facts*.  Though required by caselaw, Unsworth didn't even

10  attempt to show how Musk's disclosed facts were "both false *and* defamatory."

11  *McKee*, 874 F.3d at 63.  That's because they were not.

12        Referencing Thailand's documented reputation, Musk first tweeted that

13  Unsworth was "sus" for being a "British expat guy who lives in Thailand." (*Id.* ¶ 73.)

14  Later in an e-mail to Buzzfeed, Musk included a hyperlink to a Google search of

15  "Chiang Rai child trafficking." (*Id.* Ex. K, p. 56; *Adelson v. Harris*, 973 F. Supp. 2d

16  at 484, aff'd, 876 F.3d 413 (2d Cir. 2017) (explaining hyperlinks are the "twenty-first

17  century equivalent of the footnote for purposes of attribution in defamation law");

18  *see also People v. Paniagua*, 209 Cal. App. 4th 499, 521 (2012) (reasoning that the

19  "prosecution did not [need to] explicitly tell the jury that defendant may have gone to

20  Thailand to have sex with children" because that "was implicit in the mere mention

21  of Thailand" (alterations omitted)).)

22

23  _____

24  [24] These unpleaded tweets are properly considered on Musk's motion to dismiss.  To
    properly evaluate context, a court "must take into account all parts of the
    communication that are ordinarily heard or read with it."  *Knievel v. ESPN*, 393 F.3d

25  1068 (9th Cir. 2005); *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005); *see also
    Torain v. Liu*, 279 F. App'x 46, 47 n.1 (2d Cir. 2008) (holding that it was proper to

26  consider statements made by a defamation plaintiff during a "war of words" with
    defendant, even though those statements did not appear in the complaint).

27  For this same reason, Musk did not "flout" the Federal Rules in his motion.  (Opp. at
    6 n.5.)  Indeed, each exhibit attached by Musk was referenced in Unsworth's

28  complaint or the attached exhibits.

5510994

These facts—even if false—cannot defame Unsworth.  Musk's imaginative insults referring back to those facts can't defame Unsworth either.  *McKee*, 874 F.3d at 63.

4. *Acerbic Insults*: Unsworth argues that Musk's "accusation of pedophilia is not a typical over-the-top insult a reasonable reader would anticipate hearing."  (Opp. at 19-20.)  Yet Musk's motion cited cases protecting statements that plaintiffs had, among other things, "contracted aids from a male prostitute," "committed acts of incest," and had "poor feminine hygiene."  (Mtn. at 9, 18.)  Indeed, such insults are *less* likely to be understood as fact by the reasonable reader.  *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1194 (9th Cir. 1989) ("Ludicrous statements are much less insidious and debilitating than falsities that bear the ring of truth."); *Clifford*, 2018 WL 4997419, at *8 ("As the United States Supreme Court has held, a published statement that is 'pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage' cannot constitute a defamatory statement." (quoting *Milkovich*, 497 U.S. at 32)).

Unsworth's attempts to distinguish these cases fall short.  His treatment of *Torain I* is illustrative. Unsworth correctly notes that the *Torain I* defendant was set off by the plaintiff's graphic statements "concerning the young daughter of [a rival] disk-jockey."  2007 WL 2331073, at *1.  He is also correct that the court reasoned an "informed listener" would understand the defendant's comments to refer back to this dispute.  *Id.* at *3.  But then Unsworth makes an unsupportable leap in logic, arguing that *Torain I* does not apply because Musk wasn't "basing his accusations of pedophilia on Unsworth's statement that Musk 'can stick his submarine where it hurts.'"  (Opp. at 19.)  Put another way, Unsworth argues that a party to a back-and-forth dispute has license to insult the *content* of other side's statements and nothing else.  (*Id.*)  *Torain* contains no such limitation.  So long as the "informed listener" will understand that the insult is not "based on some undisclosed information known only to him," then the insult is nonactionable.  2007 WL 2331073, at *3.

- 21 -

1    The facts here parallel *Torain I* in every way that matters.  The informed

2 listener understood Musk's insult to be based on Unsworth's connection to Thailand.

3 The listener likely understood that Unsworth had found joy in insulting Musk:



12 (*See supra* CNN Video; *see also Torain*, 2007 WL 2331073, at *2 (holding that

13 because the reasonable reader knew the defendant's statements were "made in direct

14 response to what he considered to be plaintiff's outrageous and offensive on-air

15 comments, the statements were "clearly statements of opinion").)  If Unsworth's

16 insults are nonactionable, so too are Musk's.  *See Jacobus v. Trump*, 51 N.Y.S.3d

17 330, 342 (N.Y. Sup. Ct.), aff'd, 64 N.Y.S.3d 889 (N.Y. App. Div. 2017) (insults

18 unrelated to the content of a plaintiff's statements were nonactionable because it

19 "followed plaintiff's negative commentary about [the defendant]," which "signals to

20 readers that plaintiff and [defendant] were engaged in a petty quarrel").

21    5. *Informal Speech*: Unsworth does not address the many decisions holding

22 that statements that lack the "formality and polish typically found in documents []

23 which a reader would expect to find facts" are treated as opinion. *ComputerXpress,*

24 *Inc. v. Jackson*, 93 Cal. App. 4th 993, 1012 (2001); *see also Global Telemedia Int'l,*

25 *Inc. v. Doe I*, 132 F. Supp. 2d 1261, 1269 (C.D. Cal. 2001) (informal style "alert[s] a

26 reasonable reader to the fact that these observations are probably not written by

27 someone with authority or firm factual foundations for his beliefs").

28

- 22 -

He instead cites three cases for the proposition that "courts find similarly colloquial accusations actionable." (Opp. at 20.) The first opinion is a state trial court order denying an Anti-SLAPP motion against controversial actor James Woods. (Opp. Ex. 1.) That case began with Woods tweeting: "USATODAY app features Bruce Jenner's latest dress selection, but makes zero mention of Planned Parenthood baby parts market."[25] In direct response, a Twitter user referred to Woods as a "clown" and a "cocaine addict." That user's speech—a hyperbolic rebuke to Woods's purposefully polemical tweet—should have been protected. But the court instead denied the defendant's Anti-SLAPP because there was an "issue of fact" created by an *expert linguist's* testimony about how the reasonable reader would understand the tweet. (Opp. Ex. 1.)[26] This reasoning is inconsistent with the law in this Circuit that holds that "whether an allegedly defamatory statement is a statement of fact or statement of opinion is a question of law." *Info. Control*, 611 F.2d at 783. Neither of the remaining opinions Unsworth cites even addresses the importance of linguistic informality. *See Cahill v. Edalat*, 2017 WL 2608857, at *4 (C.D. Cal. Feb. 15, 2017); *Maxon v. Ottawa Pub. Co.*, 929 N.E.2d 666, 677-78 (3d Dist. 2010).

6. *Qualifying Language*: It is not enough for Unsworth to prove that the reasonable reader would think Musk subjectively believed Unsworth could be a pedophile. (*Supra* Part II.A.) He must instead show that the reasonable reader thinks Musk is "claiming to be in possession of objectively verifiable facts." *Haynes*, 8 F.3d at 1227. With the proper frame, Musk's tweets prove that he can't be liable.

---

[25] *See* Justin Moyer, *James Woods Sues Twitter User Who Called Him a 'Cocaine Addict'*, Washington Post (July 31, 2015).

[26] Before opting to accept the legal reasoning of a paid expert linguist, the trial court had tentatively *granted* the Anti-SLAPP. *See* David Goldman, *James Woods Can Sue a Twitter User For Calling Him a Cocaine Addict*, CNN (Feb. 12, 2016) ("[T]he judge had tentatively ruled that the case should be thrown out. But he said he was convinced by the testimony of former USC linguistics professor Edward Finegan, saying that the tweet's syntax suggested that Abe List was making a factual statement.").

1   The two instances that Unsworth identifies as Musk "doubling down" in fact show

2   that Musk told the reasonable reader he was just speculating.  Musk first tweeted,

3   "*Bet* ya a signed dollar bill its true," showing that he didn't know about Unsworth

4   one way or another.  He then tweeted "You don't think it's strange he hasn't sued

5   me?" again making clear that his speculation is unverified.  *See Partington v.*

6   *Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) ("[D]efendant's use of a question mark

7   . . . makes clear his lack of definitive knowledge about the issue.").

8          Unsworth leaves even more definitive qualifying language completely

9   unaddressed.  For example, Musk explicitly told all readers (reasonable and

10  otherwise) that he had never met Unsworth.  (Compl. ¶ 73 ("Never saw [Unsworth]

11  . . . at any point when we were in the caves."); *id.* ¶ 92 ("Never saw Unsworth at any

12  point.").)  This alone show that Musk's statements are nonactionable.  *See Tipping v.*

13  *Martin*, 2016 WL 397088, at *5 (N.D. Tex. Feb. 2, 2016) (granting defendant's

14  motion to dismiss where there were "no allegations that [the defendant] had any

15  knowledge about Plaintiff before encountering her for the first time at the [event

16  where he allegedly defamed her], much less any knowledge concerning her personal

17  life or the quality of her [professional] work").

18         7. *Reader Comments*:  Unsworth argues—with no caselaw support—that

19  "Musk cannot point to statements by this small group of people that they thought

20  Musk was just kidding or engaging in hyperbole."  (Opp. at 23.)  Courts disagree.

21  *See Doe v. Cahill*, 884 A.2d 451, 467 (Del. 2005) (finding that a statement was

22  opinion in part because "a[t] least one reader of the blog quickly reached the

23  conclusion that Doe's comments were no more than unfounded and unconvincing

24  opinion"); *Redmond v. Gawker Media, LLC*, 2012 WL 3243507, at *6 (Cal. Ct. App.

25  Aug. 10, 2012) (noting that a statement was treated as opinion by readers "[a]s

26  shown by the comments posted" below the article).  And while Unsworth identified a

27  *single* commenter who thought Musk was "accusing" Unsworth of pedophilia, that

28

5510994

1  does little to prove his case.  (Opp. at 23.)  He must show that reader believed Musk

2  was "in possession of objectively verifiable facts."  *Haynes*, 8 F.3d at 1227.

3  **IV.    CONCLUSION**

4       For reasons known only to Unsworth, he chose to attack Musk—a total

5  stranger—for Musk's efforts to help the Thai government save the youth soccer

6  team.  Unsworth did so in the most public way he could: by going on international

7  television, dismissing Musk and his team's efforts as a mere "PR stunt," and telling

8  Musk to "shove" his rescue submarine "where it hurts."

9       From 8,000 miles away, Musk learned of Unsworth's comments and was

10  rightly angered that his and his teams' efforts were being slandered.  Musk's

11  responses have all the hallmarks of nonactionable opinion.  They were made in direct

12  response to Unsworth's unjustified and false personal attacks.  They disclaimed any

13  first-hand basis.  Musk's statements were made on unmoderated internet forums

14  where readers know to expect opinion, not facts.  They were written with informality

15  and emotion.  And they traded on a disclosed, well-known trope about Thailand.

16       In these circumstances, the reasonable reader would not believe Musk's

17  insults.  Unsworth's complaint should be dismissed.

18

19  Dated:  March 18, 2019                    HUESTON HENNIGAN LLP

20

21                                        By:  */s/ Moez M. Kaba*

22                                            John C. Hueston
                                             Moez M. Kaba
23                                            Sourabh Mishra
                                             Michael H. Todisco
24
                                             Attorneys for Defendant Elon Musk
25

26

27

28

- 25 -

5510994