1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP
  | Alex Spiro (admitted pro hac vice)
2 |   alexspiro@quinnemanuel.com
  | 51 Madison Avenue, 22nd Floor
3 | New York, New York 10010
  | Telephone: (212) 849-7000
4 |
  | QUINN EMANUEL URQUHART & SULLIVAN, LLP
5 | Robert M. Schwartz (Bar No. 117166)
  |   robertschwartz@quinnemanuel.com
6 | Michael T. Lifrak (Bar No. 210846)
  |   michaellifrak@quinnemanuel.com
7 | Jeanine M. Zalduendo (Bar No. 243374)
  |   jeaninezalduendo@quinnemanuel.com
8 | 865 South Figueroa Street, 10th Floor
  | Los Angeles, California 90017-2543
9 | Telephone: (213) 443-3000

10 | *Attorneys for Defendant Elon Musk*

11

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| VERNON UNSWORTH, | Case No. 2:18-cv-08048 |
|---|---|
| Plaintiff, | Judge: Hon. Stephen V. Wilson |
| vs. | **DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT** |
| ELON MUSK, | |
| Defendant. | Complaint Filed: September 17, 2018 |
| | Trial Date: December 2, 2019 |
| | Hearing Date: October 28, 2019 |
| | Time:            1:30 p.m. |
| | Courtroom:   10A |

PLEASE TAKE NOTICE that on October 28, 2019 at 1:30 p.m. in Courtroom 10A of the above-titled Court, Defendant Elon Musk Defendant will move this Court for an order granting summary judgment in favor of the Defendant, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, on the grounds that the action has no merit, there is no triable issue as to any material fact, and Defendant is entitled to judgment as a matter of law.

In the alternative, Defendant Elon Musk will move this Court for an order granting partial summary judgment pursuant to Federal Rules of Civil Procedure, Rule 56(a) and (g), on certain parts of Plaintiff's claim for defamation, on the grounds that these parts of Plaintiff's claim have no merit, there is no triable issue as to any material fact, and Defendant is entitled to partial judgment as a matter of law. Specifically, Defendant seek the following determinations:

1. that Plaintiff is a limited purpose public figure for purposes of his defamation claim;

2. that an article published on the BuzzFeed website, on September 4, 2018, as reflected in Exhibit K to the Complaint, does not constitute defamation by Mr. Musk;

3. that the tweet made by Mr. Musk as reflected in Exhibit B to the Complaint does not constitute defamation by Mr. Musk;

4. that the tweet made by Mr. Musk as reflected in Exhibit C to the Complaint does not constitute defamation by Mr. Musk;

5. that the tweet made by Mr. Musk as reflected in Exhibit D to the Complaint does not constitute defamation by Mr. Musk;

6. that the tweet made by Mr. Musk as reflected in Exhibit E to the Complaint does not constitute defamation by Mr. Musk;

7. that the tweet made by Mr. Musk as reflected in Exhibit F to the Complaint does not constitute defamation by Mr. Musk;

8. that the tweet made by Mr. Musk as reflected in Exhibit G to the

1   Complaint does not constitute defamation by Mr. Musk;

2   9.   that the tweet made by Mr. Musk as reflected in Exhibit I to the

3   Complaint does not constitute defamation by Mr. Musk.

4   This motion is made pursuant to this Notice of Motion and Motion, the

5   concurrently-filed Memorandum of Points and Authorities, the Statement of

6   Uncontroverted Facts and Conclusions of Law, the Declarations of Elon Musk, Jared

7   Birchall, and Michael Lifrak (and all exhibits thereto), the [Proposed] Order Granting

8   Mr. Musk's Motion for Summary Judgment or in the Alternative Partial Summary

9   Judgment, the files and records in this action, and any such additional argument or

10   materials as may be submitted to the Court before the time of the decision in this

11   matter.

12   This motion is made following the conference of counsel pursuant to C.D. Cal.

13   L.R. 7-3, which took place in person on September 9, 2019.

14

15   DATED:  September 16, 2019          Respectfully submitted,

16                                       QUINN EMANUEL URQUHART &

17                                       SULLIVAN, LLP

18

19

20   By ___/s/ Alex Spiro_____

21   Alex Spiro (admitted *pro hac vice*)

22   alexspiro@quinnemanuel.com
     51 Madison Avenue, 22nd Floor

23   New York, New York 10010
     Telephone: (212) 849-7000

24

25   *Attorneys for Defendant Elon Musk*

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................... 1

STATEMENT OF RELEVANT FACTS .................................. 2

    A.    The Thai Cave Rescue and Plaintiff's Role. ........................ 2

    B.    Mr. Musk's Efforts to Assist in the Rescue ......................... 3

    C.    Without Provocation, Mr. Unsworth Attacks Musk on CNN. .............. 5

    D.    Mr. Musk's July 15, 2018 Tweets. ............................... 5

    E.    Mr. Musk Apologizes to Mr. Unsworth. ............................ 7

    F.    Mr. Musk Retains an Investigator who Reports On Mr. Unsworth........ 7

    G.    Mr. Musk's August 28, 2018 Tweet and Lin Wood's Tweet. ............. 8

    H.    The Investigator Reports More Detailed Findings to Birchall. ........... 8

    I.    Mr. Musk's "Off-the-Record" Emails to BuzzFeed ................... 9

    J.    Mr. Unsworth Sues. ........................................... 10

LEGAL DISCUSSION ......................................................... 11

I.    MR. UNSWORTH IS A LIMITED PURPOSE PUBLIC FIGURE. ............... 11

    A.    The Constitutional Framework ................................... 11

    B.    Numerous Public Controversies Arose in 2018 Over the Rescue. ....... 12

    C.    Mr. Unsworth Voluntarily Injected Himself Into the Controversies. .................................................... 13

    D.    Mr. Musk's Statements Were Germane to the Controversy. ............. 14

II.    THE BUZZFEED ARTICLE IS NOT DEFAMATION BY MR. MUSK. ..... 16

    A.    Plaintiff Must Prove Actual Malice. .............................. 16

    B.    Mr. Unsworth Cannot Prove Malice Because Mr. Musk Did Not Entertain Serious Doubts as to The Accuracy of His Statements. ........ 17

        1.    The Applicable Standard ................................... 17

        2.    Musk's Email Was Based On Investigator's Findings. ............ 17

        3.    Mr. Unsworth Cannot Prove Malice. .......................... 18

    C.    Mr. Musk Is Not Liable for Publication of Off-the-Record Emails. .... 20

          1.    The Applicable Standard ............................................................. 20

          2.    Republication Was Not Reasonably Foreseeable. ..................... 20

    D.   Mr. Musk's August 28 Tweet Lacked Actual Malice. .......................... 21

III.    MR. MUSK'S INITIAL TWEETS ARE NOT DEFAMATION. .................. 22

    A.   Mr. Unsworth Must Prove That Mr. Musk Knew or Believed Readers Would View His Statements as Objective Facts ..................... 22

    B.   Mr. Unsworth Cannot Meet This High Burden. ................................... 23

    C.   Mr. Unsworth Cannot Otherwise Prove Actual Malice. ........................ 25

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

Page

*Ampex Corp. v. Cargle,*
128 Cal. App. 4th 1569 (2005) ........................................................... 13

*Annette F. v. Sharon S.,*
119 Cal. App. 4th 1146 (2004) ................................................. 12, 13, 25

*Atlanta Journal-Constitution v. Jewell,*
555 S.E.2d 175 (Ga. App. 2001) ....................................................... 15

*Bauman v. Butowsky,*
377 F. Supp. 3d 1 (D.D.C. 2019) ....................................................... 23

*Chandler v. Berlin,*
2019 WL 1471336 (D.D.C., Apr. 3, 2019) ......................................... 20

*Christian Research Inst. v. Alnor,*
148 Cal. App. 4th 71 (2007) ....................................................... *passim*

*Copp v. Paxton,*
45 Cal. App. 4th 829 (1996) ..................................................... 12, 13, 16

*Curley v. Vick,*
211 Cal. App. 2d 670 (1963) ............................................................. 20

*D.A.R.E. Am. v. Rolling Stone Magazine,*
101 F. Supp. 2d 1270 (C.D. Cal. 2000),
*aff'd,* 270 F.3d 793 (9th Cir. 2001) .............................................. 16, 18

*De Havilland v. FX Networks, LLC,*
21 Cal. App. 5th 845, 870 ( 2018) ..................................................... 23

*Denney v. Lawrence,*
22 Cal. App. 4th 927 (1994) ......................................................... 13, 14

*DiGiorgio Corp. v. Valley Labor Citizen,*
260 Cal. App. 2d 268 (1968) ............................................................. 20

*Garrison v. Louisiana,*
379 U.S. 64 (1964) ........................................................................... 17

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323 (1974) .............................................................. 11, 12, 14

*Good Gov't Grp. of Seal Beach, Inc. v. Superior Court,*
22 Cal. 3d 672 (1978) ...................................................... 22, 23, 24

*Gordon & Holmes v. Love,*
2016 WL 374950 (Feb. 1, 2016) ....................................................... 23

*Jackson v. Paramount Pictures Corp.,*
68 Cal. App. 4th 10 (1998) ............................................................... 19

*Jankovic v. Int'l Crisis Grp.,*
822 F.3d 576 (D.C. Cir. 2016) .............................................. 14, 15, 16

*Khawar v. Globe Int'l, Inc.,*
19 Cal. 4th 254 (1998) ..................................................................... 12

*Live Oak Publ'g Co. v. Cohagan,*
234 Cal. App. 3d 1277 (1991) ........................................................... 21

-iii-

*Makaeff v. Trump Univ., LLC,*
  715 F.3d 254 (9th Cir. 2013) ........................................................ 12, 13

*McCoy v. Hearst Corp.,*
  42 Cal. 3d 835 (1986) ........................................................................ 18

*Nadel v. Regents of University of California,*
  28 Cal. App. 4th 1251 (1994) ........................................................... 14

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ............................................... 11, 16, 17, 19

*Overstock.com, Inc. v. Gradient Analytics, Inc.,*
  151 Cal. App. 4th 688 (2007) ........................................................... 19

*Reader's Digest Assn. v. Superior Court,*
  37 Cal. 3d 244 (1984) ...........................................................*passim*

*Rosenaur v. Scherer,*
  88 Cal. App. 4th 260 (2001) ...................................................... 19, 25

*Rudnick v. McMillan,*
  25 Cal. App. 4th 1183 (1994) ........................................................... 13

*Shively v. Bozanich,*
  31 Cal. 4th 1230 (2003) .................................................................... 20

*St. Amant v. Thompson,*
  390 U.S. 727 (1968) .................................................................. 17, 18

*Thomas v. Los Angeles Times Comm., LLC*
  189 F. Supp. 2d 1005, 1012 (C.D. Cal. 2002) ................................ 14

*Waldbaum v. Fairchild Publications, Inc.,*
  627 F.2d 1287 (D.C. Cir. 1980) ............................................ 12, 14, 15

# INTRODUCTION

The question for the Court on this motion is whether Plaintiff Vernon Unsworth has the right to have a jury decide whether Defendant Elon Musk defamed him in an article published by BuzzFeed News and in some tweets.  He doesn't.

*First*, Mr. Musk based his comments to BuzzFeed on what a private investigator said about Mr. Unsworth, both in written reports and by phone, based on an investigation he claimed to have undertaken in Thailand and England.  The investigator reported that Mr. Unsworth was a fixture in Pattaya Beach, Thailand—a locale notorious for prostitution and child trafficking, that he had a taste for young Thai girls, that he whore-mongered his way through the go-go bars of Thailand, that his only friends were his "sexpat" peers, and that he married his Thai wife when she was a teenager, after starting a relationship when she was a young girl.  Mr. Musk sent an email to BuzzFeed repeating some of this information, making clear it could not publish any of his statements because they were "off the record."  He implored BuzzFeed to further investigate, and he believed they would do so rather than simply publish his concerns.  To avoid summary judgment, Mr. Unsworth must prove that it was "reasonably foreseeable" to Mr. Musk that BuzzFeed would ignore his instructions, be unable to confirm the matters in his email, but publish his "off the record" remarks anyway.  Mr. Unsworth has no such evidence.

*Second*, Mr. Musk had a constitutionally-sufficient basis to say what he said to BuzzFeed.  Although it turns out that the investigator lacked solid evidence of Mr. Unsworth's behavior, that does not matter here.  To avoid summary judgment, Mr. Unsworth must show actual malice.  He must prove, by clear and convincing evidence, either that Mr. Musk knew the investigator was wrong, or that Mr. Musk entertained serious doubts about what he'd been told.  This is a subjective standard, focused solely on Mr. Musk's knowledge and state of mind.  Given the information Mr. Musk had received, Mr. Unsworth cannot meet his burden.

Case No. 2:18-cv-08048
DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

1    ***Third***, as to the tweets, Mr. Musk posted them only after Mr. Unsworth

2    attacked Mr. Musk on CNN, without cause, by saying that Mr. Musk's Herculean

3    efforts to help with the rescue of twelve Thai boys trapped in a cave "had absolutely

4    no chance of working," that Mr. Musk's efforts were nothing more than a "PR stunt,"

5    that Mr. Musk was quickly asked to leave the rescue area, as "he should have been,"

6    and that he "***can stick his submarine where it hurts***."  Mr. Musk responded in kind to

7    Mr. Unsworth, a man who abandoned his wife and daughter in England to live in an

8    area of Thailand known for sex trafficking, who is not a diver, and who did not even

9    participate in the actual rescue dives.  Mr. Musk detailed the costly efforts he and his

10   team made, for altruistic reasons; he defended the usefulness of their contributions;

11   and he dismissed Mr. Unsworth as "sus" and a "pedo guy."

12        Mr. Unsworth cannot meet his burden to prove actual malice as to being called

13   "sus" or a "pedo guy."  The Court has held that the tweets "could be construed as

14   *either* fact or opinion." (Dkt. 42, at 13 fn. 9).  To show actual malice, Mr. Unsworth

15   must prove, by clear and convincing evidence, that, ***subjectively***, Mr. Musk knew or

16   believed that readers would view such ambiguous statements as facts.  Mr. Unsworth

17   has no such evidence.  Mr. Musk testified that he believed the statements to be

18   throwaway insults and did not intend or expect them to be viewed as fact.

19        Thus, Mr. Unsworth has no case.  The motion boils down to this:  Mr.

20   Unsworth cannot establish a defamation case just because Mr. Musk insulted him on

21   Twitter and sent a private email to a reporter.  The Constitution does not allow

22   that.  The Court should grant summary judgment.

23                        **STATEMENT OF RELEVANT FACTS**[1]

24   **A.    The Thai Cave Rescue and Plaintiff's Role.**

25        On June 23, 2018, twelve members of a Thai youth soccer team and their coach

26   went missing in the Tham Luang Cave System in Thailand's Chiang Rai province.

27   _____

     [1]   References to the Statement of Uncontroverted Facts are indicated as "SUF."

28   Where there is no citation to the SUF, the information is cited for background only.

(SUF 1; Compl. ¶ 23).  Within days, an international search and rescue mission began.  (SUF 2; Compl. ¶¶ 2, 3, 23-61).  The story of the stranded boys and the efforts to rescue them captured the world's attention.  (SUF 3; Compl. ¶¶ 2, 3, 23-61).

On June 24, Mr. Unsworth traveled to the cave system.  He is a caver who, among others, had mapped and was familiar with it.  (Compl. ¶ 27).  He contacted divers and advised the rescue team about where the missing boys might be found.  (*Id*. ¶ 41).  Beyond that, he did not assist in the rescue or participate in any of the cave diving necessary to the rescue.  (*Id.* ¶ 52).  And he certainly did not put his life at risk, as so many others did.

Despite his limited role, Mr. Unsworth assumed a very public part in the media coverage.  As early as June 29, 2018, Mr. Unsworth was interviewed by the BBC on the status of the rescue efforts.  (SUF 6; Lifrak Decl. ¶ 3).  He was quoted and profiled in a number of other publications, both during and after the rescue, including in *The Daily Mail*, the *New York Times, The Sunday Times*, and CNN.  (SUF 7-10; Lifrak Decl. Exs. 6-9).  By Mr. Unsworth's own admission, his "face was very well-known to reporters." (SUF 12; Unsworth Depo. at 292:11-18).[2]

## B.   Mr. Musk's Efforts to Assist in the Rescue

Mr. Musk did not insert himself into the rescue.  He was asked to help, and he did.  On July 3, 2018, when a Twitter user asked Mr. Musk to assist, Mr. Musk responded that he was "happy to help if there is a way to do so."  (Musk Decl. ¶¶ 4-5; Exs. A-B).  Mr. Musk then inquired with Thai officials, Thai companies, and the

---

[2]   In the year since the rescue, and well after Mr. Musk said the things about Mr. Unsworth that he claims ruined his reputation, he has remained a prominent figure in the rescue and has continued to give interviews and speeches about it.  In December 2018, *GQ Magazine* profiled him in its "Men of the Year" edition.  (SUF 11; Lifrak Ex. 7).  In June 2019, Queen Elizabeth elevated Mr. Unsworth to a "Member of the Most Excellent Order of the British Empire." (SUF 13; Unsworth Depo. 102:2-15).  He also participated in two National Geographic documentaries about the rescue.  (SUF 14, Lifrak Ex. 9).  He has contributed to three books about it, including *The Boys in the Cave* by an ABC News reporter.  (SUF 15; Lifrak Ex. 9).  He has also given speeches and presentations about the rescue to schools, banks, and foreign ministers.  (SUF 19; Lifrak Ex. 9).  He has also spoken with an agent to help him negotiate rights.  (SUF 20; Lifrak Ex. 13).

1  rescue divers at the cave site to see if he could assist.  (*Id.* ¶ 6).

2  After getting confirmation that assistance would be useful, Mr. Musk got to

3  work.  (*Id.* ¶ 7).  He immediately mobilized ***a team of 50*** of his top engineers,

4  manufacturers, and logistical specialists at SpaceX, Tesla, and The Boring Company

5  to help rescue the stranded boys.  (*Id.* ¶ 8).  Their only interest was to perform an act

6  of charity—to apply their skills, technology, and resources to save lives.

7  Mr. Musk dispatched engineers to Thailand to obtain technical data about the

8  rescue and formulate a plan.  (*Id.* ¶ 9).  Based on what they learned about the

9  constantly changing conditions in the cave, Mr. Musk and his team worked on three

10  primary rescue strategies: surveying the cave to potentially drill to the trapped boys,

11  providing back-up power sources and water pumps if the weather conditions

12  worsened, and creating three different versions of a mini-submarine that could be

13  used to ferry those trapped through the flooded cave to safety.  (*Id.*).

14  Between Friday July 6 and Sunday July 8, a team of engineers from SpaceX

15  (including Mr. Musk) worked on designing, manufacturing, and testing the mini-

16  submarines, based on input from Richard Stanton, the head of the British dive team

17  leading the rescue.  (*Id.* ¶¶10, 13).  The team worked 24-hours a day, and most did

18  not leave the SpaceX facility, other than to obtain parts or perform pool tests.

19  On July 8, Thai and British divers successfully rescued an initial group of boys.

20  (Compl. ¶¶ 54-65).  That day, Mr. Musk asked Mr. Stanton if the mission still needed

21  his assistance.  (Musk Decl. ¶ 11, Ex. C).  Mr. Stanton responded that "it is absolutely

22  worth continuing with the development of the system," and told Mr. Musk that "[i]f

23  the rain holds out [the submarine] may well be used."  (*Id.*).  Mr. Musk and his team

24  worked around the clock, finished the most promising versions of the mini-

25  submarine, and flew with them for 18 hours to Chiang Rai.  (*Id.* ¶ 13).

26  Ultimately, the monsoon rains held off, the pumps continued to work, and the

27  team was rescued without use of the mini-submarine.  (Compl. ¶¶ 65-69; Musk Decl.

28  ¶ 14).  Nonetheless, Mr. Musk donated the submarines and ten power cells to the Thai

1   Navy for use in future rescue missions.  (Musk Decl. ¶ 15).  The Thai prime minister

2   personally thanked Mr. Musk for his assistance.  (*Id.* ¶ 16, Ex. D).

3   **C.   Without Provocation, Mr. Unsworth Attacks Musk on CNN.**

4   The story should have ended there, with the successful rescue of the boys and

5   their coach.  But it did not.  On July 13, 2018, Mr. Unsworth gave an interview to

6   CNN International.  (SUF 32; Unsworth Depo. 213:22-214:5).  The reporter asked

7   him what his "thoughts on Mr. Musk's idea was."  (SUF 34; Lifrak Ex. 21).  ***Mr.***

8   ***Unsworth went on the attack***.  He smirked and said that Mr. Musk "can stick his

9   submarine where it hurts."  (*Id.*).  He stated that the submarine "had absolutely no

10  chance of working," "wouldn't have gone round any corners or round any obstacles,"

11  and "wouldn't have made the first fifty meters into the cave."  (*Id.*).  He claimed that

12  Mr. Musk was "asked to leave [the rescue site] very quickly, as he should have been."

13  He dismissed Mr. Musk's efforts as "just a PR stunt."  (*Id.*).

14  **D.   Mr. Musk's July 15, 2018 Tweets.**

15  On July 15, 2018, Mr. Musk saw Mr. Unsworth's CNN interview.  (SUF 35).

16  Given the altruistic motives that had inspired his and his colleagues' huge

17  commitment of time and resources, and the fact that he had never met nor even heard

18  of Mr. Unsworth, he was stunned.  Mr. Unsworth had gone out of his way to falsely

19  and profanely challenge his and his co-workers' efforts and motives in an interview

20  broadcast around the world.  Mr. Musk had dropped what he was doing, diverted the

21  work of dozens of his top engineers, donated all of their time and materials, overseen

22  the design, manufacture, and testing of submarines, flown them to the cave system,

23  and delivered them to the Thai government.  (Musk Decl. ¶¶ 6-15).  Mr. Musk chose

24  to correct the record and fight back.  He wrote four tweets:

25  In his first tweet, Mr. Musk responded to Mr. Unsworth's false claims that he

26  was "asked to leave [the rescue site] very quickly" and that his participation was

27  driven by questionable motives: "Never saw this British expat guy who lives in

28  Thailand (sus) at any point when we were in the caves.  Only people in sight were the

1  Thai navy/army guys, who were great. Thai navy seals escorted us in – total opposite
2  of wanting us to leave." (SUF 37; Musk Ex. F). By referring to Mr. Unsworth as
3  "sus," Mr. Musk sought to convey that Mr. Unsworth was "just a weird guy …
4  looking for press," just as Mr. Unsworth had accused Mr. Musk of looking for
5  publicity. (SUF 38; Musk Depo. 154:12-24; Musk Decl. ¶ 25). Significantly, Mr.
6  Unsworth has admitted in deposition that there was nothing about him in Mr. Musk's
7  first tweet that was false. (SUF 39; Unsworth Depo. 260:6-15).

8  In the second tweet, Mr. Musk rebutted the claim that he "had no conception of
9  what the cave passage looked like." He described the conditions and that the "[w]ater
10  level was actually very low & still (not flowing) – you could literally have swum to
11  Cave 5 with no gear, which is obv how the kids got in. If not true, then I challenge
12  this dude to show final rescue video." (SUF 40; Musk Ex. G). Here again Mr.
13  Unsworth has admitted that there was nothing about him in this tweet that was false.
14  (SUF 41; Unsworth Depo. 263:5-264:9).

15  In the third tweet, Mr. Musk responded to Mr. Unsworth's assertion that the
16  submarine "had absolutely no chance of working" by tweeting that "[w]e will make
17  [a video] of the mini-sub/pod going all the way to Cave 5 no problem." He
18  concluded by answering Mr. Unsworth's colorful language about his motives with
19  colorful language of his own, "[s]orry pedo guy, you really did ask for it." (SUF 42;
20  Musk Ex. H). Mr. Musk testified that "pedo guy" was a common insult used in South
21  Africa during his youth. It is synonymous with "creepy old man" and aimed at
22  mocking a person's appearance and demeanor, not an accusation of pedophilia. (SUF
23  43-44; Musk Depo. 51:21-52:17; Musk Decl. ¶ 28).

24  Finally, in response to a tweet taking issue with his language and use of the
25  phrase "pedo guy," Mr. Musk tweeted "bet ya a signed dollar its true." (SUF 47;
26  Musk Ex. I). He explained this as a "flippant comment," meant to convey that he
27  "was not certain" about the prior tweets (SUF 48; Musk Depo. 141:2-22, 140:16-25).
28  Within hours of their publication, Mr. Musk deleted all four tweets. (SUF 49).

### E.   Mr. Musk Apologizes to Mr. Unsworth.

On July 18, Mr. Musk apologized for using heated language in his debate with Mr. Unsworth: "my words were spoken in anger after Mr. Unsworth said several untruths & suggested I engage in a sexual act with the mini-sub, which had been built as an act of kindness & according to specifications from the dive team leader." (SUF 50; Musk Ex. J). He concluded that Mr. Unsworth's "actions against me do not justify my actions against him, and for that I apologize to Mr. Unsworth and to the companies I represent as leader. The fault is mine and mine alone." (*Id.*).

### F.   Mr. Musk Retains an Investigator who Reports On Mr. Unsworth.

On July 17, James Howard, a private investigator and head of the investigation firm Jupiter Military & Tactical Systems, sent an unsolicited email to Mr. Musk and offered to conduct an investigation of Mr. Unsworth. (Musk Ex. N). Mr. Howard explained that "Mr. Unsworth has skeletons in his cupboard." (*Id.*). The following month, Mr. Musk, through the president of his home office, Jared Birchall, retained Mr. Howard to investigate. (SUF 51; Birchall Decl. ¶ 4; Ex. A).

Mr. Howard sent Mr. Birchall a presentation on his firm's capabilities and said he had performed sensitive investigations for high profile clients, including Paul Allen and George Soros. (SUF 52; Birchall Ex. A). Mr. Birchall made clear to Mr. Howard that Mr. Musk was seeking the truth, and no more: "[W]e aren't looking to frame anyone. If there is definitively no smoking gun, then let's get the information necessary to make that determination and ***it is what it is.***" (SUF 53; Birchall Ex. D). Mr. Birchall ultimately paid Mr. Howard more than $50,000 to perform the investigation. (SUF 54; Birchall Decl. ¶ 8).

Days after he was retained, Mr. Howard reported troubling facts about Mr. Unsworth. On August 17, Mr. Howard wrote to Mr. Birchall that "there is indeed an unpleasant undertone to some of his lifestyle choices" and "[t]here is no question that [he] 'associates' locally with Europeans who enjoy 'Thai comforts' that are not acceptable in a developed society." (SUF 55; Birchall Ex. C). Mr. Howard also

1   stated to Mr. Birchall in a phone call that there was evidence that Mr. Unsworth met

2   and began a relationship with his alleged Thai wife when she was eleven or twelve

3   years old.  (SUF 56; Birchall Decl. ¶ 12).  On August 27, Mr. Howard emailed Mr.

4   Birchall that Mr. Unsworth, had frequently traveled to Thailand since the 1980s and

5   that he was a "Manther"—an older man who prefers young women.  (SUF 59;

6   Birchall Ex. D).[3]  Mr. Birchall relayed this to Mr. Musk.  (SUF 57, 60; Birchall Decl.

7   ¶ 15; Musk Decl. ¶ 35).

8         **G.    Mr. Musk's August 28, 2018 Tweet and Lin Wood's Tweet.**

9         On August 28, 2018, just days after Mr. Musk heard the investigator's initial

10  findings, Drew Olanoff, a reporter for TechCrunch, tweeted at Mr. Musk "your

11  dedication to facts and truth would have been wonderful if applied to that time when

12  you called someone a pedo."  (SUF 62; Musk Ex. K).  In response, and with

13  knowledge of Mr. Howard's initial findings, Mr. Musk replied "[y]ou don't think it's

14  strange he hasn't sued me?  He was offered free legal services."  (*Id.*).

15        Mr. Unsworth's attorney, Lin Wood, then went on the attack himself, tweeting

16  a response to Mr. Musk stating "@elonmusk should check his mail before tweeting"

17  and attaching a copy of a demand letter.  (SUF 70; Lifrak Ex. 22).

18        **H.    The Investigator Reports More Detailed Findings to Birchall.**

19        In late August 2018, Mr. Howard provided Mr. Birchall with regular telephonic

20  reports of his team's findings.  (SUF 64; Birchall Decl. ¶ 17).  Mr. Howard told Mr.

21  Birchall that he learned that Mr. Unsworth spent significant time in Pattaya Beach – a

22  known hotspot for prostitution and sex tourism, Mr. Unsworth associated with other

23  European expatriates with nefarious sexual proclivities, and that Mr. Unsworth was

24  unpopular at the Thai Cave Rescue because others regarded him as "creepy." (*Id.*).

25  _____

26  [3]  In the same email, Mr. Howard reported that Mr. Unsworth's alleged Thai wife
     may have been 18 when they first met, but that this was "NOT verified."  (SUF 58;

27  Birchall Ex. D).  Subsequent to the email, Mr. Howard repeated the prior information

28  that she was eleven or twelve, not eighteen.  (SUF 61; Birchall Decl. ¶ 16).

Mr. Howard represented on these calls that he was confident in the information he was providing. (*Id.*). Mr. Birchall reported this information to Mr. Musk shortly after receiving it. (*Id.*).

On August 30, Mr. Howard sent Mr. Birchall a preliminary report of his investigation of Mr. Unsworth. The report was consistent with the prior information Mr. Howard provided to Mr. Birchall on calls and in emails, and stated the following:

- "Mr. Unsworth has been a frequent visitor to Thailand since the 1980s. Prior to meeting his current wife we believe that Mr. Unsworth was living in the Pattaya Beach…Pattaya Beach is synonymous with prostitution and scam artists."

- "The sexpat whore-mongers his way through the go-go bars of Thailand. His only other friends are his sexpat peers. Peek-density occurs in and around Pattaya – Thailand's sin city."

- "[S]ome of the UK and Dutch divers who also volunteered stated that Mr. Unsworth was not a popular or particularly liked man in the Cave Rescue Team. When pushed as to why, they simply replied 'Creepy.'"

(SUF 66-67; Birchall Ex. E).

### I.    Mr. Musk's "Off-the-Record" Emails to BuzzFeed

On August 29, 2018, Ryan Mac, a reporter with BuzzFeed News, emailed Mr. Musk about the demand letter Mr. Unsworth's counsel had sent to Mr. Musk. (SUF 71). On August 30, Mr. Mac sent a follow up. (SUF 72; Musk Ex. L).

Mr. Musk sent two emails in response. (SUF 73). In the first, he relayed the investigator's findings as they were represented to him and implored Mr. Mac to "call people you know in Thailand, find out what's actually going on." (SUF 77; Musk Ex. L). He wrote that Mr. Unsworth had been "traveling to or living in Thailand for 30 to 40 years, mostly Pattaya Beach, until moving to Chiang Rai for a child bride that was about 12 years old at the time," which is what Mr. Birchall had told him the investigator had reported. (SUF 80-81; Musk Decl. ¶ 45). Based on this, Mr. Musk referred to Mr. Unsworth as a "child rapist[]." (SUF 79; Musk Depo. 176:4-24). He

wrote that "there's only one reason people go to Pattaya Beach. It isn't where you go for caves, but it is where you'd go for something else," which was also consistent with the investigator's reports to Mr. Birchall. (SUF 82-83; Musk Decl. ¶ 46; Musk Depo. 62:8-64:15). It stated that "Chiang Rai is renowned for child sex-trafficking," which was supported by a Google search Mr. Musk provided in the email. (SUF 84-85; Musk Ex. L). He wrote, as had been reported to him, that "most of the actual dive team refused to hang out with [Mr. Unsworth.]" (SUF 86-87; Musk Decl. ¶ 48).

Mr. Musk told BuzzFeed that it could not publish his email. And he did not intend for it to become public without independent verification. (SUF 74-75; Musk Depo. at 173:23-175:11; Musk Decl. ¶ 43). To those ends, Mr. Musk conspicuously wrote "Off the record" at the start of the email. (SUF 74; Musk Decl. L).

In his second email, which he designated "On background," Mr. Musk responded to Mr. Unsworth's claims that he was asked to leave the rescue site, that the submarine would not fit, and that his involvement was "just a PR stunt." (SUF 89-90; Musk Ex. M).

Five days later, on September 4, Mr. Mac responded and said he intended to publish the emails because "he didn't agree for the conversation to be off the record." (SUF 94-95; Musk Ex. L). Mr. Musk responded that "We haven't had a conversation at all. I sent you an off the record email, which very clearly and unambiguously said, 'off the record.' If you want to publish off the record comments and destroy your journalistic credibility, that's up to you. As for answering more questions, I would be happy to do so, but not with someone who just told me that they will not honor accepted rules of journalism." (SUF 96; Musk Decl. Ex. L).

That evening, BuzzFeed published a story that reprinted Mr. Musk's off-the-record and on-background emails. (SUF 103; Ex. K to Compl.).

### J.   Mr. Unsworth Sues.

Mr. Unsworth filed his Complaint on September 17, 2018, stating a sole claim for defamation. (Doc. No. 1). The Complaint lists the following as Mr. Musk's

"false and defamatory accusations":  "Exhibits B [first July 15 tweet], C [second July 15 tweet], D [third July 15 tweet], E [fourth July 15 tweet], F [July 18 apology tweet], G [July 18 apology tweet], I [July 28 tweet], and K [BuzzFeed September 4 article]." (SUF 106; Compl. ¶ 113).  Mr. Unsworth has also filed a claim against Mr. Musk in England.  For the Court's convenience, Appendix A contains a timeline of key events after Mr. Unsworth's CNN interview.

## **LEGAL DISCUSSION**

## **I.   MR. UNSWORTH IS A LIMITED PURPOSE PUBLIC FIGURE.**

As an initial matter, the Court must determine for purposes of the liability standard whether or not Mr. Unsworth is a public figure.  Under the law, he is.  He made himself an active participant in one of the biggest news stories of 2018.  He regularly gave interviews to the media.  He injected himself into a public controversy by debating—on worldwide TV—the rescue, Mr. Musk's motives for participating, and the need and value of Mr. Musk's efforts.  He is thus a "limited purpose" public figure and must prove that Mr. Musk's statements were made with actual malice.

### **A.   The Constitutional Framework**

To protect public debate and guard against the chilling effect of litigation, the First Amendment requires that public figures prove a statement is made with "actual malice."  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280(1964); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974).  Claims brought by "limited purpose" or "vortex" public figures—persons like Mr. Unsworth who inject themselves into a public controversy and "become[] public figure[s] for a limited range of issues" related to that controversy—are also subject to the "actual malice" standard.  *Gertz*, 418 U.S. at 351.  They are less deserving of protection because, by injecting themselves into a public controversy, they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Id.* at 345.  They also have "considerably greater access than private individuals to the media" with which they engage in self-help to protect their reputations and are thus

1   "less vulnerable" to defamation injury.  *Reader's Digest Assn. v. Superior Court*, 37

2   Cal. 3d 244, 253 (1984) (citing *Gertz*, 418 U.S. at 344-45).

3          A plaintiff is a limited purpose public figure and subject to the actual malice

4   standard where, as here: (1) there is a public controversy; (2) the plaintiff voluntarily

5   injects himself into and/or seeks to influence the resolution of the public controversy;

6   and (3) the alleged defamatory statement is "germane" to the plaintiff's participation

7   in the controversy.  *See Copp v. Paxton*, 45 Cal. App. 4th 829, 846 (1996).

8   Determining whether a plaintiff is a limited purpose public figure requires an analysis

9   of the totality of the circumstances of the controversy and is question of law that must

10  be resolved by the Court.  *See Reader's Digest,* 37 Cal. 3d at 255; *see also Khawar v.*

11  *Globe Int'l, Inc.*, 19 Cal. 4th 254, 264 (1998).

## B.     Numerous Public Controversies Arose in 2018 Over the Rescue.

13         A public controversy is a dispute that is "debated publicly" and has

14  "foreseeable and substantial ramifications for nonparticipants" to the debate.  *Annette*

15  *F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1164 (2004) (citing *Waldbaum v. Fairchild*

16  *Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)); *see also Makaeff v. Trump*

17  *Univ., LLC*, 715 F.3d 254, 267 (9th Cir. 2013) ("a public controversy 'must be a real

18  dispute, the outcome of which affects the general public or some segment of it.'")

19  (citing *Waldbaum*, 627 F.2d at 1297).  To determine whether one exists, courts

20  consider "if the press was covering the debate, reporting what people were saying and

21  uncovering facts and theories to help the public formulate some judgment," and

22  should not "question the legitimacy of the public's controversy" or substitute its

23  judgment of newsworthiness, but instead "look to what already were disputes."

24  *Waldbaum*, 627 F.2d at 1297.

25         In Summer 2018, aspects of the cave rescue were under fierce public debate

26  and worldwide media coverage.  Individuals, including Mr. Unsworth, debated where

27  the boys were likely located, how to rescue them, and how to rescue boys who were

28  weak or could not swim.  (SUF 6-10; Lifrak Decl. Exs. 3-6, 20).  There was also

debate about the viability of Mr. Musk's submarine, including a public Twitter discussion between him and the Thai Provincial Governor.  (SUF 28-30; Lifrak Exs. 14-20; Musk Ex. E).  The BBC, *New York Times*, and other international outlets also reported this debate and interviewed experts about the submarine's viability.  (SUF 21-27; Lifrak Exs. 14-19).  The *New York Times* alone published three articles about the debate before Mr. Unsworth's CNN interview.  (SUF 22-23, 27; Lifrak Exs. 14, 15, 19).  Mr. Unsworth was aware of the controversy and watched a video of the submarine before his CNN interview.  (SUF 32; Unsworth Depo. 214:17-218:10).[4]

### C.   Mr. Unsworth Voluntarily Injected Himself Into the Controversies.

A person becomes a limited purpose public figure when he "undertake[s] some voluntary act through which he seeks to influence the resolution of the public issues involved." *Reader's Digest,* 37 Cal. 3d at 254.  Courts must "look for evidence of affirmative actions" by which the plaintiff may have "thrust themselves into the forefront of particular public controversies." *Id.* at 255.

Before he spoke with CNN (and before Mr. Musk posted the July tweets), Mr. Unsworth "voluntarily thrust himself into the limelight" by giving interviews and presenting himself as a key rescue participant.  (SUF 7-10; Lifrak Exs. 3-6).  *Denney v. Lawrence,* 22 Cal. App. 4th 927, 935–36 (1994) (holding plaintiff limited purpose public figure because he volunteered to give media interviews promoting his version of events); *Rudnick v. McMillan*, 25 Cal. App. 4th 1183, 1190 (1994) (plaintiff became a limited purpose public figure by inviting the press to write about him).

After obtaining fame and credibility from **his** claimed role in the rescue, Mr.

---

[4]   As a public figure who heads several businesses (including Tesla, a public company), a debate over Mr. Musk's motives and whether his participation was a "PR stunt" to boost his companies had ramifications beyond himself.  *See Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577-78 (2005) (debate over publicly traded company had foreseeable and substantial ramifications for nonparticipant shareholders); *Annette F.*, 119 Cal. App. 4th at 1164; *Makaeff*, 715 F.3d at 267.  Whether the submarine could assist in future rescues also went beyond Mr. Musk.  *See Copp,* 45 Cal. App. 4th at 846 (debate over future earthquake disaster mitigation had foreseeable and substantial ramifications for nonparticipants).

1    Unsworth thrust himself into the public debate over **Mr. Musk's** role by giving a

2    televised interview in which he opined about the viability of the submarine and stated

3    that Mr. Musk's efforts were "just a PR stunt." (SUF 34; Lifrak Ex. 21). Like the

4    plaintiff in *Denney*, Mr. Unsworth took "advantage of his own position" and

5    "expertise" as a prominent member of the rescue team to "influence public opinion"

6    about Mr. Musk in a voluntary interview with the media. 22 Cal. App. 4th at 935-36.

7    Through his actions, he became a limited purpose public figure in the debate over the

8    rescue generally, as well as over Mr. Musk's role specifically. *See id.*; *see also Nadel*

9    *v. Regents of Univ. of California,* 28 Cal. App. 4th 1251, 1269 (1994) (plaintiff who

10   gave interviews to the press about a public controversy was a limited public figure).

11          Moreover, Mr. Unsworth has cashed in on his fame to participate in films,

12   speaking engagements, BBC Podcasts, and books. *GQ Magazine* even profiled him

13   in its "Men of the Year 2018" edition, and he accepted the Most Excellent Order of

14   the British Empire from the Queen of England. (SUF 13, 20; Lifrak Exs. 9, 13); s*ee*

15   *Thomas v. Los Angeles Times Comm., LLC*, 189 F. Supp. 2d 1005, 1012 (C.D. Cal.

16   2002) (plaintiff's cooperation in book about his life "invited public attention—and

17   public scrutiny—to his life" and rendered him a limited purpose public figure).[5]

18          **D.      Mr. Musk's Statements Were Germane to the Controversy.**

19          A statement made in discussing a public controversy is germane unless it is

20   "wholly unrelated" to that controversy. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576,

21   589 (D.C. Cir. 2016) (citing *Waldbaum*, 627 F.2d at 1298). Mr. Musk's statements

22   about Mr. Unsworth were not.

23          First, they were the mirror image of Mr. Unsworth's statements about Mr.

24   Musk's motives, on the very same public issues. Mr. Unsworth claimed that Mr.

---

25   [5]   Mr. Unsworth's relationship with the press and actions after his CNN interview
26   reinforce that he is a limited purpose public figure. During and after the rescue he
     spoke with and had relationships with reporters from major media outlets, including
27   ABC and *The Sunday Times*. (SUF 18). His access to and close relationship with the
     press renders him "less vulnerable to defamation injury" and weighs in favor of a
28   finding that he is a limited purpose public figure. *See Gertz,* 418 U.S. at 344-45.

Musk's submarine would not work (thus, putting the children in danger if used) and that Mr. Musk's motives were self-interested (PR, and not a genuine effort to help children). (SUF 34; Lifrak Ex. 21) If Mr. Unsworth were a pedophile, it would bear on *his* motives for participating in the rescue, whether *his* presence was necessary after the boys had been located, given his lack of diving qualifications, and why *he* was denigrating someone else's motives and efforts. *Jankovic*, 822 F.3d at 589 (holding statement germane when it related "to understanding [plaintiff's] role and why he wanted to be involved in the [controversy]").[6]

Second, having entered the public fray on these issues, Mr. Unsworth cannot escape scrutiny of *his* credibility, character, and motivations. By definition, his credibility, character, and motivations are germane to the public controversies into which he inserted himself. And scrutinizing Mr. Unsworth's credibility, character, and motivations is exactly what Mr. Musk was entitled to do. *See Waldbaum*, 627 F.2d at 1298 (affirming summary judgment and holding that plaintiff's "talents, education, experience, and motives" are germane to controversy because it "could have been relevant to the public's decision whether to listen to him"); *Atlanta Journal-Constitution v. Jewell,* 555 S.E.2d 175, 183 (Ga. App. 2001) (in lawsuit brought by accused 1996 Olympics bomber, alleged defamatory statements that he had "an aberrant personality" and "a bizarre employment history," were germane to controversies over the bombing).

Third, Mr. Musk's statements related directly to the public controversy regarding the parties' rescue efforts. One of Mr. Musk's emails to BuzzFeed refuted Mr. Unsworth's accusation that the Thai government had asked Mr. Musk to leave the caves, that it "should have" done so, and that the submarine would not have been

---

[6] Mr. Unsworth understood that Mr. Musk was questioning his motives, saying in a media interview shortly after the first tweets that "you know, rescuing 12 young boys, by definition, that puts everyone else in the same context." (Lifrak Decl. ¶ 30). And whether statements were true or false is not relevant to whether they were germane to Mr. Unsworth's role in the controversy. *See Jankovic*, 822 F.3d at 589.

able to assist in the rescue.  (SUF 90-91; Musk Ex. M).  The other related to Mr.
Unsworth's motives for participating in the rescue and seeking continued media
attention and proximity to the rescued children.  (SUF 77-87; Musk Ex. L).  The same
is true for the tweets describing Mr. Unsworth as "sus" and "pedo guy."  (SUF 37-42;
Musk Decl. Ex. F-H).  For these reasons, the statements are far from being "wholly
unrelated" to the public controversies. *Jankovic*, 822 F.3d at 589.

Read in their totality, as the limited purpose public figure analysis requires, Mr.
Musk's statements were relevant and germane to the ongoing debates about the cave
rescue, the legitimacy of efforts made to assist in the rescue, and the motivations for
such assistance.  And they were aimed at a public figure engaged in the same debate.
These statements thus must be analyzed under the actual malice standard.  *See
Reader's Digest,* 37 Cal. 3d at 256.[7]

## II.   THE BUZZFEED ARTICLE IS NOT DEFAMATION BY MR. MUSK.

### A.   Plaintiff Must Prove Actual Malice.

Under *New York Times* and its progeny, public figure plaintiffs must establish
by clear and convincing evidence that the defamatory statement was made with
"actual malice." *New York Times*, 376 U.S. at 280; *Christian Research Inst. v. Alnor,*
148 Cal. App. 4th 71, 84 (2007).  "The burden of proof by clear and convincing
evidence 'requires a finding of high probability. The evidence must be so clear as to
leave no substantial doubt.  It must be sufficiently strong to command the
unhesitating assent of every reasonable mind.'" *Copp*, 45 Cal. App. 4th at 846
(citation omitted).  The burden applies to summary judgment.  The Court must find
that "no triable issues" exist and grant this motion "unless it appears that actual
malice may be proved at trial by clear and convincing evidence." *Reader's Digest*,
37 Cal. 3d at 252; *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270,

---

[7]   Mr. Unsworth's lawyer has publicly conceded as much: "The current laws could
make Mr. Unsworth's case against Musk tougher, Wood said, because he gave media
interviews criticizing Musk's proposal for using a miniature submarine for the cave
rescue, and thus might be considered a public figure."  (Lifrak Ex. 8).

1278 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001) (same).  Summary

judgment is a "favored remedy" in defamation cases.  *See Reader's Digest*, 37 Cal.

3d. 244 at 252.

**B.** **Mr. Unsworth Cannot Prove Malice Because Mr. Musk Did Not Entertain Serious Doubts as to The Accuracy of His Statements.**

Mr. Musk paid a significant sum to hire an investigator and was told by a

trusted aide that the investigator learned that Mr. Unsworth engaged in illegal

activities.  He passed that information to BuzzFeed in an off-the-record email so that

it could conduct its own investigation.  (SUF 76-77; Musk Decl. ¶ 43; Musk Depo.

173:23-175:11).  That is not malice.

**1.** **The Applicable Standard**

To establish that the off-the-record BuzzFeed emails were written with actual

malice, Mr. Unsworth must prove by clear and convincing evidence that Mr. Musk

made the statements "with knowledge that [they were] false or with reckless

disregard of whether [they were] false or not."  *New York Times*, 376 U.S. at 279-80.

This test is ***subjective***.  *See e.g.*, *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  It is

irrelevant whether a reasonable person would believe that the statements were false or

entertain serious doubts as to their truth.  Establishing actual malice requires

"sufficient evidence to permit the conclusion that the ***defendant in fact*** entertained

serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S.

727, 731-32 (1968) (emphasis added).  Only "false statements made with the high

degree of awareness of their probable falsity" can give rise to liability under the

actual malice test.  *Garrison*, 379 U.S. at 74.  There is no such evidence here.

**2.** **Musk's Email Was Based On Investigator's Findings.**

There can be no finding of actual malice because Mr. Musk reported to

BuzzFeed only information that he understood had been uncovered by a private

investigator.  *See e.g.*, *Reader's Digest*, 37 Cal. 3d. at 259 (finding no actual malice

where defendant published information obtained from a third party source); *Christian*

1   *Research*, 148 Cal. App. 4th at 91 (no actual malice where information was

2   purportedly obtained from an effectively anonymous source in the postal inspector's

3   office).  Mr. Musk's close aide, Mr. Birchall, relayed the investigator's findings to

4   him.  (SUF 60, 66; Birchall Decl. ¶¶ 14-17, 19; Musk Decl. ¶ 35).  Each of the

5   allegedly defamatory statements Mr. Musk made to BuzzFeed was supported by the

6   investigator's findings, Mr. Birchall's oral reports, or statements from one of Mr.

7   Musk's employees present at the rescue.  (*See* SUF 81-87, 90-91; *Compare* Musk Ex.

8   L *with* Birchall Decl. ¶¶ 15-19; Musk Decl. ¶¶ 44-51).

9               **3.    Mr. Unsworth Cannot Prove Malice.**

10          There is no evidence that Mr. Musk knew the information was false or

11  "entertained serious doubts as to the truth of his publication" before he wrote to

12  BuzzFeed.  *St. Amant*, 390 U.S. at 731.  Messrs. Musk and Birchall both believed the

13  investigator to be credible; he represented to Mr. Birchall that he had performed

14  investigations for high profile and respected individuals.  (SUF 52; Birchall Ex. A);

15  *see D.A.R.E. Am.*, 101 F. Supp. 2d at 1281 (no actual malice where publisher believed

16  source to be credible in light of his prior affiliation with a respected news

17  organization).  Mr. Musk, through Mr. Birchall, paid the investigator over $50,000

18  for his work, which further evidences their belief that the investigation was credible.

19  (SUF 54; Birchall Decl. ¶ 8).  And at the outset, Mr. Birchall told the investigator that

20  they were not "looking to frame anyone," and instructed him to provide exculpatory

21  information if "there is definitively no smoking gun."  (SUF 53; Birchall Ex. D).

22          California courts have found no actual malice where defendants relied on far

23  less credible sources, such as imprisoned felons who made "superficially outlandish

24  claims" in their interactions with defendants, *McCoy v. Hearst Corp.*, 42 Cal. 3d 835,

25  867-68 (1986), or accusations that a plaintiff was under investigation for mail fraud

26  based on speaking with an employee of the postal inspector's office named

27  "Debra"—no title or last name was given.  *Christian Research*, 148 Cal. App. 4th at

28  91.  Even though that information was false, the court found an absence of malice,

1   holding that the "mere fact that [Defendant] could have done more to investigate the

2   reliability of his informants is not indicative of malice," and that there was "nothing

3   in the record to indicate that [Defendant] was suspicious of her veracity or doubted

4   her knowledge of the investigation." *Id.*  So too here.

5       Unlike the defendant in *Christian Research*, Mr. Musk sought further inquiry

6   and corroboration of the findings.  To rise to actual malice, the "failure to investigate

7   must fairly be characterized as 'the purposeful avoidance of the truth' or the 'product

8   of a deliberate decision not to acquire knowledge of facts that might confirm the

9   probable falsity of [the subject] charges.'" *Rosenaur v. Scherer*, 88 Cal. App. 4th

10  260, 277 (2001) (citation omitted).  Here, Mr. Musk did not purposely avoid the truth,

11  he asked a media organization to ***confirm it***.  (SUF 77; Musk Ex. L ("I suggest that

12  you call people you know in Thailand, find out what's actually going on.")).

13      It would make no difference even if Mr. Musk was not certain of the accuracy

14  of the investigator's claims or did not investigate the investigator .  *See Jackson v.*

15  *Paramount Pictures Corp.*, 68 Cal. App. 4th 10, 35–36 (1998) ("The *New York Times*

16  *Co. v. Sullivan* standard does not require that the reporter hold a devout belief in the

17  truth of the story being reported, only that he or she refrain from either reporting a

18  story he or she knows to be false or acting in reckless disregard of the truth.").

19      Mr. Musk's testimony shows that he did not know that the information he

20  relayed to BuzzFeed off the record was false.  Nor did he entertain serious doubts as

21  to its truth. *See e.g.*, *Christian Research*, 148 Cal. App. 4th at 85; *Overstock.com,*

22  *Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 710 (2007).  Because Mr.

23  Unsworth has no contrary evidence, a fortiori, he cannot prove actual malice.  Thus,

24  his claims that the off-the-record emails to BuzzFeed are defamatory cannot proceed

25  beyond the summary judgment stage. *See Reader's Digest*, 37 Cal. 3d. at 252.

26

27

28

**C.   Mr. Musk Is Not Liable for Publication of Off-the-Record Emails.**

### 1.   The Applicable Standard

Mr. Musk is liable for BuzzFeed's republication of his emails[8] only if BuzzFeed's actions were reasonably foreseeable. *Shively v. Bozanich*, 31 Cal. 4th 1230, 1243 (2003) ("repetition by a new party of another person's earlier defamatory remark also gives rise to a separate cause of action for defamation against the original defamer, when the repetition was reasonably foreseeable"); *DiGiorgio Corp. v. Valley Labor Citizen,* 260 Cal. App. 2d 268, 273 (1968) (author of article not liable for republication in another newspaper because not reasonably foreseeable); *Curley v. Vick*, 211 Cal. App. 2d 670, 672–73 (1963) (author of letter posted on bulletin board not liable for posting unless republication *on the bulletin board* was reasonably foreseeable); *see also Chandler v. Berlin*, 2019 WL 1471336, at * 4 (D.D.C., Apr. 3, 2019) (republication of document not reasonably foreseeable because document was sent "privately" and marked as "confidential.").

### 2.   Republication Was Not Reasonably Foreseeable.

It was not reasonably foreseeable that BuzzFeed would unilaterally publish communications that were labeled off-the-record instead of independently verifying the information before publishing it. BuzzFeed's own published policies require such verification. (SUF 102; Lifrak Decl. Ex. 25). ("Information — excluding common knowledge — should come from a verified source.").[9] That is what Mr. Musk reasonably expected BuzzFeed to do. (SUF 76; Musk Decl. ¶ 43; Musk Depo. 173:23-175:11); *Chandler*, 2019 WL 1471336, at * 4 ("confidential" designation on document sufficient to prove "reasonable assurance [that it] would go no further" (citing Restatement of Second of Torts § 576 (1977)). And that is what BuzzFeed

---

8   Plaintiff's defamation claim is based on the publication of the emails in a BuzzFeed article, not on the emails to BuzzFeed standing alone. *See* Compl. ¶ 113.

9   BuzzFeed's own newsroom policies in place at the time required no "agreement" to go off the record. (SUF 100; Lifrak Ex. 24). BuzzFeed added this requirement two months ***after*** Mr. Musk sent the off-the-record emails. (SUF101; Lifrak Ex. 25).

1   should have done.[10]

2       Moreover, Mr. Unsworth testified that he too had previously designated his

3   communications with reporters as "off the record" or imposed similar limits, and

4   expected that the information conveyed would not be made public even without first

5   reaching a formal agreement with the reporter.  (SUF 99; Unsworth Depo. 78:13-

6   79:19; Lifrak Ex. 23).  Mr. Musk explained that BuzzFeed's post-email insistence

7   that he had to obtain a positive confirmation from a reporter, before a communication

8   will be deemed off the record, was inconsistent with his countless off-the-record

9   interactions with reporters in the past.  (SUF 97; Musk Depo. 171:2-172:16).

10      **D.**    **Mr. Musk's August 28 Tweet Lacked Actual Malice.**

11      Similarly, Mr. Unsworth cannot establish that Mr. Musk's August 28, 2018

12  tweet was written with actual malice.  *See e.g.*, *Reader's Digest*, 37 Cal. 3d. at 252

13  (finding no actual malice where defendant published information obtained from a

14  third party source).  Mr. Musk tweeted, in response to a tweet regarding Mr.

15  Unsworth, that "You don't think it's strange he hasn't sued me? He was offered free

16  legal services."  (SUF 62; Musk Ex. K).  He testified that he "meant those words

17  literally.  That's strange.  That does not mean that he was a pedophile; just means

18  perhaps he has something to hide."  (Musk Depo. 196:20-25).

19      Mr. Musk had good reason to believe that.  His tweet and suspicions were

20  supported by the information he received from the investigation.  By August 28, the

21  investigator had reported that Mr. Unsworth had married a teenager, frequently

22  visited Thailand since the 1980s, and was known to prefer the company of young

23  women.  (SUF 63; Birchall Ex. D; Birchall Decl. ¶ 15; Musk Decl. ¶ 39).  Because

24  Mr. Musk based this tweet on information concerning which he did not have serious

25  _____

26  [10]   BuzzFeed's failure to verify the assertions about Mr. Unsworth break any causal
    chain between Mr. Musk and the BuzzFeed article.  *See Live Oak Publ'g Co. v.
27  Cohagan*, 234 Cal. App. 3d 1277, 1285 (1991) ("The rationale for making the
    originator of a defamatory statement liable for its foreseeable republication is the
28  **strong causal link** between the actions of the originator and the damage caused by
    the republication.") (emphasis added).

1    doubts, Mr. Unsworth cannot establish it was written with actual malice.  (SUF 63;

2    Musk Decl. ¶ 39); *see Christian Research*, 148 Cal. App. 4th at 91; *infra* Section II.

3    **III.   MR. MUSK'S INITIAL TWEETS ARE NOT DEFAMATION.**

4         **A.    Mr. Unsworth Must Prove That Mr. Musk Knew or Believed**

5              **Readers Would View His Statements as Objective Facts.**

6         In the Court's Order on Mr. Musk's motion to dismiss, it held that a jury would

7    decide whether Mr. Musk's statements about Mr. Unsworth were statements of

8    opinions or implied assertions of objective fact.  (Dkt. 42, at 13).  But as discussed

9    above, Mr. Unsworth must ***also*** prove by clear and convincing evidence that Mr.

10   Musk's alleged defamatory statements were made with actual malice.  As to the July

11   15, 2018 tweets, he cannot do so.

12        In a situation where, as the Court found, the statements "could be construed as

13   *either* fact or opinion," (Dkt. 42, at 13 fn. 9), *Good Gov't Grp. of Seal Beach, Inc. v.*

14   *Superior Court*, 22 Cal. 3d 672, 684 (1978), applies.  There, the California Supreme

15   Court found that in situations where a statement is "ambiguous in the sense that it can

16   reasonably be viewed as either fact or opinion" but that the speaker "neither intends

17   the statement to bear a factual meaning nor believes that it will be understood by the

18   reader in that fashion," it would chill speech if the speaker could be found liable for

19   defamation.  *Id.*

20        The Court noted that such a standard would "hobbl[e] free speech" through the

21   "fear of liability for the use of inexact semantics."  *Id.*  To protect free speech, "a

22   statement is entitled to constitutional protection if the words used are ambiguous but

23   the defendant honestly and without recklessness believes that they constitute an

24   opinion or idea."  *Id.* Thus, where the statements "could be construed as *either* fact or

25   opinion,"  Dkt. 42, at 13 fn. 9, the plaintiff must prove "not only that the words were

26   reasonably understood in their defamatory, factual sense, but also that the defendant

27   either deliberately cast his statements in an equivocal fashion in the hope of

28   insinuating a defamatory import to the reader, or that he knew or acted in reckless

1  disregard of whether his words would be interpreted by the average reader as

2  defamatory statements of fact."  22 Cal. 3d 672 at 684.  This is a ***subjective*** standard.

3  *Id.*; *see also De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 870 ( 2018)

4  ("because actual malice is a 'deliberately subjective' test, liability cannot be imposed

5  for an implication that merely 'should have been foreseen.'").

6      Thus, to prevail on his claim that the July 18 tweets are defamatory, Mr.

7  Unsworth must prove by clear and convincing evidence that Mr. Musk knew or

8  believed that his words would be interpreted as statements of fact.  *See Good Gov't.*,

9  22 Cal. 3d at 684; *see also Gordon & Holmes v. Love*, 2016 WL 374950, at * 5 (Feb.

10  1, 2016) (actual malice cannot be satisfied "based on the dictionary definition" of a

11  word and applying *Good Gov't.*).

### B.    Mr. Unsworth Cannot Meet This High Burden.

13      Here, there is no evidence that Mr. Musk intended or believed that his July 15

14  tweets, that Mr. Unsworth was "sus" or "pedo guy," would be interpreted as fact.  To

15  the contrary, the evidence is that Mr. Musk believed and intended his statements to be

16  read as what they were: bare insults.

17      Mr. Musk's deposition makes that clear.  He intended his statements about Mr.

18  Unsworth to be schoolyard taunts and not representations of fact.  By referring to Mr.

19  Unsworth as "sus," he did not intend to convey any specific facts capable of being

20  proven true or false, but that Mr. Unsworth was "just a weird guy" or some "creepy-

21  ass expat looking for press."  (SUF 38; Musk Decl. ¶ 25; Musk Depo. at 154:12-24);

22  *see Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 (D.D.C. 2019) (comment that a

23  person's action was "suspicious" was a nonactionable opinion).  There is no evidence

24  that Mr. Musk deliberately intended to couch this insult as a statement of fact or

25  entertained serious doubt that it would be so interpreted.

26      Nor is there any evidence that Mr. Musk intended to suggest or convey any

27  facts by tweeting "[s]orry pedo guy, you really did ask for it."  Read in context, Mr.

28  Musk's tweet was a response to Mr. Unsworth's charge that the mini-submarine

would not work punctuated by a dismissive and (attempted) humorous insult. (SUF 42; Musk Ex. H). As Mr. Musk testified, "pedo guy" was a common insult hurled around in his childhood. (SUF 42-44; Musk Depo. 51:21-52:17; *see also* Musk Decl. ¶¶ 28-29). The insult, as Mr. Musk understood and used it, is not meant to accuse a person of pedophilia but rather insults a person's appearance as "[a]ny old creepy guy would be referred to [as] pedo guy." (Musk Depo. 51:21-52:17.) As Mr. Musk testified, he did not frame his statement to imply that Mr. Unsworth was a pedophile, but that Mr. Unsworth "seem[ed] like a creepy old man." (*Id.*; *see also* Musk Depo. at 198:3-10 ("The pedo guy was certainly not intended to be any kind of accusation of pedophilia. It was simply an insult.")).

In fact, in Musk's mind, even calling Mr. Unsworth a pedophile (which he did not do) could not imply an assertion of objective fact because, and as the Complaint also alleges, its definition includes thoughts without action, the existence of which are incapable of being proven true or false. (SUF 46; Compl. 1, ¶ 78). Thus, in his mind, it was impossible for anyone to view his statements as ones of fact.

Finally, there is no evidence, let alone clear and convincing evidence, that Mr. Musk's tweet, "betcha a signed dollar it is true" was intended to suggest that his prior statements were factual. The tweet was a "flippant comment" that proposed a low stakes bet of a single dollar. (SUF 47-48; Musk Ex. I; Musk Depo. 141:2-22, 140:16-25). By proposing such an insubstantial wager, Mr. Musk was not taking a strong position as to whether his statements were true, or even capable of being proven true, but meant to convey that "obviously I'm not certain about this" and that he merely found Mr. Unsworth "suspicious." (*Id.*). There is no testimony or evidence showing that it was Mr. Musk's subjective intent for his readers to interpret his "becha" tweet as fact. *See Good Gov't*, 22 Cal. 3d at 684.[11]

---

[11] Although not relevant to Mr. Musk's subjective state of mind, the evidence shows that readers did not interpret the tweets to be true statements of fact because Mr.

### C.   Mr. Unsworth Cannot Otherwise Prove Actual Malice.

Even if Mr. Unsworth could prove by clear and convincing evidence that it was Mr. Musk's subjective belief that readers would understand the "sus" and "pedo guy" remarks as factual assertions, the claim still fails because Mr. Musk *did* research Mr. Unsworth before publishing the tweets and had learned that Mr. Unsworth was an older British white man who lived in an area of Thailand that was known as the "child sex trafficking capital of the world."  (SUF 36; Musk Depo. 25:5-19; 42:18-43:8).  Mr. Unsworth thus cannot prove actual malice by clear and convincing evidence.  *Christian Research*, 148 Cal. App. 4th at 91 (absence of evidence of serious doubt as to the truth of the statements and failure to conduct additional investigation was not sufficient to establish actual malice); *Rosenaur*, 88 Cal. App. 4th at 277 (same); *Annette F.*, 119 Cal. App. 4th at 1167 ("Gross or even extreme negligence will not suffice to establish actual malice.").

### CONCLUSION

For the aforementioned reasons, the Court should grant Mr. Musk's motion.

DATED:  September 16, 2019

Respectfully submitted,
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By  */s/ Alex Spiro*
Alex Spiro
*Attorneys for Defendant Elon Musk*

---

Unsworth could not identify a single person who believes he is a pedophile. (Unsworth Depo. 94:18-95:1).

## **Appendix A: Timeline of Key Events after Unsworth Interview**

| Date | Event |
|---|---|
| 7/13/18 | Mr. Unsworth states in CNN interview that "[Mr. Musk] can stick his submarine where it hurts.  It just had absolutely no chance of working.  He had no conception of what the cave passage was like.  The submarine, I believe, was about 5 foot 6 long, rigid, so it wouldn't have gone round corners or round any obstacles.  It wouldn't have made the first fifty meters into the cave from the dive start point.  Just a PR stunt."<br><br>"[Mr. Musk] was asked to leave [the rescue site] very quickly."<br><br>(SUF 33, Lifrak Decl. Ex. 21). |
| 7/15/18 | In response to Mr. Unsworth's CNN interview, Mr. Musk tweets:<br>• "Never saw this British expat guy who lives in Thailand (sus) at any point when we were in the caves. Only people in sight were the Thai navy/army guys, who were great. Thai navy seals escorted us in – total opposite of wanting us to leave."<br>• "Water level was actually very low & still (not flowing) – you could literally have swum to Cave 5 with no gear, which is obv how the kids got in. If not true, then I challenge this dude to show final rescue video. Huge credit to pump & generator team. Unsung heroes here."<br>• "You know what, don't bother showing the video. We will make one of the mini-sub/pod going all the way to Cave 5 no problem. Sorry pedo guy, you really did ask for it."<br>• "Bet ya a signed dollar its true."<br><br>Within hours, Mr. Musk deletes the tweets.<br><br>(SUF 34-48; Musk Exs. F-1; Musk Decl. ¶¶ 24-32). |
| 7/18/18 | Mr. Musk tweets apology:<br>• "As this well-written article suggests, my words were spoken in anger after Mr. Unsworth said several untruths & suggested I engage in a sexual act with the mini-sub, which had been built as an act of kindness & according to specifications from the dive team leader."<br>• "Nonetheless, his actions against me do not justify my actions against him, and for that I apologize to Mr. Unsworth and to the |

| Date | Event |
|------|-------|
| | companies I represent as leader. The fault is mine and mine alone." |
| | (SUF 49, Musk Ex. J). |
| 8/15/18 | Mr. Musk, through Mr. Birchall, retains Mr. Howard of Jupiter Military & Tactical Systems to conduct an investigation of Mr. Unsworth. |
| | (SUF 50, Birchall Decl. ¶ 4, Birchall Ex. A). |
| 8/17/18 | Investigator reports to Mr. Birchall that "there is indeed an unpleasant undertone to some of his lifestyle choices" and that Mr. Unsworth "associates locally with Europeans who enjoy 'Thai comforts' that are not acceptable in a developed society." |
| | Mr. Birchall relays information to Mr. Musk. |
| | (SUF 54, 57; Birchall Decl. ¶ 14; Birchall Ex. D). |
| before 8/27/18 | On telephone calls with Mr. Birchall, Mr. Howard describes a Thai news article that quoted Mr. Unsworth's Thai wife and reported that Mr. Unsworth married his wife when she was 18 or 19 years old, but that they met and their relationship began seven years earlier, which would imply that she was eleven or twelve years old at the time. |
| | Mr. Birchall relays this information to Mr. Musk. |
| | (SUF 56; Birchall Decl. ¶ 12; Musk Decl. ¶ 35.) |
| 8/27/18 | Investigator reports to Mr. Birchall that Mr. Unsworth "has been traveling on and off to Thailand for cave exploration since the late 1980's," and Mr. Unsworth's "behaviour is best described as a 'Manther' – UK slang for opposite of Cougar." |
| | Mr. Birchall relays information to Mr. Musk. |
| | (SUF 55, 57; Birchall Decl. ¶ 13; Birchall Ex. D). |
| 8/28/18 | Mr. Musk tweets "You don't think it's strange he hasn't sued me?" |
| | (SUF 58, Musk Ex. K). |

| Date | Event |
|------|-------|
| Late Aug. | Mr. Howard tells Mr. Birchall in telephone conversations that he learned that Mr. Unsworth spent significant time in Pattaya Beach, that Mr. Unsworth associated with other European expatriates who engaged in inappropriate sexual conduct in Thailand, and that that Mr. Unsworth was unpopular at the Thai Cave Rescue because others regarded him as "creepy."<br><br>Mr. Howard repeats his report that there is evidence suggesting that Mr. Unsworth met and began a relationship with his wife when she was eleven or twelve.  Mr. Birchall reported this information to Mr. Musk.<br><br>Mr. Birchall relays this information to Mr. Musk before August 30, 2018.<br><br>(SUF 61, 64; Birchall Decl. ¶¶16-17; Musk Decl. ¶ 38-39). |
| 8/30/18 | The investigator issues report stating, among other things:<br>• "Mr. Unsworth has been a frequent visitor to Thailand since the 1980's.  Prior to meeting his current wife we believe that Mr. Unsworth was living in the Pattaya Beach…Pattaya Beach is synonymous with prostitution and scam artists.  We are in the process of verifying this information which was mentioned to the lead investigator by Mr. Unsworth's mother-in-law."<br>• "Mr. Unsworth has been described to our investigation team by other UK volunteers attached to the Cave Rescue team as a 'Manther' slang for an older man with a taste for younger women."<br>• "The sexpat whore-mongers his way through the go-go bars of Thailand.  His only other friends are his sexpat peers.  Peek-density occurs in and around Pattaya – Thailand's sin city."<br>• "[S]ome of the UK and Dutch divers who also volunteered stated that Mr. Unsworth was not a popular or particularly liked man in the Cave Rescue Team.  When pushed as to why, they simply replied 'Creepy'"<br>• "Mr. Unsworth is an unpopular loner"<br>• "Mr. Unsworth is 63 years old.  His wife we believe is 30…which would have put her at 18/19 when they first met."<br>.<br><br>(SUF 65; Birchall Decl. ¶¶ 19; Birchall Ex. F). |

| Date | Event |
|------|-------|
| | |
| 8/30/18 | Mr. Musk emails BuzzFeed off-the-record  and "on background" stating, among other things:<br>• Mr. Unsworth is "an old, single white guy from England who's been traveling to or living in Thailand for 30 to 40 years, mostly Pattaya Beach"<br>• "There's only one reason people go to Pattaya Beach.  It isn't where you'd go for caves, but it is where you'd go for something else."<br>• "Most of the actual dive team refused to hang out with him.  I wonder why…"<br>• "Never saw Mr. Unsworth at any point.  Was told he was banned from the site."<br>• "Stop defending child rapists"<br>• Mr. Unsworth "mov[ed] to Chiang Rai for a child bride who was about 12 years old at the time."<br><br>(SUF 69-87; Musk Ex. L). |
| 9/4/18 | BuzzFeed publishes Mr. Musk's off-the-record and "on background" emails in their entirety.<br><br>(SUF 98; Compl., Ex. K; Lifrak Ex. 26). |
| 9/17/18 | Mr. Unsworth sues.<br><br>(SUF 99; Compl.). |