L. LIN WOOD, P.C.
L. Lin Wood (admitted *pro hac vice*)
lwood@linwoodlaw.com
Nicole J. Wade (admitted *pro hac vice*)
nwade@linwoodlaw.com
Jonathan D. Grunberg (admitted *pro hac vice*)
jgrunberg@linwoodlaw.com
G. Taylor Wilson (admitted *pro hac vice*)
twilson@linwoodlaw.com
1180 West Peachtree Street, Ste. 2040
Atlanta, Georgia 30309
404-891-1402; 404-506-9111 (fax)

WEISBART SPRINGER HAYES, LLP
Matt C. Wood (admitted *pro hac vice*)
mwood@wshllp.com
212 Lavaca Street, Ste. 200
Austin, TX 78701
512-652-5780
512-682-2074 (fax)

CHATHAM LAW GROUP
Robert Christopher Chatham
chris@chathamfirm.com
CA State Bar No. 240972
3109 W. Temple St.
Los Angeles, CA 90026
213-277-1800

Attorneys for Plaintiff VERNON UNSWORTH

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>        Plaintiff,<br><br>v.<br><br>ELON MUSK,<br><br>        Defendant. | Case No. 2:18-cv-08048-SVW (JC)<br><br>**DECLARATION OF G. TAYLOR WILSON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:            October 28, 2019<br>Time:            1:30 pm<br>Courtroom:    10A<br>Complaint Filed: Sept. 17, 2018<br>Trial Date:      Dec. 3, 2019 |

I, G. Taylor Wilson, declare as follows:

1.     I am an attorney at the law firm of L. Lin Wood, P.C., counsel of record in this action for Plaintiff Vernon Unsworth.  I am a member in good standing of the State Bar of Georgia and am admitted *pro hac vice* to practice before this Court.  I have personal knowledge of the facts set forth in this declaration and, if called to testify, I would testify thereto.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the August 22, 2019, deposition of Elon Musk in this case.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the September 10, 2019, deposition of Jared Birchall in this case.

4.     Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the August 14, 2019, deposition of Vernon Unsworth in this case.

5.     Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the August 27, 2019, deposition of Vanessa Unsworth in this case.

6.     Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the August 28, 2018, deposition of Woranan ("Tik") Ratrawiphukkun in this case.

7.     Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the September 30, 2019, deposition of Samuel Teller in this case.

8.     Attached hereto as **Exhibit 7** is a true and correct copy of excerpts from the October 1, 2019, deposition of David Arnold in this case.

9.     Attached hereto as **Exhibit 8** is a true and correct copy of excerpts from the October 1, 2019, deposition of Steven Davis in this case.

10.    Attached hereto as **Exhibit 9** is a true and correct copy of excerpts from the September 9, 2019, deposition of Armor Harris in this case.

11.    Attached hereto as **Exhibit 10** is a true and correct copy of the Declaration of Dr. Rob Harper.

12.    Attached hereto as **Exhibit 11** is a true and correct copy of the Declaration of Mr. Martin Ellis.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of the Declaration of Mr. Richard William Stanton MBE GM.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of the Declaration of Mr. Ben Svasti-Thomson.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of Elon Musk's July 15, 2018, tweets stating, *inter alia*, "Never saw this British expat guy who lives in Thailand (sus) … Sorry pedo guy, you really did ask for it."

16.     Attached hereto as **Exhibit 15** is a true and correct copy of Elon Musk's July 15, 2018, tweet stating, *inter alia*, "Bet ya a signed dollar it's true."

17.     Attached hereto as **Exhibit 16** is a true and correct copy of e-mail correspondence dated July 17, 2018, between Elon Musk and Sam Teller, produced as MUSK_1706-07.

18.     Attached hereto as **Exhibit 17** is a true and correct copy of Elon Musk's July 18, 2018, tweets.

19.     Attached hereto as **Exhibit 18** is a true and correct copy of Elon Musk's August 28, 2018, tweets.

20.     Attached hereto as **Exhibit 19** is a true and correct copy of e-mail correspondence dated August 29 – September 4, 2018, between Elon Musk and BuzzFeed reporter Ryan Mac, produced as MUSK_000967-71.

21.     Attached hereto as **Exhibit 20** is a true and correct copy of excerpts from Plaintiff Vernon Unsworth's Responses and Objections to Elon Musk's First Set of Interrogatories.

22.     Attached hereto as **Exhibit 21** is a true and correct copy of e-mail correspondence dated August 24-25, 2018, between Jared Birchall and James Howard, produced as MUSK_000112-17.

23.     Attached hereto as **Exhibit 22** is a true and correct copy of e-mail correspondence dated August 26-27, 2018, between Jared Birchall and James Howard, produced as MUSK_000052-56.

2

24.     Attached hereto as **Exhibit 23** is a true and correct copy of e-mail correspondence dated August 30, 2018, at 11:04 am between James Howard and Jared Birchall, produced as MUSK_000439-46.

25.     Attached hereto as **Exhibit 24** is a true and correct copy of e-mail correspondence dated September 4-18, 2018, between James Howard and Jared Birchall, produced as MUSK_000361-73.

26.     Attached hereto as **Exhibit 25** is true and correct copy of a text message chain dated August 24-October 2, 2018, between Jared Birchall and James Howard, produced as MUSK_000199-216.

27.     Attached hereto as **Exhibit 26** is a true and correct copy of e-mail correspondence dated September 1, 2018, between James Howard and Jared Birchall, produced as MUSK_000448-61.

28.     Attached hereto as **Exhibit 27** is a true and correct copy of e-mail correspondence dated July 17, 2018, from James Howard to Elon Musk, among others, produced as MUSK_000001-03.

29.     Attached hereto as **Exhibit 28** is a true and correct copy of e-mail correspondence dated August 15, 2018, between James Howard and Jared Birchall, produced as MUSK_000253-59.

30.     Attached hereto as **Exhibit 29** is a true and correct copy of the first page of the Google search results for "James Howard Jupiter" set to "Before August 15, 2018."

31.     Attached hereto as **Exhibit 30** is a true and correct copy of the article that is the first google result of Exhibit 29, authored by Alex Winter, headlined *Businessman stole £426,000 from company's accounts despite being given "numerous second chances",* Daily Echo (Nov. 3, 2016), available at https://www.bournemouthecho.co.uk/news/14839251.businessman-stole-426000-from-companys-accounts-despite-being-given-numerous-second-chances/.

32.     Attached hereto as **Exhibit 31** is a true and correct copy of *Elon Musk*

*Hired A Convicted Felon To Investigate The Cave Rescuer Who Is Now Suing Him*, Ryan Mac and Mark Di Stefano, BuzzFeed News (Oct. 3, 2019), available at https://www.buzzfeednews.com/article/ryanmac/elon-musk-hired-felon-james-howard-higgins-dirt-pedo-guy.

33.     Attached hereto as **Exhibit 32** is a true and correct copy of e-mail correspondence dated July 15, 2018, between Sam Teller, Dave Arnold, Laura Hardy, and Sarah O'Brien, produced as TESLA001455.

34.     Attached hereto as **Exhibit 33** is a true and correct copy of e-mail correspondence dated August 28, 2018, between Jared Birchall and James Howard, produced as MUSK_000410-14.

35.     Attached hereto as **Exhibit 34** is a true and correct copy of e-mail correspondence dated September 4-5, 2018, between, among others, Elon Musk and Juleanna Glover.   The document was produced as TESLA000600-39, however, because the .TIF file is largely unintelligible, the copy attached hereto is the associated .txt file produced by TESLA, TESLA000600.txt, which is only a five page e-mail chain.

36.     Attached hereto as **Exhibit 35** is a true and correct copy of the September 12, 2019, Declaration of Ryan Mac in Support of Motion to Quash Subpoena Issued from a Civil Case Pending Before the United States District Court for the Central District of California and Served on Non-Party Journalist Ryan Mac in a related action.

37.     Attached hereto as **Exhibit 36** is a true and correct copy of e-mail correspondence dated July 16-17, 2018, between Tesla's communications team, listing and discussing media coverage of Mr. Musk's July 15 "pedo guy" tweets, produced as TESLA000269-75.

38.     Attached hereto as **Exhibit 37** is a true and correct copy of *People Really Aren't Here for Elon Musk's Rescue Submarine*, Racheal Krishna, BuzzFeed News        (July        10,        2018),        available        at

4

https://www.buzzfeednews.com/article/krishrach/elon-musk-built-a-submarine-to-rescue-the-thai-boys-and.

39.    Attached hereto as **Exhibit 38** is a true and correct copy of *Elon Musk Didn't Help Save The Thai Boys.  Now He's Attacking Someone Who Did*, Remy Smidt, BuzzFeed News (July 15, 2018), available at https://www.buzzfeednews.com/article/remysmidt/elon-musk-attacks-diver-who-helped-rescue-thai-boys.

40.    Attached hereto as **Exhibit 39** is a true and correct copy of *Elon Musk Has Revisited His Baseless Pedophile Claims*, Ryan Mac, BuzzFeed News (August 28, 2018), available at https://www.buzzfeednews.com/article/ryanmac/elon-musk-revisits-baseless-pedophile-claims.

41.    Attached hereto as **Exhibit 40** is a true and correct copy of *The Cave Rescuer Elon Musk Called A "Pedo" Has Lawyered Up And Is Preparing A Libel Claim*, Ryan Mac, BuzzFeed News (August 29, 2018), available at https://www.buzzfeednews.com/article/ryanmac/the-british-diver-elon-musk-called-a-pedo-threatened-to-sue.

42.    Attached hereto as **Exhibit 41** is a true and correct copy of a May 23, 2018, tweet published by Elon Musk.

43.    Attached hereto as **Exhibit 42** is a true and correct copy of e-mail correspondence dated September 4, 2018, between, among others, Dave Arnold, Ryan Mac, and Ben Smith (editor at BuzzFeed), produced as TESLA000559-60.

44.    Attached hereto as **Exhibit 43** is a true and correct copy of a collection of Google alerts sent to Elon Musk regarding his accusation of pedophilia, produced as MUSK_000849-55, MUSK_000821-23, MUSK_000793-95, MUSK_000805-07, MUSK_000811-12, MUSK_000827-29, and MUSK_000833-40.

45.    Attached hereto as **Exhibit 44** is a true and correct copy of e-mail correspondence dated July 16-17, 2018, between SpaceX's communications team and listing and discussing media coverage of Mr. Musk's July 15 "pedo guy" tweets,

1 | produces as SPACEX00000094-104.

2 |     46.     Attached hereto as **Exhibit 45** is a true and correct copy of a collection

3 | of press inquiries sent to Tesla and SpaceX's public relations teams inquiring about

4 | accusations of pedophilia, produced as TESLA000201-03, TESLA000209-12,

5 | TESLA000214, and SPACEX00000080.

6 |     47.     Attached hereto as **Exhibit 46** is a true and correct copy of *What's the*

7 | *full story behind Elon Musk's involvement with the Thai cave rescue effort?*, Jeremy

8 | Arnold, Quora (July 16, 2018), available at https://www.quora.com/Whats-the-full-

9 | story-behind-Elon-Musks-involvement-with-the-Thai-cave-rescue-effort,        same

10 | being the article tweeted by Elon Musk on July 18, 2018, described as a "well-written

11 | article."

12 |     48.     Attached hereto as **Exhibit 47** is a true and correct copy of Defendant

13 | Elon Musk's Notice of Motion and Motion to Dismiss Plaintiff Vernon Unsworth's

14 | Complaint; Memorandum of Points and Authorities [Dkt. 30].

15 |     49.     Attached hereto as **Exhibit 48** is a true and correct copy of *Elon Musk's*

16 | *weakness for self-promotion masks his potential*, Pilita Clark, Financial Times (July

17 | 13, 2018), available at https://www.ft.com/content/39f4d1a6-85d0-11e8-a29d-

18 | 73e3d454535d.

19 |     50.     Attached hereto as **Exhibit 49** is a true and correct copy of e-mail

20 | correspondence dated July 10, 2018, between James Gleeson, SpaceX public

21 | relations, and reporter Timothy Lee, produced as TESLA001250-51.

22 |     51.     Attached hereto as **Exhibit 50** is a true and correct copy of e-mail

23 | correspondence dated July 10, 2018, from Sam Teller to various reporters, produced

24 | as TESLA001256.

25 |     52.     Attached hereto as **Exhibit 51** is a true and correct copy of e-mail

26 | correspondence dated August 24, 2018, from Martin Schmidbaur to various

27 | individuals, produced as TESLA000481-502.

28 |     53.     Attached hereto as **Exhibit 52** is a true and correct copy of e-mail

correspondence dated July 10-11, 2018, between Sara O'Brien and Caroline Liddle, produced as TESLA001402-05.

54.     Attached hereto as **Exhibit 53** is a true and correct copy of e-mail correspondence dated July 9-10, 2018, between Elon Musk, Steve Davis, and Sam Teller, produced as SPACEX00000612-14.

55.     Attached hereto as **Exhibit 54** is a true and correct copy of a text message conversation between Steve Davis and Sam Teller, produced by Davis at his deposition on October 1, 2019.

56.     Attached hereto as **Exhibit 55** is a true and correct copy of a text message conversation between Steve Davis and Elon Musk, produced by Davis at his deposition on October 1, 2019.

57.     Attached hereto as **Exhibit 56** is a true and correct copy of e-mail correspondence dated July 10, 2018, from Sam Teller to various reporters, produced as TESLA001242.

58.     Attached hereto as **Exhibit 57** is a true and correct copy of a WhatsApp chain with individuals involved in Elon Musk's mini-submarine or tube, produced as MUSK_003203-35.

59.     Attached hereto as **Exhibit 58** is a true and correct copy of e-mail correspondence dated July 17, 2018, between Sam Teller, Juleanna Glover, and Sarah O'Brien, produced as TESLA001561-71.

60.     Attached hereto as **Exhibit 59** is a true and correct copy of an unexecuted agency agreement, never signed, between Mr. Unsworth and Mr. William Robinson, produced as VU03429-36.

61.     Attached hereto as **Exhibit 60** is a true and correct copy of e-mail correspondence dated September 6, 2018, between my law office and Elon Musk, produced as VU00731, VU00810-13.

62.     Attached hereto as **Exhibit 61** is a true and correct copy of a July 11, 2018, tweet published by Elon Musk.

63.     Attached hereto as **Exhibit 62** is a true and correct copy of e-mail correspondence dated July 10-15, 2018, between Sam Teller, Elon Musk, Mark Juncosa, and others, produced as SPACEX000000702-03.

I declare under penalty of perjury under the laws of the State of Georgia and the United States that the foregoing is true and correct and that this document was executed in Atlanta, Georgia.

Dated:  October 7, 2019                              **L. LIN WOOD, P.C.**

By: */s/G. Taylor Wilson*
G. Taylor Wilson

8

# EXHIBIT 1

# EXHIBIT 1

Exhibit 1
Page 009

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4

5   VERNON UNSWORTH,

6            Plaintiff,

7            vs.                    Case No. 2:18-cv-8048

8   ELON MUSK,

9            Defendant.

10   _____

11          VIDEOTAPED DEPOSITION OF ELON MUSK

12              BEVERLY HILLS, CALIFORNIA

13                  AUGUST 22, 2019

14

15

16

17

18

19   Reported By:
     PATRICIA Y. SCHULER
20   CSR No. 11949

21   Job No. 45176

22

23

24

25

                                                              1

Exhibit 1
Page 010

```
 1    BBC.  And it was just out of the blue this guy -- I     09:36:59
 2    never heard of him before -- makes this unprovoked      09:37:03
 3    attack; says those lies about me.  I'm like what        09:37:05
 4    the heck is this guy doing, and then this is crazy.     09:37:12
 5    Who is this guy?                                        09:37:16
 6            And then I asked my team, anyone heard of       09:37:17
 7    this guy?  Nope.  Was he on the actual dive team        09:37:20
 8    that rescued the kids?  They said, "Nope."  Okay,       09:37:24
 9    this is it pretty suspicious situation.                 09:37:26
10       Q.   What did you learn about Vernon Unsworth        09:37:36
11    from the time that you first saw his name, whether      09:37:39
12    it was on Twitter or Google Alert?  What did you        09:37:42
13    learn about Mr. Unsworth from that time until the       09:37:49
14    15th of July when you tweeted about him?                09:37:54
15       A.   I am not sure of the exact dates here.          09:38:03
16    Is the 15th -- is that when I referred to him as a      09:38:07
17    sort of suspicious pedo guy, or is that a different     09:38:12
18    date?                                                   09:38:15
19       Q.   I believe that was on July the 15th.  You       09:38:16
20    don't recall the date?                                  09:38:19
21       A.   Not the specific date, no.                      09:38:20
22       Q.   July the 15th.  Am I right, gentleman?          09:38:22
23    Yeah, July the 15th.                                    09:38:25
24            What did you learn about Mr. Unsworth           09:38:27
25    from the time you first saw his name, either on         09:38:32
```

                                                                      24

Exhibit 1
Page 011

```
 1    Google alert or Twitter --                      09:38:36
 2         A.    Sure.                                 09:38:39
 3         Q.    -- and the time that you started tweeting   09:38:39
 4    about him on July the 15th?                      09:38:41
 5         A.    I literally just saw this article.  I     09:38:45
 6    think it was on Twitter.  I think somebody had   09:38:48
 7    retweeted the story or something like that.  But it   09:38:51
 8    might have been a Google newsletter; I am not sure.   09:38:55
 9    But I did not really know much of anything of this   09:39:00
10    guy except that he had gone on TV with a major news   09:39:05
11    organization, and had been -- had attacked me for   09:39:13
12    no reason, unprovoked, was incredibly rude, and you   09:39:16
13    know, to be totally frank, looked sort of like a   09:39:24
14    pedo guy, you know.                              09:39:27
15         And then I was like -- googled him, oh,    09:39:30
16    he was like, lives in Thailand.  Okay, that's    09:39:34
17    pretty suspicious.  English expat, doesn't seem to   09:39:35
18    be -- have been on the dive team, in a very dodgy   09:39:42
19    part of the world.                               09:39:46
20         Q.    What type of the world?              09:39:47
21         A.    Dodgy.                                09:39:50
22         Q.    Anything else?  Sorry I interrupted.   09:39:51
23         A.    No.  And so it's like, okay, some guy   09:39:56
24    sort of attacks me and insults me, I -- you know, I   09:40:00
25    was upset, and I insulted him back.              09:40:08
```

                                                          25

Exhibit 1
Page 012

| | | |
|---|---|---|
| 1 | Q.   So other than knowing that he was | 09:40:12 |
| 2 | connected with the cave rescue -- | 09:40:20 |
| 3 | A.   I did not know that he was connected with | 09:40:24 |
| 4 | the cave rescue. | 09:40:26 |
| 5 | Q.   Oh, you did not know that he was in any | 09:40:28 |
| 6 | way present working with the other volunteers and | 09:40:29 |
| 7 | individuals -- | 09:40:33 |
| 8 | A.   No. | 09:40:33 |
| 9 | Q.   -- who were trying to rescue the kids? | 09:40:33 |
| 10 | A.   No.  At the time, I thought he was | 09:40:36 |
| 11 | unconnected and just some random person who lived | 09:40:37 |
| 12 | in Thailand. | 09:40:39 |
| 13 | Q.   I see. | 09:40:41 |
| 14 | And so if I hear you correctly, well, let | 09:40:42 |
| 15 | me just ask you.  You said he looked -- did you | 09:40:47 |
| 16 | watch the video -- | 09:40:49 |
| 17 | A.   Yes. | 09:40:50 |
| 18 | Q.   -- interview that he gave? | 09:40:50 |
| 19 | A.   Yes. | 09:40:52 |
| 20 | Q.   It was on CNN International? | 09:40:53 |
| 21 | A.   Okay, CNN. | 09:40:54 |
| 22 | Q.   Does that ring a bell? | 09:40:56 |
| 23 | A.   It was some major news network. | 09:40:57 |
| 24 | Q.   When did you watch the video? | 09:41:00 |
| 25 | A.   It was shortly before the tweet. | 09:41:05 |

26

Exhibit 1
Page 013

| | | |
|---|---|---|
| 1 | Q.   Before the tweet on the 15th? | 09:41:07 |
| 2 | A.   Yeah.  I think just perhaps like -- | 09:41:08 |
| 3 | really shortly before -- it was like it might have | 09:41:14 |
| 4 | been less than an hour or a few hours before my | 09:41:18 |
| 5 | tweet. | 09:41:21 |
| 6 | Q.   And when was the last time you watched | 09:41:24 |
| 7 | the video? | 09:41:26 |
| 8 | A.   Probably several months ago; a year ago. | 09:41:30 |
| 9 | Q.   Would that have been after your tweet of | 09:41:33 |
| 10 | the 15th of July? | 09:41:36 |
| 11 | A.   I think I watched it maybe twice, yes. | 09:41:38 |
| 12 | Q.   So you think you watched it once, shortly | 09:41:40 |
| 13 | before you did the July 15 tweets, and then | 09:41:43 |
| 14 | sometime thereafter you watched it again? | 09:41:45 |
| 15 | A.   I think so. | 09:41:50 |
| 16 | Q.   And when did you form the impression that | 09:41:50 |
| 17 | Mr. Unsworth looked like a pedo guy?  Was that the | 09:41:54 |
| 18 | first time you watched it, or was it the second | 09:41:58 |
| 19 | time you watched it? | 09:41:59 |
| 20 | A.   It was the first time. | 09:42:00 |
| 21 | Q.   What does a pedo guy look like? | 09:42:00 |
| 22 | A.   Old angry white guy living in Thailand. | 09:42:04 |
| 23 | Q.   So any old angry guy living in Thailand | 09:42:08 |
| 24 | looks to you like a pedo guy? | 09:42:12 |
| 25 | A.   It's a sort of a look.  I don't know, | 09:42:16 |

27

Exhibit 1
Page 014

| | | |
|---|---|---|
| 1 | yeah.  And why is he talking about shoving a | 09:42:19 |
| 2 | submarine up my butt.  That's pretty weird and rude | 09:42:26 |
| 3 | and uncalled for. | 09:42:29 |
| 4 | And why is he living in Thailand with no | 09:42:30 |
| 5 | apparent job or anything?  Why is he, you know -- | 09:42:34 |
| 6 | at the time I didn't -- I thought he was | 09:42:39 |
| 7 | unconnected with the cave rescue and simply just | 09:42:41 |
| 8 | jumping in to claim credit and talk to the press | 09:42:46 |
| 9 | and whatever. | 09:42:49 |
| 10 | Q.   I want to make sure I've covered your | 09:42:50 |
| 11 | interpretation of his looks. | 09:42:53 |
| 12 | MR. WOOD:  Now, y'all can't be -- let's | 09:42:56 |
| 13 | don't be passing notes back and forth, please. | 09:42:57 |
| 14 | MR. SPIRO:  You were doing this during | 09:42:59 |
| 15 | Mr. Unsworth's deposition. | 09:42:59 |
| 16 | MR. WOOD:  No, I was not.  No, I was not. | 09:43:01 |
| 17 | MR. SPIRO:  Of course you were.  I saw | 09:43:02 |
| 18 | you doing it.  And it will be on the videotape. | 09:43:03 |
| 19 | MR. WOOD:  I did not -- let me tell you | 09:43:06 |
| 20 | this -- | 09:43:06 |
| 21 | MR. SPIRO:  You want to take a break so I | 09:43:06 |
| 22 | can confer with him for a second?  There is no | 09:43:07 |
| 23 | question pending. | 09:43:09 |
| 24 | MR. WOOD:  No, I don't want writing | 09:43:10 |
| 25 | statements or something to the witness and showing | 09:43:12 |

28

Exhibit 1
Page 015

| | | |
|---|---|---|
| 1 | MR. WOOD:  -- and he doesn't allow it in | 09:43:44 |
| 2 | the deposition. | 09:43:44 |
| 3 | MR. SPIRO:  We can take a break. | 09:43:44 |
| 4 | MR. WOOD:  Please abide by the rules. | 09:43:44 |
| 5 | Let's go. | 09:43:47 |
| 6 | (Exhibit 35 was marked for | 09:43:48 |
| 7 | identification.) | 09:43:48 |
| 8 | BY MR. WOOD: | 09:43:48 |
| 9 | Q.  Sir, I want to make sure I have covered | 09:43:48 |
| 10 | what you -- you said he was an angry-looking man? | 09:43:52 |
| 11 | A.  He was -- | 09:43:56 |
| 12 | Q.  An old man? | 09:43:56 |
| 13 | A.  In the video he was clearly, like an | 09:44:00 |
| 14 | angry old white guy, and his background was | 09:44:02 |
| 15 | Thailand, and he was like talking about my ass, | 09:44:09 |
| 16 | which is weird, and shoving something up there. | 09:44:13 |
| 17 | That is pretty bizarre. | 09:44:18 |
| 18 | He lied about the government throwing me | 09:44:22 |
| 19 | out.  This is absolutely not true.  We were | 09:44:25 |
| 20 | welcomed there by the prime minister himself.  So | 09:44:28 |
| 21 | he lied on TV.  He's obviously a liar.  Seems like | 09:44:31 |
| 22 | a pretty suspicious person. | 09:44:37 |
| 23 | Q.  Suspicious in what way? | 09:44:39 |
| 24 | A.  Just in general.  Why does somebody do | 09:44:41 |
| 25 | that?  People with integrity don't do that. | 09:44:43 |

30

Exhibit 1
Page 016

```
1        Q.   He didn't call you a fucking asshole, did    09:44:47
2   he?                                                     09:44:50
3        A.   Effectively, yes.                             09:44:55
4        Q.   What did you think about that?                09:44:56
5        A.   Well, I was very upset that he said these     09:45:01
6   things.                                                 09:45:04
7        Q.   Do you think that's rude?                     09:45:04
8        A.   Yes, I do think that is rude.                 09:45:11
9        Q.   But you say that to people, do you not?       09:45:13
10        A.   Not frequently; only if I think they are.     09:45:14
11        Q.   And did you think Ryan Mac was a fucking      09:45:17
12   asshole?                                                09:45:20
13        A.   I did.                                        09:45:21
14        Q.   So you didn't hesitate to say "You are a      09:45:22
15   fucking asshole," did you?                              09:45:24
16        A.   Not literally.  I mean, that is a figure      09:45:27
17   of speech.                                              09:45:29
18        Q.   It is an idiom.                               09:45:30
19        A.   I don't --                                    09:45:31
20        Q.   You know what an idiom is, don't you?         09:45:32
21        A.   Yes.                                          09:45:34
22        Q.   What is it, as you understand it?             09:45:35
23        A.   It is idiot with o-m at the end.              09:45:39
24        Q.   An idiom is an idiot with an o-m at the       09:45:43
25   end?                                                    09:45:44
```

31

Exhibit 1
Page 017

| 1 | A. Yes. | 09:45:47 |
| 2 | Q. Do you have any better understanding of | 09:45:47 |
| 3 | what an idiom is other than that? | 09:45:48 |
| 4 | A. Yes. It's a colloquial expression where | 09:45:51 |
| 5 | the -- you don't mean literally the thing that you | 09:45:56 |
| 6 | are saying; it's sort of like a metaphor sometimes. | 09:45:58 |
| 7 | It's a figure of speech. | 09:45:59 |
| 8 | Q. Shove it up your ass. Wouldn't that be | 09:46:03 |
| 9 | an idiomatic phrase? | 09:46:06 |
| 10 | A. Well, given -- | 09:46:08 |
| 11 | Q. As you understand idiom? | 09:46:09 |
| 12 | A. Well, my ass is not quite that big, so | 09:46:10 |
| 13 | therefore I would think this is not physically | 09:46:12 |
| 14 | possible, so I would say that is an idiom, most | 09:46:15 |
| 15 | likely. | 09:46:19 |
| 16 | Q. You would have recognized that when you | 09:46:19 |
| 17 | saw or heard Mr. Unsworth's statements? | 09:46:21 |
| 18 | A. Yes. | 09:46:24 |
| 19 | Q. You knew he wasn't literally saying take | 09:46:25 |
| 20 | the tube and shove it where it hurts. He was | 09:46:30 |
| 21 | speaking figuratively as an idiomatic phrase, true? | 09:46:32 |
| 22 | A. Yes. It's still weird, but yes. | 09:46:37 |
| 23 | Q. Now, just so that I am clear, during the | 09:46:44 |
| 24 | time frame that you were on Twitter about | 09:46:46 |
| 25 | Mr. Unsworth on July 15th, you would have still | 09:46:49 |

32

Exhibit 1
Page 018

| | | | |
|---|---|---|---|
| 1 | A. | That's right. | 09:48:59 |
| 2 | Q. | And he lied about you? | 09:49:00 |
| 3 | A. | That's correct. | 09:49:02 |
| 4 | Q. | Is there anything else that you knew | 09:49:03 |

5  about Vernon Unsworth or your impressions of     09:49:07

6  Vernon Unsworth prior to the time you started    09:49:11

7  tweeting about him on July the 15th, including the  09:49:14

8  tweet referring to him as a pedo guy?            09:49:20

9       A.   Well, obviously, he also made an       09:49:24

10  unprovoked attack on me using a very rude metaphor.  09:49:28

11      Q.   An idiomatic --                         09:49:35

12      A.   A very rude idiomatic expression.       09:49:37

13      Q.   Anything else?                          09:49:38

14      A.   Not that I can recall at this time.     09:49:44

15  There may have been other things, but I can't    09:49:45

16  recall at this time.                             09:49:47

17      Q.   You've given me your best recollection as  09:49:48

18  you sit here right now under oath --             09:49:49

19      A.   Yes.                                    09:49:51

20      Q.   -- today, right?                        09:49:51

21      A.   Yes.                                    09:49:52

22      Q.   You said that, I think you referred to  09:49:53

23  maybe -- I don't want to put words in your mouth,  09:49:56

24  so correct me.                                   09:49:59

25           You used the phrase "dodgy."  And I     09:49:59

35

Exhibit 1
Page 019

```
 1    thought it was in reference to Thailand?          09:50:02

 2         A.   Yes.                                    09:50:04

 3         Q.   What did you mean, or what do you mean  09:50:05

 4    when you say that Thailand is dodgy?              09:50:07

 5         A.   Thailand is a place where dodgy people  09:50:16

 6    go, in my experience.  People who are often up to 09:50:22

 7    no good.                                          09:50:30

 8         Q.   So that's what dodgy means?  People that 09:50:31

 9    are up to no good?                                09:50:32

10         A.   Yes.                                    09:50:36

11         Q.   And how many people do you know that have 09:50:37

12    been to Thailand that you would say were dodgy?   09:50:39

13         A.   Well, I would not say "know."  "Heard of" 09:50:45

14    perhaps is a better word.                         09:50:48

15         Q.   Tell me how many you have heard of.     09:50:50

16         A.   I mean, there's like that -- Jared, the 09:50:53

17    Subway guy.  You know, he went to Thailand a lot. 09:50:56

18         Q.   I have heard about him.                 09:50:59

19         A.   For bad reasons.                        09:51:00

20         Q.   The Twitter guy.  He is on Twitter?     09:51:02

21         A.   Perhaps he is; I don't know.  But he was 09:51:04

22    the Subway spokesman for many years before losing a 09:51:06

23    lot of weight, and was going to Thailand for, you 09:51:10

24    know, bad reasons.                                09:51:14

25         Q.   What do you mean "bad reasons"?         09:51:17
```

36

Exhibit 1
Page 020

| | | |
|---|---|---|
| 1 | A.   Sort of -- I don't know.  Engaging in | 09:51:22 |
| 2 | activity that would be -- he couldn't do here, I | 09:51:29 |
| 3 | assume, because it's a far way to go. | 09:51:34 |
| 4 | Q.   What is the activity that you are | 09:51:36 |
| 5 | referring that he could do in Thailand that you | 09:51:38 |
| 6 | couldn't do here?  I guess "here," meaning the | 09:51:40 |
| 7 | United States? | 09:51:43 |
| 8 | A.   Well, in his case, which is not to say | 09:51:43 |
| 9 | all cases, he was, you know, engaged in pedophilia | 09:51:50 |
| 10 | or something. | 09:51:55 |
| 11 | Q.   And how did you define "pedophilia"?  In | 09:51:57 |
| 12 | your mind's eye what does that mean? | 09:52:00 |
| 13 | A.   I believe the definition would be | 09:52:09 |
| 14 | sleeping with people below an age -- below the age | 09:52:12 |
| 15 | of consent in the United States, essentially. | 09:52:14 |
| 16 | Q.   Having sexual relations, physical | 09:52:16 |
| 17 | relations with a child under the age of consent? | 09:52:20 |
| 18 | A.   In the U.S., yes. | 09:52:24 |
| 19 | Q.   That would be a pedophile in your mind? | 09:52:25 |
| 20 | A.   Yes. | 09:52:28 |
| 21 | Q.   Anything else when you think of a | 09:52:29 |
| 22 | pedophile that you think of, other than a person | 09:52:30 |
| 23 | that you believe or know has been having sex | 09:52:34 |
| 24 | physically with children under the age of consent? | 09:52:37 |
| 25 | A.   I believe there is a standard definition | 09:52:45 |

37

Exhibit 1
Page 021

```
 1    of pedophile.                                     09:52:47

 2         Q.   I just want to make sure I've got yours.  09:52:48

 3    Anything else that you think of when you use the   09:52:50

 4    phrase "pedophile," other than an individual       09:52:52

 5    involved in physical sexual activity with a child  09:52:55

 6    under the age of consent?                          09:52:59

 7         A.   I believe that is an accurate definition 09:53:02

 8    of a pedophile, yes.                               09:53:05

 9         Q.   Is that your definition?  The one that   09:53:06

10    you accept as the definition?                      09:53:08

11         A.   Pedophile, yes.                          09:53:11

12         Q.   Anything else that you would add to that 09:53:12

13    definition from your perspective when you say      09:53:14

14    someone is or you believe they are a pedophile?    09:53:16

15         A.   Well, I mean, they wouldn't necessarily  09:53:19

16    have had to had relations with underaged men or    09:53:22

17    women or boys or girls.  They could simply -- they 09:53:26

18    could have pornography, or they could have simply  09:53:29

19    the desire.  That -- "pedophile" simply means lover 09:53:32

20    of children, I guess, or something like that.      09:53:39

21         Q.   Minor children?                          09:53:42

22         A.   Below the age of consent.                09:53:44

23         Q.   The line for you, whether it's thinking  09:53:47

24    about them or watching something on a film or the  09:53:50

25    internet, the line that you draw is that these are 09:53:54
```

38

Exhibit 1
Page 022

| | | |
|---|---|---|
| 1 | thoughts or activities that are related to sexual | 09:54:03 |
| 2 | acts or thoughts -- | 09:54:08 |
| 3 | A.   Or thoughts. | 09:54:11 |
| 4 | Q.   -- or desires -- | 09:54:11 |
| 5 | A.   Yes. | 09:54:13 |
| 6 | Q.   -- with respect to a minor child, that is | 09:54:13 |
| 7 | to say a child under the age of consent, true? | 09:54:17 |
| 8 | A.   That is true. | 09:54:21 |
| 9 | Q.   So we've got Jared, the sub guy.  What | 09:54:25 |
| 10 | did you call him?  Jared? | 09:54:33 |
| 11 | A.   The Subway. | 09:54:34 |
| 12 | Q.   Subway guy.  That all came out publicly, | 09:54:36 |
| 13 | didn't it? | 09:54:38 |
| 14 | A.   It did, yes. | 09:54:38 |
| 15 | Q.   So other than Jared the Subway guy, do | 09:54:39 |
| 16 | you know any other person that you would classify | 09:54:42 |
| 17 | as a pedophile because of visits to Thailand? | 09:54:48 |
| 18 | A.   Gary Glitter. | 09:54:57 |
| 19 | Q.   And who is Gary Glitter? | 09:54:59 |
| 20 | A.   I believe he is an old English rock star. | 09:55:01 |
| 21 | I am not sure if he is English or not.  I think he | 09:55:05 |
| 22 | is. | 09:55:09 |
| 23 | Q.   What did he do? | 09:55:10 |
| 24 | A.   He went to Thailand from England to have | 09:55:10 |
| 25 | sex with underage kids. | 09:55:14 |

39

Exhibit 1
Page 023

| | | |
|---|---|---|
| 1 | Q.   Anybody besides Gary Glitter, the Subway | 09:55:17 |
| 2 | guy, and Mr. Unsworth? | 09:55:25 |
| 3 | A.   Yeah, there is another rock star that was | 09:55:32 |
| 4 | into autoerotic asphyxiation in Thailand.  He was | 09:55:34 |
| 5 | also believed to have engaged in pedophilia.  I | 09:55:41 |
| 6 | forget his name.  I think it was an Australian | 09:55:44 |
| 7 | band.  I'll just put it this way:  Over the years | 09:55:44 |
| 8 | there's just, you know, you hear of someone, some | 09:55:49 |
| 9 | sort of famous or semi-famous sketchy -- and | 09:55:52 |
| 10 | there's some sketchy activity.  And Thailand is | 09:55:57 |
| 11 | often involved. | 09:56:01 |
| 12 | Q.   Well, you wouldn't call Mr. Unsworth | 09:56:01 |
| 13 | famous or semi-famous, would you? | 09:56:05 |
| 14 | He's not in the same category as these | 09:56:06 |
| 15 | celebrities that you mentioned? | 09:56:08 |
| 16 | A.   He is semi-famous these days. | 09:56:12 |
| 17 | Q.   I'm sorry? | 09:56:15 |
| 18 | A.   I mean, he's at least semi-famous these | 09:56:15 |
| 19 | days. | 09:56:18 |
| 20 | Q.   Well, are you saying because of the | 09:56:18 |
| 21 | litigation and the controversy that arose regarding | 09:56:20 |
| 22 | his interview and your tweets? | 09:56:24 |
| 23 | A.   Well, I think he is certainly taking a | 09:56:27 |
| 24 | lot of credit for the cave rescue, and has given | 09:56:30 |
| 25 | many speaking engagements from what I've heard. | 09:56:34 |

40

Exhibit 1
Page 024

1    that.                                                    09:57:34

2            Go ahead.  You want to add something.  I         09:57:37

3    don't want to stop you.                                  09:57:38

4        A.   Yeah.  Just I did just sort of a Google         09:57:40

5    search on Chiang Rai and this article came up from       09:57:51

6    the *Straits Times* about -- for a Singapore - one       09:57:52

7    newspaper about how Chiang Rai was essentially the       09:57:58

8    capital of sex trafficking in the world.  That was       09:58:02

9    also a data point.                                       09:58:08

10       Q.   Anything else?                                   09:58:10

11       A.   I was --                                         09:58:10

12       Q.   I was asking about your trips to                 09:58:10

13   Thailand.  You said you have never been except for       09:58:13

14   one time when you took the tube over.                    09:58:15

15            And then you started telling me that you         09:58:19

16   had done a Google search about Chiang Rai?               09:58:19

17       A.   Yes --                                           09:58:23

18       Q.   You did not go to Chiang Rai?                    09:58:24

19       A.   You asked me everything that I could            09:58:27

20   recall about this.  And obviously, you know, the         09:58:28

21   human memory is fallible.  So this is one extra          09:58:29

22   thing that I remember was just googling Chiang Rai       09:58:33

23   and reading the *Straits Times* article about how       09:58:37

24   Chiang Rai, which is where Mr. Unsworth is from, or      09:58:40

25   was still living, or near there, and how it being a      09:58:44

                                                          42

Exhibit 1
Page 025

```
 1    child sex trafficking capital of the world.              09:58:49
 2        Q.    When did you do that research?                 09:58:51
 3        A.    I would not call it research.  It was a        09:58:54
 4    google --                                                09:58:54
 5        Q.    So when do you the search?                     09:58:55
 6        A.    It was shortly before the tweet.  I typed      09:58:57
 7    in his name in Google and his name came up -- not        09:58:59
 8    his name.  I typed in Chiang Rai I should say.           09:59:04
 9        Q.    Why Chiang Rai?                                 09:59:08
10        A.    That is where the caves were.                  09:59:09
11        Q.    Not anything related to Mr. Unsworth?          09:59:12
12        A.    No.  Just --                                   09:59:16
13        Q.    Just the caves' location being at or near      09:59:17
14    Chiang Rai?                                              09:59:20
15        A.    Yes.                                           09:59:20
16        Q.    How many times have you done any cave          09:59:22
17    exploration?                                             09:59:25
18        A.    When you say cave exploration, do you          09:59:32
19    mean -- I have not engaged in new caves, anything        09:59:34
20    like that.  I've certainly walked through caves a        09:59:39
21    few times in my life.                                    09:59:41
22        Q.    Where?                                         09:59:43
23        A.    South Africa.  Some caves in Canada and        09:59:44
24    the U.S.  I would not say I spent any significant        09:59:51
25    time in caves.                                           09:59:54
```

43

Exhibit 1
Page 026

| | | |
|---|---|---|
| 1 | A. Yes. | 10:03:26 |
| 2 | Q. Do you have any knowledge as you sit here | 10:03:27 |
| 3 | today about how many times prior to July the 15th | 10:03:29 |
| 4 | Mr. Unsworth had visited and explored the Tham | 10:03:34 |
| 5 | Luang cave system? | 10:03:43 |
| 6 | A. No. | 10:03:45 |
| 7 | Q. Have you ever tried to find out his | 10:03:46 |
| 8 | knowledge or his experience? | 10:03:48 |
| 9 | A. I did a Google search of him and of | 10:03:53 |
| 10 | Chiang Rai. | 10:03:56 |
| 11 | Q. When did you do the Google search of | 10:03:57 |
| 12 | Vernon Unsworth? | 10:04:00 |
| 13 | A. That was after I saw his very rude | 10:04:01 |
| 14 | interview with, I guess, CNN. | 10:04:05 |
| 15 | Q. And that would have been before your pedo | 10:04:08 |
| 16 | guy tweet? | 10:04:10 |
| 17 | A. Yes. | 10:04:11 |
| 18 | Q. So when you went -- when it was brought | 10:04:12 |
| 19 | your attention that Mr. Unsworth had given this | 10:04:18 |
| 20 | interview, and as you perceived it at least, made | 10:04:21 |
| 21 | these rude attacks and told lies about you, you | 10:04:24 |
| 22 | didn't know who in the world he was, did you? | 10:04:27 |
| 23 | A. No. I thought -- I thought this -- I did | 10:04:31 |
| 24 | not know who he was, so I searched -- did the | 10:04:33 |
| 25 | search, Google search, and that's the -- and from | 10:04:35 |

47

Exhibit 1
Page 027

| | | |
|---|---|---|
| 1 | what I could tell this guy, at least at the time, | 10:04:41 |
| 2 | it seemed like he didn't have anything to do with | 10:04:43 |
| 3 | the rescue and had not been on the dive team where | 10:04:46 |
| 4 | they risked their life. | 10:04:49 |
| 5 | And so my impression was that he was just | 10:04:51 |
| 6 | some -- at the time, just some random expat that | 10:04:53 |
| 7 | the media had found to interview.  And so here was | 10:04:57 |
| 8 | some random, some creepy expat guy living in | 10:04:59 |
| 9 | Thailand attacking me for no reason. | 10:05:08 |
| 10 | Q.   And that was the sole -- that was the | 10:05:11 |
| 11 | full extent of your knowledge about Vernon Unsworth | 10:05:12 |
| 12 | when you tweeted about him on the 15th of July, | 10:05:17 |
| 13 | true? | 10:05:21 |
| 14 | A.   Yes. | 10:05:22 |
| 15 | Q.   Basically what you had learned on Google? | 10:05:23 |
| 16 | A.   Yeah, this is all in the space of maybe | 10:05:26 |
| 17 | an hour or so; maybe an hour.  Less than an hour. | 10:05:29 |
| 18 | Q.   Hour.  Could have been an hour and a half | 10:05:33 |
| 19 | you spent looking for him? | 10:05:35 |
| 20 | A.   It was maybe an hour, well, maybe less. | 10:05:37 |
| 21 | Q.   Just somewhere close to the amount of | 10:05:39 |
| 22 | time you spent preparing for this deposition, | 10:05:41 |
| 23 | wouldn't you say? | 10:05:43 |
| 24 | A.   Similar, maybe less.  Probably less. | 10:05:44 |
| 25 | Q.   And that is it; that is all you knew, | 10:05:47 |

48

Exhibit 1
Page 028

1   except you knew one other thing.  You had seen the        10:05:50

2   video, had you not?                                       10:05:54

3        A.   I saw the CNN interview.                        10:05:56

4        Q.   Before you tweeted?                             10:05:59

5        A.   Yes.  I saw the interview.  Did some            10:06:00

6   Google searches.  And I got upset because this guy        10:06:05

7   had insulted me for no reason, and I insulted him         10:06:09

8   back.                                                     10:06:13

9        Q.   You heard and saw the interview.  You did       10:06:14

10  some searching on Google for Vernon Unsworth and          10:06:16

11  Chiang Rai, and then you tweeted about him,               10:06:19

12  including referring to him as a "pedo guy," true?         10:06:22

13       A.   Yes.                                            10:06:25

14       Q.   And that was the sum total of your              10:06:25

15  knowledge of Vernon Unsworth at the time you              10:06:27

16  published those tweets on July 15, true?                  10:06:29

17       A.   To the best of my recollection, yes.            10:06:32

18       Q.   I'm trying to see if you can help me with       10:06:35

19  this, Mr. Musk.  You got this information on Google       10:06:51

20  about Chiang Rai.  Apparently you got information         10:06:55

21  from Google that Mr. Unsworth had at some time            10:06:59

22  lived in the UK and was spending most of his time         10:07:04

23  or had moved to Thailand, right?                          10:07:08

24       A.   Yes.  Something like that.                      10:07:10

25       Q.   Now, stopping there, would that have been       10:07:13

                                                                    49

Exhibit 1
Page 029

1   enough information for you to refer to Mr. Unsworth   10:07:16

2   as a pedo guy, or did you need the information that   10:07:21

3   you got when you saw him on the interview and   10:07:26

4   surmised that he looked like a pedo guy?   10:07:30

5        MR. SPIRO:  If can you answer that.  If   10:07:33

6   you understand the question.   10:07:34

7        THE WITNESS:  I'm not sure I -- let me be   10:07:37

8   clear.  I had never seen this guy before or heard   10:07:38

9   of him before until I saw this interview on CNN.   10:07:41

10  BY MR. WOOD:   10:07:45

11      Q.   And you said he looked like a pedo guy?   10:07:45

12      A.   Yeah, he looked like a pedo.   10:07:48

13      Q.   Did you need to see the interview to   10:07:51

14  reference him as a pedo guy?  Was that what kind of   10:07:53

15  tipped the scales, or was it enough that he had   10:07:55

16  simply lived in UK and apparently started spending   10:07:57

17  time in Thailand?   10:08:01

18        MR. SPIRO:  Yeah.  I'm going to object   10:08:02

19  just because of the timing sequence.  He said that   10:08:02

20  he saw the interview first.  He didn't start   10:08:03

21  googling him randomly first.   10:08:05

22        MR. WOOD:  I didn't mean to suggest --   10:08:06

23        MR. SPIRO:  Yeah.  That's why -- it can   10:08:09

24  be confusing.   10:08:09

25        THE WITNESS:  Right.   10:08:11

50

Exhibit 1
Page 030

```
 1   BY MR. WOOD:                                           10:08:11

 2        Q.   So you saw him first?                        10:08:11

 3        A.   I saw his interview.  And it's like,         10:08:12

 4   well, who the hell is this guy, and what the hell      10:08:16

 5   is he doing insulting me, insulting everything my      10:08:18

 6   team did, the hard work everyone put in to try to      10:08:22

 7   help these kids.                                       10:08:26

 8            We tried hard to be helpful and do the        10:08:27

 9   right thing, and this guy is just unprovoked           10:08:31

10   attacking us for no reason, being rude as hell, and    10:08:32

11   looking like a huge creep.                             10:08:35

12        Q.   I am just trying to figure out how much      10:08:37

13   of his looks on the interview influenced your          10:08:38

14   thoughts that he was a pedo guy or --                  10:08:41

15        A.   He just looked creepy, essentially.          10:08:46

16        Q.   So if you look creepy you think of           10:08:48

17   pedophilia?                                            10:08:52

18        A.   No.  I think if you look creepy and are      10:08:53

19   in Thailand that you look like a pedo guy.  It's       10:08:55

20   just a bad look.                                       10:08:59

21        Q.   But you did not tweet that he looked like    10:09:00

22   a pedo guy, did you?  You called him a pedo guy,       10:09:02

23   right?                                                 10:09:05

24        A.   Pedo guy is just kind of a common insult.    10:09:06

25        Q.   Common insult?                               10:09:10
```

51

Exhibit 1
Page 031

| | | | |
|---|---|---|---|
| 1 | A. | Yes.  Especially where I grew up. | 10:09:11 |
| 2 | Q. | Intending to say you're a pedophile? | 10:09:13 |
| 3 | A. | Not really. | 10:09:15 |
| 4 | Q. | What is it intended to convey? | 10:09:16 |
| 5 | A. | It just basically means are you a creepy | 10:09:18 |
| 6 | | old man, which I believe actually he did seem like | 10:09:21 |
| 7 | | a creepy old man to me. | 10:09:23 |
| 8 | Q. | And how many people have you used the | 10:09:25 |
| 9 | | insult pedo guy against? | 10:09:27 |
| 10 | A. | Growing up in South Africa, it was a | 10:09:34 |
| 11 | | common insult.  Any old creepy guy would be | 10:09:36 |
| 12 | | referred to pedo guy.  It was pretty normal. | 10:09:41 |
| 13 | Q. | You said growing up in South Africa it | 10:09:43 |
| 14 | | was an insult.  Is that talking about, you know, in | 10:09:44 |
| 15 | | your youth?  Y'all used to call people pedo guys? | 10:09:44 |
| 16 | A. | Yeah.  It was like, oh, creepy old man; | 10:09:49 |
| 17 | | pedo guy. | 10:09:52 |
| 18 | Q. | I'm more talking about as an adult any | 10:09:53 |
| 19 | | other times that you have described someone as a | 10:09:54 |
| 20 | | pedo guy, not from your youth in South Africa. | 10:09:58 |
| 21 | A. | Actually, I've not used those words | 10:10:09 |
| 22 | | publicly. | 10:10:11 |
| 23 | Q. | Have you used them in private? | 10:10:11 |
| 24 | A. | Yes, in a few cases. | 10:10:14 |
| 25 | Q. | Against whom? | 10:10:16 |

52

Exhibit 1
Page 032

| | | |
|---|---|---|
| 1 | A.   I can't recall at this time, but I've | 10:10:33 |
| 2 | certainly used it since I was a child.   I could | 10:10:34 |
| 3 | give it some thought and see if I can recall.   I | 10:10:39 |
| 4 | cannot recall specifics right now, but it is just a | 10:10:42 |
| 5 | common phrase. | 10:10:45 |



| | |
|---|---|
| 6 | 10:10:46 |
| 7 | 10:10:49 |
| 8 | 10:10:51 |
| 9 | 10:10:58 |
| 10 | 10:11:03 |
| 11 | 10:11:04 |
| 12 | 10:11:07 |
| 13 | 10:11:10 |
| 14 | 10:11:12 |
| 15 | 10:11:13 |
| 16 | 10:11:15 |
| 17 | 10:11:19 |
| 18 | 10:11:22 |
| 19 | 10:11:25 |
| 20 | 10:11:27 |
| 21 | 10:11:28 |
| 22 | 10:11:30 |
| 23 | 10:11:31 |
| 24 | 10:11:32 |
| 25 | 10:11:34 |

53

Exhibit 1
Page 033



| | | |
|---|---|---|
| 1 | | 10:13:54 |
| 2 | | 10:13:54 |
| 3 | | 10:13:56 |
| 4 | | 10:13:57 |
| 5 | | 10:13:59 |
| 6 | | 10:14:01 |
| 7 | | 10:14:02 |
| 8 | | 10:14:02 |
| 9 | | 10:14:04 |
| 10 | | 10:14:09 |
| 11 | | 10:14:11 |
| 12 | | 10:14:11 |
| 13 | | 10:14:14 |
| 14 | | 10:14:18 |
| 15 | | 10:14:19 |
| 16 | | 10:14:20 |
| 17 | | 10:14:21 |
| 18 | | 10:14:26 |
| 19 | Q.   Mr. Unsworth's companion is 23 years | 10:14:29 |
| 20 | younger than him -- Tik.   Do you have a problem in | 10:14:32 |
| 21 | terms of thinking that Mr. Unsworth is a pedo guy | 10:14:37 |
| 22 | because he was -- his companion is 23 years younger | 10:14:41 |
| 23 | than him? | 10:14:46 |
| 24 | A.   I don't think the age difference matters. | 10:14:47 |
| 25 | What matters is whether somebody is a consenting | 10:14:50 |

58

Exhibit 1
Page 034

```
 1   adult.                                            10:14:53

 2       Q.   Correct.  Meaning over the age -- being  10:14:54

 3   older than that age of consent?                   10:14:59

 4       A.   At a minimum, yes.                        10:15:01

 5       Q.   That is key for you?                      10:15:02

 6       A.   Yes, I mean -- yes.                       10:15:04

 7            MR. WOOD:  All right.  We've been going   10:15:06

 8   for about an hour.  Do you want to take a quick    10:15:06

 9   break?                                             10:15:07

10            MR. SPIRO:  We don't have to.             10:15:07

11            MR. WOOD:  Let's take a quick break.      10:15:09

12   Usually try to do it about every hour, stretch your 10:15:10

13   back.                                              10:15:12

14            THE VIDEOGRAPHER:  And we're going off    10:15:14

15   the record at 10:15 a.m.                           10:15:14

16            (Recess taken.)                           10:25:16

17            THE VIDEOGRAPHER:  And we are back on the 10:25:18

18   record at 10:25 a.m.                               10:25:19

19   BY MR. WOOD:                                       10:25:23

20       Q.   Mr. Musk, since the time of your search  10:25:25

21   on Google about Mr. Unsworth and Chiang Rai, which 10:25:32

22   I believe you told me was done after you saw the   10:25:37

23   interview on CNN or the one he gave to CNN         10:25:41

24   International, and before you tweeted about        10:25:45

25   pedo guy on the 15th of July -- since that time    10:25:48
```

Exhibit 1
Page 035

```
 1    And you know, are these -- you know, is he up to no      10:29:41
 2    good there, or is he there for legitimate reasons.       10:29:44
 3        Q.   I'm sorry.                                       10:29:49
 4        A.   Is Unsworth up to no good there, or is he       10:29:49
 5    there for legitimate reasons.                            10:29:55
 6        Q.   There for --                                    10:29:59
 7        A.   There in Thailand or in Chiang Rai.             10:29:59
 8        Q.   Okay.                                           10:30:01
 9        A.   Which is an odd place to be.                    10:30:01
10             So Jared had this investigator move            10:30:06
11    forward.  Jared, I think, thought this guy was          10:30:11
12    legitimate, and Jared told me that, you know, the       10:30:15
13    investigator was saying that Unsworth had been up       10:30:24
14    to all sorts of bad things in Thailand, and lived       10:30:27
15    in places that were equivalent to like a red-light      10:30:32
16    district or something like that.                        10:30:36
17             And told me -- these things subsequently       10:30:38
18    turned out not to be correct, but these were what       10:30:42
19    were told to me by Jared, who was told to us by         10:30:45
20    this investigator.                                      10:30:49
21             And Jared said that this investigator is       10:30:49
22    saying this guy had like a 12-year-old bride or         10:30:54
23    something like that, and that he lived in Pattaya       10:30:58
24    Beach in a hotel noted for underage sex tourism.        10:31:03
25    These were just things that were related to me --       10:31:09
```

Exhibit 1
Page 036

```
 1      or that were relayed to me by Jared.              10:31:13
 2                 And I was like, wow, this is sounding   10:31:14
 3      pretty bad, you know, maybe, you know, this sort of 10:31:17
 4      offhand insult that I had done in kind -- in       10:31:24
 5      response to his offhand insult -- maybe there's    10:31:29
 6      actually some merit to this.  We should, you know, 10:31:30
 7      try to find out more and see if this is a serious  10:31:33
 8      matter or not.                                     10:31:39
 9                 And then for some reason some guy at    10:31:40
10      BuzzFeed reached out to me about this.  I am not   10:31:45
11      sure why he reached out to me.  But he emailed me. 10:31:49
12      And I was like, well, what if this is a real       10:31:53
13      situation?  What if what we have here is another   10:31:59
14      Jeffrey Epstein.  We should, you know -- I have    10:32:02
15      this -- I am told this information.  I don't know  10:32:06
16      if it is true.  But what if we have another        10:32:09
17      Jeffrey Epstein on our hands?  And what if he uses 10:32:11
18      whatever celebrity he gains from this cave rescue  10:32:15
19      to shield his bad deeds?  This would be terrible.  10:32:20
20                 And so this was like, wow, somebody     10:32:23
21      should really look into this and just find out what 10:32:27
22      is the real situation here.  When I said           10:32:30
23      "pedo guy," I didn't mean that he was literally a  10:32:35
24      pedophile; it was just an insult.  But after       10:32:38
25      getting this information from this investigator    10:32:41
```

                                                    63

Exhibit 1
Page 037

```
 1    through Jared, I was like, well, maybe he is        10:32:43
 2    actually a pedophile.  Is this possible?            10:32:47
 3           And so when this BuzzFeed guy says "Off      10:32:49
 4    the record," meaning this is not for any            10:32:54
 5    publication or any further -- this is told in       10:32:57
 6    confidence, you should go and look into it.  You    10:33:00
 7    know, and so the BuzzFeed guy broke journalistic    10:33:04
 8    ethics and published an email that was never meant  10:33:13
 9    to be published.  I just wanted them to just make   10:33:17
10    sure this guy is not actually up to very bad        10:33:21
11    things.                                             10:33:25
12           So please go -- this is what journalists    10:33:25
13    are supposed to go do is look into these things,    10:33:29
14    try to find out if it is real, and if is we put a   10:33:33
15    stop to it.                                         10:33:39
16    Q.   So you actually had the thought at the         10:33:40
17    time back in August of 2018, this guy might be like 10:33:43
18    another Jeffrey Epstein?                            10:33:50
19           Is that what you told me?                    10:33:50
20    A.   Is that the BuzzFeed correspondence date?      10:33:53
21    I'm not sure of -- this is a year ago, so please if 10:33:57
22    you could -- if I could trouble you to refresh me   10:33:59
23    as to what you mean by that date.                   10:34:01
24    Q.   Well, let me see.                              10:34:03
25           MR. WOOD:  This will be 36.  I had one       10:34:03
```

64

Exhibit 1
Page 038

```
1    marked earlier as 35, but I'll come back to that.      10:34:13
2              (Exhibit 36 was marked for                   10:34:27
3              identification.)                             10:34:27
4    BY MR. WOOD:                                           10:34:28
5         Q.   I'm going to hand you, Mr. Musk, what has    10:34:29
6    been marked for purposes of identification to your     10:34:30
7    deposition as Exhibit 36.  And you may feel free to    10:34:35
8    take the time to review that document.                 10:34:40
9         A.   Sure.                                        10:34:42
10        Q.   But for purposes of my question, I'm just    10:34:43
11   trying to answer your question about the timeline.     10:34:45
12        A.   Thank you.  If you could allow me to take    10:34:50
13   a moment to review it.                                 10:34:54
14        Q.   If this helps.  Yes.                         10:34:57
15             Have you had a chance to review Exhibit      10:35:00
16   No. 36?                                                10:35:59
17        A.   I did.                                       10:36:00
18        Q.   Have you seen it before?                     10:36:01
19        A.   No.                                          10:36:03
20        Q.   You see that the email correspondence and   10:36:03
21   the nondisclosure agreement are dated August 15th      10:36:10
22   of 2018?                                               10:36:15
23        A.   Yes.                                         10:36:16
24        Q.   Does that refresh your recollection as to   10:36:17
25   when you would have asked Jared Birchall to reach      10:36:21
```

65

Exhibit 1
Page 039

```
 1    out to the investigator to find out what he knew or     10:36:25
 2    might be able to find out?                              10:36:28
 3        A.    Yeah, I mean, that would have                 10:36:30
 4    precipitated -- Jared had mentioned that there was      10:36:31
 5    this investigator who -- I think he had mentioned       10:36:33
 6    this before August, but we didn't take action          10:36:38
 7    because, you know, there was -- didn't seem like        10:36:45
 8    good reason to move forward.                            10:36:50
 9            So -- but then if I can recall correctly,       10:36:52
10    it was after I got what seemed like a shakedown         10:36:59
11    letter from you.  I'm like, wait a second, hey,         10:37:02
12    let's just find out if this is a real thing or not.     10:37:04
13    And so this investigator -- I asked Jared does this     10:37:07
14    investigator seem like he's got a credible             10:37:15
15    background?                                             10:37:16
16            And Jared says he sounds credible.  He         10:37:16
17    claimed to work for Paul Allen and George Soros,       10:37:24
18    and I mean, these are some credible people.            10:37:29
19    Sounded like he would be perhaps credible.  Just       10:37:31
20    get to the bottom of the situation; find out what      10:37:35
21    is real and what is not.                               10:37:38
22        Q.    So you were -- your reason for reaching       10:37:41
23    out and retaining Mr. Howard on or about               10:37:46
24    August 15th would be because you had gotten the        10:37:52
25    shakedown letter from me, and you thought maybe        10:37:57
```

66

Exhibit 1
Page 040

| | | |
|---|---|---|
| 1 | you'd better see what was going on here with | 10:38:00 |
| 2 | Unsworth, right? | 10:38:03 |
| 3 | A.   Yes. | 10:38:05 |
| 4 | (Exhibit 37 was marked for | 10:38:05 |
| 5 | identification.) | 10:38:05 |
| 6 | BY MR. WOOD: | 10:38:06 |
| 7 | Q.   Let me hand you -- this is 37.  The court | 10:38:06 |
| 8 | reporter has handed you what has been marked for | 10:38:18 |
| 9 | purposes of identification to your deposition as | 10:38:21 |
| 10 | Exhibit 37. | 10:38:23 |
| 11 | Mr. Musk, if you want to take a moment | 10:38:23 |
| 12 | and look at that document. | 10:38:26 |
| 13 | A.   Right. | 10:38:45 |
| 14 | Q.   Is Exhibit 37 the letter from me that you | 10:38:46 |
| 15 | have earlier characterized as "the shakedown | 10:38:50 |
| 16 | letter"? | 10:38:53 |
| 17 | A.   Yes.  This is the letter that came across | 10:38:54 |
| 18 | certainly as a shakedown letter. | 10:38:58 |
| 19 | Q.   And you had this letter, and you had seen | 10:39:00 |
| 20 | it before you engaged Mr. Howard, true? | 10:39:02 |
| 21 | A.   That is correct. | 10:39:07 |
| 22 | Q.   What is Excession LLC? | 10:39:20 |
| 23 | A.   Excession LLC is basically my family | 10:39:26 |
| 24 | office company. | 10:39:31 |
| 25 | Q.   And what -- generally speaking -- I don't | 10:39:33 |

67

Exhibit 1
Page 041

```
 1        Q.    What is his position at Excession LLC?      10:40:59

 2        A.    It's really just a -- a small -- like       10:41:04

 3   holding company.  It's not really -- there's           10:41:10

 4   essentially two people in it.  He would be the         10:41:12

 5   president, I guess, of Excession.                      10:41:15

 6        Q.    Take a look if you would back at            10:41:18

 7   Exhibit 36, the NDA.                                   10:41:20

 8        A.    Yes.                                        10:41:25

 9        Q.    If you look at the last page of that        10:41:26

10   exhibit, do you see where Mr. Birchall has signed      10:41:27

11   the NDA on behalf of Excession LLC?                    10:41:30

12        A.    Yeah, as manager.                           10:41:35

13        Q.    And he describes his title as "manager."    10:41:35

14              Would you agree with that?                  10:41:37

15        A.    Sure.  Yeah, I would agree with that.       10:41:39

16        Q.    Is he a salaried employee?                  10:41:41

17        A.    Yeah.                                       10:41:44

18        Q.    He works for you?                           10:41:46

19        A.    Yes.                                        10:41:46

20        Q.    He answers to you?                          10:41:47

21        A.    That is correct.                            10:41:50

22        Q.    You are his direct report?                  10:41:50

23        A.    Yes.                                        10:41:52

24        Q.    You obviously give him instructions on      10:41:54

25   what he is to do and not to do, right?                 10:41:56
```

Exhibit 1
Page 042

```
 1        Q.   I'm going to hand you what has been        10:53:31

 2   marked for purposes of identification as             10:53:33

 3   Exhibit 35, Mr. Musk.  And if you take a moment, my  10:53:33

 4   first question is simply going to be:  Are you       10:53:34

 5   familiar with that document?                         10:53:35

 6        A.   Let me take a moment to read it, if I      10:53:44

 7   may.                                                 10:53:46

 8        Q.   Certainly.  Take all the time you need.    10:53:47

 9        A.   Twitter hellswamp is a funny phrase.  But  10:54:29

10   it's accurate at times.                              10:54:34

11             Yes, I've read it.                         10:54:36

12        Q.   Are you familiar with the document?        10:54:41

13        A.   Yes.  Sam sent it to me in July of last    10:54:44

14   year.  I wouldn't say familiar.  He sends me a lot   10:54:49

15   of emails.                                           10:54:51

16        Q.   Before I showed it to you today, when is   10:54:54

17   the last time you recall seeing it?                  10:54:56

18        A.   This was shown to me briefly last night.   10:54:57

19        Q.   Before last night, when was the last time  10:55:00

20   you recall having seen it?                           10:55:02

21        A.   I guess that would have been July of last  10:55:05

22   year.                                                10:55:08

23        Q.   If you will follow along with me,          10:55:08

24   Mr. Musk, on Mr. Teller's email to you at the top.   10:55:10

25   Who is Gwynne?                                       10:55:16
```

80

Exhibit 1
Page 043

| | | |
|---|---|---|
| 1 | A.   Gwynne is the president of SpaceX, the | 10:55:20 |
| 2 | chief operating officer. | 10:55:22 |
| 3 | Q.   What is her last name? | 10:55:24 |
| 4 | A.   Shotwell. | 10:55:25 |
| 5 | Q.   How long as she been the president of | 10:55:25 |
| 6 | SpaceX? | 10:55:25 |
| 7 | A.   Since 2008. | 10:55:29 |
| 8 | Q.   Do you find her to be a valued and | 10:55:30 |
| 9 | trusted employee? | 10:55:32 |
| 10 | A.   Yes, she is great. | 10:55:33 |
| 11 | Q.   Respect her judgment? | 10:55:34 |
| 12 | A.   Yes, absolutely. | 10:55:36 |
| 13 | Q.   And who is Shallman? | 10:55:36 |
| 14 | A.   Shallman.  He's like a -- I think he's in | 10:55:39 |
| 15 | PR or something.  I don't know him well at all. | 10:55:43 |
| 16 | Q.   Do you even know his name, other than | 10:55:48 |
| 17 | Shallman; whether that's first name or last name? | 10:55:51 |
| 18 | A.   I believe that is his last name. | 10:55:53 |
| 19 | Q.   Do you know his first name? | 10:55:55 |
| 20 | A.   No. | 10:55:57 |
| 21 | Q.   Do you know who he works for? | 10:55:58 |
| 22 | A.   I don't know what company he works for. | 10:56:01 |
| 23 | Q.   Can you pull what he looks like up in | 10:56:04 |
| 24 | your mind's eye? | 10:56:08 |
| 25 | A.   No. | 10:56:09 |

81

Exhibit 1
Page 044

```
 1      Q.   You don't know him?                    10:56:09

 2      A.   I don't really know him.               10:56:12

 3      Q.   How about Saltsman?  Who is Saltsman?  10:56:12

 4      A.   Saltsman.  I believe he is a lawyer.   10:56:15

 5      Q.   In-house lawyer?                       10:56:20

 6      A.   No.  He's I think with some law firm in 10:56:21

 7  DC.  I'm not sure.  Sam knows him but I don't know 10:56:26

 8  him.  I have met him once.                      10:56:32

 9      Q.   Do you know his name?  Is Saltsman his 10:56:34

10  last name or name first?                        10:56:36

11      A.   That's his last name; I don't know his 10:56:37

12  first name.                                     10:56:39

13      Q.   So if I asked you --                   10:56:40

14      A.   I actually met him once for only five  10:56:40

15  minutes.                                        10:56:43

16      Q.   In his mind's eye can you even pull up 10:56:44

17  and recognize who he is visually?               10:56:45

18      A.   I might be able to recognize Saltsman.  I 10:56:48

19  am not sure.  But in as much as you meet        10:56:49

20  somebody -- I think I met him once two years ago 10:56:52

21  for five minutes.                               10:56:53

22      Q.   Do you know what he does, if anything, in 10:56:55

23  his role as an attorney for any of your companies? 10:56:58

24      A.   Not really, no.                        10:57:00

25      Q.   You've never -- you have no recollection 10:57:02
```

                                                        82

Exhibit 1
Page 045

| | | |
|---|---|---|
| 1 | of retaining him or his law firm for any type of | 10:57:04 |
| 2 | matter, do you? | 10:57:07 |
| 3 | A.   I think there was some Tesla thing | 10:57:09 |
| 4 | that -- Sam is the one who engaged him for some | 10:57:11 |
| 5 | Tesla-related stuff, but I am not sure what it was | 10:57:15 |
| 6 | about. | 10:57:18 |
| 7 | Q.   What about Todd?  Who is Todd? | 10:57:20 |
| 8 | A.   Todd was the general counsel of Tesla. | 10:57:23 |
| 9 | Q.   How long did Todd -- what is Todd's full | 10:57:26 |
| 10 | name? | 10:57:27 |
| 11 | A.   Todd Maron. | 10:57:27 |
| 12 | Q.   And how long has Todd been the general | 10:57:27 |
| 13 | counsel for Tesla? | 10:57:33 |
| 14 | A.   He left earlier this year, but he was | 10:57:34 |
| 15 | general counsel for about four or five years. | 10:57:36 |
| 16 | Q.   Did he do a good job? | 10:57:39 |
| 17 | A.   Yes. | 10:57:41 |
| 18 | Q.   Would you view him as a -- at the time he | 10:57:41 |
| 19 | was with you a valued and respected employee? | 10:57:44 |
| 20 | A.   Yes. | 10:57:46 |
| 21 | Q.   Whose judgment you trusted? | 10:57:46 |
| 22 | A.   Yes. | 10:57:48 |
| 23 | Q.   And how about Sarah?  Who is Sarah? | 10:57:50 |
| 24 | A.   Sarah was head of communications for | 10:57:52 |
| 25 | Tesla. | 10:57:54 |

83

Exhibit 1
Page 046

1    Q.   What is Sarah's full name?                    10:57:57

2    A.   Actually, I should know this.  I'll           10:58:02

3  recall it soon, but I don't recall it offhand.       10:58:06

4    Q.   How long has she -- is she still the head      10:58:09

5  of communications with Tesla?                         10:58:11

6    A.   No.  She's moved to Facebook.                  10:58:14

7    Q.   She moved to Facebook?                         10:58:16

8    A.   Yes.                                           10:58:18

9    Q.   How long was she head of communications        10:58:18

10  with Tesla?                                           10:58:20

11    A.   She was head of communications for, I         10:58:21

12  believe, about two years but was working for Tesla   10:58:21

13  for two or three years before that in like a number  10:58:25

14  two and number three role in communications.         10:58:26

15    Q.   Did you find her to be a valued and           10:58:33

16  respected employee?                                  10:58:34

17    A.   Generally.                                    10:58:35

18    Q.   And trusted her judgment?                     10:58:36

19    A.   Not in all matters, but generally, yes.       10:58:38

20    Q.   Anything that stand out in your mind's        10:58:41

21  eye that raised some concerns about her judgment?    10:58:44

22    A.   I think she was perhaps overly sensitive      10:58:46

23  to what the press say at times.                      10:58:47

24    Q.   Anything other than sensitivity to the        10:58:49

25  media?                                               10:58:51

84

Exhibit 1
Page 047

1      A.   Not really, no.  She's great.                    10:58:52

2      Q.   Would you consider yourself sensitive to         10:58:54

3    the media coverage of you?  Or have you kind of got     10:58:56

4    thick skin?                                             10:59:00

5      A.   It's a pretty thick skin at this point.          10:59:01

6    I mean, it's a torrent of media.  And I don't know.     10:59:03

7    The media, to be very frank, is -- especially over      10:59:09

8    the last few years, has caused me to lose some          10:59:12

9    faith in humanity.  Not good.                           10:59:16

10     Q.   Have you had to kind of steel yourself            10:59:19

11   against what you feel has been unfair attacks on        10:59:21

12   you by the media, as well as, I know, there's some      10:59:22

13   other people like short sellers you're not happy        10:59:27

14   with?                                                   10:59:28

15          But I mean, from the media perspective,          10:59:28

16   have you had to kind of toughen up your skin to         10:59:29

17   just kind of deal with it and not let it bother         10:59:32

18   you?                                                    10:59:36

19     A.   I mean, it's hard to not -- you know, we         10:59:36

20   all have feelings here.  It is not quite like water     10:59:39

21   off a duck's back.  If the media is making vicious      10:59:44

22   attacks, especially very hurtful ones, then            10:59:47

23   obviously, that's -- thick skin doesn't mean an         10:59:51

24   impenetrable skin.                                      10:59:56

25     Q.   Right, but certainly means tougher skin?         10:59:58

85

Exhibit 1
Page 048

```
 1        A.   It's inevitable.                        11:00:01
 2        Q.   And you have had to develop that type of  11:00:04
 3   toughness with respect to comments about you?     11:00:07
 4        A.   Generally.                              11:00:09
 5        Q.   For the past several years?             11:00:10
 6        A.   Last few years especially.  Past two or  11:00:12
 7   three years.                                      11:00:14
 8        Q.   And what about Deepak?  Who is Deepak?  11:00:15
 9        A.   Deepak Ahuja was the CFO of Tesla for   11:00:18
10   about eight years.                                11:00:23
11        Q.   When did he leave?                      11:00:24
12        A.   Earlier this year.                      11:00:25
13        Q.   Is it a he?                             11:00:26
14        A.   Yes.                                    11:00:27
15        Q.   And where did he go?  Do you know?      11:00:28
16        A.   He retired.                             11:00:30
17        Q.   Was he viewed by you as a loyal and     11:00:31
18   respected employee?                               11:00:36
19        A.   Yes.                                    11:00:37
20        Q.   Whose judgment you trusted?             11:00:37
21        A.   Yeah, he's great.                       11:00:39
22        Q.   And then who is Antonio?  What is       11:00:41
23   Antonio's full name?                              11:00:44
24        A.   Antonio Gracias is a board member of    11:00:46
25   Tesla, and he has been instrumental in Tesla's    11:00:54
```

86

Exhibit 1
Page 049

```
 1    success ever since 2007.                          11:00:57

 2         Q.   Is he a shareholder?                    11:01:04

 3         A.   He is a shareholder, but he has also been    11:01:06

 4    actively helpful in solving production issues and     11:01:11

 5    other issues at Tesla.                             11:01:15

 6         Q.   So you've been -- he's been around for   11:01:19

 7    almost 12 years?                                  11:01:21

 8         A.   Yeah, that's right.                      11:01:23

 9         Q.   You trust his judgment?                  11:01:25

10         A.   Yeah, he's great.                        11:01:27

11         Q.   Respected employee or actually not an   11:01:29

12    employee?                                         11:01:31

13         A.   He is not an employee.                   11:01:32

14         Q.   Not an employee, but he rolls up his     11:01:33

15    sleeves and does get involved with you?           11:01:35

16         A.   Yeah, he is great.                       11:01:37

17         Q.   And Anthony Romero.  Who is that?        11:01:41

18         A.   He is, I believe, executive director of  11:01:44

19    the ACLU.                                         11:01:48

20         Q.   Not connected in any type of employment  11:01:52

21    with any of your companies?                       11:01:54

22         A.   No.                                      11:01:57

23         Q.   How long have you known Anthony Romero?  11:01:57

24         A.   I don't know him well, but we've met     11:02:00

25    several times over the course probably about five  11:02:03
```

87

Exhibit 1
Page 050

```
 1   years.                                              11:02:05

 2        Q.    In what capacity?  Socially or business? 11:02:09

 3        A.    No, just he -- he's asked for my support 11:02:12

 4   of the ACLU.  I have provided some financial        11:02:16

 5   support of the ACLU because I believe in some, but  11:02:19

 6   not all of the things that they do.  A lot of the   11:02:22

 7   things that they do.                                11:02:25

 8        Q.    Is he a friend?                           11:02:27

 9        A.    I wouldn't say I know him well enough to  11:02:31

10   consider him a friend, but you know, we are         11:02:34

11   certainly on friendly terms, and he seems like he   11:02:38

12   cares a lot about doing good things.                11:02:41

13        Q.    You value his judgment in the times he's  11:02:44

14   expressed his feelings to you?                      11:02:47

15        A.    Yeah, sure.                               11:02:49

16        Q.    And who is Davis?                         11:02:50

17        A.    Steve Davis.  Steve is a sort of         11:02:52

18   president/CEO, basically running and building       11:02:56

19   The Boring Company.                                 11:02:59

20        Q.    And how long has he been with The Boring  11:03:01

21   Company?                                            11:03:03

22        A.    He was really part of the formation -- or 11:03:06

23   really very close to the formation, so it's been -- 11:03:07

24        Q.    2017?                                     11:03:10

25        A.    Yes, that's about right.  Been a couple   11:03:11
```

88

Exhibit 1
Page 051

1    years.  But he was -- his first job out of college    11:03:13

2    was SpaceX.  So when he graduated Stanford, he         11:03:17

3    joined SpaceX in 2003 or 2004, only a year or two       11:03:22

4    after the company was created.                          11:03:29

5        Q.   And he is still with The Boring Company?       11:03:31

6        A.   Yes.                                           11:03:33

7        Q.   So he's been around for a number of           11:03:34

8    years?                                                  11:03:36

9        A.   Yeah.  Very smart guy.                         11:03:37

10        Q.   Do you find him to be a respected and          11:03:40

11    trusted employee?                                      11:03:42

12        A.   I really don't think of people as             11:03:44

13    employees to be totally frank, but I worked with --    11:03:45

14    Steve Davis could do anything he wants.  So it's        11:03:48

15    like I wouldn't call him my employee.  He could         11:03:50

16    go --                                                  11:03:52

17        Q.   Talented guy?                                 11:03:52

18        A.   Very talented guy.                            11:03:54

19        Q.   Trust him?                                    11:03:54

20        A.   So he could do anything he wants, yeah.       11:03:55

21        Q.   Respect his judgment?                         11:03:59

22        A.   Yeah.  Not in all things, but yeah.  His      11:04:00

23    technical judgment.                                    11:04:00

24        Q.   Anything about his judgment that stands       11:04:02

25    out to you that you have a little bit of an issue       11:04:05

89

Exhibit 1
Page 052

1    with?   I remember you had one lady you thought was    11:04:07

2    really sensitive to media.                              11:04:10

3              I'm just asking you similarly:   Is there     11:04:11

4    anything about Mr. Davis where in your judgment his     11:04:12

5    judgment is not quite as solid in your mind?            11:04:17

6         A.   Well, I think his engineering judgment is    11:04:21

7    very good.   You know, I mean, I really never had       11:04:26

8    any kind of sort of social judgment discussions         11:04:33

9    with him, but it's like we have had many design --      11:04:39

10   engineering design discussions.                         11:04:43

11        Q.   Any media discussions about how to deal       11:04:45

12   with the media?                                         11:04:49

13        A.   Nothing in a serious -- nothing serious,      11:04:50

14   no, where we sold some hats and flamethrowers, you      11:04:52

15   know.                                                   11:04:54

16        Q.   So what about Elissa?   Who is that?          11:04:57

17        A.   Elissa Butterfield.   She was my             11:05:02

18   assistant.                                              11:05:05

19        Q.   How long has she -- was she your             11:05:07

20   assistant?                                              11:05:08

21        A.   I think it's three or four years.   She      11:05:10

22   still works at SpaceX and works -- is currently        11:05:16

23   running events and merchandise, I believe.             11:05:20

24        Q.   Marketing person?                            11:05:24

25        A.   Sort of a marketing person.   Sort of        11:05:25

90

Exhibit 1
Page 053

```
 1   operations get-it-done sort of person.              11:05:28
 2        Q.   And have you found her to be a loyal and  11:05:30
 3   respected employee?                                 11:05:37
 4        A.   Yes.                                       11:05:38
 5        Q.   Trust her judgment?                        11:05:39
 6        A.   Generally, yes.                            11:05:41
 7        Q.   Anything that jumps out about her          11:05:42
 8   judgment that might cause you some concern?         11:05:47
 9        A.   No.                                        11:05:50
10        Q.   And now we get to Omead.                   11:05:50
11        A.   Omead.                                     11:05:59
12        Q.   Who is Omead?                              11:06:01
13        A.   Omead, primarily -- well, I shouldn't say 11:06:04
14   primarily.  He works at Tesla.  And he works in my  11:06:04
15   executive office at Tesla.  He is an engineer;       11:06:17
16   great -- a technical problem solver.                11:06:19
17        Q.   How long has he been with your company -- 11:06:27
18   one of your companies?                              11:06:29
19        A.   I think it's been about three years.      11:06:31
20        Q.   Find him to be someone you can respect    11:06:33
21   and trust?                                          11:06:35
22        A.   Yes.  I mean, as with Steve Davis, our    11:06:36
23   interactions are primarily regarding engineering    11:06:38
24   and manufacturing and solving technical problems.   11:06:41
25        Q.   Any issues with his judgment?             11:06:47
```

91

Exhibit 1
Page 054

```
 1      A.   No.                                       11:06:49

 2           MR. WOOD:  What number are we on?         11:06:49

 3           THE REPORTER:  38 is next.                11:06:49

 4           MR. WOOD:  Mark this as 38.               11:06:49

 5           (Exhibit 38 was marked for                11:06:49

 6           identification.)                          11:06:49

 7  BY MR. WOOD:                                       11:07:28

 8      Q.   The court reporter has handed you what    11:07:28

 9  has been marked for purposes of identification to  11:07:31

10  your deposition, Mr. Musk, as Exhibit 38.          11:07:34

11           If you'll take a moment.  Look over that  11:07:35

12  document.  And my question is:  Are you familiar   11:07:38

13  with those tweets?                                 11:07:40

14      A.   Yes.                                      11:07:47

15      Q.   Those tweets were published by you on     11:07:47

16  Twitter on July 15, 2018, true?                    11:07:50

17      A.   Yes.                                      11:07:55

18      Q.   Did you write them yourself?              11:07:56

19      A.   Yes.                                      11:07:57

20      Q.   Did anyone give you any input into the    11:08:00

21  wording of those tweets?                           11:08:02

22      A.   No.                                       11:08:04

23      Q.   Did anyone review those tweets for you    11:08:05

24  before you published them on Twitter?              11:08:10

25      A.   No.                                       11:08:13
```

92

Exhibit 1
Page 055

1            MR. WOOD:  Did I just misstate the          11:08:13

2    exhibit number?  Is it 38 or 39?                    11:08:13

3            THE REPORTER:  38.  Did I write 39?  It's   11:08:13

4    38.                                                 11:08:13

5            MR. SPIRO:  We have no objection to you     11:08:13

6    correcting it later, obviously.                     11:08:13

7            Yeah, we have no objection to you           11:08:13

8    correcting it later.                                11:08:13

9    BY MR. WOOD                                         11:08:13

10       Q.   Well, Exhibit 38.  Three tweets that you   11:08:13

11   published on Twitter July 15, 2018, right?          11:08:43

12       A.   Yes.                                       11:08:48

13       Q.   Before you published those tweets, had     11:08:51

14   you received any expressions of concern from        11:08:56

15   principals at Tesla or SpaceX about                 11:09:04

16   Vernon Unsworth?                                    11:09:12

17       A.   No.  Never heard of him.                   11:09:14

18       Q.   After those tweets on Exhibit 38, did you  11:09:17

19   receive any communications from any of the folks at 11:09:22

20   Tesla or SpaceX or any of your other companies      11:09:27

21   expressing concern about the tweets set forth in    11:09:31

22   Exhibit 38?                                         11:09:36

23            MR. SPIRO:  Objection; relevance.          11:09:37

24            THE WITNESS:  Certainly there were, I      11:09:43

25   think, many expressions of concern, yeah.           11:09:45

93

Exhibit 1
Page 056

```
 1   BY MR. WOOD:                                        11:09:49

 2       Q.   What was the nature of the concerns --     11:09:49

 3   the share price took a hit after these tweets?      11:09:52

 4       A.   I guess, yeah.                             11:09:58

 5       Q.   4 percent?  Does that sound right?         11:09:59

 6       A.   Sounds about right.                        11:10:02

 7       Q    I mean, not a good day.  I mean, not as    11:10:06

 8   bad as -- worse than yesterday, but not a good day. 11:10:06

 9            Did you feel like the drop in the stock    11:10:06

10   had some nexus to your tweets about Mr. Unsworth?   11:10:08

11       A.   It's hard to say what drives the stock.    11:10:14

12   It randomly goes up and down.  As Warren Buffet     11:10:17

13   says -- I'm sorry.  Do you need a minute?           11:10:23

14       Q.   I'm sorry.                                 11:10:26

15       A.   As Warren Buffet says, having a -- being   11:10:27

16   a publicly traded stock is like having some manic   11:10:32

17   depression person at the border of your house just  11:10:34

18   yelling out house prices every day.                 11:10:38

19            It can be -- it may or may not be related  11:10:40

20   to the reality, but actually most of it -- it's not 11:10:45

21   like the, you know, house or company's actually     11:10:49

22   changed their value; it's just the betting on Wall  11:10:53

23   Street changed.                                     11:10:57

24       Q.   Do you know Mr. Buffet?                    11:10:59

25       A.   I have talked to him on a number of        11:11:01
```

94

Exhibit 1
Page 057

| | | |
|---|---|---|
| 1 | Q.   Is that right? | 11:11:42 |
| 2 | A.   Yes. | 11:11:43 |
| 3 | Q.   And whether or not you connected the | 11:11:44 |
| 4 | stock drop or not, some people did? | 11:11:47 |
| 5 | A.   Some people -- people -- this generally | 11:11:52 |
| 6 | occurs where the stock will move up or down and | 11:11:54 |
| 7 | there will be some event, but this is what I mean | 11:11:57 |
| 8 | by referring to Buffet's statement that the stock | 11:12:03 |
| 9 | market is like, you know, with a manic depressive. | 11:12:06 |
| 10 | It moves whether there is news or not. | 11:12:10 |
| 11 | And if there is some news -- the press will often | 11:12:14 |
| 12 | interpret it as the price moving just due to the | 11:12:20 |
| 13 | news, because they don't have anything else to go | 11:12:23 |
| 14 | on.  But it's really -- actually, most of the time | 11:12:25 |
| 15 | it is not related to the news. | 11:12:28 |
| 16 | It's more related to some investor woke | 11:12:30 |
| 17 | up this morning and decided the company was more or | 11:12:34 |
| 18 | less valuable, changed their portfolio allocation, | 11:12:36 |
| 19 | but it is not related specifically to the news. | 11:12:39 |
| 20 | Most of the time it's just -- even if | 11:12:43 |
| 21 | there was no news whatsoever about a company, you | 11:12:45 |
| 22 | would still see significant price movements. | 11:12:48 |
| 23 | Q.   Well, the price movement after your pedo | 11:12:50 |
| 24 | guy tweet, at least in market value -- it was about | 11:12:54 |
| 25 | a $2 billion hit to the company, true? | 11:12:57 |

96

Exhibit 1
Page 058

| | | |
|---|---|---|
| 1 | A.    4 percent is perhaps a better way to look | 11:13:04 |
| 2 | at it.  If -- 4 percent is not a particularly | 11:13:07 |
| 3 | unusual movement for Tesla.  There have been many | 11:13:11 |
| 4 | changes in value far in excess of that on a daily | 11:13:14 |
| 5 | basis. | 11:13:19 |
| 6 | Q.    While you weren't concerned that the drop | 11:13:20 |
| 7 | had related to the tweet, others did have some | 11:13:22 |
| 8 | concern.  Would that be a fair statement? | 11:13:25 |
| 9 | A.    Others did have some concern, yes. | 11:13:27 |
| 10 | Q.    In fact, you kind of thought they were | 11:13:29 |
| 11 | panicking? | 11:13:31 |
| 12 | A.    That's correct. | 11:13:32 |
| 13 | Q.    And you said you know, stop panicking? | 11:13:32 |
| 14 | A.    Yeah.  Don't panic.  Number one rule. | 11:13:36 |
| 15 | Q.    Number what? | 11:13:39 |
| 16 | A.    Number one rule.  Don't panic. | 11:13:39 |
| 17 | Q.    Don't panic.  I won't bore you with the | 11:13:45 |
| 18 | guy in the seventh grade who came to our elementary | 11:13:45 |
| 19 | school and he taught first aid.  He was a big guy | 11:13:45 |
| 20 | with a great voice, and anything that he described | 11:13:48 |
| 21 | to you, he started off by saying "Don't panic." | 11:13:52 |
| 22 | A.    That's right. | 11:13:59 |
| 23 | Q.    Snake bites you; don't panic.  Slice your | 11:13:59 |
| 24 | arm; don't panic. | 11:14:00 |
| 25 | So that's kind of your mantra:  Don't | 11:14:01 |

97

Exhibit 1
Page 059

```
 1    just caused a lot of strife that was unnecessary.      11:16:41

 2         Q.   What strife?                                  11:16:47

 3         A.   Just, you know, a lot of negativity,          11:16:49

 4    negative press.  Grief.  Probably caused                11:16:51

 5    unreasonable grief to Unsworth as well, you know.       11:16:57

 6    I --                                                    11:17:00

 7         Q.   Are you talking about your tweets?            11:17:00

 8         A.   Yeah.                                          11:17:03

 9         Q.   Yeah.  So just so it's clear -- so did       11:17:03

10    you feel genuinely remorseful about what you had        11:17:06

11    said about Mr. Unsworth suggesting that he was a        11:17:11

12    pedophile?                                              11:17:15

13         A.   I did not suggest he was a pedophile.         11:17:17

14         Q.   Strike that.                                  11:17:17

15         A.   I --                                          11:17:17

16         Q.   Strike that.                                  11:17:17

17              Did you feel genuinely remorseful about       11:17:17

18    describing Mr. Unsworth as a pedo guy?                  11:17:23

19         A.   I felt -- I felt remorseful for -- you        11:17:26

20    know, insulting this guy and for the grief that it      11:17:29

21    caused the people of my companies who had tried         11:17:39

22    hard especially to do some good for these kids.         11:17:42

23         Q.   Well, you had heard from some people with     11:17:45

24    your companies, and they were not happy with you,       11:17:47

25    were they, Mr. Musk?                                    11:17:49
```

                                                              100

Exhibit 1
Page 060

```
1      A.   No.  They were dismayed.  This is true.    11:17:52
2      Q.   By your tweets and use of "pedo guy"?       11:17:56
3      A.   Yes.                                         11:17:59
4      Q.   And so this was in part to respond to       11:18:00
5  their concerns.  You decided to publish this          11:18:06
6  explanation of what you did and why, right?            11:18:10
7      A.   I mean, I could have not done it.  It        11:18:13
8  would have been -- I mean, the companies would have    11:18:16
9  gone about their business.  Nobody was making me do    11:18:18
10 it.  But I did feel bad about having done it.  I       11:18:21
11 should not have done it.                               11:18:24
12     Q.   Do you feel bad about having done it to      11:18:27
13 Vernon Unsworth?                                        11:18:29
14     A.   In part.  Although -- that's part of it.      11:18:30
15 It's not the main reason, but it's part of it, yes.    11:18:33
16     Q.   What is the other part?                       11:18:36
17     A.   Well, mostly I feel bad for the team who      11:18:40
18 worked so hard to try to help those kids.  And, you    11:18:44
19 know, they worked day and night to do some good,       11:18:48
20 and you know, that tweet made them sad, and that       11:18:56
21 wasn't good.                                            11:19:01
22     Q.   Well, I understand that.  And you            11:19:03
23 expressed that when you say "apologize to the          11:19:05
24 companies I represent as leader," right?  But I        11:19:07
25 want to talk about Mr. Unsworth.  When you             11:19:12
```

101

Exhibit 1
Page 061

```
 1      A.   Of course.                            11:21:34
 2      Q.   -- wouldn't you?                       11:21:34
 3      A.   Of course.                            11:21:36
 4      Q.   Because I think you would agree with me,  11:21:37
 5 Mr. Musk, there is probably very little in this   11:21:38
 6 life that is worse, more heinous than an adult who 11:21:42
 7 would take sexual advantage of a minor child, true? 11:21:47
 8      A.   I think murdering people is worse.    11:21:53
 9      Q.   I don't know.  The murder victim doesn't 11:21:55
10 have to live with it.  The victim of pedophilia   11:21:57
11 lives with it all their lives.                    11:21:58
12           So I won't debate it with you, so perhaps 11:22:02
13 you want to put murder ahead of that.             11:22:04
14      A.   Serial killers, cannibals, yeah, that 11:22:07
15 kind of thing.                                    11:22:07
16      Q.   So would you say that pedophilia is right 11:22:09
17 up there with serial killers and murders?         11:22:10
18      A.   It's pretty bad.                       11:22:15
19      Q.   It is despicable.                      11:22:18
20      A.   It is.                                 11:22:18
21      Q.   It's disgusting.                       11:22:18
22      A.   Agreed.                                11:22:22
23      Q.   It is not to be tolerated in a civilized 11:22:22
24 society to have adults engaged in sexual activities 11:22:26
25 or fantasies about minor children.  It's just not 11:22:31
```

104

Exhibit 1
Page 062

| | |
|---|---|
| 1 | proper in any form or fashion, true? | 11:22:35 |
| 2 | A.   True.  You sound a bit like Bill Clinton, | 11:22:38 |
| 3 | but yes. | 11:22:43 |
| 4 | Q.   I don't know if that's a compliment or | 11:22:43 |
| 5 | not.  But you know what? | 11:22:47 |
| 6 | A.   Just the way you said it. | 11:22:47 |
| 7 | Q.   I'm going to take it -- I'm going to take | 11:22:47 |
| 8 | it as a compliment. | 11:22:48 |
| 9 | A.   Probably a mixture. | 11:22:50 |
| 10 | Q.   Hmm? | 11:22:52 |
| 11 | A.   Probably a mix. | 11:22:53 |
| 12 | Q.   I'm just kidding you. | 11:22:54 |
| 13 | A.   It's a mixed bag. | 11:22:54 |
| 14 | Q.   I probably should reflect on that.  You | 11:22:54 |
| 15 | aren't here to compliment me, huh?  So we'll let | 11:22:56 |
| 16 | that one go.  I'll just take it as a compliment. | 11:22:58 |
| 17 | A.   Yeah. | 11:23:05 |
| 18 | Q.   I mean, I just can't -- but after you | 11:23:06 |
| 19 | published this statement on -- this was on the 17th | 11:23:18 |
| 20 | of July.  This was literally two days after you had | 11:23:24 |
| 21 | described him or insulted him by saying he was a | 11:23:27 |
| 22 | pedo guy, right? | 11:23:31 |
| 23 | A.   Yeah. | 11:23:33 |
| 24 | Q.   You said at the end "The fault is mine | 11:23:36 |
| 25 | and mine alone."  Your words, right? | 11:23:37 |

105

Exhibit 1
Page 063

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 11:23:40 |
| 2 | Q. | Did you mean that? | 11:23:40 |
| 3 | A. | Yes. | 11:23:41 |
| 4 | Q. | That was sincere? | 11:23:42 |
| 5 | A. | Yes. | 11:23:42 |
| 6 | Q. | Do you still feel that way today? | 11:23:43 |
| 7 | A. | Yes. | 11:23:46 |

8      Q.   You don't put any fault on Mr. Unsworth.    11:23:46

9   The fault is mine and mine alone, right?    11:23:50

10      A.   Actually, I think I was referring to    11:23:54

11   anyone associated with the company.  I do have -- I    11:23:57

12   do think there is some fault of Unsworth, of    11:23:58

13   course, because he did an unprovoked attack and    11:24:03

14   lied on CNN about me.  So is there some fault of    11:24:07

15   Unsworth.  Of course.  But did that justify me    11:24:12

16   insulting him back?  No.    11:24:16

17      Q.   Let me see if I -- help me make sure I    11:24:18

18   understand what you're telling me.  When you say    11:24:22

19   "The fault is mine and mine alone," were you saying    11:24:23

20   that as it relates to the employees of my    11:24:26

21   companies --    11:24:31

22      A.   Yes.  No one else at the companies --    11:24:32

23      Q.   It was my fault and mine alone, and    11:24:32

24   nothing with respect to the people at the    11:24:35

25   companies, right?    11:24:37

106

Exhibit 1
Page 064

| | | |
|---|---|---|
| 1 | A.   That is correct.   No one at the | 11:24:37 |
| 2 | company -- no one else at the companies was to | 11:24:39 |
| 3 | blame or in any way responsible for my | 11:24:41 |
| 4 | counter-insult to Unsworth. | 11:24:46 |
| 5 | Q.   So then when you said "The fault is mine | 11:24:50 |
| 6 | and mine alone," you were not intending to refer to | 11:24:52 |
| 7 | Mr. Unsworth with that statement; is that true? | 11:24:56 |
| 8 | A.   In that particular statement I was | 11:24:59 |
| 9 | referring to the prior statement of the companies I | 11:25:00 |
| 10 | represented as leader. | 11:25:02 |
| 11 | Q.   Not Mr. Unsworth? | 11:25:03 |
| 12 | A.   Correct.   I would not regard Unsworth as | 11:25:06 |
| 13 | fault-free. | 11:25:10 |
| 14 | Q.   Would you describe him as being at fault | 11:25:11 |
| 15 | for what you said? | 11:25:13 |
| 16 | MR. SPIRO:   You can answer that. | 11:25:17 |
| 17 | THE WITNESS:   He is partly at fault. | 11:25:18 |
| 18 | BY MR. WOOD: | 11:25:19 |
| 19 | Q.   And you felt that way at the time you | 11:25:19 |
| 20 | published this tweet on the 17th.   You weren't | 11:25:21 |
| 21 | saying the fault is mine and not Vernon Unsworth's. | 11:25:23 |
| 22 | You were only saying the fault is mine and not the | 11:25:29 |
| 23 | fault of anybody with my companies, true? | 11:25:33 |
| 24 | A.   That is correct. | 11:25:36 |
| 25 | Q.   Because you thought he was at fault? | 11:25:36 |

107

Exhibit 1
Page 065

```
 1        Q.   Well, so you were saying "I am sorry,      11:28:12

 2   Mr. Unsworth, for saying what I said, but you were   11:28:15

 3   at fault for setting up a situation where I said     11:28:20

 4   it."                                                 11:28:23

 5             Would that be accurate?                    11:28:23

 6        A.   I was apologizing without any conditions.  11:28:25

 7   It was an unreserved apology; no question about      11:28:29

 8   that.                                                11:28:34

 9             The -- you know, his bad behavior does     11:28:34

10   not excuse my bad behavior.  And it would have       11:28:41

11   been -- so just because somebody does something bad  11:28:46

12   and there's an unprovoked attack and lies about      11:28:49

13   you, doesn't mean that you should insult them back.  11:28:52

14        Q.   Well, there were a number of people        11:28:55

15   before Mr. Unsworth or right around the time that    11:28:57

16   his interview was broadcast, you were aware of the   11:28:59

17   fact that there were reports in the media of         11:29:02

18   criticism of your efforts with regard to the cave    11:29:05

19   rescue as a publicity stunt.                         11:29:09

20             You were aware of that, weren't you?       11:29:11

21        A.   I'm frequently accused of such things,     11:29:13

22   but -- I'm frequently accused of many things.  I     11:29:16

23   mean, if you want to see insults, just look at       11:29:17

24   Twitter.  Twitter is rife with insults.  It is not   11:29:21

25   the most polite place on earth.  Twitter is kind of  11:29:25
```

110

Exhibit 1
Page 066

| | | |
|---|---|---|
| 1 | a war zone on insults.  It is -- insulting is quite | 11:29:32 |
| 2 | common on Twitter.  This is a par for the course. | 11:29:38 |
| 3 | Q.   Does that make it right? | 11:29:42 |
| 4 | A.   No. | 11:29:44 |
| 5 | Q.   Mr. Unsworth didn't insult you on | 11:29:44 |
| 6 | Twitter, did he? | 11:29:50 |
| 7 | A.   No, he insulted me on -- with CNN, an | 11:29:51 |
| 8 | international news organization.  That's worse. | 11:29:51 |
| 9 | Insults on Twitter are common.  Insults to a major | 11:29:56 |
| 10 | international news organization -- this is a much | 11:30:02 |
| 11 | more serious affair. | 11:30:04 |
| 12 | Q.   And given that you have -- and I don't | 11:30:09 |
| 13 | want to put the word "frequently."  Maybe you tell | 11:30:13 |
| 14 | me what word you would use.  Let's just say that | 11:30:14 |
| 15 | you are periodically accused in the media by | 11:30:16 |
| 16 | certain publications or reporters of engaging in | 11:30:20 |
| 17 | publicity stunts. | 11:30:23 |
| 18 | You know that, don't you? | 11:30:25 |
| 19 | A.   I am accused of everything by the media, | 11:30:27 |
| 20 | and random people, and thousands of -- I mean, I am | 11:30:29 |
| 21 | accused of good things that I probably shouldn't | 11:30:34 |
| 22 | get credit for.  Actually for sure, certainly, I'm | 11:30:38 |
| 23 | often given credit for things I don't deserve.  I'm | 11:30:42 |
| 24 | often attacked for things I don't deserve.  Or | 11:30:44 |
| 25 | given -- this is a wild world out there. | 11:30:48 |

111

Exhibit 1
Page 067

```
 1       Q.   But one of those things that you're        11:30:53

 2   frequently attacked for is engaging in publicity    11:30:53

 3   stunts.                                              11:30:57

 4       A.   I don't engage in publicity stunts.        11:30:58

 5       Q.   I didn't say whether you did or not.  I     11:30:59

 6   am saying that you recognize that you are often      11:31:00

 7   attacked for engaging in publicity stunts?           11:31:03

 8       A.   I mean, I find it ironic, because the       11:31:07

 9   very media that the vast majority of them who might  11:31:10

10   accuse me of being a publicity stunt are the same    11:31:14

11   ones who are demanding an interview, which I         11:31:16

12   refuse.                                              11:31:17

13       Q.   And I appreciate that.  But I'm just        11:31:19

14   trying to establish, sir, the answer to my question  11:31:21

15   is yes.  "Yes, Mr. Wood, I have -- in the last        11:31:22

16   several years, I get accused" --                     11:31:26

17       A.   It's not Mr. Wood.  Just so you know.       11:31:27

18       Q.   Don't what?                                 11:31:27

19       A.   Nothing. nothing.                           11:31:27

20       Q.   I -- I get accused of engaging in           11:31:27

21   publicity stunts, and it's an unfair and untrue      11:31:34

22   accusation, but I've been accused of it.             11:31:38

23            Would that be a correct statement of your   11:31:39

24   testimony?                                           11:31:40

25       A.   I'm been accused of many things; that's     11:31:41
```

                                                             112

Exhibit 1
Page 068

| | | |
|---|---|---|
| 1 | one of them. | 11:31:44 |
| 2 | Q.   That's one of them? | 11:31:45 |
| 3 | A.   Yeah. | 11:31:47 |
| 4 | Q.   And it's -- you know, I use the phrase | 11:31:47 |
| 5 | "It's like let it run off your back like water on a | 11:31:47 |
| 6 | duck's back."  You ever heard that idiom? | 11:31:49 |
| 7 | A.   Yeah.  This is more like acid off a | 11:31:52 |
| 8 | duck's back. | 11:31:55 |
| 9 | Q.   It's what? | 11:31:55 |
| 10 | A.   It feels more like acid off a duck's | 11:31:55 |
| 11 | back. | 11:31:56 |
| 12 | Q.   When somebody accuses you of a publicity | 11:31:57 |
| 13 | stunt? | 11:32:00 |
| 14 | A.   Yes.  It rolls off, but it hurts. | 11:32:02 |
| 15 | Q.   But you get that from a lot of people | 11:32:04 |
| 16 | other than the one time Mr. Unsworth said it, true? | 11:32:06 |
| 17 | A.   Yes. | 11:32:12 |
| 18 | Q.   And have you ever had anybody tell you to | 11:32:12 |
| 19 | shove it up your ass? | 11:32:17 |
| 20 | A.   Not specifically, no.  I don't recall | 11:32:19 |
| 21 | that exact phrase or a phrase quite like that, no. | 11:32:22 |
| 22 | Q.   Stick it where the sun don't shine? | 11:32:26 |
| 23 | A.   No.  Actually, now that you mention it, | 11:32:30 |
| 24 | I've not heard that phrase. | 11:32:30 |
| 25 | Q.   You have never used that phrase? | 11:32:32 |

113

Exhibit 1
Page 069

| | | |
|---|---|---|
| 1 | A.  It's not an idiom I use, no. | 11:32:33 |
| 2 | Q.  But you know it's an idiom? | 11:32:38 |
| 3 | A.  Yes.  It is physically impossible, of | 11:32:41 |
| 4 | course. | 11:32:44 |
| 5 | Q.  Pardon? | 11:32:44 |
| 6 | A.  It's physically impossible, so yes. | 11:32:44 |
| 7 | Q.  Well, I don't know if it's physically | 11:32:52 |
| 8 | impossible or not, but I understand what you are | 11:32:53 |
| 9 | telling me. | 11:32:56 |
| 10 | A.  You are insulting me? | 11:32:57 |
| 11 | Q.  I'm sorry? | 11:33:02 |
| 12 | A.  Are you insulting me? | 11:33:03 |
| 13 | Q.  What makes you think I was insulting you? | 11:33:05 |
| 14 | A.  I don't know. | 11:33:05 |
| 15 | Q.  Mr. Musk, I have lot of things to do in | 11:33:05 |
| 16 | life, but insulting you is just not something I | 11:33:06 |
| 17 | care about doing. | 11:33:08 |
| 18 | A.  Okay. | 11:33:10 |
| 19 | Q.  If I wanted to insult you, sir, I'd | 11:33:10 |
| 20 | probably know how to do.  I'm just here to ask | 11:33:11 |
| 21 | questions, representing my client, to get the truth | 11:33:13 |
| 22 | from you.  That's all.  So if I say something you | 11:33:17 |
| 23 | think is an insult, please -- I don't mean for it | 11:33:20 |
| 24 | to be. | 11:33:23 |
| 25 | A.  I was just curious. | 11:33:23 |

114

Exhibit 1
Page 070

```
 1       Q.   If I do -- I'll make you a deal.  If I        11:33:23
 2   decide to insult you, I'll go "Mr. Musk, I'm          11:33:24
 3   getting ready to insult you."                         11:33:26
 4       A.   I'll take your words at face value.          11:33:29
 5       Q.   I'm not here to do that.  Do you feel        11:33:30
 6   insulted?                                             11:33:35
 7       A.   Not really.                                  11:33:36
 8       Q.   39.  Look at the first tweet, 11:38 p.m.     11:33:39
 9       A.   Yes.                                         11:33:43
10       Q.   Would it be fair to say that in that         11:33:43
11   first tweet on the 17th of July, Exhibit 39, that     11:33:53
12   you were conveying blame on the part of               11:33:58
13   Mr. Unsworth for what had happened and what you had   11:34:03
14   said?                                                 11:34:06
15       A.   Yeah.                                        11:34:19
16       Q.   I'm sorry?                                   11:34:19
17       A.   Yes.  I think, you know, he was -- I was     11:34:19
18   upset with Unsworth for saying things that weren't    11:34:27
19   true and using this metaphor, telling me to shove     11:34:31
20   this up my ass -- shove the sub up my ass,            11:34:38
21   basically.                                            11:34:39
22       Q.   Stick it where it hurts?                     11:34:40
23       A.   Yeah.                                        11:34:43
24       Q.   And you blamed him because he provoked       11:34:43
25   you that led you to refer to him as pedo guy; is      11:34:47
```

115

Exhibit 1
Page 071

| | | |
|---|---|---|
| 1 | that right? | 11:34:52 |
| 2 | A.   He upset me greatly with his lies and | 11:34:56 |
| 3 | insults that were unprovoked. | 11:35:00 |
| 4 | Q.   So and you're making that clear -- | 11:35:02 |
| 5 | A.   Statement of fact. | 11:35:04 |
| 6 | Q.   -- in your first email or tweet on the | 11:35:05 |
| 7 | 17th of July on Exhibit 39, you are clearly | 11:35:08 |
| 8 | conveying that you felt like Mr. Unsworth was in | 11:35:11 |
| 9 | part at fault or to blame for what you said, right? | 11:35:16 |
| 10 | A.   I was essentially saying that his insults | 11:35:22 |
| 11 | and lies are what led to me insulting him back, but | 11:35:29 |
| 12 | his insults and lies do not justify me insulting | 11:35:35 |
| 13 | him back.  As my mother said, it's just best not to | 11:35:40 |
| 14 | respond in these situations. | 11:35:43 |
| 15 | Q.   But you were conveying, look "I accept | 11:35:45 |
| 16 | that I'm at fault in part, but also Mr. Unsworth | 11:35:49 |
| 17 | was also at fault"? | 11:35:54 |
| 18 | A.   Definitely.  He's definitely at fault. | 11:35:55 |
| 19 | Q.   So it was, in your words, you would have | 11:35:56 |
| 20 | been saying "I want to apologize to you, | 11:35:58 |
| 21 | Mr. Unsworth, for what you in part caused"? | 11:36:02 |
| 22 | A.   No.  It's -- make sure people understand. | 11:36:05 |
| 23 | This guy attacked me first; he insulted me first. | 11:36:13 |
| 24 | He was super rude and lied. | 11:36:17 |
| 25 | That said, my insult back to him is not | 11:36:18 |

116

Exhibit 1
Page 072

```
 1        Q.    Did you think when he said it was just a    11:39:09
 2   PR stunt that that was an attack on you, Elon Musk?    11:39:11
 3        A.    Attack on me and my team and everyone who   11:39:16
 4   tried to be helpful.                                   11:39:21
 5        Q.    So the insult part was directed, you        11:39:23
 6   felt, toward you, and that that was the "stick it      11:39:26
 7   where it hurts"?                                       11:39:27
 8        A.    Yes.                                        11:39:29
 9        Q.    Talking about your tube.                    11:39:30
10        A.    That was directed at me, yes.               11:39:32
11        Q.    Do you know what the idiom means when you   11:39:32
12   tell somebody to "stick it where the sun doesn't       11:39:37
13   shine" or "stick it where it hurts" or "stick it up    11:39:40
14   your ass"?                                             11:39:41
15        Do you know what that generally is meant          11:39:41
16   to convey?  Figuratively, I guess I should say?        11:39:44
17        A.    I think it's especially an idiomatic        11:39:55
18   expression for bullshit something.                     11:39:56
19        Q.    Bullshit?                                   11:39:59
20        A.    Yeah.                                       11:40:00
21        Q.    He was calling bullshit on your tube?       11:40:00
22        A.    Yeah.                                       11:40:03
23        Q.    And you took that as a personal attack?     11:40:03
24        A.    Of course.  And an attack on my team as     11:40:07
25   well.                                                  11:40:10
```

120

Exhibit 1
Page 073

1      Q.   Right.  How many members of your team are          11:40:11

2   presently working on the minisub?                          11:40:14

3           MR. SPIRO:  Presently?                             11:40:17

4           MR. WOOD:  Presently.                              11:40:17

5           MR. SPIRO:  Today you mean?                        11:40:17

6           THE WITNESS:  Why on earth would they be           11:40:17

7   working on it now?                                         11:40:17

8           MR. WOOD:  Let's start with today.                 11:40:17

9           MR. SPIRO:  I Just want to make sure I             11:40:21

10   understand the question.                                   11:40:22

11           MR. WOOD:  No, no, no.  You understood it          11:40:24

12   exactly.                                                   11:40:25

13           THE WITNESS:  Why on earth would they be           11:40:26

14   working on this now?  Of course not.                       11:40:26

15   BY MR. WOOD:                                               11:40:30

16      Q.   When did they last --                              11:40:30

17      A.   The minisub was made -- the Thai Navy              11:40:33

18   thought it was great.  They saw that they could            11:40:39

19   possibly use it in the future, and so it is                11:40:41

20   currently owned by the Thai Navy.                          11:40:46

21      Q.   Right.  I got that.  You left it there.            11:40:49

22      A.   Yeah.                                              11:40:50

23      Q.   Did you bring the inflatable one back?             11:40:50

24      A.   I'm not sure.  We may have left that               11:40:53

25   there or -- I'm not sure.                                  11:40:56

121

Exhibit 1
Page 074

1     Q.   So all I -- and I was precise about          11:40:58
2   today.  But let's talk about since your guys left   11:40:59
3   there -- or girls.  How many members of your team   11:41:03
4   were there when you arrived?  They had gone out      11:41:06
5   there a couple days earlier?                         11:41:07
6     A.   Yeah, there were five to ten people.  I'm    11:41:09
7   not sure how many -- I got there very late at        11:41:14
8   night, so I don't know how many people were there    11:41:17
9   exactly, but there were five to ten, I think.        11:41:19
10    Q.   And you left very early the next morning?    11:41:20
11    A.   Yes.                                          11:41:23
12    Q.   Those folks, however many it was -- they     11:41:26
13  pulled out after the kids and the coach were         11:41:27
14  successfully rescued --                              11:41:29
15    A.   That's right.                                 11:41:31
16    Q.   -- without the use of the tube.  They        11:41:31
17  came home?                                           11:41:33
18    A.   Yes.                                          11:41:35
19    Q.   My question is:  Since the time that they    11:41:37
20  returned to their regular task at their companies,   11:41:39
21  your companies, has there been any work done on      11:41:43
22  trying to further test, refine, or develop this      11:41:49
23  minisub in the event of a future rescue that might   11:41:58
24  be underwater?  Have you done anything else on the   11:42:04
25  tube at all?                                         11:42:08

122

Exhibit 1
Page 075

```
1        A.   Since then, no.                          11:42:09

2        Q.   So you worked on it.  You took it over   11:42:12

3   there.  It wasn't used.  The children, thank God,   11:42:13

4   and the coach were safely rescued.  You went to --  11:42:17

5   where did you go?                                    11:42:24

6        A.   I went to --                               11:42:24

7        Q.   You went to Shanghai afterwards, didn't   11:42:24

8   you?                                                 11:42:27

9        A.   Yes.                                       11:42:28

10       Q.   Your folks came home.  And your companies  11:42:29

11   and your employees have never since that time ever  11:42:31

12   done anything further with respect to the           11:42:34

13   minisub --                                          11:42:37

14            MR. SPIRO:  Objection as to form.          11:42:39

15   BY MR. WOOD:                                        11:42:39

16       Q.   -- or the theory of the minisub, true?    11:42:39

17            MR. SPIRO:  Objection as to form.          11:42:42

18            You can answer.                            11:42:43

19   BY MR. WOOD:                                        11:42:44

20       Q.   True?                                      11:42:45

21       A.   No, I think there was some work after --  11:42:45

22   after the rescue there was ongoing correspondence   11:42:47

23   with the Thai Navy, but then everyone went back to  11:42:51

24   their normal job, which is designing and building   11:42:55

25   rockets or electric cars.                           11:42:58
```

123

Exhibit 1
Page 076

```
1        Q.   And you knew that?                    11:46:50

2        A.   If it had not been for the Thai Navy SEAL   11:46:54

3   dying, and it hadn't been for the monsoon coming,     11:46:58

4   we wouldn't -- there wouldn't have been any need to   11:47:02

5   help.  I just thought, well, I tried -- I tried --    11:47:05

6   I was urged by many people on Twitter to say like,    11:47:09

7   hey, isn't there something you could do.              11:47:13

8            And I was like, I'm sure they've got it      11:47:14

9   under control.  I'm sure there's not going to be      11:47:17

10   any need for me to do anything.  And then that is    11:47:19

11   when the Thai Navy SEAL died, and then they said     11:47:22

12   the monsoon is coming.  And then I checked with      11:47:25

13   Stanton and a few others.  And Stanton said "Yes,    11:47:29

14   we could really use your help."  I checked with the  11:47:33

15   Thai government, and they said "Yes, we could        11:47:37

16   really use your help."  So I said "Okay, we better   11:47:40

17   take action then."                                   11:47:43

18        Q.   You reached out to them --               11:47:44

19        A.   True.                                     11:47:45

20        Q.   -- to offer your help?                    11:47:46

21        A.   No.  I was asked repeatedly on social     11:47:48

22   media to help.                                       11:47:53

23        Q.   But not by the Thai officials or          11:47:54

24   Rick Stanton?  Just by Twitter folks saying "Is     11:47:56

25   there anything you can do, Elon"?                    11:47:57
```

128

Exhibit 1
Page 077

```
 1        A.    There were some people in the Thai    11:48:01

 2   government who asked.                             11:48:03

 3        Q.    Who?                                   11:48:09

 4        A.    A member of their space agency or team --  11:48:10

 5   Thai space team.                                  11:48:13

 6        Q.    Once you landed with -- well, you flew 11:48:15

 7   into where?                                       11:48:17

 8        A.    I believe it was the Chiang Rai airport.  11:48:18

 9        Q.    And then you went immediately to the   11:48:20

10   cave, or did you first meet with someone at the   11:48:23

11   airport?                                          11:48:27

12        A.    The prime minister insisted on meeting 11:48:27

13   with me.                                          11:48:30

14        Q.    And how long did that meeting last?    11:48:30

15        A.    I think about a half an hour.          11:48:34

16        Q.    What was the substance of that         11:48:36

17   discussion?  What did he say to you?  What did you 11:48:38

18   say to him?                                       11:48:40

19        A.    He wanted to thank me for these efforts, 11:48:42

20   and express appreciation of the people of Thailand. 11:48:45

21              This did not delay our progress to the 11:48:50

22   cave, so we were unloading the sub, getting it on 11:48:53

23   transport.  This is no way delayed our progress.  11:48:56

24        Q.    Right.  I'm not suggesting that it did. 11:48:59

25        A.    It was not my interest to meet with the 11:49:03
```

129

Exhibit 1
Page 078

```
 1   sir?                                            11:59:13

 2        A.   I think Rick Stanton may have said some   11:59:14

 3   additional testing would be needed.             11:59:16

 4             (Exhibit 40 was marked for            11:59:19

 5             identification.)                      11:59:19

 6   BY MR. WOOD:                                    11:59:30

 7        Q.   Let me hand you -- is this 40?        11:59:31

 8             You see Exhibit 40 that's been marked for  11:59:33

 9   purposes of identification as such?            11:59:44

10        A.   Sure.                                 11:59:46

11        Q.   Are you familiar with that document?  11:59:47

12        A.   Yes.                                  11:59:48

13        Q.   That's a tweet that you posted on     11:59:50

14   July 15th at 11:11 a.m.?                        11:59:51

15        A.   Yes.                                  12:00:01

16        Q.   Your words?                           12:00:02

17        A.   Yes.                                  12:00:03

18        Q.   Anybody help you write that tweet?    12:00:04

19        A.   No.                                   12:00:06

20        Q.   Anybody review that tweet before you  12:00:07

21   published it?                                   12:00:09

22        A.   No.                                   12:00:11

23        Q.   "Betcha a signed dollar it's true."   12:00:11

24             Have I read it correctly?             12:00:15

25        A.   Yes.                                  12:00:17
```

139

Exhibit 1
Page 079

```
 1        Q.   What was "it's"?  What was the "it" you        12:00:18
 2   were referring to when you said "it's true"?            12:00:24
 3   "Betcha a signed dollar it's true"?                     12:00:26
 4        A.   Oh, that Unsworth was a creepy pedo guy.      12:00:32
 5        Q.   That he was a pedophile?                      12:00:39
 6        A.   I mean, obviously this is not a               12:00:40
 7   high-stakes bet.                                        12:00:41
 8        Q.   I'm not suggesting it's a high-stakes         12:00:43
 9   bet.  I'm just simply trying to find out:  You say      12:00:45
10   on Twitter "Betcha a signed dollar it is true."        12:00:47
11   Right?                                                  12:00:52
12        A.   Yeah.  Essentially I am saying that this     12:00:54
13   is -- who knows what the deal is, but you know, a       12:00:57
14   dollar if it's true; I'll pay you, you pay me,          12:01:02
15   whatever.                                               12:01:05
16        Q.   The "it" that you were referring to is       12:01:06
17   the idea that Mr. Unsworth was a pedophile?             12:01:07
18             MR. SPIRO:  Pedo guy.                         12:01:14
19             MR. WOOD:  You can ask the questions when     12:01:14
20   you want to.  That's not my question.                   12:01:14
21             THE WITNESS:  My point was that is he         12:01:16
22   some pedo guy, whatever.  Just a creepy old man.        12:01:18
23   Bet you a dollar it's true.  Obviously I'm not          12:01:22
24   certain about this, and nor is it a high-stakes         12:01:26
25   thing.  It's just suspicious.                           12:01:26
```

                                                                    140

Exhibit 1
Page 080

```
 1   BY MR. WOOD:                                      12:01:29

 2        Q.    Why would you even say that?           12:01:29

 3        A.    It was a flippant comment.             12:01:30

 4        Q.    I thought you were trying to better    12:01:33

 5   humanity.  Why are you sitting here saying on     12:01:35

 6   Twitter "Betcha a signed dollar it's true"?       12:01:36

 7              Don't you think people would have come 12:01:38

 8   away from that tweet believing that you were      12:01:41

 9   conveying the idea that it was true that          12:01:43

10   Mr. Unsworth was a pedo guy?                      12:01:48

11        A.    No.  Because I would have said "It's   12:01:50

12   true," as opposed to "It's suspicious."           12:01:51

13        Q.    You said it's true.  You didn't --     12:01:55

14        A.    No, I didn't.                          12:01:57

15        Q.    -- say it's suspicious.                12:01:58

16              "Betcha a signed dollar it is true."   12:01:58

17              What do you see there?                 12:02:01

18        A.    That is why it is some low-stakes bet. 12:02:02

19   This guy seems suspicious; that's all.  It's      12:02:06

20   obviously not a high-stakes bet, nor does a bet   12:02:11

21   convey certainty.  A bet conveys maybe this is    12:02:15

22   true; maybe it's not.                             12:02:17

23        Q.    Have you looked up the urban dictionary 12:02:18

24   or any type of dictionary for what that phrase    12:02:20

25   means "Betcha a signed dollar it's true" or "Bet  12:02:24
```

                                                       141

Exhibit 1
Page 081

```
 1   your bottom dollar it's true"?                    12:02:26

 2        A.   I didn't say bottom dollar.  "Bottom    12:02:28

 3   dollar" means all your money, but "bet you a      12:02:31

 4   dollar" is nothing, basically.                    12:02:35

 5        Q.   Why a signed dollar?  It's going to have 12:02:36

 6   more value with Elon Musk's signature on it?      12:02:39

 7        A.   Yeah, I guess.                           12:02:44

 8        Q.   Is what you were conveying?  Signed by  12:02:44

 9   me?  I betcha a signed dollar it's true?          12:02:47

10        A.   Yeah, I mean, obviously this is a case  12:02:50

11   where I would be -- yeah, maybe it's true; maybe  12:02:51

12   it's not.  It's pretty suspicious.                12:02:52

13        Q.   You didn't say maybe it's true; maybe   12:02:54

14   it's not, did you?                                12:02:56

15        A.   That is what a bet is.                   12:02:57

16        Q.   But you bet on the side of it being true, 12:02:59

17   right?                                            12:03:02

18        A.   Yeah, some chance.  But this is more    12:03:04

19   like, you know, this is like -- this is just saying 12:03:06

20   it's suspicious.  It's a likely -- who knows what's 12:03:11

21   going on there.                                   12:03:15

22        Q.   What was -- what were you -- I mean,    12:03:15

23   don't you -- I would think, Mr. Musk, that you're a 12:03:15

24   very goal-oriented person.  In other words, you   12:03:17

25   define your objective and you work to achieve it. 12:03:24
```

                                                       142

Exhibit 1
Page 082

```
1              Would that be a generally true statement    12:03:26
2     about you?                                            12:03:29
3          A.   Yes.  But I wouldn't say -- everyone       12:03:29
4     makes mistakes, including me, obviously.              12:03:32
5          Q.   It was a mistake what you said about        12:03:35
6     Mr. Unsworth, wasn't it?                              12:03:38
7          A.   Oh, of course.  I said I wish I had not     12:03:41
8     said it.                                              12:03:43
9          Q.   And it was a mistake for you to tweet       12:03:43
10    out, "Betcha a signed dollar it's true."  That was   12:03:43
11    mistake too, wasn't it?                               12:03:47
12         A.   Yeah.                                        12:03:50
13         Q.   Because there was no goal here.  I mean,    12:03:50
14    what were you trying -- maybe I should just ask       12:03:51
15    you:  What in the world were you trying to            12:03:53
16    accomplish by posting this on Twitter?  What was      12:03:54
17    your mission?                                          12:03:59
18         A.   No.  I would just regard this as Twitter    12:04:02
19    banter, essentially.                                  12:04:04
20         Q.   But you know Twitter banter sometimes is    12:04:07
21    not just banter; that factual information is          12:04:09
22    conveyed on Twitter, true?                            12:04:13
23         A.   Twitter is a conversation.  And so when     12:04:16
24    there are conversations, sometimes conversations      12:04:18
25    involve banter; sometimes they involve serious        12:04:21
```

                                                                143

Exhibit 1
Page 083

1   matters.  It's like a conversation.                    12:04:27

2        Q.   The rescue of these children was a           12:04:27

3   serious matter, true?                                  12:04:30

4        A.   Of course.                                   12:04:32

5        Q.   And you had posted any number of videos      12:04:32

6   on Twitter to demonstrate the efforts that your        12:04:34

7   people were undertaking to develop the rescue          12:04:38

8   vehicle, right?                                        12:04:42

9        A.   Yes.  I thought it would be interesting      12:04:45

10  for people to see what was happening along the way.    12:04:46

11       Q.   It was a way of publicizing what you were    12:04:50

12  doing, true?                                           12:04:52

13       A.   I didn't care about publicity.               12:04:53

14       Q.   You've never cared about publicity?          12:04:55

15       A.   Not particularly.                            12:04:57

16       Q.   Why did you tell your team to make sure      12:04:59

17  that when the tube arrived and the Navy Thai SEALs     12:05:02

18  were dealing with it in some form or fashion, to be    12:05:07

19  sure and get photographs and videos?                   12:05:10

20       A.   I don't recall saying that.                  12:05:17

21            MR. WOOD:  12:05.  Let's break for lunch.    12:05:26

22            THE VIDEOGRAPHER:  And we're going off       12:05:31

23  the record at 12:05 p.m.                               12:05:35

24            (Recess taken.)                              12:05:38

25            THE VIDEOGRAPHER:  And we are back on the    12:45:04

                                                                   144

Exhibit 1
Page 084

```
1    he learned this, and depending on when he learned      12:53:20

2    it, it is completely irrelevant.                       12:53:22

3    BY MR. WOOD:                                           12:53:24

4        Q.   Will you answer my question, please.          12:53:24

5        A.   I read, I think, in some news articles,       12:53:27

6    that he had suggested the location.                    12:53:30

7        Q.   Do you have any idea how many --              12:53:37

8        A.   I don't know if others did too, but he        12:53:39

9    was one of them, certainly.                            12:53:41

10       Q.   Do you have any information about how          12:54:32

11   many days Vernon Unsworth was on the site working      12:54:41

12   with the other people engaged in the effort?           12:54:46

13       A.   I don't know.                                 12:54:51

14       Q.   Do you know how many hours he was there       12:54:51

15   trying to assist in rescuing these boys?               12:54:55

16       A.   I don't.                                      12:55:00

17       Q.   You have never seen --                        12:55:00

18       A.   I might have seen some estimate of            12:55:03

19   Unsworth's hours.                                      12:55:06

20       Q.   Can we agree that what you have reviewed      12:55:07

21   would have revealed to you that Mr. Unsworth was an    12:55:07

22   important part of the effort to save the boys?         12:55:10

23       A.   Based on my reading in the media, he          12:55:16

24   played an important role in identifying the            12:55:17

25   location of the boys.                                  12:55:20
```

                                                               152

Exhibit 1
Page 085

```
 1        Q.   And he understood where the cave          12:55:22
 2   system -- he had been in the cave system many times  12:55:24
 3   in the seven years prior, and was very familiar      12:55:28
 4   with it.  In other words, where you might have       12:55:31
 5   problems getting through the passageway, things      12:55:34
 6   like that?                                           12:55:39
 7        A.   I mean, those caves have been mapped       12:55:40
 8   since the '60s to my understanding, and many people  12:55:42
 9   knew those caves, and he was one of them.            12:55:46
10        Q.   Well, you're not trying to take away from  12:55:48
11   Mr. Unsworth's role in this rescue, are you?         12:55:50
12        A.   I --                                       12:55:53
13        Q.   I know you've said he wasn't a diver.      12:55:53
14        A.   No.  I'm just saying that he's not the     12:55:56
15   only one who knows those caves.                      12:55:58
16        Q.   Do you believe that Mr. Unsworth should    12:56:01
17   be commended for what he did at that cave system     12:56:02
18   for those boys for several days?                     12:56:07
19             MR. SPIRO:  Objection; completely          12:56:11
20   irrelevant.                                          12:56:12
21   BY MR. WOOD:                                         12:56:12
22        Q.   Please answer my question.                 12:56:12
23        A.   Yes.  Yes, I do.                           12:56:13
24        Q.   He should be commended?                    12:56:14
25        A.   I agree.                                   12:56:16
```

153

Exhibit 1
Page 086

```
1          A.    He probably should have clarified it.      13:01:44
2          Q.    How about you?  All the articles that      13:01:47
3   came out after your July 15th tweet where they were     13:01:49
4   saying that you had called him a pedophile -- did       13:01:52
5   you ever write one email, make one phone call, lift     13:01:56
6   a finger to correct those people and say "I didn't      13:02:01
7   say that.  I just said he was a 'pedo guy' because      13:02:05
8   he was creepy-looking."                                 13:02:08
9          Did you ever try to correct all the mass         13:02:10
10  of information that was describing you as having         13:02:12
11  called this man a pedophile?                             13:02:16
12         A.    I didn't call him a pedophile.             13:02:18
13         Q.    There was a massive -- there were any      13:02:20
14  number of media reports about you calling him a          13:02:21
15  pedophile.                                               13:02:24
16         My question is:  Did you do anything --          13:02:24
17  send an email, make a phone call, give an                13:02:27
18  instruction to Jerry Birchall, anything to get that     13:02:32
19  corrected?                                               13:02:34
20         MR. SPIRO:  Just to clarify --                   13:02:36
21  BY MR. WOOD:                                             13:02:36
22         Q.    Saying that you didn't call him a          13:02:37
23  pedophile?                                               13:02:39
24         MR. SPIRO:  -- issue a correction, or you        13:02:40
25  mean anything?  Meaning, deleting the tweet,            13:02:41
```

159

Exhibit 1
Page 087

```
 1    apologizing --                                    13:02:43

 2    BY MR. WOOD:                                       13:02:44

 3        Q.    Contacting the media to say "That's not  13:02:44

 4    what I said.  That's incorrect."                   13:02:47

 5            Did do you anything?                        13:02:48

 6            MR. SPIRO:  Well, again, you're --          13:02:50

 7    contacting the media.                              13:02:51

 8    BY MR. WOOD:                                       13:02:53

 9        Q.    Contacting the media.  You said he should 13:02:53

10    have contacted the media to correct that he wasn't 13:02:56

11    married to Tik.                                    13:02:58

12            Did do you anything to try to get the      13:02:58

13    media to correct what you would have tell -- tell  13:03:03

14    me today was this misinterpretation that you had   13:03:06

15    not intended to call him a pedophile?              13:03:09

16        A.    Yes.                                     13:03:11

17        Q.    Did you?                                 13:03:11

18        A.    Yes.  I apologized on Twitter and said my 13:03:11

19    comments were a mistake.  On the other hand,       13:03:16

20    Unsworth has done nothing.                         13:03:20

21        Q.    Done nothing for what?                   13:03:23

22        A.    Nothing to correct his statements, his   13:03:24

23    insults, and attacks.  Nothing.  Nothing.          13:03:26

24        Q.    What do you want him to do?  He thought   13:03:30

25    your tube was bullshit.  He didn't think it would  13:03:37
```

160

Exhibit 1
Page 088

| | | |
|---|---|---|
| 1 | | 13:07:13 |
| 2 | | 13:07:15 |
| 3 | | 13:07:20 |
| 4 | | 13:07:22 |

```
 5        Q.    You got off on -- and I took you there in    13:07:26

 6   all fairness.  Ryan Mac.  Tell me what you know        13:07:28

 7   about Ryan Mac.                                        13:07:33

 8            Maybe it's fair -- had you ever done an       13:07:33

 9   interview with Ryan Mac before this particular         13:07:37

10   subject matter came up?                                13:07:39

11        A.    I don't know.  I mean, it's possible.  I    13:07:42

12   don't recall -- no, I don't believe I've had an        13:07:47

13   interview with Ryan Mac.                               13:07:48

14        Q.    Did you know who he was?                    13:07:50

15        A.    A reporter at BuzzFeed.                     13:07:51

16        Q.    Did you know that he had tweeted about      13:07:52

17   you on many occasions?                                 13:07:54

18        A.    No.                                         13:07:57

19        Q.    You didn't know anything about him, did     13:07:57

20   you, other than he was just a reporter at BuzzFeed?    13:08:01

21        A.    There was the email correspondence,         13:08:04

22   obviously.  Apart from that, no.                       13:08:05

23        Q.    You didn't know anything about his          13:08:08

24   reputation, right?                                     13:08:11

25        A.    No.                                         13:08:14
```

167

Exhibit 1
Page 089

```
1       Q.   You'd never had any dealings with him        13:08:14

2   where you had developed a relationship with him,      13:08:16

3   true?                                                  13:08:20

4       A.   Not with him specifically, but certainly     13:08:23

5   there had been many interactions with BuzzFeed.       13:08:25

6       Q.   Right.  And now you weren't a BuzzFeed        13:08:28

7   fan?                                                   13:08:30

8       A.   No.  I mean, it's --                          13:08:31

9       Q.   Have you seen their tweets?                   13:08:31

10      A.   I should take that back.  You know,           13:08:33

11  they've got some pretty good listicles.               13:08:34

12      Q.   But you've always taken the position that    13:08:38

13  you would not comment to anything BuzzFeed said.      13:08:38

14      A.   No.  We have commented on BuzzFeed            13:08:42

15  before.                                                13:08:44

16      Q.   You think BuzzFeed is -- do you have a        13:08:45

17  great deal of journalistic respect for BuzzFeed?      13:08:47

18      A.   Not particularly.                             13:08:52

19      Q.   How long has that been true?                  13:08:54

20      A.   Since I heard of them.  They have the         13:08:55

21  name BuzzFeed.                                         13:08:56

22      Q.   How many years ago was that?                  13:08:58

23      A.   This was -- doesn't -- it's not the most      13:08:58

24  credible name in the world.  It's feed the buzz?      13:09:03

25  You know, I mean...                                    13:09:07
```

168

Exhibit 1
Page 090

| | | |
|---|---|---|
| 1 | Q.   How long have you held that kind of | 13:09:07 |
| 2 | opinion of BuzzFeed?  Several years? | 13:09:10 |
| 3 | A.   I don't think a lot about BuzzFeed. | 13:09:15 |
| 4 | Q.   I didn't say you thought a lot about | 13:09:17 |
| 5 | them.  I just wanted to find out when you first -- | 13:09:17 |
| 6 | A.   I don't have much of an opinion, really, | 13:09:19 |
| 7 | apart from they seem a bit frivolous. | 13:09:19 |
| 8 | Q.   So how long has that been your feeling | 13:09:24 |
| 9 | about BuzzFeed? | 13:09:27 |
| 10 | A.   Since I heard of them. | 13:09:28 |
| 11 | Q.   Which would be about how long?  Two, | 13:09:29 |
| 12 | three, four years?  Longer? | 13:09:31 |
| 13 | A.   Probably, I don't know, about three years | 13:09:33 |
| 14 | ago or something? | 13:09:34 |
| 15 | Q.   You didn't think much about them as a | 13:09:34 |
| 16 | journalistic member of the media? | 13:09:35 |
| 17 | A.   I don't think they are the New York | 13:09:40 |
| 18 | Times. | 13:09:40 |
| 19 | Q.   What? | 13:09:40 |
| 20 | A.   I don't think they're the New York Times. | 13:09:40 |
| 21 | Q.   Well, I mean, did you have any respect | 13:09:42 |
| 22 | for them as a journalist? | 13:09:43 |
| 23 | A.   They have good lists. | 13:09:46 |
| 24 | Q.   They what? | 13:09:49 |
| 25 | A.   Good lists. | 13:09:50 |

169

Exhibit 1
Page 091

```
 1        A.   My recollection is dozens of times.        13:13:46

 2        Q.   Name just one person in the last couple    13:13:49

 3   of years.  Has it happened in the last couple of     13:13:49

 4   years?                                               13:13:52

 5        A.   I think so.                                13:13:52

 6        Q.   Sorry?                                     13:13:53

 7        A.   I think so.                                13:13:53

 8        Q.   So do you have the ability to go back and  13:13:53

 9   to try to find where you would have sent             13:13:54

10   information to someone saying "off the record"       13:13:56

11   without having talked to them and decided, number    13:13:58

12   one, what does "off the record" mean, and two, do    13:14:00

13   you agree to it?  You have done that before?         13:14:04

14        A.   I think so.  My recollection is that I     13:14:08

15   have done this several times.                        13:14:10

16        Q.   And so you're comfortable under oath       13:14:12

17   stating that you have done that several times?       13:14:15

18        A.   No.  I just said I believe I have done     13:14:17

19   this.  So I would have to go ahead and check.        13:14:19

20        Q.   You may not have?                          13:14:20

21        A.   It's possible.  My recollection is that I  13:14:21

22   have, but I would need to confirm it.                13:14:23

23        Q.   Why did you want the information that you  13:14:26

24   sent to Mr. Mac to be off the record?                13:14:29

25        A.   Because I was not sure that it was         13:14:33
```

173

Exhibit 1
Page 092

| | | |
|---|---|---|
| 1 | accurate.  But if it was, and we have another | 13:14:36 |
| 2 | Jeffrey Epstein on our hands, then we should find | 13:14:40 |
| 3 | out and take action. | 13:14:41 |
| 4 | Q.   Jeffrey Epstein not been in the news | 13:14:45 |
| 5 | since he was convicted in Florida as of August of | 13:14:49 |
| 6 | 2018.  The new charges against him were in 2019. | 13:14:52 |
| 7 | Do you recognize that? | 13:14:55 |
| 8 | A.   Yes.  I'm using this as an example of, | 13:15:00 |
| 9 | you know, if this guy is actually doing bad things | 13:15:03 |
| 10 | and could potentially be using the good reputation | 13:15:08 |
| 11 | acquired from the cave rescue to do bad things, | 13:15:15 |
| 12 | then this is something that should be stopped.  So | 13:15:20 |
| 13 | shouldn't we like, look into it; find out if it is | 13:15:23 |
| 14 | true. | 13:15:26 |
| 15 | Q.   So you wanted Mr. Mac to have the | 13:15:27 |
| 16 | information, right? | 13:15:32 |
| 17 | A.   I wanted him to investigate, because I'd | 13:15:37 |
| 18 | heard these -- what sounded like a pretty bad | 13:15:40 |
| 19 | information pattern from this investigator related | 13:15:47 |
| 20 | to me through Jared, and it sounded pretty bad, so | 13:15:49 |
| 21 | maybe this guy has got some serious issues, and if | 13:15:54 |
| 22 | so, we -- they should find out.  Just trying to do | 13:16:00 |
| 23 | the right thing here. | 13:16:05 |
| 24 | Q.   So but at the time you wrote this | 13:16:06 |
| 25 | information to Mr. Mac, you tell me you didn't know | 13:16:07 |

174

Exhibit 1
Page 093

| | | |
|---|---|---|
| 1 | whether it was true or not, right? | 13:16:10 |
| 2 | A.   Yes.  I specifically said try to find out | 13:16:12 |
| 3 | if this is true.  I had been told directly that | 13:16:16 |
| 4 | there were very suspicious situations, that there | 13:16:23 |
| 5 | was -- I had been told by Jared that this | 13:16:26 |
| 6 | investigator had said that -- that it looked quite | 13:16:29 |
| 7 | bad, and that, you know, what he is up to in | 13:16:35 |
| 8 | Thailand sounded pretty bad, so it seems like, if | 13:16:41 |
| 9 | you are a journalist and you care about doing the | 13:16:44 |
| 10 | right thing, you should go and find out if it's | 13:16:46 |
| 11 | true, and if it is, then take action. | 13:16:50 |
| 12 | Q.   But sir, the point is, you didn't know | 13:16:52 |
| 13 | whether the investigator's information was true or | 13:16:56 |
| 14 | not or had been verified, right?  Isn't that right? | 13:17:00 |
| 15 | A.   That's right.  That's why I said "Please | 13:17:06 |
| 16 | go and investigate." | 13:17:09 |
| 17 | Q.   So why, if you were so interested in | 13:17:10 |
| 18 | Mr. Mac investigating, why did you not tell Mr. Mac | 13:17:12 |
| 19 | the source of your information, what your | 13:17:17 |
| 20 | information precisely was, and ask him to go out | 13:17:20 |
| 21 | and see if he could verify whether it was true? | 13:17:24 |
| 22 | A.   Because as soon as he said he was going | 13:17:28 |
| 23 | to ignore my "off the record" -- that, you know, my | 13:17:30 |
| 24 | comments that these were off the record, then he -- | 13:17:37 |
| 25 | this was like this guy obviously cannot be trusted. | 13:17:40 |

175

Exhibit 1
Page 094

```
 1    This is my opinion that he had no journalistic        13:17:44

 2    ethics, and so any further correspondence was         13:17:48

 3    pointless.                                            13:17:50

 4        Q.   Who told you that Mr. Unsworth was a         13:17:52

 5    child rapist?  Did Jared tell you that?               13:18:01

 6        A.   No.  I didn't say that he was.  I think I    13:18:10

 7    said we need to find out if he is.                    13:18:11

 8        Q.   Why did you use the term "child rapist"?     13:18:15

 9    Who had used that term with you that made you         13:18:18

10    repeat it in your email to Mr. Mac?                   13:18:21

11        A.   Well, I think anyone who is -- if           13:18:25

12    somebody is sleeping with someone who is 12 years     13:18:27

13    old, I would say that that person is a child          13:18:31

14    rapist.                                               13:18:32

15        Q.   What information did you have at the         13:18:33

16    time -- and that's what you told Mr. Mac in the       13:18:35

17    "off the record," as you called it, email -- that     13:18:38

18    he was a child rapist, married to a 12-year-old       13:18:41

19    child bride, right?                                   13:18:44

20        A.   I told him this is -- you should go and      13:18:46

21    find out if this is true.                             13:18:49

22        Q.   What were you basing that on?                13:18:51

23        A.   I was basing that on what this               13:18:53

24    investigator had told Jared who had told me.          13:18:56

25        Q.   Did you ever pick up the phone say "I        13:18:59
```

176

Exhibit 1
Page 095

```
 1   want to talk to this investigator myself"?        13:19:00
 2       A.   I did not talk to this guy directly.     13:19:04
 3       Q.   Did you ever ask to?                      13:19:06
 4       A.   No.  I have faith that what Jared was     13:19:09
 5   conveying to me was an accurate retelling of this  13:19:11
 6   guy.                                               13:19:15
 7       Q.   Jared was not the source the information. 13:19:15
 8       A.   Right.                                    13:19:18
 9       Q.   Jared couldn't verify it or not.  It had  13:19:18
10   to come from the source.  The source was the       13:19:20
11   investigator.  You made no effort to -- before you 13:19:22
12   wrote Ryan Mac, you didn't lift a finger to try to 13:19:26
13   find out whether the investigator was telling you  13:19:29
14   the truth or whether the investigator was taking   13:19:31
15   you for a ride for $52,000, did you, sir?          13:19:34
16       A.   This investigator appeared to be          13:19:41
17   credible.  I did not make these comments on the    13:19:43
18   record.  I didn't mean for them ever to be         13:19:47
19   published in any way, shape, or form.              13:19:48
20            I just -- I'd just been informed of a bad 13:19:50
21   fact pattern.  It seems like if a journalist cares 13:19:56
22   about finding out what's going on, they should go  13:20:00
23   and find out what's going on.  This is what I've   13:20:02
24   been told.  May or may not be true; please         13:20:05
25   investigate.                                       13:20:08
```

177

Exhibit 1
Page 096

1   that if I say "off the record," it is off the        13:23:18

2   record.                                               13:23:21

3       Q.   So the answer is "No, Mr. Wood, I didn't     13:23:21

4   do that," right?  "And the reason I didn't do that    13:23:23

5   is because I assumed that by writing 'off the         13:23:31

6   record,' he wouldn't put it on the record."           13:23:32

7            Have I got it right?                         13:23:34

8       A.   I assumed, and I had -- since I've really    13:23:39

9   never had this happen to me before, that if I say     13:23:42

10  "off the record" with a journalist, it is off the     13:23:45

11  record.                                               13:23:48

12      Q.   Sir, you didn't -- one more time.  You       13:23:48

13  didn't ask him first before you provided the          13:23:50

14  information whether he would agree with you that it    13:23:54

15  was off the record.  You didn't do that, did you?     13:23:56

16      A.   That is correct.                             13:23:59

17      Q.   Because you assumed that Mr. Mac, who you     13:24:01

18  did not know very well if at all -- you just          13:24:05

19  assumed that your statement, unilateral "off the      13:24:08

20  record," would be honored by him, true?               13:24:13

21      A.   That is my expectation in dealing with       13:24:18

22  journalists.  And so I assumed that statement "off    13:24:21

23  the record" would be treated as such.                 13:24:26

24      Q.   Have you looked at any search yourself       13:24:30

25  about how the journalistic community generally        13:24:32

181

Exhibit 1
Page 097

1    record at 2:10 p.m.                              14:10:26

2    BY MR. WOOD:                                     14:10:27

3         Q.   Mr. Musk, back to Exhibit 38.          14:10:28

4         A.   Yes.                                    14:10:31

5         Q.   What was your point in tweeting "Never 14:10:32

6    saw this British expat guy into lives in Thailand 14:10:36

7    (SUS) at any point when we were in the caves."    14:10:40

8              What was the point that you were trying 14:10:44

9    to make?                                         14:10:46

10        A.   That I had no knowledge of this guy.  At 14:10:47

11   the time I didn't think he had anything to do with 14:10:50

12   the rescue process at all.  I'd never heard his   14:10:52

13   name or seen him.                                14:10:58

14        Q.   Once you saw, whether it was on Twitter 14:11:00

15   or Google Alerts -- whenever you saw the story    14:11:02

16   first about Vernon Unsworth, you assumed that he  14:11:08

17   had had nothing to do with the rescue, true?      14:11:15

18        A.   Yes.                                    14:11:20

19        Q.   Before you tweeted on July the 15th about 14:11:23

20   Mr. Unsworth, had you undertaken any efforts to   14:11:28

21   investigate who he was before you went out and    14:11:35

22   talked about him?                                14:11:40

23        A.   Yes.  I'd sort of tried to sort of      14:11:43

24   search -- do a Google search, yeah.              14:11:46

25        Q.   There was nothing there except the      14:11:50

                                                      184

Exhibit 1
Page 098

| | | |
|---|---|---|
| 1 | interview he gave to CNN International, right? | 14:11:52 |
| 2 | A.   That's right. | 14:11:55 |
| 3 | Q.   So you didn't have any information about | 14:11:56 |
| 4 | who he was, what he had done, if anything.  You | 14:11:58 |
| 5 | didn't look into who Vernon Unsworth was except to | 14:12:01 |
| 6 | take a look at Google search, right? | 14:12:04 |
| 7 | A.   Yes. | 14:12:09 |
| 8 | Q.   Had you -- | 14:12:09 |
| 9 | A.   Obviously I had heard many names | 14:12:09 |
| 10 | associated with the rescue, but so I had assumed | 14:12:12 |
| 11 | that if I had not heard somebody's name at all or | 14:12:16 |
| 12 | seen them, that they were not closely involved with | 14:12:21 |
| 13 | the rescue. | 14:12:24 |
| 14 | Q.   Who were the British divers?  You | 14:12:25 |
| 15 | mentioned Rick Stanton.  Who else were the British | 14:12:29 |
| 16 | divers that you were aware of their names? | 14:12:32 |
| 17 | A.   I don't recall their names right now. | 14:12:35 |
| 18 | Q.   Who is the name of the prime minister | 14:12:36 |
| 19 | that you met with? | 14:12:38 |
| 20 | A.   I do not recall the name of the prime | 14:12:40 |
| 21 | minister. | 14:12:44 |
| 22 | Q.   And the Thai Navy SEALs that you met with | 14:12:44 |
| 23 | at the cave when you went -- the Thai Navy Army | 14:12:47 |
| 24 | guys -- can you identify any one of those | 14:12:52 |
| 25 | individuals by name as we sit here today? | 14:12:55 |

185

Exhibit 1
Page 099

```
1    unfair to Mr. Unsworth, wouldn't you agree?         14:15:43

2         A.   That was just a statement of fact.         14:15:46

3         Q.   For what purpose?  What were you trying     14:15:48

4    to convey with that statement of fact in your        14:15:49

5    Twitter?                                              14:15:52

6         A.   I am saying this is my experience.          14:15:52

7         Q.   Did I understand you that you wrote         14:15:59

8    Ryan Mac "Off the record," as you titled it,         14:16:04

9    because you felt like this could be another Jeffrey  14:16:07

10   Epstein.  I've gotten this information from the       14:16:11

11   investigator.  I don't know whether it's true or     14:16:15

12   not.  But you wanted Ryan Mac to investigate it.     14:16:17

13              Is that a fair characterization of your   14:16:20

14   testimony?                                            14:16:22

15        A.   Yeah.                                        14:16:23

16        Q.   And if he discovered that it was true,     14:16:23

17   you fully would have expected him to publish that,   14:16:26

18   true?                                                 14:16:29

19        A.   I have expected him to, yes, take some     14:16:29

20   action if -- if this -- you know, Unsworth was up    14:16:32

21   to no good, to bring that to light.                  14:16:38

22        Q.   Publish it and let folks know, right?      14:16:42

23        A.   If true.                                    14:16:44

24        Q.   That's what you thought when you sent it   14:16:45

25   to him?                                               14:16:48
```

189

Exhibit 1
Page 100

```
 1        A.   Yes.                                  14:16:48

 2        Q.   And if he did not find any evidence to   14:16:49

 3   support it, did you likewise expect that he would  14:16:52

 4   report that.   That he had looked into it and could  14:16:55

 5   not find any substantiation?                  14:16:57

 6        A.   Yes.                                  14:16:59

 7        Q.   So you were relying on Mr. Mac to      14:17:00

 8   ascertain whether the accusations against     14:17:02

 9   Mr. Unsworth were true or not; is that right?  14:17:08

10        A.   When you say "accusations," whether what  14:17:13

11   I had been told by what appeared to be a credible  14:17:16

12   investigator; whether those things were true?  14:17:22

13        Q.   He was making the accusations.  We can go  14:17:24

14   through it in a minute.  He was, wasn't he?   14:17:26

15             MR. SPIRO:  Who is "he"?             14:17:30

16   BY MR. WOOD:                                   14:17:31

17        Q.   The investigator.                    14:17:31

18        A.   Which accusations?  I mean, he was saying  14:17:33

19   things that he believed to be true or that he -- he  14:17:36

20   was claiming that he believed these things to be  14:17:38

21   correct, yes.                                  14:17:42

22        Q.   How do you know that he was saying he  14:17:43

23   believed them to be correct?                  14:17:45

24        A.   This is what Jared conveyed to me.    14:17:47

25        Q.   Did Jared convey to you that he himself  14:17:49
```

Exhibit 1
Page 101

```
 1    had complained to the investigator, Mr. Howard,      14:17:52

 2    that his information was not verified?               14:17:55

 3        A.   No.                                         14:17:58

 4        Q.   Did Jared tell you that?                    14:17:59

 5        A.   No.                                         14:18:01

 6        Q.   Should he have told you that?               14:18:01

 7             MR. SPIRO:  Objection to form.              14:18:04

 8    BY MR. WOOD:                                         14:18:06

 9        Q.   Should Jared have told you "I am not get    14:18:06

10    any verification here, Mr. Musk"?                    14:18:10

11        A.   He did convey later -- as the               14:18:16

12    communication with the investigator continued, I    14:18:19

13    believe Jared did raise some concerns.  This is      14:18:22

14    after the Ryan Mac stuff.  He raised some concerns   14:18:26

15    like maybe this guy isn't -- maybe this guy is       14:18:31

16    making it up.                                        14:18:35

17        Q.   He was making it up.  Didn't you conclude   14:18:36

18    that after -- I know it's after --                   14:18:38

19        A.   I did conclude that, because we said        14:18:39

20    "Okay, you've got to produce -- if you keep saying   14:18:43

21    these things, you've got to produce some kind of     14:18:46

22    firm evidence."  And he was unable to produce firm   14:18:48

23    evidence.  And then he went radio silent on us.      14:18:52

24        Q.   He was not able to produce any verified     14:18:57

25    evidence, was he?                                    14:19:00
```

191

Exhibit 1
Page 102

```
 1        A.   That is correct.                          14:19:02

 2        Q.   Why would you not wait until you had      14:19:02

 3   gotten his final report before communicating it to 14:19:05

 4   a member of the media?                              14:19:10

 5        A.   Well, if something bad was going on, it   14:19:12

 6   could be literally a crime in progress.             14:19:15

 7        Q.   Did you ever contact any member of law    14:19:18

 8   enforcement about Mr. Unsworth in an effort to stop 14:19:20

 9   the idea that something could be going on and a     14:19:24

10   crime could be in progress?                         14:19:27

11        A.   I was told through Jared that this        14:19:31

12   investigator had reached out to the Thai -- sort of 14:19:34

13   police, but I suspect this is probably not actually 14:19:41

14   true.                                               14:19:44

15        Q.   The investigator from all appearances now 14:19:46

16   you know was probably a con man that took your      14:19:48

17   money?                                              14:19:51

18        A.   That is correct.  That is my impression   14:19:52

19   at this point.                                      14:19:53

20        Q.   So how did you determine that this guy    14:19:54

21   you ultimately believed to be a con man that        14:19:56

22   took -- I think took $52,000, maybe more?           14:19:59

23        A.   Right.                                    14:20:04

24        Q.   How did you determine before you hired    14:20:04

25   him that that he was credible?  What due diligence  14:20:08
```

Exhibit 1
Page 103

1   did you do or Jared do?                              14:20:12

2             MR. SPIRO:  If you know.                    14:20:15

3             THE WITNESS:  I don't know what all due     14:20:17

4   diligence Jared did.  He claimed to have worked for   14:20:19

5   credible people.                                      14:20:26

6   BY MR. WOOD:                                          14:20:28

7        Q.   Paul Allen and George Soros.               14:20:28

8        A.   That's right.                              14:20:31

9        Q.   Do you know George Soros?                  14:20:32

10       A.   I don't know him, no.                      14:20:32

11       Q.   Do you know Paul Allen?                    14:20:33

12       A.   He is deceased, but yes.                   14:20:35

13       Q.   I can't remember when he died.  Was he     14:20:37

14  alive in 2018?  I think he was.                       14:20:37

15       A.   I mean, if he was, he was not well.         14:20:42

16       Q.   But you did not yourself make any effort    14:20:44

17  to reach out to verify this guy's credibility.        14:20:47

18  This guy being James Howard the investigator.  You    14:20:49

19  yourself didn't do anything, right?                   14:20:53

20       A.   I did not.                                  14:20:55

21       Q.   And to your knowledge, Jared didn't do     14:20:56

22  anything except accept what Mr. Howard had told him   14:20:59

23  about Paul Allen and George Soros, right?             14:21:02

24       A.   Yes, that's correct.                        14:21:05

25       Q.   So whatever the investigator told you      14:21:10

193

Exhibit 1
Page 104

```
 1   about the authorities, you yourself, Elon Musk, or      14:21:13

 2   Jared at your direction, did not in any way contact     14:21:17

 3   any member of law enforcement to alert them to the      14:21:20

 4   possibility this man may be a pedophile committing      14:21:25

 5   crimes against minor children; am I right?             14:21:28

 6       A.   We didn't directly reach out to the           14:21:31

 7   authorities.                                            14:21:33

 8       Q.   Or indirectly?                                 14:21:34

 9       A.   No, indirectly through this investigator,     14:21:36

10   the investigator told us that he had contacted the     14:21:38

11   authorities to find out if there were issues, but      14:21:43

12   obviously in retrospect, he probably just made it      14:21:46

13   up.                                                     14:21:50

14       Q.   So but your goal was to have someone look     14:21:51

15   into these very serious statements about               14:21:59

16   Mr. Unsworth to determine whether or not he was a      14:22:03

17   pedophile and might be committing crimes against      14:22:04

18   minor children, true?                                  14:22:08

19       A.   Yeah.                                          14:22:09

20       Q.   Did you ever ask any member of the           14:22:10

21   media -- for example, the New York Times, The          14:22:11

22   Washington Post, CNN -- did you ever yourself ask      14:22:14

23   anyone else in the media besides Ryan Mac to look      14:22:23

24   into what you were learning from this investigator?    14:22:27

25       A.   I believe I did suggest on Twitter, and      14:22:30
```

194

Exhibit 1
Page 105

```
 1    I'm followed by a lot of journalists, that they      14:22:32
 2    should just find out whether these things were       14:22:36
 3    true; like they should look into it.  You've got     14:22:39
 4    Drew Olanoff, the Yoda guy, @yoda.  It's like, Yo,   14:22:41
 5    man, why don't you just like see if there is any     14:22:41
 6    veracity to the situation?                           14:22:52
 7         Q.    Well, actually, you tweeted back @yoda?   14:22:53
 8         A.    Yoda.  Yeah.                              14:22:56
 9         Q.    Well, @yoda.  That was his name.  You     14:22:56
10    made reference to him.                               14:23:01
11         A.    Yes.                                      14:23:02
12         Q.    Your name is Yoda.  You go by Yoda, but   14:23:02
13    you don't seem very yodaish.  Something like that.   14:23:03
14         A.    That's right.                             14:23:05
15         Q.    I mean, you tweeted @yoda "Don't you      14:23:10
16    think it's strange that he hasn't sued me," didn't   14:23:12
17    you?                                                 14:23:16
18         A.    Yes.                                      14:23:17
19         Q.    Strange in what way?                      14:23:19
20         A.    Strange implying perhaps there is some    14:23:20
21    guilt there.                                         14:23:23
22         Q.    Right.  The tweet that you published in   14:23:24
23    response to Yoda's tweet conveyed that, the idea     14:23:28
24    that here's a guy that's got three lawyers I think   14:23:31
25    you referenced.                                      14:23:37
```

195

Exhibit 1
Page 106

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 14:23:38 |
| 2 | Q. | Don't you think it's strange he hasn't | 14:23:38 |
| 3 | sued me, conveying the idea that this guy may be | | 14:23:38 |
| 4 | guilty and that's why he's not suing me, true? | | 14:23:43 |
| 5 | A. | Yes. | 14:23:47 |
| 6 | Q. | That he might in fact be a pedophile, | 14:23:47 |
| 7 | right? | | 14:23:49 |
| 8 | A. | Possibly. | 14:23:52 |
| 9 | Q. | Yeah, I mean, that's what you were | 14:23:53 |
| 10 | conveying? | | 14:23:54 |
| 11 | A. | Possibly. | 14:23:55 |
| 12 | Q. | Well, no, not possibly conveying.  When | 14:23:56 |
| 13 | you made that tweet, you were conveying in your | | 14:23:58 |
| 14 | mind's eye just what you've told me.  It's strange | | 14:24:01 |
| 15 | that he hadn't sued me, and it suggests he might be | | 14:24:04 |
| 16 | guilty of pedophilia. | | 14:24:08 |
| 17 | A. | I think -- | 14:24:10 |
| 18 | Q. | Right? | 14:24:10 |
| 19 | A. | You're putting words in my mouth here. | 14:24:10 |
| 20 | Q. | I am not trying to do that.  I'm trying | 14:24:11 |
| 21 | to -- I think that's what you told me. | | 14:24:12 |
| 22 | A. | No.  I simply said it's strange that -- I | 14:24:14 |
| 23 | meant those words literally.  That's strange.  That | | 14:24:19 |
| 24 | does not mean that he was a pedophile; just means | | 14:24:22 |
| 25 | perhaps he has something to hide. | | 14:24:25 |

196

Exhibit 1
Page 107

```
 1   going on.  Pedophilia being potentially one of         14:25:24
 2   those things.                                           14:25:26
 3       Q.   That was the issue.  That was the issue        14:25:28
 4   on the forefront, whether or not he was a               14:25:33
 5   pedophile.  You were aware that that was the            14:25:35
 6   controversy that you sparked with "pedo guy."  You      14:25:40
 7   know that, don't you, sir?                              14:25:43
 8       A.   The pedo guy was certainly not intended        14:25:48
 9   to be any kind of accusation of pedophilia.  It was     14:25:52
10   simply an insult.                                       14:26:01
11           The investigator who merely was, in            14:26:03
12   retrospect, just taking us for a ride, came back        14:26:08
13   with what sounded like very serious information         14:26:12
14   that, you know, perhaps there was something             14:26:18
15   problematic going on.                                   14:26:23
16           I mean, he claimed that Unsworth had a          14:26:25
17   12-year-old bride.  I mean, that's obviously -- in      14:26:30
18   that case it would be pedophilia of course.             14:26:35
19       Q.   As you sure as you sit here today that         14:26:39
20   the investigator conveyed that Mr. Unsworth had a       14:26:41
21   12-year-old bride?                                      14:26:45
22       A.   That is my recollection of what Jared          14:26:47
23   told me, yes.                                           14:26:50
24       Q.   Well, Jared told you he was getting            14:26:50
25   written reports, right?                                 14:26:53
```

198

Exhibit 1
Page 108

```
 1      A.   Yes.                                     14:26:54

 2      Q.   And did you say "Let me see what you've  14:26:55

 3  got there"?                                       14:26:57

 4      A.   I asked Jared to convey the essence of   14:27:02

 5  the reports.  I don't recall seeing the reports.  14:27:05

 6  And he conveyed the essence of the reports; one of 14:27:07

 7  which that it's rumored to have a 12-year-old      14:27:11

 8  bride.                                             14:27:14

 9      Q.   Do you deny under oath seeing any of the  14:27:16

10  written reports or emails sent by the investigator 14:27:20

11  to Jared?                                          14:27:24

12      A.   I do not -- I'm confident -- I'm          14:27:28

13  confident I didn't see the reports.  I don't --    14:27:32

14  maybe there was an email.  I don't know if there   14:27:35

15  was an email.  There was an email that was sent,   14:27:39

16  but --                                             14:27:44

17      Q.   There were several?                       14:27:45

18      A.   I have seen emails, but --                14:27:47

19      Q.   From the investigator?                    14:27:49

20      A.   Yes.                                      14:27:50

21      Q.   To Jared?                                 14:27:51

22      A.   Yes.  But you're confusing emails and     14:27:53

23  reports.                                           14:27:55

24      Q.   I didn't mean to.  Well, maybe I did.     14:27:57

25  There were some reports that were kind of more     14:27:57
```

Exhibit 1
Page 109

| | | | |
|---|---|---|---|
| 1 | | formal? | 14:28:00 |
| 2 | A. | Yeah. | 14:28:01 |
| 3 | Q. | Columned off.  Do you remember those? | 14:28:02 |
| 4 | A. | I don't recall seeing those. | 14:28:04 |
| 5 | Q. | Have you ever seen anything like that? | 14:28:05 |
| 6 | A. | To the best of my knowledge, no. | 14:28:07 |
| 7 | Q. | And then there were emails that contained | 14:28:08 |
| 8 | | information, and you believe you saw those emails? | 14:28:10 |
| 9 | A. | The emails I would have seen, yes. | 14:28:14 |
| 10 | Q. | And -- | 14:28:16 |
| 11 | | MR. WOOD:  What number are we up to now? | 14:28:16 |
| 12 | | THE REPORTER:  41. | 14:28:16 |
| 13 | | MR. WOOD:  41? | 14:28:16 |
| 14 | | (Exhibit 41 was marked for | 14:28:16 |
| 15 | | identification.) | 14:28:16 |
| 16 | BY MR. WOOD: | | 14:28:56 |
| 17 | Q. | We were talking about this.  I thought I | 14:28:58 |
| 18 | | would present it to you.  Exhibit 41.  That is, in | 14:29:03 |
| 19 | | fact, a true and correct copy of your tweet on | 14:29:06 |
| 20 | | August 29th? | 14:29:10 |
| 21 | A. | Yes. | 14:29:12 |
| 22 | Q. | In response to Drew Olanoff, who is known | 14:29:12 |
| 23 | | as @yoda, right? | 14:29:16 |
| 24 | A. | That is correct. | 14:29:18 |
| 25 | Q. | And follow me -- Drew Olanoff.  Do you | 14:29:19 |

200

Exhibit 1
Page 110

```
 1   know who he is?                                        14:29:21
 2        A.    He is a reporter at National, I think, or   14:29:25
 3   something like that.                                   14:29:29
 4        Q.    A reporter?                                 14:29:29
 5        A.    A reporter.                                 14:29:30
 6        Q.    "One other thing, Elon, your dedication     14:29:31
 7   to facts and truth would have been wonderful if        14:29:35
 8   applied to that time when you called someone a         14:29:38
 9   pedo."                                                 14:29:41
10             Have I read that correctly?                  14:29:42
11        A.    Yes.                                        14:29:43
12        Q.    And then read for me your response on       14:29:44
13   Twitter.                                               14:29:46
14        A.    "You don't think it's strange he hasn't     14:29:48
15   sued me?  He was offered free legal services.  And     14:29:50
16   you call yourself @yoda."                              14:29:52
17        Q.    Referring to what he had just tweeted       14:29:55
18   regarding you calling Mr. Unsworth a pedo, right?      14:29:58
19        A.    Yes.  Yes.                                  14:30:05
20        Q.    Suggesting that there may be truth to it,   14:30:06
21   right?  Because he hadn't sued me, right?              14:30:09
22        A.    "You don't think it's strange he hasn't     14:30:15
23   sued me," seems like there is something suspicious     14:30:17
24   going on.                                              14:30:20
25        Q.    In response to his commenting on you        14:30:21
```

201

Exhibit 1
Page 111

```
 1    calling Mr. Unsworth a pedo, right?                14:30:23

 2         A.   It seems suspicious.                      14:30:26

 3         Q.   If you read this in context "it looks     14:30:27

 4    like it's strange he hasn't sued me" meant it may   14:30:32

 5    be true; otherwise, he would have sued me.  True    14:30:35

 6    that he is a pedo, right?                           14:30:38

 7         A.   No.  I just think it's suspicious that he 14:30:42

 8    didn't sue me.                                      14:30:42

 9         Q.   Why?  Suspicious in what way?             14:30:47

10         A.   Maybe he's got something to hide.         14:30:52

11         Q.   Maybe he's a pedo?                        14:30:54

12         A.   Maybe he's many things.                   14:30:57

13         Q.   But you're responding to Mr. Olanoff      14:30:59

14    saying "applied to that time you called someone a   14:31:00

15    pedo," and you say "You don't think it's strange he 14:31:03

16    hasn't sued me," right?                             14:31:06

17              MR. SPIRO:   Objection; asked and answered 14:31:09

18    several times.                                      14:31:10

19    BY MR. WOOD:                                        14:31:11

20         Q.   Right?                                    14:31:11

21         A.   I think it is very, very suspicious.      14:31:11

22         Q.   And possibly suggesting that he might be  14:31:14

23    a pedo, a pedophile, right?                         14:31:17

24         A.   I think I just thought it was suspicious. 14:31:20

25         Q.   How did you -- what were you trying to    14:31:21
```

202

Exhibit 1
Page 112

| | | | |
|---|---|---|---|
| 1 | | convey?  "Don't you think it's strange he hadn't | 14:31:22 |
| 2 | | sued me."  Maybe it's true that he's a pedo.  Isn't | 14:31:25 |
| 3 | | that what you were trying to say? | 14:31:28 |
| 4 | A. | No.  I was just saying he was suspicious. | 14:31:30 |
| 5 | Q. | Suspicious in what way?  The issue is | 14:31:32 |
| 6 | | whether he is a pedo or not. | 14:31:35 |
| 7 | A. | Something to hide.  Who knows what. | 14:31:37 |
| 8 | Q. | Could he be a pedophilia? | 14:31:38 |
| 9 | A. | Suspicious. | 14:31:42 |
| 10 | Q. | Including the allegation that Olanoff's | 14:31:43 |
| 11 | | referring to about being a pedo?  That he might be? | 14:31:46 |
| 12 | A. | He's suspicious of many things.  I don't | 14:31:50 |
| 13 | | know. | 14:31:52 |
| 14 | Q. | Including being a pedo? | 14:31:53 |
| 15 | A. | It is one of many possibilities. | 14:31:54 |
| 16 | Q. | And you had that in your mind when you | 14:31:57 |
| 17 | | wrote that tweet, didn't you? | 14:31:59 |
| 18 | A. | I just thought he was suspicious. | 14:32:01 |
| 19 | Q. | And might be a pedophile because you | 14:32:04 |
| 20 | | wanted him investigated because you were afraid he | 14:32:06 |
| 21 | | might be another Jeffrey Epstein, and you wanted to | 14:32:10 |
| 22 | | stop what may be a crime in progress, right? | 14:32:14 |
| 23 | A. | He seemed suspicious. | 14:32:16 |
| 24 | Q. | About being a pedo? | 14:32:18 |
| 25 | A. | He seemed suspicious. | 14:32:19 |

Exhibit 1
Page 113

| | | | |
|---|---|---|---|
| 1 | Q. | Am I right?  About being a pedophile? | 14:32:21 |
| 2 | A. | He seemed suspicious. | 14:32:23 |
| 3 | Q. | In that regard? | 14:32:24 |
| 4 | A. | He seemed suspicious. | 14:32:24 |
| 5 | Q. | Suspicious of potentially being a | 14:32:24 |
| 6 | | pedophile? | 14:32:26 |
| 7 | A. | He seemed suspicious. | 14:32:26 |
| 8 | Q. | Is the answer "Yes, Mr. Wood, I thought | 14:32:28 |
| 9 | | he was suspicious and might be a pedophile"? | 14:32:29 |
| 10 | A. | He seemed suspicious. | 14:32:32 |
| 11 | Q. | Why would you say you thought he might be | 14:32:32 |
| 12 | | another Jeffrey Epstein? | 14:32:34 |
| 13 | A. | He seemed -- | 14:32:34 |
| 14 | Q. | We're talking about a pedophile. | 14:32:34 |
| 15 | A. | I've been clear.  How many times do you | 14:32:40 |
| 16 | | want me to answer this question? | 14:32:40 |
| 17 | Q. | One more time, because I didn't get the | 14:32:40 |
| 18 | | answer. | 14:32:43 |
| 19 | | MR. SPIRO:  Okay.  One more time. | 14:32:43 |
| 20 | | BY MR. WOOD: | 14:32:43 |
| 21 | Q. | You keep saying he was suspicious. | 14:32:43 |
| 22 | | Weren't you suggesting that one of the things that | 14:32:44 |
| 23 | | was suspicious is that in response to you calling | 14:32:48 |
| 24 | | him "pedo guy," he had not sued you. | 14:32:51 |
| 25 | | MR. SPIRO:  One of the many possible | 14:32:56 |

204

Exhibit 1
Page 114

```
 1   things?  Is that the question?                    14:32:58

 2              MR. WOOD:  You want to answer?  Because I  14:32:59

 3   don't really want to cross-examine you today.  Let  14:32:59

 4   me finish.  I got to start all over again because  14:33:01

 5   you interrupted me.                                14:33:03

 6   BY MR. WOOD:                                       14:33:04

 7      Q.   Sir.  Seems simple.  Maybe it's not.  It  14:33:05

 8   may be my problem I'm not articulating it well.    14:33:07

 9              The guy writes you and says "Your        14:33:11

10   dedication to facts and truth would have been      14:33:15

11   wonderful if applied to that time when you called  14:33:17

12   someone a pedo"?                                   14:33:20

13      A.   He seemed suspicious.                      14:33:21

14      Q.   Of being -- potentially being a pedo?     14:33:23

15      A.   He seemed suspicious.                      14:33:25

16      Q.   Sir, that's answering -- I know you said  14:33:27

17   he was suspicious.  Was one of things that he was  14:33:27

18   suspicious about was potentially being a pedophile? 14:33:31

19      A.   He seemed suspicious.                      14:33:35

20      Q.   Including being a pedophile?              14:33:37

21      A.   He seemed suspicious.                      14:33:39

22      Q.   Does that mean being a pedophile?         14:33:41

23      A.   He seemed suspicious.                      14:33:43

24      Q.   Why did you draw the analogy to           14:33:43

25   Jeffrey Epstein?  What did you know about          14:33:46
```

205

Exhibit 1
Page 115

| | | |
|---|---|---|
| 1 | Mr. Epstein?  Didn't you know he was accused of | 14:33:48 |
| 2 | pedophilia? | 14:33:50 |
| 3 | A.   I was aware Jeffrey Epstein was accused | 14:33:52 |
| 4 | of pedophilia. | 14:33:57 |
| 5 | Q.   And you wanted Ryan Mac to investigate | 14:33:57 |
| 6 | Mr. Unsworth because you thought he might be like | 14:34:01 |
| 7 | Jeffrey Epstein and be involved in pedophilia, | 14:34:03 |
| 8 | true? | 14:34:08 |
| 9 | A.   Well, you're changing context, but I -- | 14:34:09 |
| 10 | in the case of Ryan Mac, based on what I had been | 14:34:09 |
| 11 | told through Jared from the investigator, it seemed | 14:34:13 |
| 12 | like this guy could indeed be engaged the | 14:34:16 |
| 13 | pedophilia for the Ryan Mac thing, not the Drew | 14:34:20 |
| 14 | Olanoff thing. | 14:34:23 |
| 15 | Q.   Mr. Howard? | 14:35:00 |
| 16 | A.   Yes. | 14:35:01 |
| 17 | Q.   Excuse me.  Let me know when you're done. | 14:35:01 |
| 18 | A.   Yes. | 14:35:06 |
| 19 | Q.   You done? | 14:35:07 |
| 20 | A.   Yes. | 14:35:07 |
| 21 | Q.   Mr. Howard was investigating on your dime | 14:35:07 |
| 22 | the question of whether Vernon Unsworth was a | 14:35:15 |
| 23 | pedophile, right? | 14:35:18 |
| 24 | A.   Yes.  Well, he was investigating this | 14:35:19 |
| 25 | guy.  It was like let's go find -- let's find out | 14:35:24 |

206

Exhibit 1
Page 116

| | | |
|---|---|---|
| 1 | what is the situation here. | 14:35:26 |
| 2 | Q.   Find out, among other things, he's a | 14:35:32 |
| 3 | pedophile? | 14:35:35 |
| 4 | A.   That was one of the possible outcomes. | 14:35:36 |
| 5 | Q.   And you were aware of that at the time | 14:35:41 |
| 6 | that you engaged his services?  Mr. Howard's | 14:35:43 |
| 7 | services, true? | 14:35:45 |
| 8 | A.   His services were engaged to figure out | 14:35:47 |
| 9 | what is Unsworth really up to. | 14:35:50 |
| 10 | Q.   But he had contacted you suggesting that | 14:35:53 |
| 11 | he might have information that Vernon Unsworth was, | 14:35:58 |
| 12 | in so many words, engaged in potentially | 14:36:01 |
| 13 | pedophilia.  And y'all hired him on the 15th of | 14:36:03 |
| 14 | August to go investigate that and tell you what he | 14:36:08 |
| 15 | learned, right? | 14:36:10 |
| 16 | A.   I think, as I recall, he said -- he | 14:36:14 |
| 17 | contacted Jared and said he might have -- be able | 14:36:17 |
| 18 | to learn the truth about Unsworth.  I don't think | 14:36:20 |
| 19 | there was a specific mention of pedophilia at the | 14:36:23 |
| 20 | time. | 14:36:27 |
| 21 | Q.   But it was in response to the lawsuit, in | 14:36:27 |
| 22 | response to my letter where my letter was clear as | 14:36:29 |
| 23 | a bell that we said you accused him of being a | 14:36:32 |
| 24 | pedophile, right? | 14:36:34 |
| 25 | A.   It was -- | 14:36:38 |

207

Exhibit 1
Page 117

```
 1            Have I read that correctly?              14:47:48

 2       A.   Yes.                                     14:47:50

 3       Q.   Wouldn't you agree that your             14:47:51

 4   characterization of Mr. Mac would apply to your   14:47:54

 5   knowledge about Vernon Unsworth when you tweeted on 14:47:57

 6   July 15th, that with respect to Mr. Unsworth you  14:48:00

 7   essentially knew nothing and had not even bothered 14:48:03

 8   to research the basic facts about him?            14:48:07

 9            MR. SPIRO:  Objection; vague and         14:48:09

10   confusing.                                        14:48:10

11   BY MR. WOOD:                                       14:48:11

12       Q.   You may answer my question, please, sir. 14:48:12

13       A.   Can you repeat the question.             14:48:14

14            MR. WOOD:  Could you it read it back,    14:48:14

15   please, or do you want me to do it, Patricia?     14:48:15

16            (Record read.)                           14:48:37

17            MR. SPIRO:  Objection.  Same objections. 14:48:37

18   Incomprehensible, but he can answer it.           14:48:37

19            THE WITNESS:  That is incomprehensible.  14:48:38

20   BY MR. WOOD:                                       14:48:40

21       Q.   What part is it you don't understand?    14:48:40

22   I'll try to make it more clear.                   14:48:41

23       A.   Let's try maybe ask it a different way.  14:48:43

24       Q.   Well, let me try it a different way.     14:48:45

25            You had not done any basic research on   14:48:45
```

219

Exhibit 1
Page 118

| | | |
|---|---|---|
| 1 | Vernon Unsworth on or before July the 15th, other | 14:48:49 |
| 2 | than to google his name, right? | 14:48:53 |
| 3 | A.   Yes. Oh, yeah. | 14:48:55 |
| 4 | Q.   I'm sorry? | 14:48:56 |
| 5 | A.   Yes. | 14:48:57 |
| 6 | Q.   You didn't really know essentially | 14:48:57 |
| 7 | anything about him, did you, except that he had | 14:48:58 |
| 8 | given the interview on CNN International? | 14:49:00 |
| 9 | A.   On which date? | 14:49:02 |
| 10 | Q.   The interview that you -- well, I'm | 14:49:03 |
| 11 | sorry.  On or before the 15th of July. | 14:49:05 |
| 12 | A.   Correct. | 14:49:08 |
| 13 | Q.   Yeah.  You essentially knew nothing about | 14:49:09 |
| 14 | him, right? | 14:49:11 |
| 15 | A.   Yes. | 14:49:12 |
| 16 | Q.   So then he writes you back and says "Hey | 14:49:13 |
| 17 | Elon, thanks for getting back.  He actually prefers | 14:49:17 |
| 18 | to be called a spelunker."  Did I get that right? | 14:49:19 |
| 19 | Thank you. | 14:49:20 |
| 20 | "And we've confirmed that he actually | 14:49:23 |
| 21 | does do cave diving, but do you have any comment on | 14:49:26 |
| 22 | the letter you received?" | 14:49:29 |
| 23 | A.   Yeah. | 14:49:32 |
| 24 | Q.   And you didn't respond to that, did you? | 14:49:32 |
| 25 | A.   No. | 14:49:36 |

220

Exhibit 1
Page 119

1    from England who's been traveling to or living in          14:57:25

2    Thailand for 30 to 40 years; mostly Pattaya Beach,         14:57:26

3    until moving to Chiang Rai for a child bride who           14:57:32

4    was about 12 years old at the time.                        14:57:35

5         "There's only one reason people go to               14:57:37

6    Pattaya Beach.  It isn't where you would go for            14:57:38

7    caves, but it is where go would go for something           14:57:41

8    else.  Chiang Rai is known for --                          14:57:42

9         Q.    Renowned.                                      14:57:44

10        A.    -- "renowned for child sex trafficking.        14:57:44

11   He may claim to know how to cave dive, but he              14:57:50

12   wasn't on the cave dive rescue team, and most of           14:57:51

13   the actual dive team refused to hang out with him.         14:57:53

14   I wonder why."  Google search for child sex                14:57:57

15   trafficking in Chiang Rai.                                 14:58:01

16        "As for this alleged threat of a lawsuit            14:58:01

17   which magically appeared when I raised the issue           14:58:06

18   (nothing was sent or raised beforehand), I fucking         14:58:08

19   hope he sues me."                                          14:58:12

20        Q.    Now, in your statement, he's an old            14:58:17

21   white -- "He's an old single white guy from England        14:58:26

22   who's been traveling to or living in Thailand for          14:58:29

23   30 to 40 years, mostly Pattaya Beach, until moving         14:58:31

24   to Chiang Rai for a child bride who was about              14:58:35

25   12 years old at the time."                                 14:58:37

                                                                229

Exhibit 1
Page 120

```
 1              I've read that correctly, just as you've    14:58:39
 2    read it, right?                                       14:58:41
 3        A.    Right.                                      14:58:42
 4        Q.    You are stating that as a matter of fact,   14:58:43
 5    aren't you?                                           14:58:44
 6        A.    No.  I am saying -- like these -- you       14:58:47
 7    know, I was conveying what I was told by this         14:58:51
 8    investigator.                                         14:58:56
 9        Q.    You didn't tell Ryan Mac that.  You         14:58:56
10    didn't say "I have been told by an investigator       14:58:57
11    that..."                                              14:58:59
12              You didn't say that, did you?               14:58:59
13        A.    No.  I probably should have.                14:59:04
14        Q.    You didn't mention anything about your      14:59:05
15    investigator to Ryan Mac in this email, did you?      14:59:07
16        A.    No.                                         14:59:11
17        Q.    I mean, wouldn't you expect that a          14:59:11
18    reasonable person would look at this email and        14:59:14
19    believe that you were making specific statements of   14:59:16
20    fact about Mr. Unsworth?                              14:59:19
21              MR. SPIRO:  Objection.                      14:59:22
22    BY MR. WOOD:                                          14:59:22
23        Q.    "He's an old single white guy from          14:59:22
24    England who's been traveling to or living in          14:59:25
25    Thailand for 30 to 40 years, mostly Pattaya Beach,    14:59:26
```

230

Exhibit 1
Page 121

```
 1    this one.                                        15:00:29

 2            MR. SPIRO:  He's been answering questions 15:00:29

 3    for hours and hours.                             15:00:29

 4            MR. WOOD:  I'm just trying to make a      15:00:31

 5    lighthearted comment.  Loosen up.                15:00:31

 6    BY MR. WOOD:                                     15:00:35

 7        Q.   Mr. Musk, it seems simple.  You didn't  15:00:35

 8    mention a word about having an investigator, did 15:00:38

 9    you?                                             15:00:40

10        A.   I mean, not in this email, no.          15:00:40

11        Q.   Had he published any of the information  15:00:41

12    in your email where it says "off the record" by the 15:00:46

13    time he responded to you on September 4th, at    15:00:52

14    8:49 a.m.?                                       15:00:55

15        A.   Pardon?  I don't understand you.        15:01:05

16        Q.   You sent this information to him on      15:01:06

17    August 30th.  He writes you back on September 4th. 15:01:08

18        A.   Right.                                  15:01:13

19        Q.   Had he published any information         15:01:13

20    contained in your August 30 email as September 4th 15:01:15

21    at 8:49 a.m.?                                    15:01:19

22        A.   Had he published it?  You're asking if he 15:01:26

23    had published anything?                          15:01:27

24        Q.   Yeah.  That was in your email of         15:01:30

25    August 30th?                                     15:01:32
```

233

Exhibit 1
Page 122

1      A.   I -- I don't recall.  I don't think so.      15:01:37

2   I don't recall.                                       15:01:39

3      Q.   I'm sorry?                                    15:01:42

4      A.   You're asking me did he publish something    15:01:42

5   between August 30th and September 4th?  Is that       15:01:45

6   what you're asking?                                   15:01:47

7      Q.   I think so, yeah.                             15:01:49

8      A.   I don't recall.  I don't know if he did      15:01:51

9   during those days.                                    15:01:53

10     Q.   While he finds the article, I'll go back     15:02:20

11  to Exhibit No. 42.                                    15:02:23

12          On September 4th, he wrote you and           15:02:24

13  said -- among other things, I did not -- "I didn't    15:02:35

14  agree for the conversation to be off the record,      15:02:39

15  but appreciate the response."                         15:02:42

16          Have I read that correctly?                  15:02:43

17     A.   Yes.                                          15:02:47

18     Q.   So you knew at that time that Mr. Mac was    15:02:48

19  not treating your email as being off the record,      15:02:50

20  didn't you, sir?                                      15:02:55

21     A.   Yeah, it's -- it's clear that Ryan Mac       15:03:01

22  was not behaving according to the accepted rules of   15:03:03

23  journalism in my view.                                15:03:07

24     Q.   When he told you that he was not -- you      15:03:08

25  knew he wasn't -- yeah, you knew he wasn't going to   15:03:09

234

Exhibit 1
Page 123

1    treat this as off the record, he said "I didn't    15:03:13

2    agree to it," right?                                15:03:15

3        A.    He says "I didn't agree for the          15:03:18

4    conversation to be off the record," right.          15:03:19

5        Q.    And you write back and you say "Off the   15:03:24

6    record.  We haven't had a conversation at all.  I   15:03:27

7    sent you an off the record email which very clearly 15:03:31

8    and unambiguously said 'off the record.'  If you    15:03:32

9    want to publish off-the-record comments and destroy 15:03:39

10   your journalistic credibility, that is it up to     15:03:42

11   you."                                               15:03:45

12            Right?                                      15:03:45

13       A.    Obviously I cannot control this guy's     15:03:47

14   behavior.                                           15:03:50

15       Q.    Never could.  From the first email        15:03:53

16   forward, you had no control over his behavior.      15:03:55

17       A.    It's my expectation that journalists      15:03:59

18   adhere to off the record.  In this case he did not. 15:04:02

19            MR. WOOD:  44?                              15:04:05

20            THE REPORTER:  Yes.                         15:04:05

21            (Exhibit 44 was marked for                 15:04:05

22            identification.)                            15:04:05

23   BY MR. WOOD:                                         15:04:49

24       Q.    Let me just say this, Mr. Musk.  This     15:04:51

25   exhibit has the article published by Mr. Mac and    15:05:00

235

Exhibit 1
Page 124

1      A.    Yes.   So this is the morning -- morning          15:07:12

2    before the article is printed that evening.              15:07:14

3      Q.    And then at 10:53 a.m., you write him and         15:07:22

4    you again say "Off the record.  We haven't had a         15:07:25

5    conversation at all.  I sent you an off-the-record       15:07:30

6    email which very clearly and unambiguously said          15:07:31

7    'off the record.'  If you want to publish                15:07:34

8    off-the-record comments and destroy your                 15:07:35

9    journalistic credibility, that's up you to.  As for      15:07:38

10   answering more questions, I would happy to do so,        15:07:40

11   but not with someone who has just told me that they      15:07:43

12   will not honor accepted rules of journalism."            15:07:45

13   Right?                                                   15:07:47

14     A.    That's accurate.                                 15:07:49

15     Q.    So you said "if you want to publish it           15:07:50

16   and destroy your journalistic credibility, that's       15:07:52

17   up to you," right?                                       15:07:54

18     A.    Yeah, I mean, I don't -- obviously, if he        15:07:57

19   cannot be -- I don't have, like, mind control over       15:07:59

20   this guy.                                                15:08:04

21     Q.    No.  But did you write him back and say          15:08:04

22   "Do not publish that information.  If you publish         15:08:04

23   that information, I will take action against you          15:08:07

24   because I gave it to you off the record."                15:08:09

25          You didn't say anything like that, did            15:08:12

238

Exhibit 1
Page 125

1    you, sir?                                               15:08:14

2         A.    I mean, I was clearly extremely unhappy      15:08:15

3    that he was violating journalistic integrity in my     15:08:18

4    view and publishing off-the-record comments that       15:08:23

5    were never meant to be published.                      15:08:26

6         Q.    Sir, you didn't write him back and say      15:08:30

7    "Do not publish that information because I sent it      15:08:33

8    off the record."  You say "Publish it if you want      15:08:35

9    to destroy your journalistic credibility; that's up    15:08:43

10   to you."                                               15:08:45

11        Those were your words, right?                     15:08:45

12        A.    This is obviously not suggesting that he    15:08:49

13   publish anything.                                      15:08:50

14        Q.    Nor is it telling him specifically that     15:08:51

15   you did not want it published, other than to say --    15:08:53

16        A.    No --                                       15:08:57

17        Q.    -- you choose -- excuse me -- other than    15:08:57

18   to say you choose whether you want to publish it       15:08:57

19   and destroy your journalistic credibility.  That's    15:09:00

20   up to you.                                             15:09:02

21        A.    No.                                         15:09:05

22        Q.    That's not what you said?                   15:09:05

23        A.    You are mischaracterizing the situation.    15:09:05

24        Q.    "If you want to publish off-the-record      15:09:06

25   comments and destroy your journalistic credibility,   15:09:08

                                                            239

Exhibit 1
Page 126

```
 1    Mr. Unsworth and find out that he had a 30-year        15:10:57
 2    history of visiting Thailand, and he'd spent a lot     15:11:00
 3    of time in Pattaya Beach without looking and/or        15:11:02
 4    visiting caves?                                        15:11:07
 5        A.   Yeah.  This is a full-on hope that this       15:11:15
 6    guy would actually investigate, but obviously he       15:11:16
 7    had no interest in doing so.                           15:11:19
 8        Q.   I'm sorry?                                    15:11:20
 9        A.   I just had a full-on hope that this           15:11:20
10    reporter would investigate, do something, would       15:11:24
11    actually care about doing the right thing, but        15:11:28
12    obviously at this point he was just -- that was not    15:11:30
13    realistic.                                            15:11:34
14        Q.   At 1:18 on the 4th, you were still hoping     15:11:35
15    that this reporter, Mr. Mac, would do right thing      15:11:38
16    and investigate Vernon Unsworth, right?               15:11:43
17        A.   Yeah.  I was hoping he would look into        15:11:54
18    it.                                                    15:11:56
19        Q.   The same reporter, who you had a few days     15:11:57
20    earlier accused him of defending a child rapist and   15:12:00
21    called him a fucking asshole, right?  Same guy?       15:12:04
22        A.   Yeah, I was pretty upset with that guy.      15:12:09
23        Q.   And then he wrote back "Hey, Elon, I'm       15:12:13
24    sure you have seen the story at this point.  Still    15:12:17
25    happy to talk with you on whatever terms you want     15:12:19
```

Exhibit 1
Page 127

```
 1   as long as we set them beforehand.  Let me know if     15:12:21
 2   you want to do a phone call.  Best, R."                15:12:24
 3          And what did you write back and say?            15:12:26
 4   A.   "Get lost, you creep."                            15:12:29
 5   Q.   I thought you wanted this guy to                  15:12:31
 6   investigate, to try to stop a potential crime in       15:12:33
 7   progress, an act of pedophile.  Why all of a sudden    15:12:35
 8   now are you saying "Get lost, you creep"?              15:12:39
 9   A.   He obviously had no -- at this point it           15:12:41
10   was obvious that he had no intention of doing any      15:12:43
11   real investigation on his own.                         15:12:46
12   Q.   And who did you turn to in the media that         15:12:48
13   you respected to provide them with this information    15:12:50
14   you had gotten from your investigator to see if        15:12:54
15   another member of the media would investigate it in    15:12:58
16   hopes of finding out if it was true, and if so,        15:13:01
17   stop pedophilia before it continues to occur?          15:13:04
18          Who did you turn to after you wrote "get        15:13:08
19   lost, you creep"?                                      15:13:11
20   A.   I didn't -- I don't recall turning to             15:13:13
21   anyone.                                                15:13:14
22   Q.   Didn't ask any other member of the media          15:13:15
23   or journalist to investigate, right?                   15:13:18
24   A.   I had lost faith in the media at this             15:13:20
25   point.                                                 15:13:22
```

243

Exhibit 1
Page 128

```
 1   claimed?                                                  15:38:25

 2        A.   I had heard from some of the SpaceX            15:38:31

 3   engineers that he -- that they had talked to             15:38:39

 4   somebody who had said that he had -- they -- his         15:38:41

 5   name didn't come up.  And he was not -- you know,        15:38:46

 6   they either hadn't -- didn't know who he was, or if      15:38:50

 7   they did know who he was, they said they didn't          15:38:55

 8   want him there.  That was my recollection.               15:39:01

 9        Q.   If they didn't know who he was, they did       15:39:04

10   not want him there?                                      15:39:06

11        A.   Some people didn't know who he was, and        15:39:09

12   the others didn't want him there.                        15:39:10

13        Q.   Who were these people?  First, who were        15:39:11

14   the SpaceX employees that reported that to you?          15:39:11

15        A.   I believe it was a conversation with           15:39:14

16   Armor Harris.                                            15:39:14

17        Q.   Anybody else besides Mr. Harris?               15:39:18

18        A.   I think I asked a couple people.  I'm not      15:39:19

19   sure who else.                                           15:39:19

20        Q.   Mr. Harris, though, was somebody you           15:39:22

21   definitely know said that to you?                        15:39:24

22        A.   I believe -- that's my recollection.           15:39:25

23        Q.   And did he tell you who had actually told      15:39:28

24   him that?                                                15:39:30

25        A.   I'd asked him to inquire with people that      15:39:33
```

248

Exhibit 1
Page 129

```
 1    think your comments were going to do in terms of      15:44:03

 2    how they impacted Mr. Unsworth's life?  Did you        15:44:06

 3    ever think about that?                                 15:44:09

 4              MR. SPIRO:  Can I ask you to specify         15:44:20

 5    which comments.                                        15:44:22

 6    BY MR. WOOD:                                           15:44:23

 7         Q.   Do you know what comments I'm talking        15:44:24

 8    about?                                                 15:44:26

 9         A.   Yeah, it was -- it's difficult to say,       15:44:30

10    you know, if -- you know, if he -- if he was up to     15:44:34

11    no good, then, you know, then obviously this would     15:44:45

12    have been appropriate, but if he was not up to no      15:44:47

13    good, then obviously this is a tragic outcome;         15:44:51

14    tragic situation.                                      15:44:53

15         Q.   That he will live with for the rest of       15:44:54

16    his life, true?                                        15:44:56

17         A.   I mean, these -- you know, I'm not sure      15:45:00

18    what you mean by that.                                 15:45:08

19         Q.   Google is forever; the internet is          15:45:10

20    forever.                                               15:45:11

21         A.   Actually, technically in Europe you can     15:45:12

22    delete Google stuff.                                   15:45:15

23         Q.   Not in the United States?                    15:45:16

24         A.   Not in the United States.                    15:45:17

25         Q.   So it's there forever?                       15:45:18
```

253

Exhibit 1
Page 130

```
 1        A.   If you google things, they are there for    15:45:19
 2   a long time; that is true.  I wouldn't say forever,    15:45:23
 3   but it's a long time.                                  15:45:25
 4        Q.   Do you have any idea of the cost that one    15:45:27
 5   person might incur if they tried to hire someone to    15:45:29
 6   remediate all of the accusations that are published   15:45:32
 7   on the internet?                                       15:45:36
 8        A.   I -- I don't.                                15:45:40
 9        Q.   It would be millions of dollars, wouldn't   15:45:41
10   you agree?                                             15:45:44
11        A.   I don't know.                                15:45:45
12        Q.   Well, it turned out not to be true,          15:45:47
13   didn't it?                                             15:45:53
14        A.   It appears not to be true.                   15:45:55
15        Q.   No, no.  It turned out not to be true.       15:45:56
16   Your investigator was a con man you've concluded,      15:45:57
17   right?                                                 15:46:00
18        A.   He was not the -- the investigator was       15:46:04
19   not being truthful.                                    15:46:06
20        Q.   And so the result is tragic as it relates    15:46:08
21   to Mr. Unsworth, true?                                 15:46:13
22        A.   This is very regrettable situation.          15:46:16
23        Q.   That you started at least in calling him     15:46:18
24   a "pedo guy."                                          15:46:20
25        A.   No, this --                                  15:46:22
```

254

Exhibit 1
Page 131

```
 1      Q.   I understand he made the -- as you        15:46:22

 2   perceived it, he insulted you about the tube --   15:46:24

 3      A.   Yes.                                       15:46:27

 4      Q.   -- saying it was bullshit, saying it was  15:46:27

 5   a PR stunt, saying it wouldn't work.               15:46:29

 6      A.   He made an unprovoked and uncalled-for     15:46:33

 7   attack on me, and with false statements.           15:46:35

 8      Q.   How did that impact your life?  Was it     15:46:39

 9   tragic?                                            15:46:43

10      A.   It was deeply hurtful --                   15:46:44

11      Q.   What was the impact --                     15:46:46

12      A.   -- as well as --                           15:46:46

13      Q.   -- other than --                           15:46:47

14      A.   -- an insult -- may I finish?              15:46:48

15      Q.   Yeah.  I want you to tell me fully.        15:46:50

16      A.   As well as an insult to the great efforts 15:46:53

17   of my team in a very difficult time.               15:46:57

18      Q.   How has that tragically impacted you?      15:47:03

19      A.   I think it's hurt me greatly.              15:47:07

20      Q.   How?                                       15:47:10

21      A.   It has damaged my reputation greatly.      15:47:11

22      Q.   How?                                       15:47:15

23      A.   What are you talking about?                15:47:16

24      Q.   How has it damaged your reputation?  What  15:47:17

25   Mr. Unsworth said on CNN International?             15:47:20
```

255

Exhibit 1
Page 132

```
 1       A.   He -- this guy is like basically saying I      15:47:31
 2   did this for a publicity stunt.  He's questioning       15:47:37
 3   my motives; I questioned his motives.  He insulted      15:47:41
 4   the efforts of a great many people who tried to be      15:47:48
 5   helpful.  His actions were not good.                    15:47:52
 6            Now, my actions were not good either.          15:47:55
 7   Two wrongs don't make a right, that is for sure.        15:48:00
 8       Q.   But you suggested over the course of your      15:48:03
 9   communications that Mr. Unsworth may have been          15:48:07
10   involved in pedophilia, right?                          15:48:11
11       A.    In the later comments, yes, this is what      15:48:17
12   I was told by the investigator.                         15:48:20
13       Q.   So you've got the tragedy you suffered by      15:48:23
14   someone describing your tube as a publicity stunt,      15:48:27
15   calling it bullshit through use of an idiom "Stick      15:48:31
16   it where it hurts."                                     15:48:40
17            And then you've got the tragedy of            15:48:41
18   Mr. Unsworth with a billionaire, one of the world's     15:48:45
19   most influential and powerful people, suggesting        15:48:46
20   that he was a pedophile.                                15:48:49
21            Which one -- which tragedy strikes you as     15:48:50
22   being greater?  Who suffered the most; you or           15:48:54
23   Mr. Unsworth?                                           15:48:58
24            MR. SPIRO:  Objection.                        15:48:59
25            You don't have to answer that.                 15:48:59
```

256

Exhibit 1
Page 133

```
 1   BY MR. WOOD:                                     15:49:01

 2       Q.   You can answer it for me, please.       15:49:01

 3            MR. SPIRO:  I mean, if you can answer    15:49:03

 4   that question.  I don't know how he could possibly  15:49:04

 5   answer.                                          15:49:06

 6            MR. WOOD:  Seems like a pretty obvious   15:49:07

 7   answer, but let's see what he says.              15:49:08

 8            MR. SPIRO:  You can answer the question.  15:49:10

 9   I don't know how you could.                      15:49:10

10            THE WITNESS:  In my opinion, this whole  15:49:13

11   thing has damaged my reputation greatly.  It may be  15:49:14

12   the single biggest damage to my reputation ever.  15:49:15

13   BY MR. WOOD:                                     15:49:18

14                                                    15:49:18

15                                                    15:49:21

16                                                    15:49:24

17                                                    15:49:26

18                                                    15:49:26

19                                                    15:49:29

20                                                    15:49:31

21                                                    15:49:33

22                                                    15:49:33

23                                                    15:49:38

24                                                    15:49:39

25                                                    15:49:44
```

257

Exhibit 1
Page 134

| | | | |
|---|---|---|---|
| 1 | Q. | Isn't that what you just told me? | 15:52:16 |
| 2 | A. | Obviously people decide what they want to | 15:52:18 |
| 3 | decide. | | 15:52:20 |
| 4 | Q. | "Elon Musk.  Weakness for self-promotion | 15:52:20 |
| 5 | masks his potential." | | 15:52:25 |
| 6 | | Do you agree? | 15:52:26 |
| 7 | A. | No. | 15:52:27 |
| 8 | Q. | "The billionaire's meddling in the Thai | 15:52:27 |
| 9 | cave rescue looks like a narcissistic PR stunt." | | 15:52:32 |
| 10 | | Do you see that? | 15:52:36 |
| 11 | A. | As I said, are you going back one page? | 15:52:38 |
| 12 | Q. | Yeah, this was an article published in | 15:52:40 |
| 13 | the *Financial Times*.  That's a respected | | 15:52:43 |
| 14 | publication, isn't it, sir? | | 15:52:46 |
| 15 | | MR. SPIRO:  Opinion piece.  Very nice. | 15:52:48 |
| 16 | | THE WITNESS:  It's an opinion piece. | 15:52:50 |
| 17 | | MR. WOOD:  So is that an objection? | 15:52:51 |
| 18 | | THE WITNESS:  There is a difference | 15:52:53 |
| 19 | between -- | | 15:52:54 |
| 20 | | MR. WOOD:  Was that an objection?  I | 15:52:54 |
| 21 | missed it. | | 15:52:56 |
| 22 | | THE WITNESS:  Opinions necessarily are -- | 15:52:56 |
| 23 | an opinion piece is just an opinion piece.  It's | | 15:52:56 |
| 24 | not the same as regular journalism.  That is why | | 15:53:01 |
| 25 | they call it opinion. | | 15:53:05 |

261

Exhibit 1
Page 135

```
 1   BY MR. WOOD:                                          15:53:07

 2        Q.   "The billionaire's meddling in the Thai     15:53:07

 3   cave rescue looks like a narcissistic PR stunt."      15:53:07

 4            Does that offend you?                         15:53:11

 5        A.   I can see how this would look like a         15:53:14

 6   "narcissistic PR stunt."  It wasn't, but it can        15:53:16

 7   look like that.                                        15:53:20

 8        Q.   Well, why would you be upset with            15:53:21

 9   Mr. Unsworth if he looked at it and thought it         15:53:24

10   looked to him, like it did to this writer, as a PR     15:53:27

11   stunt.  He didn't say anything different than what     15:53:31

12   this person is opining about in Exhibit 45?            15:53:35

13        A.   That doesn't mean I agree with this          15:53:38

14   person.                                                15:53:39

15        Q.   I didn't say that.                           15:53:40

16        A.   Yeah.                                        15:53:40

17        Q.   I'm just saying:  You tell me that this      15:53:40

18   is the most damaging thing that's ever happened to     15:53:42

19   you in terms of Vernon Unsworth's comments?            15:53:46

20        A.   No.  This whole fiasco is the most           15:53:48

21   damaging thing.                                        15:53:51

22        Q.   What do you mean?                            15:53:51

23        A.   His original comments were, of course,       15:53:53

24   hurtful, but this whole fiasco I'd say has damaged     15:53:54

25   my reputation more than anything.                      15:53:58
```

                                                            262

Exhibit 1
Page 136

```
 1      Q.   What do you mean when you say "this whole      15:54:00
 2  fiasco"?                                                15:54:02
 3      A.   This is like, these tweets.                    15:54:05
 4      Q.   What do you mean when you say "this whole      15:54:12
 5  fiasco"?                                                15:54:15
 6      A.   The series of tweets, the interaction          15:54:20
 7  with BuzzFeed.  These have all been very damaging,      15:54:22
 8  and has hurt me greatly.                                15:54:24
 9      Q.   But they were your tweets?                     15:54:26
10      A.   It's, you know, I think self-inflicted         15:54:31
11  wounds are the worst ones.                              15:54:33
12      Q.   And so the damage that you've suffered         15:54:34
13  from this fiasco, to your reputation -- the tragic      15:54:35
14  damage, is, in fact, you believe fairly described      15:54:42
15  as self-inflicted, true?                                15:54:46
16      A.   This isn't -- not entirely -- it was           15:54:49
17  partly self-inflicted, yes; partly inflicted by        15:54:54
18  others.  But what I regret most here are the --         15:55:00
19  the -- whatever foolish actions I made.  Generally      15:55:11
20  I am attacked constantly from all angles.               15:55:15
21           When the wound is partly                       15:55:19
22  self-inflicted -- these are the worst ones.  These      15:55:28
23  are the ones that cause the most damage.  I'm           15:55:32
24  attacked all the time constantly.                       15:55:35
25      Q.   You gave them a sword here.  The people        15:55:37
```

263

Exhibit 1
Page 137

```
 1   that wanted to attack you, didn't you?              15:55:41
 2        A.   Yes.                                       15:55:42
 3        Q.   And then you can say other people might    15:55:42
 4   have had a role to play, but I think you would       15:55:44
 5   admit to me, Mr. Musk, the damage that you feel you  15:55:46
 6   have suffered here has been largely self-inflicted,  15:55:50
 7   true?                                                15:55:54
 8        A.   No.                                         15:55:56
 9        Q.   Equally?  Who else do you blame besides    15:55:56
10   yourself?                                            15:56:03
11        A.   No, but it has a significant element of    15:56:03
12   self-inflicted.  Essentially, without the           15:56:08
13   self-inflicted element, these attacks would have --  15:56:10
14   would not resonate.                                  15:56:11
15        Q.   I am not sure I -- explain that to me.     15:56:13
16   What do you mean?                                    15:56:16
17        A.   As I gave those who -- the haters of the   15:56:20
18   world ammunition.                                    15:56:26
19        Q.   Do you include Mr. Unsworth as a hater of  15:56:29
20   the world?  Hater of you?                            15:56:33
21        A.   He did launch an unprovoked attack on me.  15:56:33
22        Q.   He didn't know who you were.               15:56:34
23        A.   Well, then why did he launch --            15:56:36
24        MR. SPIRO:  Objection.  Assuming facts          15:56:36
25   not in evidence.                                     15:56:37
```

                                                             264

Exhibit 1
Page 138

| | | |
|---|---|---|
| 1 | Other than deleting the tweets of the | 17:19:43 |
| 2 | 15th, did you ever take any action to contact | 17:19:46 |
| 3 | anyone in the media to correct any reporting being | 17:19:53 |
| 4 | done that said that you had accused Mr. Unsworth of | 17:19:58 |
| 5 | being a pedophile? | 17:20:04 |
| 6 | A.   No, I don't think so. | 17:20:13 |
| 7 | | 17:20:22 |
| 8 | | 17:20:27 |
| 9 | | 17:20:30 |
| 10 | | 17:20:36 |
| 11 | | 17:20:38 |
| 12 | | 17:20:45 |
| 13 | | 17:20:45 |
| 14 | | 17:20:49 |
| 15 | | 17:20:52 |
| 16 | Q.   And while we're on the subject of | 17:20:57 |
| 17 | $20 million, I believe that in July of 2018 that | 17:20:58 |
| 18 | your Twitter account showed approximately 20 to | 17:21:02 |
| 19 | 22 million followers. | 17:21:06 |
| 20 | Does that sound about right to you? | 17:21:07 |
| 21 | A.   That is probably about right. | 17:21:09 |
| 22 | Q.   You would not dispute that | 17:21:10 |
| 23 | characterization of somewhere in the neighborhood | 17:21:12 |
| 24 | of 20 to 22 million followers? | 17:21:14 |
| 25 | A.   I am not sure, but that sounds like it is | 17:21:14 |

319

Exhibit 1
Page 139

```
 1    probably right.                                   17:21:18

 2         Q.   And up to about 27 million now?         17:21:18

 3         A.   Sure.                                    17:21:21

 4         Q.   Do you recognize the influence you have  17:21:22

 5    when you speak publicly?                           17:21:24

 6         A.   Sure.  Yes.  Somewhat influential.  So   17:21:29

 7    people -- so more influential to some than others, 17:21:33

 8    but it's not to...                                 17:21:36

 9         Q.   There used to be a great commercial, you 17:21:37

10    may remember it, EF Hutton?  When EF Hutton speaks, 17:21:39

11    people listen.  Remember the room would get still?  17:21:41

12         A.   I don't remember that ad.                17:21:45

13         Q.   You don't remember it?                   17:21:48

14         A.   No.                                      17:21:49

15         Q.   I'm dating myself.                        17:21:49

16         A.   I have heard of that ad.                 17:21:51

17         Q.   But don't you recognize that you carry a 17:21:53

18    lot of power and influence because of not only who  17:21:55

19    you are, but what you've accomplished and what you  17:21:59

20    seek to accomplish?                               17:22:01

21         A.   Yes.  There is -- this influence is      17:22:04

22    certainly mixed.  There's people that like me;      17:22:08

23    people that don't like me.                         17:22:13

24         Q.   But knowing that you carry that type of  17:22:15

25    weight and influence --                            17:22:19
```

320

Exhibit 1
Page 140

```
 1      A.   Mm-hmm.                              17:22:21

 2      Q.   -- doesn't that make you more careful    17:22:21

 3  about what you say publicly?                  17:22:24

 4      A.   I'm no Justin Bieber.  I think he's got  17:22:26

 5  100 million.                                  17:22:28

 6      Q.   But my question is, sir:  Knowing the   17:22:34

 7  influence that you do have --                 17:22:35

 8      A.   Mm-hmm.                              17:22:36

 9      Q.   -- doesn't that tell you to be careful  17:22:36

10  about what you say because people tend to believe  17:22:40

11  Elon Musk?                                    17:22:45

12      A.   I think it's -- I wouldn't say that just  17:22:48

13  because I have a lot of followers people believe  17:22:51

14  what I say.                                   17:22:53

15      Q.   I'm not talking about your followers.   17:22:55

16  I'm talking about -- you're -- I think like the  17:22:58

17  40th richest man in the world based on your net  17:22:58

18  worth, somewhere in that neighborhood.        17:23:00

19      A.   If you say so.                       17:23:01

20      Q.   You're building space rockets.  You're  17:23:03

21  building Tesla, the automobile, you know, the wave  17:23:06

22  of the future.  You're a powerful man.  You know  17:23:09

23  that, don't you?                              17:23:13

24      A.   I build rockets and cars.            17:23:16

25      Q.   You could bring the weight of your money  17:23:18
```

321

Exhibit 1
Page 141

1

2

3

4

5

6

7

8

9   I, ELON MUSK, do hereby declare under the penalty of

10   perjury that I have read the foregoing transcript;

11   that I have made any corrections as appear noted, in

12   ink, initialed by me, or attached hereto; that my

13   testimony as contained herein, as corrected, is true

14   and correct.

15        EXECUTED this __5th__ day of ___September___ ,

16   20_19_ , at _____Los Angeles_____ , ___California___ .

17                    (City)                (State)

18

19                    _____

20                         ELON MUSK

21

22

23

24

25

327

Exhibit 1
Page 142

# EXHIBIT 2

# EXHIBIT 2

Exhibit 2
Page 143

1

2                    UNITED STATES DISTRICT COURT

3                   CENTRAL DISTRICT OF CALIFORNIA

4

5

6   VERNON UNSWORTH,

7            Plaintiff,

8            vs.              Case No. 2:18-cv-8048-svw

9   ELON MUSK,

10           Defendant.

11   _____

12       VIDEOTAPED DEPOSITION OF JARED BIRCHALL

13              LOS ANGELES, CALIFORNIA

14                SEPTEMBER 10, 2019

15

16

17

18

19

20   Reported By:
     PATRICIA Y. SCHULER
21   CSR No. 11949

22   Job No. 45748

23

24

25

Exhibit 2
Page 144

```
 1        Q.   And did you search your email for        09:44:15
 2   relevant records, that email being your            09:44:17
 3   Excession.com --                                   09:44:23
 4        A.   Correct.                                 09:44:26
 5        Q.   -- email?                                09:44:26
 6        A.   Yes.                                      09:44:27
 7        Q.   And what is that email address?           09:44:28
 8        A.   It's Jared@Excession.com.                 09:44:30
 9        Q.   When you were emailing Mr. Howard, did    09:44:35
10   you email from Jared@Excession.com?                09:44:39
11        A.   No.                                       09:44:44
12        Q.   Why not?                                  09:44:44
13        A.   I used, I guess, an assumed name when I   09:44:47
14   corresponded with Mr. Howard.  I was being asked   09:44:52
15   to -- to do something that was very much out of my 09:44:56
16   wheelhouse, and to help gather information about a 09:45:04
17   matter in an area that had things that I -- I just 09:45:15
18   felt I would be better -- it would be better not to 09:45:21
19   have my personal name, both for me as well as      09:45:24
20   Mr. Musk, to not to have my personal name attached 09:45:27
21   to that.                                            09:45:31
22        Q.   Why?  Why were you concerned about your  09:45:32
23   personal name being attached to email             09:45:36
24   communications?                                    09:45:38
25        A.   Well, first and foremost, my job involves 09:45:39
```

12

Exhibit 2
Page 145

1    finance, right, and that is what I do.  So when it    09:45:43

2    comes to being asked to go and facilitate, you    09:45:47

3    know, communication from someone who is gathering    09:45:50

4    information about a legal matter or about a    09:45:56

5    seemingly seedy topic.    09:46:00

6            I -- You know, I work in finance.  I have    09:46:06

7    a family.  This isn't what I do, and my preference    09:46:09

8    was to not be personally tied to something of that    09:46:14

9    nature.    09:46:18

10    Q.    Did anyone suggest that you should use a    09:46:19

11    different name?    09:46:23

12    A.    No.    09:46:24

13    Q.    Mr. Musk know that you were using a    09:46:25

14    different name?    09:46:29

15    A.    He may have, but he did not    09:46:29

16    specifically -- I did not specifically discuss that    09:46:31

17    with him.    09:46:34

18    Q.    Did Mr. Musk have access to the email    09:46:35

19    address that you came up with?  I think it was    09:46:40

20    J. Brickhouse?    09:46:50

21    A.    James Brickhouse.    09:46:53

22    Q.    James Brickhouse at -- let me make sure    09:46:55

23    I've got that email:  JBrickhouse11@Gmail.com?    09:47:03

24    A.    That is the email address, but no, he    09:47:09

25    didn't have access to that.    09:47:11

13

Exhibit 2
Page 146

| | | | |
|---|---|---|---|
| 1 | Q. | You are sure of that? | 09:47:13 |
| 2 | A. | 100 percent. | 09:47:14 |
| 3 | Q. | When did you establish that Gmail | 09:47:16 |
| 4 | account? | | 09:47:18 |
| 5 | A. | I couldn't tell you the date, but it was | 09:47:20 |
| 6 | in conjunction with initiating this effort. | | 09:47:22 |
| 7 | Q. | And does it remain active today? | 09:47:27 |
| 8 | A. | Yes. | 09:47:29 |
| 9 | Q. | Have you gone through and searched that | 09:47:32 |
| 10 | email address to determine if you have given to | | 09:47:34 |
| 11 | lawyers for Mr. Musk -- | | 09:47:39 |
| 12 | A. | Yes. | 09:47:40 |
| 13 | Q. | I haven't asked you the question yet. | 09:47:41 |
| 14 | A. | Oh. | 09:47:43 |
| 15 | Q. | -- to provide all of the emails relevant | 09:47:43 |
| 16 | to this issue of the investigation by Mr. Howard | | 09:47:47 |
| 17 | and information about Mr. Unsworth? | | 09:47:52 |
| 18 | | Have you given to the lawyers all of the | 09:47:55 |
| 19 | emails from the JBrickhouse11@Gmail.com account? | | 09:47:59 |
| 20 | A. | I have. | 09:48:06 |
| 21 | Q. | And were there any emails in that account | 09:48:06 |
| 22 | that would have addressed any other subject matter | | 09:48:12 |
| 23 | other than Mr. Unsworth, Mr. Howard, and the | | 09:48:16 |
| 24 | information you were receiving? | | 09:48:22 |
| 25 | | MR. SPIRO:  Objection; relevance. | 09:48:24 |

14

Exhibit 2
Page 147

```
 1      A.   That's right.                              09:49:40

 2      Q.   And so Mr. Howard always knew you as       09:49:41

 3   Jim Brickhouse, right?                             09:49:45

 4      A.   Yes, though at one point he does -- he     09:49:48

 5   either said on the phone or maybe it's somewhere he 09:49:52

 6   said something to the effect of -- something to the 09:49:55

 7   effect I realize who you represent, or I know -- I  09:50:00

 8   don't know how they do this, but because my email   09:50:05

 9   was being sent in a certain way, he said something  09:50:09

10   to the effect of "I realize your name is not        09:50:15

11   James Brickhouse" or something like that.           09:50:19

12      Q.   Where in the -- on the timeline would he    09:50:22

13   have raised that with you?  "He" being Mr. Howard?  09:50:26

14      A.   I mean, probably two-thirds of the way      09:50:29

15   into my correspondence with him.                    09:50:32

16      Q.   Which would date about what date?           09:50:35

17      A.   Hard to say, but I mean, I -- I don't       09:50:41

18   know.  Maybe early September.                       09:50:43

19      Q.   So when he was initially engaged to         09:50:45

20   investigate he did not know your real name?         09:50:49

21      A.   I don't believe he knew my real name, no.   09:50:55

22      Q.   And he did not know that it was being       09:50:57

23   undertaken for Elon Musk?                           09:50:59

24      A.   I actually think he -- I mean, he is the    09:51:01

25   one that reached out to us.  And so I think he did  09:51:03
```

                                                          16

Exhibit 2
Page 148

```
1    know that it was being -- that this -- his work was      09:51:11

2    being done for Mr. Musk.  But he just didn't know        09:51:15

3    that -- didn't know who I personally was.                09:51:19

4               And you know, I was also preventing a --      09:51:22

5    you know, someone's ability to just forward an           09:51:25

6    email exchange and easily tie that to myself or          09:51:28

7    Elon or someone, you know.  So that was just             09:51:31

8    another reason behind the anonymity on that.             09:51:37

9        Q.   When was the anonymity -- when was the          09:51:42

10   curtain drawn back?  You said about two-thirds of        09:51:42

11   the way into your correspondence with him?               09:51:48

12       A.   Well, I never -- there was never that           09:51:49

13   moment where I said -- and by the way, here is my        09:51:52

14   name, and here is what I do, and -- you know, that       09:51:54

15   moment never happened, though he made a reference.       09:51:58

16   Like I said, I don't know the exact date.  I could       09:52:01

17   probably get that for you if you gave me time to         09:52:05

18   look for it, but there was a moment where he -- he       09:52:08

19   felt it necessary to tell me that he knew who I          09:52:13

20   was, basically.                                          09:52:18

21       Q.   Did he do that by email?                        09:52:20

22       A.   I don't recall.                                 09:52:23

23       Q.   Well, if he did, you would have produced        09:52:25

24   it?                                                      09:52:27

25       A.   Of course.                                      09:52:28
```

17

Exhibit 2
Page 149

```
 1      Q.   So if you assume that you were -- you may    09:52:29

 2   know the precise date.  Do you know when you          09:52:32

 3   started working with Mr. Howard?                      09:52:35

 4      A.   Yeah, I -- like I said, I mean, it's all      09:52:39

 5   in the emails, but I don't have the exact date, no.   09:52:41

 6      Q.   What is your best recollection?               09:52:44

 7      A.   I mean, my first -- I would guess that it     09:52:47

 8   was mid-August.                                       09:52:50

 9      Q.   When you first started working with him?      09:52:54

10      A.   When I first had exchanged any                09:52:56

11   information with him.  Approximately, yes.            09:52:58

12      Q.   Do you have in your mind's eye, from your     09:53:02

13   preparation or otherwise, that the story published   09:53:05

14   by Ryan Mac was, I believe published on              09:53:09

15   September 4.  That was based on an email that        09:53:13

16   Mr. Musk had sent him on the 30th of August.         09:53:15

17           Does that sound right?                        09:53:19

18      A.   Yes.                                          09:53:20

19      Q.   At that time had Mr. Howard indicated to      09:53:21

20   you that he had figured out who you were, or was it  09:53:27

21   after that?                                           09:53:31

22      A.   Yeah, I couldn't tell you.  I would need      09:53:32

23   to go back and look.                                  09:53:34

24      Q.   But you were very conscious that you did      09:53:35

25   not want him to know your real name, true?           09:53:36
```

18

Exhibit 2
Page 150

```
 1        A.   True.                                    09:53:41

 2        Q.   And you made every effort you could to   09:53:41

 3   prevent him from knowing your real name, true?     09:53:43

 4        A.   Yeah, yeah.                               09:53:48

 5        Q.   And that was important to you because --  09:53:49

 6   why?                                                09:53:52

 7        A.   Well, again, there are maybe a few        09:53:55

 8   reasons, but one of those was so there was no       09:53:58

 9   ability to forward correspondence, as people do in  09:54:07

10   today's electronic communication, and have him      09:54:10

11   forward an email exchange that so easily ties him   09:54:13

12   to me personally or to Mr. Musk.                    09:54:17

13            And again, I was a novice being asked to   09:54:21

14   do something that I'd never done before, and didn't 09:54:26

15   know what it entailed, and wanted to err on the     09:54:30

16   side of conservatism, and not unnecessarily tie my  09:54:35

17   personal name to an investigation in a random       09:54:39

18   country about a random matter.  That's really what  09:54:46

19   it was.                                             09:54:50

20        Q.   Were you trying to limit the information  09:54:51

21   that could be sent by Mr. Howard to your Jim        09:54:56

22   Brickhouse@Gmail?                                   09:55:03

23            MR. SPIRO:  Objection to form.             09:55:07

24            You can answer that.                       09:55:08

25            THE WITNESS:  You said I can?              09:55:13
```

                                                                 19

Exhibit 2
Page 151

```
1              MR. SPIRO:  You can.                      09:55:14

2              THE WITNESS:  No.  I was encouraging that 09:55:15

3   all information possible would be sent to that      09:55:16

4   email address.                                      09:55:19

5   BY MR. L. WOOD:                                      09:55:20

6       Q.   And no one -- I mean, you said you were a  09:55:20

7   novice.  No one at all suggested to you that you    09:55:21

8   might want to consider setting up a fake Gmail      09:55:24

9   account?                                            09:55:29

10      A.   No.                                         09:55:29

11      Q.   That was done on your own?                  09:55:29

12      A.   100 percent.                                09:55:31

13      Q.   And did you tell Mr. Musk that you had      09:55:32

14  done it that way?                                    09:55:34

15      A.   I didn't.                                   09:55:35

16      Q.   Why not?                                    09:55:36

17      A.   I didn't feel like it was relevant.  He    09:55:36

18  asked me to -- to gather information, and how I     09:55:39

19  went about doing that -- I didn't feel like it was  09:55:48

20  relevant to -- to share.                            09:55:52

21      Q.   Did he want you to share the information    09:55:54

22  that you were learning with him?  Mr. Musk?         09:55:57

23      A.   Yes.                                        09:56:01

24      Q.   And you would have made sure that you       09:56:02

25  provided him accurate information about             09:56:04
```

20

Exhibit 2
Page 152

```
 1   Mr. Howard's investigation, true?                    09:56:06

 2        A.   True.                                       09:56:09

 3        Q.   You would not in any way have provided      09:56:09

 4   information from Mr. Howard -- that you obtained       09:56:12

 5   from Mr. Howard -- to Mr. Musk that would be          09:56:15

 6   misleading, true?                                     09:56:18

 7        A.   True.                                       09:56:20

 8        Q.   You wanted to give him a complete report    09:56:21

 9   on the information you were receiving from            09:56:24

10   Mr. Howard on any and all significant issues that     09:56:27

11   were being investigated, true?                        09:56:32

12        A.   True.                                       09:56:33

13             (Exhibit 61 was marked for                  09:56:33

14             identification.)                            09:56:33

15   BY MR. L. WOOD:                                       09:56:33

16        Q.   So if you look at what's been identified    09:56:36

17   for purposes of your identification to your           09:56:45

18   deposition as Exhibit 61 -- you're familiar with      09:56:47

19   that document?                                        09:56:52

20        A.   I am.                                       09:56:53

21        Q.   That's the only document that we have       09:56:54

22   from Excession in response to the subpoena.           09:56:57

23        A.   Okay.                                       09:57:00

24        Q.   Did you only find that one document?        09:57:00

25        A.   Yeah.  I mean, in doing all of the -- I     09:57:03
```

21

Exhibit 2
Page 153

```
 1    didn't actually identify this as the one missing        09:57:05
 2    piece, but I went through, and with modified search     09:57:09
 3    terms and whatnot per direction from Alex, and          09:57:14
 4    apparently this was the one piece of information        09:57:18
 5    that was missing from the original searches.           09:57:23
 6        Q.   What search terms were you given?             09:57:25
 7        A.   I don't remember all of them right now,       09:57:27
 8    but of course they involved Unsworth, Thailand,        09:57:28
 9    pedophile, child rapist, and some combinations of      09:57:37
10    those.  And there may have been a few others.          09:57:44
11        Q.   Was that sent to you -- do you have the       09:57:50
12    search terms in writing somewhere?                     09:57:51
13        A.   I believe I do, yes.                          09:57:54
14        Q.   Email?                                        09:57:56
15        A.   Yes.                                          09:57:56
16        Q.   So if asked to produce those, you would       09:57:57
17    have them?                                             09:57:59
18        A.   I think so, yeah.                             09:58:01
19        Q.   Do you know when you were asked to            09:58:03
20    conduct that search?                                   09:58:05
21             MR. SPIRO:  Objection; form.  Which           09:58:07
22    search?                                                09:58:10
23    BY MR. L. WOOD:                                        09:58:10
24        Q.   The search for Excession.                     09:58:11
25        A.   Well, I was asked to search all of my         09:58:14
```

22

Exhibit 2
Page 154

```
 1    such that I asked all of the -- all of the people        10:20:45
 2    that I know would have received that type of             10:20:51
 3    correspondence, whether or not it had been               10:20:54
 4    received.  And if those people hadn't received it,       10:20:59
 5    it for sure had not been received.                       10:21:02
 6         Q.   So you feel good having done the search        10:21:05
 7    that in your mind knowing how Mr. Musk -- his            10:21:07
 8    routine or requirements, whatever he calls them --       10:21:11
 9    you are comfortable in saying that you checked all       10:21:14
10    the available avenues on how he could have himself       10:21:18
11    received it, and you were comfortable and confident      10:21:21
12    that he didn't get it at least as of August 29,          10:21:24
13    true?                                                    10:21:28
14         A.   True.                                          10:21:29
15         Q.   Let me ask you:  Did you engage the            10:21:30
16    services of Mr. Howard by written agreement with         10:21:37
17    him?                                                     10:21:41
18         A.   There was a written agreement, yes.            10:21:42
19         Q.   And who was that agreement between?            10:21:44
20         A.   I believe it was between Excession and         10:21:47
21    Mr. Howard.                                              10:21:53
22         Q.   And this would have been dated when?           10:21:55
23         A.   Again, that goes back to -- I mean, it         10:21:59
24    would have been later August when he was, I guess        10:22:01
25    formally retained.                                       10:22:07
```

45

Exhibit 2
Page 155

| | | | |
|---|---|---|---|
| 1 | Q. | And you left out part of it? | 10:24:45 |
| 2 | A. | On behalf of James Brickhouse. | 10:24:47 |
| 3 | Q. | So here you have communicated your name | 10:24:51 |
| 4 | and your email address to Mr. Howard, right? | | 10:24:54 |
| 5 | A. | Correct.  This was a mistake. | 10:24:59 |
| 6 | Q. | Well, it was not -- look at the last | 10:25:02 |
| 7 | page.  Musk Bates 0259 of Exhibit 36. | | 10:25:04 |
| 8 | A. | The last page of this -- | 10:25:10 |
| 9 | Q. | Exhibit 36, Bates No. 0259. | 10:25:12 |
| 10 | A. | Yes. | 10:25:16 |
| 11 | Q. | Is that your signature? | 10:25:16 |
| 12 | A. | It is. | 10:25:18 |
| 13 | Q. | You signed this document on | 10:25:19 |
| 14 | August 15, 2018, true? | | 10:25:21 |
| 15 | A. | True. | 10:25:24 |
| 16 | Q. | And you signed it as the manager of | 10:25:25 |
| 17 | Excession LLC, right? | | 10:25:28 |
| 18 | A. | Correct. | 10:25:30 |
| 19 | Q. | Mr. Musk's family office corporation, | 10:25:31 |
| 20 | right? | | 10:25:33 |
| 21 | A. | That's right. | 10:25:34 |
| 22 | Q. | Identifying yourself as Jared Birchall, | 10:25:35 |
| 23 | right? | | 10:25:37 |
| 24 | A. | That's right. | 10:25:38 |
| 25 | Q. | On August the 15th? | 10:25:39 |

48

Exhibit 2
Page 156

```
 1        A.    "Attached is the NDA which should be from    10:26:52

 2   you to me."  Yes.                                        10:26:56

 3        Q.    He is calling you "Jim," right?               10:27:00

 4        A.    Yes.                                          10:27:01

 5        Q.    Your alias for purposes of this              10:27:02

 6   investigation, right?                                    10:27:05

 7        A.    Yes.                                          10:27:06

 8        Q.    And then you write him back from              10:27:07

 9   Jared Birchall on behalf of James Brickhouse.            10:27:09

10        A.    Yes, so --                                    10:27:14

11        Q.    And then -- excuse me.                        10:27:16

12              And then you signed the Excession LLC NDA     10:27:16

13   as Jared Birchall, manager of Excession LLC.  Have       10:27:21

14   I got it right?                                          10:27:25

15        A.    You have got it right.                        10:27:26

16        Q.    So were you trying to convey to               10:27:27

17   Mr. Howard that there were two people involved;          10:27:29

18   you, Jared Birchall, and a man named Jim Brickhouse      10:27:32

19   who was different than you?                              10:27:38

20        A.    This was -- so in every email                10:27:41

21   correspondence that I sent to -- to James Howard --      10:27:44

22   so the mechanics of me sending that email in my          10:27:49

23   Gmail is that I need to change the "from" address        10:27:56

24   to the James Brickhouse email address.                   10:28:01

25              And in this case it was an oversight that     10:28:04
```

50

Exhibit 2
Page 157

```
 1    I did not change that, because you can see that I        10:28:09
 2    signed it "Jim" -- that email "Jim," and I did not       10:28:12
 3    take that extra step of changing the "from" to be        10:28:14
 4    the Brickhouse email.                                    10:28:20
 5            And so really all this highlights is that        10:28:23
 6    an inexperienced novice trying to do what I thought      10:28:29
 7    was the right thing to do, and I missed a step           10:28:33
 8    there and sent -- sent it from an unintentional          10:28:36
 9    email address because I didn't change the "from."        10:28:42
10        Q.   When you say "change the from," are you         10:28:45
11    talking about changing it -- like typing a               10:28:47
12    different "from" on it, or are you talking about         10:28:51
13    changing to a different account?                         10:28:51
14        A.   My email accounts -- some of them --            10:28:54
15    James Brickhouse and JaredBirchall@Gmail.com are         10:28:57
16    part of the same -- one merges into the other.  I        10:29:02
17    have folder within JaredBirchall.com.  And so -- so      10:29:06
18    I have the ability to, while in the                      10:29:12
19    JaredBirchall@Gmail.com, send an email from the          10:29:15
20    JamesBrickhouse email address.  So I don't have to       10:29:19
21    toggle between email accounts.                           10:29:26
22        Q.   And you meant to be careful and only send       10:29:30
23    something to Mr. Howard that referred to you as          10:29:32
24    Jim Brickhouse?                                          10:29:36
25        A.   In this case, yes.                              10:29:38
```

                                                          51

Exhibit 2
Page 158

| | | |
|---|---|---|
| 1 | A.   I -- typically, daily. | 11:14:44 |
| 2 | Q.   So you knew from the beginning that this | 11:14:56 |
| 3 | was a sensitive and delicate project that you were | 11:15:00 |
| 4 | going to be involved in as it pertains to | 11:15:03 |
| 5 | Mr. Howard. | 11:15:05 |
| 6 | Can we agree on that? | 11:15:06 |
| 7 | A.   Yes, I -- I think that's probably a | 11:15:10 |
| 8 | fair... | 11:15:12 |
| 9 | Q.   This is your first investigative role or | 11:15:13 |
| 10 | a role in an investigation, right? | 11:15:16 |
| 11 | A.   Correct. | 11:15:20 |
| 12 | Q.   You wanted to make sure that from your | 11:15:21 |
| 13 | standpoint, in terms of your role, that you got it | 11:15:24 |
| 14 | done and done right, true? | 11:15:27 |
| 15 | A.   To my best ability, yes. | 11:15:30 |
| 16 | Q.   Tell me what you did to perform any | 11:15:32 |
| 17 | diligence on Mr. Howard. | 11:15:35 |
| 18 | A.   So first -- again, it is important to | 11:15:43 |
| 19 | understand that he came to us, and -- | 11:15:48 |
| 20 | Q.   I understand that. | 11:15:50 |
| 21 | A.   I only mention that because it would have | 11:15:51 |
| 22 | been -- there would have maybe been a slightly | 11:15:54 |
| 23 | different process if someone said go out and | 11:15:58 |
| 24 | identify the best investigator in the world to go | 11:16:00 |
| 25 | and find information in Thailand. | 11:16:03 |

72

Exhibit 2
Page 159

1          With that said, there was some high-level          11:16:07

2    online looking into -- you know, was his company          11:16:15

3    that he claimed to represent a real company?  Did          11:16:18

4    he have any experience working with similar          11:16:21

5    high-net-worth individuals?  Did he have, you know,          11:16:25

6    a résumé that pointed to someone that could -- you          11:16:32

7    know, could potentially handle investigative work?          11:16:36

8    And we -- we checked each of those boxes.          11:16:38

9          Q.    Who is "we"?          11:16:47

10         A.    When I say "we," I mean, I felt like I'd          11:16:48

11   checked each of those boxes, and certainly that is          11:16:49

12   not to say that, you know, with hindsight being          11:16:55

13   20/20 could have been done better or different.          11:16:58

14         Q.    Well, you said -- you said your words          11:17:02

15   were "There was some high-level online looking"?          11:17:04

16         A.    Um-hmm.          11:17:07

17         Q.    Who performed the high-level online          11:17:08

18   looking at Mr. Howard?          11:17:10

19         A.    That would have been me.          11:17:12

20         Q.    Anyone else?          11:17:13

21         A.    Not that I know of.          11:17:14

22         Q.    So what exactly did you look for, and          11:17:15

23   what did you find before you signed the NDA and          11:17:20

24   entered into the agreement with him?          11:17:25

25         A.    Again, it would have -- it would have          11:17:31

73

Exhibit 2
Page 160

| | | |
|---|---|---|
| 1 | just been a simple search for his information, his | 11:17:32 |
| 2 | company, and then a discussion about his experience | 11:17:36 |
| 3 | with him, specifically. | 11:17:41 |
| 4 | He had a fairly convincing story to tell | 11:17:44 |
| 5 | about his experience, which involved British, you | 11:17:47 |
| 6 | know, Special Forces, and time spent working for | 11:17:50 |
| 7 | George Soros and Paul Allen and some others. | 11:17:59 |
| 8 | It seemed like he was, you know, | 11:18:06 |
| 9 | experienced enough to be able to produce the | 11:18:10 |
| 10 | information that he came to us saying that he | 11:18:14 |
| 11 | suspected existed. | 11:18:17 |
| 12 | Q.   Well, when you say that he had a fairly | 11:18:18 |
| 13 | convincing story, I'm talking about now, you, | 11:18:21 |
| 14 | Jared Birchall -- | 11:18:23 |
| 15 | A.   Um-hmm. | 11:18:24 |
| 16 | Q.   You're the manager.  Maybe you have a | 11:18:24 |
| 17 | corporate title for Excession as you do for other | 11:18:26 |
| 18 | of Mr. Musk's corporations.  You want to make sure | 11:18:29 |
| 19 | you get this done right. | 11:18:32 |
| 20 | And what did you do specifically to | 11:18:34 |
| 21 | verify that in fact this man, Mr. Howard, is or was | 11:18:38 |
| 22 | who he claimed to be?  Did you reach out to anybody | 11:18:44 |
| 23 | connected with the British Special Forces? | 11:18:48 |
| 24 | A.   No, I did not. | 11:18:54 |
| 25 | Q.   Did you reach out to anybody connected | 11:18:55 |

74

Exhibit 2
Page 161

```
 1   with George Soros?                              11:18:57
 2        A.   No.                                   11:18:58
 3        Q.   Did you reach out to anybody connected 11:18:58
 4   with Paul Allen?                                11:19:00
 5        A.   No.                                   11:19:02
 6        Q.   What did you do to verify the reliability 11:19:03
 7   of the information that Mr. Howard was giving you 11:19:08
 8   concerning his experience and background?        11:19:12
 9        A.   Again, I used what I would probably now 11:19:16
10   consider as somewhat rudimentary, you know, big  11:19:19
11   high-level vetting process.  He came to us, and the 11:19:21
12   need to reach out to him was brought to me by    11:19:30
13   someone internal.  It wasn't an outward          11:19:33
14   investigative search for the best in the world.  11:19:37
15            It was someone who came to us, and so the 11:19:41
16   manner in which he came to us probably affected the 11:19:44
17   amount or type of research that was done.        11:19:54
18        Q.   I'm still trying to figure out the     11:19:57
19   research that was done.  Did you google his name? 11:19:59
20        A.   Well, yeah, that's what I'm saying.    11:20:02
21        Q.   Did you google his name?               11:20:03
22        A.   Yeah, absolutely.                      11:20:04
23        Q.   Do you do anything besides google his  11:20:05
24   name?                                            11:20:07
25        A.   And probably the name of his company.  11:20:08
```

75

Exhibit 2
Page 162

1        Q.    Anything besides googling his name and        11:20:10

2   the name of his company?                                 11:20:13

3        A.    Not that I can recall.                        11:20:15

4        Q.    And you knew when he came to Mr. Musk          11:20:16

5   that he was suggesting that he had some dirt on          11:20:19

6   Vernon Unsworth, true?                                   11:20:24

7        A.    Yes.                                          11:20:29

8        Q.    So he was not an independent investigator     11:20:30

9   from day one, wouldn't you agree?                        11:20:32

10            MR. SPIRO:  Objection to form.                 11:20:34

11            THE WITNESS:  I actually did think he was      11:20:35

12   an independent investigator that just happened to       11:20:37

13   have some information.                                  11:20:40

14   BY MR. L. WOOD:                                         11:20:41

15        Q.    What information did he tell you he had       11:20:42

16   about Mr. Unsworth before you engaged his services      11:20:45

17   on behalf of Mr. Musk?                                  11:20:51

18        A.    Purely the inference that -- that he         11:20:55

19   believed there were skeletons in the closet.  That      11:20:56

20   there may have been information that existed that       11:21:00

21   would be -- that we would want to have.                 11:21:03

22        Q.    Did he -- when he said he believed there      11:21:10

23   were skeletons in the closet, did he tell you that?     11:21:15

24        A.    That he didn't use those words              11:21:17

25   necessarily to me.  That's what was obviously in        11:21:19

76

Exhibit 2
Page 163

```
 1   being -- as to questioning his motives for being in      11:22:34
 2   Thailand in my initial conversation with him.  Just      11:22:40
 3   that he believed that there could -- where there is      11:22:43
 4   smoke, there's fire.  That's there are reasons to        11:22:46
 5   question his motives for being in Thailand.              11:22:49
 6        Q.   Did you let Mr. Musk know that you had,        11:22:52
 7   in fact, retained him following up on the emails he      11:22:54
 8   had earlier sent in July?                                11:22:59
 9        A.   Yes.  At some point I'm sure I did.            11:23:01
10        Q.   Well, he -- you would have done that as a      11:23:03
11   matter of course because you -- you had to get           11:23:04
12   Mr. Musk's authority to pay him?                         11:23:06
13        A.   Typically, yeah.  I mean, absolutely.  At      11:23:08
14   some point there was no question that that               11:23:10
15   conversation was had.                                    11:23:13
16        Q.   And it would have been early, because you      11:23:14
17   wouldn't have tapped -- you wouldn't have retained       11:23:15
18   him and started spending, you know, $20,000 to           11:23:16
19   retain his guy without getting it approved by            11:23:20
20   Mr. Musk, true?                                          11:23:22
21        A.   I mean, there is -- to say -- there is,        11:23:25
22   on the spectrum of things that go on in a day in         11:23:34
23   Elon's life, there is such a magnitude that there        11:23:39
24   are times where he does expect me to make decisions      11:23:43
25   like that; that involve tens of thousands of             11:23:47
```

78

Exhibit 2
Page 164

| | | | |
|---|---|---|---|
| 1 | A. | Among -- among others, yes. | 11:27:09 |
| 2 | Q. | So it had priority in your mind, true? | 11:27:10 |
| 3 | A. | There were other things that had higher | 11:27:15 |

4    priority, but it was an important matter for sure.    11:27:16

5         Q.    It was a high priority matter.  I'm not    11:27:19

6    suggesting it was the highest, but it was a high    11:27:22

7    priority matter for you to find out what Howard was    11:27:24

8    getting and to get that information to Mr. Musk,    11:27:27

9    true?    11:27:29

10         A.    Sure.  Yes.    11:27:31

11         Q.    So you've never done this before.  Who    11:27:32

12    told you to hire Mr. Howard?    11:27:58

13         A.    So again, going back to my previous    11:28:00

14    comment about Sam Teller coming and sharing the    11:28:04

15    nature of Mr. Howard's reach-out and saying that    11:28:13

16    Elon wanted us to see what information this guy    11:28:20

17    had.    11:28:24

18         Q.    Did you let Elon know that you were going    11:28:24

19    to hire him?    11:28:27

20         A.    Yes.  I mean, again, the sequence of that    11:28:29

21    and cadence -- I'm not clear exactly how that --    11:28:32

22    but of course there was that initial -- I mean,    11:28:37

23    eventual -- that information would have been shared    11:28:39

24    that yes, we were having -- we were engaging him.    11:28:44

25         Q.    Well, you were engaging him because it    11:28:46

Exhibit 2
Page 165

| | | |
|---|---|---|
| 1 | had been made clear to you from Mr. Teller that | 11:28:48 |
| 2 | Elon wanted you to see what information Mr. Howard | 11:28:51 |
| 3 | had. | 11:28:56 |
| 4 | A.   Correct. | 11:28:57 |
| 5 | Q.   True? | 11:28:58 |
| 6 | A.   True. | 11:28:58 |
| 7 | Q.   So that the reason for hiring Mr. Howard | 11:28:59 |
| 8 | was because it was at the request and the desire of | 11:29:03 |
| 9 | Mr. Musk, true? | 11:29:06 |
| 10 | A.   That's true. | 11:29:08 |
| 11 | Q.   Let me hand you 64. | 11:29:10 |
| 12 | (Exhibit 64 was marked for | 11:29:12 |
| 13 | identification.) | 11:29:12 |
| 14 | BY MR. L. WOOD: | 11:29:22 |
| 15 | Q.   Hand what you has been marked for | 11:29:26 |
| 16 | purposes of identification to your deposition as | 11:29:29 |
| 17 | Exhibit 64. | 11:29:29 |
| 18 | A.   Yes. | 11:29:30 |
| 19 | Q.   This is what appears to be an email from | 11:29:33 |
| 20 | James Brickhouse to Jupiter Private.  That would be | 11:29:38 |
| 21 | Mr. Howard, right? | 11:29:43 |
| 22 | A.   Yes. | 11:29:44 |
| 23 | Q.   Project Rowena, right? | 11:29:46 |
| 24 | A.   Yes. | 11:29:48 |
| 25 | Q.   Do you know how Mr. Howard came up with | 11:29:49 |

83

Exhibit 2
Page 166

1   that name?  Did he tell you?                    11:29:51

2        A.    No idea.                              11:29:52

3        Q.    But he came up with it, not you?      11:29:53

4        A.    Correct.                              11:29:56

5        Q.    And you say in the first paragraph "Some    11:29:56

6   of the specific questions that would be good to  11:29:58

7   answer are," okay.  And then you bullet list out a  11:30:01

8   series of questions, true?                       11:30:06

9        A.    True.                                 11:30:09

10       Q.    Mr. Musk had input into the questions  11:30:10

11  that you sent.  You and he discussed those, didn't  11:30:13

12  you?                                             11:30:17

13       A.    I'm sure, yes.                        11:30:18

14       Q.    And do you know which ones Mr. Musk was  11:30:19

15  saying "Ask him this," or would you just say that  11:30:23

16  it was a collaboration between you and Mr. Musk to  11:30:26

17  come up with this list of questions?             11:30:30

18       A.    A collaboration.                      11:30:32

19       Q.    On each one of them?                  11:30:33

20       A.    Yeah.  I mean, I -- I can't say each one  11:30:35

21  of them, but I'm sure there were some here that  11:30:38

22  were being asked because of his input.           11:30:40

23       Q.    Right.  These are questions that you  11:30:43

24  believe from your discussions with Mr. Musk that he  11:30:45

25  wanted answers to, true?                         11:30:49

                                                      84

Exhibit 2
Page 167

```
1      A.   Yes.  And specifically he had shared      11:30:52

2    information regarding most of these matters, and  11:30:56

3    had shared some information that had evolved.  And  11:31:01

4    so I was trying to nail him down on some          11:31:08

5    specific --                                        11:31:11

6      Q.   Well, it was actually you and Mr. Musk    11:31:11

7    were trying to nail him down, true?               11:31:13

8      A.   Well, yeah, I mean, this ultimately was   11:31:16

9    for him.                                           11:31:19

10     Q.   Yeah, well, but he was talking with you   11:31:19

11   about it.  You collaborated on the questions, and  11:31:21

12   those were in fact questions that you believed from  11:31:23

13   your discussions with Mr. Musk that he wanted     11:31:25

14   answers to, true?                                  11:31:27

15     A.   Again, I don't know which of these        11:31:31

16   specific would have been his ones where he said   11:31:33

17   "This is an answer to your question," but yes,    11:31:36

18   there was some collective effort to determine what  11:31:39

19   we were trying to get from Mr. Howard.            11:31:41

20     Q.   And you advised Mr. Musk on which -- on   11:31:45

21   the questions that you were going to have         11:31:48

22   Mr. Howard answer, true?                           11:31:51

23     A.   Not always.  I mean, there --             11:31:54

24     Q.   I am talking about this one; Exhibit 64.  11:31:55

25     A.   I mean, I didn't then review this with    11:31:58
```

85

Exhibit 2
Page 168

```
 1                When did he meet Tik in Thailand?  What       11:35:07
 2   did you learn?                                             11:35:10
 3        A.   It depends at what point you're asking me        11:35:13
 4   that.  If -- if I was answering on this date versus        11:35:17
 5   what I know today -- I mean, to be honest there            11:35:20
 6   were numerous answers given over time to where for         11:35:24
 7   me to clearly state this is exactly when he met            11:35:27
 8   her -- it honestly is not clear in my head, because        11:35:31
 9   the answer evolved over time.                              11:35:35
10                But from what I recall -- if you're           11:35:39
11   asking me what I understand today?                         11:35:41
12        Q.   No.  I'm asking you the simple question:         11:35:43
13   What did you learn as to when Mr. Unsworth met Tik         11:35:45
14   in Thailand?                                               11:35:52
15        A.   So the answer to that question evolved           11:35:55
16   over time.  And there were different answers.              11:35:57
17        Q.   Okay.  Let's start with the first answer.        11:35:59
18   What was the first information you got on when he           11:36:01
19   met her?                                                   11:36:05
20        A.   So I can't think of the date, but as it          11:36:06
21   pertains to her age, it would have been when she           11:36:07
22   was a young teenage girl.                                  11:36:10
23        Q.   Young teenage girl.  Would that be an 18-        11:36:13
24   or 19-year-old girl?                                       11:36:14
25        A.   No.  12 or 13.                                   11:36:17
```

89

Exhibit 2
Page 169

```
1        Q.   Because now we're talking about him        11:37:27

2   having met her when she was a minor, true?  Under    11:37:29

3   the age of 15 or 16?                                 11:37:40

4        A.   Yes.                                        11:37:42

5        Q.   And that's not the kind of information      11:37:42

6   you would pass to Mr. Musk unless you were clear as   11:37:44

7   to what Mr. Howard had told about it, true?          11:37:47

8        A.   True.                                       11:37:49

9        Q.   So you were clear in telling Mr. Musk       11:37:50

10  "Howard tells me they met when Tik was 12 or 13,"     11:37:52

11  true?                                                 11:37:57

12       A.   Yes.                                        11:37:59

13       Q.   He didn't -- Mr. Howard didn't tell you     11:38:00

14  that Mr. Unsworth married Tik at age 12 or 13, did    11:38:02

15  he?                                                   11:38:09

16       A.   Not that I recall, no.                      11:38:10

17       Q.   He didn't tell you -- Mr. Howard didn't     11:38:11

18  tell you that Mr. Musk had some type of a sexual      11:38:13

19  relationship with Tik when she was 12 or 13?  He      11:38:18

20  never told you that, did he?                          11:38:25

21       A.   No.  He would have never had that           11:38:27

22  evidence.                                             11:38:29

23            (Off-the-record comment from counsel.)      11:38:29

24            MR. L. WOOD:  I did misstate that.  Thank    11:38:29

25  you.                                                  11:38:29
```

91

Exhibit 2
Page 170

```
1   BY MR. L. WOOD:                                      11:38:29

2        Q.   I meant to say Mr. Howard did not tell     11:38:32

3   you that Mr. Unsworth had had some type of a sexual  11:38:36

4   relationship with Tik when she was 12 or 13.  He     11:38:41

5   never told you that, did he?                         11:38:44

6        A.   No.                                        11:38:47

7        Q.   At what age -- he didn't tell you that at  11:38:52

8   any time, did he?                                    11:39:02

9             MR. SPIRO:  Objection to form.             11:39:05

10  BY MR. L. WOOD:                                       11:39:07

11       Q.   Is that correct?                            11:39:07

12       A.   He did not have photographic or -- you      11:39:08

13  know, other direct evidence that that was the         11:39:10

14  case --                                               11:39:13

15       Q.   I am not asking about that.                 11:39:14

16       A.   He -- he implied on numerous occasions      11:39:16

17  that he believed that was the case.                   11:39:17

18       Q.   I'm not asking you what he implied.  I'm    11:39:19

19  asking what he told you.  He did not tell you that    11:39:23

20  Vernon had married Tik at 12 or had had any type of   11:39:29

21  a sexual relationship with Tik at 12 or 13 years of   11:39:33

22  age?                                                  11:39:36

23            MR. SPIRO:  Objection; form.  Compound.     11:39:37

24  Argumentative.                                        11:39:38

25  ///
```

92

Exhibit 2
Page 171

```
 1    and green, what we know is it fact, right?        11:46:43

 2        A.   Right.                                   11:46:45

 3        Q.   In that report of August the 27,         11:46:46

 4    Exhibit 65, where does he report that             11:46:51

 5    Vernon Unsworth met Tik when she was 12 or 13 years  11:46:56

 6    old?                                              11:47:04

 7        A.   I don't -- I don't see that outlined here  11:47:07

 8    in this specific correspondence.                  11:47:10

 9        Q.   Well, take a look at the next to last    11:47:12

10    bullet point where it was "What was her age when  11:47:14

11    they met."  You see that on Bates No. 053?        11:47:17

12        A.   Yes.                                     11:47:19

13        Q.   And this is answered in orange, meaning  11:47:19

14    we are in the process of verifying, right?        11:47:21

15        A.   Correct.                                 11:47:24

16        Q.   And what he told you was -- read with me.  11:47:25

17    "The target is 63 years old.  His wife" -- and    11:47:27

18    that's referring to Tik, right?                   11:47:30

19        A.   Yes.                                     11:47:32

20        Q.   "His wife, we believe, is 30, which would  11:47:33

21    have put her at 18/19 when they first met."       11:47:36

22             Have I read that correctly?              11:47:43

23        A.   Yes.                                     11:47:44

24        Q.   So this is not when he told you that he  11:47:45

25    had information that she was 12 or 13.  He told you  11:47:48
```

99

Exhibit 2
Page 172

1    on the 27th that he was trying to verify                          11:47:51

2    information that he had that suggested that she was                11:47:55

3    18 or 19 when they first met --                                    11:48:00

4          A.    Um-hmm.                                                11:48:03

5          Q.    -- based off of what he believed to be                 11:48:03

6    her age -- present agent of 30, right?                             11:48:06

7          A.    Correct.                                               11:48:10

8          Q.    Turned out down the road that you                      11:48:12

9    learned, because you got the birth certificate                     11:48:14

10   before he provided it to you -- you learned that                   11:48:17

11   she was in fact 40 years old at the present time                   11:48:18

12   that this was going on in September of -- August                   11:48:21

13   and September of 2018, right?                                      11:48:26

14         A.    That's right.                                          11:48:28

15         Q.    Which, under this analysis, would have                 11:48:29

16   put at age of 28 to 29 when they first met, right?                 11:48:31

17         A.    Yes.                                                   11:48:37

18         Q.    Okay.  Where did he ever tell you that he              11:48:39

19   believed that she was 25 or 20 years old when they                 11:48:42

20   first met -- I mean, strike that.                                  11:48:50

21               When did he ever tell you that he thought              11:48:51

22   her present age was less than 30?                                  11:48:52

23         A.    So on multiple occasions he said that                  11:48:57

24   they met seven years prior to being married at 18                  11:49:01

25   or 19, and that was shared on multiple occasions.                  11:49:08

                                                              100

Exhibit 2
Page 173

```
 1        Q.   So now let me ask you to take a look        11:51:51
 2   at -- did you -- as part of your reporting to         11:52:04
 3   Mr. Musk, did you give Mr. Musk the benefit of the    11:52:21
 4   answers to the questions you had posed to             11:52:26
 5   Mr. Howard; that you had posed on the 26th, he then   11:52:29
 6   answered on the 27th, Exhibit 65?                     11:52:36
 7             Did you give that information or the        11:52:38
 8   significant or key points in that report to           11:52:41
 9   Mr. Musk?                                             11:52:44
10        A.   I'm sure I would have communicated, you     11:52:45
11   know, in some form, the responses.                    11:52:47
12        Q.   Accurately?                                 11:52:54
13        A.   As accurately as I could of in whatever     11:52:57
14   summary I was giving him.                             11:53:00
15        Q.   Well, this is a key and significant issue   11:53:01
16   of when they met, right?  You would have told --      11:53:02
17   you believe you told Mr. Musk what this report        11:53:04
18   said.  That Howard believes that Tik was 30 when      11:53:08
19   they met -- or it's 30 at the present time, and       11:53:13
20   would have put her at 18 or 19 when they first met.   11:53:15
21   You would have told that to Mr. Musk, wouldn't you?   11:53:18
22        A.   I -- I'm sure I would have mentioned        11:53:21
23   that, because his assertion of the age when they      11:53:24
24   met had been repeatedly presented to us as a young    11:53:29
25   teenager, that -- that that assertion was evolving.   11:53:36
```

                                                          104

Exhibit 2
Page 174

1    And I would imagine that I would have shared that          11:53:41

2    with him.                                                   11:53:44

3        Q.   So before sharing with him that -- that          11:53:44

4    Howard had said he believed they were 18 or 19 when        11:53:46

5    they met, do you believe prior to that you had told        11:53:50

6    Mr. Musk that Howard had reported that they were --        11:53:53

7    that Tik was 12 or 13 when they met?                       11:53:56

8        A.   I'm sure at some point that I did                11:54:00

9    communicate with them.                                      11:54:02

10       Q.   I know that.  I'm trying to find out at          11:54:03

11   what point.  Do you believe that Mr. Howard had           11:54:07

12   suggested to you that he had information that Tik          11:54:08

13   was 12 or 13 when they met prior to him writing you       11:54:11

14   on the 27th of August saying that he calculated the       11:54:14

15   age of Tik when they met at 18 to 19?                      11:54:20

16       A.   Yes.                                              11:54:25

17       Q.   So now you've got conflicting information        11:54:25

18   from Mr. Howard.  Earlier he's told you 12 or 13.         11:54:27

19   Now he's telling you 18 to 19, true?                       11:54:32

20       A.   True.                                             11:54:36

21       Q.   And he's telling you that that's -- he's        11:54:36

22   in the process of verifying that, right?  It's            11:54:39

23   unverified?                                                11:54:42

24       A.   Correct.                                          11:54:44

25       Q.   And you would have told Mr. Musk that           11:54:44

105

Exhibit 2
Page 175

| | | |
|---|---|---|
| 1 | this is what he's telling me, but it's not verified | 11:54:45 |
| 2 | yet.  He's in the process of verifying it, right? | 11:54:50 |
| 3 | MR. SPIRO:  Objection; calls for | 11:54:52 |
| 4 | speculation.  Form. | 11:54:52 |
| 5 | BY MR. L. WOOD: | 11:54:53 |
| 6 | Q.   Okay.  Answer my question, please. | 11:54:53 |
| 7 | A.   Yeah.  I would -- I mean, I don't know | 11:54:56 |
| 8 | what verbiage I used with Mr. Musk that day, but I | 11:54:57 |
| 9 | would have attempted to summarize this in the best | 11:55:00 |
| 10 | way possible to him. | 11:55:04 |
| 11 | Q.   Well, this is a key and significant | 11:55:05 |
| 12 | issue.  What age were they when they met, right? | 11:55:08 |
| 13 | A.   It's an important part of this, yes. | 11:55:11 |
| 14 | Q.   Yeah, so you had earlier told Mr. Musk | 11:55:13 |
| 15 | that you had information from Howard that they met | 11:55:16 |
| 16 | when Tik was 12 or 13? | 11:55:19 |
| 17 | A.   Um-hmm. | 11:55:21 |
| 18 | Q.   Yes? | 11:55:21 |
| 19 | A.   Yes. | 11:55:22 |
| 20 | Q.   Prior to August 27, right? | 11:55:23 |
| 21 | A.   Correct. | 11:55:26 |
| 22 | Q.   And now on August the 27th, you're | 11:55:26 |
| 23 | getting different information that says 18 to 19 | 11:55:28 |
| 24 | that they're trying to verify, right? | 11:55:32 |
| 25 | A.   Right. | 11:55:34 |

106

Exhibit 2
Page 176

```
 1        Q.   And you would have told Mr. Musk "Hey,      11:55:35
 2   he's changed it.  12 or 13, and now he's telling me   11:55:37
 3   18 or 19."                                            11:55:41
 4             MR. SPIRO:  Objection; form.                11:55:42
 5   BY MR. L. WOOD:                                       11:55:42
 6        Q.   You would have told him that, would you     11:55:43
 7   not, sir?                                             11:55:44
 8             MR. SPIRO:  You can answer.                 11:55:45
 9             THE WITNESS:  Oh, there were multiple       11:55:46
10   changes in the story.                                 11:55:48
11   BY MR. L. WOOD:                                       11:55:50
12        Q.   I'm not asking about multiple changes.      11:55:51
13        A.   And this would have been one of those       11:55:53
14   items that I shared.                                  11:55:55
15        Q.   Right.  Yes, you would have told him        11:55:56
16   "Look, he's told me 12 to 13.  But now I've got a     11:55:57
17   report from him saying 18 to 19 that he's trying to   11:56:01
18   verify," right?                                       11:56:02
19        A.   Likely, yes.                                11:56:04
20        Q.   Because that's -- that's a big conflict.    11:56:04
21   It's very significant to know whether they met at     11:56:05
22   12 or 13 as he had earlier told you before the 27th   11:56:09
23   of August, to then come up on the 27th of August      11:56:12
24   and say "Hey, we think it was 18 to 19," right?       11:56:15
25        A.   There is a difference.                      11:56:19
```

107

Exhibit 2
Page 177

1    Q.   That's a big deal.  And that information    11:56:20

2  you communicated to Elon Musk, true?    11:56:22

3    A.   Likely.  I don't know what words or what    11:56:24

4  form, but yes, likely that --    11:56:26

5    Q.   You would have made the point that there    11:56:27

6  had been a change, a significant change in the date    11:56:29

7  of her age of when they met from prior to the 27th    11:56:31

8  what he told you, and what he told you on the 27th,    11:56:35

9  true?    11:56:38

10    A.   Likely.    11:56:39

11    MR. L. WOOD:  What number are we up to    11:56:39

12  now?    11:56:39

13    THE WITNESS:  66.    11:56:39

14    MR. L. WOOD:  66.    11:56:39

15    Off the record for a second.    11:56:39

16    (Exhibit 66 was marked for    11:56:39

17    identification.)    11:56:39

18    THE VIDEOGRAPHER:  And we are going off    11:57:12

19  the record at 11:56 a.m.    11:57:13

20    (Recess taken.)    11:57:42

21    THE VIDEOGRAPHER:  And we're back on the    11:57:43

22  record at 11:56 a.m.    11:57:44

23  BY MR. L. WOOD:    11:57:46

24    Q.   Now, on -- I've handed you what has been    11:57:48

25  marked for purposes of identification as    11:57:50

108

Exhibit 2
Page 178

```
 1   Exhibit 66.                                          11:57:51

 2            Are you familiar with that email            11:57:52

 3   exchange?                                            11:57:55

 4      A.   Yes.                                         11:57:56

 5      Q.   Chain.                                       11:57:56

 6            And did you review that yesterday?          11:57:56

 7      A.   Yes.                                         11:58:00

 8      Q.   And this is another email that you had      11:58:02

 9   yourself compiled from your search back several      11:58:04

10   weeks ago, right?                                    11:58:07

11      A.   Correct.                                     11:58:08

12      Q.   Now, on the 28th, Mr. Howard is providing   11:58:10

13   you with additional information about Mr. Musk.  I   11:58:17

14   mean, about Mr. Unsworth, but not information about  11:58:22

15   the age of Tik when they met, true?                 11:58:25

16      A.   Yeah.  I don't see anything talking about   11:58:30

17   age here.                                            11:58:33

18      Q.   And you write back, and say "Thank you      11:58:37

19   for this information," right?                        11:58:40

20      A.   Yes, I did.                                  11:58:46

21      Q.   And then you say "We would like you to      11:58:48

22   immediately move forward with "leaking" this        11:58:50

23   information to the UK press.  Obviously must be      11:58:55

24   done very carefully."                                11:58:58

25            Have I read that correctly?                 11:58:59
```

109

Exhibit 2
Page 179

| | | | |
|---|---|---|---|
| 1 | A. | Correct. | 11:59:01 |
| 2 | Q. | The "we" is you and Mr. Musk, true? | 11:59:01 |
| 3 | A. | Yes. | 11:59:06 |
| 4 | Q. | Mr. Musk wanted this information leaked | 11:59:07 |
| 5 | | to the UK press, true? | 11:59:09 |
| 6 | A. | I believe so, yes. | 11:59:13 |

```
 7        Q.   In fact it was his idea, because this was    11:59:15

 8   an area outside of your life's experience dealing     11:59:17

 9   with the press.                                        11:59:21

10           Mr. Musk was the one that said -- when        11:59:24

11   you gave him the information, said "Hey, let's get     11:59:26

12   it leaked to the UK press," true?                      11:59:29

13           MR. SPIRO:  Objection; form.                   11:59:31

14   BY MR. L. WOOD:                                         11:59:32

15        Q.   True?                                         11:59:33

16        A.   It was James Howard's idea.                   11:59:33

17        Q.   No.  "We would like you to immediately       11:59:35

18   move forward with leaking this information to the      11:59:37

19   UK press."                                             11:59:39

20           That is you and Mr. Musk, right?               11:59:40

21        A.   In this in correspondence.  There was       11:59:42

22   prior correspondence where he was the one that        11:59:43

23   initiated the idea of using the press to balance      11:59:46

24   the scales in this.                                    11:59:51

25           MR. SPIRO:  "He" meaning who?                  11:59:52
```

110

Exhibit 2
Page 180

```
 1          THE WITNESS:  James Howard.              11:59:55

 2  BY MR. L. WOOD:                                  11:59:54

 3      Q.   And that was in writing --             11:59:55

 4      A.   Uh --                                   11:59:57

 5      Q.   You said in correspondence -- prior    11:59:57

 6  correspondence he was the one that initiated the 11:59:59

 7  idea of using the press to balance the scales?   12:00:02

 8      A.   I can't clearly state whether it was in 12:00:06

 9  writing or not.  I would have to go back and look, 12:00:08

10  but he clearly was the one that initiated that   12:00:09

11  idea.                                            12:00:12

12      Q.   Aside for the moment who initiated the  12:00:16

13  idea --                                          12:00:19

14      A.   Um-hmm.                                 12:00:19

15      Q.   -- let's assume that it was Mr. Howard as 12:00:19

16  you said.                                        12:00:20

17      A.   Okay.                                   12:00:21

18      Q.   You and Elon Musk said "Yes, go ahead and 12:00:22

19  leak it," right?                                 12:00:26

20      A.   Yes.                                    12:00:27

21      Q.   You knew it was going -- you said "We   12:00:28

22  agree to it," and Mr. Musk said that "I agree to it 12:00:30

23  being leaked," right?                            12:00:33

24      A.   Yes.                                    12:00:35

25      Q.   And who -- whose idea was it where you  12:00:36
```

111

Exhibit 2
Page 181

```
1       Q.   Yeah.  "Share the facts" --              12:02:48

2       A.   As you said --                           12:02:49

3       Q.   Meaning, share these facts with the      12:02:50

4   media, right?  That you bullet point above?       12:02:52

5       A.   Yeah, I mean, let's see here.  I'm       12:03:03

6   clearly responding to something that he said.     12:03:14

7       Q.   Well, you're responding to his email     12:03:20

8   below.  "Thank you for this information."         12:03:22

9            And then you say "We'd like to move      12:03:24

10  forward with leaking the information to the UK     12:03:26

11  press," which you say is an idea that he had raised 12:03:29

12  with you, right?                                   12:03:32

13      A.   Correct.                                 12:03:33

14      Q.   "Obviously must be done very carefully." 12:03:33

15  And then you say "The line of thinking at this     12:03:35

16  point is as follows."  And is that then the facts  12:03:39

17  that you wanted -- you and Mr. Musk had agreed      12:03:43

18  should be leaked to the UK press?                  12:03:47

19      A.   Yeah, what I'm questioning in my mind is  12:03:50

20  was there a phone conversation in between what he   12:03:53

21  and what I sent, which would have been me referring 12:03:57

22  to the facts that he said.  I don't know.          12:04:00

23      Q.   Mr. Musk may have had input in           12:04:10

24  collaborations, discussions with you about what    12:04:13

25  facts or information were going to be shared in the 12:04:15
```

114

Exhibit 2
Page 182

```
1   media leaks, true?                               12:04:18
2       A.   May have.                               12:04:20
3       Q.   Yes.  You don't deny that he did, do you?  12:04:21
4       A.   Yeah, I mean, I don't know to what      12:04:25
5   extent, but he may have had some input on that.  12:04:27
6       Q.   Wouldn't that be consistent with how you  12:04:30
7   all were collaborating about going back and forth  12:04:31
8   in your discussions with Mr. Howard?             12:04:34
9       A.   Typically.                              12:04:36
10      Q.   And then it says "Share the facts, and as  12:04:37
11  you said, that should be enough for a story."     12:04:41
12           I've read that correctly, right?        12:04:45
13      A.   That is correct.                        12:04:47
14      Q.   Then you go to say "But we'd like to make  12:04:48
15  this happen immediately."                        12:04:51
16           Have I read that correctly?             12:04:52
17      A.   Yes.                                     12:04:54
18      Q.   And you are saying there what you knew is  12:04:54
19  that you and Mr. Musk did want these leaks to     12:04:57
20  happen immediately, true?                        12:05:02
21      A.   Yes.                                     12:05:05
22           MR. L. WOOD:  Why don't we get the lunch  12:05:11
23  and take a five-minute break.                    12:05:11
24           THE VIDEOGRAPHER:  We are going off the  12:05:13
25  record at 12:04 p.m.                             12:05:15
```

Exhibit 2
Page 183

| 1 | Q. You have not deleted anything, right? | 12:18:49 |
| 2 | A. Right. No. | 12:18:52 |
| 3 | Q. So looking at the 28th at 9:55, it looks | 12:18:53 |
| 4 | like Mr. Howard says "Jim, are you free for a | 12:19:00 |
| 5 | conversation"? | 12:19:03 |
| 6 | And you write back in ten minutes, and | 12:19:05 |
| 7 | you say "Now works," right? | 12:19:07 |
| 8 | A. Correct. | 12:19:12 |
| 9 | Q. And then he asked you for more money. | 12:19:13 |
| 10 | Can you authorize a further 12,000 U.S. dollars to | 12:19:16 |
| 11 | expedite the second stages of the project as | 12:19:22 |
| 12 | discussed? | 12:19:27 |
| 13 | A. Yes, I see that. | 12:19:29 |
| 14 | Q. And you said "Yes, we can get it out | 12:19:31 |
| 15 | tomorrow. What is the timeline?" Right? | 12:19:33 |
| 16 | A. Um-hmm. | 12:19:35 |
| 17 | Q. He says "Jim, timeline is ASAP. I am | 12:19:37 |
| 18 | meeting Mike at 0800 GMT to begin the process. It | 12:19:41 |
| 19 | has to appear organic and not contrived." | 12:19:49 |
| 20 | Did you understand him to be referring to | 12:19:53 |
| 21 | the media leaks? | 12:19:55 |
| 22 | A. Yes. Something involving the media, | 12:19:58 |
| 23 | yeah. | 12:20:00 |
| 24 | Q. "Priority is to divert the story away | 12:20:01 |
| 25 | from the principal." | 12:20:06 |

118

Exhibit 2
Page 184

```
 1              That would be referring to Elon Musk,      12:20:08
 2    right?                                               12:20:09
 3         A.    Yup.                                      12:20:11
 4         Q.    "Priority is to divert the story away     12:20:11
 5    from the principal, and let the UK tabloids develop  12:20:15
 6    their story."                                        12:20:17
 7              Hoping to get a story about                12:20:20
 8    Vernon Unsworth, right?                              12:20:21
 9         A.    Correct.                                  12:20:24
10         Q.    "And an unflattering story," true?        12:20:25
11         A.    Right.  Just wherever the cards would     12:20:27
12    fall in investigative work, gathering information    12:20:33
13    and -- but yes, something that would be -- would     12:20:34
14    have people question the motive for being in         12:20:37
15    Thailand.                                            12:20:45
16         Q.    And raise the possibility of sexual       12:20:45
17    misconduct, including pedophilia?                    12:20:48
18         A.    I mean, that would be among the things    12:20:56
19    that people would question, I would assume, yes.     12:20:58
20         Q.    And you wanted that story to be           12:21:01
21    published, and Mr. Musk wanted it to be published    12:21:03
22    too.  True?                                          12:21:06
23         A.    When you say "that story."  I mean,       12:21:07
24    it's --                                              12:21:08
25         Q.    Well, the points that you all talked      12:21:09
```

119

Exhibit 2
Page 185

| | | |
|---|---|---|
| 1 | about on Exhibit 66. | 12:21:11 |
| 2 | A.   Yeah. | 12:21:13 |
| 3 | Q.   That's what you were talking about, | 12:21:13 |
| 4 | right? | 12:21:15 |
| 5 | A.   Yeah, I mean, in general you have someone | 12:21:16 |
| 6 | who has disrupted many industries, and you as a | 12:21:18 |
| 7 | result has many people who seek to discredit him, | 12:21:22 |
| 8 | and therefore any data point, good or bad, is blown | 12:21:24 |
| 9 | extremely out of proportion in the media, and | 12:21:29 |
| 10 | therefore, you know, my instinct to protect was | 12:21:32 |
| 11 | that we needed to somehow balance, because there | 12:21:39 |
| 12 | was a clear imbalance in what was in the media. | 12:21:42 |
| 13 | Q.   The imbalance being Elon Musk was looking | 12:21:48 |
| 14 | very bad? | 12:21:52 |
| 15 | A.   100 percent negative towards -- | 12:21:53 |
| 16 | Q.   And Unsworth was looking very good as a | 12:21:54 |
| 17 | victim? | 12:21:57 |
| 18 | A.   It was all negative -- or a lot of it was | 12:21:57 |
| 19 | negative toward Elon. | 12:21:58 |
| 20 | Q.   And you wanted to shift the balance to | 12:22:00 |
| 21 | have more negative about Vernon Unsworth. | 12:22:01 |
| 22 | A.   To have a more balanced view.  If there | 12:22:02 |
| 23 | was information to be found, part of it was to | 12:22:04 |
| 24 | encourage investigative reporting to do, you know, | 12:22:08 |
| 25 | part of the lifting here. | 12:22:10 |

120

Exhibit 2
Page 186

```
 1   Bates 0201.                                      12:26:25

 2            Are you with me?                        12:26:28

 3       A.   Yes, I'm looking at it.                 12:26:30

 4       Q.   And then compare 66 with the bullet     12:26:31

 5   points.                                          12:26:34

 6       A.   Yes.                                    12:26:37

 7       Q.   Am I correct that Mr. Howard is sending 12:26:38

 8   to the Sun News in the UK almost -- almost       12:26:43

 9   verbatim, the bullet points that are reflected in 12:26:47

10   Exhibit 66 under "The line of thinking at this   12:26:53

11   point is as follows"?                            12:26:59

12       A.   Yeah.  Yes; very similar.               12:27:01

13       Q.   So when you say that you and Mr. Musk   12:27:06

14   agreed that this information could be leaked,     12:27:09

15   you -- you both wanted it published to, as you say, 12:27:12

16   balance the scales of the coverage, right?       12:27:16

17       A.   Yes.                                    12:27:21

18       Q.   You weren't -- you weren't literally or 12:27:23

19   anticipating or expecting it to be published.  You 12:27:25

20   wanted it published, true?  You and Mr. Musk?    12:27:28

21       A.   I'm not sure the difference between them. 12:27:31

22       Q.   There may not be any.  The fact of the  12:27:33

23   matter is you and Elon Musk wanted this information 12:27:34

24   contained in Exhibit 66 and forwarded to the Sun as 12:27:38

25   reflected on Exhibit 67, you and Mr. Musk wanted 12:27:43
```

125

Exhibit 2
Page 187

| | | |
|---|---|---|
| 1 | this information to be public; to be written about | 12:27:48 |
| 2 | by the media, true? | 12:27:54 |
| 3 | A.   Yes. | 12:27:55 |
| 4 | Q.   And then on the next page it appears that | 12:28:05 |
| 5 | Mr. -- and correct me if I'm wrong -- it appears | 12:28:07 |
| 6 | that Mr. Howard is telling you that he has now | 12:28:10 |
| 7 | reached out to Mick Smith at the Daily Mail. | 12:28:13 |
| 8 | And he has a little text exchange with | 12:28:18 |
| 9 | Mr. Smith above, right? | 12:28:22 |
| 10 | A.   Yes. | 12:28:24 |
| 11 | Q.   And did you understand that that was | 12:28:24 |
| 12 | telling you in essence that "I've given the same | 12:28:26 |
| 13 | information to Mr. Smith that I gave to the Sun. | 12:28:29 |
| 14 | They're interested, but here is what he said."  And | 12:28:31 |
| 15 | he sent you the text, right? | 12:28:36 |
| 16 | A.   Yes, I believe so. | 12:28:39 |
| 17 | Q.   And then you suggest in your text of | 12:28:50 |
| 18 | 8:29, another thought -- other thought.  "Maybe we | 12:28:55 |
| 19 | consider the Australian press as well.  The UK | 12:29:00 |
| 20 | press may be prone to protect one of their own." | 12:29:05 |
| 21 | Have I read that correctly? | 12:29:08 |
| 22 | A.   Yes. | 12:29:10 |
| 23 | Q.   And that is your suggestion, true? | 12:29:10 |
| 24 | A.   True. | 12:29:12 |
| 25 | Q.   Did you and Mr. Musk discuss that and | 12:29:12 |

126

Exhibit 2
Page 188

```
 1   So again, I -- could he have been a part of this      12:31:07

 2   conversation?  It is very possible.  I just don't     12:31:11

 3   clearly recollect.                                    12:31:14

 4       Q.   Can we agree that it would have been one     12:31:15

 5   of two things.  Either Mr. Musk suggested to you      12:31:18

 6   "See if he can get this in Australia," or you came    12:31:21

 7   up with the idea "Maybe we can get something done     12:31:27

 8   in Australia," true?                                  12:31:30

 9       A.   It could have been either of those.          12:31:32

10       Q.   But either one -- Mr. Musk would have        12:31:34

11   known that you were suggesting the avenue of also     12:31:36

12   publishing in Australia, true?                        12:31:42

13       A.   Likely.                                      12:31:44

14       Q.   Why were you focusing the efforts to leak    12:31:50

15   this information initially on the United Kingdom;     12:31:54

16   UK?                                                   12:31:59

17       A.   I mean, just that's where he was.  That's    12:32:01

18   where we had reason to believe that he was looking    12:32:04

19   for counsel.                                          12:32:10

20            I mean, that's, you know, what Howard was    12:32:11

21   sharing with us.  That's where Howard was based out   12:32:14

22   of.  That's where his kind of central focus was, so   12:32:18

23   I think that's what influenced that.                  12:32:21

24       Q.   Do you think the time zone on that --        12:32:34

25   your email is May 29 at 7:52 p.m.  Do you think       12:32:35
```

129

Exhibit 2
Page 189

1    all -- what was the ruse -- or lack of a better        12:34:02

2    word -- about this representative of a UK charity?      12:34:06

3           Who were you trying to say this was              12:34:09

4    coming from somebody that represented a UK charity      12:34:11

5    interested in Mr. Unsworth as an ambassador?            12:34:15

6        A.   In reviewing that -- so I was relying on       12:34:21

7    James Howard to investigate this, using the, you         12:34:28

8    know, norms and resources and rules and whatever         12:34:32

9    that would be commonly expected in an                    12:34:39

10   investigation.                                          12:34:42

11          That is not my bailiwick, but -- let             12:34:43

12   alone in another country, let alone across              12:34:47

13   countries.  And from what I understood, that was        12:34:51

14   one of his methods to be able to gather                 12:34:55

15   information.                                            12:35:01

16       Q.   And Mr. Howard was telling you that he         12:35:03

17   also thought he could get information about             12:35:06

18   Mr. Unsworth's legal strategy through                   12:35:08

19   Mr. Unsworth's law firm in the UK, true?                12:35:13

20   Mark Stephens?                                          12:35:16

21       A.   We asked to verify whether or not there        12:35:20

22   was counsel being retained.  There was no request       12:35:22

23   for, you know, strategic information or -- we were      12:35:27

24   asking for verification whether or not there was        12:35:34

25   counsel.                                                12:35:36

131

Exhibit 2
Page 190

```
 1      A.   No.  It sounds like something I would        12:36:56
 2   have used.                                            12:36:59
 3      Q.   What did you mean when you tell him to        12:37:00
 4   be -- just to "make sure the team in Thailand keeps   12:37:03
 5   digging, creatively, extensively, and when            12:37:06
 6   possible, aggressively."                              12:37:10
 7           What are you suggesting that he's telling     12:37:11
 8   these people to do, since it's your phrase and not    12:37:13
 9   Mr. Musk?                                             12:37:16
10      A.   To me that is pretty straightforward; to     12:37:18
11   go -- kind of think outside of the box and to it      12:37:20
12   exhaust every resource, and to, as possible,          12:37:23
13   aggressively seek out, you know, the information.     12:37:30
14      Q.   Why was it that important to you to make      12:37:34
15   sure that this effort to leak information to the      12:37:38
16   media -- strike that.                                 12:37:41
17           Why was it so important to you to            12:37:43
18   reiterate to Mr. Howard that the team in Thailand     12:37:47
19   keep digging and dig creatively, extensively, and     12:37:52
20   when possible, aggressively.                          12:37:57
21           Why was that so important to you?            12:37:57
22      A.   Because he had provided a lot of             12:38:02
23   information at that point, and that information had    12:38:04
24   at times varied, and we needed to -- you know, all    12:38:07
25   along we told him that we wanted facts                12:38:14
```

                                                                      133

Exhibit 2
Page 191

```
 1    hired him.  He was not working for any law firm.      12:40:03

 2    BY MR. L. WOOD:                                        12:40:07

 3         Q.    All right.  I don't want to know anything   12:40:07

 4    that a lawyer said to you, and I don't know if         12:40:10

 5    it's -- you can tell me.                               12:40:12

 6              First, yes or no, did you ever discuss       12:40:14

 7    with Mr. Musk the idea that you needed to get          12:40:16

 8    another or different investigator to flush out the     12:40:20

 9    truth, yes or no?                                      12:40:25

10         A.    Yes.  Yes.  In early September when the     12:40:28

11    facts had fluctuated enough, and -- and we were        12:40:30

12    pressing him hard to substantiate some of the          12:40:34

13    claims that he had made, including those about his     12:40:38

14    age and he was still waffling between a marriage       12:40:41

15    date and a -- and a "met date," and you know,          12:40:43

16    things like that.  And records that existed about      12:40:45

17    him verified in hotel stays in Pattaya and all that    12:40:50

18    stuff.  When that stuff didn't materialize,            12:40:56

19    there -- there was a discussion that you know,         12:40:57

20    about do we need to find something; a different        12:41:04

21    solution here.                                         12:41:07

22         Q.    Who was involved in that discussion?        12:41:08

23         A.    It would have been --                       12:41:10

24         Q.    Just you and Mr. Musk?                      12:41:11

25         A.    Yes.                                        12:41:12
```

Exhibit 2
Page 192

```
 1      Q.   What did he say?                         12:41:14

 2      A.   Well, I mean, I don't recall the words    12:41:16

 3   that were said.                                   12:41:18

 4      Q.   Well, did he say "Get another             12:41:18

 5   investigator"?                                    12:41:20

 6      A.   No.  He just -- it was questioning -- you 12:41:20

 7   know, at that point the validity of this guy,     12:41:22

 8   and -- and whether or not we needed a backup or a 12:41:27

 9   secondary investigator in the process.            12:41:35

10      Q.   Well, if your goal was to investigate to  12:41:37

11   find out the truth, you would agree with me at this 12:41:39

12   time when you-all were questioning to get another 12:41:45

13   investigator, you and Mr. Musk were concerned that 12:41:48

14   you weren't getting a straight story from         12:41:50

15   Mr. Howard, true?                                 12:41:53

16      A.   True.                                      12:41:54

17      Q.   So if you really wanted -- you had        12:41:55

18   concerns about whether you were getting the truth 12:41:58

19   from Mr. Howard, you tell me, right?              12:41:59

20      A.   Correct.                                   12:42:01

21      Q.   Mr. Musk had that same concern, true?     12:42:02

22      A.   True.                                      12:42:05

23      Q.   And you-all had had that concern ever     12:42:05

24   since his data being provided to you started to   12:42:07

25   change, right?                                     12:42:11
```

137

Exhibit 2
Page 193

| | | |
|---|---|---|
| 1 | A.    That's right. | 12:42:12 |
| 2 | Q.    Like when it went from 12 or 13 prior to | 12:42:12 |
| 3 | 27th, to 18 to 19 on the 27th, right? | 12:42:16 |
| 4 | A.    Yes, though it continued to waffle even | 12:42:19 |
| 5 | after the 27th -- | 12:42:22 |
| 6 | Q.    We can go into that at length -- | 12:42:23 |
| 7 | A.    There were phone conversations -- | 12:42:23 |
| 8 | Q.    -- about waffling on the age and when | 12:42:24 |
| 9 | they met and when they got allegedly married. | 12:42:27 |
| 10 | A.    Okay. | 12:42:29 |
| 11 | Q.    But right now I'm trying to just pin down | 12:42:29 |
| 12 | in my mind's eye when you had this conversation | 12:42:32 |
| 13 | with Mr. Musk, and the goal was let's find out the | 12:42:34 |
| 14 | truth.  We need an investigation to learn the | 12:42:38 |
| 15 | truth, right?  Right? | 12:42:41 |
| 16 | A.    Correct. | 12:42:43 |
| 17 | Q.    Both of you-all had serious doubts about | 12:42:45 |
| 18 | whether you were in the hands of the right guy with | 12:42:48 |
| 19 | Jim Howard, true? | 12:42:50 |
| 20 | MR. SPIRO:  Objection.  Date?  When? | 12:42:52 |
| 21 | MR. L. WOOD:  At the time they had the | 12:42:53 |
| 22 | meeting about whether they needed to get another | 12:42:55 |
| 23 | investigator? | 12:42:57 |
| 24 | MR. SPIRO:  That was September. | 12:42:57 |
| 25 | THE WITNESS:  Well, yeah, so early | 12:42:57 |

138

Exhibit 2
Page 194

```
 1   September.                                        12:42:58

 2           MR. L. WOOD:  Who cares.  I'm not asking  12:42:59

 3   about the date.  Early September.                12:43:00

 4           MR. SPIRO:  All I'm saying is in a couple 12:43:03

 5   of your last questions, I just want to make sure 12:43:03

 6   the time is accurate.                            12:43:04

 7           MR. L. WOOD:  I'm listening.  Nobody is   12:43:06

 8   trying to sneak anything in here --              12:43:06

 9           MR. SPIRO:  No --                         12:43:08

10           MR. L. WOOD:  -- on this side of the      12:43:08

11   table.  Look, I'm saying that September -- you   12:43:09

12   believed this conversation occurred in very early 12:43:11

13   of September, right?                             12:43:14

14           THE WITNESS:  Yes.                        12:43:17

15   BY MR. L. WOOD:                                  12:43:17

16      Q.   Likely after you got the preliminary     12:43:17

17   report of the 30th and the final report, or at   12:43:19

18   least not preliminary report, on September 1?    12:43:22

19      A.   Yes.                                      12:43:25

20      Q.   That's when you and Elon Musk sat down    12:43:26

21   and said "Wait a minute.  This guy is all over the 12:43:29

22   place.  Maybe we ought to get somebody else,"    12:43:30

23   right?                                           12:43:34

24      A.   Yeah, I mean, I don't think there was    12:43:35

25   like this one summit meeting that summed that up, 12:43:36
```

139

Exhibit 2
Page 195

| | | |
|---|---|---|
| 1 | but there was -- there were a few conversations | 12:43:38 |
| 2 | that -- that caused us to question, you know, the | 12:43:41 |
| 3 | validity, and then what is the solution for this. | 12:43:44 |
| 4 | Q.   And at least one of those conversations, | 12:43:50 |
| 5 | if not more, had occurred when you got the | 12:43:51 |
| 6 | information saying 18 to 19. | 12:43:55 |
| 7 | You told Mr. Musk without delay "We're | 12:43:58 |
| 8 | getting different information now, Elon," right? | 12:44:02 |
| 9 | A.   Yes. | 12:44:06 |
| 10 | Q.   And that would have been reported to him | 12:44:06 |
| 11 | within a day? | 12:44:09 |
| 12 | A.   Most likely, yes. | 12:44:11 |
| 13 | Q.   By the 28th he knew there was a problem | 12:44:13 |
| 14 | in the dates that you were getting on when they met | 12:44:16 |
| 15 | and when they got married, right? | 12:44:18 |
| 16 | A.   You say a "problem," I mean... | 12:44:20 |
| 17 | Q.   Well, the date -- | 12:44:23 |
| 18 | A.   Yeah, he was waffling. | 12:44:23 |
| 19 | Q.   -- a serious discrepancy? | 12:44:23 |
| 20 | A.   He was waffling as far as when marriage | 12:44:25 |
| 21 | versus met, yeah.  Yes, he was waffling back and | 12:44:28 |
| 22 | forth there. | 12:44:31 |
| 23 | Q.   And not just waffling a little bit.  You | 12:44:31 |
| 24 | recognized that there was a serious discrepancy in | 12:44:34 |
| 25 | what he was telling you according to you on when | 12:44:36 |

140

Exhibit 2
Page 196

```
1    they met in terms of Tik's age, and you knew that      12:44:40

2    on the 27th and 28th, and you discussed it with        12:44:45

3    Mr. Musk, true?                                        12:44:48

4        A.   I would have shared the information that      12:44:50

5    was shared with me.                                    12:44:52

6        Q.   On the 28th when you got it?                  12:44:53

7        A.   Most likely, yes.                             12:44:56

8            MR. L. WOOD:  Let me get, if you don't         12:44:57

9    mind -- 17.  What number did you come up with?         12:44:57

10           MR. M. WOOD:  68, yeah.                        12:44:57

11           MR. L. WOOD:  68, thank you.                   12:44:57

12           (Exhibit 68 was marked for                     12:44:57

13           identification.)                               12:44:57

14   BY MR. L. WOOD:                                        12:45:51

15       Q.   Exhibit 68.  Are you familiar with that       12:46:01

16   document?                                              12:46:03

17       A.   I'm looking at it right now.                  12:46:06

18            Yes, I am familiar with this document.        12:46:08

19       Q.   And this was the August 30th project.         12:46:14

20   Rowena preliminary report, true?                       12:46:18

21       A.   Yes, that's --                                12:46:22

22       Q.   This was information received by you from     12:46:23

23   Mr. Howard before Mr. Musk sent his email on the       12:46:27

24   30th to Ryan Mac, true?                                12:46:33

25       A.   I don't know the time schedule of what        12:46:36
```

141

Exhibit 2
Page 197

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 12:52:10 |
| 2 | Q. | Which meant it had to go to Elon Musk | 12:52:10 |
| 3 | from you, right? | | 12:52:15 |
| 4 | A. | Yes. | 12:52:15 |
| 5 | Q. | Did you ever refer to Mr. Unsworth as a | 12:52:16 |
| 6 | child rapist? | | 12:52:19 |
| 7 | A. | I never used that term. | 12:52:22 |
| 8 | Q. | Neither did Mr. Howard, true? | 12:52:24 |
| 9 | A. | True. | 12:52:27 |
| 10 | Q. | Just like he told you when you tried to | 12:52:28 |
| 11 | write him on September the 6th and try to explain | | 12:52:29 |
| 12 | to him how Mr. Musk might have somehow confused or | | 12:52:32 |
| 13 | inferred or drawn the wrong conclusions about the | | 12:52:35 |
| 14 | information -- he made it clear to you -- clear | | 12:52:39 |
| 15 | as -- water.  "I never said child rapist."  And | | 12:52:41 |
| 16 | there's a big difference between saying somebody's | | 12:52:47 |
| 17 | 18 or 19, and somebody saying that you are a child | | 12:52:51 |
| 18 | rapist. | | 12:52:56 |
| 19 | His mistake is he acknowledged to you was | | 12:52:56 |
| 20 | the age 30 to 40, and you were upset because that | | 12:53:00 |
| 21 | put them meeting at age 29 to 30 instead of 18 or | | 12:53:03 |
| 22 | 19, right? | | 12:53:05 |
| 23 | MR. SPIRO:  Objection.  That question -- | | 12:53:07 |
| 24 | BY MR. L. WOOD: | | 12:53:08 |
| 25 | Q. | I'm going to go through it with you in a | 12:53:08 |

147

Exhibit 2
Page 198

| | | |
|---|---|---|
| 1 | A.   Yeah, I'm looking, but I don't know of | 12:54:03 |
| 2 | where it would say that. | 12:54:08 |
| 3 | Q.   Well, look at 0443 if that helps. | 12:54:09 |
| 4 | A.   Okay.  I'm looking at it. | 12:54:12 |
| 5 | Q.   Third paragraph on the first right-hand | 12:54:21 |
| 6 | column:  "Mr. Unsworth is 63 years old.  His wife, | 12:54:21 |
| 7 | we believe, is 30.  We will confirm this in the | 12:54:24 |
| 8 | next 48 hours, which would have put her at 18 to 19 | 12:54:28 |
| 9 | when they first met.  The target would have been 52 | 12:54:34 |
| 10 | years old at the time." | 12:54:40 |
| 11 | Have I read that correctly? | 12:54:41 |
| 12 | A.   Yes. | 12:54:43 |
| 13 | Q.   So the latest and greatest information | 12:54:43 |
| 14 | you had on August the 30th from Mr. Howard was that | 12:54:45 |
| 15 | he believed that Tik was 30, but he had to confirm | 12:54:49 |
| 16 | that in the next 48 hours, but that if 30 was | 12:54:53 |
| 17 | correct, they would have met at age -- when she was | 12:54:57 |
| 18 | age 18 to 19, true? | 12:54:59 |
| 19 | MR. SPIRO:  Objection to form. | 12:55:02 |
| 20 | MR. L. WOOD:  True? | 12:55:02 |
| 21 | MR. SPIRO:  You can answer that. | 12:55:02 |
| 22 | THE WITNESS:  Yes.  I mean, based on what | 12:55:03 |
| 23 | is written here, it's true. | 12:55:03 |
| 24 | BY MR. L. WOOD: | 12:55:04 |
| 25 | Q.   And then look over, if you would -- if | 12:55:04 |

149

Exhibit 2
Page 199

 1    you look back at Exhibit 65, that was the

 2    green-orange-red report, right?

 3        A.   I'm looking at that.                          12:56:06

 4        Q.   He says in that report on page 2 on the       12:56:07

 5    27th of August, "The target is 63 years old.  His     12:56:10

 6    wife, we believe, is 30, which would have put her     12:56:12

 7    at 18 to 19 when they first met.  The target would    12:56:14

 8    have been 52 years old at the time."                  12:56:17

 9             That is the exact same information that       12:56:20

10    he provided in the report on August 30th that he      12:56:23

11    had earlier provided you on the 27th, true?           12:56:26

12        A.   True.                                         12:56:30

13        Q.   And we can agree that if you first meet,      12:56:31

14    for purposes of the question, at age 18 or 19, it     12:56:33

15    is impossible that you got married seven years        12:56:40

16    earlier than when you met, true?                      12:56:46

17        A.   That is true.                                 12:56:47

18             MR. L. WOOD:  Why don't we take our lunch     12:56:48

19    break.                                                12:56:50

20             MR. SPIRO:  Good deal.                        12:56:51

21             THE VIDEOGRAPHER:  Off the record at          12:56:51

22    12:56 p.m.                                            12:56:52

23             (Recess taken.)                               13:49:44

24             THE VIDEOGRAPHER:  And we are back on the     13:50:38

25    record at 1:50 p.m.                                   13:51:14

                                                            150

Exhibit 2
Page 200

| | | |
|---|---|---|
| 1 | A.   Yes. | 14:02:36 |
| 2 | Q.   It says "Sure, the report is large so I | 14:02:36 |
| 3 | wanted to send in this format.  Any instructions | 14:02:38 |
| 4 | from the principal?" | 14:02:40 |
| 5 | Talking about any instructions from | 14:02:41 |
| 6 | Mr. Musk, right? | 14:02:44 |
| 7 | A.   Yes. | 14:02:46 |
| 8 | Q.   And then it says "I'm proceeding with the | 14:02:46 |
| 9 | UK surveillance as discussed." | 14:02:48 |
| 10 | Have I read that correctly? | 14:02:50 |
| 11 | A.   Yes. | 14:02:53 |
| 12 | Q.   What was the UK surveillance? | 14:02:53 |
| 13 | Surveillance of whom or what?  What did you-all | 14:02:54 |
| 14 | discuss about UK surveillance? | 14:03:00 |
| 15 | A.   In general, I mean, I don't know like the | 14:03:04 |
| 16 | specifics of this discussion, but in general, the | 14:03:08 |
| 17 | surveillance there was, was he in the UK?  Had he | 14:03:11 |
| 18 | retained counsel?  That was really what it was. | 14:03:16 |
| 19 | Q.   Mr. Birchall, he told you he was going to | 14:03:23 |
| 20 | try and have a person at one point go over and try | 14:03:23 |
| 21 | to get in the golf foursome with Mr. Unsworth, | 14:03:29 |
| 22 | didn't he? | 14:03:33 |
| 23 | A.   I don't recall that. | 14:03:35 |
| 24 | Q.   And that if he couldn't do that, he was | 14:03:36 |
| 25 | going to get someone to be in the -- I guess -- I | 14:03:38 |

159

Exhibit 2
Page 201

```
1        Q.    Did you want to try to get information on     14:04:53

2    his litigation strategy?                               14:04:55

3        A.    We never asked for that.                     14:04:56

4        Q.    Never used those words --                    14:04:58

5        A.    Never.                                        14:04:59

6        Q.    -- nor did he ever use those words           14:05:00

7    regarding trying to learn about the litigation          14:05:02

8    strategy of Mr. Unsworth.  Is that your testimony?      14:05:05

9        A.    He, being --                                  14:05:08

10       Q.    Mr. Howard?                                   14:05:09

11       A.    Mr. Howard?  Whether or not he used those     14:05:10

12   words, I'm not sure, but we never asked him to          14:05:13

13   discover strategy regarding his --                      14:05:15

14       Q.    Did you put the brakes on him when you        14:05:19

15   realized he was trying to surveil matters regarding     14:05:21

16   Mr. Unsworth and his lawyers?  Did you say "Don't       14:05:24

17   do that"?  Did you ever do that?                        14:05:27

18       A.    No.  We asked him to provide general          14:05:30

19   surveillance.                                           14:05:35

20           MR. SPIRO:  Just to clarify the record,         14:05:36

21   the "we" -- are you talking about yourself?             14:05:37

22           MR. L. WOOD:  Hang on a second.  Let him        14:05:41

23   answer the question.  You can clarify what you need     14:05:42

24   on your part of the examination.                        14:05:46

25   ///
```

161

Exhibit 2
Page 202

```
 1   BY MR. L. WOOD:                                    14:05:46

 2        Q.   Did you put the brakes on him when you   14:05:46

 3   realized he was trying to surveil matters regarding 14:05:48

 4   Mr. Unsworth and his lawyers?  Did you ever do      14:05:52

 5   that?                                               14:05:56

 6        A.   No.  The assumption of any surveillance   14:05:56

 7   that was being done was that it was following any   14:05:58

 8   guideline that proper investigations should follow. 14:06:03

 9        Q.   But the surveillance that was being done  14:06:06

10   was being done at the request and on the dime of    14:06:09

11   Mr. Elon Musk, true?                               14:06:13

12             MR. SPIRO:   Objection on "the request    14:06:15

13   of."                                               14:06:16

14             THE WITNESS:   The request was to confirm 14:06:17

15   counsel as being secured, and there was no further  14:06:20

16   guidance suggesting that he needed to surveil a     14:06:29

17   lawyer or to surveil a meeting with a lawyer or     14:06:32

18   overhear a conversation with a lawyer; that none of 14:06:35

19   that happened.                                     14:06:41

20   BY MR. L. WOOD:                                    14:06:44

21        Q.   Did you provide Mr. Musk with the        14:06:44

22   information that he was meeting with                14:06:46

23   Howard Stevens?                                    14:06:48

24        A.   Likely.                                  14:06:49

25             MR. SPIRO:   Howard Stevens?             14:06:54
```

162

Exhibit 2
Page 203

| | | |
|---|---|---|
| 1 | THE WITNESS:  It's Mark Stephens. | 14:06:57 |
| 2 | MR. L. WOOD:  Mark Stephens. | 14:06:57 |
| 3 | MR. SPIRO:  Yeah. | 14:06:59 |
| 4 | MR. L. WOOD:  There are a lot of names. | 14:06:59 |
| 5 | MR. SPIRO:  I know, that's just for your | 14:07:01 |
| 6 | own... | 14:07:01 |
| 7 | MR. L. WOOD:  The firm was | 14:07:03 |
| 8 | Howard Kennedy. | 14:07:03 |
| 9 | THE WITNESS:  Yes. | 14:07:04 |
| 10 | MR. L. WOOD:  That's where I got it. | 14:07:04 |
| 11 | MR. SPIRO:  No, I know. | 14:07:05 |
| 12 | MR. L. WOOD:  If Mark is listening or | 14:07:05 |
| 13 | watching, I hope he will forgive me. | 14:07:07 |
| 14 | THE WITNESS:  Likely that was information | 14:07:10 |
| 15 | that I shared. | 14:07:12 |
| 16 | BY MR. L. WOOD: | 14:07:13 |
| 17 | Q.   You would have informed Mr. Musk of that | 14:07:13 |
| 18 | information? | 14:07:14 |
| 19 | A.   Likely, yes. | 14:07:16 |
| 20 | Q.   Relatively soon after you received it? | 14:07:17 |
| 21 | A.   Typically within 24 hours was the | 14:07:21 |
| 22 | cadence. | 14:07:23 |
| 23 | Q.   And sooner if Mr. Musk's schedule | 14:07:24 |
| 24 | permitted.  Because you said you wanted to get the | 14:07:25 |
| 25 | information from Mr. Howard to him along the way, | 14:07:27 |

163

Exhibit 2
Page 204

| | | |
|---|---|---|
| 1 | but on his schedule as soon as possible, true? | 14:07:31 |
| 2 | A.   Sure, if possible. | 14:07:35 |
| 3 | Q.   And generally, that would have meant | 14:07:36 |
| 4 | clearly at least no longer than 24 hours? | 14:07:39 |
| 5 | A.   Generally, yes. | 14:07:41 |
| 6 | Q.   Generally sooner, though, true? | 14:07:43 |
| 7 | A.   If possible. | 14:07:44 |
| 8 | Q.   And that was generally possible? | 14:07:45 |
| 9 | MR. SPIRO:   Conjecture. | 14:07:46 |
| 10 | MR. L. WOOD:   I'm sorry.  I didn't mean | 14:07:46 |
| 11 | to say something funny, but if you want to laugh. | 14:07:51 |
| 12 | I mean, look, you're the one telling me | 14:07:51 |
| 13 | you tried to get it to him within 24 hours -- | 14:07:53 |
| 14 | THE WITNESS:   Yeah. | 14:07:55 |
| 15 | MR. L. WOOD:   -- if possible.  The fact | 14:07:55 |
| 16 | is you wanted to get it to him as soon as | 14:07:56 |
| 17 | possible -- | 14:07:58 |
| 18 | THE WITNESS:   Um-hmm. | 14:07:58 |
| 19 | MR. L. WOOD:   -- and usually you were | 14:07:58 |
| 20 | able to get in touch with him pretty quickly after | 14:07:59 |
| 21 | you had gotten information to tell him what you | 14:08:03 |
| 22 | were learning, true? | 14:08:06 |
| 23 | MR. SPIRO:   Objection; form. | 14:08:07 |
| 24 | THE WITNESS:   So I would in some cases | 14:08:12 |
| 25 | either request a conversation, or send, you know, a | 14:08:13 |

164

Exhibit 2
Page 205

```
1        A.   I do see it, yes.                      14:12:51

2        Q.   "He has been a frequent visitor to     14:12:53

3   Thailand since the 1980s.  Prior to meeting his  14:12:55

4   current wife, we believe that Mr. Unsworth was   14:13:00

5   living in the Pattaya Beach, which is a well-known 14:13:04

6   tourist destination.                             14:13:09

7        "Pattaya Beach is synonymous with           14:13:11

8   prostitution and scam artists.  We are in the    14:13:15

9   process of verifying this information, which was  14:13:16

10  mentioned to the lead investigator by            14:13:20

11  Mr. Unsworth's mother-in-law."                   14:13:22

12       Have I read that correctly?                 14:13:22

13       A.   Yes.                                    14:13:25

14       Q.   And now he's referencing Pattaya Beach. 14:13:26

15  And then under "Thailand" on the next Bates, 0043, 14:13:27

16  he tells you and Mr. Musk, at least in his report 14:13:33

17  to you and Mr. Musk, "If this is the case that    14:13:38

18  Mr. Unsworth chose to live in Pattaya Beach before 14:13:45

19  moving to northern Thailand, then it would be a   14:13:48

20  strong indicator as to his lifestyle interest."   14:13:52

21       Have I read that correctly?                 14:13:55

22       A.   Yes.                                    14:13:57

23       Q.   Proceeding forward.  "If we can establish 14:13:59

24  that Mr. Unsworth was a regular visitor to this   14:14:02

25  part of Thailand, which is not known for its      14:14:06
```

169

Exhibit 2
Page 206

```
 1    extensive cave networks, then this is something      14:14:08
 2    that may support the assumption that he is a 'sex    14:14:11
 3    pat.'"                                               14:14:13
 4            Have I read that correctly?                  14:14:13
 5       A.   Yes.                                         14:14:18
 6       Q.   At least on the 30th of August, it was       14:14:19
 7    clear from this report, Exhibit 68, that he had      14:14:24
 8    not, in fact, confirmed that Mr. Unsworth had ever   14:14:31
 9    lived at Pattaya Beach.  He says "We believe it,     14:14:35
10    but we are in the process of verifying it," and      14:14:39
11    then in the second reference I read to you, both     14:14:41
12    times it starts with "If this is the case," or "If   14:14:43
13    we can establish," true?                             14:14:45
14       A.   Those are his words.                         14:14:48
15       Q.   And he has not stated as a matter of fact    14:14:50
16    that Vernon Unsworth ever lived in Pattaya Beach?    14:14:53
17       A.   True, but it's important to note that        14:14:57
18    there are numerous phone calls between each of       14:14:58
19    these correspondence where he is much more           14:15:01
20    affirmative in his beliefs of her age and of         14:15:04
21    Unsworth's activities and of his time spent in       14:15:10
22    Pattaya Beach.                                       14:15:14
23            And I don't know if this is because          14:15:14
24    him -- he needs to filter this through his, you      14:15:16
25    know, supervisor or whatever.  It is a more          14:15:19
```

170

Exhibit 2
Page 207

```
 1   conservative version of what he was sharing        14:15:23

 2   verbally.                                           14:15:28

 3           And he was much more aggressive in his --   14:15:28

 4   in the verbal communication that we had with him.   14:15:32

 5       Q.   Now --                                     14:15:34

 6       A.   But yes, the words that you -- those are   14:15:34

 7   his words; the ones that you've confirmed.          14:15:38

 8       Q.   Now, just reminding what you know; that    14:15:41

 9   you're under oath.                                  14:15:42

10       A.   Yes.                                       14:15:42

11       Q.   Did you discuss any part of your           14:15:42

12   testimony with Mr. Spiro or counsel during the      14:15:44

13   recess?                                             14:15:48

14       A.   Did I discuss any part of my testimony     14:15:50

15   that we had --                                      14:15:52

16       Q.   Any part of your testimony.  Did you       14:15:54

17   discuss it during the lunch break?                  14:15:56

18       A.   Yes.                                       14:15:59

19       Q.   Did you discuss the very issue that you    14:16:00

20   just testified to about phone calls being more      14:16:01

21   aggressive?                                         14:16:05

22       A.   We did not --                              14:16:05

23       Q.   Did you discuss it with Mr. Spiro during   14:16:05

24   the break?                                          14:16:10

25           MR. SPIRO:  He's trying to --               14:16:10
```

Exhibit 2
Page 208

```
 1    know that?                                          14:16:35

 2         A.    No.                                      14:16:38

 3         Q.    Mr. Spiro knows that.  I want to know    14:16:38

 4    whether you discussed during the lunch break with  14:16:42

 5    Mr. Spiro or any other break during today's         14:16:45

 6    testimony, this idea that Mr. Howard was more       14:16:49

 7    aggressive in the telephone calls than he was in    14:16:54

 8    the letters.                                        14:16:57

 9         A.    No.  That is not something that was      14:16:58

10    discussed.                                          14:16:59

11         Q.    You deny that under oath?                14:17:00

12         A.    Yes.                                     14:17:01

13         Q.    Can you -- I think I know the answer to  14:17:07

14    this but I'm going to ask it.                       14:17:13

15               Did you have a telephone conversation    14:17:14

16    with Mr. Howard on August the 30th?                 14:17:16

17         A.    I mean, I don't remember off the top of  14:17:25

18    my head, but it's certainly possible.              14:17:27

19         Q.    Can you give -- this is where I think I  14:17:33

20    know the answer.                                    14:17:34

21               Can you give me any details specific to  14:17:35

22    time and conversation by phone on any conversation  14:17:38

23    you claim to have had with Mr. Howard?  In other    14:17:43

24    words, can you say "Mr. Wood, on August 29th, I     14:17:47

25    remember speaking to him on the phone and this is   14:17:50
```

                                                            173

Exhibit 2
Page 209

```
 1    what he told me?"                              14:17:52

 2             Can you do that on any telephone      14:17:54

 3    conversation you claim to have had with Mr. Howard?   14:17:57

 4        A.    Not off the top of my head.          14:18:00

 5        Q.    So the only thing that we have to    14:18:07

 6    document information with certainty that you   14:18:08

 7    received from Mr. Howard is what he put in writing   14:18:12

 8    to you, true?                                  14:18:17

 9             MR. SPIRO:  Objection as to form.     14:18:18

10             THE WITNESS:  Yeah, as far as certainty   14:18:19

11    goes, of course, yes.  I mean, we don't have the   14:18:23

12    verbiage that was shared on the phone conversation.   14:18:27

13    BY MR. L. WOOD:                                14:18:30

14        Q.    Right.  But while you may speculate as to   14:18:30

15    why he may give you information different on the   14:18:33

16    phone you say, or more aggressive on the phone than   14:18:36

17    he did in his written words --                 14:18:39

18        A.    Um-hmm.                              14:18:41

19        Q.    -- you don't have any idea why he would   14:18:41

20    have done that, do you?                        14:18:44

21        A.    I -- I have an opinion.              14:18:51

22        Q.    But factual knowledge is what we are   14:18:52

23    asking from you, sir.                          14:18:56

24        A.    Factual --                           14:18:57

25             MR. SPIRO:  Objection to that.        14:18:58
```

174

Exhibit 2
Page 210

```
1              THE WITNESS:  No.                        14:18:59

2    BY MR. L. WOOD:                                    14:18:59

3         Q.   Wouldn't you -- don't you generally      14:18:59

4    consider in your business dealings that the written 14:19:02

5    record is the highest and best evidence as opposed 14:19:04

6    to someone's vague recollection of a conversation?  14:19:07

7              MR. SPIRO:  Objection.                   14:19:11

8              THE WITNESS:  Sure, but there is such     14:19:12

9    thing as a verbal contract.                        14:19:13

10   BY MR. L. WOOD:                                     14:19:14

11        Q.   I know there is such thing as a verbal    14:19:14

12   contract, but if you really want to know down the  14:19:16

13   road what was the best and highest evidence,       14:19:17

14   wouldn't you agree that if you've got the written  14:19:18

15   word in front you and the only thing you compare   14:19:21

16   that to is someone saying "Well, we discussed it by 14:19:24

17   phone, but I can't remember when, and I can't      14:19:27

18   really remember what we said," the written word is 14:19:29

19   the highest and best evidence, wouldn't you agree  14:19:32

20   with that?                                         14:19:35

21             MR. SPIRO:  Objection; form.             14:19:36

22   BY MR. L. WOOD:                                     14:19:36

23        Q.   From your business experience?           14:19:36

24        A.   It's more specific.                      14:19:36

25        Q.   It's more concrete in terms of proof of  14:19:38
```

175

Exhibit 2
Page 211

```
 1   what was said, isn't it, sir?                      14:19:40

 2        A.   Sure.                                     14:19:43

 3        Q.   And is there any reason -- did you        14:19:44

 4   instruct Mr. Howard to not put the most damning     14:19:46

 5   information in his written emails or reports?        14:19:52

 6        A.   I didn't instruct anything -- to what he  14:19:55

 7   would put in his reports.                           14:19:57

 8        Q.   But he told you himself that he was       14:19:58

 9   trying to, and intended in his reports to give      14:20:00

10   you-all of the information that he had collected to  14:20:02

11   date, true?                                         14:20:05

12        A.   Yep.  Yes.                                14:20:07

13        Q.   Now, do you have any email or report --   14:20:11

14   and when I say report, I'm talking more like        14:20:16

15   Exhibit 68 -- that makes reference to Mr. Unsworth  14:20:21

16   and Pattaya Beach, other than the references we     14:20:25

17   just went over in Exhibit 68?                       14:20:31

18        A.   Other than this report that he provided?  14:20:40

19        Q.   Yes, sir.  Do you have an -- other than   14:20:42

20   the information about the Pattaya Beach that we     14:20:46

21   just went over in Exhibit 68, do you have any       14:20:48

22   written email or report, preliminary or otherwise,  14:20:54

23   from Mr. Howard prior to September 1 where he makes  14:20:59

24   any reference to Pattaya Beach?                     14:21:09

25        A.   Not that I am aware of off the top of my  14:21:13
```

176

Exhibit 2
Page 212

```
 1   head.                                              14:21:15
 2        Q.   Given that Mr. Musk very specifically    14:21:16
 3   said in the email to Mr. Mac -- what number is     14:21:18
 4   that? -- Exhibit 23.                               14:21:22
 5        A.   I don't know that I have 23, but...      14:21:41
 6        Q.   44.                                      14:21:42
 7        A.   Oh, I've got 44.                         14:21:43
 8        Q.   Bates 02706.                             14:21:43
 9        A.   02706.  Yes --                           14:21:56
10        Q.   The page after that.                     14:21:56
11        A.   Yep.  I'm looking at it.                 14:21:56
12        Q.   Mr. Musk wrote, "He's an old single white 14:21:57
13   guy from England who's been traveling to or living 14:22:01
14   in Thailand for 30 to 40 years, mostly Pattaya     14:22:03
15   Beach, until moving to Chiang Rai for a child bride 14:22:07
16   who was about 12 years old at the time."           14:22:13
17             Have I read that correctly?              14:22:15
18        A.   Yes.                                     14:22:17
19        Q.   Given that Mr. Musk is writing           14:22:18
20   specifically about Pattaya Beach, does that, in    14:22:21
21   fact, lead you to believe that you had discussed   14:22:25
22   with Mr. Musk prior to his email to Mr. Mac the    14:22:29
23   information you had received earlier that day on   14:22:35
24   August the 30th from Mr. Howard as set forth in    14:22:38
25   Exhibit 68?                                        14:22:43
```

177

Exhibit 2
Page 213

| | | |
|---|---|---|
| 1 | A.   I believe what that shows is that we had | 14:22:45 |
| 2 | definitely discussed Howard's efforts in Pattaya | 14:22:48 |
| 3 | Beach, and that had been ongoing prior to this for | 14:22:56 |
| 4 | some time.  I can't tell exactly how much time, but | 14:23:02 |
| 5 | the Pattaya Beach subject had been discussed for at | 14:23:09 |
| 6 | least days. | 14:23:17 |
| 7 | Q.   And what did he tell you about Pattaya | 14:23:22 |
| 8 | Beach?  Because on the 30th, he's telling you he | 14:23:24 |
| 9 | doesn't know, isn't he?  If.  If.  We believe, but | 14:23:25 |
| 10 | we need to verify. | 14:23:29 |
| 11 |    When did he tell you prior to the 30th | 14:23:30 |
| 12 | that he knew as a matter of fact that Mr. Unsworth | 14:23:33 |
| 13 | had been traveling to or living in Thailand for 30 | 14:23:39 |
| 14 | to 40 years, and mostly Pattaya Beach? | 14:23:42 |
| 15 | A.   He actually told us that he had contacts | 14:23:46 |
| 16 | in the British Embassy that had copies of travel | 14:23:50 |
| 17 | records for Unsworth having frequented those | 14:23:56 |
| 18 | hotels, and he provided some periods of time when | 14:24:00 |
| 19 | he had done that and over a number of years that | 14:24:02 |
| 20 | that had happened. | 14:24:04 |
| 21 | Q.   That was after September 1? | 14:24:06 |
| 22 |    MR. SPIRO:  Objection.  Is that a | 14:24:12 |
| 23 | question? | 14:24:12 |
| 24 | BY MR. L. WOOD: | 14:24:12 |
| 25 | Q.   Do you know when he provided you with the | 14:24:12 |

178

Exhibit 2
Page 214

| | | |
|---|---|---|
| 1 | hotels -- I remember the picture with this pole. | 14:24:13 |
| 2 | Do you remember that one? | 14:24:15 |
| 3 | A.   I do. | 14:24:15 |
| 4 | Q.   When did you get that? | 14:24:16 |
| 5 | A.   I'm not sure of the date on that. | 14:24:17 |
| 6 | Q.   How did you get it?  By email or text? | 14:24:19 |
| 7 | A.   Likely -- let's see, that would have | 14:24:22 |
| 8 | been -- actually, I think he probably sent that via | 14:24:22 |
| 9 | an email. | 14:24:32 |
| 10 | Q.   What date? | 14:24:33 |
| 11 | A.   We can obviously look and -- | 14:24:35 |
| 12 | Q.   Maybe this will help if you look at | 14:24:38 |
| 13 | exhibit -- your text -- numbers -- text messages, | 14:24:41 |
| 14 | Exhibit 67. | 14:24:47 |
| 15 | A.   I'm looking at it. | 14:24:50 |
| 16 | Q.   Take a look at Bates number -- | 14:24:53 |
| 17 | A.   Yep.  I see it. | 14:24:59 |
| 18 | Q.   You see it? | 14:25:00 |
| 19 | A.   Yep. | 14:25:00 |
| 20 | Q.   Bates No. 0211? | 14:25:00 |
| 21 | A.   Yes. | 14:25:03 |
| 22 | Q.   Talking about on 0210 about the hotels, | 14:25:05 |
| 23 | the investigators, we -- he says -- on looking at | 14:25:11 |
| 24 | the top he's telling you on September the 3, "We | 14:25:14 |
| 25 | have deployed times three investigators to Pattaya. | 14:25:16 |

179

Exhibit 2
Page 215

```
1    And I still believe there's a value in the UK          14:25:20

2    surveillance."                                         14:25:25

3         A.   I see that.                                  14:25:26

4         Q.   "Pattaya will take some time; probably       14:25:28

5    seven days."  He goes on to then start talking         14:25:31

6    about "Can you confirm the hotel names in Pattaya."    14:25:35

7    Then he talks about the Penthouse Hotel, the           14:25:39

8    Dusit Thani or something.  Thani.  Penthouse Hotel     14:25:40

9    is purely designed for sex."  And then on the next     14:25:45

10   page sends you the picture, the room with the pole?    14:25:51

11        A.   I see that.                                  14:25:55

12        Q.   All of which -- excuse me, none of which     14:25:57

13   he had verified as being someplace that               14:26:00

14   Mr. Unsworth had been to, but only telling you that   14:26:03

15   he was investigating whether Mr. Unsworth had been    14:26:07

16   there, true?                                           14:26:10

17        A.   I believe that's true.  I mean, I don't      14:26:13

18   think he had an actual, like, hotel record of his     14:26:15

19   stay.                                                  14:26:19

20        Q.   Right.  And he didn't give you that          14:26:20

21   information until September 4, four days or so         14:26:21

22   after Mr. Musk made a statement of fact to Mr. Mac     14:26:27

23   that said that Mr. Unsworth had been traveling to     14:26:33

24   or living in Thailand for 30 to 40 years, mostly      14:26:37

25   Pattaya Beach?                                         14:26:42
```

180

Exhibit 2
Page 216

```
1              MR. SPIRO:  Just a moment.  It's not        14:26:50
2    clear on here.                                        14:26:50
3              Objection as to form; confusing.            14:26:50
4              MR. L. WOOD:  It's noted.                   14:26:50
5              MR. SPIRO:  Yeah.                           14:26:50
6    BY MR. L. WOOD:                                       14:27:05
7         Q.   Answer my question, please, sir.           14:27:06
8         A.   Would you ask it again, please.            14:27:07
9         Q.   Sure.                                       14:27:08
10             MR. SPIRO:  You can read it to him.         14:27:08
11   BY MR. L. WOOD:                                       14:27:08
12        Q.   He did not give you any information         14:27:09
13   about -- well, the information that you say he gave   14:27:10
14   to you about going to Penthouse Hotels or whatever.   14:27:15
15   Let's see what you told me.                           14:27:20
16             He told you he had contacts in the          14:27:20
17   British Embassy that had couples of travel records    14:27:27
18   for Mr. Unsworth having frequented those hotels.      14:27:30
19   He provided some period of time he had done that     14:27:34
20   and over a number of years that had happened.        14:27:36
21             And I said that was after September 1.      14:27:39
22   And it was.  It was on September the 4th, right?     14:27:42
23        A.   Yes.                                        14:27:48
24        Q.   That was four or five days after Mr. Musk  14:27:49
25   wrote as a statement of fact to Mr. Mac that          14:27:56
```

181

Exhibit 2
Page 217

| | | |
|---|---|---|
| 1 | Mr. Unsworth had been traveling to or living in | 14:27:59 |
| 2 | Thailand for 30 to 40 years, mostly Pattaya Beach, | 14:28:02 |
| 3 | right? | 14:28:05 |
| 4 | MR. SPIRO:  Objection to form. | 14:28:06 |
| 5 | THE WITNESS:  Yeah, I believe that he | 14:28:07 |
| 6 | wrote what he believed to be the -- the facts that | 14:28:09 |
| 7 | he understood at that point from Investigator | 14:28:14 |
| 8 | Howard. | 14:28:17 |
| 9 | BY MR. L. WOOD: | 14:28:17 |
| 10 | Q.   And the facts -- you're talking about | 14:28:17 |
| 11 | Mr. Musk? | 14:28:19 |
| 12 | A.   Yes. | 14:28:20 |
| 13 | Q.   But the facts that he would have | 14:28:20 |
| 14 | understood would have only been conveyed by you to | 14:28:23 |
| 15 | Mr. Musk, right? | 14:28:26 |
| 16 | A.   Yes. | 14:28:28 |
| 17 | Q.   And the Pattaya Beach reference and the | 14:28:29 |
| 18 | 30 to 40 years reference is found in the | 14:28:31 |
| 19 | preliminary report, Exhibit 68. | 14:28:35 |
| 20 | A.   It is found there, but that wouldn't have | 14:28:40 |
| 21 | been the first mention of it. | 14:28:41 |
| 22 | Q.   And I asked you again, because I've | 14:28:44 |
| 23 | looked.  You gave me -- I trust you've given me all | 14:28:46 |
| 24 | of the emails between you and Mr. Howard, either in | 14:28:49 |
| 25 | your name or Jim Brickhouse's name, or any other | 14:28:51 |

| | | |
|---|---|---|
| 1 | fake name that you came up with.  I've got them | 14:28:55 |
| 2 | all, right? | 14:28:58 |
| 3 | A.   Yes. | 14:28:59 |
| 4 | Q.   You can point me to any -- any reference | 14:28:59 |
| 5 | to Pattaya Beach in all of your communications in | 14:29:04 |
| 6 | writing with Mr. Howard prior to the preliminary | 14:29:08 |
| 7 | report that he sent on August the 30th? | 14:29:12 |
| 8 | A.   Not in writing, no. | 14:29:16 |
| 9 | Q.   And when it was in writing on September | 14:29:17 |
| 10 | the 30 -- on August the 30th, it was not verified, | 14:29:24 |
| 11 | and it was qualified by "if" it turns out to be the | 14:29:28 |
| 12 | case, true? | 14:29:33 |
| 13 | MR. SPIRO:  Objection as to form. | 14:29:34 |
| 14 | BY MR. L. WOOD: | 14:29:38 |
| 15 | Q.   You want me to read it again? | 14:29:38 |
| 16 | A.   He did state that they were in the | 14:29:40 |
| 17 | process of verifying that. | 14:29:41 |
| 18 | Q.   Did you tell Mr. Musk that we've got him | 14:29:42 |
| 19 | working on verifying Pattaya Beach? | 14:29:45 |
| 20 | A.   I'm sure at some point that information | 14:29:47 |
| 21 | was shared.  I mean, I didn't use those words, but | 14:29:49 |
| 22 | I'm sure the discussion about Pattaya Beach was had | 14:29:51 |
| 23 | at some point.  I'm also sure that wasn't the first | 14:29:54 |
| 24 | revelation about Pattaya Beach. | 14:29:59 |
| 25 | Q.   But any revelation that you claim | 14:30:00 |

183

Exhibit 2
Page 219

```
 1    occurred about Pattaya Beach, you will tell me had    14:30:03

 2    to be by telephone, because there is it no            14:30:06

 3    document --                                           14:30:07

 4        A.    Absolutely.                                 14:30:07

 5        Q.    -- that ever mentions Pattaya Beach until   14:30:07

 6    August the 30th, true?                                14:30:12

 7        A.    That's true.                                14:30:12

 8        Q.    Can you even give me the date on which      14:30:15

 9    you say you had a conversation about Pattaya Beach    14:30:17

10    prior to August the 30th?                             14:30:19

11        A.    Not with certainty I can't give you that    14:30:24

12    date.                                                 14:30:26

13        Q.    Can you give me --                          14:30:26

14        A.    But I can certainly tell it was prior to    14:30:26

15    that date.                                            14:30:29

16        Q.    But what was the Pattaya Beach              14:30:30

17    information?  Was it that we were looking into it     14:30:33

18    like he said on the 30th, or are you telling me       14:30:36

19    that prior to the 30th he told you unequivocally he   14:30:39

20    lived most of the time in Pattaya Beach.  Which one   14:30:45

21    is it?                                                14:30:47

22        MR. SPIRO:  Objection as to form.  He             14:30:48

23    never said "we are looking into it."  That's not --   14:30:48

24    you're misstating this.                               14:30:51

25        MR. L. WOOD:  Your form objection is              14:30:53
```

184

Exhibit 2
Page 220

```
 1   noted.                                            14:30:54

 2   BY MR. L. WOOD:                                   14:30:54

 3       Q.   Answer my question.                      14:30:54

 4       A.   Can you please restate the question.     14:30:55

 5       Q.   Sure.  You say that he gave you          14:31:11

 6   information about Pattaya Beach prior to the email 14:31:13

 7   preliminary report on August the 30th, right?     14:31:18

 8   Right?                                            14:31:19

 9       A.   Yes.                                      14:31:20

10       Q.   You tell me that you are certain of that, 14:31:20

11   but you can't -- well, you're telling me you can't 14:31:23

12   give me the date of when he told that you in a    14:31:26

13   telephone conversation, right?                    14:31:29

14       A.   Not with certainty, no.                  14:31:30

15       Q.   But you know that it occurred, you say,  14:31:32

16   in a telephone conversation, right?               14:31:34

17       A.   Yes.                                      14:31:38

18       Q.   You acknowledge that there is no written 14:31:38

19   reference in any of his emails or reports, prior to 14:31:40

20   the August 30th preliminary report that references 14:31:43

21   Pattaya Beach, true?                              14:31:47

22       A.   That's right.                            14:31:49

23       Q.   What I'm trying to find out now is when  14:31:50

24   he told you in the preliminary report his belief -- 14:31:53

25   again, we just went over it; 0442.  "He has been a 14:32:00
```

                                                      185

Exhibit 2
Page 221

```
 1    frequent visitor to Thailand since the 1980s."      14:32:40

 2              You think that's where Mr. Musk -- that    14:32:44

 3    you reported that to him, and that's where he got   14:32:45

 4    the reference in his email to Mr. Mac that he's an  14:32:49

 5    old single white guy from England who's been        14:32:53

 6    traveling to or living in Thailand 30 to 40 years?  14:32:56

 7         A.   I just know that that information -- he    14:33:00

 8    wouldn't have come up with that on his own.  I'm    14:33:02

 9    sure derived from information shared from            14:33:05

10    Mr. Howard, whether -- much of this information had 14:33:08

11    been discussed prior, and was an effort to organize 14:33:13

12    his --                                              14:33:16

13         Q.   His information?                          14:33:17

14         A.   Yeah.                                     14:33:17

15         Q.   Well, here it is.  That's what I want to  14:33:18

16    talk to you about.  He says again, "Prior to        14:33:20

17    meeting his current wife."  We're talking about     14:33:27

18    Tik, right?                                         14:33:29

19         A.   Yes.                                      14:33:30

20         Q.   "We believe that Mr. Unsworth was living  14:33:31

21    in the Pattaya Beach."                              14:33:35

22              Have I read that correctly?               14:33:36

23         A.   I'm sorry.  Which page are you on?        14:33:40

24         Q.   442 Bates.                                14:33:42

25         A.   Yes, I see that.                          14:33:46
```

186

Exhibit 2
Page 222

| | | |
|---|---|---|
| 1 | Q.   And then he says -- he talks about | 14:33:47 |
| 2 | Pattaya Beach, and he says "We are in the process | 14:33:49 |
| 3 | of verifying this information, which was mentioned | 14:33:51 |
| 4 | to the lead investigator by Mr. Unsworth's | 14:33:56 |
| 5 | mother-in-law," right? | 14:33:59 |
| 6 | A.   Yes. | 14:34:03 |
| 7 | Q.   So he's telling you there that he has not | 14:34:03 |
| 8 | verified it yet, right? | 14:34:05 |
| 9 | A.   Yes, though he says "we believe" in the | 14:34:09 |
| 10 | prior statement.  I mean, he -- | 14:34:11 |
| 11 | Q.   You can believe anything, but you've got | 14:34:12 |
| 12 | to go verify.  You would not publish as a fact | 14:34:13 |
| 13 | someone's belief, would you? | 14:34:16 |
| 14 | MR. SPIRO:  Objection. | 14:34:18 |
| 15 | BY MR. L. WOOD: | 14:34:18 |
| 16 | Q.   That's not what Elon Musk did.  He didn't | 14:34:18 |
| 17 | say "I believe he's been living there in -- mostly | 14:34:21 |
| 18 | in Pattaya Beach."  He stated it as a fact, didn't | 14:34:25 |
| 19 | he? | 14:34:28 |
| 20 | MR. SPIRO:  Objection to form.  Move to | 14:34:29 |
| 21 | strike. | 14:34:30 |
| 22 | THE WITNESS:  He also didn't publish it. | 14:34:31 |
| 23 | It was an off-the-record comment. | 14:34:32 |
| 24 | BY MR. L. WOOD: | 14:34:34 |
| 25 | Q.   We're going to get into that in a little | 14:34:34 |

Exhibit 2
Page 223

```
 1    bit.  I know you were ready to say that to me.        14:34:35
 2              But trust me, we're going to cover that     14:34:39
 3    before this seven hours is up, but that's not what    14:34:39
 4    I'm asking you about right now.                       14:34:41
 5         A.   Okay.                                       14:34:43
 6         Q.   But going back to the preliminary report,   14:34:45
 7    he again says at 443 --                               14:34:47
 8         A.   Yep.                                         14:34:54
 9         Q.   "If this is the case that Mr. Unsworth      14:34:54
10    chose to live in Pattaya Beach.  If we can            14:35:00
11    establish that Mr. Unsworth was a regular visitor     14:35:05
12    to this part of Thailand."                            14:35:10
13              Are you reading with me?                    14:35:11
14         A.   I am.                                       14:35:13
15         Q.   So it's clear, at least from the report     14:35:13
16    portions that we've read, that there had been no      14:35:16
17    confirmation as a matter of fact that Mr. Unsworth    14:35:19
18    lived in Pattaya Beach.                               14:35:22
19              Would you agree with that?                  14:35:23
20         A.   Based on this paragraph by itself,          14:35:25
21    it's -- you know, it definitely questions the         14:35:27
22    veracity of that.  Though his -- the conversations    14:35:31
23    you had with him much more affirmative.  Much more.   14:35:36
24         Q.   They were -- it sounds like they were in    14:35:40
25    conflict with each other on several key points.       14:35:42
```

188

Exhibit 2
Page 224

```
 1   Wouldn't you agree?                                    14:35:45

 2       A.   Conflict, I don't -- I wouldn't agree         14:35:46

 3   with.  They conflicted, but I would -- I would         14:35:49

 4   agree that in some cases he verbally was much          14:35:51

 5   more -- I don't know if the word's "aggressive" or     14:35:57

 6   much more sure of certain things that he was           14:36:04

 7   bringing to us than what the wording would             14:36:08

 8   entail -- or would show.                               14:36:11

 9       Q.   It was inconsistent.  Are you telling me      14:36:13

10   that prior to August the 30th, that Mr. Howard had     14:36:16

11   stated to you unequivocally, "We know that Vernon      14:36:19

12   Unsworth lived in Pattaya Beach most of the time       14:36:23

13   that he visited Thailand."                             14:36:27

14       A.   Yes.                                          14:36:28

15       Q.   Did he tell you that?                         14:36:28

16       A.   Not unequivocally, no.                        14:36:31

17       Q.   No.  It was always that they were looking     14:36:32

18   into it.  They believed it, but they had not           14:36:34

19   verified it, true?                                     14:36:34

20       A.   Sure.                                         14:36:35

21       Q.   It wasn't a factual statement before          14:36:36

22   August the 30th or on August the 30th, that yes, he    14:36:38

23   lived there.  It was "We believe he did, but we're     14:36:41

24   going to try to verify it, and if he did, we can       14:36:44

25   maybe argue such and such," right?                     14:36:47
```

189

Exhibit 2
Page 225

```
 1       A.   I believe so, yes.                        14:36:49

 2       Q.   Isn't that the truth, sir?                14:36:49

 3       A.   I believe so, yes.                        14:36:51

 4       Q.   That's the truth, isn't it?               14:36:51

 5       A.   I believe so.                             14:36:54

 6       Q.   He was never inconsistent about Pattaya   14:36:54

 7   Beach prior to the 30th?                           14:36:56

 8       A.   To say he was never consistent is not     14:36:58

 9   true.                                              14:37:00

10       Q.   To say what?                              14:37:01

11       A.   That he was inconsistent about -- that he 14:37:02

12   was not inconsistent about his portrayal of        14:37:04

13   Unsworth's activity in Pattaya Beach and other     14:37:06

14   activities -- there were inconsistencies.          14:37:13

15       Q.   I'm not asking you about other            14:37:15

16   activities.  I'm asking about Pattaya Beach.       14:37:17

17       A.   Yeah.  There were inconsistencies.        14:37:18

18       Q.   But you've told me just within the last   14:37:20

19   four questions -- we can read it back if we need   14:37:21

20   to -- that he had never affirmatively stated to you 14:37:24

21   on a phone call or in writing that he had          14:37:27

22   demonstrated as a fact that Vernon Unsworth lived  14:37:31

23   in Pattaya Beach.                                  14:37:34

24       A.   That's right --                           14:37:35

25       Q.   Is that true, sir?                        14:37:35
```

190

Exhibit 2
Page 226

| | | | |
|---|---|---|---|
| 1 | Q. | I don't care it's Excession -- | 14:41:40 |
| 2 | A. | There's a difference between -- | 14:41:42 |
| 3 | Q. | -- or SpaceX 6000 or -- | 14:41:42 |
| 4 | A. | Or a public company as Tesla.  SpaceX is | 14:41:44 |

5    a completely -- it a 6,000-person organization with    14:41:44

6    a dedicated IT team that monitors email.  It's a    14:41:47

7    very big difference between Excession.    14:41:50

8        Q.    You and Mr. Musk made a conscious    14:41:53

9    decision and agreement:  Do not report anything    14:41:55

10    about Mr. Howard to me in writing, true?    14:41:58

11        A.    There was no agreement made on that.  I    14:42:02

12    was using my best judgment and chose to not send    14:42:05

13    anything.    14:42:09

14        Q.    So did Elon just happen to say "Okay, I'm    14:42:09

15    not going to send you anything in writing"?    14:42:11

16    Because he didn't write you about it.    14:42:13

17        A.    I think it was just a -- a general    14:42:17

18    understanding that that was the best practice in    14:42:18

19    this case.    14:42:20

20        Q.    An unspoken agreement as to the best    14:42:20

21    practice.  The best practice being, don't put    14:42:23

22    anything in writing about Howard's information,    14:42:27

23    true?    14:42:29

24        A.    I mean, if you want to call it an    14:42:30

25    agreement --    14:42:32

195

Exhibit 2
Page 227

```
1    BY MR. L. WOOD:                               14:48:11

2         Q.   I think we're on the same page, here,  14:48:11

3    Mr. Birchall.                                  14:48:12

4         A.   Okay.                                 14:48:14

5         Q.   I am trying to find out, because you knew  14:48:16

6    that you had to give Mr. Musk accurate information.  14:48:19

7    There was no room for error.  There can't be   14:48:22

8    anything lost in the translation between you,  14:48:25

9    Howard, and Mr. Musk.                          14:48:27

10             As the intermediary, you had to give him  14:48:28

11   correct information, true?                     14:48:32

12        A.   As much as possible, yes.            14:48:34

13        Q.   And so you say "I may have told him they  14:48:36

14   believe he lived in Pattaya Beach"?            14:48:39

15        A.   Those were their words, yes.         14:48:40

16        Q.   But you didn't tell him they had have  14:48:42

17   established that he lived in Pattaya Beach.     14:48:44

18             You never told him anything like that,  14:48:45

19   did you?                                       14:48:48

20        A.   No, I wouldn't have said that they had  14:48:49

21   proof of that.  I would have said they believed  14:48:53

22   that.                                          14:48:54

23        Q.   You would have said they told you they  14:48:54

24   did not; that they were trying to get it, true?  14:48:56

25        A.   That they believed that he lived there.  14:48:58
```

201

Exhibit 2
Page 228

```
1            MR. SPIRO:  You're giving a summation.      15:25:23
2    What is the question?                               15:25:25
3            MR. L. WOOD:  When I get through with my    15:25:27
4    summation, object to the form.  Laughing is rude.   15:25:29
5    I'm about to get to the point.                      15:25:30
6            MR. SPIRO:  It's not a laugh.               15:25:32
7            MR. L. WOOD:  Well, whatever you're         15:25:33
8    doing.  I don't care.  Go ahead and do it.  Listen, 15:25:33
9    here is my question.  I'm here to -- I want to get  15:25:33
10   through.                                            15:25:36
11           MR. SPIRO:  I know.                         15:25:36
12           MR. L. WOOD:  We may not.                   15:25:36
13   BY MR. L. WOOD:                                     15:25:38
14       Q.  I want to know, sir, what information?      15:25:38
15   You've told me about Tik.  You've told me about     15:25:40
16   Pattaya Beach.                                      15:25:45
17           Any other information that you were         15:25:46
18   provided that established factually that            15:25:49
19   Vernon Unsworth "had engaged in a period of         15:25:54
20   exploring the world of underaged Thai girls."  Yes  15:25:58
21   or no?                                              15:26:01
22       A.  Again, you are saying established           15:26:02
23   factually.  What I'm telling you is that he shared  15:26:05
24   a lot of information, including travel habits to    15:26:07
25   and from Thailand, having left his family in the    15:26:10
```

222

Exhibit 2
Page 229

| | | |
|---|---|---|
| 1 | UK.  He shared -- | 15:26:13 |
| 2 | Q.   I am asking about underaged girls.  Stay | 15:26:15 |
| 3 | on point so we can get done. | 15:26:19 |
| 4 | A.   That's part of the story.  When you leave | 15:26:20 |
| 5 | your family, you're more likely to go and do | 15:26:21 |
| 6 | nefarious things.  When you're visiting a remote | 15:26:23 |
| 7 | area of a third-world country -- that's just part | 15:26:28 |
| 8 | of the story that was told to us. | 15:26:30 |
| 9 | Q.   Are you telling me that if you leave your | 15:26:31 |
| 10 | family and go to Thailand, that means you are | 15:26:33 |
| 11 | engaged in dealing with underaged girls? | 15:26:38 |
| 12 | A.   No.  I wouldn't say that. | 15:26:42 |
| 13 | Q.   I wouldn't think you were telling me | 15:26:42 |
| 14 | that. | 15:26:43 |
| 15 | A.   No.  That information alone doesn't say | 15:26:44 |
| 16 | that -- | 15:26:47 |
| 17 | Q.   No. | 15:26:47 |
| 18 | A.   -- but that's part of what goes into -- | 15:26:47 |
| 19 | Q.   That would be rank speculation, wouldn't | 15:26:50 |
| 20 | it? | 15:26:51 |
| 21 | A.   That was part of the information shared | 15:26:52 |
| 22 | with us, that -- | 15:26:55 |
| 23 | Q.   That would be rank speculation to say | 15:26:55 |
| 24 | that because he left his home and went to -- | 15:26:56 |
| 25 | A.   Yeah -- | 15:26:58 |

223

Exhibit 2
Page 230

```
 1      Q.   -- Thailand he was involved with underage      15:26:58

 2   girls.                                                  15:27:01

 3      A.   In and of itself, yes.                          15:27:01

 4      Q.   Do you understand there is a difference         15:27:05

 5   between Pattaya being by reputation, a place for        15:27:09

 6   prostitution, and Pattaya Beach being a place of        15:27:13

 7   child prostitution?                                     15:27:20

 8           MR. SPIRO:   What was the question?             15:27:28

 9   BY MR. L. WOOD:                                         15:27:29

10      Q.   Do you understand the difference between        15:27:29

11   prostitution and child prostitution?                   15:27:31

12      A.   I understand there is a difference.             15:27:35

13      Q.   It is a big difference, isn't it?               15:27:36

14      A.   There is a big difference.                      15:27:37

15      Q.   Yes, sir.  You're talking here about            15:27:39

16   underaged Thai girls.  You're talking about girls       15:27:44

17   under the age of 15, right?                             15:27:46

18      A.   Yes.                                            15:27:50

19      Q.   18 and 19 is not an underage Thai girl,         15:27:51

20   right?                                                  15:27:54

21      A.   Correct.                                        15:27:54

22      Q.   Look what he had written to you after he        15:27:56

23   gave you Tik's name.  As of August 24, 2018, he         15:28:00

24   told you "The target," that's Vernon Unsworth,          15:28:10

25   right?                                                  15:28:12
```

                                                               224

Exhibit 2
Page 231

| 1 | A. | Right. | 15:28:12 |
| 2 | Q. | And War Noon, which is Tik, right? | 15:28:12 |
| 3 | A. | Yes. | 15:28:17 |
| 4 | Q. | In effect he said that the target, Vernon | 15:28:20 |
| 5 | | and Tik -- read the next part for me. | 15:28:24 |
| 6 | A. | "Have been married for seven years." | 15:28:30 |
| 7 | Q. | That would have put them getting married | 15:28:32 |
| 8 | | in 2011, right? | 15:28:35 |
| 9 | A. | Yes, based on the date. | 15:28:38 |
| 10 | Q. | And then read for me what he told you | 15:28:39 |
| 11 | | that related to Tik's age. | 15:28:43 |
| 12 | A. | 28-year gap between them both. | 15:28:46 |
| 13 | Q. | Mr. Unsworth was 63, I believe he was | 15:28:50 |
| 14 | | telling you, right? | 15:28:53 |
| 15 | A. | Yeah. | 15:28:56 |
| 16 | Q. | So what is he telling you in that | 15:28:57 |
| 17 | | statement on August 24 about Tik's age, when he | 15:29:00 |
| 18 | | said 28-years' gap between them both? | 15:29:04 |
| 19 | A. | In that statement you would -- assuming | 15:29:12 |
| 20 | | that Unsworth's age is 63, you would assume a | 15:29:15 |
| 21 | | mid-30s age. | 15:29:18 |
| 22 | Q. | 35 if he was 63? | 15:29:20 |
| 23 | A. | Correct. | 15:29:23 |
| 24 | Q. | So he had told you on the 24th that the | 15:29:25 |
| 25 | | age differential was 28 years, and that Tik was 35, | 15:29:27 |

225

Exhibit 2
Page 232

| | | |
|---|---|---|
| 1 | I mean, that's what they said. | 14:48:58 |
| 2 | Q.   And that they were trying to prove it? | 14:48:58 |
| 3 | A.   Correct. | 14:49:00 |
| 4 | Q.   As to whether it was true or not? | 14:49:01 |
| 5 | A.   Yes. | 14:49:02 |
| 6 | Q.   And you would have told that to Mr. Musk. | 14:49:03 |
| 7 | You would not have led him to believe they had | 14:49:04 |
| 8 | proven it as a fact when you knew that they were | 14:49:08 |
| 9 | still trying to prove it, true? | 14:49:11 |
| 10 | A.   Yeah, I mean, it comes down to an issue | 14:49:13 |
| 11 | of semantics, but I would have communicated that | 14:49:16 |
| 12 | they believed that it was -- that it was a -- a | 14:49:19 |
| 13 | legitimate thing.  That's what they believed.  And | 14:49:20 |
| 14 | they were -- yes, they were working on proving it. | 14:49:26 |
| 15 | Q.   And they were trying to prove it? | 14:49:28 |
| 16 | A.   Yes.  They had a team there working to | 14:49:30 |
| 17 | prove it out -- | 14:49:31 |
| 18 | Q.   That's -- | 14:49:31 |
| 19 | A.   But they believed that -- | 14:49:31 |
| 20 | Q.   That's all I wanted to establish.  You | 14:49:31 |
| 21 | told Mr. Musk they believed he was in Pattaya | 14:49:33 |
| 22 | Beach? | 14:49:35 |
| 23 | A.   Yeah. | 14:49:36 |
| 24 | Q.   Pattaya Beach is not a good place? | 14:49:36 |
| 25 | A.   Yeah. | 14:49:38 |

202

Exhibit 2
Page 233

| | | |
|---|---|---|
| 1 | and they met -- they married seven years earlier, | 15:29:31 |
| 2 | which would have told you that Tik and Vernon got | 15:29:35 |
| 3 | married when Tik was 28, true? | 15:29:39 |
| 4 | A.   True.  But you're pulling one time that | 15:29:43 |
| 5 | you said this out of -- | 15:29:45 |
| 6 | Q.   Oh, I'm going to go through all of them. | 15:29:47 |
| 7 | Don't you worry about that. | 15:29:50 |
| 8 | A.   You don't know about all the phone | 15:29:50 |
| 9 | conversations. | 15:29:52 |
| 10 | Q.   Oh, I know by design, I don't, but I | 15:29:53 |
| 11 | think I've got a pretty good idea. | 15:29:54 |
| 12 | A.   How could it be by design? | 15:29:55 |
| 13 | Q.   Because you intentionally didn't put it | 15:29:58 |
| 14 | in writing. | 15:29:59 |
| 15 | A.   Well, I mean -- | 15:30:00 |
| 16 | Q.   So you want me to come in here -- do you | 15:30:00 |
| 17 | want us to believe -- | 15:30:01 |
| 18 | A.   You put all your conversations in | 15:30:02 |
| 19 | writing? | 15:30:04 |
| 20 | Q.   On a -- yes.  On a matter like this, | 15:30:04 |
| 21 | absolutely. | 15:30:06 |
| 22 | A.   Well, I -- | 15:30:06 |
| 23 | Q.   And if you didn't put it in writing as my | 15:30:06 |
| 24 | employee, I'd fire you.  Because it's too critical | 15:30:09 |
| 25 | of information to come back a year and some months | 15:30:10 |

226

Exhibit 2
Page 234

```
 1   later and claim you don't remember what was said.      15:30:14

 2        A.    Yeah, I've never put phone conversations     15:30:17

 3   in writing.                                             15:30:19

 4        Q.    Because you can't document it.               15:30:20

 5        A.    Never put --                                 15:30:21

 6        Q.    I think others will understand.              15:30:21

 7   Nonetheless, maybe I'm missing the point, but I         15:30:24

 8   don't think so.                                         15:30:26

 9             Let's go over -- the bottom line is you       15:30:26

10   had information from him on the 24th to suggest         15:30:27

11   that she was 35, and they got married when she was      15:30:29

12   28, right?                                              15:30:33

13        A.    I do see that, yes.                          15:30:35

14        Q.    Right.  Now, on the next email exchange      15:30:37

15   you write -- because you've asked him the question,     15:30:41

16   "Can we get a firm confirmation when they met --        15:30:56

17   that they met while she was a minor?"                   15:30:58

18             You see the question?                         15:31:00

19        A.    Looking for that.  Yes, I see that.          15:31:07

20        Q.    And then he writes back "Jim, I will         15:31:10

21   inquire and confirm.  We are working a number of        15:31:13

22   different inquiries, and I will have more               15:31:17

23   information over the weekend.  I am contactable any     15:31:18

24   time.  Regards, James."                                 15:31:21

25             Have I read that correctly?                   15:31:23
```

227

Exhibit 2
Page 235

```
 1        A.    Yes.                                        15:31:24

 2        Q.    And then what did you write him back and    15:31:25

 3   say on the 25th of August 24, or maybe the 24th,       15:31:26

 4   depending on the time frame -- I mean, the time        15:31:29

 5   zone.  What was your response?  Read it to me.         15:31:30

 6        A.    "Sounds good.  Also for successful          15:31:33

 7   confirmation of nefarious behavior, there is an        15:31:36

 8   additional 10K bonus.  Timing is important as you      15:31:37

 9   know.  Preferable in the next 36 to 48 hours."         15:31:41

10        Q.    Did Mr. Musk know that you were offering    15:31:47

11   a $10,000 bonus to Mr. Howard if he could confirm      15:31:47

12   nefarious behavior by Vernon Unsworth?                 15:31:52

13        A.    I'm not sure with certainty that he did.    15:31:56

14   It's possible, but --                                  15:31:58

15        Q.    Do you think it's likely that you would     15:31:59

16   have told him "I've thrown in a bonus to try to get    15:32:00

17   him to get this information and get it to us as         15:32:02

18   quickly as possible"?                                  15:32:05

19        A.    It's possible.                              15:32:05

20        Q.    Is it likely?                               15:32:05

21        A.    I mean, there are a lot of decisions that   15:32:06

22   I make on my own that don't fall --                    15:32:07

23        Q.    You've never done this before?             15:32:10

24        A.    Yes.  But there are one-off little parts    15:32:11

25   of, you know, negotiations and day-to-day business     15:32:14
```

228

Exhibit 2
Page 236

```
 1   routines that I don't bounce off him.              15:32:16

 2        Q.   Why would you give him a bonus?          15:32:20

 3        A.   Incentive.                               15:32:22

 4        Q.   Why would you just not pay him for --    15:32:23

 5        A.   Same reason an athlete gets a bonus.     15:32:24

 6        Q.   For -- well, for -- for producing        15:32:26

 7   results.  That's what they get a bonus for.        15:32:29

 8   Results beyond the ordinary, wouldn't you agree, so 15:32:32

 9   you get a bonus?                                   15:32:36

10        A.   Giving an extraordinary effort.          15:32:39

11        Q.   But you weren't saying give us an        15:32:40

12   extraordinary effort and we'll give you $10,000 -- 15:32:43

13        A.   That's a confirmation.                   15:32:47

14        Q.   You said confirmation.  You didn't say   15:32:48

15   get us the truth?                                  15:32:51

16        A.   That's what a confirmation is.           15:32:53

17        Q.   Confirmation of nefarious behavior?      15:32:55

18        A.   Confirmation is truth.                   15:32:58

19        Q.   You wanted nefarious behavior confirmed. 15:32:59

20   And if he could give you -- excuse me.             15:33:01

21             It's clear as a bell.  You're telling him 15:33:03

22   if you get confirmation of nefarious behavior by   15:33:07

23   Vernon Unsworth, there's another $10,000 in it for 15:33:12

24   you.                                               15:33:15

25        A.   That's exactly what I wrote.             15:33:15
```

229

Exhibit 2
Page 237

```
 1      Q.   Did you pay him the $10,000?          15:33:17
 2      A.   No, I didn't.                         15:33:19
 3      Q.   Because he didn't give you confirmation  15:33:20
 4   of nefarious behavior, did he?               15:33:24
 5      A.   Correct.                              15:33:26
 6      Q.   Sir, now, look up at Exhibit -- and   15:33:26
 7   hopefully we're moving to the point I was thought  15:33:28
 8   we'd get to earlier, but we'll get there.    15:33:34
 9      A.   Do you bonus people in your law firm?  15:33:37
10   You know why you do.                          15:33:53
11      Q.   Are you asking me questions?          15:33:54
12      A.   I am asking you questions.            15:33:55
13      Q.   When we're done with the deposition, I'm  15:33:55
14   going to give you a freebie, and I'm going to let  15:33:57
15   you ask me questions, but not during my time to  15:34:00
16   question you.  Fair enough?                   15:34:04
17      A.   Sure.                                 15:34:04
18      Q.   And I'll be happy to answer that question  15:34:04
19   for you.  You may not necessarily like it, but I'll  15:34:06
20   tell you what I give bonuses for.  It wouldn't be  15:34:09
21   for this kind of garbage.                     15:34:12
22      A.   Well, lawyers don't do this for a living.  15:34:14
23   That's what investigators do for a living.   15:34:15
24      Q.   You don't do this for a living, but you  15:34:17
25   took it upon yourself to throw out a $10,000 bonus  15:34:19
```

230

Exhibit 2
Page 238

```
 1        Q.   I'm going to give you the chance to grill      15:35:01
 2   me after we're done here.  I'm sure Alex wants it        15:35:04
 3   to stay with me asking you right now.                    15:35:07
 4             MR. SPIRO:  Well, it's coming off the          15:35:11
 5   tracks a little bit.                                     15:35:13
 6             MR. L. WOOD:  No, it's not.  It's              15:35:14
 7   staying -- let me tell you.  It's dead on the            15:35:14
 8   center of the tracks heading toward the courthouse.      15:35:15
 9             MR. SPIRO:  Okay.  So let's keep moving.       15:35:18
10   Question-answer, question-answer.                        15:35:20
11             MR. L. WOOD:  24.  73.                         15:35:22
12             (Exhibit 73 was marked for                     13:37:33
13             identification.)                               13:37:33
14   BY MR. L. WOOD:                                          15:36:07
15        Q.   Are you familiar with Exhibit 73?             15:36:07
16        A.   I am.                                          15:36:09
17        Q.   And that's a fairly lengthy email thread.     15:36:09
18   It starts on -- with an email dated September the        15:36:13
19   4th where he writes you and says "Jim, I appreciate      15:36:16
20   your need -- you need quick results.  I'm very           15:36:25
21   confident that we will get what we need from             15:36:29
22   Pattaya."                                                15:36:31
23             Have I read that correctly?                    15:36:31
24        A.   Yes.                                           15:36:33
25        Q.   So as of September 4th, he hadn't gotten       15:36:33
```

Exhibit 2
Page 239

1    that he thought he needed from Pattaya yet, right?        15:36:36

2         A.    That is correct.                                15:36:39

3         Q.    What was the -- what was the -- back to         15:36:40

4    your bonus offer, what was the time concern about          15:36:43

5    24 to 36 hours?  What was the urgency?                     15:36:46

6         A.    There's -- there's always a desire to get       15:36:53

7    information faster.  I mean, that's just a general         15:36:55

8    principal in Elon's world.                                 15:37:00

9         Q.    In Elon's world.  So Elon was the one           15:37:01

10   pushing for the urgency of results?                        15:37:03

11        A.    No.  That trickles down to every -- every       15:37:05

12   group that works for him.                                  15:37:07

13        Q.    Had Elon told you to tell this guy to           15:37:09

14   kind of hit the accelerator and get things done?          15:37:11

15        A.    I knew Elon's expectations in all things,       15:37:14

16   and therefore I was conveying what I felt needed to        15:37:16

17   be conveyed.                                               15:37:19

18        Q.    And then he says down there "We know            15:37:22

19   Vernon is a "bad boy," and we are close to having          15:37:23

20   the evidence we need."                                     15:37:30

21             Have I read that correctly?                      15:37:31

22        A.    Yes.                                            15:37:33

23        Q.    He still didn't have the evidence he            15:37:33

24   needed, did he?                                            15:37:36

25        A.    No.                                             15:37:38

233

Exhibit 2
Page 240

```
 1   history of not writing flattering pieces about him,   15:42:16

 2   didn't he?                                            15:42:20

 3        A.   I don't know about his history.            15:42:20

 4        Q.   You've never looked at Ryan Mac's history  15:42:22

 5   on Twitter when he's reporting about Mr. Musk?        15:42:23

 6        A.   No.                                         15:42:25

 7        Q.   Other than perhaps the article I gave you  15:42:26

 8   today from June of 2018?                              15:42:28

 9        A.   No.  I mean, have I ever read one of his   15:42:30

10   articles?  I probably have.  I just don't correlate  15:42:32

11   him as specifically an enemy of Elon.                 15:42:35

12        Q.   And here's what you said before the        15:42:38

13   self-sabotage:  "You have not reported this."         15:42:40

14             You are confirming the accuracy of         15:42:43

15   Mr. Howard's statement that he had never reported    15:42:47

16   that Mr. Unsworth was a child rapist, right?          15:42:52

17             You are saying to him, you have not        15:42:56

18   reported that to me, right?                           15:42:57

19        A.   He had not used that term, yes.            15:42:59

20        Q.   And then you made it clear that you had    15:43:01

21   not communicated it either, right?                    15:43:04

22        A.   Yes, I'd never --                           15:43:07

23        Q.   You had not communicated that to          15:43:07

24   Elon Musk, true?                                      15:43:09

25        A.   I'd never used that term "child rapist."   15:43:10
```

238

Exhibit 2
Page 241

```
 1      Q.   You'd never communicated to Elon Musk      15:43:13

 2   that Mr. Unsworth was a child rapist, true?        15:43:16

 3      A.   Never used that term.                       15:43:20

 4      Q.   So the answer is "Yes.  True, Mr. Wood"?   15:43:21

 5      A.   Yes.                                         15:43:22

 6      Q.   Right?  Okay, now, then you go back and     15:43:24

 7   you write another email.  See the one right above  15:43:33

 8   it, September 6?                                     15:43:38

 9      A.   I do see that, yes.                          15:43:40

10      Q.   You want to go back now and revisit the    15:43:42

11   discussion about the target, Mr. Unsworth, as a    15:43:44

12   child rapist, right?                                15:43:47

13      A.   Well, you said September 6th.  Are you     15:43:49

14   talking about September --                          15:43:51

15      Q.   Right here.                                 15:43:52

16      A.   Oh, yes.  I do see that.                    15:43:53

17      Q.   Bates 0370.                                 15:43:55

18      A.   Yes.                                        15:43:58

19      Q.   "Also, as you may expect, I have spent     15:43:59

20   over the last 24 hours -- I have spent time over   15:44:06

21   the last 24 hours compiling the information you've 15:44:07

22   provided," right?                                   15:44:11

23      A.   Yes.                                        15:44:15

24      Q.   "Not to be beat a dead horse, but to       15:44:15

25   briefly revisit the point below."                  15:44:19
```

239

Exhibit 2
Page 242

1          The point below being "child rapist,"          15:44:21

2     right?          15:44:24

3          A.     Yes.          15:44:25

4          Q.     You repeat "You never did report that the          15:44:25

5     target is a child rapist."          15:44:28

6               Have I read that correctly?          15:44:30

7          A.     Yep.          15:44:31

8          Q.     Now read the rest of your email for the          15:44:32

9     record for me, please.          15:44:35

10         A.     "However, you undoubtedly understand --          15:44:36

11         Q.     A little slower.          15:44:38

12         A.     "However, you undoubtedly understand          15:44:38

13     where the principal is drawing this conclusion          15:44:40

14     from.     You reported in multiple phone conversations          15:44:44

15     that the age of the target's girlfriend, believed          15:44:47

16     to be his wife at this time, would have put her in          15:44:48

17     her teens when they were married, and that she was          15:44:51

18     quoted in a Thai news article saying they first met          15:44:53

19     seven years prior to that, which would have made          15:44:56

20     her a very young teenager at the time.          15:44:58

21               "Some, all? of this information has now          15:45:01

22     been proven to be wrong.  Why -- I'm sorry -- they          15:45:03

23     aren't married, and her age is unconfirmed.  I also          15:45:06

24     haven't seen the Thai article that you referenced.          15:45:09

25               "So while I agree that the comments by          15:45:12

240

Exhibit 2
Page 243

1    the principal were ill-advised, you can understand       15:45:14

2    that using the data you provided would have allowed      15:45:17

3    him to draw this conclusion without you explicitly       15:45:20

4    reporting it as a fact."                                 15:45:24

5         Q.   Did you have conversations with Mr. Musk       15:45:26

6    that lead to you writing that email that you just        15:45:29

7    read to me?                                              15:45:32

8         A.   No.                                            15:45:34

9         Q.   So you are now trying to figure out where      15:45:34

10   in the hell did Elon Musk come with the idea that        15:45:37

11   he's a child rapist, right?                              15:45:40

12        A.   I'm trying to figure that out?                 15:45:42

13        Q.   Yeah.                                          15:45:42

14        A.   No.  I know why where he came -- came --       15:45:42

15   how he came -- like, again, as I stated there --         15:45:44

16        Q.   Keep going.                                    15:45:49

17        A.   He didn't use the words "child rapist."        15:45:50

18        Q.   Mr. Musk did.                                  15:45:52

19        A.   I'm saying -- sorry.  Howard did not use       15:45:53

20   the word "child rapist."                                 15:45:55

21        Q.   He didn't say anything close to it.            15:45:56

22             MR. SPIRO:  Let him finish.                    15:46:00

23             THE WITNESS:  However, he, on multiple         15:46:00

24   occasions, shared that he had met Tik as a young         15:46:02

25   teenager.  And -- and so what I was saying is,           15:46:06

241

Exhibit 2
Page 244

| | | |
|---|---|---|
| 1 | because of that information that was shared on | 15:46:09 |
| 2 | multiple occasions -- | 15:46:11 |
| 3 | BY MR. L. WOOD: | 15:46:13 |
| 4 | Q.   When he met her. | 15:46:13 |
| 5 | A.   That's -- that is what would have led | 15:46:14 |
| 6 | Mr. Musk to that conclusion, not to mention the | 15:46:16 |
| 7 | added information about Pattaya and everything | 15:46:20 |
| 8 | else.  And so that is where that conclusion came | 15:46:23 |
| 9 | from.  It's a term that he used to sum up what -- | 15:46:25 |
| 10 | Q.   Who used?  Mr. Musk? | 15:46:28 |
| 11 | A.   Mr. Musk used to sum up Howard's | 15:46:32 |
| 12 | information. | 15:46:35 |
| 13 | Q.   And part of that information you're | 15:46:35 |
| 14 | claiming is -- you're saying that you had provided | 15:46:37 |
| 15 | Mr. Musk with information from Mr. Howard that Tik | 15:47:07 |
| 16 | and Mr. Unsworth were married when Tik was in her | 15:47:15 |
| 17 | teens.  Not met.  Married, right? | 15:47:24 |
| 18 | A.   Yes. | 15:47:30 |
| 19 | Q.   So you're telling me that Mr. Howard told | 15:47:30 |
| 20 | you they were married when she was how old? | 15:47:33 |
| 21 | A.   18 or 19. | 15:47:37 |
| 22 | Q.   Not that they met when she was 18 or 19, | 15:47:38 |
| 23 | but that they were married when she was 18 or 19, | 15:47:40 |
| 24 | true? | 15:47:44 |
| 25 | A.   That's correct.  True. | 15:47:46 |

Exhibit 2
Page 245

| | | |
|---|---|---|
| 1 | Q.   Being married to an 18 or 19-year-old is | 15:47:47 |
| 2 | not a child.  She's not a child bride, is she? | 15:47:50 |
| 3 | A.   That's -- | 15:47:55 |
| 4 | Q.   She's certainly not a 12-year-old child | 15:47:55 |
| 5 | bride? | 15:47:58 |
| 6 | A.   That is true. | 15:47:58 |
| 7 | Q.   So that statement by Mr. Musk was false, | 15:47:59 |
| 8 | and had no factual foundation. | 15:48:02 |
| 9 | MR. SPIRO:  Objection. | 15:48:06 |
| 10 | BY MR. L. WOOD: | 15:48:06 |
| 11 | Q.   Nobody ever told him -- | 15:48:07 |
| 12 | MR. SPIRO:  Form. | 15:48:08 |
| 13 | Q.   Excuse me. | 15:48:08 |
| 14 | Nobody ever told him -- not you, not | 15:48:08 |
| 15 | Mr. Howard, nobody -- that in fact Tik and Vernon | 15:48:11 |
| 16 | were married when she was 12 years old, true? | 15:48:17 |
| 17 | A.   That is true. | 15:48:21 |
| 18 | Q.   In fact, if you work back under your | 15:48:27 |
| 19 | statement, if they got married when she was 18 or | 15:48:30 |
| 20 | 19 -- and that's what you were contending, right? | 15:48:39 |
| 21 | A.   Yep.  Yes. | 15:48:42 |
| 22 | Q.   That would not make him a child rapist, | 15:48:42 |
| 23 | because she would be over the age of consent. | 15:48:46 |
| 24 | A.   However, it was made clear that they met | 15:48:52 |
| 25 | seven years prior to -- | 15:48:55 |

243

Exhibit 2
Page 246

```
 1   BY MR. L. WOOD                                      15:49:55

 2        Q.   So if she's 18 or 19, and they are        15:49:55

 3   married -- which would assume sexual intercourse,   15:50:03

 4   right?                                              15:50:06

 5        A.   Most likely.                              15:50:06

 6        Q.   He's not -- she's not a 12-year-old child 15:50:10

 7   bride, true?                                        15:50:12

 8        A.   True.                                     15:50:12

 9        Q.   And that -- that fact of marriage at 18   15:50:12

10   does not in any way support that he was a child     15:50:16

11   rapist, true?                                       15:50:21

12        A.   Someone being married at 18 does not      15:50:23

13   suggest they are a child rapist in and of itself,   15:50:25

14   correct.                                            15:50:28

15        Q.   And if you go back and assume that she    15:50:28

16   was seven years -- that they had met seven years    15:50:33

17   before they were married at age 18 or 19, that      15:50:38

18   would be evidence that they met each other -- met   15:50:43

19   each other when she was 11 or 12 years old, true?   15:50:46

20        A.   True.                                     15:50:52

21        Q.   To meet someone is not to have sexual     15:50:52

22   intercourse with them, is it?                       15:50:55

23        A.   Not -- no.                                15:50:58

24        Q.   And to meet someone at 11 or 12 years old 15:51:00

25   does not support an accusation that having met her  15:51:04
```

246

Exhibit 2
Page 247

```
 1        A.    We're talking about child rapists.            15:52:14

 2        Q.    How do you -- how does the logic that you      15:52:14

 3   set out in any way support that Elon -- that --           15:52:14

 4        A.    Well, you're saying the logic --              15:52:21

 5        Q.    Excuse me.  I've got to finish.  No.          15:52:21

 6   You're trying to say what you thought might explain       15:52:21

 7   what Elon said and why he said it.                        15:52:26

 8             But you recognize that even your efforts        15:52:29

 9   to explain it do not in any way support Elon Musk's       15:52:30

10   statement that Vernon Unsworth had a 12-year-old          15:52:35

11   child bride and was a child rapist.                       15:52:41

12             Can we agree on that?                           15:52:43

13        A.    That's -- that's incorrect.  What I'm --       15:52:45

14   I wasn't, again, trying to create a court of law          15:52:47

15   argument there --                                         15:52:52

16        Q.    I'm not suggesting that.                       15:52:53

17        A.    I was trying to help James understand          15:52:54

18   clearly and recall that he was the source of all          15:52:58

19   information.                                              15:53:00

20             There was lot more information that what        15:53:00

21   I outlined here that allowed those conclusions to         15:53:01

22   be drawn.                                                 15:53:05

23        Q.    Well, here's the chance to say it.            15:53:05

24   You-all are in a discussion about whether or not          15:53:05

25   you said to Elon "Unsworth's a child rapist."  I          15:53:08
```

                                                              248

Exhibit 2
Page 248

```
 1   didn't say it.  You didn't tell him that.          15:53:14

 2            You didn't communicate to Elon Musk that  15:53:14

 3   Vernon Unsworth's a child rapist, right?            15:53:18

 4       A.   That's right.                              15:53:20

 5       Q.   And you didn't communicate to Elon Musk    15:53:21

 6   that Mr. Howard said that Vernon was a child        15:53:22

 7   rapist, did you?                                    15:53:25

 8       A.   No, I did not communicate that.            15:53:28

 9       Q.   And you didn't communicate to Elon Musk    15:53:30

10   that Vernon Unsworth married Tik when she was 12    15:53:33

11   years old, did you?                                 15:53:36

12       A.   No.                                        15:53:37

13       Q.   And Mr. Howard never communicated to you  15:53:37

14   at any time, that in fact, Tik and Vernon were      15:53:40

15   married when she was 12 years old, right?           15:53:45

16       A.   Correct.                                   15:53:48

17       Q.   Therefore you never communicated to        15:53:50

18   Mr. Musk any information, from Mr. Howard or        15:53:52

19   otherwise, that would in any way remotely support   15:53:57

20   the conclusion that Vernon and Tik were married     15:54:01

21   when she was 12 years old, and that Vernon Unsworth 15:54:04

22   a child rapist, true?                               15:54:08

23            MR. SPIRO:  Objection.                     15:54:10

24            THE WITNESS:  I disagree with that.        15:54:10

25   ///
```

249

Exhibit 2
Page 249

```
 1   BY MR. L. WOOD:                                         15:54:12

 2        Q.   Where -- I want to make sure I               15:54:12

 3   understand.  Where do you disagree?                    15:54:13

 4        A.   So I --                                      15:54:14

 5        Q.   Where does it break down there?              15:54:14

 6        A.   So I -- I -- I would -- there is some        15:54:17

 7   support for the first half of that statement --        15:54:18

 8        Q.   What support?                                15:54:20

 9        A.   -- about the child bride.                    15:54:20

10        Q.   What support?                                15:54:22

11        A.   What you just outlined would support not     15:54:25

12   being a child bride by --                              15:54:27

13        Q.   12-year-old child bride.                     15:54:29

14        A.   Exactly.  So that's what I'm saying.         15:54:31

15   You're correct in that regard.  Some would say that    15:54:33

16   an 18-year-old is a child bride, but that's            15:54:35

17   obviously by definition of the law.  Not the case      15:54:37

18   in Thailand, however --                                15:54:38

19        Q.   I don't think it's the definition of the     15:54:41

20   law in the United States.                              15:54:42

21             MR. SPIRO:  We're not going to submit to     15:54:44

22   an argument about --                                   15:54:44

23             MR. L. WOOD:  Well, he's the one that        15:54:45

24   said it.  I'm just saying it for him.                  15:54:45

25             THE WITNESS:  I'm just saying that some      15:54:47
```

```
 1   would say that that's a child getting married.        15:54:47

 2              MR. L. WOOD:  He's struggling here.  Be     15:54:49

 3   careful.  I mean --                                    15:54:49

 4              MR. SPIRO:  Lin.  Lin.  Objection.          15:54:50

 5              THE WITNESS:  I'm stating --                15:54:51

 6              MR. L. WOOD:  You're trying to justify --   15:54:51

 7              THE WITNESS:  No, I'm not trying to         15:54:53

 8   justify anything.                                      15:54:54

 9   BY MR. L. WOOD:                                        15:54:54

10        Q.    All I want to know is where is my logic     15:54:54

11   wrong?  Where did Elon Musk --                         15:54:55

12        A.    I just finished saying your logic wasn't    15:54:59

13   wrong.                                                 15:55:01

14        Q.    Well, maybe I didn't hear you.              15:55:01

15        A.    About the child bride.                      15:55:01

16              MR. SPIRO:  That's what he just said.       15:55:01

17              MR. L. WOOD:  He said what?                 15:55:02

18              THE WITNESS:  The child bride logic was     15:55:02

19   not wrong.                                             15:55:04

20   BY MR. L. WOOD:                                        15:55:06

21        Q.    Right.  But how do you make it right --     15:55:06

22        A.    I'm saying the child rapist side of it is  15:55:08

23   incorrect.  That there was a lot of information        15:55:10

24   that would have led one to draw that conclusion.       15:55:12

25        Q.    What information?                           15:55:15
```

251

Exhibit 2
Page 251

```
1              MR. SPIRO:  This has been asked and          15:55:17

2    answered two times.                                    15:55:18

3              MR. L. WOOD:  No, it has not.                15:55:20

4              MR. SPIRO:  Yes, it has been.                15:55:20

5              MR. L. WOOD:  This is the first time I've    15:55:20

6    asked him.                                             15:55:21

7              He's sitting -- you're sitting here          15:55:21

8    having an exchange with Mr. Howard, and you are        15:55:21

9    discussing the statement by Elon Musk that             15:55:26

10   Vernon Unsworth was a child rapist, right?             15:55:32

11             THE WITNESS:  Yes.                           15:55:36

12   BY MR. L. WOOD:                                        15:55:37

13        Q.   And you write Mr. Howard, and he writes      15:55:37

14   you.  And you say "I never told Elon that Unsworth     15:55:42

15   was a child rapist."  And Howard said "I didn't        15:55:49

16   tell anybody that -- I never told you that             15:55:55

17   Vernon Unsworth was a child rapist," right?            15:55:57

18             So what I -- am I right so far?              15:56:00

19        A.   Yes, that term was never used.               15:56:03

20        Q.   That's what he said to a member of the       15:56:06

21   United States media, that Vernon Unsworth was a        15:56:07

22   child rapist.                                          15:56:12

23             What do you understand a child rapist to     15:56:13

24   refer to?                                              15:56:19

25        A.   Someone who has sex with a child.            15:56:21
```

                                                            252

Exhibit 2
Page 252

```
1        Q.   Defining a child as being at what age?    15:56:23

2        A.   Oh, from what I understand it differs in  15:56:26

3    different countries, but --                         15:56:28

4        Q.   In the U.S. of A?                          15:56:31

5        A.   Under 18 years.  Is that wrong?            15:56:33

6        Q.   So where do you come up with any support  15:56:39

7    for Elon Musk making the outrageous and disgusting 15:56:44

8    accusation that Mr. Unsworth was a child rapist?   15:56:49

9        A.   I come up with --                          15:56:54

10            MR. SPIRO:  Objection.                     15:56:56

11            You -- can answer.  You know, I'm going    15:56:56

12   to object to continued theatrics.  He's answered   15:56:56

13   this question 20 times.                             15:57:00

14            MR. L. WOOD:  There's no theatrics.        15:57:00

15            MR. SPIRO:  Twenty times, but you can      15:57:02

16   answer the question.                                15:57:02

17            MR. L. WOOD:  I thought you liked to say   15:57:02

18   50 times.                                           15:57:05

19            MR. SPIRO:  No.  This is wasn't 50 times.  15:57:07

20            MR. L. WOOD:  Listen, you want to get      15:57:07

21   done, you better -- you better get to it.           15:57:07

22            MR. SPIRO:  So let's do it one more time.  15:57:10

23            Answer the question of what you think the  15:57:11

24   basis was for him to say that.                      15:57:13

25            MR. L. WOOD:  I didn't ask him that        15:57:14
```

253

Exhibit 2
Page 253

```
1    question.  Hold on.  I want to make where --      15:57:17
2              MR. SPIRO:  Do you find any support?  Any  15:57:19
3    support.                                           15:57:19
4              MR. L. WOOD:  Let me just stop you.       15:57:19
5              MR. SPIRO:  Yeah.                          15:57:21
6              MR. L. WOOD:  It is not your turn.        15:57:21
7              MR. SPIRO:  Okay.  I don't need --         15:57:23
8              MR. L. WOOD:  You make objections.  And   15:57:24
9    I'll ask the questions.                            15:57:25
10             MR. SPIRO:  I'm looking at the question   15:57:26
11   you wrote.                                          15:57:26
12             MR. L. WOOD:  Right.  That's my job, not  15:57:26
13   yours.                                              15:57:29
14   BY MR. L. WOOD:                                     15:57:29
15      Q.    I want to find where you got any           15:57:29
16   information, what information it was, that would    15:57:34
17   have in any way supported as true that              15:57:38
18   Vernon Unsworth was a child rapist.                 15:57:44
19             Just tell me what it is.                  15:57:47
20      A.    Yeah.  So if you go back and read a        15:57:52
21   number of things that -- that Howard wrote, and if  15:57:54
22   you knew all of what was said and what was          15:57:58
23   communicated, you would know that we had an         15:58:00
24   investigator telling us that -- that he spent -- or 15:58:03
25   that he met a young Thai girl in a -- in Thailand,  15:58:06
```

254

Exhibit 2
Page 254

| | | |
|---|---|---|
| 1 | known for what it's -- you know, for pedophilia and | 15:58:11 |
| 2 | all that stuff, that he spent time with her as a | 15:58:16 |
| 3 | young girl, and that he had frequented other | 15:58:21 |
| 4 | establishments in Pattaya that were known for those | 15:58:23 |
| 5 | same things. | 15:58:27 |
| 6 | And so there was -- those were -- those | 15:58:27 |
| 7 | are some of the few reasons that would have caused | 15:58:29 |
| 8 | that conclusion to be drawn.  So that -- | 15:58:34 |
| 9 | Q.   I'm still trying to look for child | 15:58:38 |
| 10 | rapist.  Number one, rape would assume that he | 15:58:41 |
| 11 | forced -- that he, because of her age, he would | 15:58:44 |
| 12 | have to have sexual intercourse or anal intercourse | 15:58:47 |
| 13 | or sodomy.  That would be the rape, right? | 15:58:50 |
| 14 | A.   Yes. | 15:58:55 |
| 15 | MR. SPIRO:  You're defining the term as | 15:58:57 |
| 16 | you're -- as you're going.  How -- | 15:59:01 |
| 17 | MR. L. WOOD:  Why don't you just object | 15:59:03 |
| 18 | and stop -- you know.  I don't mind you keeping | 15:59:03 |
| 19 | laughing; that doesn't matter to me. | 15:59:05 |
| 20 | MR. SPIRO:  I'm not laughing.  I'm | 15:59:07 |
| 21 | just -- it's a gasp. | 15:59:07 |
| 22 | MR. L. WOOD:  Do that in front of the | 15:59:07 |
| 23 | jury.  Do that in front of the judge. | 15:59:09 |
| 24 | It's a what? | 15:59:10 |
| 25 | MR. SPIRO:  It is a gasp; it's not a | 15:59:11 |

255

Exhibit 2
Page 255

```
 1   laugh.                                                15:59:12

 2           MR. L. WOOD:  Oh, I know the difference        15:59:15

 3   between a gasp --                                      15:59:15

 4           MR. SPIRO:  You should.                        15:59:15

 5           MR. L. WOOD:  I would be gasping a lot if      15:59:15

 6   I were you today.  You too.  Let's ask questions       15:59:17

 7   and get answers.                                       15:59:17

 8           MR. SPIRO:  Go ahead.  Ask the questions.      15:59:18

 9   BY MR. L. WOOD:                                        15:59:18

10       Q.   Mr. -- Mr. Birchall, I'm still not            15:59:18

11   getting it.                                            15:59:23

12       A.   Okay.                                         15:59:24

13       Q.   I'm looking for support on information        15:59:24

14   that you got from Mr. Howard that could in some way    15:59:27

15   be analyzed by Elon Musk to come to the conclusion     15:59:33

16   that he had been told as a fact that                   15:59:38

17   Vernon Unsworth was a child rapist?                    15:59:41

18       A.   So I don't know if you want me to keep        15:59:46

19   repeating what I've said previously.                   15:59:47

20       Q.   I just want you to tell me.  I haven't        15:59:50

21   heard an answer yet to child rapist.  I've heard --    15:59:50

22   here's what you told me.                               15:59:52

23           That an investigator tells that he met a       15:59:54

24   young Thai girl in Thailand.                           15:59:58

25           That would be Tik?                             15:59:59
```

Exhibit 2
Page 256

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 16:00:01 |
| 2 | Q. | And the investigator is telling you | 16:00:02 |
| 3 | | different things about the time and her age when | 16:00:05 |
| 4 | | they met? | 16:00:09 |
| 5 | A. | In a region known for this behavior. | 16:00:10 |
| 6 | Q. | Sir.  Pedophilia is not necessarily -- | 16:00:13 |
| 7 | A. | You asked the question.  I'm telling you. | 16:00:16 |
| 8 | Q. | You are saying Thailand is known for | 16:00:17 |
| 9 | | child rape? | 16:00:20 |
| 10 | A. | Yes. | 16:00:24 |
| 11 | Q. | So you got Mr. Unsworth meeting a young | 16:00:25 |
| 12 | | Thai girl in Thailand. | 16:00:28 |
| 13 | | How is she when they met? | 16:00:28 |
| 14 | A. | I mean, at times we believed around 12 | 16:00:30 |
| 15 | | years old. | 16:00:35 |
| 16 | Q. | There were more statements that she was | 16:00:37 |
| 17 | | 18 to 19, based on the age of 30. | 16:00:38 |
| 18 | A. | Written statements. | 16:00:41 |
| 19 | Q. | Yeah, but he was going back and forth | 16:00:42 |
| 20 | | with you.  He would say 18 or 19 at one point. | 16:00:43 |
| 21 | | Then he would tell you 12 at one point.  Then he | 16:00:46 |
| 22 | | would go 18 or 19 at one point.  And then he would | 16:00:47 |
| 23 | | go to 12 at one point. | 16:00:50 |
| 24 | | Is that the way it happened? | 16:00:52 |
| 25 | A. | Yes.  Not exactly that sequence, but -- | 16:00:53 |

257

Exhibit 2
Page 257

| | | |
|---|---|---|
| 1 | Q. But like that. He was going back and | 16:00:56 |
| 2 | forth between 12 and 18 and 19, right? | 16:00:57 |
| 3 | A. There was some back and forth. | 16:01:01 |
| 4 | Q. And you told Mr. Musk there was | 16:01:02 |
| 5 | discrepancies and there was back and forth and it | 16:01:03 |
| 6 | was not the same, true? | 16:01:05 |
| 7 | A. Yes. I communicated what was | 16:01:07 |
| 8 | communicated to me. | 16:01:09 |
| 9 | Q. Right. Prior to when he made the | 16:01:13 |
| 10 | statement about him being a child rapist, right? | 16:01:15 |
| 11 | A. Prior. So that would have been prior | 16:01:20 |
| 12 | to -- | 16:01:22 |
| 13 | Q. Prior to August the 30th. | 16:01:22 |
| 14 | A. There was vacillation by Howard prior | 16:01:25 |
| 15 | to -- to August 30th, though he had stuck to his | 16:01:28 |
| 16 | guns that his belief was that it was the younger | 16:01:36 |
| 17 | age. | 16:01:40 |
| 18 | Q. The last communications he had, sir, put | 16:01:43 |
| 19 | her at best 18 or 19, based on the age of Tik being | 16:01:46 |
| 20 | either 30 -- there was another one at 35. | 16:01:49 |
| 21 | A. Yeah, that's written communication. | 16:01:54 |
| 22 | Q. I understand that. But you told Elon I'm | 16:01:54 |
| 23 | getting mixed signals here. He's telling me 12. | 16:01:58 |
| 24 | Now he's written me and saying 18 or 19. You know | 16:01:59 |
| 25 | Mr. Musk about the problem, didn't you? | 16:02:03 |

258

Exhibit 2
Page 258

| | | | |
|---|---|---|---|
| 1 | A. | I would have communicated everything | 16:02:08 |
| 2 | communicated to me, yes. | | 16:02:09 |
| 3 | Q. | You would have told him about that age | 16:02:09 |
| 4 | problem about when they met or when they got | | 16:02:11 |
| 5 | married before August the 30th when he wrote that | | 16:02:12 |
| 6 | email to Ryan Mac, true? | | 16:02:14 |
| 7 | A. | Again, I would have communicated all | 16:02:17 |
| 8 | information.  To me -- and so I didn't single out | | 16:02:18 |
| 9 | that as an individual issue, but it would have been | | 16:02:25 |
| 10 | included in information that I shared. | | 16:02:28 |
| 11 | Q. | Prior to August the 30th when he wrote | 16:02:31 |
| 12 | and said he was a child rapist. | | 16:02:32 |
| 13 | A.  I mean, again, if you're suggesting that | | 16:02:36 |
| 14 | I shared the report that was provided -- | | 16:02:39 |
| 15 | Q.  No, I'm not. | | 16:02:40 |
| 16 | A.  -- I don't know -- | | 16:02:40 |
| 17 | Q.  No, no -- | | 16:02:42 |
| 18 | A.  I don't know that that -- | | 16:02:43 |
| 19 | Q. | I don't know if you did or not.  You | 16:02:44 |
| 20 | don't -- you haven't told me that you did, but what | | 16:02:45 |
| 21 | you have told me is that you told Elon Musk before | | 16:02:48 |
| 22 | August the 30th -- | | 16:02:51 |
| 23 | A. | There was some vacillation. | 16:02:52 |
| 24 | Q. | -- that you were getting 12, and you were | 16:02:52 |
| 25 | getting 18 or 19, and her date -- her age had not | | 16:02:55 |

259

Exhibit 2
Page 259

| | | |
|---|---|---|
| 1 | been verified.  You told that to Elon -- | 16:02:58 |
| 2 | A.   There was some truth -- | 16:02:58 |
| 3 | Q.   Excuse me.  You told that to Elon Musk | 16:02:58 |
| 4 | before he wrote BuzzFeed on the 30th of August, | 16:03:03 |
| 5 | true? | 16:03:05 |
| 6 | A.   Yes. | 16:03:05 |
| 7 | Q.   All right.  Now, I want to go back and | 16:03:07 |
| 8 | finish up where I was. | 16:03:09 |
| 9 | So you write Mr. Howard, and you give him | 16:03:10 |
| 10 | this -- we're still looking at Exhibit 73, okay. | 16:03:23 |
| 11 | He writes you back.  Same day, right? | 16:03:27 |
| 12 | Starts off "Jim, just to clarify the point you | 16:03:46 |
| 13 | made." | 16:03:51 |
| 14 | You with me? | 16:03:51 |
| 15 | A.   I am. | 16:03:54 |
| 16 | Q.   Now he's giving you -- there's no | 16:03:55 |
| 17 | lawsuit.  Nobody's cross-examining anybody.  He | 16:03:57 |
| 18 | says to you "Just to clarify the points you made. | 16:04:02 |
| 19 | The investigation team in Chiang Rai was able to | 16:04:05 |
| 20 | establish a number of important information." | 16:04:13 |
| 21 | Have I read that correctly? | 16:04:14 |
| 22 | A.   Yes. | 16:04:16 |
| 23 | Q.   Now read the next part for me that he | 16:04:16 |
| 24 | wrote to you. | 16:04:18 |
| 25 | A.   "I made the assumption based on what was | 16:04:18 |

260

Exhibit 2
Page 260

```
 1    reported back to me that if her age is in fact 30      16:04:21

 2    and not 40, that she has been married, not legally,    16:04:25

 3    but in a religious context, for seven years.           16:04:27

 4            "Plus we also know that she was dating          16:04:31

 5    Unsworth for at least a further three years prior      16:04:33

 6    to this.  Then she would have been in her late         16:04:36

 7    teenage years when they met.  I believe I told you     16:04:39

 8    that I thought this would have been about 19.          16:04:42

 9    There's a big difference between 19 and 29, I          16:04:44

10    agree, and even bigger leap to being a child          16:04:49

11    rapist.                                                16:04:52

12            "I don't know how anyone could come to         16:04:52

13    that conclusion, as neither of us have ever           16:04:55

14    mentioned child, children, or rape in our             16:04:57

15    conversations."                                        16:04:59

16        Q.   That's good.  Is that true that neither       16:05:00

17    one of you had ever mentioned children or rape in     16:05:02

18    your conversations?                                    16:05:05

19            MR. SPIRO:  Objection; asked and answered      16:05:05

20    many times.                                            16:05:06

21            THE WITNESS:  Yeah.                            16:05:07

22            MR. L. WOOD:  I just -- answer my              16:05:07

23    question, sir.                                         16:05:07

24            THE WITNESS:  To say children or -- child     16:05:07

25    rapist was not mentioned in our conversations.        16:05:13
```

261

Exhibit 2
Page 261

```
 1   BY MR. L. WOOD:                                    16:05:15

 2        Q.   Exhibit 73, is it a true, accurate, and  16:05:15

 3   correct copy of the email exchange that you had    16:05:17

 4   with Mr. Howard, starting on the email of          16:05:20

 5   September the 4th, ending with the last email --   16:05:27

 6   September 18th.                                     16:05:31

 7        A.   I believe so.                             16:05:32

 8        Q.   Is that a true and correct copy of the   16:05:32

 9   email thread between the two of you?               16:05:34

10        A.   I believe so.                             16:05:39

11             MR. L. WOOD:  Let's take a break.         16:05:39

12             THE VIDEOGRAPHER:  Going off the record   16:05:40

13   at 4:04 p.m.                                        16:05:41

14             (Recess taken.)                           16:16:24

15             THE VIDEOGRAPHER:  And we're back on the  16:16:25

16   record at 4:15 p.m.                                 16:16:34

17   BY MR. L. WOOD:                                     16:16:56

18        Q.   Mr. Birchall, after you received the     16:16:56

19   email that we just went over from Mr. Howard, okay, 16:17:00

20   that's at 0369 of Exhibit 73?                       16:17:02

21        A.   Yeah.                                     16:17:12

22        Q.   You wrote him back, did you not?          16:17:12

23        A.   I believe so, but I'll confirm that in a  16:17:14

24   second.  Yeah, I'm looking -- I'm sorry.  So what   16:17:16

25   was the date that you are referring to              16:17:26
```

                                                    262

Exhibit 2
Page 262

```
 1   specifically?                                    16:17:28

 2        Q.    September 6.  Bates 00368.            16:17:30

 3        A.    Yes, I'm looking at that.             16:17:33

 4        Q.    Second paragraph, you say "Regarding your    16:17:34

 5   follow-up comment.  We were told numerous times  16:17:37

 6   that they were married or formed a relationship in    16:17:41

 7   her late teens (you said 18), but that she was   16:17:45

 8   quoted in a newspaper saying they met seven years    16:17:51

 9   prior."                                          16:17:56

10            Have I read that correctly?             16:17:56

11        A.    Yes.                                   16:17:58

12        Q.    So you were saying that when there was    16:17:58

13   vacillation about her age, that you had been told    16:18:00

14   by Mr. Howard that Vernon and Tik were married or    16:18:04

15   formed a relationship, I guess similar to marriage,    16:18:12

16   at her -- at the age of 18, true?               16:18:18

17        A.    True.                                  16:18:23

18        Q.    And you never got any information to    16:18:28

19   suggest that he married her or formed a          16:18:30

20   relationship with her earlier than her age being    16:18:33

21   18, true?                                        16:18:37

22            MR. SPIRO:  Objection to form.  Formed a    16:18:38

23   relationship with whom?                          16:18:41

24   BY MR. L. WOOD:                                  16:18:42

25        Q.   Is that right, sir?                    16:18:42
```

263

Exhibit 2
Page 263

| | | | |
|---|---|---|---|
| 1 | A. | I believe so. | 16:18:44 |
| 2 | Q. | Yeah. | 16:18:46 |
| 3 | A. | I thought so. | 16:18:46 |
| 4 | Q. | I want to get these.  So -- just so that | 16:18:47 |

5    I have covered my bases, Exhibit 73 is a true and    16:19:06

6    correct and accurate copy of the email exchanges    16:19:13

7    between you and Mr. Howard as reflected thereon,    16:19:15

8    true?    16:19:18

9        A.   True.    16:19:19

10        Q.   Exhibit 72 is a true and correct copy and    16:19:21

11    accurate of the email exchanges contained therein    16:19:23

12    between you and Mr. Howard, right?    16:19:29

13        A.   Yes.  I mean, I haven't inspected every    16:19:30

14    word, but I believe so, yeah.    16:19:33

15        Q.   Is there any doubt?    16:19:33

16        A.   Well, I mean, we don't have time for me    16:19:35

17    to inspect every word.    16:19:37

18        Q.   Well --    16:19:37

19        A.   Yes.  I believe that, yes.    16:19:37

20            MR. L. WOOD:  You may be able to help him    16:19:39

21    by stipulating.    16:19:41

22            MR. SPIRO:  Yeah, we --    16:19:44

23            MR. L. WOOD:  Can we just go through --    16:19:44

24            MR. SPIRO:  The documents --    16:19:45

25            MR. L. WOOD:  -- and stipulate --    16:19:45

Exhibit 2
Page 264

| | | |
|---|---|---|
| 1 | report. | 16:26:16 |
| 2 | A.   Yeah, again, I -- | 16:26:17 |
| 3 | Q.   The truth of the matter is when you wrote | 16:26:19 |
| 4 | him back on October 17th, you didn't want any more | 16:26:20 |
| 5 | reports from him.  You were done with him? | 16:26:22 |
| 6 | A.   Basically, yes. | 16:26:24 |
| 7 | Q.   Had not gotten -- he had not earned his | 16:26:26 |
| 8 | bonus, and his information, as you said on 10/2, | 16:26:29 |
| 9 | had not ever been verified. | 16:26:31 |
| 10 | You've given me absolutely nothing | 16:26:34 |
| 11 | verified.  True? | 16:26:38 |
| 12 | A.   True. | 16:26:41 |
| 13 | Q.   One last thing.  The -- I know we talked | 16:26:42 |
| 14 | about and you mentioned -- did you ever talk with | 16:26:47 |
| 15 | Mr. Musk about his email to Ryan Mac of August the | 16:27:37 |
| 16 | 30th?  The one you said earlier had titled at the | 16:27:40 |
| 17 | top "Off the record"? | 16:27:45 |
| 18 | A.   Yes.  I believe at some point we had a | 16:27:46 |
| 19 | conversation. | 16:27:49 |
| 20 | Q.   What did he tell you? | 16:27:50 |
| 21 | A.   I mean, again, I wasn't in that, like, | 16:27:51 |
| 22 | what you'd call this kind of crises room or | 16:27:53 |
| 23 | whatever to deal with any of the aftermath of that, | 16:27:56 |
| 24 | so I can't -- I think it was a comment made | 16:28:02 |
| 25 | probably in the week or two after in one of our | 16:28:06 |

271

Exhibit 2
Page 265

```
1    know.                                              16:29:05

2    BY MR. L. WOOD:                                    16:29:05

3         Q.   Well, strike that.  Withdraw that.       16:29:05

4              The Ryan Mac email fell within the exact 16:29:07

5    time frame of when you and Mr. Howard were seeking 16:29:11

6    to get information, negative information, published 16:29:16

7    about Vernon Unsworth, true?                       16:29:19

8         A.   If you say so, yes.                       16:29:24

9         Q.   I don't want to do that.                  16:29:26

10             MR. SPIRO:  We can stipulate to the       16:29:26

11   dates.                                             16:29:28

12   BY MR. L. WOOD:                                    16:29:28

13        Q.   We went over your text messages, and it  16:29:28

14   was the 28th.                                      16:29:31

15        A.   Yeah, I'm --                              16:29:31

16        Q.   Yeah.  The Ryan Mac email fell square     16:29:31

17   into the time period when you and Mr. Musk had     16:29:34

18   agreed --                                          16:29:36

19        A.   Got it.                                   16:29:37

20        Q.   -- for Howard to try to get negative     16:29:38

21   information about Vernon published in the media    16:29:40

22   without any disclosure that it was coming from     16:29:45

23   Elon Musk or one of his investigators, true?       16:29:47

24        A.   True.                                     16:29:56

25        Q.   Okay.                                     16:29:56
```

273

Exhibit 2
Page 266

# EXHIBIT 3

# EXHIBIT 3

Exhibit 3
Page 267

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

5    VERNON UNSWORTH,

6          Plaintiff,

7          vs.                    Case No. 2:18-cv-8048

8    ELON MUSK,

9          Defendant.

10   _____

11       VIDEOTAPED DEPOSITION OF VERNON UNSWORTH

12            BEVERLY HILLS, CALIFORNIA

13               AUGUST 14, 2019

14

15

16

17

18

19   Reported By:
     PATRICIA Y. SCHULER
20   CSR No. 11949

21   Job No. 41370

22

23

24

25

                                                    1

Exhibit 3
Page 268

| | | | |
|---|---|---|---|
| 1 | A. | No. | 10:08:29 |
| 2 | Q. | Now, when did you meet Tik? | 10:08:32 |
| 3 | A. | I met Tik on -- in February 2011. | 10:08:39 |
| 4 | Q. | How old were you in February of 2011? | 10:08:48 |
| 5 | A. | I would be roughly -- trying to think | 10:08:51 |
| 6 | | back.  56, 57. | 10:08:56 |
| 7 | Q. | And how old was Tik when you met her? | 10:08:59 |
| 8 | A. | Approximately 32. | 10:09:05 |

```
 9        Q.   So if I am doing my math right, you're      10:09:08

10   approximately 24 years older than Tik; is that        10:09:11

11   correct?                                               10:09:14

12        A.   Yes.                                         10:09:17

13        Q.   And how old was your daughter, Danielle,     10:09:19

14   when you began living with Tik?                        10:09:22

15             MR. WOOD:  Have you asked had him when he    10:09:30

16   began living with Tik?  I missed that.                 10:09:32

17   BY MR. SCHWARTZ:                                       10:09:34

18        Q.   Well, let's do that.  When did you begin     10:09:35

19   living with Tik?                                       10:09:35

20        A.   On a more sort of permanent basis, after    10:09:42

21   we separated.                                          10:09:44

22        Q.   What year was that?                          10:09:45

23        A.   That was March 22, 2013.                     10:09:46

24        Q.   How old was your daughter, Danielle, when   10:09:54

25   you began living with Tik on a more permanent basis    10:09:58
```

69

Exhibit 3
Page 269

```
 1   in March 2013?                              10:10:00
 2        A.   She would be nearly 18.           10:10:03
 3        Q.   How did you and Tik meet?         10:10:08
 4        A.   We met in a coffee shop in London.  10:10:11
 5        Q.   And how did it come about that you  10:10:14
 6   actually started talking to one another?  Did  10:10:16
 7   someone -- this wasn't a blind date, I assume.  You  10:10:19
 8   met her for the first time in that coffee shop?  10:10:21
 9             MR. WOOD:  Objection to the form of the  10:10:25
10   question.                                    10:10:26
11   BY MR. SCHWARTZ:                             10:10:27
12        Q.   I'll withdraw it.  Let's just ask one  10:10:27
13   question at a time.                          10:10:27
14             Just tell me:  What were the      10:10:28
15   circumstances under which you met Tik?      10:10:30
16        A.   I was in a coffee shop, having had a  10:10:31
17   business meeting.  And she was in the same coffee  10:10:31
18   shop on another table, and I asked her to join me.  10:10:37
19        Q.   What caused you to want to ask a woman  10:10:50
20   you had not met before in a coffee shop to join  10:10:53
21   you?                                         10:10:56
22        A.   I can't really recall exactly how it  10:10:59
23   happened, but just something that, spur of the  10:11:01
24   moment, she looked up and she was on her own.  I  10:11:07
25   was on my own.  I was having a coffee.  She was  10:11:10
```

70

Exhibit 3
Page 270

```
 1    came with you this time or that time?              10:16:09

 2         A.   Because I was being honored at Buckingham  10:16:12

 3    Palace to receive my MBE.                           10:16:17

 4         Q.   Does Tik have any children?               10:16:27

 5         A.   She has a daughter called Panisa who is,  10:16:28

 6    I think she's either -- she is 13 or 14.  I am not  10:16:32

 7    sure of her exact age.                              10:16:37

 8         Q.   She is not your daughter?                 10:16:39

 9         A.   She is not my daughter, no.               10:16:40

10         Q.   You are not legally married to Tik, are   10:16:47

11    you?                                                10:16:49

12         A.   No, we are not married.                   10:16:49

13         Q.   Have you ever had any kind of a           10:16:51

14    commitment ceremony or some other religious         10:16:53

15    ceremony to consummate or memorialize in some       10:16:56

16    fashion your relationship with Tik?                 10:17:02

17         A.   No.                                       10:17:04

18         Q.   All right.  Had you ever been to Thailand 10:17:05

19    before you met Tik?                                 10:17:17

20         A.   No.                                       10:17:18

21         Q.   Your first trip to Thailand was in 2011,  10:17:27

22    correct?                                            10:17:31

23         A.   July 2011.                                10:17:32

24         Q.   Why did you go to Thailand your first     10:17:33

25    trip there?  Why did you go there?                  10:17:36
```

                                                               75

Exhibit 3
Page 271

```
 1        A.   Because Tik was on a six-month visa.  Her     10:17:40

 2   visa was ending, so I decided to go back with her        10:17:43

 3   in July 2011.                                            10:17:47

 4        Q.   And when you went back to Thailand --          10:17:48

 5   strike that.                                             10:17:50

 6             How many times have you been to Thailand       10:17:55

 7   since 2011?                                              10:17:57

 8        A.   I don't recall how many times; I can't         10:18:00

 9   put a number on it.                                      10:18:07

10        Q.   Before the cave rescue, had anybody ever       10:18:15

11   asked you why you spent so much time in Thailand?        10:18:18

12        A.   No.                                            10:18:22

13        Q.   So people were never curious why you were      10:18:23

14   spending time in Thailand or why you were going          10:18:30

15   there so often?                                          10:18:32

16        A.   No.                                            10:18:35

17        Q.   I believe you said yes, but maybe I            10:18:38

18   misheard you.                                            10:18:40

19             Have you ever been to Soi Su Nee,              10:18:41

20   Thailand?                                                10:18:43

21             MR. WOOD:  I don't remember that.              10:18:45

22   BY MR. SCHWARTZ:                                         10:18:45

23        Q.   I'll spell it.  It's three words:  S-o-i,      10:18:47

24   S-u, N-e-e.                                              10:18:47

25        A.   Soi?                                           10:18:54
```

76

Exhibit 3
Page 272

```
 1        Q.   Soi Su Nee.                            10:18:55

 2        A.   No.                                    10:18:57

 3        Q.   Have you ever been to Pattaya, Thailand,  10:19:10

 4   or Pattaya Beach?                                10:19:12

 5             MR. WOOD:  Which one do you want him to  10:19:15

 6   answer?                                          10:19:16

 7   BY MR. SCHWARTZ                                  10:19:16

 8        Q.   Are those two different places?        10:19:16

 9        A.   Yes.                                   10:19:20

10        Q.   Let's talk about Pattaya, P-a-t-t-a-y-a,  10:19:21

11   Thailand.                                        10:19:22

12             Have you ever been there?              10:19:26

13        A.   No.                                    10:19:27

14        Q.   Have you been to the Su Nee Plaza in    10:19:29

15   Pattaya?                                         10:19:31

16        A.   No.                                    10:19:33

17        Q.   Strike the "in Pattaya," but have you   10:19:34

18   ever been to Su Nee Plaza?                       10:19:35

19        A.   No.                                    10:19:37

20        Q.   Have you ever been to the Penthouse     10:19:38

21   Hotel?                                           10:19:40

22        A.   Where?                                 10:19:43

23        Q.   In Thailand.                           10:19:43

24        A.   No.                                    10:19:45

25             MR. WOOD:  Is that the one with the     10:19:46
```

77

Exhibit 3
Page 273

```
 1    the cave system, to the actual location where the        12:26:20
 2    boys and their coach were found?                          12:26:21
 3         A.   Many, many times.                               12:26:24
 4         Q.   What was that area called?                      12:26:25
 5         A.   It was a section just after Pattaya             12:26:28
 6    Beach.                                                     12:26:30
 7         Q.   Were you the first person to map that           12:26:32
 8    area of the cave system?                                  12:26:34
 9         A.   No.                                             12:26:37
10         Q.   Who was?                                        12:26:37
11         A.   The French team on their survey, which         12:26:38
12    they did back in 1986, '87.                               12:26:41
13         Q.   So the June 24, 2018 -- is that the date       12:26:46
14    you first learned that the boys had gone missing?        12:26:57
15         A.   Yes.                                            12:27:01
16         Q.   And all of the boys and their coach were       12:27:02
17    successfully rescued.  The last one that was out,        12:27:05
18    so to speak, was July 10, 2018; is that right?           12:27:08
19         A.   Yes.                                            12:27:11
20         Q.   So the cave rescue occurred over a period      12:27:12
21    of approximately 17 days; is that right?                 12:27:17
22         A.   18 days.                                        12:27:20
23         Q.   18 days.  Okay.                                 12:27:20
24              And is it true that a lot of people            12:27:24
25    contributed to the cave rescue?                          12:27:25
```

                                                                    155

Exhibit 3
Page 274

```
 1        A.   Yes, very much so.                      12:27:29

 2        Q.   How many?                               12:27:32

 3        A.   Well over 10,000 people, which included 12:27:33

 4   volunteers and cave rescuers -- well, rescuers in 12:27:33

 5   general.                                          12:27:38

 6        Q.   How many divers assisted with the cave  12:27:38

 7   rescue?                                           12:27:41

 8        A.   I can't put an exact figure on that.  Do 12:27:46

 9   you mean just the divers that were involved in the 12:27:48

10   extraction, or do you mean the divers as a whole in 12:27:51

11   terms of the whole operation?                     12:27:56

12        Q.   I mean in the whole operation, and if you 12:27:57

13   can't give me the precise number, that's okay, but 12:27:59

14   can you estimate the number of divers?            12:28:02

15        A.   I can't give you an exact number.       12:28:04

16        Q.   More than 100?                          12:28:05

17        A.   I would be guessing.                    12:28:08

18        Q.   More than 10?                           12:28:12

19        A.   More than 10.                           12:28:14

20        Q.   And then in terms of --                 12:28:15

21        A.   Let me finish.                          12:28:16

22        Q.   I'm sorry.                              12:28:17

23        A.   You have to appreciate that it was not  12:28:17

24   just the UK divers.  It was the Thai Navy SEALs,  12:28:18

25   and there was other divers involved, so I cannot  12:28:21
```

156

Exhibit 3
Page 275

```
 1    put an exact number on that.                      12:28:24
 2         Q.   Is it fair to say -- correct to say that 12:28:26
 3    there were many divers involved in locating the   12:28:28
 4    boys in the cave?                                  12:28:32
 5         A.   When you say "many," what I can say is   12:28:37
 6    that some of the divers never got past Chamber 3, 12:28:40
 7    and it only the most experienced divers that got  12:28:43
 8    past from Chamber 3 to where the boys were found. 12:28:48
 9         Q.   All right.                               12:28:51
10         A.   So I can't put a number on that.         12:28:51
11         Q.   Is it correct that people came from all 12:28:54
12    over the world to assist in the rescue?            12:28:56
13         A.   Yes.                                     12:28:59
14         Q.   And they were --                         12:29:00
15         A.   From at least 24 countries.              12:29:00
16         Q.   You didn't see everybody who was trying 12:29:04
17    to help with the cave rescue, did you?             12:29:07
18         A.   No.                                      12:29:10
19         Q.   And you didn't see what everyone who was 12:29:10
20    trying to help with the cave rescue did, right?   12:29:12
21         A.   No.                                      12:29:15
22         Q.   And you certainly personally don't know, 12:29:16
23    and certainly at the time the cave rescue ended did 12:29:18
24    not know, what every person at the rescue site was 12:29:23
25    doing during the rescue, right?                    12:29:26
```

                                                                157

Exhibit 3
Page 276

| | | |
|---|---|---|
| 1 | We are off the video record. | 12:33:09 |
| 2 | (Lunch recess taken.) | 12:33:11 |
| 3 | (Recess taken.) | 13:28:00 |
| 4 | THE VIDEOGRAPHER:  The time is 1:27 p.m. | 13:28:04 |
| 5 | We are back on the video record. | 13:28:05 |
| 6 | BY MR. SCHWARTZ: | 13:28:08 |
| 7 | Q.   Good afternoon, Mr. Unsworth.  A few days | 13:28:09 |
| 8 | after the cave rescue, CNN interviewed you about | 13:28:12 |
| 9 | the rescue, right? | 13:28:12 |
| 10 | A.   Yes. | 13:28:15 |
| 11 | Q.   And tell me how that interview came | 13:28:15 |
| 12 | about?  This was, I think the rescue was ended on | 13:28:18 |
| 13 | July 10th.  The interview was on the 13th. | 13:28:22 |
| 14 | How did this July 13, 2018, CNN interview | 13:28:25 |
| 15 | come about? | 13:28:28 |
| 16 | A.   CNN contacted myself via my partner Tik, | 13:28:29 |
| 17 | and the interview was arranged. | 13:28:33 |
| 18 | Q.   Before you sat down for the interview -- | 13:28:42 |
| 19 | well, actually, how many days went by -- or how | 13:28:44 |
| 20 | much time went by when CNN asked to interview you | 13:28:48 |
| 21 | and you sat down on July 13th for the interview? | 13:28:53 |
| 22 | A.   I can't recall. | 13:28:58 |
| 23 | Q.   Was it several days?  Was it after the | 13:28:59 |
| 24 | cave rescue? | 13:29:04 |
| 25 | A.   It was after the cave rescue, so it can't | 13:29:05 |

162

Exhibit 3
Page 277

| | | |
|---|---|---|
| 1 | be too many days if we're talking the 10th.  It | 13:29:07 |
| 2 | happened on the 13th, so there can't be much | 13:29:10 |
| 3 | difference in the time for the request to the | 13:29:14 |
| 4 | actual interview taking place. | 13:29:17 |
| 5 | Q.   Before CNN interviewed you, did you know | 13:29:20 |
| 6 | that the interview was going to be videotaped? | 13:29:23 |
| 7 | A.   No. | 13:29:27 |
| 8 | Q.   Was the entirety of the July 13 interview | 13:29:29 |
| 9 | with CNN recorded, or just parts of it? | 13:29:34 |
| 10 | A.   So far as I recall, the whole lot was | 13:29:38 |
| 11 | recorded.  That is what I recall; that is what I | 13:29:42 |
| 12 | can say as I sit here today. | 13:29:45 |
| 13 | Q.   Were you all excited about the fact that | 13:29:47 |
| 14 | CNN wanted to interview you about the cave rescue? | 13:29:49 |
| 15 | A.   No. | 13:29:53 |
| 16 | Q.   Were you nervous at all about the CNN | 13:29:53 |
| 17 | interview? | 13:29:55 |
| 18 | A.   No. | 13:29:56 |
| 19 | Q.   Did you have an agent or a publicist at | 13:29:56 |
| 20 | that point? | 13:29:59 |
| 21 | A.   No. | 13:30:00 |
| 22 | Q.   Do you have one now? | 13:30:00 |
| 23 | A.   No. | 13:30:03 |
| 24 | Q.   Did you speak to anyone -- well, I'll | 13:30:04 |
| 25 | back up again. | 13:30:06 |

163

Exhibit 3
Page 278

| | | |
|---|---|---|
| 1 | How did you know where and when to be for | 13:30:07 |
| 2 | the CNN interview? | 13:30:09 |
| 3 | A.   That was arraigned through Tik, my | 13:30:11 |
| 4 | partner.  So they arranged to meet at a specific | 13:30:12 |
| 5 | place, which was in Wai Krai, which was at the | 13:30:18 |
| 6 | Amazon coffee shop. | 13:30:19 |
| 7 | Q.   Did you have any -- you personally have | 13:30:21 |
| 8 | any conversations or other communications with | 13:30:22 |
| 9 | anyone at CNN before you showed up on July 13 for | 13:30:26 |
| 10 | the interview? | 13:30:30 |
| 11 | A.   Not that I recall. | 13:30:32 |
| 12 | Q.   Did anyone from CNN -- well, withdraw the | 13:30:36 |
| 13 | question. | 13:30:38 |
| 14 | Tell me what the CNN person or persons | 13:30:39 |
| 15 | told Tik about wanting to interview you.  In other | 13:30:43 |
| 16 | words, what did she relay to you that they had told | 13:30:47 |
| 17 | her? | 13:30:50 |
| 18 | A.   So far as I can recall, Tik just advised | 13:30:51 |
| 19 | or told me or asked me that CNN wanted to do an | 13:30:53 |
| 20 | interview, would I be happy to do the interview, | 13:30:57 |
| 21 | and that was arranged. | 13:30:58 |
| 22 | Q.   And you can just take me back to this | 13:31:02 |
| 23 | point.  Is she just standing there on her phone | 13:31:04 |
| 24 | talking to CNN and telling you what she is hearing, | 13:31:07 |
| 25 | or did she have a conversation, end the call, and | 13:31:10 |

164

Exhibit 3
Page 279

```
 1   report it to you?                                    13:31:12

 2        A.   As I sit here today, I can't recall        13:31:14

 3   exactly what happened; whether she made contact      13:31:16

 4   with me later.  I can't recall.                      13:31:19

 5        Q.   Either way, at some point you told her     13:31:22

 6   that she should tell CNN that you were willing to    13:31:24

 7   participate in the interview; is that right?         13:31:27

 8        A.   Yes.                                        13:31:29

 9        Q.   And you said that she asked you or she     13:31:30

10   said -- I don't know if these were her words or she  13:31:34

11   is repeating CNN, whether you'd be happy to do an    13:31:37

12   interview with CNN.                                  13:31:40

13             Is that something that she said or CNN     13:31:40

14   said?                                                13:31:43

15        A.   She relayed to me whether I would be       13:31:45

16   happy to do an interview with CNN.                   13:31:47

17        Q.   And did you tell Tik that you would, in    13:31:49

18   fact, be happy to do with an interview CNN?          13:31:52

19        A.   I answered that before.                    13:31:57

20        Q.   I just -- okay.                            13:31:59

21             Before the July 13 interview with CNN,     13:32:00

22   did you know whether CNN was going to ask you        13:32:02

23   anything about Mr. Musk?                             13:32:06

24        A.   No.                                        13:32:09

25        Q.   At the location where CNN interviewed you  13:32:10
```

165

Exhibit 3
Page 280

```
1    about the cave rescue on July 13th, was CNN          13:32:13

2    interviewing other people?                           13:32:15

3        A.   Not that I know of.                         13:32:18

4        Q.   So as far as you know, you were the only    13:32:20

5    person CNN was interviewing at that on location      13:32:22

6    about the cave rescue?                               13:32:24

7        A.   Yes.                                        13:32:28

8        Q.   So let's now move forward in time.  You     13:32:29

9    arrive at the CNN interview.  Did they put any       13:32:32

10   makeup on you?                                       13:32:36

11       A.   No.                                         13:32:38

12       Q.   Did they ask you to sit in an area until    13:32:41

13   they were ready for you to come and sit with the     13:32:43

14   interviewer?                                         13:32:46

15       A.   They just made arrangements for me to sit   13:32:47

16   where the interview was going to be taking place.    13:32:49

17       Q.   And after the interview was over, did CNN   13:32:54

18   give you a copy of it, like in a written form or     13:32:56

19   video?                                               13:32:59

20       A.   Nope.                                       13:33:00

21       Q.   So what I want to do -- and we can do       13:33:01

22   this many different ways.  I want to play for you    13:33:08

23   the clip from CNN where you spoke.  And so we have   13:33:11

24   it on a laptop here.  And what I would like to have  13:33:16

25   happen here is I want to turn it around so you can   13:33:20
```

166

Exhibit 3
Page 281

```
 1    see it while we play it.                        13:33:22
 2            MR. SCHWARTZ:  So is that -- can we      13:33:24
 3    disconnect that?  Then hand it to me.  Hopefully he  13:33:25
 4    will just hit the play button there?            13:33:33
 5            And what we will do is we have this flash  13:33:36
 6    drive, and we'll give it to the court reporter so  13:33:40
 7    she can keep it in the transcript so it will be  13:33:42
 8    part of the record.  And I'm getting a thumbs-up  13:33:44
 9    sign from Counsel.                              13:33:48
10            All right.  So I am going to play --     13:33:49
11    hopefully this will go.  This is not loud enough.  13:33:49
12    Maybe it is; maybe it isn't.  Let's stop for a  13:33:49
13    second.  Why is this -- all right.  So how do we  13:33:49
14    make this louder?  That is as loud as it goes?  13:33:49
15            THE WITNESS:  I can hear it.            13:33:49
16            MR. SCHWARTZ:  Can you hear it okay?    13:33:49
17            THE WITNESS:  Yeah.                     13:34:32
18            MR. SCHWARTZ:  Good.  And I guess a good  13:34:32
19    aspect of it is, it does appear that CNN is there  13:34:32
20    is putting closed captions or something on it.  13:34:36
21            MR. WOOD:  Yeah.                        13:34:39
22            MR. SCHWARTZ:  All right.  Let's all be  13:34:39
23    as quiet as we can so we can hear it, and here we  13:34:41
24    go.                                             13:34:45
25            (Video playing).                        13:34:47
```

167

Exhibit 3
Page 282

```
 1   BY MR. SCHWARTZ:                                  13:35:40
 2      Q.   I don't why CNN -- I want to show you     13:35:41
 3   both of them.  So why don't you just come around if 13:35:43
 4   you can?                                          13:35:47
 5           MR. WOOD:  So 14 is the one you just      13:35:48
 6   played?                                           13:35:48
 7           MR. SCHWARTZ:  13.                        13:35:48
 8           MR. WOOD:  So now you're going to do 14?  13:35:48
 9           MR. SCHWARTZ:  No, that was 13, and now   13:35:48
10   what we will do is 14.  It's -- you'll see it.  I  13:35:57
11   don't know why CNN did it that way.               13:36:00
12           MR. WOOD:  If we understood why CNN does  13:36:02
13   what CNN does, we would all be very, very wealthy. 13:36:04
14           (Exhibit 13 was marked for               13:36:16
15           identification.)                         13:36:16
16           (Exhibit 14 was marked for               13:36:18
17           identification.)                         13:36:18
18           MR. SCHWARTZ:  So now this will be 14.    13:36:18
19   Let's take a look.                                13:36:19
20           (Video playing.)                          13:37:06
21   BY MR. SCHWARTZ:                                  13:37:14
22      Q.   And then -- okay.  So let's go through    13:37:17
23   that a little bit.                                13:37:22
24           You remember giving -- sitting for that  13:37:23
25   interview a year ago July?                        13:37:25
```

168

Exhibit 3
Page 283

| | | |
|---|---|---|
| 1 | A.   Yes. | 13:37:27 |
| 2 | Q.   The first statement you see from the | 13:37:28 |
| 3 | reporter from CNN in that clip is "We just talked | 13:37:31 |
| 4 | about this before.  What are your thoughts on | 13:37:34 |
| 5 | Elon Musk's idea," correct? | 13:37:40 |
| 6 | A.   That is what was stated on the video, | 13:37:44 |
| 7 | yes. | 13:37:47 |
| 8 | Q.   Correct.  That is the reporter asking | 13:37:47 |
| 9 | that to you, correct? | 13:37:49 |
| 10 | A.   Yes. | 13:37:50 |
| 11 | Q.   I am focusing on the portion of the | 13:37:52 |
| 12 | reporter's question that says "We just talked about | 13:37:55 |
| 13 | this before." | 13:37:57 |
| 14 | What had you and the CNN reporter just | 13:37:58 |
| 15 | talked about? | 13:38:00 |
| 16 | A.   Sitting here now, I can't recall what was | 13:38:03 |
| 17 | talked about. | 13:38:05 |
| 18 | Q.   Do you recall anything you and the CNN | 13:38:07 |
| 19 | reporter talked about that she is referring to when | 13:38:09 |
| 20 | she says "We just talked about this before.  What | 13:38:13 |
| 21 | are your thoughts on Elon Musk's idea"? | 13:38:17 |
| 22 | A.   No. | 13:38:22 |
| 23 | Q.   Well, sometimes reporters will have | 13:38:22 |
| 24 | conversations with their subjects, they'll talk | 13:38:24 |
| 25 | about something, and then they'll decide to put it | 13:38:26 |

169

Exhibit 3
Page 284

| | | |
|---|---|---|
| 1 | on tape. | 13:38:29 |
| 2 | And for whatever reason, maybe human | 13:38:31 |
| 3 | nature being what it is, when the tape rolls, they | 13:38:35 |
| 4 | say "We just talked about this," and then they ask | 13:38:37 |
| 5 | the question. | 13:38:40 |
| 6 | Is that what happened?  In other words, | 13:38:41 |
| 7 | right before the tape, the camera turned on, the | 13:38:42 |
| 8 | reporter from CNN and you had been talking about | 13:38:46 |
| 9 | Elon Musk's idea? | 13:38:51 |
| 10 | MR. WOOD:  Objection as to form. | 13:38:54 |
| 11 | THE WITNESS:  So far as I recall, there | 13:38:56 |
| 12 | was no break in the interview.  So I can't -- I | 13:38:58 |
| 13 | don't recall what was talked about before the | 13:39:03 |
| 14 | comment was made there. | 13:39:07 |
| 15 | BY MR. SCHWARTZ: | 13:39:08 |
| 16 | Q.  So are you saying -- well, clearly, the | 13:39:09 |
| 17 | reporter is -- I'm sorry.  I did not want to | 13:39:11 |
| 18 | interrupt you. | 13:39:13 |
| 19 | A.  I have just confirmed that I don't recall | 13:39:14 |
| 20 | what was talked about before that part of the | 13:39:17 |
| 21 | interview. | 13:39:20 |
| 22 | Q.  But there was a conversation, was there | 13:39:21 |
| 23 | not? | 13:39:23 |
| 24 | A.  If there was a conversation, I cannot | 13:39:25 |
| 25 | recall what the conversation was about. | 13:39:27 |

170

Exhibit 3
Page 285

```
 1              MR. WOOD:  He is asking about that one,    15:40:21

 2    and this one is going to stay here.  Did you -- did  15:40:27

 3    he get No. 20?                                        15:40:32

 4              MR. SCHWARTZ:  That's the one right here.   15:40:32

 5              MR. WOOD:  He's asking you to look at 19    15:40:32

 6    and 20.  It's inside that.                            15:40:34

 7              THE WITNESS:  I prefer the big writing.     15:40:40

 8              MR. WOOD:  Oh, yeah.  So do I.              15:40:42

 9    BY MR. SCHWARTZ:                                      15:40:52

10        Q.  So now we have the three tweets that he       15:40:53

11    sent on Exhibit 19, and the fourth tweet of the day   15:40:58

12    on Exhibit 20.                                        15:41:05

13              Have you read them?                         15:41:06

14        A.  Yes.                                          15:41:07

15        Q.  Taking all these tweets together from         15:41:11

16    that day, tell me everything that is false and        15:41:14

17    harmful to you about them.                            15:41:16

18              MR. WOOD:  I'm going to object to the       15:41:19

19    form of the question because it is compound.  Maybe   15:41:20

20    if you broke it down, like what is false, and then    15:41:23

21    we can talk about that.                               15:41:25

22    BY MR. SCHWARTZ:                                      15:41:26

23        Q.  Fair enough.  Tell me everything that is      15:41:27

24    false.                                                15:41:27

25        A.  Okay.  We take the first tweet regarding      15:41:29
```

Exhibit 3
Page 286

```
 1   the water level was actually very low and still not    15:41:32
 2   flowing.  The "not flowing" part of that is totally    15:41:36
 3   100 percent wrong.                                      15:41:43
 4        Q.   And I apologize --                            15:41:45
 5        A.   No.  Excuse me.                               15:41:47
 6        Q.   No, I'll explain.  I asked you the wrong      15:41:47
 7   question.  I need to withdraw the question.            15:41:49
 8             So what I want to ask you is:  Tell me        15:41:51
 9   everything about these tweets, about you,              15:41:55
10   Vernon Unsworth, that is false?                        15:41:58
11        A.   About me?                                     15:42:05
12        Q.   Yes.  That concerns you, is about you,       15:42:07
13   that is false.                                         15:42:09
14        A.   There is nothing in this first tweet that    15:42:21
15   is about me.                                            15:42:24
16             MR. WOOD:  The first tweet is this one.      15:42:26
17             THE WITNESS:  I don't understand.  Sorry.    15:42:29
18   BY MR. SCHWARTZ:                                        15:42:30
19        Q.   I'm sorry.  Let me withdraw the question     15:42:31
20   again.  I didn't want to ask if I -- my question       15:42:31
21   was about the first tweet.  I misspoke.  I             15:42:34
22   apologize.                                             15:42:37
23             Tell me everything about you in these        15:42:37
24   four tweets that is false.  Could be in any one of     15:42:40
25   four of them that is either about you, concerning      15:42:46
```

260

Exhibit 3
Page 287

```
 1   you, of you, in reference to you in any way?        15:42:49
 2             MR. WOOD:  Or if the stain or the gist is  15:42:54
 3   about him.                                           15:42:57
 4             MR. SCHWARTZ:  Exactly.                     15:42:58
 5             MR. WOOD:  I'm not sure he understands      15:42:58
 6   that.  And I think we set this out pretty clearly    15:43:00
 7   in our complaint.                                    15:43:03
 8             MR. SCHWARTZ:  All right.  Let's try it     15:43:04
 9   that way. see what happens, and if we need to ask a  15:43:07
10   different question, we will.                         15:43:10
11             MR. WOOD:  Yeah.  I just think you're       15:43:11
12   moving into an area where --                         15:43:11
13             MR. SCHWARTZ:  I understand.  Let's see     15:43:14
14   what we can do.                                      15:43:14
15             MR. WOOD:  -- it's difficult for a lay      15:43:14
16   witness to understand exactly what you are asking.   15:43:15
17   BY MR. SCHWARTZ                                       15:43:16
18       Q.   Well, how about if I do it this way --      15:43:19
19       A.   Well, if you look at the first tweet.       15:43:20
20       Q.   Sorry.  Go ahead.                           15:43:22
21       A.   I never saw this British expat guy who      15:43:23
22   lives in Thailand (SUS) at any point in the caves.   15:43:25
23   I've given you the answer to that.                   15:43:28
24       Q.   Can you just repeat.  I'm not sure what     15:43:32
25   you are referring to when you say that.              15:43:33
```

261

Exhibit 3
Page 288

```
 1      A.   I mentioned, and my answer was, the        15:43:36

 2   reason he didn't see me was because it was the     15:43:38

 3   early hours of the morning of the --               15:43:42

 4      Q.   Ah.                                         15:43:44

 5      A.   -- 10th of July --                          15:43:44

 6      Q.   Okay.                                       15:43:44

 7      A.   -- and quite rightly I was trying to get   15:43:44

 8   some well-earned sleep after finishing day two of  15:43:49

 9   the rescue.                                         15:43:52

10           So that's the reason why he never saw me.  15:43:54

11   With regards "SUS," I regard that as "suspect."  I  15:43:57

12   don't know what he was really -- or why he was      15:44:02

13   really referring to that -- obviously because I     15:44:04

14   live in -- part of the year in Thailand.            15:44:07

15           There is nothing in here, in the second    15:44:11

16   tweet, the water level that's actually about me.    15:44:13

17   There is nothing there that I can see relative to   15:44:16

18   me as an individual, because all he says "If not    15:44:22

19   true, then I challenged him to show the final       15:44:26

20   rescue video."                                      15:44:29

21           Well, that's not necessarily about me      15:44:30

22   personally, nothing harmful about that particular   15:44:33

23   tweet, okay?                                        15:44:37

24           And then the part that is harmful to me    15:44:37

25   is "Sorry, pedo guy."                               15:44:37
```

Exhibit 3
Page 289

```
1        Q.   Again, I just -- counsel asked that I       15:44:58

2    focus your attention on what is false, and that may  15:45:01

3    be false too.  You used the word "harmful."          15:45:03

4        A.   It is false.                                15:45:06

5        Q.   I understand, but you used the word         15:45:06

6    "harmful."  I just want to make sure we're focusing  15:45:07

7    at this -- in this question is:  Is there anything   15:45:09

8    in here about you that is false.  And your answer    15:45:12

9    may be the same.                                     15:45:15

10            I just didn't want you to have answered a   15:45:17

11   different question.  We're focusing on falsity --    15:45:20

12       A.   I think we're clear on the part of being    15:45:22

13   false, not harmful; is that correct?                 15:45:24

14       Q.   Tell you what.                              15:45:31

15            MR. WOOD:  Why don't you just tell him --   15:45:31

16            THE WITNESS:  There is nothing there --     15:45:31

17   there is nothing there --                            15:45:31

18            MR. SCHWARTZ:  I'm sorry.  Only one         15:45:35

19   person can talk at a time.                           15:45:36

20            MR. WOOD:  First he's asking you is there   15:45:37

21   anything -- and now you're looking at the last       15:45:37

22   tweet, Vernon, first -- and it may be the same       15:45:40

23   thing -- what is false in this tweet?                15:45:44

24            And I am talking about one at the bottom    15:45:47

25   of 814, and that's Exhibit 18.  That's the one he's  15:45:49
```

263

Exhibit 3
Page 290

| | | |
|---|---|---|
| 1 | asking you about. | 15:45:53 |
| 2 | MR. SCHWARTZ:  Exhibit 19. | 15:45:53 |
| 3 | MR. WOOD:  I'm sorry.  19. | 15:45:55 |
| 4 | THE WITNESS:  False about me? | 15:45:56 |
| 5 | BY MR. SCHWARTZ: | 15:45:58 |
| 6 | Q.  Yes. | 15:46:01 |
| 7 | A.  There is nothing -- there is nothing in | 15:46:01 |
| 8 | there that is effectively false about me, other | 15:46:02 |
| 9 | than the comment "Sorry, pedo guy." | 15:46:04 |
| 10 | Q.  And then the question that prompted all | 15:46:08 |
| 11 | this was:  Taking all four of these tweets | 15:46:11 |
| 12 | together, is there anything false in them about | 15:46:14 |
| 13 | you, that concerns you, or attenuated to.  I just | 15:46:18 |
| 14 | want to make sure you've told me everything.  You | 15:46:22 |
| 15 | haven't said anything about the last tweet, and I | 15:46:23 |
| 16 | want to make sure you do that. | 15:46:26 |
| 17 | A.  I was going to go on to that. | 15:46:29 |
| 18 | Q.  Okay. | 15:46:29 |
| 19 | A.  But there's the two things, but you | 15:46:29 |
| 20 | didn't let me finish with the fourth tweet.  So we | 15:46:30 |
| 21 | got "Sorry, pedo guy," and then "Bet ya a signed | 15:46:34 |
| 22 | dollar that it's true."  So that's harmful. | 15:46:36 |
| 23 | Q.  You're answering harmful; we're focusing | 15:46:42 |
| 24 | on falsity. | 15:46:46 |
| 25 | A.  Not false. | 15:46:47 |

264

Exhibit 3
Page 291

```
 1      Q.   When you say "not false," what do you      15:46:48

 2   mean?                                               15:46:50

 3      A.   I am saying it's -- sorry.  It's false.     15:46:51

 4      Q.   What's false?                               15:46:54

 5      A.   So "Bet you a signed dollar it's true" is   15:46:55

 6   false.  I'm not a pedo.                             15:46:58

 7      Q.   Ah, okay.  So is it correct, you are        15:47:01

 8   assuming that the statement "Bet ya a signed dollar 15:47:04

 9   it's true," that "it's" is a reference to pedo guy? 15:47:09

10      A.   Yes.                                        15:47:13

11      Q.   Okay.  So --                                15:47:13

12           MR. WOOD:  Do you have -- I'm just asking    15:47:13

13   for purposes of clarity and context.  Do you have   15:47:15

14   the tweet that Mr. Musk was responding to when he   15:47:19

15   made that statement about "Bet ya a signed dollar   15:47:22

16   it's true"?                                         15:47:23

17           MR. SCHWARTZ:  I don't.                      15:47:25

18           MR. WOOD:  I think that would help           15:47:25

19   everybody to clearly understand what he was         15:47:26

20   referring to.                                       15:47:28

21   BY MR. SCHWARTZ:                                    15:47:32

22      Q.   All right.  So let's take it from the top   15:47:33

23   again.  Now I want to ask about harm because of     15:47:33

24   what your lawyer said.  Let's do harm -- falsity    15:47:36

25   separate from harm.                                 15:47:38
```

265

Exhibit 3
Page 292

```
 1              So looking at the four tweets of          15:47:39

 2    July 15, 2018, on Exhibits 19 and 20, is there      15:47:42

 3    anything in there about you that is harmful to you?  15:47:49

 4        A.   Yes.  In the first tweet the S-U-S, SUS,    15:47:55

 5    suspect, "Sorry, pedo guy," and "Bet ya a signed     15:47:59

 6    dollar it's true."  All three harmful.              15:48:06

 7        Q.   Had you heard the term "Bet ya a signed     15:48:52

 8    dollar," "Bet ya a signed quid it's true" before     15:48:54

 9    you saw the July 15 tweet that used that term?       15:48:59

10        A.   No.                                         15:49:04

11        Q.   Did it have any meaning to you when you     15:49:06

12    saw it?                                              15:49:09

13        A.   To me it referred to the fact that he       15:49:11

14    referred to me as "pedo guy."                        15:49:13

15        Q.   And before July 15, 2018, had you ever      15:49:20

16    heard the words, or word or expression, "pedo guy,"  15:49:25

17    P-E-D-O guy?                                         15:49:30

18        A.   No.                                         15:49:35

19        Q.   Do you know whether Mr. Musk deleted the    15:49:59

20    July 15 tweets on Exhibits 19 and 20?                15:50:03

21        A.   I believe there was reference to the fact   15:50:13

22    that he had deleted them.  I believe there is        15:50:15

23    reference, but that's all I know.                    15:50:17

24        Q.   When did you learn that Mr. Musk had        15:50:23

25    deleted the July 15 tweets?                          15:50:29
```

Exhibit 3
Page 293

```
 1
 2
 3
 4
 5
 6
 7
 8
 9    I, VERNON UNSWORTH, do hereby declare under the
10    penalty of perjury that I have read the foregoing
11    transcript; that I have made any corrections as
12    appear noted, in ink, initialed by me, or attached
13    hereto; that my testimony as contained herein, as
14    corrected, is true and correct.
15         EXECUTED this 16ᵗʰ day of SEPTEMBER
16    20 19 , at _____London_____ , _____ .
17                    (City)                    (State)
18
19
20                         VERNON UNSWORTH
21
22
23
24
25
```

344

Exhibit 3
Page 294

# EXHIBIT 4

# EXHIBIT 4

Exhibit 4
Page 295

```
 1

 2                 UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
 3

 4

 5

 6
      ------------------------)
 7                            )
                              )
 8    VERNON UNSWORTH,        )
                              )
 9           Plaintiff        )
                              )
10    vs.                     )  Case No. 2:18-cv-08048
                              )
11                            )
      ELON MUSK,              )
12                            )
             Defendant        )
13    ------------------------)

14

15

16
       Videotape Deposition of VANESSA JULIET UNSWORTH
17

18
              On Tuesday, 27th August 2019
19

20

21
      Taken at the offices of:
22
              Howard Kennedy LLP
23            1 London Bridge
              London SE1 9BG
24            United Kingdom

25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 4
Page 296

```
 1                    UNSWORTH - WILSON
 2           A.      Portugal was summer holidays.  We
 3     also sort of looked after a villa for a friend of
 4     ours who when he was not there, we used to go over
 5     and just check that it was okay, so we used to go
 6     to Portugal a lot.
 7           Q.      Was it just ----
 8           A.      Just family time.
 9           Q.      Family time?
10           A.      Yes, family holidays.
11           Q.      From the time you met Vernon in
12     1987 to the time of your separation in 2013, did
13     Vernon ever travel abroad without you?
14           A.      From 2011.
15           Q.      From 2011?
16           A.      Yes.
17           Q.      Where did Vern go in 2011?
18           A.      He went to Thailand.
19           Q.      To your knowledge, was that his
20     first visit to Thailand?
21           A.      Yes.  Yes, it was.
22           Q.      Do you know what Vernon was doing
23     in Thailand in 2011?
24           A.      No.  I think he had gone over
25     there -- I know that he was plotting the caves.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

**www.martenwalshcherer.com**

Exhibit 4
Page 297

```
 1              UNSWORTH - WILSON
 2     well.  Yes, it has impacted.  It makes you think.
 3     It makes you very uncomfortable at work.  It
 4     impacts everything to do with your life,
 5     basically.  You know, your life just lives this
 6     event.  The more people talked about it, the more
 7     people contacted you, the more you had to think
 8     about it more.  Yes, it caused many sleepless
 9     nights.  It made me very upset.  It made me un --
10     I did not go out as much as I would have normally.
11     It has a really detrimental effect on your own
12     mental health and your self esteem.
13     BY MR. WILSON:
14          Q.     Thank you for that.  Earlier in the
15     deposition you mentioned the accusations as being
16     Mr. Musk accused Vernon of being a paedophile, a
17     child rapist and taking a 12-year-old child bride?
18          A.     Hmm.
19          Q.     To your knowledge, are each of
20     those accusations false?
21          A.     Totally false.
22          Q.     Thank you for talking with me this
23     morning.  We are going to let Mr. Spiro ask you
24     some questions.
25          A.     Thank you.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 4
Page 298

# EXHIBIT 5

# EXHIBIT 5

Exhibit 5
Page 299

```
 1

 2                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
 3

 4

 5

 6
        ------------------------)
 7                              )
                                )
 8      VERNON UNSWORTH,        )
                                )
 9              Plaintiff       )
                                )
10      vs.                     )  Case No. 2:18-cv-08048
                                )
11                              )
        ELON MUSK,              )
12                              )
                Defendant       )
13      ------------------------)

14

15

16
          Videotape Deposition of WORANAN RATRAWIPHAKKUN
17

18
               On Wednesday, 28th August 2019
19

20
        Taken at the offices of:
21
                Howard Kennedy LLP
22              1 London Bridge
                London SE1 9BG
23              United Kingdom

24

25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 5
Page 300

```
 1              RATRAWIPHAKKUN - WILSON
 2         Q.     Okay, thank you.  Tik, can you tell
 3    me where you were born?
 4         A.     Chiang Rai Province, Mae Sai
 5    District.
 6         Q.     Where do you live now?
 7         A.     In Huai Krai Subdistrict.
 8         Q.     Could you spell that for the
 9    record, please?
10         THE WITNESS:  H-U-A-I K-R-A-I.
11         Q.     H-U-A-I K-R-A-I, Huai Krai.
12         A.     Yes.
13         Q.     When were you born?
14         A.     18th of May 1978.
15         Q.     18th of May 1978?
16         THE WITNESS:  No.
17         THE INTERPRETER:  Sorry, November.
18    BY MR. WILSON:
19         Q.     Tik, you brought with you a few
20    documents today; right?
21         A.     Yes.
22         Q.     If the reporter would please mark
23    this Exhibit 52.
24         (Exhibit 52 marked for identification)
25         Q.     Do you recognise this document?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 5
Page 301

```
 1                  RATRAWIPHAKKUN - WILSON
 2          A.      Daughter.
 3          Q.      How old is she?
 4      THE WITNESS:  Now she 15.
 5          Q.      And how old are you?
 6      THE WITNESS:  40.
 7          Q.      Do you have a relationship to any
 8  of the parties in this case?
 9          A.      Do you mean Vernon?
10          Q.      Vernon, yes.  You have a
11  relationship with Vernon?
12      THE WITNESS:  Yes.
13          Q.      Do you refer to him as Vernon or
14  Vern?
15      THE WITNESS:  I call him Vern.
16          Q.      Vern?
17      THE INTERPRETER:  Vern.
18  BY MR. WILSON:
19          Q.      How did you meet Vern?
20      THE WITNESS:  We meet in London.
21          Q.      When was that?
22      THE WITNESS:  February 2011.
23          Q.      How did you meet him?
24      THE WITNESS:  We just meet by accident
25  like in coffee shop.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 5
Page 302

```
 1              RATRAWIPHAKKUN - WILSON
 2        Q.    What were you doing in London?
 3        THE WITNESS:  I just go out to travelling
 4   ----
 5        A.    (Through interpreter) I just came
 6   here to visit.
 7        Q.    You were just travelling in London?
 8        A.    Yes.
 9        Q.    Did you ever begin -- strike that.
10   How would you describe your relationship with
11   Vern?
12        A.    You mean since we met?
13        Q.    Yes.
14        THE WITNESS:  He come to see me in the
15   coffee shop and ask me to join coffee.  So we go
16   talking.  We good friends.
17        A.    (Through the interpreter) So we
18   became friends.
19        THE WITNESS:  Vern take care of me, see
20   London.  He take me go out to see some things.  He
21   want to see Thailand with me.
22        Q.    Are you in a romantic relationship
23   with Vern?
24        A.    Yes.
25        Q.    When did the romantic part of your
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

**www.martenwalshcherer.com**

Exhibit 5
Page 303

```
 1                  RATRAWIPHAKKUN - WILSON
 2   relationship begin?
 3          A.      About April.   In April 2011.
 4          Q.      And I believe you just testified
 5   that he wanted -- Vern wanted to come see Thailand
 6   with you?
 7          A.      Yes.
 8          Q.      Did you invite him to Thailand?
 9          A.      Yes, I did, and I wanted him to
10   come and spend some times here in Thailand first
11   and then we will see if he can stay.
12          Q.      When was the first time that Vern
13   visited with you in Thailand?
14          A.      July 2011.
15          Q.      To your knowledge, had Vern ever
16   been to Thailand before July 2011?
17          A.      No, he had never been out of
18   England at that time.   The first time he went to
19   Thailand.
20          Q.      How long did Vern spend in Thailand
21   in 2011?
22          A.      He initially got the 60-day visa to
23   visit Thailand and then later on he extended his
24   visa in Myanmar to come back to spend another 30
25   days.  Initially, he got a 60-day visa to stay in
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

**www.martenwalshcherer.com**

Exhibit 5
Page 304

```
1                   RATRAWIPHAKKUN - WILSON
2    him.
3            Q.      When Vern is in Thailand, where
4    does he stay?
5            A.      My house.
6            Q.      Where is your house?
7            A.      House number 99 M1.
8            THE WITNESS:  M3.
9            THE INTERPRETER:  M3, sorry, Huai Krai,
10   Mae Sai, Chiang Rai.
11   BY MR. WILSON:
12           Q.      Do you and Vern travel together
13   outside of Huai Krai?
14           A.      Yes, we mostly, you know, stay
15   together and go places together.
16           Q.      To your knowledge, does Vern travel
17   around Thailand without you?
18           THE WITNESS:  No.
19           Q.      You recall the cave rescue about a
20   year ago?
21           A.      Hmm.
22           THE INTERPRETER:  About two years.
23           Q.      How did you become involved in the
24   cave rescue?
25           A.      (Through the interpreter) Like
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 5
Page 305

RATRAWIPHAKKUN - WILSON

A.    Yes.  It is meant that my husband was homosexual.

Q.    To your knowledge, is there any truth that Vern is a paedophile?

A.    No, there is no fact, nothing about that.

Q.    To your knowledge, is there any truth to the statement that Vern is a child rapist?

A.    No, it is not true.

Q.    To your knowledge, has Vern ever married a child bride?

A.    No.  If that child you mean was me, I am not a child.  I am 40 years old.

Q.    Accusations of these kind, paedophilia, child rape, marrying a child bride, are they the types of statements that would tend to cause people in Thailand to shun Vern?

MR. SPIRO:  Objection - form, relevance.

A.    Yes, it affect not just for Thai people.  If he posted on Twister, 30, 40 million people follow him, and some people, you know, who read this from social media as well.  People,

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 020 7067 2900

www.martenwalshcherer.com

Exhibit 5
Page 306

1                     RATRAWIPHAKKUN - WILSON

2     of the governor of the province.  If Elon Musk

3     accepted these comments, which are true, and if he

4     stopped at that point, it should not have anything

5     else, but when he accuse of someone being a

6     paedophile, it is causing a difficulty in our

7     lives.

8     BY MR. WILSON:

9          Q.     Just one more question for you.  To

10    your knowledge, has Vern ever visited any area in

11    Thailand known for sex trafficking?

12         A.     No.  He normally travel with me.

13    Once he did not go with me when he went to the

14    cave in Nan province with Rob.  He went one time

15    with Rob one year before the rescue and one year

16    after the rescue, and then one trip that he went

17    to Laos for his passport.  He went to Laos twice.

18    The first trip we went together, but the second

19    trip I did not go, because at the time we wanted

20    to save some cost.  That is the trip when, you

21    know, he went alone, but apart from that he always

22    go, you know, everywhere with me.

23         Q.     So, to your knowledge, there has

24    only been two instances when Vern has travelled

25    without you within Thailand: once with Rob Harper

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

**www.martenwalshcherer.com**

Exhibit 5
Page 307

```
 1                    RATRAWIPHAKKUN - SPIRO
 2     to see another cave in Thailand and once to try to
 3     extend his visa?
 4            A.     That is right.
 5                   MR. WILSON:   Thank you.  Mr. Spiro
 6     has some questions for you.
 7                QUESTIONS BY MR. SPIRO
 8     BY MR. SPIRO:
 9            Q.     Hi, good morning, how are you?
10     I am going to ask you some questions.  You can
11     follow in English, obviously.  You speak some
12     English; right?
13            THE WITNESS:  Yes.
14            Q.     Can you read English?
15            THE WITNESS:  Little bit.
16            THE INTERPRETER:  A little bit.
17     BY MR. SPIRO:
18            Q.     Like a book, a magazine, a
19     newspaper?
20            THE WITNESS:  (Witness nods).
21            Q.     You can read?  That is a yes?
22            THE WITNESS:  Yes.
23            Q.     You were asked some questions about
24     Exhibit 53, which was that article.  Did you have
25     an opportunity to review that before you testified
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 020 7067 2900**

www.martenwalshcherer.com

Exhibit 5
Page 308

# EXHIBIT 6

# EXHIBIT 6

Exhibit 6
Page 309



Deposition of:

# Samuel Teller

*September 30, 2019*

In the Matter of:

# Unsworth, Vernon v. Musk, Elon

## Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Exhibit 6
Page 310

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4      _____
                                      )
 5      VERNON UNSWORTH,              )
                                      )
 6              Plaintiff,            )
                                      )
 7         vs.                        )  No. 2:18-cv-08048-SVW (JC)
                                      )
 8      ELON MUSK,                    )
                                      )
 9              Defendant.            )
        _____)

10

11

12

13

14      VIDEOTAPED DEPOSITION OF SAMUEL W. TELLER

15              Los Angeles, California

16           Monday, September 30, 2019

17                    Volume I

18

19

20

21   Reported by:

     NADIA NEWHART

22   CSR No. 8714

23

24

25
```

Samuel Teller                                September 30, 2019
Unsworth, Vernon v. Musk, Elon

Page 10

```
 1        A    SpaceX and Tesla.

 2        Q    Not the Boring Company?

 3             THE REPORTER:  "Not the" what company?

 4             MR. WOOD:  Boring, B-o-r-i-n-g.

 5             THE WITNESS:  It's a little tech- -- no,

 6    my sal- -- my salary came from SpaceX and Tesla,

 7    although I did work for the Boring Company.  So I

 8    was -- I'd say I was a de facto employee of the

 9    Boring Company, but maybe not in a technical sense.

10    BY MR. WOOD:

11        Q    Right.  Technical -- they don't -- they don't

12    sign your paycheck, but you did work for Boring too?

13        A    That is correct.

14        Q    And do you work for Mr. Musk in any capacity

15    other than your job with SpaceX, Tesla and whatever

16    you do for Boring Company?

17        A    I'm employed by SpaceX and Tesla, but I

18    worked for Mr. Musk in kind of a general capacity in

19    ways that weren't always strictly encompassed by the

20    business of those companies.

21        Q    I think I'm correct that it was Mr. Musk that

22    described you as basically his chief of staff?

23        A    Is that a question?

24        Q    Yes.

25        A    Oh, yeah, yeah.  That's correct.
```

Veritext Legal Solutions

Exhibit 6
Page 312

Page 11

1      Q    You would agree --

2      A    Yeah.

3      Q    -- that in your capacity knowing that you

4     were working, as you've told me for SpaceX, Tesla

5     and Boring Company, you were serving as Mr. Musk's

6     chief of staff, true?

7      A    That's correct.

8      Q    How long did you serve him in that capacity?

9      A    A little under five years.

10     Q    Starting when?

11     A    August 2014.

12     Q    And August 2014, was that your first

13    employment for Mr. Musk in connection with either

14    SpaceX, Tesla or Boring Company?

15     A    Yes.

16     Q    I know you had a startup.  What was -- tell

17    me about the name of that company.

18     A    I've been involved in a few companies before

19    then, so I'm not sure what you're referring to, but

20    I'm happy to walk you through my career or -- yeah.

21     Q    I don't want to have to take up much time --

22     A    Happy to.

23     Q    -- but it probably would be helpful.  Let me

24    ask you, did -- did you graduate from college?

25     A    I did.

Exhibit 6
Page 313

Page 27

```
 1      A   Not exactly.
 2      Q   Who would be the person that you would say
 3  was the most responsible for Mr. Musk's public
 4  relations efforts?
 5      A   I -- well, I was the person who was probably
 6  most responsible, but I was not the only one who had
 7  significant responsibility.
 8      Q   Right.  But the buck generally in an
 9  organization has to stop somewhere?
10      A   Yeah, we're not a normal organization.
11      Q   Well, those are your words, not mine.  But
12  whatever, normal or abnormal organization, when it
13  comes to PR matters during the five years you were
14  there --
15      A   Sure.
16      Q   -- other than Mr. Musk, the public relations
17  buck basically stops with you, true?
18      A   As it relates to Mr. Musk, yes.
19      Q   Each of the companies has their own public
20  relations?
21      A   Correct.
22      Q   And you would be involved in knowing about
23  their activities, true?
24      A   Correct.
25      Q   But you and you alone would be involved in
```

Exhibit 6
Page 314

Page 53

1    as of July the 10th a fair amount of negative press

2    about how public Mr. Musk had been his efforts to

3    help the children in Thailand?

4        A    I'm -- I'm not -- I'm not trying to be

5    difficult.  I just actually don't remember the

6    specific timeline of like what -- where July 10th

7    was in the sequence.

8        Q    Let's do it this way.

9        A    Yeah.

10       Q    Would you admit or concede that prior to the

11   "pedo guy" Tweet, Exhibit 38 --

12       A    Yeah.

13       Q    -- that there had been a fair amount of

14   negative press about how public Elon Musk had been,

15   posting videos and other information on his Twitter

16   account, in terms of putting out there his efforts

17   to help the children?  He had gotten a significant

18   amount of negative publicity for doing that, hadn't

19   he?  Not -- excuse me, not for -- not for his

20   efforts to build the -- the tube, but for his

21   publicly talking about it so much.

22       A    Yes.  There was -- there was some public

23   criticism of him and our team for -- in the way that

24   you described, in addition to, I think, you know,

25   quite a bit of public praise for the kind of

Samuel Teller                                       September 30, 2019
Unsworth, Vernon v. Musk, Elon

Page 65

1      Q    You said you -- you thought the -- the act

2   of -- or conveying that it didn't mean pedophilia

3   might have been conveyed by deleting the Tweet and

4   apologizing, and I don't follow the logic.  I'm just

5   trying to explore it.

6      A    The -- if you say something that you don't

7   mean or that's misunderstood, you can clarify it or

8   you can delete it.  It's -- those are two ways to

9   handle a situation like this.

10     Q    Did Mr. Musk ever attempt to clarify what he

11  meant when he Tweeted "pedo guy," to your knowledge?

12          MR. SPIRO:  Objection as to form.

13          THE WITNESS:  When do you mean?  Sorry.

14  BY MR. WOOD:

15     Q    Anytime.  Are you aware of Mr. Musk ever

16  attempting to clarify what he meant when he Tweeted

17  "pedo guy," that is, that he didn't mean pedophile?

18  Did he ever attempt to clarify that, to your

19  knowledge?

20     A    I don't remember.  I don't have a specific

21  memory.

22     Q    The only thing you remember that suggests to

23  the contrary where you came up with this creepy old

24  man is from the last week or so --

25     A    Yeah.

Exhibit 6
Page 316

Samuel Teller                                           September 30, 2019
Unsworth, Vernon v. Musk, Elon

Page 66

1          Q    -- either social media or news coverage where

2     they were writing about Mr. Musk's declaration that

3     he filed in this case in support of his motion for

4     summary judgment, true?

5          A    I believe so.

6          Q    That would have been the first time you, as

7     his former chief of staff, had ever heard that there

8     was some meaning about creepy old guy to the use of

9     the pedo guy phrase by Mr. Musk other than

10    pedophile, true?

11         A    Possibly, but I can't be certain.  I don't

12    remember every --

13         Q    We're here -- we're here -- we're here today

14    to do our best.

15         A    Sure.

16         Q    Do you have any recollection prior to the

17    publicity over Mr. Musk's declaration and motion for

18    summary judgment in the last couple of weeks --

19         A    Uh-huh.

20         Q    -- of Mr. Musk ever conveying to you or

21    anyone else, to your knowledge, that pedo guy -- the

22    reference to pedo guy meant creepy old man and not a

23    pedophile?

24         A    I don't have a specific memory of that.

25              MR. WOOD:  All right.  Why don't we take a

Veritext Legal Solutions

Exhibit 6
Page 317

Page 67

1      break.  We've been going for a while.

2              THE VIDEOGRAPHER:  We're going off the record

3      at 10:45 a.m.  This is the end of media one.

4              (Recess.)

5              THE VIDEOGRAPHER:  We're on the record at

6      10:59 a.m.  This is the beginning of media two in

7      the deposition of Samuel Teller.

8              THE WITNESS:  Sorry.  Is this a --

9      BY MR. WOOD:

10         Q   It's also a real -- it's also a -- a

11     streaming of your video to my office.

12         A   Got it.  Okay.

13             MR. WOOD:  Back on the record.

14         Q   Exhibit 78 is a true and correct copy of the

15     e-mail chain that we've earlier discussed, true?

16         A   As far as I know.

17         Q   Okay.  You have no reason to doubt that it's

18     accurate?

19         A   I have no reason to doubt that it's accurate.

20         Q   Now, you have received, I'm sure, litigation

21     hold notices, true?

22         A   Ever?

23         Q   During the last year and a half of this

24     litigation that we went over in that list, you --

25     you have been made aware that you are under a

Samuel Teller                                      September 30, 2019
Unsworth, Vernon v. Musk, Elon

Page 88

1    mouth.  He was -- he was -- he was upset.  He felt

2    like he had been attacked unfairly.

3        Q   We will go through the articles before the

4    day is out, but this may be able to help short

5    circuit some of it.

6            Mr. -- before he Tweeted "pedo guy," the

7    truth is, Mr. Teller, that Elon Musk was very upset

8    about the media coverage criticizing his efforts

9    with the tube to assist the children in Thailand;

10   isn't that the truth?

11       A   I believe he was unhappy with some of the

12   coverage.

13       Q   He was unhappy with all of the coverage that

14   criticized his efforts with the tube, including the

15   coverage that was suggesting that it was a PR stunt.

16   You know that, don't you, sir?

17       A   Certainly.

18       Q   And that was before Mr. Unsworth ever said a

19   word to CNN.  The coverage had already started

20   unrelated to Mr. Unsworth, true?

21       A   Yeah.

22       Q   Mr. -- from your five years as chief of staff

23   or close to five years, you were aware of how

24   sensitive Elon Musk is to criti- -- public

25   criticisms of himself, aren't you?

Exhibit 6
Page 319

Page 162

1    involving the Thai government, so it was just we

2    were de facto interacting with the government.

3        Q    Through this entrepreneur?

4        A    Through James and someone on his team whose,

5    name, I think, was Nuttapon and maybe -- maybe a few

6    others.  We were also in touch with someone in the

7    American government.

8        Q    I'm just trying to find out if you yourself,

9    based on your knowledge of the efforts -- and you --

10   you kept up with what was going on when they were

11   trying to build this tube, didn't you?

12       A    Generally, yeah.

13       Q    And Elon Musk was Tweeting almost daily about

14   it, true?

15       A    Yeah.

16       Q    With videos and pictures, right?

17       A    Yes.

18       Q    So much so that there was a question raised

19   in the communications team that he may be going

20   overboard in trying to publicly show what he was

21   doing, which might not look so good while others

22   were busy at work in Thailand trying to save the

23   kids.

24            Do you remember that problem?

25       A    I was -- yeah.  We were also at work trying

Page 216

1        And we actually talked to -- we talked to the

2    gent- -- one of the gentlemen I mentioned earlier.

3    We talked to a couple members of the military.  One

4    of them asked for a photo with Elon.  And then after

5    a cer- -- after some period of time, Elon and I went

6    to -- with his security team, we went to a hotel to

7    sleep.

8        Q   And what was the name of the hotel?

9        A   I don't remember.

10       Q   And how long did you stay at the hotel?

11       A   I think it was maybe like five hours or six

12   hours or something.  We -- we had to -- we were

13   leaving quite early the next morning, so we --

14       Q   For Shang- -- Shanghai?

15       A   For Shanghai, yes.  Yeah, I believe.  Yeah,

16   exactly.  We went to Shanghai and then Beijing.

17       Q   You went to Shanghai with Mr. Musk?

18       A   I did.

19       Q   So at the time you left the cave to go get

20   your five hours or so of sleep before you go to

21   Shanghai, what had you learned about the status of

22   the children that were trapped in the cave and that

23   had not been rescued, how many?

24       A   Well, you -- you told me earlier it was five.

25       Q   I -- I didn't tell you.

Page 228

1      A    That's not true.

2      Q    I'm a good guy.

3      A    That's not true.

4      Q    Just -- I'm not trying to interrupt you.  It

5   gets a little stilted at times because --

6      A    Sure.

7      Q    -- you break up your answers a little bit.

8      A    Sure.

9      Q    But -- but I'm with you.  We're going to let

10  you get it all out.

11     A    The -- I apologize for interrupting you.

12     Q    That's okay.

13     A    I don't remember what the question was,

14  sorry.

15     Q    There had been --

16     A    Oh --

17     Q    Look, there's some negative publicity from

18  the BBC about the Thai rescue chief saying that the

19  sub was not practical, right?

20     A    Yes.

21     Q    And that's the subject of a -- what looks

22  like a fairly early morning e-mail from Mr. Musk

23  when he's in Shanghai after he gets a text from his

24  girlfriend.  And then Steve Davis responds about it

25  to BBC blog, and he quotes from it.  And he's

Exhibit 6
Page 322

Samuel Teller                                     September 30, 2019
Unsworth, Vernon v. Musk, Elon

Page 229

1      talking about the head of the rescue mission says

2      that he (as read):

3              "Acknowledges the help of Mr. Musk

4              and his team, but the equipment they

5              brought to help us is not practical

6              with our mission.  Even though their

7              equipment is technologically

8              sophisticated, it doesn't fit with

9              our mission to go in the cave,"

10             okay?

11             Was this your effort to counter that

12     publicity by creating this statement or

13     forwarding -- referencing this statement to these

14     members of the media about the prime minister's

15     press briefing?

16         A   Generally, yes.

17         Q   Okay.  You never made any efforts -- this --

18     I'm sorry.  I may have asked this, but I didn't

19     check it off in the break.

20             You didn't make any efforts to do any due

21     diligence to check out James Howard or James

22     Howard-Higgins or Phoenix Security or whatever his

23     company's name was, did you?

24         A   I did not.

25         Q   You all had never heard of him before until

Exhibit 6
Page 323

Samuel Teller                                      September 30, 2019
Unsworth, Vernon v. Musk, Elon

                                                    Page 271

 1     So I think this is totally accurate.

 2         Q    Did any of the SpaceX team members, when you

 3     were there, ever try to meet with Rick Stanton?  I

 4     know I asked you about Mr. Musk.  What about any of

 5     the SpaceX people?  Did they ever try to meet with

 6     Mr. Stanton and go over the tube?

 7         A    You'd have to ask them.  I don't know.

 8         Q    You were there.  Did you see him do it?

 9         A    I was there briefly.  So I didn't see anyone

10     after --

11         Q    You were there with Mr. Musk, sir.

12         A    I was there briefly with Mr. Musk.  The rest

13     of our team -- some people were there before us.

14     Most of them stayed after us.  So there was a lot of

15     time they could have asked to meet Mr. Stanton

16     without us being there to observe it.

17         Q    The well written article that Mr. Musk is

18     referring to is the article that was referenced in

19     Exhibit 93, is it not?

20         A    I -- I believe it is.

21         Q    And Mr. Musk re-Tweeted that article's link,

22     did he not?

23         A    I believe he did.

24         Q    He wanted people to read it, true?

25         A    I believe he did.

                        Veritext Legal Solutions

Page 272

1      Q   And he felt that it was helpful to his public

2   image with respect to having -- trying to recover

3   from having made the pedo guy accusation, true?

4      A   I believe he thought it was helpful -- it

5   would be helpful in having the public understand the

6   truth.

7      Q   And he thought that this article, upon

8   review, was the truth; is that what you're telling

9   me?

10     A   Generally, I believe that represents Elon's

11  view, but again, you'd have to ask him.

12     Q   Does it represent your view based on your

13  involvement and knowledge?

14     A   I'd have to take five minutes to read it to

15  give you a yes or no.

16     Q   Okay.  Yeah.  I mean, listen, if you want to

17  do that and need to, I'm happy to do that.

18     A   Do you want me to?  Okay.

19         MR. SPIRO:  Tell him the good news?

20         MR. WOOD:  What am I doing?

21         MR. SPIRO:  You got your three days.

22         MR. GRUNBERG:  Motion for was extension

23  granted.

24         MR. WOOD:  Good.  Good news.  It still didn't

25  change the hearing though.

Page 273

1       Q   Hey, do you know what?  Let me withdraw that

2    question because, you know -- because I don't want

3    to disrespect your right to read it, but I really

4    don't think it's entirely necessary --

5       A   Okay.

6       Q   -- for purposes of what I want to ask you

7    about.

8           This article, sir, that Mr. Musk thought

9    conveyed the truth, right?

10      A   I believe that was his view, but I can't

11   speak for him.

12      Q   But certainly an article that he wanted

13   hopefully to be reviewed and -- by a large number of

14   people and put on his Twitter, right?

15      A   Yes.

16      Q   Which at the time, would you agree, had a

17   little over 22 million followers?

18      A   I don't remember, but that sounds right.

19      Q   Yeah.  And this article discusses the "pedo

20   guy" Tweet, does it not?

21      A   I believe it does, yes.

22      Q   Look at the page TESLA 01568.

23          Really, actually, 1567.  Back to the black

24   mark (as read):

25          "Cave rescuer Elon Musk.  It was a

Samuel Teller                                          September 30, 2019
Unsworth, Vernon v. Musk, Elon

Page 334

```
 1              e-mail" -- "I sent you an off the
 2              record e-mail which clearly and
 3              unambiguously said off the record."
 4              Have I read that correctly?
 5         A    Yes.
 6         Q    And then he states (as read):
 7               "If you want to publish off the
 8              record comments and destroy your
 9              journalistic credibility, that's up
10              to you."
11              Have I read that correctly?
12         A    Yes.
13         Q    He left it up to Mr. Mac whether to publish
14    it or not under the threat, as he saw it, that if he
15    did so, it would destroy Mr. Mac's journalistic
16    credibility, true?
17         A    I mean, that was -- that was the gist of what
18    he said, yes, sir.  But that was after --
19         Q    That was before the publication.
20         A    Before the publication, but it was after Mac
21    suggested that --
22         Q    -- he was going to publish it?
23         A    Yes.
24         Q    Yeah.  And he said it's up to you, right?
25         A    Those -- those were his words.
```

Exhibit 6
Page 327

# EXHIBIT 7

# EXHIBIT 7

Exhibit 7
Page 328



Deposition of:

# David Arnold

*October 1, 2019*

In the Matter of:

# Unsworth, Vernon v. Musk, Elon

## Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Exhibit 7
Page 329

David Arnold                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 1

1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4       _____
                                        )
5       VERNON UNSWORTH,                )
                                        )
6              Plaintiff,               )
                                        )
7         vs.                           )  No. 2:18-cv-08048-SVW (JC)
                                        )
8       ELON MUSK,                      )
                                        )
9              Defendant.               )
        _____)
10

11

12

13

14

15        VIDEOTAPED DEPOSITION OF DAVID ARNOLD

16             Los Angeles, California

17             Tuesday, October 1, 2019

18                  Volume I

19

20

21      Reported by:

        NADIA NEWHART

22      CSR No. 8714

23

24

25

Page 9

1       Q    Are you -- what is your age?

2       A    34.

3       Q    What is your present employment?

4       A    Currently unemployed.

5       Q    And how long has that been your status?

6       A    Since middle of June.

7       Q    Of this year?

8       A    Yes.

9       Q    Where were you employed prior to the middle

10   of June of this year?

11       A    Tesla.

12       Q    Tesla?

13       A    Yes.

14       Q    Okay.  And how long had you been employed at

15   Tesla --

16       A    I started at --

17       Q    -- prior --

18       A    Sorry.

19       Q    That's okay.  -- prior to June of this year

20   when you left?

21       A    I started at Tesla in January of 2017.

22       Q    And where were you employed prior to Tesla?

23       A    Virgin America.

24       Q    How long at Virgin America?

25       A    May 2015 up until January 2017.

David Arnold                                                      October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                              Page 53

 1       Q    Do you know Ben Wilson?

 2       A    Ben Wilson?  I don't --

 3       Q    Ben -- I'm sorry.  I misspoke.  Long day.

 4            Do you know Ben Smith?

 5       A    At BuzzFeed?

 6       Q    Yes.

 7       A    Yes.

 8       Q    How long have you known Mr. Smith?

 9       A    It goes back a few years.  He worked in --

10   covered New York politics for a while when I was

11   involved in New York politics.  So I -- I'd say

12   maybe ten years.

13       Q    Do you find him to be a solid newsman?

14       A    We've had a good relationship.

15       Q    Do you believe he's a solid journalist?

16       A    Yes.

17       Q    Are you familiar with the phrase "off the

18   record"?

19       A    Yes.

20       Q    Are you familiar with the phrase "on

21   background"?

22       A    Yes.

23       Q    Are you familiar with the phrase "for

24   attribution"?

25       A    Yes.

David Arnold                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 76

1      A   Yes.

2      Q   It talks about Tesla at length --

3      A   Correct.

4      Q   -- does it not?

5          It talks about SpaceX at length, does it not?

6      A   Yes.

7      Q   And then there are references to Boring

8   Company, true?

9      A   I -- I believe so, yes.

10     Q   So now you've kind of got wrapped up in one

11  bundle, Exhibit 63, an article which is critical of

12  Mr. Musk, right?

13     A   Yes.

14     Q   Critical of his Tesla public relations team,

15  yes?

16     A   Yes.

17     Q   Likewise, critical of his SpaceX

18  communications team, true?

19     A   Yes.

20     Q   I can't recall, as I sit here, but I'm kind

21  of guessing that whatever it said about Boring, it

22  was not favorable to Boring.

23     A   I don't recall, but I think that's -- that's

24  fair.

25     Q   So now you've got in one bundled article

David Arnold                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 77

1    criticisms of all the companies' PR and Mr. Musk
2    individually, right?
3        A    Yes.
4        Q    Given that acknowledgment, you would have
5    expected this article to be either reviewed by
6    Mr. Musk or for someone in his various
7    communications teams to have brought it to his
8    attention, true?
9        A    True.
10       Q    Thank you.  When you said that you have a
11   breakdown between -- and I know it was an estimate
12   so I'm not trying to -- to play hard with you on
13   your testimony.  You said somewhere in the
14   neighborhood of 70 to 80 percent of your
15   communications with Mr. Musk were by e-mail?
16       A    Correct.
17       Q    About 20 to 30 percent in person?
18       A    Yes.
19       Q    And then a minimal amount by text?
20       A    Correct.
21       Q    In your experience in dealing with Mr. Musk,
22   how, if any way, did you decide which method of
23   communication?  And here's what I'm trying to get at
24   directly so that it's clear.
25            It sounds like that you rarely texted him; is

David Arnold                                              October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 100

1      Q    And then we get -- and Elon Musk says (as

2    read):

3               "Completely agree.  I was told

4               about a lot of bad things this guy

5               did and was upset that no one cared

6               to investigate, so responded in what

7               I felt was off the record.  In the

8               past, BuzzFeed has respected e-mails

9               prefaced with 'off the record' but

10              this time they did not.  It was

11              still one of the dumbest things I've

12              ever done and this distraction

13              couldn't come at a worse time."

14              Have I read that correctly?

15     A    Correct.

16     Q    Do you, sir, have any knowledge yourself --

17    beyond Mr. Musk's statement that BuzzFeed had

18    respected e-mails prefaced with "off the record" in

19    the past, do you have any knowledge beyond that,

20    firsthand or secondhand, that BuzzFeed and/or Ryan

21    Mac had ever in the past respected a communication

22    from Elon Musk that was unilaterally sent with an

23    "off the record" statement and there being no

24    agreement by the reporter?

25              Do you have any such knowledge?

Exhibit 7
Page 335

David Arnold                                              October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                        Page 101

 1        A    Not specifically with respect to BuzzFeed but

 2     with other publications.

 3        Q    But that's the key here.  When we talk about

 4     "off the record," we have to -- in terms of looking

 5     at whether Mr. Musk was reasonable in expecting that

 6     it wouldn't be published, we can't just look across

 7     the board and say, well, other people have done it.

 8            In order to be confident that it was going to

 9     be respected in this instance, there has to be an

10     established relationship upon which Mr. Musk could

11     reasonably expect that his confidence would be

12     respected, true?

13            MR. SPIRO:  Objection as to form.

14            THE WITNESS:  I don't agree with that with

15     respect to Elon Musk.  And -- and the reason is

16     because he is a very high profile public figure.

17     And I think, you know, it's one thing if a reporter,

18     you know, burns me, Dave Arnold, a communications

19     person working at Tesla or any other company.  I

20     think it's different in my mind.

21            If you're Elon -- Elon Musk -- it was

22     surprising to me that they took something that he

23     felt was off the record and put it on the record,

24     because I mean, you know, you're damaging that

25     relationship.

                    Veritext Legal Solutions

Page 102

```
 1      Q   But that was their right, BuzzFeed and Ryan
 2   Mac's right to decide, true?
 3          MR. SPIRO:  Objection as to form.
 4   BY MR. WOOD:
 5      Q   If they thought that they were going to bust
 6   whatever relationship someone thought existed with
 7   Elon Musk, that was their right to say we don't
 8   care.  We're going to publish it, true?
 9          MR. SPIRO:  Objection --
10   BY MR. WOOD:
11      Q   Isn't that true, sir?
12          MR. SPIRO:  Objection as to form.
13          THE WITNESS:  It is up to them if they want
14   to publish it.
15   BY MR. WOOD:
16      Q   And on the flip side, in order to determine
17   what level of confidence Mr. Musk claims to have
18   placed in BuzzFeed and Ryan Mac, we've got to find
19   some basis upon which he could say that he had
20   confidence.  He just can't manufacture it.  You
21   can't send something to someone who's essentially a
22   stranger to you and give them a unilateral dictate
23   to maintain your confidence without knowing that you
24   are taking a chance that that person might not
25   respect the confidence; isn't that true?
```

Page 103

1          MR. SPIRO:  Objection to the form.

2          If you can understand that.

3    BY MR. WOOD:

4      Q   Isn't that the truth, sir?

5      A   Could you please repeat the question.

6      Q   Yes, sir.  I'll read it back.  In order --

7    and I said, on the flip side, in order to determine

8    what level of confidence Mr. Musk claims that he

9    placed in BuzzFeed and Ryan Mac, we've got to find

10   some basis upon which he can say that he had

11   confidence.  He just can't manufacture it.

12          You can't send something to someone who's

13   essentially a stranger to you and give them a

14   unilateral dictate to maintain your confidence

15   without knowing that you were taking a chance that

16   that person might not respect the confidence; isn't

17   that true, sir?

18          MR. SPIRO:  Same objections.

19   BY MR. WOOD:

20     Q   It's just common sense.

21     A   I --

22          MR. SPIRO:  Same -- another objection.

23          THE WITNESS:  He's, of course, taking a

24   chance, but I think -- I mean, I would imagine he'd

25   based that on his dealings with media, you know,

David Arnold                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 104

1    that he's been doing for years.

2    BY MR. WOOD:

3        Q   No, I don't care what media he was doing for

4    years.  If he had a relationship of years with this

5    fellow at QUORA, I understand that he might

6    reasonably expect that if he sends him something

7    that says off the record, that based on their

8    relationship, he would expect it would be kept off

9    the record.

10           Do you follow me?

11       A   I -- I can only speak to how I would do it.

12       Q   Well, that's just it.  This isn't about how

13   you or even Mr. Musk would do it.  This is about how

14   a reasonable person would do it.  It's an objective

15   standard.  And a reasonable person wouldn't run

16   around and provide confidential information to

17   someone who was a -- as a practical matter, a

18   stranger to them, whether they're in the media or

19   not.

20           Don't you agree, sir?

21           MR. SPIRO:  Objection as to form.

22           THE WITNESS:  I -- I don't think it's an

23   unreasonable expectation on his part to think that

24   that -- when he said this is off the record, it was

25   going to be off -- of the record.  You know, was

David Arnold                                                October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 105

1    it -- could he have been more careful and -- and

2    asked in advance for, you know, a formal agreement?

3    Yes.   And is that what I would have done as a

4    communications person?   Yes.

5            But I think based on -- I've seen him send

6    "off the record" e-mails to other reporters.

7    BY MR. WOOD:

8        Q   That doesn't mean it's right.

9        A   Unilaterally, out of the blue, and it's

10   honored.   And in my own experience, when I've sent

11   off the record e-mails unilaterally to reporters, I

12   can't think of a time when that hasn't been

13   respected by a reporter.

14       Q   Have you -- so I want a name or two so that I

15   can speak with them.   Give me the name of a

16   journalist that you had no relationship with except

17   potentially an adverse relationship, where you

18   unilaterally, on your own, sent very sensitive

19   information where you claimed off the record without

20   first getting an agreement from that person that it

21   would be off the record.   Name one.

22       A   Off the top of my head, I can't.   I send

23   hundreds of e-mails.

24       Q   I'm not asking you to go through it.   We're

25   going to take another break.   I'm going to ask you

Exhibit 7
Page 340

David Arnold                                October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 111

1    article.

2        Q    We'll let the finder of fact read this e-mail

3    and decide.

4        A    Okay.

5        Q    But your opinion is you -- you don't believe

6    it was direct.

7        A    No.

8        Q    Was it indirect?

9        A    In fact, the -- the reason that Joe Rogan was

10   discussed, because it was a three-hour format, and

11   Elon is generally in his element when he has an

12   opportunity to speak at length about things and

13   really get into detail rather than, you know, a -- a

14   sort of quick five-minute interview or something

15   that's going to be focused on one topic.  That's my

16   memory of why ultimately, he did Joe Rogan.

17       Q    Thank you.  Mr. Musk didn't fall off the

18   space rocket yesterday.  He's been around dealing

19   with the media for quite a number of years, hasn't

20   he?

21       A    Yes.

22       Q    And Mr. Musk knows that when he says

23   something, it is potentially news, true?

24       A    Yes.

25       Q    And, therefore, Mr. Musk has to be careful

Page 112

1     both in what he says and who he says it to.

2          Do you agree?

3     A    Yes.

4          MR. WOOD:  Let me have the Ryan Mac article,

5     the September 4th article.

6          Do you have the exhibit notebook?  It's going

7     to be in there.  Sorry for the delay.

8          Do you have all the exhibits?

9          THE REPORTER:  I hope so. I'll check at the

10    end.

11         MR. WOOD:  From the very beginning of time?

12    I'm talking about Exhibit 1.

13         THE REPORTER:  No, no.  I don't have all of

14    them.

15         MR. WOOD:  Let me have that real quick.  I

16    will find it.  What number?

17         MR. GRUNBERG:  23.

18         MR. WOOD:  Do we have a copy of this?  It

19    should be in that stack there.  There you go.  23.

20         Do we have two copies?

21    Q    I'm going to hand you what has been

22    previously identified as Exhibit 23.

23         Are you familiar with that article?

24    A    I am.

25         MR. WOOD:  Here you go, Alex.

David Arnold                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 113

1        Q    That's -- that's the article.  That's the

2    September 4, 2018 article we've been discussing,

3    right?

4        A    Correct.

5        Q    Look at the next to the last page of that

6    article where he includes in the article Mr. Musk's

7    e-mail of August 30th, 20- -- 2018 at 6:43 p.m.

8        A    I'm sorry.  You said the second to the last

9    page?

10       Q    Well, the next to the last page.  I'm sorry.

11       A    Got it.

12       Q    Here are the e-mails that Ry- -- Elon Musk

13   sent to BuzzFeed News reporter Ryan Mac.

14            Do you see where I'm looking?

15       A    Yes.

16       Q    Now, before we look at that, if you're going

17   to -- if you're Elon Musk -- as you've said, he has

18   a high, high profile.  He's one of the wealthiest

19   men in the world, true?

20       A    Yes.

21       Q    Generally considered by his followers to be a

22   genius, right?

23       A    Yes.

24       Q    Worth, according to Forbes, at or and above

25   $20 billion, right?

Page 114

 1     A    Correct.

 2     Q    The guy that's going to take us to Mars and

 3  save our civilization; that's kind of his tag, isn't

 4  it?

 5     A    Correct.

 6     Q    The guy that's going to clean up the

 7  environment and build -- I call them the glorified

 8  golf carts, but I like -- I like a good Chevy.  But

 9  he's the guy that's going to build the -- the

10  electric vehicle, right?

11     A    Right.

12     Q    When he talks, it's news?

13     A    Correct.

14     Q    So he's got to be careful, right?

15     A    Yes.

16     Q    And part of being careful, you have to

17  consider the nature of what he's saying, don't you?

18     A    Yes.

19     Q    And what he said about Vernon Unsworth was an

20  accusation of the most heinous conduct in our

21  civilized society, a child rapist, true?

22     A    It's -- it's a serious accusation.

23     Q    No, no, please, sir.  I know serious

24  accusations.  This was a heinous accusation.

25     A    You said the most heinous accusation.

Exhibit 7
Page 344

Page 115

1      Q    It was a heinous accusation.

2      A    I'd say it is -- it is a heinous accusation.

3      Q    Not many are worse, wouldn't you agree?

4      A    Yes.

5      Q    And here he is with a reporter who has,

6    within two months, produced an article profiling

7    Mr. Musk and his companies in a way that is critical

8    of all four, right?

9      A    Yes.

10     Q    And he doesn't take the time to pick up the

11   phone or send an e-mail saying, can we have an off

12   the record conversation?  He doesn't do that, does

13   he?

14     A    He does not.

15     Q    That would have been the prudent thing to do,

16   wouldn't it?

17     A    That would have been the most prudent thing

18   to do, yes.

19     Q    Yes.  And he then doesn't do that.  But he

20   starts off and he says (as read):

21         "Off the record."

22         Follow me when I read (as read):

23          "I suggest that you call people you

24          know in Thailand, find out what's

25          really going on and stop defending

Page 116

1          child rapists you fucking asshole."

2          Have I read that correctly?

3     A    Yes.

4     Q    Now, even if you've got some level of

5     confidence that somebody's, from a historical

6     standpoint, going to keep your confidence, you're

7     pushing the line when you call them a fucking

8     asshole in the first sentence, aren't you, sir?

9     A    Yes.

10    Q    It's hard to realize -- it's hard to envision

11    anybody reasonably expecting that someone who he has

12    no relationship of trust with is going to keep

13    information unilaterally off the record from Elon

14    Musk when he addresses them in the first sentence as

15    a fucking asshole.  Don't you agree with me?

16    A    It makes it harder, yes.

17    Q    You agree with me, don't you, sir?

18    A    Could you restate the question.

19    Q    Yes.  It's hard to envision anybody

20    reasonably expecting that a reporter who he has no

21    established relationship of trust with is going to

22    keep information confidential and off the record at

23    his unilateral request when he starts off giving the

24    information in the first sentence calling the

25    reporter a fucking asshole, true?

Page 117

1              MR. SPIRO:  Objection to form.

2              THE WITNESS:  I think if -- if I sent that

3        e-mail, that would be true.  I think it is, again,

4        as I said earlier, different for Elon Musk.

5        BY MR. WOOD:

6        Q    When you send that e-mail, with all due

7        respect, sir, nobody really cares about your

8        statements.  You're just Dave Arnold, just like I'm

9        Lin Wood.  It doesn't make news necessarily what

10       Dave Arnold says, does it?

11       A    No.

12       Q    But when it comes from Elon Musk on a subject

13       matter that has been out front as one of the most

14       covered news events in recent weeks and months, the

15       chances of that being news to be published are

16       significantly higher than it's just from the average

17       Joe or Dave Arnold or Lin Wood, don't you agree?

18       A    That's true.

19       Q    And you're calling the reporter a fucking

20       asshole.  I mean, would you walk up to somebody that

21       you really don't know or know somebody that says

22       something critical about you and say, hey, I want to

23       tell you a secret that you better keep, you fucking

24       asshole?

25              Would you really expect them to keep that

Page 118

1     secret?

2             MR. SPIRO:   Objection to form.

3     BY MR. WOOD:

4        Q    Mr. Arnold, would you reasonably expect that

5     person to keep that secret?

6        A    If it were me saying it, no.

7        Q    If anybody reasonably were to do that, you

8     wouldn't expect that person to believe that that

9     person was going to keep a secret?

10       A    I mean, again, I think it's -- it's different

11    for Elon.

12       Q    No, it's not.  It's worse for Elon.

13            MR. SPIRO:  Objection; argumentative.

14            MR. WOOD:  I'm not through.  Don't interrupt

15    me.

16            MR. SPIRO:  You are badgering the witness

17    again.

18            MR. WOOD:  Don't interrupt me.  State your

19    objection after I've asked -- finished asking my

20    question.

21       Q    It's worse with Mr. Musk.  The chances of

22    publication are greater because it's coming from

23    Elon Musk than if it's coming from Dave Arnold,

24    true?

25            MR. SPIRO:  Objection as to form.

                                                              Page 119

1      BY MR. WOOD:

2          Q   Because he makes news, you don't.

3          A   I --

4              MR. SPIRO:  Objection to form.

5              THE WITNESS:  I don't agree.  The thing to

6      balance here is that there's bigger risk for the

7      publication if they burn him.

8      BY MR. WOOD:

9          Q   But that's their risk.

10         A   That's, I think, a significant risk.  As you

11     said, he's one of the biggest newsmakers in the

12     world.  And if you, as a publication, cut off --

13     essentially run the risk of cutting off your access

14     to one of the biggest newsmakers in the world,

15     that's a serious risk.

16         Q   It's a risk that -- that only BuzzFeed has

17     the right to assess and evaluate and decide, right?

18         A   Correct.

19         Q   But I want to talk about Mr. Musk.  When

20     Mr. Musk, with his high profile nature, knowing that

21     he's got to be careful about what he says and

22     careful about who he says it to because he knows

23     that when he speaks, it can make news and he knows

24     he's talking about an event of such public interest

25     as the Thai cave rescue, it's Mr. Musk that has a

Page 120

1    responsibility to reasonably ensure that his

2    statements, especially when they are heinous

3    accusations of child rapist against an individual,

4    he's the one that's got a higher duty to make sure

5    that he takes the steps to get an agreement that

6    it's not going to be published before he types it

7    out in an e-mail, true?

8          MR. SPIRO:  Objection as to form and --

9          THE WITNESS:  I think he has a higher duty to

10   ensure that it's not -- do what he can to ensure

11   it's not printed, and I think putting "off the

12   record" on there is a clear way of doing that.

13   BY MR. WOOD:

14   Q   It's one way, but it's not a good way.

15   A   That's --

16   Q   The only -- the only reasonable protection at

17   a minimum to get protection before you run your

18   mouth and accuse somebody of being a child rapist in

19   this kind of public event when you're Elon Musk is

20   to first look over at the reporter and say I'm going

21   to tell you what you need to learn about

22   Mr. Unsworth, but you're going to have to agree to

23   do it off the record and not for publication.  That

24   is the reasonable step in this type of a situation,

25   isn't it, sir?

David Arnold                                            October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                        Page 121

1        A    It would be the most prudent thing to do,

2   yes.

3        Q    Thank you.  And he didn't do it.  In fact,

4   Exhibit 42 -- do you have 42?

5            MR. GRUNBERG:  She has it.

6            MR. WOOD:  Do you have 42?  Thank you.

7        Q    The court reporter has handed you Exhibit 42,

8   Mr. Arnold.  And it starts with an e-mail from

9   Mr. Mac, August the 29th, and he's asking him about

10  a Tweet.  I don't know if you recall this or not but

11  you probably looked at it.  Mr. Musk Tweeted --

12  where is the Tweet?  Exhibit 41.

13            Mr. Musk had Tweeted on the 29th at 2:41 a.m.

14  in response to a Tweet by Drew Olanoff at Yoda.

15  Drew Olanoff Tweets (as read):

16            "One other thing Elon.  Your

17            dedication to facts and truth would

18            have been wonderful if applied to

19            that time when you called someone a

20            pedo."

21            Have I read that correctly?

22       A    Yes.

23       Q    And then what does Elon Musk reply on

24  Twitter?

25       A    He says (as read):

Veritext Legal Solutions

Exhibit 7
Page 351

Page 122

1             "You don't think it's strange he

2             hasn't sued me?  He has offered

3             freely" -- "he was offered free

4             legal services and you call yourself

5             at Yoda."

6      Q    And then you're aware of the fact that I

7    replied to this Tweet by Mr. Musk, and I said (as

8    read):

9             "Elon Musk should check his mail

10            before he Tweets."

11            And I attached to that Tweet in defense of my

12   client and the implications of Mr. Musk's Tweet

13   about him the letter that I had sent to him on

14   August the 6th advising him that a lawsuit was being

15   considered and giving him an opportunity to discuss

16   how to correct the record.

17            Do you remember that?

18      A    I -- I have a vague recollection of that.

19      Q    Yeah.

20      A    I don't remember the specifics.

21      Q    And that spurred Ryan Mac on the 29th to

22   write Mr. Musk and say (as read):

23            "There's a letter dated August 6th

24            sent to your Los Angeles home and

25            discusses legal proceedings against

Page 123

1          you for libel.  Given the Twitter

2          conversation yesterday" --

3          Which I think you would agree is a reference

4     to the conversation on Exhibit 41, right?

5     A    Correct.

6     Q    (As read):

7          "I was hoping you could talk about

8          the letter and whether you had seen

9          it yet.  I'm happy to chat on the

10         phone if you want to call me."

11         And then he gives Mr. -- he gives Mr. Musk

12    his phone number, right?  Do you see that?

13    A    I do.

14    Q    But Mr. Musk didn't call him.  Mr. Musk

15    writes him back and says (as read):

16         "Have you actually done any

17         research at all?"

18         That's a little bit insulting, isn't it?

19    A    I --

20    Q    Come on.

21    A    I --

22    Q    (As read):

23         "Have you real-" -- "have you

24         actually done any research at all?"

25         That's demeaning, isn't it?

David Arnold                                              October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 124

 1      A   I wouldn't necessarily take it that way.
 2      Q   Now you go with "necessarily."  When I'm
 3   sitting there saying I want to talk to you about a
 4   subject matter and you write me back and say, have
 5   you done any research at all, you're demeaning me in
 6   the sense of suggesting that I don't know what
 7   I'm -- I'm talking about, right?
 8      A   I have a thick skin.  I don't take that
 9   particularly -- I'm not offended by --
10      Q   The average person might feel differently?
11      A   Perhaps.
12          MR. SPIRO:  Objection to form.
13   BY MR. WOOD:
14      Q   Now he goes on to say (as read):
15          "For example, you incorrectly state
16          that he's a diver, which shows that
17          you know essentially nothing and
18          have not even bothered to research
19          basic facts."
20          Now, that is insulting, isn't it?
21      A   Yes.
22      Q   So now he comes back to -- it's a reasonable
23   request from Mr. Mac that he made initially.
24          Wouldn't you agree?
25      A   I think it's a pretty pro forma e-mail.

David Arnold                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 125

1      Q   Standard handling, isn't it?

2      A   Yes.

3      Q   Nothing offensive about it to Mr. Musk,

4   wouldn't you agree?

5      A   Yes.

6      Q   And then Musk goes back and insults the man,

7   doesn't he?

8      A   Some might see it as insulting, but yes.

9      Q   You see it as insulting, don't you?

10      A   Yes.

11      Q   And then Mr. Mac writes him and says (as

12   read):

13          "Hey Elon.  Thanks for getting back.

14          Actually he prefers to be called a

15          spelunker."

16          Do you know what a spelunker is?

17      A   Cave diving?

18      Q   No.

19      A   Then no.

20      Q   A cave diver is a cave diver.  Mr. Unsworth

21   has never represented himself to be a cave diver.

22   He does diving, but he's a cave explorer.  He goes

23   in and explores caves and maps them.  He's a

24   spelunker.  He's a caver.

25          He writes back and says (as read):

David Arnold                                          October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                    Page 126

1              "Hey Elon.  Thanks for getting

2              back.  Actually, he prefers to be

3              called a spelunker, and we've

4              confirmed that he actually does do

5              cave diving, but do you have any

6              comment on the letter you received?"

7          Now, that is also a pro forma.  In fact, it's

8      almost like Mr. Mac professionally ignored the

9      insult and still made a reasonable request to get

10     Mr. Musk to talk with him.

11          Do you agree?

12     A   Yes.

13     Q   And then he doesn't hear anything, and he

14     writes back, and he says (as read):

15             "Hey Elon.  Just wanted to make sure

16             I did my due diligence to research

17             basic facts and follow up here."

18             Do you see that?

19     A   Yes.

20     Q   Very appropriate professional e-mail from

21     Mr. Mac despite the insults, right?

22     A   It's a professional e-mail.

23     Q   And then Elon Musk writes the e-mail that we

24     just talked about that starts off (as read):

25             "I suggest you call people you know

David Arnold                                        October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 127

1           in Thailand and find out what's
2           really going on and stop defending
3           child rapists, you fucking asshole."
4           Now, he has added a significant insult on top
5    of an already insulting e-mail, true?
6        A   Yes.
7        Q   Nobody would reasonably expect writing to a
8    reporter like this that this person is going to
9    honor your unilateral off the record, are they, sir?
10           MR. SPIRO:  Objection, again, to form.
11   BY MR. WOOD:
12       Q   Unless their ego is so great that they think
13   they're so omnipotent and powerful that people will
14   do whatever they say without question.
15       A   Again, it is insulting, I agree, but I think
16   you balance that versus the risk to the publication
17   of losing access to the -- that is the mental
18   calculus that I would do on this, but --
19       Q   I know that.  But I -- but we're talking
20   about the calculus that should be done on Elon
21   Musk's part.  He had no business reasonably
22   expecting that this publication was going to honor
23   his unilateral demand that it be off the record when
24   he already knows they have criticized him in a
25   significant article and he has gone out of his way

Page 128

```
 1        to insult the reporter to the point of calling him a
 2        fucking asshole.
 3               That's not a reasonable expectation under
 4        these facts, is it, sir?
 5           A    I think if he wanted it to be on the record,
 6        he wouldn't --
 7               MR. SPIRO:  Objection to form.
 8               THE WITNESS:  -- have said "off the record."
 9        BY MR. WOOD:
10           Q    Oh, I don't think -- I don't know whether
11        Mr. Musk wanted it to be -- I would assume that he
12        in his own world believed that he could say off the
13        record and people would do whatever Elon Musk said.
14        I don't doubt that.  But that's not the real world.
15               When you ask somebody to keep your confidence
16        and you're getting ready to say something that is a
17        heinous accusation against a private individual, you
18        are taking a major chance that your confidence will
19        not be honored if you are insulting the person
20        you're asking to keep your confidence not once but
21        twice and the second one being -- calling them a
22        fucking asshole, wouldn't you agree?
23           A    I would agree you're taking a chance.  I
24        wouldn't classify it as a major chance, in the -- in
25        the case of Elon Musk.
```

David Arnold                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 129

1      Q   When you start calling people a fucking

2    asshole, the chances of that person saying, you

3    know, basically, fuck you, Elon Musk.  I don't care

4    who you are.  You insult me like this, I have no

5    obligation not to publish.  I'm going to publish.

6         He actually increases the chance of

7    publication by calling this reporter a fucking

8    asshole, doesn't he?

9         MR. SPIRO:  Objection as to form.  He can't

10   possibly answer that question.

11   BY MR. WOOD:

12     Q   Doesn't he?

13     A   I -- it's a risk.

14     Q   It gets bigger when you call the reporter a

15   fucking asshole, doesn't it, sir?

16         MR. SPIRO:  Objection to form.

17         THE WITNESS:  I think the fact that he said

18   it off the record and he's Elon Musk --

19   BY MR. WOOD:

20     Q   It wasn't off the record to Ryan Mac.  He

21   called Ryan Mac essentially in an e-mail to his face

22   a fucking asshole.  That certainly increased the

23   chances that Ryan Mac might publish that

24   information, didn't it?

25         MR. SPIRO:  Objection.

David Arnold                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 130

1            THE WITNESS:   I think that's fair.

2    BY MR. WOOD:

3        Q    Thank you.   And then Mac writes him back and

4    says (as read):

5              "I didn't agree for the

6              conversation to be off the record

7              but appreciate the response."

8              Very professional.

9              And then he goes on to say (as

10             read):

11              "To follow up, I've tried to report

12             out some of the accusations on" --

13             "on my own but have not found

14             anything to corroborate the claims.

15             Are you able to share anything that

16             you found about Elon" -- "about

17             Vernon Unsworth?"

18             And then it goes on to say some specifics

19   about what Musk had accused him of and says -- and

20   then, again, asks him about the August 6th letter.

21   And Elon Musk writes back and says (as read):

22             "We haven't had a conversation at

23             all."

24             And they had not, had they?   They had an

25   e-mail communication.   But, you know, as you sit

David Arnold                                          October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                    Page 131

1     here today, that you would tell me, Mr. Wood, I read

2     this and I agree a hundred percent with you.  Elon

3     Musk and Ryan Mac never reached any agreement to

4     keep any information off the record.

5          You would tell me that, wouldn't you?

6          MR. SPIRO:  Objection to form.

7          THE WITNESS:  They did not reach an agreement

8     in advance, no.

9     BY MR. WOOD:

10         Q   There wasn't even an agreement sought.  There

11    was just one demanded by Mr. Musk, wasn't it?

12         A   I wouldn't --

13         MR. SPIRO:  Objection to form.

14         THE WITNESS:  -- qualify it as demanded.

15    When I say "off the record" to reporters, I wouldn't

16    say I'm demanding that.  I'm --

17    BY MR. WOOD:

18         Q   You're asking for it to be?

19         A   No.  You're -- it's standard practice.

20         Q   No, it's not.  And you know that's not the

21    truth, sir.

22         A   I --

23         Q   Ben Smith is going to tell you in a minute

24    when we go over his e-mails that you're wrong, isn't

25    he?

                    Veritext Legal Solutions

Exhibit 7
Page 361

Page 143

1    Q   Take out the "haphazardly," and you would

2    agree with me; would that be true?

3    A   Would you repeat it, then.

4    Q   Yeah.  You're working me hard, Mr. Arnold.

5        Mr. Musk had an absolute responsibility to

6    consider the consequences of what he was saying as

7    they might impact Vernon Unsworth before he goes out

8    and utters them through e-mail, making these heinous

9    accusations of Mr. Unsworth without even trying to

10   get an agreement that it would be off the record.

11   He's got to consider the consequences to the person

12   he's talking about, doesn't he, sir?

13   A   The question keeps changing.  I mean, you

14   added "without seeking an agreement."

15   Q   He didn't seek an agreement.

16   A   He did not, but I think stating "off the

17   record" up front, again --

18   Q   It's his desire for it to be confidential.

19   A   He --

20   Q   It's a one-way street.  If I say, hey, I'm

21   going to tell you a secret.  I've expressed the idea

22   that I'm going to tell you a secret, right?  And

23   most people, maybe if you know them well enough and

24   they're friends, you're comfortable saying I want to

25   tell you a secret and then you tell it.  You don't

Exhibit 7
Page 362

Page 144

1    wait for them to say I'll keep it because you know

2    who they are and you trust them, right?

3        A    Yes.

4        Q    But if I talk to somebody I don't really know

5    that has just finished calling me a fucking asshole,

6    I am acting in my own peril when I look over in

7    response and go, I'm going to tell you a secret.

8    Don't tell anybody.  Wouldn't you agree that -- from

9    that, sir, from just a common sense standpoint?

10            MR. SPIRO:  Objection to form.

11            THE WITNESS:  It is a risk in that regard.

12   BY MR. WOOD:

13       Q    So you do agree with me from a common sense

14   standpoint, don't you?

15       A    With respect to that specific example that

16   you just gave; however, I think journalistic

17   practices are slightly different, and I think it's

18   a -- it's a norm to say "off the record" and then

19   have that be on it.

20       Q    It's what?

21       A    A norm.

22       Q    That's just your opinion, and you know that

23   many members of the journalistic community disagree

24   with you, including the man you tried to talk out of

25   publishing it, Ben Smith, a man you respect as a

David Arnold                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 145

1       journalist --

2               A    He disagreed with --

3               Q    -- over ten years, right?

4               A    He disagreed with me in this, yes.

5               Q    Right.  He's the editor.  Let's get that on

6       the record.  Look at -- look at Exhibit -- have we

7       marked 107?

8                    THE REPORTER:  Yes.

9       BY MR. WOOD:

10              Q    Take a look at 107.

11                   So Ryan Mac reaches out to you on September

12      the 4th, 2018, 1:04 p.m.  (as read):

13                   "Hey Dave, I hope you had a nice

14                   long weekend.  I just wanted to give

15                   you a heads-up.  They're working on

16                   a story about Elon and some

17                   accusations he made to me about the

18                   British diver Vernon Unsworth.  Elon

19                   e-mailed me last week with some new

20                   accusations that we intend to

21                   publish.  I wanted to see if Tesla

22                   PR had any response to that.  In

23                   addition, we wanted to pose the

24                   following question:  Does Tesla and

25                   its board believe that Elon Musk is

Exhibit 7
Page 364

Page 165

1     A    I believe the latter.

2     Q    He just told you to call the editor?

3     A    Yeah.

4     Q    So you followed his instructions, and you

5     sent an e-mail to Ben Smith that we just went over,

6     right?

7     A    Yes.

8     Q    And Ben Smith responded and said -- and you

9     knew Ben?

10    A    I did.

11    Q    He said (as read):

12           "Hi Dave, happy to chat.  But

13           you've been doing this long enough

14           to know that you agree to the terms

15           of a conversation in advance."

16           Then he gives you his phone number and says

17    (as read):

18           "If you want to give me a call right

19           now, Ben."

20           Have I read that accurately?

21    A    Correct.

22    Q    There's no doubt about what Ben Smith was

23    telling you there, is there, sir?

24    A    That is what he said, yes.

25    Q    He's saying you've been around this business

Page 166

1    long enough to know better.  You know that you agree

2    to the terms of a conversation in advance.  That's

3    what he's conveying to you straight up, isn't it?

4        A   That is what he said, yes.

5        Q   And then you say (as read):

6            "See below.  I'll call you."

7            And that's to Juleanna Glover, right?

8        A   Correct.

9        Q   Did you call Mr. Smith back?

10       A   I did.

11       Q   What did you all say?

12       A   I don't remember the specifics of the

13   conversation, but I believe I -- I told him I was

14   confused about, you know, why they put this on the

15   record when it was stated that it was off the

16   record -- when Elon stated it was off the record.

17           And I believe I said, you know, "I'm

18   particularly confused about this given that, you

19   know, I myself have said off the record to BuzzFeed

20   reporters before and -- and that's been totally

21   fine."

22       Q   And Ben Smith told you what?

23       A   He said, you know --

24       Q   You know better?

25       A   I'm paraphrasing -- no.  He -- I don't

Page 167

1    recall.   I think he said, you know, thanks, but

2    we're publishing it anyway.

3        Q   He pretty much repeated what he -- he

4    conveyed to you pretty much what he had conveyed in

5    the e-mail?

6        A   I don't recall exactly, but I expect that he

7    did, yes.

8        Q   Yeah, that you ought to know better?

9        A   I think he -- we differed in an opinion on

10   this matter.

11       Q   But he said, "You ought to know better."

12       A   He said that in an e-mail.

13       Q   And that's the gist of what he said in the

14   conversation.   He didn't change his position one

15   bit, did he?

16       A   I can't recall exactly what his response was.

17       Q   He didn't change his position --

18       A   He did not.

19       Q   -- one bit, did he?

20       A   No.

21           MR. WOOD:  108.

22           THE REPORTER:  109.

23           MR. WOOD:  109.

24           (Exhibit 109 was marked for identification

25       by the court reporter and is attached hereto.)

Page 168

1    BY MR. WOOD:

2        Q    Do you know what is contained in the blank --

3    is there any lawyer on this e-mail 109 on the -- it

4    says "Elon Musk to Dave Arnold, Sam Teller and Todd

5    Maron."

6            Who's Todd Maron?

7        A    He was with Tesla's general counsel at the

8    time.

9        Q    Okay.  That helps me.  Is that a true and

10   correct copy of -- well, you've already

11   stipulated --

12           MR. SPIRO:  Yes.

13           MR. WOOD:  -- right?

14       Q    I mean, you report back to Elon Musk.

15   Essentially, you're telling him it didn't work;

16   they're going to publish, right?

17       A    Oh, at the very top?

18       Q    Yeah.  The report you wrote to Elon Musk and

19   essentially you said --

20       A    Yeah.

21       Q    -- I talked to him.  It didn't work.  They're

22   going to publish, right?

23       A    Yep.

24       Q    Even after you tried to argue with Ben Smith

25   this idea that you claim you unilaterally said a

Exhibit 7
Page 368

Page 169

1     number of things off the record to BuzzFeed

2     reporters, Ben Smith didn't bite for it, did he?

3         A    No.

4         Q    Didn't -- you didn't convince Ben Smith at

5     all about saying that to him, did you?

6         A    I did not.

7              MR. WOOD:   110.

8              (Exhibit 110 was marked for identification

9         by the court reporter and is attached hereto.)

10             MR. WOOD:   And while I've got you, because it

11    may be the last one, 111.

12             (Exhibit 111 was marked for identification

13        by the court reporter and is attached hereto.)

14             MR. WOOD:   What number are we up to?

15             THE REPORTER:   110 and 111.

16    BY MR. WOOD:

17        Q    Do you see Exhibit 110?

18        A    Yes.

19        Q    That is, in fact, an e-mail that you sent to

20    Sarah O'Brien?

21        A    Correct.

22        Q    You had talked to Ryan Mac?

23        A    It appears so, yes.

24        Q    (As read):

25             "Ugh, Ryan Mac is not relenting.  I

# EXHIBIT 8

# EXHIBIT 8

Exhibit 8
Page 370



Deposition of:

**Steven Davis**

*October 1, 2019*

In the Matter of:

**Unsworth, Vernon v. Musk, Elon**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Exhibit 8
Page 371

Page 1

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4     _____

                                     )

5     VERNON UNSWORTH,               )

                                     )

6              Plaintiff,            )

                                     )

7         vs.                        )  No. 2:18-cv-08048-SVW (JC)

                                     )

8     ELON MUSK,                     )

                                     )

9              Defendant.            )

      _____)

10

11

12

13

14

15       VIDEOTAPED DEPOSITION OF STEVEN M. DAVIS

16              Los Angeles, California

17              Tuesday, October 1, 2019

18                    Volume I

19

20

21    Reported by:

      NADIA NEWHART

22    CSR No. 8714

23

24

25

Exhibit 8
Page 372

Steven Davis                                                October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 10

1        A    Approximately five years.

2        Q    Why -- I don't want to go into your personal

3    business but if you can tell me if you don't mind,

4    why the move from D.C. to Vegas?

5        A    So I'm a dual employee of SpaceX and The

6    Boring Company.   And The Boring Company has a

7    project in Las Vegas that was relevant for me to be

8    local for.

9        Q    What -- how long have you worked for -- you

10   work for SpaceX and Boring?

11       A    Correct.

12       Q    Let me break them down in case there's a

13   difference.   How long have you worked for SpaceX?

14       A    Since 2003.

15       Q    And how long have you worked for Boring?

16       A    2018.

17       Q    What has your -- can you give me an overview

18   of your history at SpaceX in terms of the positions

19   you've held since you joined it in 2003.

20       A    Yeah.   Earlier, I was a guidance navigation

21   and control engineer.   Then I became an engineer on

22   the Dragon spacecraft.   And then my official title

23   is director of advanced projects, which kind of

24   means projects off the beaten path for SpaceX.

25       Q    And then if you would, tell me what you do

Veritext Legal Solutions

Steven Davis                                          October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                        Page 11

1      for The Boring Company in terms of your position.

2      A      At Boring Company, I'm the president.

3      Q      And who do you answer to for Boring Company?

4      A      For Boring Company, I answer to Elon Musk.

5      At SpaceX, my manager is Hans Koenigsmann.

6      Q      I'm sorry.  At SpaceX, your manager is who?

7      A      Hans Koenigsmann.

8      Q      Prior to joining SpaceX in 2003 -- did I get

9      that right?

10     A      Uh-huh.

11     Q      Where were you employed?

12     A      SpaceX was my first job.

13     Q      Had you just graduated?

14     A      Correct.

15     Q      Where did you graduate from, and what was

16     your degree?

17     A      It was a grad degree at Stanford in aerospace

18     engineering.

19     Q      And your undergraduate degree was in?

20     A      In business and engineering from Penn.

21     Q      My son, who is co-counsel on this case with

22     me went, to Tech --

23     A      Wait.  Is it --

24     Q      No, no.  My son is much better looking than

25     Jonathan.  My son is not, here but may be on the --

Exhibit 8
Page 374

Page 24

1        A    -- assuming we're talking about the Lauren

2    Caplan who lives in Denver.

3        Q    C-a-p-l-a-n?

4        A    Correct.

5        Q    And does she work, in any way, with

6    Mr. Musk's organizations?

7        A    Not to my knowledge.

8        Q    Is she a personal friend of yours?

9        A    Yeah.  She's a good friend.

10           THE REPORTER:  97.

11           MR. WOOD:  97.

12           (Exhibit 97 was marked for identification

13         by the court reporter and is attached hereto.)

14           THE WITNESS:  Should I read this or --

15    BY MR. WOOD:

16        Q    Hang on a second.  Okay.  Now, the court

17    reporter has handed you what has been marked for

18    purposes of identification Exhibit 97 to your

19    deposition.  And I would ask you to take a moment

20    and look at that document.

21        A    Okay.

22        Q    Before --

23           THE WITNESS:  Do you want me to pass this to

24    you?

25           MR. WOOD:  He's got a copy.  He's got a copy.

Page 25

1            Before I examine Mr. Davis on that, can we

2       put into the record our agreed upon stipulation

3       yesterday that the authenticity, including whether

4       the documents are true and accurate and correct

5       copies, that you have stipulated on behalf of

6       Mr. Musk the authenticity as to any document

7       produced by SpaceX, Tesla or Mr. Musk and I would

8       assume to the extent there may be some from Boring

9       Company?

10            MR. SPIRO:  Agreed.

11            MR. WOOD:  Great.  That will save us some

12       technicalities.

13       Q   And then you provided us -- I need to get

14       those texts.

15            MR. SPIRO:  They're right there.

16            MR. WOOD:  The texts that we got this

17       morning.  I'll come back to the texts.

18            MR. SPIRO:  But yes, we -- we would stipulate

19       that those are from Mr. Davis' phone this morning.

20            MR. WOOD:  Yeah.  That's -- let me get to

21       that in a sec.  I jumped ahead of myself looking for

22       them.

23       Q   Mr. Davis, let me go back to Exhibit 97 for a

24       moment.

25            This e-mail was sent to you by Lauren Caplan,

Exhibit 8
Page 376

Steven Davis                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 26

1    a friend, on -- it appears to be 7/5/2018 at around

2    6:09 p.m.; is that right?  Is that right?

3        A   Yes.  This says July 5th 2018 at 6:09 p.m.

4        Q   At the time that you received this e-mail

5    from Ms. Caplan, had you already received any

6    instructions -- instructions from Mr. Musk, or did

7    he get in touch with you in effect after this?

8        A   I don't know that -- the timing between that

9    and when Elon first reached out.

10       Q   You don't know whether the Bloomberg report

11   "Elon Musk Team is Talking With Thai Officials For

12   Cave Rescue," you don't know if that report was

13   published before you were asked to help by Mr. Musk

14   or whether Mr. Musk reached out to you was after

15   that publication?

16       A   I can't definitively give you a before or

17   after on those two things.

18       Q   Or even essentially contemporaneously, you

19   don't know?

20       A   No, I -- I wouldn't want to guess.

21       Q   The article says that -- that?

22           "Elon Musk was in talks with Thai

23           authorities about aiding in the

24           rescue of a boys' soccer team, said

25           a spokesman for the billionaire."

Page 27

1          Again, do you know what -- the identities of

2     any Thai authorities that are being referenced there

3     that were allegedly being in discussions with

4     Mr. Musk?

5          A    I don't.

6          Q    And then it says (as read):

7               "Musk companies could try" --

8               strike that.

9               (As read):

10              "Musk companies could help by trying

11              to locate the boys' precise location

12              using SpaceX exploration

13              Technologies Corp. or Boring Company

14              technology, pumping water or

15              providing heavy-duty battery packs

16              known as Tesla Inc."

17              Have I read that correctly?

18         A    Yeah, that's what it says.

19         Q    At this point in time -- well, who is -- when

20    it says "SpaceX Exploration Technologies

21    Corporation," is that SpaceX?

22         A    That's correct.

23         Q    Okay.  It looks like at least the initial

24    report, according to this document, said that you --

25    Mr. Musk was going to initially consider assistance

Exhibit 8
Page 378

Steven Davis                                          October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 28

1      in locating the boys' precise location, right?

2          A    Yes.   That's what the article says.

3          Q    Pumping water, right?

4          A    Uh-huh, yes, that's what the article says.

5          Q    Or providing heavy-duty battery packs known

6      as Tesla, Inc., right?

7          A    Yes, that is what the article says.

8          Q    The initial article that is at least on its

9      face based on comments from a spokesman for the

10     billionaire -- and the billionaire I'm sure refers

11     to Mr. Musk -- does not make any reference to

12     building any type of a pod.

13              Would you agree with that?

14         A    I agree the article does not reference a pod.

15         Q    What -- when -- and again, how long have you

16     known Lauren Caplan?

17         A    I'm guessing seven years; sounds about right.

18         Q    What type of work does Ms. Caplan do?

19         A    She's an attorney.

20         Q    Well, she has my sympathies.   She's an

21     attorney in Denver?

22         A    Yes.

23         Q    Can you tell us if you would -- read for us

24     what Ms. Caplan wrote to you on July the 5th as part

25     of attaching this reference to the Bloomberg

Page 93

```
 1    restroom.

 2              MR. SPIRO:  All right.

 3              THE VIDEOGRAPHER:  We're going off the record

 4    at 11:24 a.m.  This is the end of media three.

 5              (Recess.)

 6              THE VIDEOGRAPHER:  We're on the record at

 7    11:39 a.m.  This is the beginning of media four in

 8    the deposition of Steven Davis.

 9    BY MR. WOOD:

10        Q    Mr. Davis, do you have in front of you now

11    what has been marked for purposes of identification

12    as Exhibit 99?

13        A    Yes.

14        Q    This is the beginning of what you've produced

15    during the deposition.  This is text communications

16    between you and Sam Teller --

17        A    Yes.

18        Q    -- related to the Thai rescue efforts, right?

19        A    Yes.

20        Q    And I asked you, do you have your phone so we

21    could get times.

22        A    Yes.

23        Q    I need to get a date first on the first page

24    of Exhibit 99.  In fact, I don't see any dates as to

25    when these -- these text exchanges occurred.  Can
```

Exhibit 8
Page 380

Page 94

1    you look at your phone and tell me that.

2        A    I talked to consul, which is -- the first one

3    is July 10th, 2018 sent at 12:12 a.m.   Also,

4    remember I'm -- I was sending these from eastern

5    time.

6        Q    Yeah.   Oh, eastern time.   Yeah, so eastern

7    time.   You sent this on July 10th 2018 at 12:12 a.m.

8    eastern time?

9        A    Correct.

10       Q    Thank you.   And you say (as read):

11            "I talked to consul."

12            That's the guy in L.A.?   Or I don't mean guy,

13   I guess, man or woman in L.A.?

14       A    I believe so.

15       Q    Was it a man?

16       A    Yes.

17       Q    And you said (as read):

18            "He claims he will call PM and try

19            to get it reversed."

20            Have I read that correctly?

21       A    Correct.

22       Q    Tried to get -- well, are we talking about

23   the prime minister of Thailand, PM?

24       A    Yes.

25       Q    And then you say (as read):

Page 95

1           "And try to get it reversed."

2           What were you trying to get the prime

3    minister to reverse?

4       A   I'm not positive, but looking at future

5    texts, somebody who refers, as he called it,

6    impractical, and I assume it was getting that

7    statement reversed.

8       Q   And what time did Mr. Musk say that would

9    be -- (as read):

10          "Thank you.  That would be best"?

11      A   Oh, this is not a text with Elon.

12      Q   I'm sorry, Mr. Teller.

13      A   Same time, 12:12 a.m.

14      Q   And your times are showing up as eastern

15   time?

16      A   Correct.

17      Q   Regardless of where he is, you're talking

18   about when you received it?

19      A   I believe that's how it worked, yes.

20      Q   And then you -- what time did you write (as

21   read):

22          "He said it was a 'one second

23          comment' where the word

24          'impractical' slipped out.  Not sure

25          I believe that"?

Page 100

1    called the consul to talk about the one second -- or

2    the comment where impractical slipped out.

3          Does this make you believe that this is the

4    subject matter of your conversation with the consul,

5    that is the article where BBC said Elon's Musk --

6    (as read):

7                "Elon Musk offer 'not practical,'

8                for cave mission Thai rescue chief

9                says"?

10    A    I don't remember if this referred to this.

11    But I remember there was an article, which could be

12    this, that mentioned impractical, and that's what

13    was being responded to.

14    Q    Or not practical?

15    A    Or not practical.

16    Q    Okay.  And then you said (as read):

17                "The Thai prime minister's office

18                had been planning to issue a thank

19                you statement so they are actually

20                scrambling and aren't happy about it

21                and diplomats are calling them

22                concerned as well."

23                What time did you send that text to

24    Mr. Teller?

25    A    I'm trying to find -- oh, the one that begins

Steven Davis                                                October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 101

1    with the PM office had been planning, is 12:19 a.m.

2        Q    And again, your recollection is such that

3    looking at this text chain that -- I mean, yes, this

4    text chain that you were -- when you say "they

5    aren't happy about it," are we talking about some

6    article where a Thai official had said that the tube

7    was not practical?   Are we still talking about the

8    same thing?

9        A    Correct.   There was an article where someone

10   said publicly that it was not practical.

11       Q    And then is it Mr. Teller that says back to

12   you (as read):

13            "The SpaceX mini sub is a

14            technically sound solution for

15            rescuing the Thai children, the

16            design of which was informed by

17            feedback from divers and rescuers on

18            the ground.   Thankfully, the current

19            rescue method is working well, and

20            the mini sub is a practical backup

21            in case of a contingency"?

22            Have I read Mr. Teller's text correctly?

23       A    Correct.

24       Q    Was that a text that you interpreted to be

25   what he wanted to have put out publicly?

                                                        Page 104

1           it right now, the ungrateful ass-"

2           "asshole."

3      Q    Who is he calling an ungrateful asshole?

4      A    That, I'm not sure.

5      Q    Somebody in the governor's office that said

6      it was not practical?

7      A    I'm not sure.

8      Q    Why is there such a concern about the

9      comments from a Thai official that the tube was not

10     practical?  Why is there this effort to try and

11     somehow respond to that comment?  Does that have

12     anything to do with saving the kids?

13     A    One more time.

14     Q    Does it have anything whatsoever to do with

15     efforts to save these children and their coach, to

16     be going back and forth about being unhappy with

17     some Thai governor's office official publicly

18     stating that the tube was "not practical"?

19     A    No.  That's separate from saving the kids.

20     Q    This part is separate, because this part

21     deals with publicity regarding the tube, doesn't it?

22     A    I don't -- I don't know about that.  But

23     it -- you had mentioned this happened after the

24     kids, correct?

25     Q    You told me that.  I -- I asked the question.

Page 105

1      A    Oh, I didn't know the dates.  I thought you

2    had mentioned that.

3      Q    Well, I'm -- I'm just relying on your

4    testimony.  I'm not here to testify.

5      A    This is, obviously, separate from physically

6    saving the kids.

7      Q    So what is this?  I -- it looks to me, you

8    know, to be an effort to get publicity over a

9    response to the governor's -- or someone in the

10   governor's office publicly stating that the tube was

11   not practical.  Is it something other than what it

12   appears to be?

13     A    No.  It sounds like someone made a negative

14   statement, and we were not happy that a negative

15   statement was made.

16     Q    And you wanted to get something out publicly

17   to refute it or respond to it or even to pressure

18   the governor into changing it, am I right?

19     A    That, I don't remember.  I'm looking at it

20   and trying to remember.  All I remember, that we

21   weren't happy about it.  And then --

22     Q    Do you want to answer my question, or do I

23   need to restate it?

24     A    Yeah, please restate.

25     Q    Was it clear that Mr. Teller, at least since

Exhibit 8
Page 386

Steven Davis                                             October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                         Page 106

1     you were texting with him -- although he says that

2     he was in touch with Elon Musk, was it clear that

3     the focus of these texts were on responding to the

4     public statement by someone in the governor's office

5     that the tube was not practical?

6         A    Statement -- yes.   And I don't remember the

7     details, but a negative statement was made publicly,

8     and we were responding to it.

9         Q    And you were spending some time on this.

10    There's more texts on -- on this issue than there

11    was on the efforts to build the tube, from what I'm

12    looking at --

13        A    I mean, that's --

14        Q    -- from you.

15        A    I mean, that's not accurate but --

16        Q    It is accurate.   Do you want to count them?

17        A    Oh, no, from --

18        Q    Do you want to challenge me on the accuracy?

19    And I'll tell you to count them.   You spent a lot

20    more time texting about the publicity regarding the

21    "not practical" comment than what you gave me

22    earlier in Exhibit 98 where you're talking about

23    helping these kids.

24        A    Correct.   With Sam and Elon, there were more

25    texts -- well, at least from a number wise on that.

Steven Davis                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 108

1              action."

2              What are you talking about here?

3       A   We're responding to a negative statement.

4       Q   This is your -- you're spending your time

5    coming up with at least a three-prong plan to try to

6    refute publicly the statement of the prime -- of the

7    Thai government -- governor official, if not the

8    governor, that the tube -- Mr. Musk's tube was not

9    practical, right?

10      A   Yes.  This is all in response to that

11   comment.

12      Q   And then you go on (as read):

13             "Prime minister will be holding

14             press conference and will say what

15             we want."

16             Have I read that correctly?

17      A   Yes.

18      Q   How do you know he was going to say what you

19   and Mr. Musk or Mr. Teller wanted him to say?

20      A   That, I don't remember.

21      Q   And then you say (as read):

22             "Can't be verbatim from Army, so

23             maybe," colon.

24             What do you mean can't be verbatim from Army?

25   That they can't give -- the Army is not going to

Steven Davis                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 109

1    give the verbatim statement that you and Mr. Musk

2    and Mr. Teller wanted them to give?

3        A    I'm not sure.

4        Q    You can't deny that, though, can you?

5        A    That the text says that?

6        Q    You can't deny that the reference means that

7    you were saying the -- the Army cannot state

8    verbatim what Musk and SpaceX wanted to be said, am

9    I right?

10       A    One more time.

11       Q    Look at it, where you say it, sir.  (As

12   read):

13            "PM will be holding press

14            conference and will say what we

15            want.  Can't be" -- "be verbatim

16            from Army, so maybe."

17            And then you suggest what the Army could say,

18   is that -- am I right?

19       A    I assume what this is saying, that the

20   statement shouldn't be the same as the Army's

21   statement.

22       Q    Got you.  You wanted to make sure that the

23   Army and the prime minister didn't give verbatim

24   statements, because that would look a little bit

25   suspicious, wouldn't it?

1        A   I don't remember the logic at the time, but
2    that -- that's how I read this.

3        Q   Maybe Mr. Teller would.

4        A   Sure.

5        Q   Or Mr. Musk.  Wouldn't you agree?

6        A   I don't know.

7        Q   Well, they were the principals involved in
8    trying to make the decisions on how to respond to
9    the statement by the Thai official about the tube
10   was not practical.  It would -- the people calling
11   the shots -- with your help but calling the shots --
12   would have been Elon Musk and Sam Teller, true?

13       A   All of us were involved.

14       Q   Except I didn't get to ask Elon Musk about
15   any of this either, because it was not produced
16   before I took Mr. Musk's deposition.  But it was
17   available at all times on your phone for the past at
18   least year, plus, right?

19       A   Yes.  It's on my phone.

20       Q   And would have been easily provided to
21   counsel for Mr. Musk or Mr. Musk if you had been
22   asked to give it to them, true?

23       A   It's been on my phone for the past year is
24   correct.

25       Q   And I've already covered that.  So,

Steven Davis                                                October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 112

1      A   I respond fast when Elon asks me to do

2   things.

3      Q   So that's a fair assumption on my part,

4   wouldn't you agree?

5      A   I would either produce fast or I would make

6   an error.  Those are one of the two options.

7      Q   The chances of you making an error where you

8   totally omit all of your texts in response to a

9   request for them coming from Elon Musk is slim to

10   none, isn't it, sir?

11      A   Yes, yeah.

12      Q   Now, you go on and you say (as read):

13          "Powerwall donation already known

14          and will be mentioned," right?

15      A   Is that 99?

16      Q   Yes.  Last page of 99.

17      A   Yes.

18      Q   And then you say -- and that's a -- so you're

19   trying to get publicly out there that Musk had made

20   some offer or donation of the Powerwall, right?

21      A   We had donated Powerwalls, and it says it

22   would be mentioned in one of these statements.

23      Q   You wanted that out there publicly?

24      A   We wanted it to be mentioned in the

25   statement.

Page 113

1      Q    Public statements.

2      A    I want to make sure before I say yes, I

3    understand.

4      Q    What -- you -- you and Sam Teller were

5    discussing public statements that you were hoping to

6    have issued by certain individuals, including a

7    mention publicly of the Powerwall donation.

8           Isn't that clear as a bell, sir?

9      A    The Powerwall donation was going to be

10   included in -- in a statement, that's correct.

11     Q    A public statement.  You wanted statements

12   issued publicly, didn't you?

13     A    It would be included in the public statement,

14   yes.

15     Q    Because you wanted those statements to be

16   published or to be public, to respond to the public

17   statements by the Thai official that the tube was

18   not practical, right?

19     A    I -- I do not know the exact correlation, but

20   that was going to be included in the statement.

21     Q    And then you say (as read):

22          "Once the kids are out, we should

23          demo the sub in the cave."

24          Have I read that correctly?

25     A    Yes.

Steven Davis                                              October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                              Page 116

 1          factory."

 2          Have I read that correctly?

 3     A    Yes.

 4     Q    So here's Teller trying to tell you what he

 5   would like and Musk would like to have the prime

 6   minister of Thailand say publicly, true?

 7     A    It sounds like this is all working on one

 8   statement, correct.

 9     Q    And you and, I assume, Mr. Teller who's in

10   touch with Mr. Musk, you were urging the prime

11   minister to say that SpaceX is awesome, right?

12     A    Yes.   That would be part of the statement.

13     Q    You were urging the prime minister to include

14   in his public statement that the SpaceX engineers

15   were helpful, right?

16     A    Yes.

17     Q    You were trying to get the prime minister, in

18   his public statement, to say that the pod was not

19   necessary because this went well, this being the

20   actual rescue efforts, right?

21     A    Yes.

22     Q    You wanted the prime minister -- you were

23   urging -- Mr. Musk and Mr. Teller, through you,

24   wanted the prime minister to be urged to say

25   publically that the pod was not necessary because

Page 117

1    this went well, but it's a useful and cool design,

2    right?

3        A    Yes.

4        Q    And then he tells you that they're about to

5    announce publicly a Tesla Shanghai factory, right?

6        A    Yes.

7        Q    This text is all about public statements and

8    publicity, isn't it, sir?

9        A    The first part is about one public statement,

10   and the other is about the opening of a Tesla

11   factory.

12       Q    Which was getting ready to be publicly

13   announced, right?

14       A    The factory?

15       Q    Yes.

16       A    Yes.

17       Q    So it was all -- all of this text that I've

18   just been over that starts at "okay" and ends at

19   "Shanghai factory," this is about publicity, isn't

20   it?

21       A    Two separate ones, but yes.

22       Q    Two different types of publicity.  One about

23   trying to get publicity favorable on the Musk SpaceX

24   efforts, right?

25       A    One was about a public statement for --

Exhibit 8
Page 394

Steven Davis                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                    Page 118

1       Q   Tesla and Musk -- I mean, SpaceX and Musk and

2   their efforts to help.

3       A   One was a public statement about the

4   Thailand, and one was about Tesla.

5       Q   Now, when you say "Thailand," you're talking

6   about it was a public statement about SpaceX's

7   exercise or efforts in Thailand?

8       A   Oh, correct.

9       Q   Okay.  And then you respond -- I guess -- I

10  have to assume -- if you don't remember or it's

11  different, tell me -- when he says (as read):

12          "About to announce Tesla's Shanghai

13          factory."

14          You go, with an exclamation mark (as

15          read):

16          "Holy crap!"

17      A   Correct.

18      Q   And was the "holy crap" related to the Tesla

19  Shanghai factory announcement, or was it related to

20  the efforts to get the PM, the prime minister, to

21  say positive favorable things in the words of

22  SpaceX?

23      A   I don't know what I was thinking about at the

24  time, but reading that, Shanghai factory was pretty

25  exciting.

Steven Davis                                        October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 119

1      Q    So you believe it was related -- "holy crap"

2   was related solely to the announcement of the Tesla

3   Shanghai factory?

4      A    It looks like it.  It's pretty amazing.

5      Q    It's pretty amazing at the time that these 12

6   children and their coach -- after having been lost

7   and stranded in the cave since June of 23rd, it's

8   pretty amazing that the people on the ground, the

9   divers, the support personnel had saved every one of

10  their lives.  That was pretty amazing, wasn't it?

11     A    It is.

12     Q    It probably beats out an amazement of the

13  opening of a Tesla Shanghai factory, wouldn't you

14  agree?

15     A    They're both amazing.

16     Q    And in the process, you understand, of trying

17  to save these children, the people on the ground,

18  the divers, the rescue personnel --

19     A    Uh-huh.

20     Q    -- you know for a fact, do you not, that one

21  Thai Navy SEAL diver died in his efforts to help

22  these kids?

23     A    I do.

24     Q    Now, you then have what I will promise you I

25  can barely read because it's so small -- and if you

Veritext Legal Solutions

Exhibit 8
Page 396

Steven Davis                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 120

1    have trouble reading it, I would urge you to pull it

2    up on your cell phone.

3           What is the next entry underneath -- there's

4    one, two, three, four separate entries underneath

5    "holy crap."

6           Would you read that to me, please, into the

7    record verbatim.

8    A    So it's within these small text messages?

9    Q    Yes, after "holy crap."

10   A    It says (as read):

11          "Okay.  One moment.  If you could

12          add something along the lines of the

13          SpaceX mini subs are technically

14          sound and practical solution for

15          rescuing the Thai children design of

16          which was informed by feedback from

17          divers and rescuers on the ground."

18          End of that first blurb.  Second

19          blurb (as read):

20          "Mainly to stress that the mini sub

21          would have worked and was designed

22          with feedback from the divers," end

23          of blurb.  "Thank you so much."  End

24          of blurb.  Then it says (as read):

25          "Conveyed to the secretary general

Page 121

1           of the prime minister."
2           And then next blurb (as read):
3           "Deepest apology once again to
4           Mr. Elon Musk and his team for this
5           unpleasant incident."
6      Q    Is the unpleasant incident referring to the
7   statement by the Thai governor or someone in his
8   office that the tube was not practical?
9      A    I'm not sure.  It --
10     Q    So you're writing stuff and you don't know
11   what the hell you're talking about?
12     A    Yeah.  It was a long time ago.
13     Q    Do you think you knew at the time you wrote
14   it what you were talking about?
15     A    I hope so.
16     Q    Do you think Sam Teller and Elon Musk might
17   be able to enlighten me as to what they believe this
18   discussion was about if I had had the chance to ask
19   them?
20     A    I don't know.
21     Q    We don't know now, do we, because I didn't
22   have a chance to ask them, but we'll address that.
23          There's something else on this document page
24   that's very small after "holy crap."  And I'd like
25   to see your phone if you don't mind, and you can

Steven Davis                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 130

1      A   I think it's reasonable.

2      Q   Thank you.  And then he says (as read):

3          "Who is?"

4          And you respond, so you had to understand

5      what he was asking.  And you say (as read):

6          "Florence X Li."

7      A   Correct.

8      Q   Right.  And she's a SpaceX employee?

9      A   Correct.

10     Q   And she's involved in the press release or

11     dealing with the press on the issue of the tube,

12     true?

13     A   I don't remember exactly what she's doing at

14     the time, but I -- I responded that she was the

15     point on press.

16     Q   Press on what?

17     A   That, I'm not sure.  I assume all of this.

18     Q   The Thai rescue efforts?  The tube?  She's

19     not the point person on point about the -- or is she

20     the person on point about the Shanghai Tesla

21     factory?

22     A   No.  She does not have anything to do with

23     that.

24     Q   She doesn't have anything to do with Tesla?

25     A   Correct.

Veritext Legal Solutions

Exhibit 8
Page 399

Page 131

1      Q   So it had to be with respect to the tube,
2    wouldn't you agree?
3      A   I want to just make sure -- she would --
4    she -- while I was asleep, she would have taken
5    any -- any like requests or comment that was made.
6      Q   About the tube?
7      A   The tube?  Sorry --
8      Q   The tube, your tube.
9      A   Oh, the pod.
10     Q   The pod, excuse me.  It's been called a
11   variety of things.  It looked like a tube to me, but
12   I'll call it a pod.
13     A   Any requests would have gone to her while I
14   was asleep.
15     Q   Have you ever talked with her recently?
16     A   Florence -- Flo works for The Boring Company.
17         MR. WOOD:  Well, I've never had her
18   identified in any shape, form or fashion in this
19   litigation.  So put that on your list too, Alex,
20   please.
21     Q   And then you write -- she writes (as read):
22         "Teller writes great."
23         And then you said (as read):
24         "Need input.  What's the action?"
25         This is on July 10th, 2018 at 5:13 a.m.,

Steven Davis                                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

                                                                   Page 132

1     right?

2          A    Correct.

3          Q    And he says (as read):

4                "On press?"

5                What -- what are you all talking about here?

6          A    It says we are looking for a statement to be

7     put out.

8          Q    A written statement from the prime minister,

9     right?

10         A    Correct.

11         Q    And then you say (as read):

12               "Consul texted.  Will be on website

13               soon," right?

14               Talking about on the website of what?

15    SpaceX?

16         A    I don't know which website he was referring

17    to.

18         Q    No.  You're the one that says it.

19         A    I don't know what website I was referring to.

20         Q    Well, do you think it would have been on some

21    Musk or SpaceX or Boring Company website?

22         A    That seems highly unlikely.

23         Q    Well, why in the world would you note -- are

24    you saying that the consul said that he was going to

25    have the prime minister's written statement put on a

Exhibit 8
Page 401

Page 138

1       Sam Teller?

2           A    Sure.   You could ask him.

3           Q    And then you go (as read):

4                "Sure.   Just gathering info."

5                And then he responds (as read):

6                "E," Elon, "will call the prime

7                minister if necessary."

8                To get the statement done, right?

9           A    That, I don't know.

10          Q    Well, you said (as read):

11               "Don't think we would need to."

12               Don't think you need to contact the prime

13      minister, why?   Why not?

14          A    I don't remember what was happening at this

15      time.

16          Q    I think you're talking about trying to get

17      into the cave, sir, or the -- as you call it, the

18      mysterious swimming pool fixture, because he goes on

19      to say, Mr. Teller (as read):

20               "We can say what we want to test it

21               so that we know it's viable for

22               future use, et cetera.   Thanks."

23               Have I read that correctly?

24          A    Yes.

25          Q    And you said (as read):

Exhibit 8
Page 402

Page 139

1          "Has to be same cave?  To the boys

2          spot?"

3     A    Correct.

4     Q    You're talking about trying to get

5  permission, if necessary, from the prime minister to

6  get the tube into the cave to potentially go to the

7  spot where the boys were found, true?

8     A    I agree that this part is about testing the

9  pod.

10    Q    In the cave potentially to the spot where the

11 boys were found, right?

12    A    Correct on these, yes.

13    Q    And then he says (as read):

14          "That's what he said.  It's not

15          possible, then let's tell him with a

16          next best option."

17          He's clearly referring to Elon Musk at that

18 point, isn't he, sir?

19    A    That, I'm not sure.

20    Q    He goes back and you go (as read):

21          "Yup."

22          And then he says (as read):

23          "Armor on phone with E.  Sounds like

24          talking him out of it," right?

25    A    Yes.

Steven Davis                                    October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 140

1        Q    Talking Elon Musk out of the idea of trying
2     to put this tube back into the cave to go to where
3     the spot where the boys were, right?
4        A    I don't know for sure, but that is
5     reasonable.
6        Q    Well, if you keep reading on, sir, it says
7     (as read):
8             "Best offer I have heard so far is
9             that they will put it in s plane."
10            What's S plane?
11       A    My --
12       Q    Same plane?
13       A    My guess is a typo for "a."
14       Q    (As read):
15            "Putting it in a plane, fly to
16            Bangkok and train in the Navy
17            pools."
18            And he says (as read):
19             "I," and then he says, "Sounds
20            cool," right?
21       A    Yes.
22       Q    Who is Boom?
23       A    That, I don't know.
24       Q    Because you write back and say (as read):
25            "Boom said" --

Veritext Legal Solutions

Steven Davis                                                October 1, 2019
Unsworth, Vernon v. Musk, Elon

Page 152

1       A    The goal was to help.

2       Q    You don't go out -- sir, answer my question.

3   Let me rephrase it -- state it again.

4            The goal was never supposed to be about

5   getting photographs or videos to publicize your

6   voluntary efforts to save someone's life to garner

7   positive publicity, is it, sir?

8       A    Say it one more time.

9       Q    I'll give you one more time if it helps.

10      A    Sure.

11      Q    The goal should never have been about getting

12  photographs or videos to publicize someone's

13  voluntary efforts to save another's life just for

14  positive publicity.

15           Do you agree, sir?

16      A    I do.   The goal was to help.

17      Q    It should be to help, not to get publicity,

18  true?

19      A    The goal was to help, yeah.

20      Q    Is the answer yes, then?   Is that what you're

21  telling me?   Yes, Mr. Wood, the goal is always to --

22  to help, not to get publicity; is that what you're

23  saying?

24      A    That's correct.

25      Q    Thank you.   And then you -- Musk 3222, which

# EXHIBIT 9

# EXHIBIT 9

Exhibit 9
Page 406

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

VERNON UNSWORTH,

        Plaintiff,

        vs.

                        Case No. 2:18-cv-8048-svw

ELON MUSK,

        Defendant.

_____

VIDEOTAPED DEPOSITION OF ARMOR HARRIS

BEVERLY HILLS, CALIFORNIA

SEPTEMBER 9, 2019

Reported By:
PATRICIA Y. SCHULER, CSR No. 11949

Job No.: 45747

Exhibit 9
Page 407

ARMOR HARRIS

September 09, 2019

```
1              Do you see that?
2    A.    Um-hmm.
3    Q.    I'm just giving you some context here.
4    A.    Um-hmm.
5    Q.    Down about halfway, there's a message
6  from you later that same day, it looks like, that
7  says -- to a number -- I'm not sure what number
8  that is -- "We can't accommodate Elon's request to
9  send them into the cave with the pod."
10             Do you see that?
11   A.    Um-hmm.
12   Q.    Tell me about that request.
13   A.    So it was after the -- all the kids were
14  out.
15             Elon had asked if it was possible to take
16  the pod in there all the way and see if it would be
17  able to make it through the passages.
18             The conditions in the cave had gotten
19  significantly worse.
20             The water level was much higher, and the
21  dive section was much longer.
22             So it would have required staging tanks,
23  and it would have been a pretty complicated
24  operation.
25             And it just was not worth doing at that
```

Exhibit 9
Page 408

ARMOR HARRIS

September 09, 2019

```
 1    time because the kids were out.

 2         Q.   Do you know why Elon made that request?

 3         A.   I do not know.

 4         Q.   Did he make that request to you

 5    personally?

 6         A.   No.

 7              He made it to whoever (310)245-2197 is.

 8              And then they asked me about it.

 9         Q.   And you said "We can't ask them to go in

10    there and risk their lives for a demo," right?

11              I guess you're talking about the

12    divers --

13         A.   Right.

14         Q.   -- is that right?

15         A.   Yeah.

16              And the reason for this was what I was

17    saying.  It won't make it any more useful for

18    future scenarios with different geology.

19              Like just proving that it can work in

20    this cave doesn't make it any more or less useful

21    for future cave rescue operations that have

22    different geology, like different geometry in the

23    passageways.

24              Yeah.

25         Q.   Got it.
```

ARMOR HARRIS

September 09, 2019

```
 1   giving us, you know, suggestions and criteria for
 2   what the pod should be able to do.
 3        Q.   Okay.
 4        A.   I remember Ben was one of them, but I
 5   don't remember the names of any of the other ones.
 6             It all kind of blends together in my
 7   head.
 8        Q.   Yeah.
 9             It's a lot of people, right?
10             I mean, a lot of people were involved in
11   the rescue effort?
12        A.   Yeah.
13        Q.   So did you ever talk to Mr. Musk about
14   Vernon Unsworth?
15        A.   No.
16        Q.   No communication with him at all about
17   Vernon?
18        A.   No.
19        Q.   Did he ever -- he never asked you for
20   information about Vernon Unsworth?
21        A.   No.
22        Q.   He never asked you if you had seen him on
23   the site?
24        A.   No.
25        Q.   He never asked you if you had heard
```

Exhibit 9
Page 410

ARMOR HARRIS

September 09, 2019

```
 1    whether he was kicked off the rescue or asked to
 2    leave?
 3         A.    No.
 4               Not from Elon.
 5         Q.    Not from Elon?
 6         A.    No.
 7         Q.    Did anybody ever ask you on his behalf
 8    what you knew about Vernon?
 9         A.    No.
10               Well --
11         Q.    I mean, besides the litigation,
12    obviously.  This is all binding you up in that.
13         A.    Yeah.
14         Q.    I mean more kind of contemporaneously.
15         A.    Yeah.  So putting us in a compartment.
16         Q.    Sure.
17         A.    Yeah.  There might have been like a, you
18    know, "Hey, we met this guy.  We talked to him-type
19    thing" from one of the folks back in California
20    like Sam or Steve Davis.
21               Sam Teller or Steve Davis.
22               I recall them asking "Hey, you met
23    Vernon.  You talked to him.
24               What's -- why is he saying this stuff?"
25         Q.    Yeah.  What did you say when they asked
```

Exhibit 9
Page 411

ARMOR HARRIS

September 09, 2019

```
 1   you that?
 2        A.   I said no, I had not.
 3        Q.   You had not met him; hadn't talked to
 4   him?
 5        A.   Yeah.
 6        Q.   Did you say anything about "Oh, I think
 7   he got kicked off the rescue or asked to leave" or
 8   anything like that?
 9        A.   No.
10        Q.   After you heard about these comments that
11   Mr. Unsworth made: "Stick it where it hurts" --
12   once you got back to the U.S., was there ever any
13   discussion around that time about those comments?
14        A.   No.
15        Q.   It didn't come up with anybody?
16        A.   No.
17        Q.   Did you talk to people about the work on
18   the pod and what it was like in Thailand?
19             Did that come up with people?
20        A.   I mean, sure, amongst coworkers and
21   family members and friends.
22             But nothing public or nothing on social
23   media or anything like that.
24        Q.   Sure.  But you know, it was -- I mean, it
25   was probably a pretty amazing experience, right, to
```

Exhibit 9
Page 412