QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (admitted *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
Jeanine M. Zalduendo (Bar No. 243374)
  jeaninezalduendo@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>Plaintiff,<br><br>vs.<br><br>ELON MUSK,<br><br>Defendant. | Case No. 2:18-cv-08048<br><br>Judge: Hon. Stephen V. Wilson<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 4 TO EXCLUDE THE EXPERT OPINION OF ERIC W. ROSE**<br><br>Complaint Filed: September 17, 2018<br>Trial Date: December 2, 2019<br><br>Hearing Date:  November 25, 2019<br>Time:              3:00 p.m.<br>Courtroom:     10A |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at 3:00 p.m. on November 25, 2019, or as soon thereafter as this matter may be heard, in Courtroom 10A of the above-titled Court, Defendant Elon Musk will move this Court for an Order, pursuant to Fed. R. Evid. 701, 702, 403, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), excluding all of the opinions and testimony of Plaintiff's designated expert, Eric W. Rose, as embodied in his Report and reflected in his deposition testimony, including any argument or reference to them by Plaintiff or his attorneys, even if not attributed to Mr. Rose, including without limitation, the following:

1. Mr. Rose's opinion that Mr. Unsworth has suffered reputational harm or damages, including as a result of Mr. Musk's statements about him. (Exhibit 1, Report of Eric W. Rose ("Report") at 23-24; 39-41.)

2. Mr. Rose's opinion that Mr. Unsworth suffered online reputational harm. (Report at 9-19; 40.)

3. Mr. Rose's opinions and testimony regarding reputation recovery programs and reputation repair. (Report at 24-41.)

4. Mr. Rose's opinion that Mr. Unsworth should undertake a reputation recovery program. (Report at 24-38.)

5. Mr. Rose's recommended tasks and associated costs of his proposed reputation recovery program for Mr. Unsworth. (Report at 38-39.)

6. Mr. Rose's opinion that Mr. Unsworth "has a right to have his reputation repaired." (*See*, *e.g.*, Exhibit 2, Rose Deposition ("Rose Depo.") at 156:13-25.)

7. Mr. Rose's opinion that BuzzFeed's republication of Mr. Musk's August 30, 2018 emails to Ryan Mac was "reasonably foreseeable." (Rose Depo. 95:24-96:22.)

8. Mr. Rose's opinions regarding Mr. Musk's interactions with BuzzFeed.

9.  Mr. Rose's other opinions regarding "off-the-record" interactions with journalists, any purported requirements for statements to be treated as "off-the-record," and his opinion that "Mr. Musk knows or should have known the rules regarding interactions with a reporter and that both parties must come to an agreement about how information is going to be used and sourced." (Report at 5, Exhibit B.)

10. Mr. Rose statements opining on Mr. Musk's or Mr. Unsworth's intent, motives, or states of mind, including that:

   a.   "Musk embarked on a PR campaign to destroy Mr. Unsworth's reputation by publishing false and heinous accusations of criminality against him to the public."  (Report at 3.)

   b.  "Musk confirmed that he intended his accusation literally when he replied in a fourth July 15 tweet from his Twitter account saying, 'Bet ya a signed dollar it's true.'" (*Id.*)

   c.  "Musk deleted his previous accusatory tweets and issued a lack-luster statement."  (*Id.*)

   d.  "Then, on August 28, 2018, Mr. Musk tweeted that he found it odd Mr. Unsworth did not sue him for his previous remarks, insinuating that he must be guilty."  (*Id.*)

   e.  "Then, in an e-mail sent directly to a reporter at Buzzfeed News, Musk confirmed his earlier accusations of pedophilia and published  new false and defamatory allegations against Mr. Unsworth, including that Mr. Unsworth was a 'child rapist' and had taken 'a child bride who was about 12 years old at the time.'" (*Id.* at 3-4.)

   f.  "Mr. Musk must be well aware of the power of his words when used on Twitter"  (*Id.* at 7.)

g. "The word choices and phrases used were designed to communicate the message that Mr. Unsworth is not who he claims to be and that he was a pedophile." (*Id.* at 21.)

h. "Mr. Musk's statement to Buzzfeed that Mr. Unsworth was a "child rapist" and that Mr. Unsworth frequented Pattaya Beach and moved to Chiang Rai was intentional message crafting, designed to reinforce his narrative that the person attacking him was a pedophile." (*Id.*)

i. "It is my opinion that Mr. Musk intended that the public believe his charge against Mr. Unsworth. Mr. Musk chose to amplify his allegations that Mr. Unsworth was a pedophile by communicating with a reporter that charge. It is not just that the message was explicitly stated through the use of the words 'pedo guy.' Mr. Musk put an exclamation point on his interaction with the reporter as to his charge that Mr. Unsworth was a pedophile via his frank and vulgar challenge to the reporter: 'stop defending child rapists, you f----ing asshole.'" (*Id.* at 22.)

j. "How Mr. Musk's messages were delivered is also important, as Mr. Musk employed a communication strategy to try to lend 'authenticity' to the claims made in his tweets." (*Id.*)

k. "It is clear that his interaction with the reporter was designed to send a message to the reporter, and hence the people who read any ensuing reporting, that the information Mr. Musk was peddling regarding Mr. Unsworth was accurate and not merely a one time 'off the cuff' angry response to undermine Mr. Unsworth's statements about Mr. Musk. It is clear from the record that Mr. Musk made false statements to retaliate against Mr. Unsworth for questioning his submarine plan." (*Id.*)

l.  "Using his stature as a respected CEO, Mr. Musk attempted to buttress his sensational comments about Mr. Unsworth that by challenging reporters to investigate his claims."  (*Id.* at 40.)

m.  "It is my opinion that the statements made by Mr. Musk were designed to cause hatred, contempt, and reputational injury to Mr. Unsworth."  (*Id.* at 41.)

11.  Mr. Rose's statements that purport to opine on causation and apportion fault or responsibility.  (Report 24; *see e.g.* Rose Depo. 123:16-126:14.)

Defendant's motion is made on the grounds that the opinions offered by Mr. Rose are not based on reliable methodologies or on any scientific, technical, or other specialized knowledge for which Mr. Rose is purportedly offered, they fail to apply methodologies in an reliable manner, they are speculative and based on assumptions wholly unsupported by the facts, they improperly opine on the parties' intent and states of mind, they opine on ultimate issues for the Court and/or jury, and they are not helpful and confusing to the jury.

This motion is based upon this notice of motion and supporting memorandum of points and authorities; the Declaration of Michael T. Lifrak, and the exhibits attached thereto; the pleadings and papers on file in this case; and such other written or oral argument as may be presented at or before the time this motion is deemed submitted by the Court.

DATED:  November 8, 2019          Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By  /s/ Alex Spiro
Alex Spiro
*Attorneys for Defendant Elon Musk*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................... 1

BACKGROUND FACTS ............................................................... 4

    A.   Mr. Rose's Purported Basis for his Reputational Harm Opinion .......... 4

    B.   Mr. Rose's $30 Million Recovery Program ............................. 7

    C.   Mr. Rose's Opinions Regarding Mr. Musk's State of Mind ............ 8

LEGAL DISCUSSION ................................................................. 9

I.    MR. ROSE'S TESTIMONY MUST MEET RIGOROUS STANDARDS ........................................................................ 9

II.   THE COURT SHOULD EXCLUDE MR. ROSE'S TESTIMONY ON "DAMAGE" TO MR. UNSWORTH'S REPUTATION .............................. 10

    A.   Mr. Rose's Testimony About Overall Reputational Harm Is Unsupported And Speculative. ......................................... 10

    B.   The Court Should Exclude Mr. Rose's Testimony About Harm to Mr. Unsworth's "Online" Reputation .................................. 12

III.  THE COURT SHOULD EXCLUDE ALL OF MR. ROSE'S "REPUTATIONAL RECOVERY" TESTIMONY ................................. 15

    A.   Mr. Rose's Speculative Opinion Employs An Unreliable Methodology That Cannot Be Tested. ............................... 15

    B.   Mr. Rose Failed To Apply His Methodology In A Reliable Manner ...................................................................... 17

IV.  THE COURT SHOULD EXCLUDE MR. ROSE'S TESTIMONY ABOUT THE "REASONABLE FORESEEABILITY" OF BUZZFEED'S REPUBLICATION OF MR. MUSK'S AUGUST 2018 EMAIL ...................................................................... 20

    A.   Under Rule 702, the Court Should Exclude Mr. Rose's Opinion That BuzzFeed's Republication Was "Reasonably Foreseeable." ....... 21

    B.   Mr. Rose's "Reasonably Foreseeable" Opinion Is Unhelpful to the Jury and Should be Excluded Under Rules 701 and 702 ............... 22

V.   THE COURT SHOULD EXCLUDE MR. ROSE'S OTHER INADMISSIBLE TESTIMONY .......................................... 23

    A.   Mr. Rose May Not Testify as to Anyone's State of Mind. ............ 23

    B.   Mr. Rose May Not Testify that Mr. Musk is Responsible for Mr. Unsworth's Actions or Their Consequences. ......................... 24

C.   Mr. Rose's Testimony That Mr. Unsworth "Has a Right" To Have His Reputation Repaired Is An Impermissible Legal Conclusion.................................................................................25

CONCLUSION...........................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*24/7 Records, Inc. v. Sony Music Entm't, Inc.,*
514 F. Supp. 2d 571 (S.D.N.Y. 2007) ..................................................14, 16, 17

*Acad. of Motion Pictures Arts and Sciences v. GoDaddy.com, Inc.,*
2013 WL 12122803 (C.D. Cal. June 21, 2013) ................................................9

*Agha v. Feiner,*
198 N.J. 50 (2009) ...............................................................................14

*Aguilar v. Int'l Longshoremen's Union Local No. 10,*
966 F.2d 443 (9th Cir. 1992) ....................................................................20

*Arista Networks, Inc. v. Cisco Sys. Inc.,*
2018 WL 8949299 (N.D. Cal. June 15, 2018) ...............................................14

*Chen-Oster v. Goldman, Sachs & Co.,*
114 F. Supp. 3d 110 (S.D.N.Y. 2015) .........................................................15

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City,*
2003 WL 24010950 (W.D. Pa. Apr. 23, 2003) ..........................11, 16, 20, 21

*City of Pomona v. SQM N. Am. Corp.,*
750 F.3d 1036 (9th Cir. 2014) .................................................................16

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993) ...............................................................................9

*Diviero v. Uniroyal Goodrich Tire Co.,*
114 F.3d 851 (9th Cir. 1997) ....................................................................10

*DSU Med. Corp. v. JMS Co, Ltd,*
296 F. Supp. 2d 1140 (N.D. Cal. 2003) .......................................................15

*Eisenbise v. Crown Equip. Corp.,*
260 F. Supp. 3d 1250 (S.D. Cal. 2017) .......................................................22

*First Sav. Bank, F.S.B. v. U.S. Bancorp,*
117 F. Supp. 2d 1078 (D. Kan. 2000) .............................11, 18, 19, 20

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) ...........................................................................9, 21

*Hill v. Novartis Pharms. Corp.,*
2012 WL 5451816 (E.D. Cal. Nov. 7, 2012) ................................................24

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999) ...............................................................................9

*Lust v. Merrell Dow Pharm., Inc.*,
   89 F.3d 594 (9th Cir. 1996)......................................................................10

*Moussouris v. Microsoft Corp.*,
   311 F. Supp. 3d 1223 (W.D. Wash. 2018)................................................12

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014).........................................................14, 16, 20

*Powell v. Anheuser-Busch Inc.*,
   2012 WL 12953439 (C.D. Cal. Sept. 24, 2012)........................................12

*Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*,
   927 F. Supp. 2d 1069 (D. Or. 2013)..........................................................24

*Smith v. Pac. Bell Tel. Co.*,
   649 F. Supp. 2d 1073 (E.D. Cal. 2009)......................................................10

*Smith v. Wyeth–Ayerst Labs. Co.*,
   278 F.Supp. 2d 684 (W.D.N.C. 2003).......................................................24

*Strong v. E. I. DuPont de Nemours Co*
   667 F.2d 682 (8th Cir. 1981)......................................................................23

*United States v. 87.98 Acres of Land More or Less in the Cty. of Merced*,
   530 F.3d 899 (9th Cir. 2008)......................................................................13

*United States v. Freeman*,
   498 F.3d 893 (9th Cir. 2007)......................................................................14

*United States v. Mitchell*,
   365 F.3d 215 (3d Cir. 2004).......................................................................17

*United States v. Moran*,
   493 F.3d 1002 (9th Cir. 2007)....................................................................25

*United States v. Tran Trong Cuong*,
   18 F.3d 1132 (4th Cir. 1994)......................................................................15

*Younan v. Rolls-Royce Corp.*,
   2013 WL 1899919 (S.D. Cal. May 7, 2013)..............................................16

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005)......................................................................12

## Other Authorities

29 Charles A. Wright. et al., *Federal Practice & Procedure*,
   § 6265 at p. 255 & nn. 34 & 35 (1977).....................................................24

## **Rules**

Fed R. Evid. 403 ................................................................................. 10,21,23

Fed. R. Evid. 701 ....................................................................................... 23

Fed. R. Evid. 702 .................................................................................... 9, 10

Fed. R. Evid. 702(d) .................................................................................. 17

Fed. R. Evid. 703 ....................................................................................... 15

Fed. R. Evid. 704 ....................................................................................... 23

DEFENDANT'S MOTION IN LIMINE NO. 4 TO EXCLUDE THE EXPERT OPINION OF ERIC W. ROSE

## **INTRODUCTION**

The Plaintiff in this case, Vernon Unsworth, has no evidence of any actual harm to his business or reputation due to anything Defendant Elon Musk said about him.  Nor is he able to quantify any other type of damage, such as emotional distress.  Instead, the only form of compensatory damages he is seeking is so-called "presumed" damages, the amount of which is left to the jury to decide.  But to give the jury as high a number as possible to latch onto, Plaintiff has designated a "media relations" expert, Eric Rose, to testify that Mr. Unsworth should spend at least $30 million to undertake a "reputation recovery" plan in nearly two dozen countries around the globe, after the case is over.  Mr. Rose's testimony is unreliable and not tethered to any theory of liability or damages in the case.

As explained below, Mr. Rose has not used any recognized methodology or facts to opine that Mr. Unsworth needs his "reputation recovery" plan, that its $30 million price tag is justified, or that a jury can even consider this evidence.  He plans to offer other improper, speculative, and unsupported opinions based on untestable "subjective" judgments, his instincts, and a review of the record in which he considered *no* depositions and *no* document the parties produced.  For example, despite his having put on blinders, and possessing no education or experience in psychology or psychiatry (or a college degree in any field), Mr. Rose wants to testify as to what Mr. Musk was thinking when he took certain actions and to usurp the jury's role by opining that it was "reasonably foreseeable" for BuzzFeed to republish Mr. Musk's August 30, 2018 emails to its reporter, Ryan Mac.

It is apparent from Mr. Rose's report and the concessions he made at his deposition that his opinions do not come close to meeting the admissibility and relevance standards that govern expert testimony in a federal court.  This Court should exercise its gate-keeping function and exclude them from trial.

***First***, Mr. Rose plans to testify that Mr. Unsworth's reputation has been harmed by what Mr. Musk said about him.  But he has no basis to offer that opinion.

Mr. Rose conducted no surveys, focus groups, or other research to determine the scope of any harm.  Thus, he does not know: (a) how many people anywhere in the world (other than Mr. Unsworth's family and friends) even know who he is, (b) how many people in the world know what Mr. Musk said, (c) whether anyone in the world (other than family or friends) knows that he is the person about whom Mr. Musk said those things, (d) whether anyone in the world believed anything Mr. Musk said, or (e) whether anyone in the world thinks less of Mr. Unsworth or that his reputation has been harmed as a result of anything Mr. Musk said.  Although Mr. Rose agrees that these questions must be answered before undertaking any "reputation recovery" program, he has not done any of that work.  He thinks it can be deferred until *after* the case is over.  For now, he wants to take the stand knowing nothing on these admittedly–key questions.

Relatedly, Mr. Rose seeks to opine that Mr. Unsworth's "online" reputation has been harmed, based on work he farmed out to a company called Five Blocks (which coded certain articles about Mr. Unsworth as favorable, unfavorable, or neutral).  Mr. Rose not only lacks sufficient knowledge of how that work was done and what standards Five Blocks applied to its evaluations (by someone whose credentials he does not know), he cannot explain how Five Blocks could have undertaken the work under his direction, or at all, given that the work was done in May 2019—one month *before* he was hired and began his work.  Nor can he explain inconsistencies in its results that are apparent on their face.  And he admits that the work was purely "subjective" and "not scientific."

*Second*, even though Mr. Rose has no basis to testify that Mr. Unsworth's reputation *has* been harmed in any meaningful way, he plans to testify that the jury should award Mr. Unsworth at least $30 million to "repair" it.  Mr. Rose's "reputation recovery" plan is not the product of reliable information, nor methods or principles that can be tested.  Mr. Rose has never met or communicated with Mr. Unsworth, or even read his deposition transcript.  Mr. Rose had no idea that Mr.

Unsworth has already admitted that: (1) he is unaware of anyone in the world who believes Mr. Musk's comments about him; and (2) he has not lost any business, opportunities, awards, or Thai cave rescue recognition after Mr. Musk said what he said. It is thus not surprising that Mr. Rose did not base his "reputation recovery" plan on any professional standards, guides, or literature. Instead, he says his opinions are based on his supposed professional experience managing comparable programs. But he refused to produce any documents concerning these claimed programs. Mr. Rose has thus deprived Mr. Musk of his right to test Mr. Rose's opinions. At present, they are mere *ipse dixit*. And they are undermined further by the fact that three of his high-profile clients accused of sexual harassment or assault, about whom he did testify, spent *zero* dollars on any paid "reputation recovery" ad campaigns of the type he recommends here. *Zero* dollars, not $30 million.

**Third**, Mr. Rose's opinion that it was "reasonably foreseeable" that BuzzFeed would republish Mr. Musk's August 2018 emails is for the jury to decide. Relatedly, his opinions regarding the publication of "off-the-record" information are not based on any guideline or law that governs journalists and their sources. He undertook no research to support his position. He is not a journalist. And his opinion failed to consider (and is contrary to) the undisputed facts of the case: He chose not to consider Mr. Musk's testimony, Mr. Musk's history of interactions and practices with BuzzFeed, or BuzzFeed's actual newsroom guidelines.

**Finally**, the Court should exclude Mr. Rose's opinions that go beyond the scope of his claimed expertise and are mere speculation. His report is littered with legal conclusions, conclusions as to causation and blame, and opinions regarding the parties' intent and states of mind. These are impermissible and inadmissible.

### BACKGROUND FACTS

Mr. Rose issued his report (Ex. 1, "Report" ) on September 13, 2019. He was deposed on November 1, 2019. His opinions fall under three topics:

First, he opines that Mr. Musk's statements harmed Mr. Unsworth's reputation.  This opinion is based on a review of certain news stories about Mr. Musk's statements (including videos and podcasts) that Plaintiff's attorneys gave him, plus a review of Tweets by people following the story, an analysis of "Google Trends" for search activity for the term "Vernon Unsworth," and a review of Google search results performed by Five Blocks.  (Report at 3, 9-19.)  Mr. Rose believes this analysis shows that Mr. Unsworth's online reputation has been harmed.  (*Id.*)

Second, Mr. Rose opines that Mr. Unsworth should spend at least $30 million over two years on a "reputation recovery program" to repair the damage to his name.  (*Id.* at 39.)  This would include an international advertising campaign in which Mr. Unsworth would spend at least $3 million on newspaper ads, at least $2 million on radio and television ads, at least $3 million on Twitter ads, $2 million on news-based ads, at least $4 million on Google ads, $16 million on online reputation management, $300,000 on "strategic research" (to discovery the basic facts about his reputation), and $216,000 per year for a PR firm.  (*Id.*)

Third, Mr. Rose opines that Mr. Musk should have known that BuzzFeed would publish his off-the-record statements.  (*Id.* at 5.)

## A.     Mr. Rose's Purported Basis for his Reputational Harm Opinion

Mr. Rose bases his opinion that Mr. Unsworth has a reputation and that it has been damaged on the limited information Plaintiff's attorneys provided and subjective, made-for-litigation data from a consultant about the news coverage of Mr. Unsworth after Mr. Musk made his statements.  (*Id.* at 3, 9-16.)

First, Mr. Rose used something called "Google Trends," a Google application that shows how often a term was searched during a given period of time or in certain geographic location.  (*Id.* at 17-19.)  Mr. Rose queried for searches of "Vernon Unsworth" in Summer and Fall of 2018.  (*Id.*)  But the tool does not say how many people ran those searches or how many searches they ran.  (Ex. 2, Rose Deposition Transcript ("Rose Depo.") at 70:9-19.)  It shows only when the spikes in that

unknown number of searches occurred, relative to the number of searches done on other days during that period.  (*Id.* at 82:3-83:17.)  According to Mr. Rose's charts (Report at 17-19), an ***unknown*** volume of Google search interest in "Vernon Unsworth" increased around July 15, 2018 and September 4, 2018, the days Mr. Musk's statements were published.  (*Id.*)  Mr. Rose admitted that Google Trends is an "imperfect tool" and that it provides only limited information.  (Rose Depo. 71:20-72:8).  His Google Trends data does not say how many people searched for "Vernon Unsworth" on those dates, whether they read any of the stories to which Google provided links, what stories (if any) they read, whether anyone believed what Mr. Musk had said, or whether anyone formed a negative impression of Mr. Unsworth as a result.  (*Id*. at 87:21-88:7; 90:2-9.)

Mr. Rose conducted no studies, market research, polling, or focus groups to determine the scope or state of Mr. Unsworth's "reputation."  (*Id.* at 250:22-251:4.) He did not calculate what percentage of the public, anywhere in the world, knows who Mr. Unsworth is, how many people are aware of Mr. Musk's statements about Mr. Unsworth, if anyone believed Mr. Musk's statements about Mr. Unsworth, whether anyone has a negative opinion of Mr. Unsworth, or whether anybody believes that Mr. Unsworth's reputation has been harmed by Mr. Musk's statements. (*Id.* at 64:10-24;65:25-66:8; 134:10-23; 148:17-151:11; 178:20-179:2; 293:4-10.)

Mr. Rose also based his opinion about Mr. Unsworth's online reputation on the first one or two pages of Google search results of "Vernon Unsworth," which he says are filled with links to "unfavorable" stories about him.  (Report at 9-16).  Mr. Rose based this conclusion the work of Five Blocks.  Mr. Rose says he hired Five Blocks in May 2019 to run Google searches of "Vernon Unsworth" and "rate" whether the stories that were linked on the results page were "unfavorable," "favorable," or "neutral."  (*Id.* at 9.)  Five Blocks does not use a software program, algorithm, or objective criteria to determine whether a given story is "unfavorable,"

"favorable," or "neutral."  According to Mr. Rose, Five Block's work "is a subjective analysis.  It's not a scientific analysis."  (Rose Depo. 187:16-188:12.)

A Five Blocks employee Googled Mr. Unsworth's name, read the headlines and stories on the first two pages of the results, and made a subjective determination whether the story was "unfavorable," "favorable," or "neutral."  (*Id*. at 191:3-16.) Mr. Rose did not supervise this work.  (*Id.* at 184:21-185:2.)   He did not review the articles after they were coded to validate the accuracy of the ratings.  (*Id.* at 204:9-13.)  He does not know whether Five Blocks has any written criteria governing how it codes a story.  (*Id.* at 191:21-23.)  He does not know if the reviewer received any instruction as to how rate the articles, or if the reviewer has any training or education in English or journalism.  (*Id.* at 191:24-192:12.)

Five Blocks knew that it was performing this work to assist Mr. Unsworth in litigation.  (*Id.* at 189:21-182:2 ("Q. And did that person know who had hired them? Like it was Vern Unsworth, or someone working for Vern Unsworth, requested this? A. I was very clear that I – so the answer is yes.  I told them that – what I was doing and what, because I asked them to do me a favor and provide screenshots and give their analysis." ).)  Five Blocks conducted its analysis in May 2019, one month before Mr. Rose was hired.  (*See* Report at 9; Rose Depo. 202:25-204:8.)

Five Block's "subjective" and "unscientific" analyst rated most of the articles on the first two pages of Google's "Vernon Unsworth" results as "unfavorable." (Report at 11-16.)  But all but one of the "unfavorable" articles were written about this lawsuit, and Mr. Rose agreed they would not have been written if Mr. Unsworth had not filed it.  (Rose Depo. 283:12-25.)  None of the entries said or suggested that Mr. Musk's statements about Mr. Unsworth were actually true.  (Report at 11-16\5.)

## B.    Mr. Rose's $30 Million Recovery Program.

Mr. Rose wants to testify that Mr. Unsworth should spend millions of dollars on ads to correct any theoretically negative views about him arising from Mr. Musk's statements.  He wants to tell the jury that the content, size, and scope of the

program would depend on the results of strategic research into Mr. Unsworth's reputation that would be done after trial, because he has yet to do this foundational work.  (Rose Depo. 147:7-16; 179:15-19.)  He said that the scope of the program could change based on the results of that research.  (*Id*. at 144:25-145:17.)  He testified that, even if no one believed Mr. Musk's statements, he would still recommend that Mr. Unsworth spend approximately $11 million.  (*Id*. at 171:11-174-10.)

Although Mr. Rose is confident that he knows that Mr. Unsworth needs to spend all of this money (implying that the jury needs to award it to him so that he can), Mr. Rose does not know what any of these "reputation recovery" ads would actually contain or say, where they would need to run, how often, or what people or markets to which they would be directed.  (*Id*. at 322:24-336:2.)  Nor does he know whether, if Mr. Unsworth wins this case, any advertising campaign would be necessary (because a favorable result would generate "favorable" stories that would replace "unfavorable" stories on Google search results pages), or if any campaign, regardless of the outcome of this case, would actually work.  (*Id*. at 336:4-10 ("You can never be certain that an ad campaign will be successful.  Period.").)  Mr. Rose does not know whether Mr. Unsworth would actually spend any money on a reputation recovery program, should he obtain the funds to do so from the outcome of this case.  (*Id.* at 328:23-329:9.)  When asked how much three of his high-profile clients accused of sexual misconduct spent on the "reputation repair" programs he had recommended, the total amount was ***zero*** dollars.  (*Id.* at 346:14-350:1.)

Because Mr. Rose has conducted no research, he admitted to basing his opinions on the size, scope, and cost of the recovery program on his professional experience.  (Report at 39.)  Mr. Rose did not consult any other communications professionals, books, or professional writings in his work and could point to no professional standards or rules applicable to it.  (Rose Depo. 104:24-105:10.)

Mr. Rose's report does not describe any prior reputation recovery programs that he or is firm managed that are comparable to the one he proposes for Mr. Unsworth.  (*See generally*, Report.)  Mr. Rose refused to produce any documents that constituted or memorialized any reputation recovery programs that he or his firm has actually done.  (Rose Depo. 164:14-166:24.)

**C.**     **Mr. Rose's Opinions Regarding Mr. Musk's State of Mind**

Mr. Rose wants to testify as to what Mr. Musk was thinking during the events at issue in the case, including as to Mr. Musk's intent, motive, and state of mind. His report opines that, among other things:

- "Musk embarked on a PR campaign to destroy Mr. Unsworth's reputation"
- "Then, on August 28, 2018, Mr. Musk tweeted that he found it odd Mr. Unsworth did not sue him for his previous remarks, insinuating that he must be guilty."
- "It is clear that [Mr. Musk's] interaction with the reporter was designed to send a message to the reporter"
- "It is my opinion that Mr. Musk intended that the public believe his charge against Mr. Unsworth. Mr. Musk chose to amplify his allegations that Mr. Unsworth was a pedophile by communicating with a reporter that charge."
- "It is my opinion that the statements made by Mr. Musk were designed to cause hatred, contempt, and reputational injury to Mr. Unsworth."

(Report at 4; 22; 23; 41.)  Mr. Rose did not read Mr. Musk's deposition and has never met him.  (Rose Depo. 99:10-21.)

## LEGAL DISCUSSION

**I.     MR. ROSE'S TESTIMONY MUST MEET RIGOROUS STANDARDS**

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), this Court serves as a "gatekeeper" for expert opinion

testimony.  The Court may permit the admission of expert opinions based on "scientific, technical, or other specialized knowledge," but only if:

> (a) [it] will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In making this determination, the Court is to consider whether the expert's theory or technique: (1) may be objectively tested; (2) has been subject to peer review and publication; (3) has a known rate of error; and (4) has been generally accepted.  *See Daubert*, 509 U.S. at 592-94.  The *Daubert* factors are not limited to testimony regarding strictly scientific knowledge.  Courts may consider the factors in assessing the reliability of the proffered expert testimony but are not limited to them.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-151 (1999) (*Daubert* applies to "scientific, technical, or other specialized knowledge").

As the gatekeeper, this Court must screen expert testimony "to ensure that the expert testimony both rests on reliable foundation and is relevant."  *Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, 2013 WL 12122803, at *2 (C.D. Cal. June 21, 2013); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  Because speculative opinions are not helpful to the trier of fact, they are neither reliable nor admissible.  *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (expert opinion "was unsubstantiated and subjective, and therefore unreliable and inadmissible").

Mr. Unsworth, as the party proffering the expert, has the burden of proving that Mr. Rose's opinions are admissible.  *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).   He cannot meet this burden.

## II.     THE COURT SHOULD EXCLUDE MR. ROSE'S TESTIMONY ON "DAMAGE" TO MR. UNSWORTH'S REPUTATION

Mr. Rose contends that Mr. Unsworth has suffered reputational harm as a result of Mr. Musk's statements.  Mr. Rose has admitted, however, that his opinions are not based on any quantifiable, objective, or scientific measure of Mr. Unsworth's reputation.  His testimony is thus unreliable, unsupported, and should be excluded under Rules 702 and 403.

### A.     Mr. Rose's Testimony About Overall Reputational Harm Is Unsupported And Speculative.

Mr. Rose's testimony that Mr. Unsworth has suffered reputational harm is not based on sufficient facts or based on reliable methods to be admitted.  Fed. R. Evid. 702.  "Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion." *Smith v. Pac. Bell Tel. Co.*, 649 F. Supp. 2d 1073, 1096 (E.D. Cal. 2009).

In his report and at his deposition, Mr. Rose asserted that Mr. Musk harmed Mr. Unsworth's reputation: Mr. Musk "besmirched the reputation of Mr. Unsworth not only in the United Kingdom but throughout the United States and the world," "Mr. Unsworth will never be able to altogether remove doubts about his character from those who saw the post, read or saw news stories about the claim," and that people will "steer[] clear of Mr. Unsworth" as a result.  (Report at 22-23.)

But Mr. Rose has no facts to support those opinions.  By his own admission, Mr. Rose does *not* know whether Mr. Unsworth's reputation was actually harmed. (Rose Depo. 293:4-10; 64:10-24.)  He conducted no studies, focus groups, or polls to find out whether *anyone* knew about Mr. Unsworth or believed Mr. Musk's statements about him.  (*Id.* at 64:10-24; 134:10-23; 148:17-151:11; 178:20-179:2.)

Mr. Rose did not review Mr. Unsworth's deposition testimony, speak to Mr. Unsworth, or communicate with any of Mr. Unsworth's peers or business associates to substantiate his assumptions. (*Id.* at 39:18-20; 256:3-6; 278:3-19.) Mr. Rose's opinions are based solely on his own "interactions with clients who have dealt with allegations of misconduct"; he did not investigate whether Mr. Unsworth's reputation was actually harmed or if any of the consequences he described occurred. (*Id.* at 254:10-258:5.)

Mr. Rose's opinion thus lacks a proper foundation and may be excluded on this ground alone. *See First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1086 (D. Kan. 2000) (excluding testimony of advertising expert who did not calculate harm to brand ); *Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 2003 WL 24010950, at *8–9 (W.D. Pa. Apr. 23, 2003), *aff'd sub nom. Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004).

Mr. Rose's contention that Mr. Unsworth suffered any damage to his image, good will, or business is similarly unsupported. Mr. Rose admitted at his deposition that he could not quantify or place a dollar value on this supposed damage, nor would he attempt to do so here. (Rose Depo. 276:10-280:1.) He did not conduct any investigation to support these conclusions. (*Id.*) In fact, Mr. Rose did not even attempt to learn whether Mr. Unsworth's business and finances suffered because of Mr. Musk's statements. (*Id.* at 278:20-22.) Mr. Unsworth has admitted that they did not. (Ex. 3, Unsworth Depo. 80:24-81:14.) Thus, Mr. Rose's opinions on this subject should be excluded because they are "without a full understanding or knowledge of the facts of this case" and without sufficient factual investigation and support. *Powell v. Anheuser-Busch Inc*., 2012 WL 12953439, at *6-7 (C.D. Cal. Sept. 24, 2012) (excluding testimony where expert "failed to sufficiently consider the relevant underlying facts necessary to support his opinions and conclusions"); *Moussouris v. Microsoft Corp*., 311 F. Supp. 3d 1223, 1246 (W.D. Wash. 2018) (excluding testimony based on insufficient facts and data).

Mr. Rose's opinion on the fact or extent of any harm to Mr. Unsworth's reputation must be excluded also because he failed to employ a reliable methodology. When asked what methods and facts supported his conclusions, Mr. Rose effectively "answered 'my expertise' or some variant []—which is to say that he either had no method or could not describe one. He was relying on intuition, which won't do." *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418-19 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."); (Rose Depo. 254:10-255:17.)

## B.   The Court Should Exclude Mr. Rose's Testimony About Harm to Mr. Unsworth's "Online" Reputation.

As a sub-set of alleged reputational harm, Mr. Rose intends to testify that Mr. Musk damaged Mr. Unsworth's "online" reputation. But the Court should exclude that testimony under Rule 702, as well. Mr. Rose's opinion is based on two "analyses": (1) Google Trends data showing an uptick in searches for "Vernon Unsworth" around the time Mr. Musk's statements became available online, and (2) Five Block's analysis of Mr. Unsworth's Google results. (Report at 11-19.)

***Google Trends Testimony***: Mr. Rose's Google Trends-based testimony, including the data on the charts on pages 17-19 of his report, is irrelevant and confusing. He admitted at his deposition that, at most, Google Trends shows only that the search term "Vernon Unsworth" was more popular on certain days relative to other days, in certain geographic locations relative to others. He conceded that it is "an imperfect tool" with only limited utility. (Rose Depo. 71:20-72:8) ("Google Trends is just what it is. Just a trend and a snapshot of interest.").

It would be charitable to say the utility of that information is "limited." In reality, it is non-existent. The Google Trends data does not tell ***how many*** people searched for "Vernon Unsworth" on any day or days, what ***results*** Google showed, whether ***anyone*** read anything in those results, or whether (if they did), ***anyone***

believed Mr. Musk's statements.  (*Id.* at 70:3-19.)  Google Trends is thus not capable of measuring Mr. Unsworth's online reputation or whether it was harmed. Not only is it irrelevant, it also presents a genuine risk that the jury will interpret his charts and testimony as if Google Trends does say those things.  This Court should exclude the testimony.  *See United States v. 87.98 Acres of Land More or Less in the Cty. of Merced*, 530 F.3d 899, 906 (9th Cir. 2008) (excluding expert opinion as irrelevant and potentially confusing to the jury).

**Five Blocks Charts and Testimony:**  The Court should preclude Mr. Rose's testimony based on the Five Block's "analysis," found on pages 9-16 of his report, because it is unreliable.  In fact, Mr. Rose is in no position to testify otherwise.

The Five Blocks analysis consists of screen shots of Google search results of the term "Vernon Unsworth," conducted in May 2019.  Each item in the page of search results is color coded: (a) green if the story is deemed "favorable" to Mr. Unsworth, (b) gray if deemed "neutral," and (c) red if deemed "unfavorable."  Mr. Rose relies on that analysis to opine that, in May 2019, most Google search results of "Vernon Unsworth" were supposedly "unfavorable."  (Report at 9-16; 38.)  These charts, and any testimony about the Five Blocks analysis or the results of these Google searches, are unreliable and should be excluded.

To begin, ***Mr. Rose*** did not decide what ratings to assign to any of these articles.  (Rose Depo. 199:11-19)  He outsourced that work to someone at Five Blocks.  (*Id.*)  Mr. Rose does not know whether this  Five Blocks employee followed any written or objective criteria, or whether this person received any training to do so.  (*Id.* at 187:7-15; 191:12-192:12.)  Under these circumstances, he cannot base any testimony on it.  *See Arista Networks, Inc. v. Cisco Sys. Inc*., 2018 WL 8949299, at *3 (N.D. Cal. June 15, 2018) (excluding expert testimony as a mere conduit for evidence) (citing *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007)); *Agha v. Feiner*, 198 N.J. 50, 63 (2009) ("[T]he only fair interpretation is that

[Rule 703] was not intended as a conduit through which the jury may be provided the results of contested out-of-court expert reports.").

Second, Mr. Rose admits that Five Block's work is "subjective" and "not a scientific analysis." (Rose Depo. 187:16-188:12.)  Mr. Rose himself made clear the extent to which that infected the results, when he was unable to account why the unknown employee assigned "unfavorable" ratings to some articles on the same page as articles with near identical headlines to which the Five Blocks employee assigned a "neutral" rating.  (*Id.* at 195:11-196:16.)  In sum, this "analysis" is mere guesswork.  And Mr. Rose cannot explain how it was created or why similar articles received different ratings.  (*Id.*)  His testimony has to be excluded.  *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (excluding testimony based on "personal opinion" and not a "systematic assessment" of data); *24/7 Records, Inc. v. Sony Music Entm't, Inc.,* 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007) (excluding subjective opinion).

Third, the Five Blocks data is unreliable because of the inherent risk of bias.  When Mr. Rose requested that Five Blocks perform the analysis (if, in fact, he did), he told Five Blocks that he was working for Mr. Unsworth and the nature of his testimony.  (Rose Depo. 189:21-190:2.)  And although Mr. Rose claimed that he performed no work for Mr. Unsworth before he was retained, the evidence shows that ***someone*** asked Five Blocks to perform its analysis ***before*** Mr. Unsworth hired him.  (*See id.* at 202:25-204:8.)  Perhaps the analysis was some sort of "audition" for Mr. Unsworth.  Given the subjective nature of the analysis, this potential bias independently supports a finding that it is unreliable and Mr. Rose cannot be allowed to testify to it.  *See Chen-Oster v. Goldman, Sachs & Co*., 114 F. Supp. 3d 110, 124 (S.D.N.Y. 2015), *objections overruled*, 325 F.R.D. 55 (S.D.N.Y. 2018) (excluding analysis with "significant danger of reporting bias").

Further, Mr. Rose is not allowed to rely on such made-for-litigation analysis where, as here, the person who did the analysis is not put forth as an expert, subject

1  to cross-examination.  *See*, *e.g.*, *United States v. Tran Trong Cuong*, 18 F.3d 1132,

2  1143 (4th Cir. 1994) ("Reports specifically prepared for purposes of litigation are

3  not, by definition, 'of a type reasonably relied upon by experts in the particular

4  field.'") (quoting Fed. R. Evid. 703 (1975)).

5  **III.   THE COURT SHOULD EXCLUDE ALL OF MR. ROSE'S**

6  **"REPUTATIONAL RECOVERY" TESTIMONY**

7        To give the jury a huge number to consider, Mr. Unsworth wants Mr. Rose to

8  testify that he needs to spend at least $30 million on a reputational management

9  plan.[1]  But Mr. Rose is putting the cart before the horse.  As explained above, he has

10  conducted no research to determine if Mr. Unsworth's reputation has been harmed

11  and, thus, if a "reputation recovery" program is necessary.  But even if he had done

12  that work and even if there were a valid basis for him to testify that some form of

13  program were justified, he failed to use any reliable principles or methods to support

14  his opinion on the $30 million scope of that program.  Instead, it is just his *ipse dixit*.

15        **A.   Mr. Rose's Speculative Opinion Employs An Unreliable**

16        **Methodology That Cannot Be Tested.**

17        Mr. Rose's opinions should be excluded as unreliable because he has failed to

18  justify the use of his reputation recovery estimates as a reliable methodology for

19  calculating the cost of repairing any harm to Mr. Unsworth's reputation.

20        First, Mr. Rose's method cannot be tested because he has failed to provide

21  sufficient evidence of relevant experience designing or implementing any

22  "reputation recovery" programs.  *See*, *e.g., City of Pomona v. SQM N. Am. Corp.*,

23  750 F.3d 1036, 1046 (9th Cir. 2014) (expert's opinion should be capable of being

---

[1] Whether this is even a recognized remedy in a defamation lawsuit, and thus
whether any testimony in support of it relevant and admissible, is not settled.
Plaintiff is not seeking reimbursement for anything he spent to "repair" his
reputation.  Defendant does not waive his rights in that regard.  *See DSU Med. Corp.
v. JMS Co, Ltd.*, 296 F. Supp. 2d 1140, 1156 (N.D. Cal. 2003) (opinion based on
"legal 'principle' that is not legally acceptable" is inadmissible).

"challenged in some objective sense" and not be "simply a subjective, conclusory approach that cannot reasonably be assessed for reliability."); *24/7 Records*, 514 F. Supp. 2d at 576 (excluding opinion based on an expert's "instinct, an approach that cannot be tested, has no known rate of error, and is not subject to any standards").

Although Mr. Rose claims to have based his plan on his purported experience managing comparable "reputation repair" programs, he refused to provide any meaningful documents to support that assertion.  (Report at 39; Rose Depo. 164:14-166:24.)  Mr. Rose must allow Mr. Musk to test whether his testimony is the product of some specialized knowledge with the type of "reputational repair" program he proposes.  *See Younan v. Rolls-Royce Corp.*, 2013 WL 1899919, at *16-17 (S.D. Cal. May 7, 2013) (excluding opinion as unreliable where expert failed to establish he possessed the requisite experience necessary to form the challenged opinions).

Further, Mr. Rose failed to employ a reliable methodology, as he must on any subject, but certainly on rehabilitative advertising.  *Citizen Fin. Grp.*, 2003 WL 24010950, at *8–9 (excluding name rehabilitation opinion that applied no principals and methods but was based only on expert's "marketing experience").  Opinions are excluded where, as here, they are based "on personal opinions and speculation" rather than a "systematic assessment" of relevant data.  *See Ollier*, 768 F.3d at 861 (affirming bar of expert testimony based on "superficial" inspection and analysis).

In *Citizen Fin. Grp.*, the expert sought to testify that the plaintiff needed to undertake an extensive marketing campaign to "restore its reputation and brand." *Citizen Fin. Grp., Inc.*, 2003 WL 24010950, at *8.  As with Mr. Rose, the expert did not conduct any market research to support his conclusion, but based his opinion on his experience.  *Compare with* Report at 38 ("Based on my professional experience, the costs to repair Mr. Unsworth's reputation from the damage caused by Mr. Musk are estimated to a reasonable degree of professional certainty as follows").  The court excluded the opinion as mere *ipse dixit*, finding that the "analysis appears to be nothing more than [the expert's] instinctive reaction to the materials provided to

him." *Id.* at *9.  The court also noted, as with Mr. Rose, that the expert "cite[d] to no standards for his opinions," nor "provide[d] any explanation that could be tested or subjected to peer review."  *Id.*; (*see* Rose Depo. 104:24-105:10.)

Significantly, Mr. Rose refused to produce any documents regarding his work on reputation recovery, which would have enabled Defendant to test whether Mr. Rose has any foundation for his opinion as to whether Mr. Unsworth needs to spend money to "recover" his reputation and, if so, what he needs to do, and how much it would cost.  Before deposing Mr. Rose, Defendant requested that he produce all reputation recovery programs that he or his firm performed in the last 10 years.  (Ex. 4.)  Mr. Rose refused to produce ***any***.  (Rose Depo. 164:14-166:24.)  As a result, he deprived Mr. Musk of his right to test and challenge the reliability of Mr. Rose's opinion by comparing his proposal to actual work he has done in the past, and to confirm that he has ever applied the methodology he proposed to use here.  *United States v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004) ("Testability ensures the basic possibility of meaningful cross-examination.").  His opinion should be excluded on that basis alone.  *See 24/7 Records, Inc.*, 514 F. Supp. 2d at 575 (excluding expert who could not identify any comparable situations to support his opinion).

**B.     Mr. Rose Failed To Apply His Methodology In A Reliable Manner.**

Even if Mr. Rose could show that his "reputational repair" program is based on an accepted and reliable methodology, he failed to apply it in a reliable manner. To be admissible, expert testimony must be the result of an "expert [that] has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(d).  Mr. Rose has not met that standard here.

First, Mr. Rose's application of the methodology here is unreliable because he does not know the existence or extent of any harm to Mr. Unsworth's reputation. As noted above, Mr. Rose does not know what the state of Mr. Unsworth's reputation is.  (Rose Depo. 293:4-10.)  He does not know, and did not even attempt to learn, how many people in the world even know who Mr. Unsworth is.  (*Id.* at

148:8-16.) He does not know, and did not attempt to learn, how many people in the world know about Mr. Musk's statements. (*Id.* at 64:18-24.) He does not know, and did not attempt to learn, how many people in the world believe Mr. Musk's statements. (*Id.* at 115:8-116:17.) And he does not know, and did not attempt to learn, how many people in the world think that Mr. Unsworth's reputation has been harmed by the statements. (*Id.* at 178:20-179:3.)

That has consequences not only for any testimony Mr. Rose wants to give on the alleged fact of reputational harm. It has consequences for any opinions regarding any rehabilitation of it. Mr. Rose admitted that he would need to know this information ***before*** designing any program and that he would have to conduct "strategic research" ***before*** then, to get a "baseline public opinion from which to build [the reputation recovery program] off of." (*Id.* at 62:13-63:5, Report at 33.) Yet Mr. Rose has done none of that research. *See First Sav. Bank,* 117 F. Supp. 2d at 1086 (excluding testimony as to remedial advertising campaign where expert did not calculate actual harm to brand or determine campaign's message).

Mr. Rose revealed just how unbounded and unreliable his plan is, and how the testimony is being offered solely to enable Plaintiff to wave a huge number in front of the jury: He confessed that he has no idea how to even evaluate the information this "research" might yield. For example, he has no idea what minimum percentage of survey respondents in a given country would need to say they knew who Mr. Unsworth was before he could conclude that Mr. Unsworth even had a reputation, or what minimum percentage would need to say they thought less of Mr. Unsworth because of what Mr. Musk said before he could conclude that the reputation needed "repair." (Rose Depo. 156:13-158:1.) He was candid enough, however, to admit that, absent ***some*** sufficient percentage in each country, he could not recommend spending any money at all. (*Id.* at 159:3-13.)

Second, the application of the methodology here is unreliable because Mr. Rose has not connected the expensive ad campaign he proposes to remedying harm

to Mr. Unsworth from Mr. Musk's statements.  Mr. Rose opines that Mr. Unsworth has to spend at least $3 million on newspaper advertisements, $2 million on television and radio advertisements, and $9 million on online advertisements over two years, but he provides insufficient explanation as to why these costs are needed. (*See* Report at 39; 37 ("I would estimate that Mr. Unsworth team would have to spend a minimum of two million dollars to have an effective radio and television ad campaign that is integrated into the overall campaign.").)  Mr. Rose cannot explain—because he does not know—what the advertisements will look like, where they will run, or when.  (Rose Depo. 329:10-333:16; 270:18-25.)  Nor does he attempt to substantiate these estimates by comparing them to past reputation recovery programs he has purportedly run.  (*See generally*, Report.)   His testimony must be excluded for failing to apply the methodology in a reliable manner.

In *First Sav. Bank*, the expert testified that he did not know the "specific harm" suffered by the plaintiff and that he "would have to know that information" before he would "implement an advertising campaign."  117 F. Supp. 2d at 1086. Mr. Rose admitted the same thing here.  ( Rose Depo. 88:1-7 ("Q.  Do these charts [on pages 17-19 of the Report] tell us whether Mr. Unsworth's reputation has been harmed to any degree as a result of anything Elon Musk said about him? A. These charts do not.  Which is the reason why I specifically recommend the strategic research **to determine** the amount of harm that was done.").)  And like Mr. Rose, the expert in *First Sav. Bank* admitted that he did not know what the corrective advertisements would say.  *Compare* 177 F. Supp. 2d at 1086 ("Eskilson did not go so far as to determine what the concept or message would be in the advertising campaign, but admits that the message can have an effect on the cost") *with* (Rose Depo. 270:18-25 ("Q. So as you sit here today you can't tell me what the contents of any of the ads would consist of, whether the TV ads, the newspaper ads, or any other form of advertising?  A. That's correct.").)  The court excluded the expert's testimony for "fail[ing] to take into account the specific facts

1   of the case," and for being "too speculative to assist the jury in determining the

2   amount plaintiff would be damaged by engaging in a remedial advertising

3   campaign." *Id.*  That is the case here.

4        Based on Mr. Rose's prior experience, his opinion as to cost is grossly

5   inflated.  He testified that he performed reputation work for three high-profile public

6   figures who had been publicly accused of sexual harassment and assault; yet they

7   spent a total of ***zero dollars*** on any paid ad campaigns.  (Rose Depo. 346:22-350:1. )

8        Further, and equally significant, Mr. Rose cannot say how much Mr.

9   Unsworth's reputation will improve without any "program" or "plan"—that is, on its

10  own—if Mr. Unsworth wins this case.  (Rose Depo. 293:11-22.)  That is because, as

11  Mr. Rose admitted, even if the jury awards Mr. Unsworth $1, the mere fact of his

12  prevailing at trial will likely generate many favorable stories that will be carried all

13  over the world.  (*Id.* at 260:22-262:5.)  Those cost Mr. Unsworth nothing.

14       Mr. Rose's failure to determine if and to what extent Mr. Unsworth's

15  reputation was harmed, plus his inability to describe with certainty the content of

16  any "reputation recovery" program, and his refusal to apply specific methods or

17  principals in designing his program render it speculative and inadmissible.  *See*

18  *Ollier*, 768 F.3d  at 860; *First Sav. Bank*, 117 F. Supp. 2d at 1086;  *Citizen Fin.*

19  *Grp., Inc.*, 2003 WL 24010950, at *8.  *First Sav. Bank* and *Citizen Fin. Grp*. are

20  instructive.  In both of those cases, the courts excluded remedial advertising and

21  name rehabilitation expert testimony where, as here, the opinions were speculative,

22  not based in fact, and did not apply reliable methods.  *First Sav. Bank*,  117 F. Supp.

23  2d at 1086; *Citizen Fin. Grp., Inc.*, 2003 WL 24010950, at *8.

24  **IV.   THE COURT SHOULD EXCLUDE MR. ROSE'S TESTIMONY**

25  **        ABOUT THE "REASONABLE FORESEEABILITY" OF BUZZFEED'S**

26  **        REPUBLICATION OF MR. MUSK'S AUGUST 2018 EMAIL**

27       Mr. Rose intends to testify that it was "reasonably foreseeable" that BuzzFeed

28  news would republish Mr. Musk's August 30, 2018 email to Ryan Mac regarding

Mr. Unsworth.  (Rose Depo. 95:24-96:5; Report at 5.)   This opinion should be excluded under Rule 702 because: (a) Mr. Rose is not qualified to give it, (b) it lacks sufficient factual foundation, and (c) he did not apply reliable and testable methods and principles.  The opinion is inadmissible also under Rules 701, 702, and 403 as it usurps the role of and is unhelpful to the jury.  *See Aguilar v. Int'l Longshoremen's Union Local No. 10,* 966 F.2d 443, 447 (9th Cir. 1992) ("[T]he reasonableness and foreseeability of the casual workers' reliance were matters of law for the court's determination.  As such, they were inappropriate subjects for expert testimony.").

A.      **Under Rule 702, the Court Should Exclude Mr. Rose's Opinion That BuzzFeed's Republication Was "Reasonably Foreseeable."**

Mr. Rose seeks to testify that Mr. Musk "knows or should have known" that he needed first "to come to an agreement" with BuzzFeed's reporter on attribution before his off-the-record email would be treated off-the-record.  (Report at 5.)  This opinion is irrelevant, and not based on reliable methods or sufficient facts.

Mr. Rose, who has never worked in a newsroom, failed to apply reliable methods or principles to demonstrate that any uniform standards exist on what would cause a journalist to treat information as "off-the-record."  He admitted that there is no professional or legal standard mandating that reporters enter into advance contracts with sources to treat the information as off-the-record.  (Rose Depo. 222:20-223:16; 232:1-4.)  There is none.  His client handout on the subject states that, although it may be a "best practice" for a source to reach an attribution agreement before sharing "off-the-record" information,  journalists can and do treat information as "off-the-record" even without a prior agreement.  (Report, Ex. B).  Besides his own article, personal "experience" interacting with reporters, and "familiar[ity] with how news organizations work," Mr. Rose has not identified any methods or principles guiding his opinions.  (Report at 5.)  He conducted no research to confirm the existence of a rule that "off-the-record" requires a prior agreement and was unable to cite to any books, guidelines, or treatises supporting

DEFENDANT'S MOTION IN LIMINE NO. 4 TO EXCLUDE THE EXPERT OPINION OF ERIC W. ROSE

his opinion.  (Rose Depo. 223:17-224:11.)  His inability to identify any research, standards, or literature to support this opinion renders it untestable *ipse dixit* and inadmissible.  *See Joiner*, 522 U.S. at 146; *Citizen Fin. Grp., Inc.*, 2003 WL 24010950, at *8 (excluding opinion that did not identify any governing standards and was not subject to peer review).

The opinion also lacks sufficient factual support for purposes of Rule 702. Mr. Rose testified that he did not know whether BuzzFeed's newsroom guidelines when it republished Mr. Musk's emails required that an agreement between source and reporter be reached before information would be treated off-the-record.  (Rose Depo. 240:22-241:15.)  Those guidelines did not require that; BuzzFeed added it only ***after*** it published Mr. Musk's emails.  (*Compare* Ex. 5 at 2 *with* Ex. 6 at 4.) Remarkably, Mr. Rose also admitted that, although he doesn't know what Mr. Musk was thinking when he sent the emails to BuzzFeed, he believes that "Mr. Musk had every expectation, clearly every expectation, that it was off the record."  (*Id*. at 240:8-20.)  And finally, Mr. Rose did not know or consider how Mr. Musk and his companies interacted with BuzzFeed prior to the republication of his emails or whether—as it did—BuzzFeed regularly treated information from Mr. Musk's companies as "off-the-record" if it was unilaterally designated in an email and no prior agreement was reached.  (*Id.* at 237:16-238:2.)  Mr. Rose's failure to be aware of, much less consider, these facts renders his opinion inadmissible.  *See Powell*, 2012 WL 12953439, at *6 (excluding opinion for failing to consider relevant facts).

Mr. Rose's opinion should also be excluded as irrelevant.  As reflected in his testimony and in his client handout, his testimony concerns situations where a source does ***not*** designate information "off-the-record," discloses it to a journalist, and then attempts to designate it off-the-record retroactively.  (Report at Exhibit B; Rose Depo. 233:18-235:11.)  But that is not the situation here, where the disclosure to the reporter was prefaced with an "off-the-record" designation that the reporter chose not to honor.  The facts underlying Mr. Rose's opinion are thus "disparate and

1   distinguishable" from this case, and therefore irrelevant and inadmissible. *See*

2   *Eisenbise v. Crown Equip. Corp.*, 260 F. Supp. 3d 1250, 1262 (S.D. Cal. 2017)

3   (excluding as irrelevant witness's opinion based distinguishable data).

4         **B.**    **Mr. Rose's "Reasonably Foreseeable" Opinion Is Unhelpful to the**

5                **Jury and Should be Excluded Under Rules 701 and 702.**

6       Mr. Rose's testimony as to whether it was "reasonably foreseeable" that

7   BuzzFeed would publish Mr. Musk's off-the-record email is inadmissible for the

8   additional reasons that it is unhelpful to and usurps the role of the jury. *See* Fed R.

9   Evid. 701-702. The Advisory Committee Notes make clear that Rules 701, 702, and

10  403 "afford ample assurances against the admission of opinions which would

11  merely tell the jury what result to reach." *See* Fed. R. Evid. 704 advisory

12  committee's note. Thus, the Federal Rules "exclude opinions phrased in terms of

13  inadequately explored legal criteria. Thus the question, 'Did T have capacity to

14  make a will?' would be excluded." *Id.* Accordingly, courts routinely exclude

15  opinion testimony, like this, that is framed to match a legal element, especially

16  where the expert seeks to opine whether or not an action is "reasonable." *See Strong*

17  *v. E. I. DuPont de Nemours Co.,* 667 F.2d 682, 686 (8th Cir. 1981) ("[T]he question

18  of whether the lack of warnings rendered the DuPont and Norton McMurray

19  products unreasonably dangerous is not the kind of issue on which expert assistance

20  is essential for the trier of fact. The jury was capable of drawing its own inferences

21  from the available evidence.").

22       The "reasonable foreseeability" inquiry in this case is not complicated; the

23  jury can draw its own conclusion without Mr. Rose's instruction as to what result to

24  reach. *See* Fed. R. Evid. 704, advisory committee's note.

25  **V.**    **THE COURT SHOULD EXCLUDE MR. ROSE'S OTHER**

26        **INADMISSIBLE TESTIMONY**

27       Mr. Rose plans to offer impermissible and unreliable opinions regarding a

28  number of other matters. They should be excluded under Rules 403, 701, and 702.

### A.     Mr. Rose May Not Testify as to Anyone's State of Mind.

The court should exclude the portions of Mr. Rose's report and testimony that include improper opinions and conclusions about Mr. Musk and Mr. Unsworth's states of mind, intent, and motives.  (*See*, *e.g.*, Report at 4, 22-23, 39 (discussing Mr. Musk's intent and state of mind); Rose Depo. 123:16-125:5 (discussing Mr. Unsworth's state of mind during in his July 2018 CNN interview).) Expert testimony as to the parties' intent, motive, or state of mind is impermissible. *See*, *e.g.*, *Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077-78 (D. Or. 2013); *Hill v. Novartis Pharms. Corp.,* 2012 WL 5451816, at *2 (E.D.Cal. Nov. 7, 2012) ("The Court finds this and other testimony regarding Defendant's intent, motives or state of mind to be impermissible and outside the scope of expert testimony."); *Smith v. Wyeth–Ayerst Labs. Co.,* 278 F.Supp.2d 684, 700 (W.D.N.C.2003) ("[T]he jury should hear and/or see first-hand any relevant evidence pertaining to the Defendant's intent. Then the jury, not the witnesses, should consider the facts and make its own determination regarding Defendant's intent.").  Accordingly, Mr. Rose should be precluded from offering any such testimony at trial.

### B.     Mr. Rose May Not Testify that Mr. Musk is Responsible for Mr. Unsworth's Actions or Their Consequences.

During his deposition, Mr. Rose offered a number of unsupported opinions on causation and apportioning fault.  For example, he stated that, even though the harmful articles noted in the Five Points analysis concern the lawsuit (Report at 9-16), and he obviously cannot state that, absent the lawsuit, they still would have been written (Rose Depo. 283:12-25), he thinks Mr. Musk is nonetheless responsible for any harm to Mr. Unsworth's reputation from those articles, even though it was Mr. Unsworth's decision to file it.  (*Id.* at 359:20-360:12.)

The Court should bar such testimony.  Plaintiff has not offered Mr. Rose as a causation expert witness and he has offered no evidence that purported

1   communications expertise qualifies him to be one.  *See* 29 Charles A. Wright. et al.,

2   *Federal Practice & Procedure*, § 6265 at p. 255 & nn. 34 & 35 (1977) ("Even

3   where a witness has special knowledge or experience, qualification to testify as an

4   expert also requires that the area of the witness's competence matches the subject

5   matter of the witness's testimony.").  Further, the testimony veers into a legal

6   opinion and is not based on any scientific or other recognized method of analysis.

7       **C.     Mr. Rose's Testimony That Mr. Unsworth "Has a Right" To Have**

8           **His Reputation Repaired Is An Impermissible Legal Conclusion.**

9       Mr. Rose testified at his deposition that Mr. Unsworth "has the right to have

10  his reputation repaired" whether or not it was actually harmed.  (*See*, *e.g.*, Rose

11  Depo. 156:13-25.)  This statement is a legal conclusion and is inadmissible.  *See*

12  *United States v. Moran*, 493 F.3d 1002, 1008 (9th Cir. 2007) ("[A]n expert witness

13  cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate

14  issue of law. Similarly, instructing the jury as to the applicable law is the distinct

15  and exclusive province of the court.").  Mr. Rose should therefore be precluded from

16  making any reference to Mr. Unsworth's "right" to reputational repair at trial.

17                          **CONCLUSION**

18      For the foregoing reasons, Mr. Musk respectfully request that the Court enter

19  an order excluding Mr. Rose from testifying, as more specifically set forth in the

20  Notice of Motion.

21  DATED:  November 8, 2019           Respectfully submitted,

22                                     QUINN EMANUEL URQUHART

23                                        & SULLIVAN, LLP

24

25                                 By_____*/s/ Alex Spiro*_____

26                                     Alex Spiro

                                       *Attorneys for Defendant Elon Musk*

27

28