QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (admitted *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
Jeanine M. Zalduendo (Bar No. 243374)
  jeaninezalduendo@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>       Plaintiff,<br><br>     vs.<br><br>ELON MUSK,<br><br>       Defendant. | Case No. 2:18-cv-08048<br><br>Judge: Hon. Stephen V. Wilson<br><br>**DEFENDANT'S MOTION IN LIMINE NO. 5 TO EXCLUDE THE EXPERT OPINION OF DR. BERNARD J. JANSEN**<br><br>Complaint Filed: September 17, 2018<br>Trial Date: December 2, 2019<br><br>Hearing Date:  November 25, 2019<br>Time:         3:00 p.m.<br>Courtroom:   10A |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at 3:00 p.m. on November 25, 2019, or as soon thereafter as this matter may be heard, in Courtroom 10A of the above-titled Court, Defendant Elon Musk will move this Court for an Order, pursuant to Fed. R. Evid. 701, 702, 403, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), excluding all of the opinions and testimony of Plaintiff's designated expert, Dr. Bernard "Jim" Jansen, as embodied in his Report and reflected in his deposition testimony, including any argument or reference to them by Plaintiff or his attorneys, even if not attributed to Dr. Jansen, including without limitation, the following:

1. Dr. Jansen's opinions related to his contention "[t]he defaming statements made by Mr. Elon Musk asserting that Mr. Vernon Unsworth is a pedophile, is a child rapist, married a child, and/or is involved in child sex trafficking: a. have been disseminated on at least 354 online media or other sites, b. in at least 605 stories or articles, c. with more than 98 million potential daily unique visitors, since the statements were made to the date that I filed this report, inclusive." (Exhibit 1, Expert Report of Bernard "Jim" Jansen ("Report") at ¶¶ 20, 72, 77, 80.)

2. Dr. Jansen's opinions regarding the number of people who "could have potentially" seen Mr. Musk's tweets about Mr. Unsworth, including Mr. Jansen's opinion that "all [of Mr. Musk's twitter followers] could potentially have seen the defaming statements" and " [f]rom Mr. Musk's Twitter account, millions of people could have seen the defaming statements." (Report ¶¶ 33, 38, 48.)

Defendant's motion is made on the grounds that the opinions offered by Dr. Jansen are irrelevant and not helpful to the jury; the probative value of Dr. Jansen's opinions  are substantially outweighed by the danger of unfair prejudice, confusing

the issues, and misleading the jury; Dr. Jansen's opinions are not based on reliable methodologies or on any scientific, technical, or other specialized knowledge for which Dr. Jansen is purportedly offered; they fail to apply methodologies in an reliable manner; and they are speculative and based on assumptions wholly unsupported by the facts.

This motion is based upon this notice of motion and supporting memorandum of points and authorities; the Declaration of Michael T. Lifrak, and the exhibits attached thereto; the pleadings and papers on file in this case; and such other written or oral argument as may be presented at or before the time this motion is deemed submitted by the Court.

DATED:  November 8, 2019          Respectfully submitted,

                                 QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP


                                 By_____/s/ Alex Spiro_____
                                    Alex Spiro
                                    *Attorneys for Defendant Elon Musk*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

     A.    Dr. Jansen's Approach to Collecting Articles. ....................................... 3

     B.    Dr. Jansen Estimated the Number of "Unique Daily Visitors" For the Websites Where The Articles Were Available. ................................. 4

LEGAL DISCUSSION .......................................................................................... 6

I.     DR. JANSEN MAY NOT OFFER HIS OPINIONS UNLESS THEY MEET RIGOROUS STANDARDS ......................................................... 6

II.    THE COURT SHOULD EXCLUDE JANSEN'S "UNIQUE VISITORS" TESTIMONY AS IRRELEVANT AND UNRELIABLE ........... 7

     A.    Dr. Jansen's Testimony That 98 Million Unique Visitors Visited Websites Is Irrelevant ........................................................ 7

     B.    Dr. Jansen's Methods to Calculate Unique Visitors Are Unreliable ....................................................................................... 9

     C.    Dr. Jansen Failed to Apply His Methodology In A Reliable Manner ......................................................................................... 12

III.   THE COURT SHOULD EXCLUDE DR. JANSEN'S OPINION THAT 605 ARTICLES CONTAINED DEFAMING STATEMENTS ......... 13

IV.   THE COURT SHOULD EXCLUDE ANY TESTIMONY REGARDING THE NUMBER OF PEOPLE WHO SAW MR. MUSK'S TWEETS ............................................................................... 15

CONCLUSION ...................................................................................................... 16

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

3
### <u>Cases</u>

4
*Acad. of Motion Pictures Arts and Scis. v. GoDaddy.com, Inc.*
  2013 WL 12122803 (C.D. Cal. June 21, 2013)......................................................6
5

6
*Agha v. Feiner,*
  198 N.J. 50 (2009) ................................................................................................12

7
*Allen v. Am. Capital Ltd.,*
  287 F. Supp. 3d 763 (D. Ariz. 2017) ...............................................................9, 10
8

9
*Arista Networks, Inc. v. Cisco Sys. Inc.,*
  2018 WL 8949299 (N.D. Cal. June 15, 2018)....................................................11

10
*Chesebrough-Pond's, Inc. v. Faberge, Inc.,*
  666 F.2d 393 (9th Cir. 1982) ...............................................................................14
11

12
*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993).......................................................................................6, 7, 9, 15

13
*Dible v. Haight Ashbury Free Clinics, Inc.,*
  170 Cal. App. 4th 843 (2009) ................................................................................8
14

15
*Diviero v. Uniroyal Goodrich Tire Co.,*
  114 F.3d 851 (9th Cir. 1997) .................................................................................7

16
*G v. Fay Sch., Inc. by & through its Bd. of Trustees,*
  282 F. Supp. 3d 381 (D. Mass. 2017)..................................................................12
17

18
*G. v. Fay Sch.,*
  931 F.3d 1 (1st Cir. 2019).....................................................................................12

19
*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997)...............................................................................................6
20

21
*Haley v. Casa Del Rey Homeowners Assn.,*
  153 Cal. App. 4th 863 (2007) ................................................................................7

22
*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.,*
  984 F. Supp. 2d 1021 (C.D. Cal. 2013) ..............................................................11
23

24
*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999)...............................................................................................6

25
*Lust By & Through Lust v. Merrell Dow Pharm., Inc.,*
  89 F.3d 594 (9th Cir. 1996) .............................................................................7, 11
26

27
*Ollier v. Sweetwater Union High Sch. Dist.,*
  768 F.3d 843 (9th Cir. 2014) ...............................................................................13

28

*Sanchez v. Jiles,*
  2012 WL 13005996 (C.D. Cal. June 14, 2012) ................................................. 14

*Smith v. Pac. Bell Tel. Co.,*
  649 F. Supp. 2d 1073 (E.D. Cal. 2009) ........................................................ 16

*Tamkin v. CBS Broad., Inc.,*
  193 Cal. App. 4th 133 (2011) ................................................................. 7, 8

*United States v. 87.98 Acres of Land More or Less in the Cty. of Merced,*
  530 F.3d 899 (9th Cir. 2008) .................................................................... 8

*United States v. Cordoba,*
  194 F.3d 1053 (9th Cir. 1999) ................................................................. 11

*United States v. Freeman,*
  498 F.3d 893 (9th Cir. 2007) ................................................................... 12

*United States v. Fultz,*
  18 F. Supp. 3d 748 (E.D. Va. 2014) .......................................................... 11

*United States v. Mitchell,*
  365 F.3d 215 (3d Cir. 2004) ............................................................... 10, 13

*United States v. Montas,*
  41 F.3d 775 (1st Cir. 1994) .................................................................... 14

## **Statutes**

Fed. R. Evid. 403 ..................................................................................... 15

Fed. R. Evid. 702 .......................................................................... 6, 7, 12, 14

## **Other Authorities**

6A Cal. Jur. 3d Assault and Other Willful Torts § 188 ....................................... 7

# **INTRODUCTION**

Plaintiff Vernon Unsworth has no admissible evidence, expert or otherwise, that any appreciable number of people know what Defendant Elon Musk said about him, thought it was true, or thought less of Mr. Unsworth as a result.  That is a problem for Mr. Unsworth, as a defamation plaintiff seeking to recover damages based on the extent to which the defaming statements were allegedly read all over the world.  So he hired a computer scientist, Dr. Bernard "Jim" Jansen, to prepare a report that makes it look like Mr. Unsworth has such evidence.  Dr. Jansen estimates that, back in September 2018, the "daily unique visitors" to 335 websites that hosted one or more of 605 articles he located—articles that mention Mr. Musk's "defaming statements"—was "potentially 98 million."

But even a cursory review of Dr. Jansen's report reveals that this is just smoke and mirrors and that his "98 million potential daily unique visitors" opinion is irrelevant.  That is because Dr. Jansen does not know ***how many*** people read those articles.  At most, all he can tell the jury is that those articles were merely ***available***, ***somewhere*** on 335 web sites whose estimated daily unique visitors adds up to 98 million.  At his deposition, he repeatedly admitted that he did not attempt to determine, and knows nothing about, whether ***anyone*** navigated to the locations within those web sites where these articles could be found, or whether ***anyone*** may have clicked on them, read them, or saw what they say about Mr. Unsworth.  And he offers the jury no means by which to convert his irrelevant and misleading number into numbers that go to those questions, which are the ones that matter to Mr. Unsworth's case.  The jury would have to come up with a way to estimate those numbers on its own, based on no evidence, guidance, or anything but mere guesswork.  The mischief of this testimony, and the prejudice it would work on the Defendant, are clear.  This is not proper expert testimony.

It gets worse.  Even if his testimony were not irrelevant and misleading, it is based on methods and practices that *Daubert* forbids.  Dr. Jansen based his opinion

on estimates of web traffic that he pulled from third-party software, called SimilarWeb, that has never been peer-reviewed or scientifically validated, has been heavily criticized for overestimating visitor counts, and whose methods he does not sufficiently understand to present to a jury.

Further, he does not know how SimilarWeb came up with its estimated visitor counts for the sites. SimilarWeb is a proprietary software program that he did not design and whose fundamental aspects he does not know, such as what data is considered or how its algorithm weighs the data. And although the estimate is based on sampling, which means it is subject to an error rate, there is no established error rate for SimilarWeb and he did not attempt to calculate or apply one.

Further still, his estimate does not even tell how many unique ***people*** visited these 335 websites. By Dr. Jansen's own admission, under his method, a single individual could be counted as 335 different "unique daily visitors." And a large proportion of the 98 million unique daily "visitors" to these websites—perhaps one-half—may not even be human beings. Dr. Jansen does not account for that.

At bottom, Dr. Jansen's number rests on the validity of his decisions to include each of the 605 articles in his collection. In deciding which ones to include, each had to contain the "defaming statements" but none could be "primarily" about the lawsuit. Unlike Mr. Unsworth's other expert, Eric Rose, at least Dr. Jansen realizes that Mr. Musk should not bear responsibility for articles written about a lawsuit he did not file.

But in attempting to explain where he drew that line, Dr. Jansen revealed the *Daubert*-deficient nature of what he did. He could not explain coherently what criteria he relied on to, for example, include an article (and all of the unique visitors to each website that hosted it) that discussed the lawsuit to "some" extent but not enough to cross his line of being "primarily" about the lawsuit. And he chose not to log his search queries or the articles that he read but chose to exclude. As a result, his methodology cannot be tested or trusted. Moreover, he did not use any scientific

method to pick or categorize the articles.  He simply read them and added them to his list based on his personal opinion as to whether they meet his standards.  As a result, Dr. Jansen seeks to give the imprimatur of scientific opinion to a simple Google search that any layperson could conduct.  In any event, the fact that 605 articles may exist does not help the jury determine whether and how many people read them.  In sum, Dr. Jansen's opinions are irrelevant, unhelpful, prejudicial, and unreliable.  This Court should exclude them and bar him from testifying at trial.

## FACTUAL BACKGROUND

Dr. Jansen is an adjunct professor in computer science at Penn State University.  Plaintiff's attorneys hired him to determine "the level of dissemination of the defaming statements made by Mr. Elon Musk asserting that Mr. Vernon Unsworth is a pedophile, is a child rapist, married a child, or is involved in child sex trafficking."  (Ex. 1, Jansen Report ("Report") at ¶¶ 1, 2, 12.)[1]  As described in his report, Dr. Jansen attempted to answer this question in a two-step analysis: (1) find online articles containing Mr. Musk's statements and (2) use a third-party software program to estimate "unique daily visitors" to the websites that hosted those articles.

Dr. Jansen did not determine and cannot opine on the number of people who read, saw, or learned about Mr. Musk's statements—online or anywhere else.  (Ex. 2, Jansen Deposition ("Jansen Depo.") at 30:24-33:13.)  Nor does Dr. Jansen know, or even attempt to determine, how many people actually read or saw the articles he identified in his report.  (*Id.*)  Dr. Jansen also does not know how many humans visited the websites whose traffic he estimated.  (*Id.* at 99:8-100:24; 134:13-18.)

### A.   Dr. Jansen's Approach to Collecting Articles.

Dr. Jansen's first step was to identify all online articles that "directly reference" Mr. Musk's statements and are "not primarily about this case."  (Report ¶ 58.).  He ran Google searches to locate them.  He then read the articles and decided

---

[1] Exhibits are attached to the Declaration of Michael T. Lifrak, filed concurrently .

"as a thinking person" whether they were responsive to his criteria.  (*Id.*, ¶¶ 58-62; Jansen Depo. 226:14-23.)  Dr. Jansen did not create a software program or algorithm to identify or categorize the articles; he Googled and read them.  (Report ¶¶ 58-62; Jansen Depo. 52:4-53:10.)  As someone with degrees and experience in computer science, Dr. Jansen does not bring meaningful training or expertise on those subjects to the case.  (Jansen Depo. 49:7-50:13.)

At some point, Dr. Jansen concluded that his search was complete.  He had identified 605 articles that "directly reference" Mr. Musk's statements and are "not primarily" about this case.  (Report ¶ 64.)  Dr. Jansen did not exclude articles based on their defamatory effect or message to the reader.  Dr. Jansen included in his list articles that were critical of Mr. Musk, said that his statements were baseless, or said that they were untrue.  (*See*, *e.g.*, Exs. 3-4.)  Dr. Jansen does not know and did not determine what number or percentage of the articles on his list are critical of Mr. Musk or reported his statements as untrue.  (Jansen Depo. 238:20-241:3.)  Additionally, he did not track or log the articles that he read, but excluded from his list for one reason or another.  (*Id.* at 223:8-224:9.)

Dr. Jansen then determined that the articles on his list had been made available on 354 websites.  (Report ¶ 20.)  Dr. Jansen excluded visitor counts from 19 of these websites, reducing his population to 335 sites.  (*Id.* at ¶ 68.)

**B.     Dr. Jansen Estimated the Number of "Unique Daily Visitors" For the Websites Where The Articles Were Available.**

Dr. Jansen next attempted to calculate the number of "unique daily visitors" who went to the 335 websites during September 2018.  (*Id.* at ¶¶ 67-71.) He used SimilarWeb, third-party web traffic software, to obtain estimates of the "unique daily visitors" to those websites.  (*Id.*)  SimilarWeb estimates online traffic at websites by sampling from four categories of data: (1) panels of people who have opted to have their browsing traffic logged, (2) data from Internet Service Providers, (3) publicly available data "probably" (he thinks) scraped from search engine pages,

and (4) websites that have allowed SimilarWeb to study their traffic.  (Jansen Depo. 115:16-116:17.)  SimilarWeb then runs this data through a proprietary "machine learning algorithm" to estimate the visitor traffic to thousands of websites.  (*Id.*)

Dr. Jansen did not design SimilarWeb.  He does not know the data on which SimilarWeb bases its estimates.  He has not seen its algorithm.  (*Id.* at 130:2-6;131:25-132:15; 116:22-117:1; 118:1-22; 128:7-129:4.)  There is no mention in his report that SimilarWeb's estimation methods have ever been scientifically tested or subject to peer review.  Although SimilarWeb estimates traffic through sampling, Dr. Jansen did not identify or apply an error rate to the estimates.

Dr. Jansen used SimilarWeb to calculate web traffic for the 335 websites he identified.  (Report ¶ 71.)  Because SimilarWeb estimates traffic on only a monthly basis, he took each SimilarWeb result and divided it by 30.  (Jansen Depo. 143:18-144:9.)  He added the results together and reached an estimate of approximately 98 million "unique daily visitors."  (Report ¶ 72.)

The estimate of 98 million unique daily visitors does not mean that 98 million different individuals visited those sites.  For example, a single individual could have visited multiple websites on Dr. Jansen's list, such as cnn.com, nytimes.com, or foxnews.com, and be counted as a separate "unique visitor" for each one.  (Jansen Depo. 96:17-100:24.)  Under Dr. Jansen's calculation, that single person is recorded as three separate "unique visitors."  (*Id.*)  Dr. Jansen did not attempt to weed out the double- or triple-counting (or more) or adjust his number to account for that inflation.  (*Id.* at 108:8-109:3.)  Additionally, although it has been estimated that more than 50% of all web traffic is generated not by human beings but by automated software programs known as "bots,"  Dr. Jansen's estimate does not exclude and is not adjusted to account for traffic to these web sites who are bots and not human. (*Id.* at 123:22-124:5; 134:13-18; *see also* Ex. 5.)

# LEGAL DISCUSSION

## I.  DR. JANSEN MAY NOT OFFER HIS OPINIONS UNLESS THEY MEET RIGOROUS STANDARDS

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), this Court serves as a "gatekeeper" for expert opinion testimony.  The Court may permit the admission of expert opinions based on "scientific, technical, or other specialized knowledge" if:

(a) [it] will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In making this determination, the Court may consider whether the expert's theory or technique: (1) may be objectively tested; (2) has been subject to peer review and publication; (3) has a known rate of error; and (4) has been generally accepted.  *See Daubert*, 509 U.S. at 592-94.  The *Daubert* factors are not limited to testimony about strictly scientific knowledge.  Courts may consider the factors in assessing the reliability of proffered testimony but are not limited to them.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–151 (1999) (concluding that *Daubert* applies to "scientific, technical, or other specialized knowledge").

As the gatekeeper, this Court must screen expert testimony "to ensure that the expert testimony both rests on reliable foundation and is relevant."  *Acad. of Motion Pictures Arts and Scis. v. GoDaddy.com, Inc.*, 2013 WL 12122803, at *2 (C.D. Cal. June 21, 2013); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered.").  Because speculative opinions are not helpful to the trier of fact, they are neither reliable nor admissible.  *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (expert opinion "was unsubstantiated and subjective, and therefore unreliable and inadmissible").

Mr. Unsworth, as the party proffering the expert, has the burden of proving that Dr. Jansen's opinions are admissible.  *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).   He cannot meet this burden.

## II.     THE COURT SHOULD EXCLUDE JANSEN'S "UNIQUE VISITORS" TESTIMONY AS IRRELEVANT AND UNRELIABLE

### A.     Dr. Jansen's Testimony That 98 Million Unique Visitors Visited Websites Is Irrelevant.

Rule 702 requires that expert evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citations omitted).  The "helpfulness" standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92.

Here, given that Mr. Unsworth intends to argue that he was damaged by each republication of Mr. Musk's statements, the pertinent inquiry is how many people actually read Mr. Musk's republished statements.  Dissemination and republication under California law requires that the alleged defamatory statement be "communicated to a third person who understands its defamatory meaning as applied to the plaintiff." *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 145-46 (2011); *Haley v. Casa Del Rey Homeowners Assn.*, 153 Cal. App. 4th 863, 877 (2007); *see also* 6A Cal. Jur. 3d Assault and Other Willful Torts § 188 (republication occurs when a defamatory statement is communicated to a third person).  Critically, as a matter of law, a false statement that is not read or heard by someone is not "republished." *See Tamkin*, 193 Cal. App. 4th at 145-146.

Under this framework, the relevant question is not whether the statements could be found in articles that had been posted online.  The question is how many people *actually read* them.  Dr. Jansen's analysis does not answer that question.  He does not have an opinion as to how many people actually saw or read any of these articles.  That is because he does not know and was not asked to determine that number.  (Jansen Depo. 31:25-32:6 ("Q. Are you giving any testimony in this case as to the number of people who actually read any of the articles on your list?  A. As I said, I was asked to measure the level of dissemination.  I was not asked to measure the number of people that read the articles.").)  All Dr. Jansen can say is that 98 million unique visitors potentially went to the websites where his 605 articles were available.  (Report ¶¶ 20, 72.)  He does not even know—and did not investigate—where the articles were posted on the websites or whether it was likely that a person visiting a given site would even come across the article or its allegedly defamatory content.  (Jansen Depo. 146:2-18; 147:14-150:3;161:10-162:3.)

As a result, Dr. Jansen's estimates do not provide any guidance or assistance to the jury to know to how many people the statements were actually communicated.  *See Tamkin*, 193 Cal. App. 4th at 145-146.  *C.f. Dible v. Haight Ashbury Free Clinics, Inc.*, 170 Cal. App. 4th 843, 851 (2009) ("A defamation action does not exist, of course, for a statement that one *might* make in the future.").

Dr. Jansen's opinion is not only irrelevant and unhelpful, but it also presents a genuine risk of jury confusion.  The estimate that 98 million unique visitors went to websites hosting articles containing Mr. Musk's statements is likely to invite unsupported inferences that 98 million people actually saw the statements.  At the very least, the jury may use this estimate as a variable to calculate the number of people who saw the statements, even though Dr. Jansen provides no way for the jury to arrive at such a number from his estimate.  This real risk of confusion and prejudice far outweighs any probative value of Dr. Jansen's opinion.  *See United*

*States v. 87.98 Acres of Land in the Cty. of Merced*, 530 F.3d 899, 906 (9th Cir. 2008) (excluding expert opinion as irrelevant and potentially confusing to the jury).

**B.      Dr. Jansen's Methods to Calculate Unique Visitors Are Unreliable.**

Dr. Jansen's 98 million unique visitors estimate should be excluded because it is derived from an unreliable method that materially overstates web traffic numbers, and because Dr. Jansen did not attempt to account or control for this inflation.

To determine whether an expert opinion is reliable, courts applying *Daubert* consider whether the methods have been tested, whether the methods have a known error rate, whether the methods have been published or peer reviewed, and whether they are generally accepted in the field. *Daubert*, 509 U.S. at 593-594.  Dr. Jansen's web traffic estimate is based entirely on results generated from commercial software called SimilarWeb.  (Report ¶ 67.)  Although he states that SimilarWeb is generally accepted in the advertising business, he has not produced adequate evidence that he or any other scientist has tested it; he did not provide or consider a known error rate; and his methods are not published or peer reviewed.  (*See generally*, Report.)  His opinion thus fails to satisfy *Daubert* and should be excluded.  *See, e.g.*, *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 787-88 (D. Ariz. 2017) (excluding expert opinion that failed three of the four *Daubert* factors).

•      ***Dr. Jansen's Method Has Not Been Subjected to Formal Testing***:  Dr. Jansen has no evidence that the SimilarWeb traffic sampling estimates have been subject to formal testing.  In fact, Dr. Jansen does not know the methods SimilarWeb uses to calculate unique visitors or even to what extent its estimates are based on bot traffic.  (Jansen Depo. 130:2-6; 131:25-132:15; 116:22-117:1; 118:1-18)  Dr. Jansen does not have access to SimilarWeb's algorithm, code, or the actual data that it considers to estimate traffic, and therefore does not know what SimilarWeb considers or what formula SimilarWeb uses to arrive at its estimate.  (*Id.*; *see also id.* at 128:7-129:4 ("But I don't know the internal workings of the SimilarWeb algorithm, you know, how that's done, where its done.").)  That

information is proprietary and not available to Dr. Jansen or the jury.  (*Id.* at 121:9-17; 131:25-132:15.)

Dr. Jansen did not examine SimilarWeb's actual methods or conduct any formal testing to ensure that they are scientifically sound.  (*See*, *e.g.*, *id*. at 182:19-23.)   As a result, Defendant cannot test the SimilarWeb algorithm or methods to determine whether they are, in fact, scientifically sound.  *See United States v. Mitchell*, 365 F.3d 215, 238 (3d Cir. 2004) (testing "assures the opponent of proffered evidence the possibility of meaningful cross-examination").  Nor can Dr. Jansen identify any scientific studies that have analyzed SimilarWeb's algorithm or methods and found them to be satisfactory.[2]  Courts routinely exclude expert testimony employing such untested methods.  *See Allen*, 287 F. Supp. 3d at 787 (excluding method that was "susceptible to testing" but never subjected to it).

- ***Dr. Jansen's Method Has Not Been Subject to Peer Review and Publication***:  Dr. Jansen admitted that he did not consult with any guidebooks, treatises, websites or articles in forming his opinion.  He felt "there was no need to." (Jansen Depo. 82:7-83:1.)  He did not identify any instance in which his methods were the subject of any formal scientific study or peer reviewed research.  (*See generally*, Report.)  And he could not point to a single objective source to show that he has followed the scientific method.  Rather, Dr. Jansen simply testified that SimilarWeb is the "de facto" industry standard for competitive web traffic analysis. (Jansen Depo. 83:2-11.)  By failing to identify or consult any scientific literature or objective source to confirm his methodology, Dr. Jansen's methodology lacks an

---

[2] The only study Dr. Jansen cites is a blog from screamingfrog.com that compared SimilarWeb's search results to actual traffic numbers from just 25 websites.  There is no indication that screamingfrog.com had access to SimilarWeb's algorithm or data.  Nonetheless, of those 25 websites, it found that SimilarWeb ***overestimated*** traffic for 40%, and that the net overestimation, taking into account all traffic on all sites, was 17%.  (*See* Jansen Depo. 197:3-17; Ex. 6 at 5-6.)

1   adequate scientific basis.  *See Lust*, 89 F.3d at 597 (affirming exclusion of expert

2   testimony that was not subject to peer review).

3       •   ***Dr. Jansen Does Not Identify or Apply Any Known Error Rate to his***

4   ***Method***:  Courts exclude expert testimony that is either silent on the method's

5   known or potential error rates or based on methods without known error rates.

6   *United States v. Cordoba*, 194 F.3d 1053, 1062 (9th Cir. 1999) (affirming exclusion

7   of testimony regarding method with no known error rate); *United States v. Fultz*, 18

8   F. Supp. 3d 748, 758 (E.D. Va. 2014) (excluding report that was silent on the known

9   or potential error rate in method).  That is the case here.

10      Because SimilarWeb estimates traffic through statistical sampling (Jansen

11  Depo. 115:15-116:17), its estimates necessarily include a rate of error.  *See*, *e.g., In*

12  *re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1030-

13  32 (C.D. Cal. 2013) (discussing error rates in statistical sampling).  Dr. Jansen

14  knows this, but he failed to identify or take into account any known error rates in the

15  SimilarWeb software and did not disclose whether SimilarWeb publishes any error

16  rate in its software.  (*See generally*, Report; Jansen Depo. 201:25-202:6.)

17      In fact, Dr. Jansen knew from the screamingfrog.com article cited in his

18  Report (*see* fn. 2) that SimilarWeb overestimated web traffic by 17% and

19  overestimated traffic to some sites by 128% and 98%.  (Ex. 6 at 5-6.)  Another

20  report—by a web security group Dr. Jansen is aware of but whose work he chose

21  not to review—found that SimilarWeb overestimates unique visitors by ***309%*** on

22  average.  (Ex. 7 at 7.)  Despite this data, he did not apply an error rate to his results.

23      Even worse, by blindly accepting the SimilarWeb results, Dr. Jansen is acting

24  as a mere conduit for the result of the SimilarWeb analysis while insulating the

25  SimilarWeb data and results from challenge.  Rule 703 does not permit a testifying

26  expert to convey the analysis of a non-testifying expert to the jury in this manner.

27  *See Arista Networks, Inc. v. Cisco Sys. Inc*., 2018 WL 8949299, at *3 (N.D. Cal.

28  June 15, 2018) (excluding expert testimony as a mere conduit for evidence) (citing

1   *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007)); *Agha v. Feiner*, 198

2   N.J. 50, 63 (2009) ("[T]he only fair interpretation is that [Rule 703] was not

3   intended as a conduit through which the jury may be provided the results of

4   contested out-of-court expert reports.").

5       **C.     Dr. Jansen Failed to Apply His Methodology In A Reliable**

6           **Manner.**

7       Even if Dr. Jansen had identified a reliable method for determining the

8   number of unique visitors to websites, he failed to apply the method in a reliable

9   manner.  Rule 702 requires that an expert "apply the principles and methods reliably

10  to the facts of the case."  Fed. R. Evid. 702.  Here, by failing to take into account

11  material variables and information that inflated or affected his estimates, Dr. Jansen

12  failed to apply his methodology in a reliable manner.  *See*, *e.g., G v. Fay Sch., Inc.*

13  *by & through its Bd. of Trustees*, 282 F. Supp. 3d 381, 391 (D. Mass. 2017), *aff'd*

14  *sub nom. G. v. Fay Sch.*, 931 F.3d 1 (1st Cir. 2019) (excluding expert testimony that

15  neglected to account for material facts and variables).

16      Dr. Jansen represents that his unique visitor estimate calculates the number of

17  "people" who accessed the website (Report ¶ 23) but as noted above, his opinion

18  fails to consider the number of bots who are being recorded as unique visitors or

19  account for individuals who visited more than one of these websites and who were

20  nonetheless counted as unique visitors to each one.  (Jansen Depo. 108:8-109:3;

21  134:13-18.)  As also noted above, Dr. Jansen failed to apply an error rate or account

22  for whether SimilarWeb overestimated or inflated its unique visitor estimates, even

23  though there are articles finding that SimilarWeb overestimates unique visitors by

24  309 percent.  (*Id.* at 201:25-202:6; *see generally* Report.)  That Dr. Jansen's analysis

25  turns a blind eye to these material facts renders his application of his methods

26  unreliable under Rule 702.

27

28

## III.   THE COURT SHOULD EXCLUDE DR. JANSEN'S OPINION THAT 605 ARTICLES CONTAINED DEFAMING STATEMENTS

First, Dr. Jansen's opinion that 605 articles exist should be excluded because it is irrelevant to answering the question how many people read Mr. Musk's statements. *See Daubert*, 509 U.S. at 591. As discussed in Section II.A., *supra*, the relevant inquiry is whether and how many people saw what Mr. Musk wrote about Mr. Unsworth. Dr. Jansen testified that he does not know and did not attempt to find out. (Jansen Depo. 30:24-33:13.) Listing a number of articles without any information regarding whether they were actually viewed or read does not assist the jury in answering this question.

Second, Dr. Jansen neglected to apply a reliable methodology to his analysis. Instead, he simply ran Google searches and reviewed online articles to identify those that "directly referenced the defaming statements and were not primarily about this case." (Report ¶ 58.) He did not create a standard or algorithm to identify the articles or use any accepted method of computer science. After completing his Google searches, which anyone who knows how to use Google could have done, Dr. Jansen concluded that 605 such articles existed.

Third, Dr. Jansen's opinion is not based on reliable, testable methods and principles. Expert opinions are to be excluded where they are based on "personal opinion" rather than a "systematic assessment" of relevant data. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (affirming exclusion of expert based on "superficial" inspection and analysis). Dr. Jansen did not apply a rigorous or scientific analysis. Instead, he simply read the articles and determined, not as a computer scientist, but merely "as a thinking person" that they met his criteria, particularly that no article was "primarily" about the lawsuit. (Jansen Depo. 226:14-23.)

His opinion and analysis were not based on any peer reviewed standards and is not capable of being tested. There is no evidence that this is a generally accepted

method of determining the universe of stories written about a particular topic while not "primarily" being written about another topic.  Dr. Jansen did not take any notes regarding the articles that he read or create a log of the articles that he excluded for not meeting his subjective criteria.  (Jansen Depo. 223:8-224:9.)  As a result, Defendant is unable to effectively probe and cross-examine Dr. Jansen on his methods.  *See Mitchell*, 365 F.3d at 238.  This analysis does not satisfy any of the four *Daubert* factors and should therefore be excluded as unreliable.

Fourth, Dr. Jansen's opinion should be excluded because his analysis could be performed by a layperson.  "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  Fed. R. Evid. 702 advisory committee's notes; *see also Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982) (finding that "it would be well within the discretion of the trial judge" to exclude expert testimony regarding "a matter easily evaluated by laymen within the realm of their common knowledge and experience"); *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994) ("Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real.").

Here, Dr. Jansen identified all 605 articles by running Google searches for simple English language terms and statements, reading the results, and determining whether the articles referenced Mr. Musk's statements but were not "primarily" about the case.  (Report. ¶ 58.)  Dr. Jansen has no special expertise in English or journalism, and he did not apply his computer science expertise in making these assessments because, under the "method" he chose, there was no need to.  He read the articles simply "as a thinking person" and determined whether they contained Mr. Musk's statements and whether they were "primarily" about the litigation.

(Jansen Depo 226:14-23.)  He applied no other skills or methods to make this determination.  Because any "thinking person" could do this work, it is not the product of expert work, nor helpful, and should be excluded.  *See Chesebrough-Ponds*, 666 F.2d at 398; *Sanchez v. Jiles*, 2012 WL 13005996, at *31 (C.D. Cal. June 14, 2012) (excluding expert opinion that "relies on common sense and knowledge a layperson is likely to possess").

Finally, the inclusion of Dr. Jansen's list of articles carries the risk of prejudice and jury confusion.  Dr. Jansen purportedly included all articles referencing Mr. Musk's statements (that were not "primarily" about the litigation) regardless of whether the articles represented that the statements were true, false, or were critical of Mr. Musk for making them.  (Jansen Depo. 238:20-240:6.)  For instance, Dr. Jansen did not exclude from his lists articles that described Mr. Musk's statements as "baseless" or false.  (*See*, *e.g.*, Exs. 3-4.)  Thus, Dr. Jansen does not know how many of his 605 articles communicated the alleged defamatory meaning of Mr. Musk's statements to its readers.  (Jansen Depo. 238:20-240:6.)  His testimony may mislead the jury into inferring that all 605 articles reported Mr. Musk's statements without context or comment.  The probative value of this list is substantially outweighed by the danger that it may prejudice Defendant and mislead the jury.  *See* Fed. R. Evid. 403.

## IV.   THE COURT SHOULD EXCLUDE ANY TESTIMONY REGARDING THE NUMBER OF PEOPLE WHO SAW MR. MUSK'S TWEETS

In his report, Mr. Jansen opines—without support—that "millions of people *could* have seen" Mr. Musk's tweets about Mr. Unsworth.  (Report ¶ 48 (emphasis added).)  Mr. Jansen does not know and did not attempt to find out how many people actually saw Mr. Musk's tweets.  (Jansen Depo. 256:17-257:11.)  This purported expert opinion is no more than conjecture.  Because Dr. Jansen lacks factual foundation for this statement, it should be excluded.  *See Smith v. Pac. Bell Tel. Co.*, 649 F. Supp. 2d 1073, 1096 (E.D. Cal. 2009) ("Relevant expert testimony

is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion.").  At his deposition, Dr. Jansen said he is not going to offer such an opinion at trial.  (Jansen Depo. 264:6-13.)  Without that, Mr. Unsworth's attorneys have no basis to tell the jury that some or any number of Mr. Musk's Twitter followers actually saw the Tweets, and they should not be allowed to do so.

## **CONCLUSION**

For the foregoing reasons, Mr. Musk respectfully requests that the Court exclude Dr. Jansen's testimony.

DATED:  November 8, 2019          Respectfully submitted,

QUINN EMANUEL URQUHART
    & SULLIVAN, LLP

By _____ */s/ Alex Spiro* _____
    Alex Spiro
    *Attorneys for Defendant Elon Musk*