L. LIN WOOD, P.C.
L. Lin Wood (*pro hac vice*)
lwood@linwoodlaw.com
Nicole J. Wade (*pro hac vice*)
nwade@linwoodlaw.com
Jonathan D. Grunberg (*pro hac vice*)
jgrunberg@linwoodlaw.com
G. Taylor Wilson (*pro hac vice*)
twilson@linwoodlaw.com
1180 West Peachtree Street, Ste. 2040
Atlanta, Georgia 30309
404-891-1402
404-506-9111 (fax)

WEISBART SPRINGER HAYES, LLP
Matt C. Wood (*pro hac vice*)
mwood@wshllp.com
212 Lavaca Street, Ste. 200
Austin, TX 78701
512-652-5780
512-682-2074 (fax)

CHATHAM LAW GROUP
Robert Christopher Chatham
chris@chathamfirm.com
CA State Bar No. 240972
3109 W. Temple St.
Los Angeles, CA 90026
213-277-1800

*Attorneys for Plaintiff VERNON UNSWORTH*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>        Plaintiff,<br><br>v.<br><br>ELON MUSK,<br><br>        Defendant. | Case No. 2:18-cv-08048-SVW (JCx)<br>Judge: Hon. Stephen V. Wilson<br><br>**PLAINTIFF VERNON UNSWORTH'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 5 TO EXCLUDE EXPERT OPINION OF DR. BERNARD J. JANSEN**<br><br>Pretrial Conference: Nov. 25, 2019<br>Hearing Date:       Nov. 25, 2019<br>Time:              3:00 p.m.<br>Courtroom:         10A |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ............................................................................................ 1

FACTS ............................................................................................................. 2

ARGUMENT ................................................................................................... 4

I.   DR. JANSEN'S TESTIMONY WILL ASSIST THE TRIER OF FACT............. 6

   1. Unsworth Has No Burden to Prove How Many People Actually Read the Accusations.   6

   2.  The Dissemination of the Accusations is Relevant to Damages.   8

II. DR. JANSEN'S TESTIMONY THAT THERE WERE 605 ARTICLES THAT REPUBLISHED THE ACCUSATIONS IS ADMISSIBLE. ............................ 10

   1. Dr. Jansen Conducted the Analysis Plaintiff Requested.   10

   2. Dr. Jansen's Conclusion Could Not Be Reached by a Layperson.   11

III. DR. JANSEN'S TESTIMONY THAT THERE WERE 98 MILLION POTENTIAL UNIQUE VISITORS TO WEBSITES THAT REPUBLISHED THE ACCUSATIONS IS ADMISSIBLE. ......................................................... 13

   1. Web Traffic Analysis Is an Appropriate Subject for Expert Testimony.   13

   2. Dr. Jansen's Use of SimilarWeb Is Reliable.   16

   3. Musk Relies on a Competitor's Self-Promotion Blog to Attempt to Discredit SimilarWeb.   19

   4. Musk Has Provided No Admissible Evidence to Support the Assertion that Dr. Jansen's Results Include Bots.   20

CONCLUSION.................................................................................................22

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A&M Records, Inc. v. Napster, Inc.*, 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000) ...................................................................................................... 10, 17

*Alioto v. Cowles Commc'ns, Inc.*, 430 F. Supp. 1363 (N.D. Cal. 1977), *aff'd* 623 F.2d 616 (9th Cir. 1980) ........................................................................ 9

*Berman v. Freedom Fin. Network, LLC*, 2019 WL 4194195 (N.D. Cal. Sept. 4, 2019) .................................................................................................... 12

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) ........................... passim

*Farr v. Bramblett*, 132 Cal. App. 2d 36 (1955), *disapproved on other grounds*, *Field Research Corp. v. Superior Court*, 71 Cal. 2d 110 (1969) ............. 7

*Foerster v. Ridder*, 57 N.Y.S.2d 668 (1945) .................................................... 9

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ........................................... 1

*Granite State Trade Sch., LLC v. The New Hampshire Sch. Of Mech. Trades, Inc.*, 120 F. Supp. 3d 56 (D.N.H. 2015) ..................................................... 14

*Healthbox Global Partners, LLC v. Under Armour, Inc.*, 2016 WL 3919452, at *7 (D. Del. Jul. 19, 2016) .................................................................... 17

*In re Eros Int'l Secs. Litig.*, 2017 WL 6405846, at *5 (S.D. N.Y. Sept. 22, 2017) ...................................................................................................... 17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................................... 5

*McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142 (S.D. Cal. 2019) ............. 5, 14

*Milum v. Banks*, 283 Ga. App. 864 (2007) ..................................................... 7

*Neary v. Regents of Univ. of Cal.*, 185 Cal. App. 3d 1136 (1986) ..................... 7

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, 2011 WL 5417090, at *8 (N.D. Cal. Oct. 27, 2011) ................................................................5

*Rives v. Atlanta Newspapers, Inc.*, 220 Ga. 485 (1964) ..................................7

*S.M. v. J.K.*, 262 F.3d 914 (9th Cir. 2001) ..................................................6

*Schwartz v. Avis Rent a Car Sys., LLC*, 95 Fed. R. Evid. Serv. 350 (D.N.J. 2014) ...............................................................................................14

*Scott v. Times-Mirror Co.*, 181 Cal. 345 (1919) ...........................................8

*Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133 (2011) ............................7

*United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509 (D.D.C. Nov. 28, 2017) ...............................................................14, 16

*United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006) ....................5

*Weller v. Am. Broad. Cos.*, 232 Cal. App. 3d 991 (1991) ...............................9

*Wickfire, LLC v. Woodruff*, No. 2017 WL 1149075 (W.D. Tx. Mar. 23, 2017).........3

**<u>Rules</u>**

Fed. R. Evid. 702 ...............................................................................4, 5, 6

# INTRODUCTION

Musk's Motion in Limine to exclude the testimony of Dr. Jansen (the "Motion") is based upon the faulty premise that Unsworth has a burden to prove how many people actually **read** Musk's false and defamatory accusations about Unsworth ("the accusations").  Musk's argument on the damages issue is a red herring. Upon proof of negligent publication, Unsworth is entitled to a recovery of actual damages which include, among other things, harm to his reputation in the worldwide community.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974).  Upon proof of reckless and malicious publication of defamatory per se accusations, Unsworth is entitled to a recovery of presumed damages which includes reputational damage that Unsworth is not required to prove.  *Gertz*, 418 U.S. at 349.  Unsworth is entitled to present expert testimony as to the circulation or dissemination of Musk's accusations against Unsworth to support a jury's determination of both actual and presumed damages.

Musk chose not to submit any expert evidence. To fill this self-created void in expert evidence, Musk is left with only general legal arguments attacking Dr. Jansen's expert testimony. Musk's general legal arguments fail because they are based on unreliable hearsay, false assertions of Unsworth's burden, false statements about both Dr. Jansen's investigation and the sources upon which he relies, and irrelevant pronouncements about various factors applied to determine the reliability of scientific testimony. Musk objects to the admissibility of Dr. Jansen's statements about standard methodology and tools used for web analytics and web traffic analysis without any evidence to justify his efforts to preclude the trier of fact from considering Dr. Jansen's well-founded, relevant, and probative testimony. His objection should be denied.

Dr. Jansen's testimony is relevant and probative evidence which proves damage and assists the trier of fact in determining the amount of damages to be awarded for the worldwide publication of the accusations. Dr. Jansen's testimony

will establish the magnitude of the number of potential third parties who read the accusations. To the point, Dr. Jansen will testify that the accusations were disseminated on at least 354 online media or other sites in at least 605 separate stories, articles, or publications with at least a combined 98 million potential daily visitors. The circulation to potential readers of the accusations cannot be calculated by a lay person and therefore, Dr. Jansen's testimony is admissible expert evidence of their circulation that aid the jury in determining Unsworth's damages.

**FACTS**

Dr. Jansen's credentials in computer science and web analytics are extensive and impeccable. Musk cannot challenge them and does not even attempt to do so. (*See* Lifrak Decl. (Doc. 101-1) at Ex. 1 (Dr. Jansen's Expert Report) at 43-102 (Dr. Jansen C.V. attached as App. A)). Dr. Jansen has a B.S. from the United States Military Academy at West Point, and an M.CS. and Ph.D. from Texas A&M University, all in Computer Science. (*See* Dr. Jansen C.V. 44)[1]. He has worked in the computer science field for over 20 years, including serving as a Professor at West Point and Penn State University. (*Id.* 44-45). He has won numerous awards for his research and teaching in the area of computer science and website analytics. (*Id.* 45-47). Dr. Jansen has written 4 different books on web analytics (*id.* 47-48), and 16 portions of books involving computer science and web analytics. (*Id.* 48-49). His list of refereed journal articles in this field goes on for over 8 pages. (*Id.* 49-57). He has published a number of book reviews and non-refereed articles. (*Id.* 58-59). Dr. Jansen's list of conference presentations is over 15 pages long (*id.* 59-

---

[1] *See also* Jansen Depo 48:4-6, 14-17, attached as Exhibit 1 to Wade Declaration, which is being submitted simultaneously herewith. Because both Musk and Unsworth have designated large portions of Dr. Jansen's deposition testimony, and because neither party has requested an evidentiary hearing on the *Daubert* motion, Unsworth has attached as Exhibit 1 to the Wade Declaration the entire deposition testimony of Dr. Jansen to facilitate the Court's review of that transcript in one location.

74), and his list of papers presented at technical and professional meetings is over 4 pages long.  (*Id.* 74-78).  He has served as a Senior Fellow at the Pew Research Center and has authored four scholarly reports for the Pew Internet & American Life Project regarding internet use.  (*Id.* 44, 79).  He has received over 20 grants from a variety of agencies.  (*Id.* 79-82).  He has served as a reviewer for numerous technical and scientific publications, (*id.* 88-90), and as a grant reviewer for numerous public and private entities.  (*Id.* 90-91).  He has served as a keynote speaker for conferences around the world.  (*Id.* 97-99). He has served as an editor for numerous industry journals and currently serves as the editor-in-chief of the international academic journal, *Information Processing and Management*, which is a top-ranked journal in the information science field.  (*Id.* at 88).

As a small subset of his career, Dr. Jansen has provided testimony in 6 cases over the last 4 years, (*id.* 101-102), and he has been qualified to testify as an expert witness at trial in one reported case.  *See Wickfire, LLC v. Woodruff*, No. 2017 WL 1149075 (W.D. Tx. Mar. 23, 2017).  In short, Dr. Jansen is eminently well-qualified to provide expert witness testimony in this case regarding the magnitude of dissemination of the false and accusatory statements by Musk that Unsworth is a pedophile, child rapist, married a 12-year-old child bride, or was involved in child sex trafficking.  (*See* Dr. Jansen's Expert Report ("Report") at 3-6).

Dr. Jansen, relying on his experience, training, and education in the area of web data collection, web analytics, and web traffic analysis, used web analytics and related techniques commonly used in the industry to develop a very conservative opinion that the accusations were disseminated on at least 354 online media or other sites, in at least 605 stories or articles, with more than 98 million potential daily unique visitors.  (Report ¶¶ 15-19; Depo. 16:22-17:8, 18:2-5, 22:24-23:2).  Dr. Jansen detailed in his Report and in his deposition the web analytics tools that he used in developing his opinion.  (Report ¶¶ 23-31).  He explained that those tools are "the de facto industry standard tools for this type of investigation," and he

provided references to support this assertion.  (Report ¶¶ 24-27, 30; Depo. 81:6-7, 83:7-21).  He detailed every step of his investigation, describing the steps he took, the tools he used, and the methods he used to ensure accuracy.  (Report ¶¶ 59-76; Depo. 81:11-82:6).  He also explained at length all of the factors demonstrating why his opinion regarding dissemination of the defamatory accusations is conservative. (Report ¶¶ 79(a)-(q); Depo. 19:17-20:7, 21:3-5, 22:11-15, 24:5-7, 88:21-89:2).

## ARGUMENT

Musk has not challenged Dr. Jansen's qualifications[2] but instead challenges the admissibility of his expert opinions that (1) the defamatory statements by Musk about Unsworth were republished in at least 605 separate stories or articles, and (2) there were more than 98 million potential daily unique visitors to the sites with those stories or articles.  Although Musk contends in his Notice of Motion that he is also challenging Dr. Jansen's opinion that the defamatory statements were republished on at least 354 online media or other sites, Musk provides no basis or argument for challenging that conclusion.

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence. . .";  (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  As the Comments note, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed.

---

[2] Musk's failure to challenge Dr. Jansen's expertise and credibility is not surprising given that Musk's counsel has engaged Dr. Jansen on behalf of its clients in the past.  (Depo. 59:24-60:4, 61:5-19, 62:9-14).

1 R. Evid. 702, Comment to 2000 Amendments.

2     The Ninth Circuit, while acknowledging the applicability of the factors
3 enunciated by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.,* 509
4 U.S. 579, 596 (1993) in exercising the court's gate-keeping function, also has
5 recognized that the *Daubert* factors cannot be applied rigidly to all types of expert
6 testimony:

> Of course, "there are many different kinds of experts, and many
> different kinds of expertise," so these factors "may or may not
> be pertinent in assessing reliability, depending on the nature of
> the issue, the expert's particular expertise, and the subject of his
> testimony."  When evaluating specialized or technical expert
> opinion testimony, "the relevant reliability concerns may focus
> upon personal knowledge or experience."

14 *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (quoting
15 *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  Thus, "[t]rial courts
16 must exercise reasonable discretion in evaluating ***and in determining how to***
17 ***evaluate*** the relevance and reliability of expert opinion testimony." *Id*. (emphasis
18 added).  *See also PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
19 2011 WL 5417090, at *8 (N.D. Cal. Oct. 27, 2011) ("When expert testimony is based
20 on specialized or technical knowledge, as distinguished from scientific knowledge,
21 it is not necessary to rigidly adhere to the *Daubert* factors.").

22     Even following *Daubert*, "[a] district court's inquiry into admissibility is a
23 flexible one," and "expert testimony is liberally admitted." *McCurley v. Royal Seas*
24 *Cruises, Inc.*, 331 F.R.D. 142, 156 (S.D. Cal. 2019) (citations omitted).  Indeed,
25 even when faced with "somewhat questionable testimony," the rule remains that
26 "[v]igorous cross-examination, presentation of contrary evidence, and careful
27 instruction on the burden of proof are the traditional and appropriate means of
28 attacking shaky but admissible evidence." *S.M. v. J.K.*, 262 F.3d 914, 921-22 (9th

Cir. 2001) (quoting *Daubert,* 509 U.S. at 596 (1993)).

Dr. Jansen is undisputedly qualified to testify as an expert regarding web analytics and web traffic analysis. His testimony will aid the jury in assessing the dissemination of Musk's false and defamatory accusations against Unsworth, which, as set forth herein, is a relevant factor to be considered in awarding Unsworth damages and determining their amount. Dr. Jansen makes clear that his investigation in this case is based on reliable methods and techniques which are standard in this industry, and that he reliably and faithfully applied those methods and techniques. He also has set forth his facts and data in detail. Dr. Jansen's expert opinion is admissible under FRE 702 and the applicable *Daubert* principles.

# I.   DR. JANSEN'S TESTIMONY WILL ASSIST THE TRIER OF FACT.

Dr. Jansen's testimony should be admitted because it is probative and will assist the trier of fact in assessing damages based on a consideration of the circulation of the accusations.

## 1.   <u>Unsworth Has No Burden to Prove How Many People Actually Read the Accusations.</u>

The thrust of Musk's objections to Dr. Jansen's testimony is his inaccurate contention that Unsworth has a burden to establish "how many people actually read Mr. Musk's republished statements." (Mot. 7). Based on that incorrect assumption, Musk attacks Dr. Jansen's opinion for failing to "help the jury determine whether and how many people read" the articles containing Musk's false accusations. (Mot. 3). Demonstrating how many people "actually read" Musk's false accusations is not Unsworth's burden of proof, and Dr. Jansen offers no opinions as to actual readership. Musk's argument on this point is merely smoke and mirrors.

A plaintiff in a defamation case is not required to plead or prove that the false and defamatory statements were "actually read" by those third persons to whom they were published:

It was suggested on oral argument that the pleading of the publication of the matrixes [containing the defamatory statements] is insufficient because it is not alleged that those to whom they were exhibited read them. It is alleged that the matrix was "published" to such persons. The verb "publish" is a term of art in the law of libel, and "in itself imports that communication to others which is essential to the tort." "It is sufficient to state, generally, that the same was published."

*Farr v. Bramblett*, 132 Cal. App. 2d 36, 46-47 (1955) (citations omitted), *disapproved on other grounds*, *Field Research Corp. v. Superior Court*, 71 Cal. 2d 110 (1969). *See also Neary v. Regents of Univ. of Cal.*, 185 Cal. App. 3d 1136, 1147 (1986) (citing *Farr* and recognizing that "[p]ublication is, of course, a term of art…."); *accord Rives v. Atlanta Newspapers, Inc.*, 220 Ga. 485, 488 (1964) ("[T]he number of readers in no wise increases the one libel, nor constitutes multiple causes of action. 'The moment a man delivers a libel from his hands, his control over it is gone; he has shot his arrow and it does not depend upon him whether it hits the mark or not. There is an end of the *locus penitentiae—his offense is complete*—all that depends upon him is consummated; and from that moment, upon every principle of common sense he is liable to be called upon to answer for his act.' When the publisher delivered papers containing libel, if they did, for public exposure, libel was complete."); *Milum v. Banks*, 283 Ga. App. 864 (2007) (holding that the defendant "'published' these statements when he posted them on his website": "Here enters the troublesome question of whether in addition to placing it available for public view there must be proof that it was actually read. We think that whether or not it is read is immaterial once it is shown that it was exposed to public view.") (quoting *Rives*, 220 Ga. at 488).

Musk is forced to misrepresent *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133 (2011), in order to rely on it. Nowhere does the court in *Tamkin* say that "a

false statement that is not read or heard by someone is not 'republished.'"[3]  (Mot. 7).   To the contrary, the cited portion of the opinion relates to the "of and concerning" requirement, stating that "'each time the defamatory statement is communicated to a third person who understands its defamatory meaning as applied to plaintiff, the statement is said to have been 'published,' although a written dissemination, as suggested by the common meaning of that term, is not required." Stated differently, '[i]n defamation actions, the First Amendment . . . requires that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the plaintiff in some way.'"  *Id.* at 145-46.

Dr. Jansen's testimony is not being offered to show how many people actually read Musk's statements, because Unsworth has no burden of persuasion on that issue.  Unsworth has met his burden – he has proven publication to third parties.

**2.   <u>The Dissemination of the Accusations is Relevant to Damages.</u>**

While Unsworth does not have any burden to establish that any particular number of individuals actually saw or read the accusations, the extent of circulation of the accusations is relevant to the proof and amount of damages. For more than a century, it has been "well settled" that California courts allow juries to award damages based on the "average daily circulation" of the publication containing a defamatory statement—without regard to whether the people who, for example, received a newspaper actually opened it up and read the defamatory statement. *Scott v. Times-Mirror Co.*, 181 Cal. 345, 365 (1919) (holding a jury may award damages based on the "average daily circulation of the Los Angeles Times"); *see also Alioto v. Cowles Commc'ns, Inc.*, 430 F. Supp. 1363, 1371-72 (N.D. Cal. 1977), *aff'd* 623

---

[3] Moreover, Musk cannot cite a single case holding that the publication element was not met when the accusations were disseminated on a publicly available Internet page. As Dr. Jansen's report makes clear, the publications on which he relies are readily available to the public on the Internet, and he did not rely on publications with limited availability, like those on social media or behind firewalls. (Report ¶¶ 20-22).

F.2d 616 (9th Cir. 1980) ("[T]he trier of fact may consider as a basis for its award of actual damages the wide publicity given to the libel …") (internal quotation marks omitted); *Weller v. Am. Broad. Cos.*, 232 Cal. App. 3d 991, 1013 (1991) (noting that plaintiff proved that the "broadcasts were published on seven different occasions and *reached* approximately two hundred thousand homes.  The jury could reasonably infer that there were numerous others who had heard the broadcasts and formed a negative opinion of Weller and Argentum.") (emphasis added); *accord Foerster v. Ridder*, 57 N.Y.S.2d 668, 673 (1945) (holding that $100,000 was reasonable punitive damages where "the libel found circulation through the medium of a metropolitan newspaper having a large circulation," because "[t]he circulation which is given to a defamatory statement fundamentally constitutes an important factor in determining the damage caused by the utterance of the defamation").

The number of potential daily unique visitors is simply the modern-day equivalent of a newspaper's circulation. It may be that some of the unique visitors are shared across websites, just like the daily average circulation of *The New York Times*, *The Wall Street Journal*, and the *Los Angeles Times* will include some individuals who subscribe to all three.  Musk cannot cite a single case that has rejected circulation numbers because some people receive information from multiple sources. Indeed, the number of potential daily unique visitors and the numbers of newspapers' daily average circulation are reliable proxies that inform a jury's understanding of the wide publicity given to a libel—and neither need be nor purport to be an exact measure of the number of people who read the defamatory statements. In this case, Dr. Jansen has properly analyzed the dissemination, "the distribution, circulation of these articles and defamatory statements." (Depo. 28:7-18, 29:23-25, 31:2-5).  This expert testimony will assist the jury in determining the "reach" of the defamatory statements to assess appropriate damages.

## II.     DR. JANSEN'S TESTIMONY THAT THERE WERE 605 ARTICLES THAT REPUBLISHED THE ACCUSATIONS IS ADMISSIBLE.

Dr. Jansen's testimony regarding the number of articles that republished the accusations is relevant, reliable, and admissible.  Even if Musk were correct that this portion of Dr. Jansen's testimony is not properly the subject of *expert* testimony, Dr. Jansen would be able to testify to this conclusion as a lay witness who performed these searches.   It is clear, however, that the investigation that resulted in Dr. Jansen's conclusion that there are 605 articles containing Musk's accusations is a predicate for Dr. Jansen's opinion that there were a potential 98 million unique visitors to the sites hosting the articles with the accusations.  Thus, the conclusion is not a separate opinion but part and parcel of his entire opinion as to the extent of the circulation of the accusations.

### 1.   Dr. Jansen Conducted the Analysis Plaintiff Requested.

Musk argues that Dr. Jansen did not sufficiently account for the method by which he excluded articles that are primarily about this litigation, as opposed to being primarily about the accusations by Musk. (Mot. 13).  This is not an appropriate basis upon which to challenge the admissibility of Dr. Jansen's opinions, because there is no requirement that Dr. Jansen include or not include articles about the litigation.   Dr. Jansen conducted the investigation requested by Unsworth – to determine the dissemination of the original defamation by Musk separate from articles about the litigation.  To the extent that Musk challenges Dr. Jansen's report because it underestimates the number of articles by excluding articles that Dr. Jansen deemed to be about this lawsuit instead of primarily about Musk's accusations, "[t]he Ninth Circuit has stated that '[c]hallenges to survey methodology go to the weight given the survey, not its admissibility," and "alleged under-inclusiveness of survey in copyright infringement action affected 'the weight of the survey, not its admissibility." *A&M Records, Inc. v. Napster, Inc.*, 2000 WL 1170106, at *3 (N.D. Cal. Aug. 10, 2000) (citations omitted).

1   Indeed, by excluding articles relating primarily to this litigation, Dr. Jansen

2   has further ensured a very conservative estimate when reaching his conclusions

3   about the dissemination of the accusations.  (*See* Report ¶ 79(k) and App. E; Depo.

4   19:17-20).  The fact that any articles were culled is an evidentiary benefit for Musk,

5   who is liable for all republications that were reasonably foreseeable, including those

6   republished in discussing this lawsuit – a lawsuit which if not filed would suggest to

7   Musk that the accusations were true: "don't you think it's strange he hasn't sued

8   me?"; "I fucking hope he sues me."

9       **2.  Dr. Jansen's Conclusion Could Not Be Reached by a Layperson.**

10   Musk's argument that Dr. Jansen's investigation could be performed by a

11   layperson first ignores the fact that jurors are not entitled to conduct their own

12   Google searches to attempt to create their own evidence in a case.  Opinions that can

13   be reached by a lay person are those that are based on the evidence submitted.  In

14   this case, Dr. Jansen's selection of data, searches, and compilation of data cannot be

15   performed by a jury during trial.

16   Musk ignores all of the steps that Dr. Jansen took in conducting his

17   investigation, as outlined above, and the expertise and experience that he applied to

18   that investigation.  Counsel for Musk should understand this distinction given his

19   own misunderstanding of the information provided by "a simple Google search."

20   During Dr. Jansen's deposition, counsel for Musk advised Dr. Jansen that "earlier

21   today I went to Google and I ran a search, Vernon Unsworth. It returned

22   approximately 370,000 articles." (Depo. 228:12-14).  Counsel for Musk then asked

23   Dr. Jansen to agree that "the number of articles on your list [a]s a fraction of the total

24   number of articles that mention Mr. Unsworth would be .0016."  (Depo. 228:3-7).

25   Counsel's "legal-lay" conclusion was wholly incorrect, however.  First Dr. Jansen

26   pointed out that "results may or may not be articles."  (Depo. 231:11-12). Counsel

27   for Musk then adjusted his questions to ask about the 370,000 "results" returned by

28   Google.  Dr. Jansen next pointed out "that number is an algorithmic calculation. So

when you actually look at all the results it may not match the number that is – Google estimates that there are." (Depo. 232:15-18).  Dr. Jansen also indicated that "when you go to page 10 and 20, they're not really valid good results." (Depo. 232:24-25). To find an actual number of "articles," Dr. Jansen explained that you could "start with a search engine," such as Google, but would then "us[e] an algorithmic approach trying to narrow it down." (Depo. 235:4-11).  Like the trier of fact in this case, Musk's counsel would benefit from Dr. Jansen's testimony because he cannot himself conduct the investigation with accuracy or understand the meaning of the results returned from a Google search.

Musk argues that in selecting search queries or articles, Dr. Jansen was not acting as an expert, but that is incorrect.  Dr. Jansen himself pointed out that he did not make "a choice" about article selection, he was applying "criteria." (Depo. 79:3-9).  With respect to searches, Dr. Jansen testified that he started with the defaming statement and then culled down until he reached "theoretical saturation."  (Depo. 204:22-205:7).  Indeed, Dr. Jansen testified that "as a researcher and academic, reading papers is part of my job. I read hundreds of papers. So my job is to analyze papers…. Is it part of my job as a scientist to read papers and evaluate what people have written? Yes." (Depo. 220:1-8).  An expert's application of his expertise and experience to such criteria does not render his opinion inadmissible.  Courts have rejected that very argument in cases where an expert witness, as part of the development of his opinion, must make certain judgment calls within his expertise. *See, e.g.*, *Berman v. Freedom Fin. Network, LLC*, 2019 WL 4194195, at *4-5 (N.D. Cal. Sept. 4, 2019) (rejecting objection to expert web development practitioner's testimony regarding whether certain website designs might confuse users because expert had a "lack of training and expertise in psychology or consumer behavior"); *compare* Depo. 49:1-6 (questions regarding whether Dr. Jansen has a degree or expertise in psychology). Dr. Jansen's testimony provides information that cannot be ascertained by a lay person.

III.   **DR. JANSEN'S TESTIMONY THAT THERE WERE 98 MILLION POTENTIAL UNIQUE VISITORS TO WEBSITES THAT REPUBLISHED THE ACCUSATIONS IS ADMISSIBLE.**

Musk's primary basis for seeking exclusion of Dr. Jansen's testimony on "unique visitors" is an attack on Dr. Jansen's use of SimilarWeb to obtain the number of potential unique visitors. As an initial matter, Musk is incorrect in saying that Dr. Jansen's web traffic estimate is based "entirely" on results generated from SimilarWeb. (Mot. 9). Dr. Jansen explained that because "traffic numbers can vary among services and even website analytics platforms," he conducted a comparison with another marketing research service, Comscore, "to verify that SimilarWeb was not overly optimistic in the reported number of unique visitors." (Report ¶ 74). After conducting this comparative analysis, Dr. Jansen determined that use of the SimilarWeb data resulted in "a conservative traffic estimation." (Report ¶¶ 75-76).

Additionally, as discussed more fully below, Dr. Jansen's methodology – including the use of data from a web analytics database – is based on reasonable and reliable methodology that is standard in this industry, and Dr. Jansen has provided all of his research data, including spreadsheets. (Depo. 71:1-10). Other than throwing stones that go to the weight of Dr. Jansen's testimony, not to its admissibility, Musk has identified no expert evidence to contradict the testimony of this well-qualified expert.

1.   **Web Traffic Analysis Is an Appropriate Subject for Expert Testimony.**

Website traffic analysis is an established tool used in many areas, including marketing, trademark disputes, and contract disputes. Courts have recognized that where actual website data is not available, use of third-party data collection programs can be reliable. For example, when considering a *Daubert* motion earlier this year against "an expert who can opine on website traffic analysis," the District Court for the Southern District of California recognized that "Plaintiffs' reliance on Amazon's Alexa web traffic rankings and a conversion formula is therefore entirely

understandable as a proxy for the data that would directly address Plaintiffs' theory." *McCurley*, 331 F.R.D. at 158. Another federal court admitted expert testimony regarding "available web traffic data," recognizing that "the fact that [the expert] did not gather her own data does not render her opinion inadmissible," and noted that objections to the expert's reliance on certain data to the exclusion of other data "is only relevant to the weight of her testimony, not its admissibility." *Schwartz v. Avis Rent a Car Sys., LLC*, 95 Fed. R. Evid. Serv. 350, at *4-6 (D.N.J. 2014); *see also Granite State Trade Sch., LLC v. The New Hampshire Sch. Of Mech. Trades, Inc.*, 120 F. Supp. 3d 56, 59-60 (D.N.H. 2015) (considering testimony of web traffic analysis).

The District Court for the District of Columbia rejected a *Daubert* motion to exclude expert testimony very similar to the opinion offered here by Dr. Jansen. *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509 (D.D.C. Nov. 28, 2017). In *Landis*, the Government offered the testimony of an expert witness, Gerbrandt, to provide testimony regarding the linkage of the United States Postal Service with media coverage of Lance Armstrong's doping scandal to assist the jury in determining damages suffered by the USPS. Armstrong challenged Gerbrandt's testimony on the media coverage by contending that his media impression count was not based on reliable methodology. The court rejected this assertion:

> But Gerbrandt's expert report reveals a method to his calculations. He consulted the "premiere independent sources for marketing, advertising, public relations, Internet and social media and entertainment decisions and purchases" such as Nielsen Co. … and Cision…. He examined these sources, surveyed them for media that connected Armstrong with PED use and that mentioned or referenced USPS in some fashion, and gathered information on the "reach" of these sources, i.e., the

number of viewers. Based on this research, Gerbrandt totaled the "media impressions" from the individual media types and sources.

Armstrong complains that Gerbrandt "merely states that his 41,912 Internet articles translate into 154.4 billion impressions … but provides no meaningful explanation for how he made those calculations." But Gerbrandt's expert report states that, for Internet articles, he consulted Cision database – which archives traditional print and digital media – with "a series of search terms … connecting Mr. Armstrong with the use of performance enhancing drugs and blood doping." The search was additionally "constrained to only those news items and articles that specifically mentioned or identified the USPS in some fashion." Cision also provided the "**reach**" of the article, which is simply "**the unique visitors per month to the website on which the article is posted**" for an online article. Based on this information, Gerbrandt was able to calculate the "media impressions" by summing the number of articles multiplied by the reach of each article. Clearly, Gerbrandt *did* provide an explanation of the method he used in reaching the total impressions for Internet articles and the other forms of media in his report. His process has an underlying methodology that is sound and reasonable.

Armstrong's criticisms of this method – such as that impressions may be different lengths, or that different media has different advantages and disadvantages – are the sort that go to the weight to give Gerbrandt's testimony not its admissibility. See <u>Ambrosini</u>, 101 F.3d at 140 ("[E]fforts to discredit [an

1  expert's] methodology by pointing to the limits of the research

2  he undertook … goes to the weight rather than the admissibility

3  of his testimony.").

4  *Landis*, 2017 WL at *7-8 (citations omitted) (bold emphasis added).

5  The methodology outlined in *Landis* for determining the "reach" of articles

6  linking the USPS to Armstrong's doping scandal is almost identical to the

7  methodology used by Dr. Jansen to determine the "dissemination" of articles relating

8  Musk's defamatory accusations about Unsworth.  The database used by Gerbrandt,

9  Cision, is the same type of database as SimilarWeb, the tool used by Dr. Jansen.  *See,*

10  *e.g.,*   "Comparison   SimilarWeb   Pro   v.   Cision,"   *avail   at*

11  https://comparisons.financesonline.com/similarweb-pro-vs-cision (last visited Nov.

12  14, 2019); "The Best Tools to Find UVM and Website Traffic," *avail. at*

13  https://www.techimage.com/blog/best-tools-uvm-website-traffic/ (last visited Nov.

14  14, 2019).  The fact that Dr. Jansen's methodology is so similar to Gerbrandt's

15  methodology further demonstrates the reliability of Dr. Jansen's investigation and

16  the fact that he has used and relied on industry standards in developing his opinion

17  in this case.  (*See* Depo. 81:6-7, 11-25 (testimony regarding following industry

18  standard methodologies)).

19  **2.  Dr. Jansen's Use of SimilarWeb Is Reliable.**

20  As Dr. Jansen testified, SimilarWeb is "a de facto industry standard" for

21  calculating website user traffic data and web analytics.  (*See* Report ¶ 74 n.48;

22  Depo. 81:6-7, 11-25).  Although Dr. Jansen does not have access to the proprietary

23  database used by SimilarWeb, he sufficiently described how it operates and why it

24  is reliable.  (Depo. 119:17-120:9). He testified that he is very familiar with

25  SimilarWeb, having used it "extensively," and having relied on it in at least 2 other

26  cases in which he provided similar expert testimony analyzing web traffic data.

27  (Depo.  56:11-18,  57:3-12,  83:7-21,  198:12-23).   Dr.  Jansen  also  provided

28  explanation in his expert report for the basis of his reliance on SimilarWeb, as well

as links to the SimilarWeb website, which clearly outlines its sources and methods of data collection.  (Report ¶¶ 18 n.6, 24 n.9, 30 n.11-13, 74 n.48).  He further testified that he reviewed the methodology that SimilarWeb uses and reviewed the general reputation for accuracy that SimilarWeb has in the industry.  (Depo. 111:15-20, 115:19-116:17, 183:1-16, 193:16-29).

The fact that Dr. Jansen relied on proprietary third-party software does not render his opinion defective.  *See, e.g., Napster*, 2000 WL at *6 ("The court also rejects defendant's contention that the proprietary nature of the Soundscan's software system mandates exclusion under *Daubert*.  Soundscan is widely used in the recording industry to track music sales, and plaintiff apparently made the software available to defendant to run its own tests.[4]  Although publication or some other form of peer review is a pertinent consideration, the Supreme Court specifically noted that this factor is not dispositive of reliability.").  Dr. Jansen has sufficiently explained his reliance on this tool that is widely used in the industry to track website traffic data, and Musk could have used this tool to collect his own data.

Data compiled by SimilarWeb has been relied on by experts and submitted by parties in reported cases.  *See In re Eros Int'l Secs. Litig.*, 2017 WL 6405846, at *5 (S.D. N.Y. Sept. 22, 2017) (noting introduction of evidence of "data from SimilarWeb, a commercial service that records and aggregates the duration of 'hits' and visits that websites receive on a monthly basis"); *Healthbox Global Partners, LLC v. Under Armour, Inc.*, 2016 WL 3919452, at *7 (D. Del. Jul. 19, 2016) ("Defendant submits a report from SimilarWeb Ltd., an analytics company offering website traffic reports….").  SimilarWeb also has been used and relied upon in many scientific and peer-reviewed studies.  For example, see:

---

[4] SimilarWeb is a publicly available product to which Musk has equal access, and there is even a free version available.  (*See* Depo. 70:1-5).

- Baumel, A., PhD, et al., "Objective User Engagement with Mental Health Apps: Systematic Search and Panel-Based Usage Analysis," J. Med. Internet Res. 2019;21(9):e14567, *avail. at* https://www.jmir.org/2019/9/e14567/ (last viewed Nov. 13, 2019) (relying on information regarding user traffic from SimilarWeb and noting that the information provided by SimilarWeb "provides aggregated nonpersonal information on user engagement with websites and mobile apps all over the world to enable Web and mobile app traffic research and analytics")

- Heilman, J. (2015) "Open Access to a High-Quality, Impartial, Point-of-Care Medical Summary Would Save Lives: Why Does It Not Exist?" PLoS Med 12(8): e1001868, https://doi.org/10.1371/journal.pmed.1001868 (commissioned and externally peer reviewed) (relying on website user traffic information from SimilarWeb);

- Szolnoki, P., et al, "Who Should be my Facebook Partner? Analysis of the Relationship between Hungarian Large-scale Facebook Pages," Procedia Computer Science, Vol. 101:86-95 (2016), *avail. at* https://www.sciencedirect.com/science/article/pii/S18770509163267 95 (relying on data from SimilarWeb);

- Brumshteyn, Y., "Analysis of the Webometric Indicators of the Main Websites that Aggregate Multithematic Scientific Information," Automatic Documentation & Mathematical Linguistics (Nov. 2017) Vol. 51:6:250-265, *avail. at* https://doi.org/10.3103/S0005105517060048 (international peer-reviewed journal) (relying on data from SimilarWeb).

SimilarWeb has been relied upon in peer-reviewed articles and cited in many instances, supporting Dr. Jansen's testimony that it is an industry standard.

18

Moreover, as set forth *supra*, Dr. Jansen also documented in his report and testified extensively about his reliance on industry standard methodology and the extent to which he took pains to ensure that the numbers he relied upon were not only accurate but "very conservative." (Depo. 107:3-11). For example, although most, if not all, of the websites he analyzed remain available online, Dr. Jansen analyzed only ***one day*** of data to reach his figure of 98 million potential unique visitors to the relevant websites. (Depo. 103:13-22). He also compared the data he obtained from SimilarWeb to the actual data received from BuzzFeed in this case and to comparable data he obtained from a different web analytics tool, Comscore. (Depo. 105:18-106:8). He took other steps as well, such as not counting traffic to multiple articles from the site. (Depo. 107:3-11).

Dr. Jansen has established that his reliance on SimilarWeb to provide web traffic data is standard and acceptable in the industry and is a reliable method of obtaining such data.

### 3. Musk Relies on a Competitor's Self-Promotion Blog to Attempt to Discredit SimilarWeb.

Musk consciously elected not to designate a rebuttal expert witness and has no expert evidence to contradict Dr. Jansen's testimony regarding the reliability of his methodology, including his reliance on SimilarWeb as an industry standard. Musk is disingenuous, at best, when he advises this Court that a "report" written by a "web security group," "found that SimilarWeb overestimates unique visitors by ***309%*** on average." (Mot. 11 (emphasis in original); *see also* Mot. 12 ("[T]here are articles finding that SimilarWeb overestimates unique visitors by 309 percent.")). As an initial matter, the purported "report" has not been authenticated and, in any case, constitutes inadmissible hearsay.

Even if it were admissible, the article generously described by Musk as a "report" is actually a blog post written by the Head of Content for Ahrefs, ***a competitor of SimilarWeb***. The blog post was posted on Ahrefs.com website blog

and is obviously a promotional piece encouraging people to buy Ahrefs web analytics tools instead of SimilarWeb's. For example, the blog post recites SimilarWeb pricing and then advises readers "[t]hat's double the cost of our lowest plan (https://ahrefs.com/pricing). We also have a 7-day trial (https://ahrefs.com/pricing), whereas SimilarWeb offers no such thing." (Doc. 101-2 at 37). The post then advises readers to keep reading "before you make a decision." (*Id.*).

Even though it is a promotional piece, the author of the blog post even recognizes the limitations of his analysis of the accuracy of the SimilarWeb data. He concedes that his "analysis" of SimilarWeb is based on a limited amount of websites used for the comparison sample and admits that "a critical point" to note is that SimilarWeb provided estimates for roughly only 20% of the sites he tested, because it does not provide data for smaller sites. The blogger then noted that his assessment of SimilarWeb is based on an "admittedly rather small" sample size and that "*[y]ou should, therefore, take our findings with a massive pinch of salt.*" (Doc. 101-2 at 27 (emphasis added)).

The Ahrefs promotional blog cannot be used to question SimilarWeb results – particularly when it is to be taken with "a massive pinch of salt" – and Musk has provided no evidence or testimony that SimilarWeb is unreliable or that is it not widely relied upon in the industry to provide website traffic data. At its best, Musk's "SimilarWeb" argument would go to the weight to be accorded by the jury to Dr. Jansen's testimony.

### 4. Musk Has Provided No Admissible Evidence to Support the Assertion that Dr. Jansen's Results Include Bots.

Musk makes the completely unfounded assertion that Dr. Jansen "fails to consider the number of bots who are being recorded as unique visitors…." (Mot. 12). This is another straw argument set up by Musk that has no relevance, because there is no evidence that *any* bots are being recorded as unique visitors. Musk's

counsel purports to rely on an unauthenticated and inadmissible article from *The Atlantic* for the proposition that a significant amount of the traffic on the internet is bots.  (Depo. 124:25-125:3).  Counsel for Musk questioned Dr. Jansen extensively on this point, attempting to force him to say that his conclusions are unreliable because of the possibility of bots being counted as unique visitors.  Dr. Jansen gave no such testimony, however, and Musk completely misrepresents Dr. Jansen's testimony on this point.

When asked if he reduced the figures he obtained from SimilarWeb to account for bot traffic, Dr. Jansen testified "I did not, ***and the reason I did not*** is because one of the data collection points are these panel data, and so that – those are humans, so you know those are humans.  And I – the – so I did not discount for bot traffic to those particular sites because of that."  (Depo. 127:9-14 (emphasis added)).  When counsel for Musk continued to ask questions mischaracterizing Dr. Jansen's testimony, Dr. Jansen answered the question very clearly, explaining that although he does not know exactly what SimilarWeb's algorithm is and ***how*** or ***when*** any bot traffic is removed from the results, he knows from the types of data collected that bots would not be a factor in the data:

> As I – that's not what I said. As I said, if for – let's go over their data collection methods again, one of which is the panel, those are humans. And so there's no bot traffic there.
>
> The other is the web scraping.  Again, not affected by bot traffic.
>
> So that leaves the ISP data or the data reported by individual websites. From setting up Google Analytics and Adobe Analytics, those platforms, you typically exclude the bot traffic from the analytics you report, or at least separate it out.
>
> But I don't know the internal workings of the SimilarWeb algorithm, you know, how that's done, where it's done.

21

(Depo. 128:14-129:4).  Dr. Jansen never testified that he failed to take into account bot traffic – he was consistently clear that "the industry standard approach is you separate the bot traffic from the human traffic."  (Depo. 132:7-9; *see also* Depo. 114:22-115:3).  In fact, Dr. Jansen testified that "I can't point to the exact reference.  But ***the purpose of these traffic estimation tools is to get the estimation of human traffic***.  But again, I don't have the exact reference today."  (Depo. 122:22-25 (emphasis added)).

There is no evidence – admissible or otherwise – to support the idea that Dr. Jansen's figures are inflated by bot traffic.  Dr. Jansen has testified clearly that they are not because of the nature of data collection conducted by SimilarWeb.  Again, at its best, Musk's "bot" argument would go to the weight to be accorded by the jury to Dr. Jansen's testimony.

## CONCLUSION

Dr. Jansen's expert testimony is admissible, and Musk's motion to exclude his testimony must be denied.

Dated:  November 14, 2019          L. LIN WOOD, P.C.


By: */s/L. Lin Wood*_____
L. Lin Wood
***Attorneys for Plaintiff Vernon Unsworth***