L. LIN WOOD, P.C.
L. Lin Wood (admitted *pro hac vice*)
lwood@linwoodlaw.com
Nicole J. Wade (admitted *pro hac vice*)
nwade@linwoodlaw.com
Jonathan D. Grunberg (admitted *pro hac vice*)
jgrunberg@linwoodlaw.com
G. Taylor Wilson (admitted *pro hac vice*)
twilson@linwoodlaw.com
1180 West Peachtree Street, Ste. 2040
Atlanta, Georgia 30309
404-891-1402; 404-506-9111 (fax)

WEISBART SPRINGER HAYES, LLP      CHATHAM LAW GROUP
Matt C. Wood (admitted *pro hac vice*)Robert Christopher Chatham
mwood@wshllp.com                  chris@chathamfirm.com
212 Lavaca Street, Ste. 200       CA State Bar No. 240972
Austin, TX 78701                  3109 W. Temple St.
512-652-5780                      Los Angeles, CA 90026
512-682-2074 (fax)                213-277-1800

*Attorneys for Plaintiff VERNON UNSWORTH*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>    Plaintiff,<br><br>v.<br><br>ELON MUSK,<br><br>    Defendant. | Case No. 2:18-cv-08048-SVW (JC)<br>Judge: Hon. Stephen V. Wilson<br><br>**DECLARATION OF NICOLE JENNINGS WADE IN SUPPORT OF PLAINTIFF VERNON UNSWORTH'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 5 TO EXCLUDE THE EXPERT OPINION OF DR. BERNARD J. JANSEN**<br><br>Trial Date: Dec. 2, 2019<br>Hearing Date:  Nov. 5, 2019<br>Time:  3:00 pm<br>Courtroom:  10A |

**I, Nicole Jennings Wade, declare as follows:**

1.      I am an attorney at the law firm of L. Lin Wood, P.C., counsel of record in this action for Plaintiff Vernon Unsworth.  I am a member in good standing of the State Bar of Georgia and am admitted *pro hac vice* to practice before this Court.  I have personal knowledge of the facts set forth in this declaration and, if called to testify, I would testify thereto.

2.      I submit this declaration in support of Plaintiff Vernon Unsworth's Response in Opposition to Defendant's Motion in Limine No. 5 to Exclude the Expert Opinion of Dr. Barnard J. Jansen.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the November 4, 2019, deposition of Dr. Bernard J. Jansen taken in this case, with excerpts cited by Plaintiff highlighted.

I declare under penalty of perjury under the laws of the State of Georgia and the United States that the foregoing is true and correct and that this document was executed in Atlanta, Georgia.

Dated:  November 14, 2019          **L. LIN WOOD, P.C.**

By: */s/Nicole Jennings Wade*
Nicole Jennings Wade

1

# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

VERNON UNSWORTH,

      Plaintiff,

vs.                    Case No. 2:18-cv-8048-svw

ELON MUSK,

      Defendant.


VIDEO DEPOSITION OF BERNARD J. "JIM" JANSEN, PhD
November 4, 2019
9:57 a.m.
L. Lin Wood, P.C.
1180 West Peachtree Street
Suite 2040
Atlanta, Georgia
Valerie N. Almand, RPR, CRR, CRC
Chelsea Diallo, Legal Video Specialist


Job No. 47149

EXHIBIT 1
PAGE 3

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1                    INDEX OF EXHIBITS

 2    DEFENDANT'S

 3    EXHIBIT          DESCRIPTION              PAGE

 4    Exhibit 132   excerpt from the report      12

 5                  of Dr. Jansen in the instant

 6                  case (pages 1-40)

 7    Exhibit 133   Appendix A, Curriculum Vitae,  13

 8                  excerpted from the report of

 9                  Dr. Jansen (pages 41-98)

10    Exhibit 134   Appendix B, Testimony in the   14

11                  Last Four Years, excerpted

12                  from the report of

13                  Dr. Jansen (pages 99-100)

14    Exhibit 135   Appendix C, Documents Referenced, 14

15                  excerpted from the report

16                  of Dr. Jansen (pages 101-102)

17    Exhibit 136   Appendix D, Links to Articles   14

18                  containing the Defaming

19                  Statements (all functional

20                  on the date that I viewed

21                  the article) excerpted from

22                  the report of Dr. Jansen

23                  (pages 104-126)

24

25
```

EXHIBIT 1
PAGE 4

BERNARD J.JANSEN, PHD

November 04, 2019

| 1  | Exhibit 137 | Appendix E, Supporting       | 15 |
| 2  |             | and Supplementary Documents, |    |
| 3  |             | excerpted from the report    |    |
| 4  |             | of Dr. Jansen (pages 127-157)|    |
| 5  | Exhibit 138 | Appendix F, List of Countries| 15 |
| 6  |             | with Sites That Disseminated |    |
| 7  |             | Articles Containing the      |    |
| 8  |             | Defaming Statement, excerpted|    |
| 9  |             | from the report of Dr. Jansen|    |
| 10 |             | (page 158)                   |    |
| 11 | Exhibit 139 | Retainer Agreement and Fee   | 39 |
| 12 |             | Schedule dated July 10, 2019 |    |
| 13 |             | from Jansen Expert Witnessing,|   |
| 14 |             | LLC to Jonathan Grunberg     |    |
| 15 |             | (JANSEN_03547)               |    |
| 16 | Exhibit 140 | letter of 1 September 2019    | 44 |
| 17 |             | from Dr. Jansen to Jonathan  |    |
| 18 |             | Grunberg with attachment     |    |
| 19 |             | (JANSEN_03696-97)            |    |
| 20 | Exhibit 141 | letter of 1 October 2019      | 44 |
| 21 |             | from Dr. Jansen to Jonathan  |    |
| 22 |             | Grunberg with attachment     |    |
| 23 |             | (JANSEN_03698-700)           |    |
| 24 |             |                              |    |
| 25 |             |                              |    |

EXHIBIT 1
PAGE 5

| 1 | Exhibit 142 | spreadsheet of dates, | 44 |
| 2 | | tasks, and hours worked | |
| 3 | | by Dr. Jansen (JANSEN_04944-54) | |
| 4 | Exhibit 143 | letter of November 19, 2018 | 61 |
| 5 | | from Patrick Schmidt of | |
| 6 | | Quinn Emanuel to Dr. Jansen | |
| 7 | Exhibit 144 | letter of November 19, 2018 | 61 |
| 8 | | from Patrick Schmidt of | |
| 9 | | Quinn Emanuel to Dr. Jansen | |
| 10 | Exhibit 145 | printout re foxnews.com | 92 |
| 11 | | website performance | |
| 12 | | (JANSEN_055554-58) | |
| 13 | Exhibit 146 | screen shot re monthly | 92 |
| 14 | | unique visitors from | |
| 15 | | SimilarWare | |
| 16 | Exhibit 147 | printout of article dated | 124 |
| 17 | | January 31, 2017 from | |
| 18 | | theatlantic.com titled | |
| 19 | | The Internet is Mostly Bots, | |
| 20 | | by Adrienne Lafrance | |
| 21 | Exhibit 148 | printout from cars.com | 164 |
| 22 | | website | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

EXHIBIT 1
PAGE 6

BERNARD J.JANSEN, PHD

November 04, 2019

| | | | |
|---|---|---|---|
| 1 | Exhibit 149 | printout from cars.com | 172 |
| 2 | | website of article entitled | |
| 3 | | The Week in Tesla News: | |
| 4 | | Snoozing on Autopilot, Musk | |
| 5 | | 'Deletes' Twitter and the | |
| 6 | | EV Evolution, dated June | |
| 7 | | 18, 2019 by Nick Kurczewski | |
| 8 | Exhibit 150 | printout from | 188 |
| 9 | | screamingfrog.co.uk. website of | |
| 10 | | article entitled How Accurate Are | |
| 11 | | Website Traffic Estimators? dated | |
| 12 | | 13 June, 2016 by Patrick Langridge | |
| 13 | Exhibit 151 | printout from ahrefs.com | 199 |
| 14 | | of article entitled Find | |
| 15 | | Out How Much Traffic a | |
| 16 | | Website Gets:  3 Ways | |
| 17 | | Compared, dated August 16, | |
| 18 | | 2018 by Joshua Hardwick | |
| 19 | Exhibit 152 | printout from feedimo.com | 241 |
| 20 | | of article entitled Elon | |
| 21 | | Musk Calls Thai Cave Diver | |
| 22 | | Hero A 'Child Rapist' As | |
| 23 | | He Escalates Baseless Feud | |
| 24 | | | |
| 25 | | | |

EXHIBIT 1
PAGE 7

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    Exhibit 153    printout from inc.com of          242
 2                   article entitled
 3                   If You're Calling Someone
 4                   a 'Pedo' on Twitter, Elon
 5                   Musk, It's Time to Take a
 6                   Long, Hard Look at Your Life
 7
 8                   INDEX OF EXAMINATION
 9    By Mr. Schwartz                    Page 8
10    By Mr. Grunberg                    Page 273
11    By Mr. Schwartz                    Page 276
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 1
PAGE 8

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiff:

 3             JONATHAN D. GRUNBERG, Esquire

 4             NICOLE JENNINGS WADE, Esquire

 5             L. Lin Wood, P.C.

 6             1180 West Peachtree Street

 7             Suite 2040

 8             Atlanta, Georgia  30309

 9             404.891.1403

10    On behalf of the Defendant:

11             ROBERT M. SCHWARTZ, Esquire

12             Quinn Emanuel Urquhart & Sullivan, LLP

13             865 South Figueroa Street

14             10th Floor

15             Los Angeles, California  90017

16             213.443.3675

17    Legal Video Specialist:  Chelsea Diallo

18

19

20

21

22

23

24

25
```

EXHIBIT 1
PAGE 9

1          THE VIDEOGRAPHER:  Okay.  We are on the

2     record.  Today's date is November 4th, 2019.  The

3     time is approximately 9:57 a.m.  This will be the

4     videotaped deposition of Jim Jansen.

5          Will the attorneys present please state

6     their names and whom they represent.

7          MR. GRUNBERG:  Jonathan Grunberg for the

8     plaintiff.

9          MS. WADE:  Nicole Wade representing the

10     plaintiff.

11          MR. SCHWARTZ:  And Robert Schwartz for

12     the defendant.

13          THE VIDEOGRAPHER:  Will the court

14     reporter now swear in the witness.

15          BERNARD J. "JIM" JANSEN, PhD,

16     being duly sworn, was examined and testified as

17     follows:

18                    EXAMINATION

19     BY MR. SCHWARTZ:

20          Q.  Good morning, Mr. Jansen.

21          A.  Good morning, sir.

22          Q.  You've just taken an oath to tell the

23     truth and the whole truth to each question that I

24     ask.  Do you understand that's the same oath that

25     will be administered to you or would be

EXHIBIT 1
PAGE 10

```
 1   administered to you if you were testifying in
 2   court in front of the judge and jury in this case?
 3        A.  Yes, I do.
 4        Q.  The law expects witnesses who are
 5   faithful to that oath will give testimony that is
 6   candid, forthcoming and free of deception.  Is it
 7   your firm intention to give answers to my
 8   questions throughout this deposition that are
 9   candid, forthcoming and free of deception?
10        A.  Absolutely.
11        Q.  Although we're sitting in a conference
12   room in an office, your testimony here has the
13   same legal effect that it would if you were giving
14   it in a courtroom in this case.  Do you understand
15   that as well?
16        A.  Yes, I do.
17        Q.  Okay.  Please make sure that you've heard
18   and understand each question that I ask before you
19   answer it.  If you don't hear or understand a
20   question I ask, will you let me know?
21        A.  Yes, I will.
22        Q.  If you answer a question I'm going to
23   assume, then, that you heard it and you understood
24   it.  Do you understand?
25        A.  Yes, I do.
```

EXHIBIT 1
PAGE 11

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.   Is that fair?

2        A.   That seems fair.

3        Q.   Okay.  You will be given a written

4    transcript of the deposition today.  By the way,

5    let's back off.  Have you been deposed before?

6        A.   Yes, I have.

7        Q.   Approximately how many times?

8        A.   12 times.

9        Q.   So you're generally familiar with the

10   procedures.

11       A.   I am, but I would prefer that you assume

12   I'm not and just so we both know the rules and

13   what the expectations are.  So please go ahead.

14       Q.   You will receive a written transcript of

15   the deposition shortly after it's completed.

16   We'll work out arrangements with counsel as to how

17   quickly that will happen at the end of the

18   deposition.

19            You're allowed, in fact you're required

20   to review that transcript and to make sure that it

21   accurately reflects what you said here today.  If

22   you make any changes to the transcript that are

23   substantive in nature, however, for example you

24   answer yes here in this room, you cross out the

25   yes and you write no or you start writing in some

EXHIBIT 1
PAGE 12

BERNARD J.JANSEN, PHD

November 04, 2019

```
1   additional information, then I or anybody else is
2   free at the time of trial to comment on those
3   changes and to argue that they indicate that
4   you're not a credible witness.  Do you understand?
5       A.  Yes, I do.
6       Q.  Okay.  So for the benefit of the court
7   reporter I'm going to try really hard not to begin
8   a new question until you've finished your answer,
9   and when I'm asking questions even if you're 99
10  percent sure you know what I'm going to ask you, I
11  would request or do request that you wait until I
12  finish my questions before you begin your answer,
13  because the court reporter can take down only one
14  person at a time, and pausing will also allow
15  counsel for the plaintiff to object if they wish
16  to do so.  Will you do your best to do that?
17      A.  Yes, I will.
18      Q.  Great.  Your answers need to be comprised
19  of words as opposed to gestures or things like
20  uh-huh or huh-uh, because nobody really knows what
21  that means when it shows up in a transcript, okay?
22      A.  Okay.
23      Q.  Great.  Let me know if you want to take a
24  break.  The only caveat is that you have to answer
25  a question before you say, Let's take a break,
```

EXHIBIT 1
PAGE 13

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    okay?

2         A.   Okay.

3         Q.   Great.  Are you taking any medication

4    today that would interfere with your ability to

5    hear my questions, understand them, or answer them

6    truthfully?

7         A.   No.

8         Q.   All right.  Let's begin.

9              MR. SCHWARTZ:  I'm not sure what our next

10   exhibit number is, but I think if I skip a couple

11   from Friday -- I think we were around 128 or 129.

12             MS. WADE:  I may have it right here,

13   actually.  I think this is my -- yeah, I do.

14             MR. SCHWARTZ:  Just to be careful why

15   don't we start with 132.  So this will be 132.

16             (Defendant's Exhibit 132 marked)

17             MR. SCHWARTZ:  Actually, this is more

18   than I wanted to be.  What I'd ask is just for

19   convenience during the deposition -- actually, you

20   know what, this will be okay.  Trees have already

21   given up their lives.

22             MR. GRUNBERG:  And then some, in

23   California.

24             THE WITNESS:  Holy moly.

25             MR. SCHWARTZ:  Sorry.  Seriously, let me
```

EXHIBIT 1
PAGE 14

BERNARD J. JANSEN, PHD

November 04, 2019

1   start again.

2   BY MR. SCHWARTZ:

3       Q.  So the court reporter has placed before

4   you what we've marked as Exhibit 132, what I

5   believe to be, but I want you to confirm, is a

6   true and correct copy of your report and exhibits

7   in this case.  Could you take a look at it for a

8   moment and just confirm that that's correct.

9       A.  Sure.  Without looking at all 158 pages,

10  it looks like my report.

11      Q.  Okay, great.  And then what I want to do

12  is then mark some of the individual pieces

13  separately so that we can get to them faster

14  during the deposition, and I apologize.  The idea

15  was that just the report would be in Exhibit 132

16  instead of everything, but let's mark that as our

17  next exhibit, this be 133?

18          (Defendant's Exhibit 133 marked)

19  BY MR. SCHWARTZ:

20      Q.  Mr. Jansen, if you could look at Exhibit

21  133 and tell us or confirm for us that this is a

22  true and correct copy of the curriculum vitae you

23  attached as Appendix A to your report.

24      A.  Without looking at every page, it looks

25  like the CV that I attached.

EXHIBIT 1
PAGE 15

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        Q.  If you need more time to confirm to look
 2   at it, let me know.
 3        A.  It looks close enough.  Yes, it is.
 4            (Defendant's Exhibit 134 marked)
 5   BY MR. SCHWARTZ:
 6        Q.  Mr. Jansen, Exhibit 134 is a copy of
 7   pages 99 and 100 from your report.  It's
 8   Appendix B.  Do you recognize this as Appendix B
 9   from your report?
10        A.  Yes, it looks like Appendix B from my
11   report.
12        Q.  And is this a complete list of testimony
13   you've given in the last four years?
14        A.  Yes.
15            (Defendant's Exhibit 135 marked)
16   BY MR. SCHWARTZ:
17        Q.  Okay.  Exhibit 134, can you confirm for
18   us that this is a true and correct copy of
19   Appendix C from your report titled Documents
20   Referenced?
21        A.  Yes, this looks like Appendix C.
22        Q.  I'm sorry, this is 135, yeah, 135.  This
23   will be 136.  Okay, 136.  All right.
24            (Defendant's Exhibit 136 marked)
25   BY MR. SCHWARTZ:
```

EXHIBIT 1
PAGE 16

BERNARD J.JANSEN, PHD

November 04, 2019

1       Q.   And we've placed before you as Exhibit
2   136 Appendix D from your report, pages 104 through
3   126.   Can you confirm for us that this is, in
4   fact, a true and correct copy of Appendix D to
5   your report titled Links to Articles Containing
6   the Defaming Statements (all functional on the
7   date that I viewed the article.)
8       A.   Yes, this looks like Appendix D of my
9   report.
10          (Defendant's Exhibit 137 marked)
11   BY MR. SCHWARTZ:
12       Q.   All right.   And can you confirm for us
13   that the document the reporter has marked and
14   handed to you as Exhibit 137 is a true and correct
15   copy of Appendix E to your report, pages 127
16   through 157, titled Supporting and Supplementary
17   Documents.
18       A.   Yes, this looks like Appendix E.
19          (Defendant's Exhibit 138 marked)
20   BY MR. SCHWARTZ:
21       Q.   This is 138.   And can you confirm for us
22   that Exhibit 138, which the reporter just handed
23   to you, is a true and correct copy of page 158 of
24   your report, Appendix F, titled Lists of Countries
25   With Sites That Disseminated Articles Containing

EXHIBIT 1
PAGE 17

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1   the Defaming Statement?
 2        A.  Yes, this looks like Appendix F.
 3        Q.  All right.  So, why don't we go back now
 4   to Exhibit 132.  I'm just wondering should we take
 5   out the duplicative pages, just to make it easier.
 6   I really intended it to be only your report to
 7   page 40.
 8            MR. SCHWARTZ:  We'd even be able to
 9   staple it.
10            MR. SCHWARTZ:  Yes.  Can we agree that
11   Exhibit 132 is to contain just pages 1 through 40
12   of your report and the additional pages can be put
13   aside.  Is that okay, Counsel?
14            MR. GRUNBERG:  That's fine.
15            MR. SCHWARTZ:  All right.
16   BY MR. SCHWARTZ:
17        Q.  So can you -- yes -- do that, and then
18   maybe just hand back to me the extraneous pages.
19        A.  Yes, sir.
20        Q.  Awesome.  I'll have these recycled.  All
21   right.
22            So let's take a look at Exhibit 132, and
23   please turn to page 5, paragraph 20 and let me
24   know when you have that in front of you.
25        A.  Paragraph 20?
```

BERNARD J.JANSEN, PHD

November 04, 2019

1          Q.  Paragraph 20, page 5.

2          A.  I am there.

3          Q.  Okay.  Does this paragraph 20 on page 5

4    of your report state all of the opinions you plan

5    to give in this case?

6          A.  Well, this is the conclusion opinions.  I

7    mean, my opinions are presented in the entire

8    report.

9          Q.  Well, are these conclusions -- or I

10   should start again.  Are the matters stated in

11   paragraph 20 of your report all of the conclusions

12   that you will be offering as testimony in this

13   case?

14         A.  Well, yeah.  This is what I was asked to

15   do that -- as far as presented as a summary

16   conclusion in paragraph 20.

17         Q.  So there are no other conclusions you're

18   planning to offer in the trial of this case other

19   than those stated in paragraph 20?

20         A.  Well, and the supporting statements in my

21   report.

22         Q.  Right.  I understand.  In other words,

23   paragraph 20 is supported by other information

24   throughout your report, but these are the

25   conclusions that that other information supports.

EXHIBIT 1
PAGE 19

1    Is that what you're saying?

2        A.  Yeah, these are the conclusions and

3    summaries of the research and analysis I did,

4    presented in my report and, of course, in the

5    references that go with it.

6        Q.  Let me just drill down that a little bit

7    more.  So in terms of the extent to which the --

8    I'm just going to quote from paragraph 20, The,

9    quote, defaming statements made by Mr. Elon Musk

10   asserting that Mr. Vernon Unsworth is a pedophile,

11   a child rapist, married a child and/or is involved

12   in child sex trafficking, are there any other

13   opinions you are planning to give in this case

14   regarding the extent of that dissemination that

15   are not set forth in subparts a., b., and c. of

16   that paragraph?

17       A.  Well, as of this time I've been not asked

18   to update these numbers, so at -- at the date I

19   submitted this report those are the numbers that

20   my analysis had reached.

21       Q.  As you sit here today in this deposition

22   are you aware of -- I withdraw that.  We'll come

23   back to that.

24           Let me -- let me ask you about paragraph

25   20.b.  It says, The defaming statements appeared

EXHIBIT 1
PAGE 20

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    in at least 605 stories or articles.  Do you see
 2    that?
 3          A.  Yes, sir.
 4          Q.  And those articles that are listed, those
 5    are the articles that are listed in Appendix D to
 6    your report?
 7          A.  Appendix D lists the links to those
 8    articles, yes.
 9          Q.  So if during the course of this
10    deposition -- let me start again.
11               If in the course of this deposition I say
12    your, quote, list of articles or, quote, articles
13    on your list or the list, will you understand that
14    I'm referring to the 605 articles on that list in
15    Appendix D to your report?
16          A.  Yes, sir.
17          Q.  Okay.  Now, looking down on the same page
18    in paragraph 22 you say, These numbers are
19    conservative.  Do you see that?
20          A.  Yes.
21          Q.  Okay.  And then you list some things in
22    subparagraphs a. through m. of paragraph 22 that
23    one could have done which might have resulted in a
24    number of websites and articles and unique
25    visitors to be higher; is that correct?  I should
```

EXHIBIT 1
PAGE 21

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    say higher than the number you calculated in
 2    paragraph 20.c., 98 million.
 3          A.   The -- sort of, yeah.  In paragraph 22
 4    and in the subcomponents, those are statements
 5    that -- why the number is conservative, and if I
 6    had investigated those they may have increased the
 7    number of articles presented in paragraph 20.
 8          Q.   Okay.  So just to be clear on your
 9    answer, what you're saying is the -- when you said
10    the subcomponents of paragraph 22 you meant
11    subparts a. through m., correct?
12          A.   A. through m., yes, sir.
13          Q.   Is it correct, though, that you did not
14    perform those tasks?
15          A.   The -- no, it is not correct.
16          Q.   You did perform those tasks.
17          A.   Well, I performed some of those tasks,
18    but I did not include the numbers I got in my
19    numbers presented in paragraph 20.
20          Q.   So is it correct that you are not
21    expressing any opinion in this case as to what
22    your numbers would be in terms of articles or
23    stories, website count or potential daily unique
24    visitors had you done any or all of the tasks you
25    identified in paragraph 22.a. through m.?
```

EXHIBIT 1
PAGE 22

BERNARD J.JANSEN, PHD

November 04, 2019

1           A.   If I understood your question correctly,

2   no, because in my report I do present some numbers

3   from some of these subtasks.  But, as I state,

4   they're not included in my count of 350 sites, 605

5   articles and 98 million potential daily viewers.

6           Q.   Well, I just want to make sure I

7   understand what -- let me back up for a second.

8           A.   Sure.

9           Q.   You understand this is my only

10  opportunity to ask you questions about your work

11  before trial.

12          A.   Sure.  Yes.

13          Q.   Okay.  And what I want to do is make sure

14  I understand the entirety of the testimony that

15  you plan to give at trial.

16          A.   Uh-huh.  (Nods head affirmatively.)  Yes.

17          Q.   And if there is some number or are some

18  numbers different than the 354 media or other

19  sites, different than the 605 stories or articles,

20  different than the 98 million potential daily

21  unique visitors, I'd like to know that now so I

22  understand what you're planning to say at trial.

23  Do you understand why I'm asking that?

24          A.   Yes.

25          Q.   Okay.  So is there some number you can

EXHIBIT 1
PAGE 23

BERNARD J. JANSEN, PHD

November 04, 2019

1   tell me today that is different in any way from

2   the numbers in paragraph 20 of your report based

3   on any additional work or tasks that you

4   identified in paragraphs 22.a through m of your

5   report?

6        A.  Well, yeah, that's a little different

7   than your previous question, because the numbers I

8   present in paragraph 20 and also in the other --

9   in the summary of my report, that those are the

10  number of websites, the number of articles and the

11  number of potential unique viewers.  But there is

12  a whole section of my report where I go through

13  each of these sub-bullets in paragraph 22 and kind

14  of explain why they're conservative and also why I

15  did not include them.  But there are some numbers

16  in there, is what I'm trying to say.

17       Q.  Okay.  So if you include on-line media or

18  other sites or any other place where information

19  containing the defaming statements can be located,

20  what's the total number you're aware of as you sit

21  here today of such media or sites, if it's at all

22  different from the 354 number in paragraph 20.a.

23  of your report?

24       A.  As I explain farther in the report, the

25  number of sites, 354, 605 articles, 98 million

EXHIBIT 1
PAGE 24

BERNARD J.JANSEN, PHD

November 04, 2019

1   viewers, those are the numbers that are the

2   summary of my opinions.  But there are some other

3   numbers presented in the report, and I explain why

4   I'm not including those.  So my report already

5   explains that I'm not including these numbers.

6        Q.  All right.  So at trial your opinions

7   will be -- on the issue of the dissemination of

8   the information of the defaming statements is

9   going to be the numbers in paragraph 20 of your

10  report and no other set of numbers.

11          MR. GRUNBERG:  Objection, form.

12       A.  Those are the -- again, the 354 sites,

13  605 articles, 98 million potential unique viewers,

14  those are the summary of my opinions.  But as I

15  presented in my report, there are some other

16  numbers of social media traffic, for example.  But

17  those do not -- will not alter what I'm saying

18  here, because I explain in my report that I'm not

19  including them.

20  BY MR. SCHWARTZ:

21       Q.  Okay.  So I just want to make sure at

22  trial I don't hear you say, for example, the 605

23  stories number is actually low, it's actually some

24  number greater than 605, because if you take into

25  account additional articles that might be found or

EXHIBIT 1
PAGE 25

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    that I did find doing the things I described in
 2    paragraph 22.a. through m., the number is higher.
 3    You're telling me you're not planning on doing
 4    that at trial.  You're sticking to 605.
 5         A.  I'm presenting the 605 articles as a
 6    summary of my opinion, but there are some numbers
 7    there that I explain why it's conservative.
 8         Q.  Well, how many additional articles as you
 9    sit here today do you believe exists on the
10    internet that contain the defaming statements if
11    it's not 605, using any means whatsoever to your
12    disposal?
13         A.  I'm not saying it's not 605.  I'm just
14    saying that I explain why it's a conservative
15    number in my report.
16         Q.  Okay.  But as you sit here today are you
17    aware of any stories or articles in excess of 605
18    that exist that you're going to testify to at
19    trial?
20         A.  I have not done any additional analysis
21    beyond the 605 articles and the other data
22    presented my report.
23         Q.  So is the answer to my question no?
24         A.  Could you repeat the question?
25         Q.  Sure.  As you sit here today are you
```

EXHIBIT 1
PAGE 26

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   aware of any stories or articles in excess of 605
 2   that exist that you are going to testify to at
 3   trial?
 4        A.  As I sit here today, no, I'm not aware of
 5   any.
 6        Q.  Okay.  Same question as to the 98 million
 7   potential daily visitors which you had clarified
 8   more precisely as 98,362,092.  Are you going to --
 9   based on anything in paragraphs 22.a. through m.
10   planning to say actually the number is some number
11   in excess of that at trial?
12        A.  As I sit here today, no.
13        Q.  After this deposition is over you're not
14   going to go out and do any new work, are you, such
15   that any of these -- such as any of the steps
16   you've described in paragraph 22 of your
17   deposition -- of your report?
18        A.  As I sit here today I am not planning on
19   it.
20        Q.  All right.  Okay.
21            Let's go to paragraph 2 -- wait, is it
22   paragraph 2?  Oh, paragraph 12, sorry.  It's page
23   4, paragraph 12.  And what you wrote, excuse me,
24   was, quote -- well, you know what?  Paragraph 11
25   on the prior page, you wrote , In providing my
```

EXHIBIT 1
PAGE 27

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    expert opinion I have been asked to respond to the
 2    following question, and then in paragraph 12 you
 3    list out that question; is that correct?
 4         A.   That is correct.
 5         Q.   Okay.  Does paragraph 12 describe the
 6    entirety of your assignment in this case?
 7         A.   Paragraph 12 outlines what I was asked to
 8    do for the analysis, yes.
 9         Q.   Were you asked to do anything not in
10    paragraph 12?  Put it a slightly different way.
11              MR. GRUNBERG:  Objection, form.
12              MR. SCHWARTZ:  Apology.  Let me rephrase
13    the question.
14    BY MR. SCHWARTZ:
15         Q.   Were you asked to do anything in this
16    case that is not described in paragraph 12?
17         A.   Well, paragraph 12 and, of course, the
18    supporting paragraphs in the report.  But I was
19    not asked to do anything beyond that.
20         Q.   All right.  And the "that," again I just
21    want to make sure I understand what's going on
22    here.  What I think I heard in your answer was
23    what you were asked to do in this case is
24    described in paragraph 12, how you went about
25    doing it is described elsewhere in your report.
```

EXHIBIT 1
PAGE 28

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   Is that what you -- is that what you meant to say
 2   in your prior answer?
 3        A.   Well, yeah, along with, you know, the
 4   data and the methodology and the assumptions I
 5   used and defining terms.  But paragraph 12 out
 6   lines what I was asked to do in this case.
 7        Q.   Okay.  Let's focus in on a portion of
 8   paragraph 12.  The portion I want to focus on is,
 9   quote, What is the level of dissemination of the
10   defaming statements made by Mr. Elon Musk
11   asserting that Mr. Vernon Unsworth is -- and then
12   it continues on.  I just want to focus in on the
13   portion of it as, quote, the level of
14   dissemination of the defaming statements.
15            What do you mean by the level of
16   dissemination of the defaming statements?
17        A.   And as I define in my report,
18   dissemination is the distribution of information
19   or articles.  And from that the methodology I used
20   was to locate the articles on line that contained
21   the defaming statements.
22        Q.   Right.  But what does it mean to say
23   dissemination of the statements?  Putting aside
24   defaming.  What do you mean by the dissemination
25   of the statements?
```

EXHIBIT 1
PAGE 29

BERNARD J.JANSEN, PHD

November 04, 2019

```
1        A.  I defined it in my report.

2        Q.  Can you show me where.

3        A.  Yes, sir.  Page 7.

4        Q.  Okay.  And what are you referring to?

5        A.  The first line on page 7.

6        Q.  Okay.  So there it appears -- or let me

7   start again.  There on page 7 in the top bullet

8   point appears the word dissemination.  Do you see

9   that?

10        A.  Yes.

11        Q.  And what you wrote is, quote, the act of

12   spreading or the circulation of information or

13   articles, close quote.  Is that right?

14        A.  That is correct.

15        Q.  Okay.  So dissemination means something

16   different from viewing, reading or understanding,

17   correct?

18        A.  In terms of definition, yes.

19        Q.  Okay.  They convey different -- those

20   words convey a concept different from what the

21   word dissemination conveys, right?

22        A.  Yes, they can.

23        Q.  All right.  And so what I think I -- and

24   you can tell me if I'm wrong -- what I think

25   you're testifying to in this case is what you
```

EXHIBIT 1
PAGE 30

BERNARD J. JANSEN, PHD

November 04, 2019

1   believe to be the number of potential daily unique
2   visitors to the websites that hosted the articles
3   you collected, the articles on appendix 9, as
4   calculated by a website called SimilarWeb during
5   the period May to July 2019; is that right?
6           MR. GRUNBERG:  Objection, form.
7       A.  The -- it includes that.  But as I --
8   there's many other things I kind of outline in my
9   report.  But yes, I am measuring the daily unique
10  traffic to these sites that hosted one or more of
11  these articles, and yes.
12      Q.  So your work tells us where the
13  information was available, correct?  And by "the
14  information," what I'm referring to are the
15  defaming statements that Mr. Musk made about
16  Mr. Unsworth.  Your report tells us where that
17  information was made available on the internet.
18      A.  Among other things, yes.
19      Q.  Well, it doesn't tell us to whom it was
20  disseminated, that information was disseminated,
21  does it?
22          MR. GRUNBERG:  Objection, form.
23      A.  Well, these particular sites have
24  visitors, and so it was obviously disseminated to
25  those particular visitors.  Now, who those

EXHIBIT 1
PAGE 31

BERNARD J.JANSEN, PHD

November 04, 2019

1   visitors are, I do not know.

2   BY MR. SCHWARTZ:

3       Q.   But isn't it true that in order for

4   someone to read any of the defaming statements --

5   and let me back up for a second.  If I use the

6   term defamatory statements in this deposition will

7   you understand that I'm referring to what you

8   describe in paragraph 12 as the defaming

9   statements there, so I don't have to -- we don't

10  have to say back and forth the entirety of

11  paragraph 12?

12      A.   Yes.

13      Q.   So what -- well, let me ask it this way.

14  You can't tell us the number of people to whom the

15  articles that contain statements Mr. Musk made

16  about Mr. Unsworth were actually disseminated, can

17  you?

18          MR. GRUNBERG:  Objection, form.

19      A.   Well, as I mentioned, each of these sites

20  have visitors that come to the sites, so they were

21  disseminated to them.  If your question is who

22  they actually are, then no, I don't know that.

23  BY MR. SCHWARTZ:

24      Q.   Well, are you giving any testimony in

25  this case as to the number of people who actually

EXHIBIT 1
PAGE 32

BERNARD J. JANSEN, PHD

November 04, 2019

1   saw any of the articles in your report?

2        A.   What I was asked to do is to measure the

3   level of dissemination, so the distribution,

4   circulation of these articles and defaming

5   statements.

6        Q.   Right.  But are you giving any testimony

7   as to the number of people who actually saw any of

8   the articles on your list?

9        A.   I've not been asked to do that.

10       Q.   Even if you haven't been asked, I need

11  you to tell me whether, in fact, you are planning

12  on giving any testimony in this case as to the

13  number of people who actually saw any of the

14  articles on your list in Appendix D.

15       A.   As I sit here today I'm not planning on

16  doing that.

17       Q.   Do you know how many people actually saw

18  any of the articles you've identified in your

19  list?

20       A.   Again, I was not asked to do that, so I

21  didn't investigate that.

22       Q.   And so you don't know, do you?

23       A.   I didn't investigate it, so, you know, I

24  don't know.

25       Q.   Okay.  Are you giving any testimony in

EXHIBIT 1
PAGE 33

BERNARD J.JANSEN, PHD

November 04, 2019

1   this case as to the number of people who actually

2   read any of the articles on your list?

3        A.   As I said, I was asked to measure the

4   level of dissemination.  I was not asked to

5   measure the number of people that read the

6   article -- the articles.

7        Q.   Sorry, I didn't mean to interrupt.  So

8   you will not be giving any testimony in this case

9   as to the number of people who actually read any

10  of the articles on your list.

11       A.   I've not been asked to do that.  I do

12  want to point out that in my report there are some

13  supporting articles, for example, from BuzzFeed

14  that do report some visitor traffic to the

15  articles.  But I've not been asked to analyze

16  who's read the articles.

17       Q.   Right.  My question is a little

18  different.  I appreciate the information.  What I

19  asked is whether you're giving any testimony in

20  this case as to the number of people who actually

21  read any of the articles on your list.

22       A.   I was not asked to investigate that, so

23  as I sit here today I'm not planning on providing

24  that information.

25       Q.   All right.  As you sit here today do you

EXHIBIT 1
PAGE 34

```
 1    know how many people actually read any of the
 2    articles you've identified in your report?
 3         A.   As I said, I was not asked to investigate
 4    that, so I don't know the number of people that
 5    have read the articles.
 6         Q.   Are you giving any testimony in this case
 7    as to the number of people who believed anything
 8    Mr. Musk said about Mr. Unsworth?
 9         A.   No.
10         Q.   Do you know how many people believed
11    anything Mr. Musk said about Mr. Unsworth?
12         A.   I was not asked to investigate that, so
13    no.
14         Q.   Are you giving any testimony in this case
15    as to the number of people who think that
16    Mr. Unsworth's reputation has been harmed in any
17    way by anything Mr. Musk said about Mr. Unsworth?
18              MR. GRUNBERG:  Hold on, let me look at
19    that before you answer.
20              Objection, form.
21         A.   I'm sorry, can I get the question again?
22    BY MR. SCHWARTZ:
23         Q.   Sure.  Let me read it.  Are you giving
24    any testimony in this case as to the number of
25    people who think that Mr. Unsworth's reputation
```

EXHIBIT 1
PAGE 35

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    has been harmed in any way by anything Mr. Musk
 2    said about Mr. Unsworth?
 3          A.   I was not asked to investigate that, so
 4    no, as I sit here today I'm not planning on
 5    providing that information.
 6          Q.   Do you know whether anyone thinks that
 7    Mr. Unsworth's reputation has been harmed in any
 8    way by anything Mr. Musk said about him?
 9               MR. GRUNBERG:  Objection, form.
10          A.   Well, again, I was not asked to
11    investigate that.  But personally I read quite a
12    few articles, so I have an opinion -- or I have an
13    impression.  But no, I was not asked to
14    investigate that, so no, I'm not planning on
15    providing that information.
16          Q.   Well, how many people in the world do you
17    think Mr. Unsworth's reputation has been harmed in
18    any way by anything Mr. Musk said about
19    Mr. Unsworth?
20               MR. GRUNBERG:  Objection, form.
21          A.   I was not asked to investigate that, so I
22    don't know.
23    BY MR. SCHWARTZ:
24          Q.   Now, the -- if you look at your report,
25    if we go to page 5, paragraph 20.c., you say that
```

EXHIBIT 1
PAGE 36

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    the -- just so we have it in front of us,
 2    paragraph c. says, quote, with more than 98
 3    million potential daily unique visitors, close
 4    quote.  Do you see that?
 5         A.   Yes.
 6         Q.   What do you mean by the word potential?
 7         A.   The -- well, potential has a definition,
 8    you know, in terms of the -- you know, the
 9    possible number.  I include that because I
10    outline, again in paragraph 22, the conservative
11    method that I took.  So I think what I was meaning
12    by potential, there are potential 98 million daily
13    unique visitors, and then, you know, I know I'm
14    excluding a certain amount of traffic.
15         Q.   Okay.  Just to be clear, then, in other
16    words, potential is not some kind of a modifier of
17    the term that you use throughout your report of
18    daily unique visitors.
19         A.   It's -- I wasn't meaning it in that type
20    of regard.  It's more of the aspect of using a
21    conservative approach to calculating the 98
22    million daily unique visitors.
23         Q.   Okay.  Thank you.  Were you asked to do
24    any work in this case that is not reflected in
25    your report?
```

EXHIBIT 1
PAGE 37

BERNARD J.JANSEN, PHD

November 04, 2019

1      A.   I believe everything I was asked to do is

2   reflected in the report, either directly or

3   indirectly from what I was asked to do.

4      Q.   Just to make sure that there was no

5   ambiguity in my question, to illustrate what I

6   meant, in other words, there hasn't been any

7   situation during your work in this case where

8   Mr. Unsworth's lawyers asked you to do some

9   additional work or express some additional opinion

10   on some topic and you said, No, I have to decline.

11      A.   Not that I recall, no.

12      Q.   Okay.  Did you do anything to prepare for

13   your deposition in this case today?

14      A.   Yes.

15      Q.   What did you do?

16      A.   I reread my entire report.  I reread

17   every reference.  I looked over my CV, looked over

18   all the appendices, and I met with two of the

19   lawyers yesterday.

20      Q.   Which lawyers?

21      A.   Jonathan and Nicole.

22      Q.   How long did you spend preparing for your

23   deposition in this case, all in?

24      A.   Can I ask a clarifying question?

25      Q.   Absolutely.

EXHIBIT 1
PAGE 38

BERNARD J.JANSEN, PHD

November 04, 2019

1      A.   So including my time of reviewing
2   documents and --
3      Q.   Yes.
4      A.   Probably 10 to 12 hours.
5      Q.   10 to 12 hours, okay.  And how long, or
6   how many of those 10 to 12 hours that you spent
7   preparing for your deposition in this case did you
8   spend with Mr. Unsworth's lawyers?
9      A.   Four or five hours.
10      Q.   So if my math is right, you spent a total
11   of 10 to 12 hours preparing for your deposition in
12   this case; is that right?
13      A.   Yes.  You know, I don't have an exact
14   number on the top of my head, but it's about 10 to
15   12 hours as I'm trying to process the numbers,
16   yes.  So about 10 to 12 hours.
17      Q.   And of the 10 to 12 hours you spent
18   preparing for your deposition in this case you
19   spent four to five of those hours meeting with
20   Mr. Unsworth's lawyers.
21      A.   Yes.
22      Q.   Okay.  And then you said that you reread
23   every reference in your report.  By every
24   reference in your report, what do you mean?  What
25   are you referring to there?

EXHIBIT 1
PAGE 39

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1          A.   These would be the documents listed in
 2     Appendix C of my report.
 3          Q.   So Appendix C is Exhibit 135, I believe.
 4     Okay.  All right.  Got it.
 5               Have you reviewed a report written by
 6     Eric Rose in this case?
 7          A.   No, I have not.
 8          Q.   Have you had any communications with
 9     Mr. Rose?
10          A.   No, I have not.
11          Q.   By communications, I mean to include
12     written, oral or electronic, email, text, anything
13     like that.
14          A.   As far as I know I've never communicated
15     with Mr. Rose.
16          Q.   Okay.  Do you know who he is?
17          A.   I've heard the name, but to be honest,
18     that's all I know.  I don't know who he is.
19          Q.   Do you know if he's expressing any
20     opinions or testimony in this case?
21          A.   That, I do know, yes.
22          Q.   Do you know anything about the substance
23     of his testimony?
24          A.   No, I do not.
25          Q.   To any extent are your opinions or is
```

EXHIBIT 1
PAGE 40

BERNARD J.JANSEN, PHD

November 04, 2019

1  your work in this case -- let me start again. To

2  any extent do the opinions that you express in

3  this case rely on any work that Mr. Rose has done

4  in this case?

5      A.  I did not rely on anything he's --

6  Mr. Rose has done. I've never communicated with

7  him.

8      Q.  Okay. My understanding is that you were

9  retained by Mr. Unsworth's counsel in July of this

10 year, July 2019. Does that sound right to you?

11     A.  That sounds about right.

12     Q.  All right.

13         (Defendant's Exhibit 139 marked)

14 BY MR. SCHWARTZ:

15     Q.  Okay. Mr. Jansen, we've put before you

16 Exhibit 139. It's a letter from Jansen Expert

17 Witnessing, LLC dated July 10, 2019. This appears

18 to be an agreement between you on the one hand and

19 the attorneys for Mr. Unsworth on the other hand;

20 is that right?

21     A.  That is right.

22     Q.  And this is the agreement pursuant to

23 which you were retained to work on this case?

24     A.  This looks like the retainer agreement,

25 yes.

EXHIBIT 1
PAGE 41

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  Is there any other agreement besides the
2    July 10, 2019 agreement marked as Exhibit 139 for
3    your work in this case?
4        A.  As far as I know this is the only
5    agreement.
6        Q.  Did you perform any work in connection
7    with this case before July 10, 2019?
8        A.  No, I did not.
9        Q.  And does the -- or I should say --
10       A.  Excuse me, can I modify that statement?
11       Q.  If you need to.
12       A.  I don't know if it qualifies as work, but
13   we did have the initial calls back and forth of,
14   you know, the -- kind of the vetting process that
15   typically happens in these things.  But I did not
16   perform any analysis or work, anything other than
17   just phone calls of talking to Jonathan, the
18   lawyers.
19       Q.  Before July 10, 2019.
20       A.  Yes, yeah.
21       Q.  Okay.  So, in other words, the analysis
22   you undertook that is reflected in your report in
23   terms of number of articles, websites, daily
24   unique visitors, you didn't commence any of that
25   work until on or after July 10th, 2019.

EXHIBIT 1
PAGE 42

November 04, 2019

1      A.   That's correct.

2      Q.   There's a paragraph here titled rates.

3  And does that reflect the entirety of your

4  compensation arrangement with Mr. Unsworth's

5  attorneys for your work in this case?

6      A.   Yes, that's my hourly rate and expense

7  reimbursement agreement.

8      Q.   I'm sorry.

9      A.   Expense reimbursement agreements, yes.

10     Q.   Is there any additional compensation you

11 could be entitled to or be eligible for in

12 connection with your work in this case?

13     A.   Not that I know of.

14     Q.   You haven't had any discussions with

15 anyone about getting any bonus compensation or any

16 compensation tied to the outcome of the case?

17     A.   No.

18     Q.   Putting aside the work you did to prepare

19 for your deposition in this case, let's just put

20 that aside.  Up until that point in time when you

21 began to prepare for your deposition in this case,

22 approximately how many hours of your time had you

23 put into your work?

24     A.   Setting aside those, say, 12 hours, 88

25 hours.

EXHIBIT 1
PAGE 43

BERNARD J.JANSEN, PHD

November 04, 2019

1         Q.   And that's a very precise number.   Can

2    you tell me how it is you know that it's 88 hours?

3         A.   It's a typical question I get asked, so I

4    checked to see how many hours I had put in.

5         Q.   Right, okay.   And so that's approximately

6    somewhere between 35 and $36,000 worth of time,

7    correct?

8         A.   It's -- yeah, of time, yes.

9         Q.   Right.   And then I presume you've had

10   some expenses that you've asked to be reimbursed

11   as well.

12        A.   That is correct.

13        Q.   Approximately how much in expenses have

14   you asked to be reimbursed for?

15        A.   Including the -- prior to the deposition?

16        Q.   Yes.

17        A.   3,000.

18        Q.   So putting aside the time you put -- let

19   me start again.

20             So if you put 12 hours of time into

21   preparing for this deposition, that would be

22   approximately $4800 of your time in terms of its

23   value; is that correct?

24        A.   Well, it's going to be about 100 hours,

25   so -- plus expenses, so --

EXHIBIT 1
PAGE 44

1        Q.  No, no, no.  I'm sorry, let me withdraw

2    the question.  I just want to say if you -- you

3    previously testified in this deposition that you

4    spent 10 to 12 hours of time preparing for this

5    deposition, then a moment ago you put it at 12

6    hours.  So let's assume for this next question

7    it's 12 hours.  The dollar value of that time for

8    purposes of billing it to Mr. Unsworth's counsel

9    would be $4800, correct?  12 hours --

10        A.  Oh, for just the deposition.

11        Q.  Just the deposition.

12        A.  Oh, yes, I understand now.  Yes, yes.

13        Q.  Okay.  So putting aside the $4800 in time

14    for preparing for your deposition, you've put the

15    value of the time you've put in this case through

16    today is approximately $36,000 plus approximately

17    $3,000 in expenses; is that right?

18        A.  That's approximately correct.

19        Q.  Okay.  Can you estimate for me the amount

20    of time you will put into your work in this case

21    between today, once the deposition has ended, and

22    trial, when you take the stand at trial?

23            MR. GRUNBERG:  Objection, form.

24        A.  I don't know if I could give a precise

25    number, but I've not been asked to do anything,

EXHIBIT 1
PAGE 45

BERNARD J.JANSEN, PHD

November 04, 2019

1    additional analysis, so it would be preparing for

2    my testimony at trial would be the only thing.  I

3    don't know what those hours would be.

4    BY MR. SCHWARTZ:

5        Q.  As you sit here today can you give me any

6    estimate for the number of hours you would put in

7    or will put in to prepare to testify at trial?

8        A.  My process is typically the same prep

9    that I do for depositions.  I reread my report,

10   reread all the references.  So it's going to be in

11   the 10- to 12-hour, at least, estimate.

12       Q.  So in other words, once this deposition's

13   over you anticipate an additional 10 to 12 hours

14   of your time to review materials to prepare for

15   testifying at trial.

16       A.  Yes, that would be my estimate.

17       Q.  Okay.

18           (Defendant's Exhibit 140, Defendant's

19   Exhibit 141, and Defendant's Exhibit 142 marked)

20   BY MR. SCHWARTZ:

21       Q.  All right.  So Mr. Jansen, the reporter

22   has handed you what we've marked as Exhibits 140,

23   141 and 142.  And my understanding, but I want to

24   give you every opportunity to correct me, is that

25   these -- that Exhibits 140 and 141 reflect

EXHIBIT 1
PAGE 46

BERNARD J. JANSEN, PHD

November 04, 2019

1    invoices for your work on this case through -- let
2    me see what I've got -- my understanding was these
3    were your invoices for your work through October
4    23, 2019.  But maybe I'm wrong.  So can you just
5    explain to me what these invoices reflect in terms
6    of period of time.
7        A.  I -- okay, yes, I can.  Invoice dated 1
8    September is billing through mid July through
9    August.  The invoice dated 1 October is for
10   billing through the month of September.
11       Q.  Okay.  And so if you add up the first
12   invoice number of hours to the second invoice
13   number of hours, it's approximately 74.  I'm
14   rounding up the hours, 31.88 hours in the first
15   invoice -- excuse me, the second invoice and 42
16   hours in the other invoice, that's about 74 hours.
17   You said 88 hours.  Would that be time in October
18   before you started preparing for your deposition?
19       A.  Yeah, it would be whatever is not
20   reflected in these invoices.
21       Q.  Okay.  And the invoices that you've
22   sent -- you've given us, that is for -- well,
23   Exhibits 140, 141 and 142, these appear to contain
24   logs, if you will, that show for each day that you
25   did work on this case the work you did and how

EXHIBIT 1
PAGE 47

BERNARD J. JANSEN, PHD

November 04, 2019

1    much time you spent.  Is that what those charts

2    reflect?

3          A.  Yes, that's my mode of operation.  I log

4    whenever I'm working on these cases my start time,

5    stop time, the general task I was doing during

6    that particular period, and then provide that to

7    supporting documentation for my time and billing.

8          Q.  Did you perform any work on this case

9    after you were retained that you didn't reflect or

10   record on these records, Exhibits 140 and 141 and

11   142?

12         A.  All my time within the time periods for

13   these invoices have been reflected here.

14         Q.  Okay.  Are you the only person in your

15   sort of shop, if you will, that's working on this

16   case?  In other words, is anyone assisting you

17   with your work on this case?

18         A.  Jansen Expert Witnessing is just me.

19         Q.  So no one else is helping you with your

20   work on this case.

21         A.  No.

22         Q.  All right.  So let's look at Exhibit 133,

23   which is your CV.  And let me know when you

24   have --

25         A.  Sorry.

EXHIBIT 1
PAGE 48

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  Oh, no, it's okay.  You can clean up the

2   mess we've made in front of you before you pull

3   out Exhibit 133.  Let me know when you have that

4   handy.

5        A.  I have Exhibit 133.

6        Q.  Okay.  Is this your most current

7   curriculum vitae?

8        A.  No.

9        Q.  What information do you need to tell me

10  about that's not on Exhibit 133 that would make it

11  current?

12       A.  Additional publications, some additional

13  keynote talks, those things -- things that have

14  happened from when I submitted this CV till the

15  present.

16       Q.  I see.  And approximately how many talks,

17  papers, what have you, are not included here?

18       A.  A couple talks and a handful of papers.

19       Q.  Putting those aside is there anything you

20  have done educationally or professionally since

21  graduating college that is not described in your

22  CV, Exhibit 133?

23            MR. GRUNBERG:  Objection, form.

24       A.  Yeah, I graduated college in 1985, so

25  it's a lot of stuff.  But -- so there are details,

EXHIBIT 1
PAGE 49

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    of course, that are not in here, but I've touched
 2    on all the highlights.
 3    BY MR. SCHWARTZ:
 4         Q.   Okay.  Your degrees -- you have three
 5    degrees in computer science; is that right?
 6         A.   That is right.
 7         Q.   And you also have a Master's Degree in
 8    international relations, correct?
 9         A.   Correct.
10         Q.   And are you bringing to bear in this case
11    any expertise or education from -- in the subject
12    of international relations?
13         A.   No.
14         Q.   Okay.  So the am I correct, then, that
15    the expertise that you bring to this case is in
16    the field of computer science?
17         A.   The broad field of computer science, yes.
18         Q.   You aren't an expert in behavioral
19    science, right?
20         A.   I don't know exactly what you mean by
21    behavioral science.  But my degrees are in
22    computer science.
23         Q.   Do you have any degrees in behavioral
24    science?
25         A.   No.
```

EXHIBIT 1
PAGE 50

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        Q.  Do you have any degrees or expertise in
 2   psychology?
 3        A.  I do not have any degrees in psychology.
 4        Q.  Do you hold yourself out as an expert in
 5   psychology?
 6        A.  No, I do not.
 7        Q.  Do you have any degrees in the English
 8   language -- in English language or usage?
 9            MR. GRUNBERG:  Objection, form.
10        A.  I do not have any degrees in the use of
11   English language, no.
12   BY MR. SCHWARTZ:
13        Q.  Do you hold yourself out as an expert in
14   English language or usage?
15        A.  No, I don't.
16        Q.  Do you have any degrees in journalism?
17        A.  No.
18        Q.  Do you hold yourself out as an expert in
19   the field of journalism?
20        A.  I do a lot of work with journalists, so
21   there are aspects of my job that intersect or
22   overlap with journalism.  But my focus is
23   primarily on web analytics and dissemination, user
24   traffic, those type of -- that aspect of on-line
25   journalism.
```

EXHIBIT 1
PAGE 51

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  Do you hold yourself out as having any

2   expertise in any other aspect of journalism

3   besides what you just described?

4        A.  I have no degrees in journalism.  So the

5   application of my knowledge of computer science

6   and web analytics in the domain of journalism.

7        Q.  Okay.  Do you have any expertise in the

8   field of writing newspaper or -- newspaper

9   articles or magazine articles?

10       A.  Do I have any degrees?

11       Q.  Do you have any expertise?

12       A.  Other than my high school newspaper, no,

13  I don't.

14       Q.  Okay.  Is there any aspect of your work

15  on your high school newspaper that you're bringing

16  to bear in the opinions you're expressing in this

17  case?

18       A.  Not that I can see, no.

19       Q.  Have you ever worked as a journalist for

20  any -- let me withdraw the question and asked it

21  cleanly.  Have you ever worked as a journalist?

22       A.  No, I have not.

23       Q.  Have you ever testified as an expert on

24  journalism in a case?

25       A.  Other than how it applies to web traffic,

EXHIBIT 1
PAGE 52

BERNARD J.JANSEN, PHD

November 04, 2019

1    no, I have not.

2        Q.   So, in other words, to the extent

3    journalism or the field of journalism has touched

4    on any of your work, it hasn't been with regard to

5    whether a particular article is well written, not

6    well written, what its subject matter is.

7    Instead, your expertise has been what was the web

8    traffic to a particular piece of journalism.  Is

9    that what you're saying?

10       A.   Well, your question was kind of compound

11   there.  So the aspect of whether an article is

12   written to some journalistic standard, you know,

13   that's not my domain of expertise.  In terms of

14   topical classification of articles and journalist

15   particular articles, then yes, I've done that as

16   part of my computer science application.

17       Q.   And what do you mean by topical

18   classification of articles?

19       A.   Well, one of the research products I do

20   is to use web analytics to generate personas that

21   represent customer segments for different

22   organizations.  One of those organizations are

23   several -- or some of those organizations are news

24   channels.  So we use an algorithmic approach to

25   take news articles, automatically topically

EXHIBIT 1
PAGE 53

BERNARD J.JANSEN, PHD

November 04, 2019

1    classify them, and then present them in these

2    personas so journalists and social media managers

3    will know what their consumers are interested in.

4         Q.  You said you -- are you the person who

5    developed the algorithm for making those topical

6    classifications?

7         A.  It's based on prior work, and then we

8    modify it for our particular domain of on-line

9    article classification.  I did not develop the

10   algorithms.

11        Q.  Who did?

12        A.  We use several.  One is an algorithm

13   called LDA.  I can't remember the author off the

14   top -- the researcher off the top of my head.  But

15   it's well known algorithm for topical

16   classification, widely used today.  We've modified

17   it slightly to work with social media content.

18            Then there's -- you know, we use

19   structural machine learning -- excuse me,

20   supervised machine learning.  Again, I did not

21   develop that algorithm.  Several researchers have

22   contributed that algorithmic development.  My

23   research has applied, I apply research.  I take

24   theoretical things that other people have done,

25   modify them for a particular domain.

EXHIBIT 1
PAGE 54

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        Q.   Did you use either of those tools in this
 2   case?
 3        A.   No.
 4        Q.   And by tools, I mean the algorithms,
 5   software applications or other means of using any
 6   of the topical classification algorithms or other
 7   systems you were describing in your prior
 8   testimony.  You didn't use those in your work in
 9   this case, did you?
10        A.   No, I did not.
11        Q.   Okay.  You understand the jury in this
12   case may look at your curriculum vitae in deciding
13   whether you really are an expert in the areas of
14   your testimony?
15             MR. GRUNBERG:  Objection, form.
16        A.   I don't know.
17   BY MR. SCHWARTZ:
18        Q.   Do you know that the jury may look at
19   your curriculum vitae in deciding whether you're
20   credible and how much weight to give your
21   testimony?
22        A.   I don't know.
23        Q.   Okay.  You wouldn't want there to be
24   anything in your curriculum vitae that could
25   mislead the jury about you in any way, would you?
```

EXHIBIT 1
PAGE 55

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1               MR. GRUNBERG:  Objection, form.
 2          A.  I don't know what -- I don't know what
 3     you mean.
 4     BY MR. SCHWARTZ:
 5          Q.  Well, you've listed all kinds of
 6     educational or professional papers, other things
 7     you've done.  You wouldn't want the jury to get an
 8     impression from that that -- you wouldn't want to
 9     mislead the jury about any of the information that
10     you've put in your curriculum vitae, would you?
11               MR. GRUNBERG:  Objection, form.
12          A.  I don't even understand the gist of the
13     question.  This is my vitae that I use for -- to
14     represent my professional life, so it is what it
15     is.
16     BY MR. SCHWARTZ:
17          Q.  And is it completely accurate?
18          A.  As accurate as I can make it, as accurate
19     as I know it is.  Yeah, yes.
20     BY MR. SCHWARTZ:
21          Q.  Your resume or your curriculum vitae
22     doesn't exaggerate anything about you, does it?
23          A.  As far as I know it does not.
24          Q.  Okay.
25               MR. SCHWARTZ:  We've been going for about
```

EXHIBIT 1
PAGE 56

BERNARD J. JANSEN, PHD

November 04, 2019

```
1    an hour.  Why don't we go off the record and take
2    a break.
3              THE VIDEOGRAPHER:  We're going off the
4    record.  The time is now 11:00 a.m.
5              (Recess)
6              THE VIDEOGRAPHER:  We are back on the
7    record.  The time is now 11:10 a.m.
8    BY MR. SCHWARTZ:
9         Q.  Mr. Jansen, could you pull Exhibit 134
10   out, this is Appendix B, testimony in the last
11   four years.
12        A.  Yes.
13        Q.  And -- you let me know when you have it.
14        A.  Okay.  What -- oh, this one?
15        Q.  I don't know.  It's Exhibit 134.  It's
16   Appendix B.
17             MR. GRUNBERG:  This one, testimony --
18             MR. SCHWARTZ:  It might be in this pile.
19   It looks like this, two pages (indicating.)
20             MR. GRUNBERG:  Here, you can look at mine
21   for now.  I've marked it 134 with my handwriting.
22   But we'll take it up --
23             THE WITNESS:  Oh, wait, this may be it.
24   Here it is.
25   BY MR. SCHWARTZ:
```

EXHIBIT 1
PAGE 57

BERNARD J.JANSEN, PHD

November 04, 2019

1          Q.   All right.  Mr. Jansen, do you have

2     Appendix B, Exhibit 134 in front of you?

3          A.   Yes.

4          Q.   Looking at the column deliverables, some

5     of them -- some of the cells, if you will, or the

6     rows for that, say, deposition, report, research,

7     others use the word testimony.  If you wrote

8     testimony does that mean you showed up at a trial

9     or a hearing?

10         A.   I use testimony for trial or arbitration.

11         Q.   The work that you did in the cases that's

12    reflected on Exhibit 134, did any of that involve

13    attempting to quantify the dissemination of some

14    information over the internet?

15         A.   Yes.

16         Q.   Okay.  Can you tell me which of those

17    cases did.

18         A.   Yes.

19         Q.   Okay.  Touché.

20              MR. GRUNBERG:  He's good.

21         A.   I'll just do the cases here.  The one

22    originally styled Jeffrey Epstein, then down to

23    line 3, Jane Doe versus Transocean Offshore

24    Drilling, then line 4, Virginia Giuffre and

25    Maxwell, and then the last one, Andrews v.

EXHIBIT 1
PAGE 58

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    Marriott.
 2    BY MR. SCHWARTZ:
 3         Q.   And in the four cases on Exhibit 134 in
 4    which your work involved quantifying the
 5    dissemination of information, did you use
 6    SimilarWeb -- information from SimilarWeb
 7    regarding the number of daily unique visitors to
 8    websites?
 9         A.   In some of the cases, yes.
10         Q.   Which ones?
11         A.   The Jeffrey Epstein case, the Virginia
12    Giuffre case.  Those two cases.
13         Q.   In the Jane Doe v. Transocean case, where
14    did you get your numbers for website traffic, if
15    not from SimilarWeb?
16         A.   That particular case did not require me
17    to use SimilarWeb, but it did involve the
18    dissemination of information or potential
19    dissemination of information, but I did not need
20    to come up with a quantifiable number in that
21    particular case.  I just needed to quantify the
22    risk of if something got out.
23         Q.   Okay.  And then the Andrews v. Westin
24    Hotel Partners, et al, case, you said you did not
25    use -- did that case -- start again.  In that case
```

EXHIBIT 1
PAGE 59

BERNARD J.JANSEN, PHD

November 04, 2019

1  were you asked to opine on the number of persons

2  who -- or the number of visitors to any websites?

3      A.  In -- yes, I did.  But it was not the

4  entire opinion that I offered.

5      Q.  Okay.  In order to calculate the number

6  of potential visitors to websites, if you didn't

7  use SimilarWeb how did you come up with that

8  information?

9      A.  The main gist of that particular case was

10  looking at a video, she had been -- it sounds like

11  you're familiar with the case.  But there was

12  some -- my approach in that is I also outlined

13  where my number was conservative, and so there

14  were a variety of pornographic websites that I was

15  able to get traffic data from that I did not need

16  SimilarWeb for because they self-reported it.

17      Q.  Got it.  Okay.  Thank you.  Have you ever

18  been retained in a case in which you prepared a

19  report but were not called on to testify at the

20  trial or hearing in which a trial or hearing

21  occurred, of course?

22      A.  If I understand the question correct, no.

23      Q.  Just so -- my phrase might have been bad.

24          MR. GRUNBERG:  By the way, objection.

25  Just to help you clean it up, there could have

EXHIBIT 1
PAGE 60

1   been a hearing on something that had nothing to do

2   with him.

3           MR. SCHWARTZ:  Yes.  All right.  So

4   that's why I'm going to clean this up.

5   BY MR. SCHWARTZ:

6       Q.  So when you said before that the word

7   testimony appears on Exhibit 134 to indicate where

8   you testified at a trial or an arbitration, I

9   think, at least I understood from that, that you

10  understand that when an arbitration matter is

11  finally called to what people think of as a trial,

12  they actually call it a hearing.  Is that what you

13  meant?

14      A.  I did not know that, no.

15      Q.  Okay.

16      A.  I did not take the question like that.

17      Q.  Then let's just move on.

18          Have you done any work for the law firm

19  or law firms that have hired you for

20  Mr. Unsworth's case?  In other words, is this the

21  first time you've done any work for the Lin Wood

22  Law Firm?

23      A.  Yes.

24      Q.  Have you performed any expert work for

25  the Quinn Emanuel law firm?

EXHIBIT 1
PAGE 61

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1      A.   Yes.
 2      Q.   Are you still engaged to perform any work
 3  for the Quinn Emanuel law firm?
 4      A.   No.
 5      Q.   When did your last engagement end for any
 6  lawyer at the Quinn Emanuel law firm?
 7      A.   I would have to check the exact date, but
 8  it's five years, just kind of ballparking it.  I
 9  can't remember.
10      Q.   When was the last time you were retained
11  by anyone from the Quinn Emanuel law firm?
12      A.   The -- I was retained -- let me back up
13  there.  I was retained for a case but nothing has
14  happened.  I was retained last year, but it's kind
15  of on hold, so I have no interaction with the
16  lawyer.
17      Q.   What makes you say that the matter is on
18  hold?
19      A.   Yeah, when you said Quinn Emanuel I just
20  thought the one case I had done.  But when I lad
21  talked to the lawyer, it's a patent infringement
22  case and he said they're kind of -- they're
23  working out what the different experts are going
24  to do.  It's a whole body of patent cases, and so
25  I've been retained but have not performed any
```

EXHIBIT 1
PAGE 62

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1   work.
 2        Q.   I see.   Let's mark the next exhibit.
 3             (Defendant's Exhibit 143 marked)
 4   BY MR. SCHWARTZ:
 5        Q.   So, Mr. Jansen, Exhibit 143 appears to be
 6   a November 19th, 2018 engagement letter between
 7   you and an attorney at the Quinn Emanuel law firm
 8   for a lawsuit titled BlackBerry Limited et al. v
 9   Facebook; is that correct?
10        A.   Yes.
11             MR. GRUNBERG:   You guys do a good job of
12   finding good experts.
13             (Defendant's Exhibit 144 marked)
14   BY MR. SCHWARTZ:
15        Q.   And Mr. Jansen, Exhibit 144, that's a
16   true and correct copy of an engagement letter
17   between you and an attorney at Quinn Emanuel in a
18   case titled BlackBerry v Snap, right?
19        A.   Yes.
20        Q.   And these are patent infringement
21   lawsuits, that is to say the two cases reflected
22   on Exhibit 143 and 144?
23        A.   Yeah, they're patent -- I kind of viewed
24   them as the same cases, from my side.   But yeah,
25   the -- yes.
```

EXHIBIT 1
PAGE 63

BERNARD J.JANSEN, PHD

November 04, 2019

1      Q.   Okay.

2      A.   I don't know exactly what the question

3  is, but . . .

4      Q.   I'm sorry, you don't --

5      A.   I kind of lost the question, I'm sorry.

6      Q.   So the question was both the lawsuits

7  that are -- each of the lawsuits that are -- let

8  me start again.

9           Is it correct that each of the lawsuits

10  for which the Quinn Emanuel law firm has hired you

11  reflected in Exhibits 143 and 144 are patent

12  infringement lawsuits?

13      A.   Yes, from my conversation with the

14  lawyer, they're patent infringement cases.

15      Q.   And if you turn to page 3 of Exhibit 143,

16  let's look at the paragraph that starts, We have

17  informed you.  And I'll just read aloud the third

18  sentence.  It says, quote, While engaged on this

19  matter for BlackBerry, you agree to refrain from

20  serving as an adverse expert or consultant or

21  otherwise assisting with an engagement adverse to

22  BlackBerry or Quinn Emanuel Urquhart & Sullivan,

23  LLP.

24           Do you see that?

25      A.   Yes.

EXHIBIT 1
PAGE 64

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  And the same sentence appears in Exhibit

2    144, correct?

3        A.  Yes, it does.

4        Q.  At any point between the dates of

5    engagement on these two exhibits, Exhibits 144 --

6    143 and 144, did you terminate your engagement by

7    the Quinn Emanuel law firm?

8        A.  I did not.  I -- actually, to be honest,

9    I haven't really done anything in this case so I

10   didn't even realize that it was -- yeah.  I did

11   not terminate.

12       Q.  To your knowledge did anyone at Quinn

13   Emanuel law firm or its client terminate your

14   engagement?

15       A.  No.

16       Q.  So as far as you know, these engagements

17   are still in effect, correct?  These engagements,

18   Exhibit 143 and 144?

19       A.  They have not been terminated as far as I

20   know.

21       Q.  And therefore to your knowledge they're

22   still in effect as of today.

23       A.  Yes.

24       Q.  Do you realize as you sit here now, you

25   have, in fact, taken on engagements that are

EXHIBIT 1
PAGE 65

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   adverse, as those terms are used in this -- these
 2   engagement letters?
 3        A.  I don't know if I would take it like
 4   that.  But nothing has happened on these
 5   particular cases.  They're not even top on my mind
 6   that I'm still engaged.
 7        Q.  Well, did you understand when you signed
 8   your engagement letters in Exhibits 143 and 144
 9   that while those engagements were underway that
10   you would not work on matters where Quinn Emanuel
11   represented the adverse party; that is to say,
12   that's what was meant by -- that you would refrain
13   from serving as an expert, adverse expert or
14   consultant or otherwise assisting with an
15   engagement adverse to Quinn Emanuel?
16            MR. GRUNBERG:  Objection to the extent be
17   it calls for the witness to make a legal
18   conclusion.
19            MR. SCHWARTZ:  I'm only asking for your
20   understanding.
21        A.  Well, I -- when I have dealt with this
22   particular type of thing before, the understanding
23   is that as long as it's not in the same area,
24   involves the same clients, then, you know, there
25   is no conflict.
```

EXHIBIT 1
PAGE 66

```
 1   BY MR. SCHWARTZ:

 2        Q.   At any time before today did you discuss

 3   that with anyone at the Quinn Emanuel law firm?

 4        A.   No, I did not.

 5        Q.   Have you disclosed to lawyers for

 6   Mr. Unsworth that you have signed the engagement

 7   letters for the two cases that are reflected in

 8   Exhibits 143 and 144?

 9        A.   I don't believe so.

10        Q.   Have you told Mr. Unsworth's lawyers

11   before today that those engagement letters contain

12   provisions in which you agreed to during those

13   engagements, quote, refrain from serving as an

14   adverse expert or consultant or otherwise

15   assisting an engagement adverse to Quinn Emanuel?

16        A.   As I said, that would not be my even

17   understanding of the statement, but no, I did not.

18        Q.   Who chose what methods you used to do the

19   research and other work contained in your report?

20        A.   Well, I implemented the methods and chose

21   the methods based on what I was asked to do.

22        Q.   Okay.  When you're working on a case and

23   doing the kind of work you did in this case do you

24   normally take notes or create a lab book or create

25   any other record of your work as you go forward?
```

EXHIBIT 1
PAGE 67

BERNARD J.JANSEN, PHD

November 04, 2019

1          A.   The -- I typically take screen shots of

2     my -- whatever documentation, and then typically

3     for something like this I keep spreadsheets of

4     calculations and work as I progress through the

5     assignment.

6          Q.   What about notes, whether they're written

7     or typed in?  Do you create any notes when you

8     work on an engagement of the type that this case

9     involved?

10         A.   No, I don't.

11         Q.   And the spreadsheets, that's to assist

12    you -- those spreadsheets and those screen shots,

13    those reflect the facts you've learned, the

14    information you take -- and the information you

15    take into account in reaching your opinions?

16         A.   I'm sorry, could you repeat the question?

17         Q.   I'll ask it again.  It wasn't a great

18    question.  I withdraw that.

19              You said that you typically take screen

20    shots of my whatever documentation, and then

21    typically for something like this I keep

22    spreadsheets of the calculations and work as I

23    progress through the assignment.

24              And I just want to follow up and say, Is

25    that for the purpose of memorializing or gathering

EXHIBIT 1
PAGE 68

```
 1   the facts you've learned so that you can then take
 2   that information into account when you reach your
 3   opinions that you put into your report?
 4        A.  I don't think it's exactly that.  I use
 5   the spreadsheet because it's an intermediate step
 6   for the generation of my report where I can do the
 7   calculations, because the document itself is not a
 8   place to do the calculations I need to do.
 9        Q.  When you say the document itself, you
10   mean your report itself is not the place where you
11   do the calculations you need to do to come up with
12   the information or the opinions in the report.  Is
13   that what you're saying?
14        A.  Well, it's not exactly that.  It is -- I
15   use a spreadsheet to generate the tables that are
16   then placed in the report to -- because that's my
17   end product.
18        Q.  Okay.  In connection with your work in
19   this case did you take any screen shots?
20        A.  Yes.
21        Q.  Did you create any spreadsheets?
22        A.  Yes.
23        Q.  Did you take any notes or do anything
24   else to assist you in preparing your report other
25   than the screen shots or the spreadsheets?
```

EXHIBIT 1
PAGE 69

BERNARD J.JANSEN, PHD

November 04, 2019

1          A.   The -- like I said, I don't take notes.
2    The -- the screen shots, the spreadsheets, you
3    know, there are certainly communications with the
4    lawyer and things like that that -- in terms of
5    what my assignment is.  But those would be the
6    main documents that I can recall.
7          Q.   Okay.  Did any of your -- by the way, the
8    communications with lawyers, were those done
9    through email?
10         A.   Email.
11         Q.   And is there anything in your report that
12   draws upon or is based upon any information
13   that -- or communications that you exchanged with
14   the lawyers in this case?
15         A.   In terms of all communications?  Because
16   my initial assignment, of course, was a
17   communication from the lawyers, the dissemination
18   of the defaming statements.
19         Q.   Right.  My question was a little
20   different.  What I was asking is whether there is
21   anything in your report that draws upon or is
22   based upon any communications you exchanged with
23   the lawyers in this case.
24         A.   Could you give an example?  In terms of
25   like findings, or what do you mean?

EXHIBIT 1
PAGE 70

BERNARD J.JANSEN, PHD

November 04, 2019

1     Q.  It could be, for example.  Maybe you had

2  an email exchanged with the lawyers in this case

3  where you said, This is how I'm defining a

4  defaming statement, or, This is how I'm deciding

5  whether a story primarily concerns the litigation,

6  or, This is my initial cut at the number of

7  websites where information that I found was

8  hosted, or anything like that.

9     A.  No, nothing like that.

10     Q.  Okay.  Even if it wasn't like that, is

11  there any instance where you had any

12  communications with the lawyers in this case where

13  they provided information to you that you took

14  into account in your report?

15     A.  Not that I can recall.

16     Q.  Okay.  You said earlier that you created

17  screen shots during the course of your work on

18  your report in this case.  Is that right?

19     A.  That is correct.

20     Q.  And what are those screen shots of?

21     A.  The screen shots are primarily of the

22  articles and then my original pass on the traffic

23  reports.

24     Q.  When you say pass on the traffic reports,

25  what do you mean by that?

EXHIBIT 1
PAGE 71

BERNARD J.JANSEN, PHD

November 04, 2019

1          A.   What I mean by that is that SimilarWeb

2     has a free version and a paid version.  I first

3     calculated them on the free version, and then

4     got -- paid for access to the API to reach the

5     traffic calculations.

6          Q.   Do the screen shots that you created in

7     the course of your work in this case include

8     anything other than screen shots of articles and

9     screen shots of traffic reports?

10         A.   I also included the on-line references

11    that I referenced in my report.  Those are the

12    only ones I can recall at this time.

13         Q.   Do these screen shots still exist

14    somewhere?

15         A.   I provided all of them.

16         Q.   To whom?

17         A.   To Jonathan prior to this deposition.

18         Q.   To counsel for Mr. Unsworth.

19         A.   Yes, to counsel, yes.

20         Q.   Was that for purposes of responding to

21    our request that you provide documents that you --

22    the various categories of documents that we

23    requested that you produce, was that part of that

24    process?

25         A.   Yes.

EXHIBIT 1
PAGE 72

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.   The spreadsheets that you said you

2   created during your course of this work, what were

3   those spreadsheets of?

4        A.   The spreadsheets were the links to all

5   the articles, the title of the article, the date

6   that the article was published, the domain the

7   article was published on, also the traffic

8   numbers, the tables that were placed in the

9   report.  Without looking at the spreadsheets,

10  those are the ones that I can recall.

11       Q.   Okay.  And have you provided either

12  native or printout versions of those spreadsheets

13  to Mr. Unsworth's counsel to provide to us?

14       A.   Yes.

15            MR. GRUNBERG:  Bobby, you're aware that

16  you guys have received that stuff.

17            MR. SCHWARTZ:  Yes.

18            MR. GRUNBERG:  Just to be clear.

19            MR. SCHWARTZ:  Yes.  I'm starting at the

20  root and bringing it forward in time.

21            MR. GRUNBERG:  Okay.

22            MR. SCHWARTZ:  Thank you.

23  BY MR. SCHWARTZ:

24       Q.   Now, by the way, going back earlier to

25  the engagement letters between you and lawyers at

EXHIBIT 1
PAGE 73

```
 1    the Quinn Emanuel law firm for the patent cases,
 2    do you have an understanding as you sit here today
 3    as to the scope of expertise you're being asked to
 4    provide in those cases?  Or the nature, the type
 5    of expertise?
 6         A.  It's been so long, I can't remember the
 7    exact conversation, but I would have to go back
 8    and refresh that.
 9         Q.  Okay.  Those are patent infringement
10    cases, right?
11         A.  That is correct.
12         Q.  Do you know whether the expertise you're
13    being asked to provide concerns web traffic
14    analytics, as opposed to something else?
15         A.  Again, the conversations happened so long
16    ago, I can't remember the discussion about the
17    patents.  I can't answer that question right now.
18         Q.  Okay.  Now, in the course of your work in
19    this case did you run searches on the Google
20    search engine?
21         A.  Yes.
22         Q.  Approximately how many?
23         A.  Five, five to ten, five to a dozen.  I
24    can't remember exactly.
25         Q.  Did you use any other search engines
```

EXHIBIT 1
PAGE 74

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   besides Google for your work in this case?
 2        A.   No, I believe I only used Google.
 3        Q.   And the Google searches that you ran,
 4   those were to search for articles that contained
 5   information about Mr. Musk or Mr. Unsworth or both
 6   of them; is that correct?
 7        A.   No.
 8        Q.   What were the Google searches run?
 9        A.   The Google searches were aimed at
10   articles that contained one or more of the
11   defaming statements.
12        Q.   Did you save the Google searches that you
13   ran in order to locate the defaming statements in
14   this case?
15        A.   I have the starting -- I believe the
16   starting queries are in my spreadsheet, and then
17   those were -- the starting query is in there.  Of
18   course, there were some modifications, but those
19   were the primary queries.  I primarily started
20   with the defaming statements themselves that were
21   made and then used those as the starting point.
22        Q.   Okay.  But by starting query, you mean
23   the words you typed in at the search entry line on
24   the Google website.
25        A.   Yes, I entered the defaming statements
```

EXHIBIT 1
PAGE 75

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    into the search box on Google.
2         Q.  And I didn't mean to confine that to
3    searches you ran solely using the defaming
4    statements.  I'm saying whatever searches you ran
5    for your work in this case, when you said the
6    starting query, you meant the actual words you
7    used to tell Google what to look for.
8         A.  Yes, the original starting query that
9    I -- yes.
10        Q.  I'm sorry.  And as I understand your
11   testimony, you retained a list in some way of the
12   starting queries that you've used in this case; is
13   that right?
14        A.  Yes, I believe -- without looking at the
15   spreadsheet, I believe it's on one of the sheets
16   in the spreadsheet of the queries I used.
17             MR. GRUNBERG:  Do you have the
18   spreadsheet?  That might help this along.
19        A.  They're based -- sorry.
20             MR. GRUNBERG:  Do you have the
21   spreadsheets?  Because that might help him.
22             MR. SCHWARTZ:  I may, but I'm going to
23   follow up and ask you a slightly different
24   question.
25   BY MR. SCHWARTZ:
```

EXHIBIT 1
PAGE 76

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.   When Google returned those search

2    results -- by the way, let me start all over

3    again.   You ran these searches on Google using a

4    computer that you owned; is that correct?

5        A.   That's correct.

6        Q.   Is this a computer that you used like a

7    laptop that you take with you where you go or some

8    computer or work station at one of the schools you

9    teach at?

10       A.   It's my laptop.

11       Q.   Your laptop, okay.   So you own a

12   computer, it has a web browser, the web browser is

13   connected to the internet, right?

14       A.   Yes.

15       Q.   Okay.   And you, for your work in this

16   case, navigated to google.com or some other Google

17   website to conduct searches?

18       A.   Yes, I used Google, yes.

19       Q.   And then you entered five to ten, maybe

20   even five to twelve different queries and

21   generated search results; is that correct?

22       A.   Yes, that is correct.

23       Q.   Okay.   My question in terms of what you

24   retained is not whether you retained a record of

25   the queries you used.   My question is whether you

EXHIBIT 1
PAGE 77

BERNARD J. JANSEN, PHD

November 04, 2019

1    retained the search results themselves.  Did you

2    do that?

3        A.   Oh, the search results themselves, no, I

4    did not retain the search results themselves, if

5    you mean the search list.

6        Q.   That's what I mean.  In other words, when

7    Google came back to you with its results of each

8    of the five to twelve searches or however many you

9    ran in the case, you do not have a record, you did

10   not retain a record, of what those search results

11   were, what the list of links that Google gave you

12   was.

13            MR. GRUNBERG:  Objection to form.

14   Misstates prior testimony.

15       A.   The -- I did not keep the search results.

16   I only kept the article itself that would have

17   pertained to the article I was looking for.

18   BY MR. SCHWARTZ:

19       Q.   In other words, once you went through the

20   process of looking at articles that Google

21   returned the links to you for, you kept copies of

22   the articles that became -- that ended up on your

23   list of articles in Appendix D, right?

24       A.   Yes, the articles and the links, yes.

25       Q.   Right.  But you did not retain links or

EXHIBIT 1
PAGE 78

```
 1    electronic or hard copies of articles that the
 2    Google search returned to you that are not on your
 3    list in Appendix D; is that right?
 4         A.  No.
 5         Q.  That's not right.  You did retain those.
 6         A.  I did not retain -- I did not retain the
 7    search results list, and I did not -- if the
 8    article did not contain the defaming statements, I
 9    did not retain the article.
10         Q.  Okay.  So, in other words -- well,
11    approximately how many articles did Google return
12    to you in the search results lists for however
13    many queries you ran on Google looking for the
14    articles you wanted to find in your work in this
15    case?
16         A.  I didn't keep count.  I don't know.
17         Q.  Certainly we know it's more than the
18    final number of articles on Appendix D, correct?
19    That necessarily --
20         A.  Yes, that's fair.  Yeah, that's fair.
21    Because sometimes if, like I said, so many
22    pertains -- as I said in my report, it still may
23    pertain to the case itself or the incident but not
24    contain the defaming statements, so then I didn't
25    include it.
```

EXHIBIT 1
PAGE 79

BERNARD J. JANSEN, PHD

1          Q.   So, in other words, if you were to fire

2     up your laptop or go take us back to your --

3     wherever you conduct your research or your work in

4     this case, you have no way of telling us what

5     articles Google located for you in response to the

6     search terms other than the articles that are on

7     your list in Appendix D.

8               MR. GRUNBERG:   Objection, form.

9          A.   Well, I don't know exactly why I would do

10    that, but I mean certainly Google allows you to do

11    temporal type of analysis where you can set limits

12    on the results.   But I was not investigating, you

13    know, the Google search engine performance.   I was

14    locating the dissemination of articles containing

15    these defaming statements.

16         Q.   I understand that.   But you made a

17    selection of articles to include from those search

18    results and articles not to include.

19         A.   Yeah, based on whether they contain the

20    defaming statements or not.

21         Q.   Right.   And I'm not focusing on your

22    analysis of whether they did or didn't contain the

23    defaming statements.   However you arrived at it,

24    you made a choice to include some of the articles

25    that Google returned in the search -- in response

EXHIBIT 1
PAGE 80

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   to the searches you ran and not include some of
 2   them.
 3        A.   Well, yes, in terms of -- I don't know if
 4   I'd actually call it a choice, but I had this
 5   criteria, did they contain the defamatory
 6   statements or not.  If the answer was yes, I
 7   retained them.
 8        Q.   That wasn't the only criteria.  You also
 9   said in your report that if the article primarily
10   concerned the lawsuit you excluded it, right?
11        A.   If -- I did not include those in the
12   count, but I included some of the case articles in
13   one of the appendices.  But I did not include the
14   case articles specifically.
15        Q.   Right.  So I'm going to come back to that
16   in a minute just to understand what your criteria
17   were.  But right now I'm just trying to understand
18   what record exists of your work with Google at
19   that stage of this case, and so what I'm
20   understanding from you is the record that exists
21   is your spreadsheet that shows the links to the
22   articles that made it onto your list, the 605
23   articles; is that right?
24             MR. GRUNBERG:  Objection, form.
25        A.   Well, those are the articles that contain
```

EXHIBIT 1
PAGE 81

1   the defaming statements.  And if you're asking

2   whether I retained the search results listing, no,

3   I did not retain those.

4        Q.  Right.  So if somebody wanted to go back

5   and look at things to get a sense of how many

6   articles, for example, Google returned from the

7   various searches you ran, what the total number

8   was and compare that to the number of articles on

9   your exhibit Appendix D, at this point you can't

10  tell me what those numbers are, can you?

11           MR. GRUNBERG:  Objection, form.

12       A.  I don't want to say it can't be done.  I

13  didn't keep the numbers, so I can't provide the

14  numbers.

15  BY MR. SCHWARTZ:

16       Q.  Okay.  You can't give me an estimate of

17  what that number is, can you?  In other words, how

18  many articles, links, Google returned to you when

19  you ran the searches you ran in your work in this

20  case.

21           MR. GRUNBERG:  Objection, form.

22       A.  As I said, I didn't keep a count, so I

23  don't have that number.

24  BY MR. SCHWARTZ:

25       Q.  Now, in doing your work in this case are

EXHIBIT 1
PAGE 82

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    you required to follow any rules or standards

2    issued by any academic or professional

3    organizations?

4            MR. GRUNBERG:  One second.  Objection,

5    form.

6        A.  Well, as I explained in my report, there

7    are industry standard methodologies.  I don't know

8    if there are particular rules to -- for this,

9    exactly what I'm doing.

10   BY MR. SCHWARTZ:

11       Q.  Which industry standards or standard

12   methodologies did you follow in your work in this

13   case?

14       A.  The -- in terms of methodological

15   approaches, one is the employment of a traffic

16   service, SimilarWeb.  I then clearly defined what

17   I was looking for in terms of unique daily

18   visitors.  I tried to limit the particular time

19   period to the -- to a given period.  There are

20   certainly standard procedures for identifying the

21   domain, identifying duplicate articles, whether

22   the articles contain the defaming statements or

23   not.

24               As I outline in the report, whether the

25   article contained the defaming statements or not
```

EXHIBIT 1
PAGE 83

BERNARD J.JANSEN, PHD

November 04, 2019

1    was rather straightforward.  Same way whether

2    the -- a website contained a particular article or

3    not.  And then using -- estimating web traffic

4    services, using tools like SimilarWeb again is an

5    industry standard approach for doing something

6    like this.

7         Q.  Okay.  How do you know that?  Did you

8    consult with any treatises, guide books, websites

9    to tell you that the process that you were using

10   here was consistent with industry standards or

11   methodologies?

12        A.  This is my area.  This is what I do.  I

13   do web analytics, I do searches and optimization.

14   This is my area.

15        Q.  I understand it's your area.  My question

16   was different, though.  Did you consult with any

17   guide books, treatises, websites or articles to

18   confirm that the methodologies you were using in

19   this case were consistent with those industry

20   standards and methodologies?

21        A.  The -- other than, you know, the approach

22   for using -- other than the approach of using the

23   websites I outline in my report and the definition

24   also, you know, there was no need to consult guide

25   books.  I mean, this is an approach, this is --

EXHIBIT 1
PAGE 84

1    this is what I do.

2         Q.   I understand it's what you do, but let me

3    give you an example.  Is there some recognized

4    standard or methodology in your industry that

5    endorses the use of SimilarWeb for web traffic

6    counts, head counts, visitor accounts?

7         A.   Well, it's a de facto industry standard

8    that to get competitive analysis, and to

9    understand web traffic to other sites that you

10   don't own, you know, you have to use some type of

11   web traffic service.

12        Q.   Right.  My question is more specific.  Is

13   SimilarWeb recognized as an acceptable and

14   approved source for web traffic in your field?

15        A.   Yes.  I think SimilarWeb's the --

16   probably the best web traffic estimation service

17   out there.  I've used it extensively.  I

18   understand the general layout of the methodology

19   that it uses.  If you -- it's recognized by many

20   people as the -- giving the best traffic numbers.

21   So yes.

22        Q.   All right.  You said also one of the

23   methodologies that you used that's a standard in

24   your industry was to eliminate duplicate articles.

25   Did I hear you correctly?

EXHIBIT 1
PAGE 85

```
 1            MR. GRUNBERG:  Objection, form.
 2        A.  I don't know for sure.
 3   BY MR. SCHWARTZ:
 4        Q.  So did you do anything to ensure that the
 5   articles on your exhibit D do not contain any
 6   duplicates?
 7        A.  The process I used was to use the URL,
 8   the link to the article, and if it was the -- the
 9   link was identical, then I considered that a
10   duplicate and did not include the duplicate URLs.
11        Q.  Other than making sure that you haven't
12   used a duplicate URL, did you do anything to
13   ensure that none of your articles on Exhibit D are
14   duplicates?
15            MR. GRUNBERG:  And by the way, objection
16   to form.  You may want to be more clear about
17   that.  You understand that there's syndicated
18   articles and such, so are you talking about a
19   unique instance by giving publication of issuing
20   that article, or are you talking about an article
21   that is then syndicated to another -- to a series
22   of publications and then made available to a
23   series of additional people on additional
24   platforms?
25            MR. SCHWARTZ:  Counsel makes a very good
```

EXHIBIT 1
PAGE 86

```
 1    point, and let me adopt what he's saying.
 2    BY MR. SCHWARTZ:
 3         Q.  Did you do anything to ensure that none
 4    of the articles on your Exhibit D are copies of
 5    other articles in that they are syndicated
 6    articles, that is to say, articles that are made
 7    available in substantially the same form but not
 8    necessarily the identical form at other websites?
 9         A.  For the task I was given to look at the
10    dissemination of these particular articles, I was
11    focused on the placing of these articles on
12    websites.  So whether the content was 100 percent
13    overlap, 10 percent overlap, no overlap, as long
14    as they contained the defaming statements and had
15    a unique identifier which is the link, the URL,
16    that is a specific address for a particular
17    article.  So if the URL was different I considered
18    the article different.
19         Q.  Even if the same was -- the content was
20    100 percent the same as another article on your
21    list.
22         A.  I did not evaluate the content.
23         Q.  So the answer is yes?
24         A.  -- aspect.
25         Q.  So your answer to my question is yes.
```

```
 1    You would include it or did include it, even if
 2    the content was 100 percent the same as another
 3    article on your list.
 4         A.   If it was posted on a different website,
 5    yes.
 6         Q.   Got it.  Okay, thanks.  Okay.
 7              MR. GRUNBERG:  By the way, can we go off
 8    the record for one second?
 9              THE VIDEOGRAPHER:  Going off the record.
10    The time is now 11:51 a.m.
11              (Recess)
12              THE VIDEOGRAPHER:  We are back on the
13    record.  The time is now 11:57 a.m.
14    BY MR. SCHWARTZ:
15         Q.   Mr. Jansen, do you have Exhibit C handy?
16         A.   Yes.
17         Q.   Okay.  Does this list all of the
18    documents you considered in preparing this report
19    that aren't on Exhibit D?
20         A.   Yes, these are the references from my
21    report.
22         Q.   Are there any documents you considered
23    for your work in this case that are not on
24    Appendix C and D?
25              MR. GRUNBERG:  Objection, form.
```

EXHIBIT 1
PAGE 88

BERNARD J.JANSEN, PHD

November 04, 2019

1          A.   These are the ones I directly referenced.

2     I don't know exactly your question.  I mean, I

3     have this inherent knowledge of the web.  These

4     are the ones I referenced.

5               MR. GRUNBERG:  That's my objection.

6               MR. SCHWARTZ:  You clarified.  Okay.

7     BY MR. SCHWARTZ:

8          Q.   In doing your work in this case was there

9     any information or were there any documents you

10    wanted to see but you couldn't?

11         A.   Not that I recall.

12         Q.   All right.  So -- all right.  I'm going

13    to speed this up.  All right.  Maybe I can't.  But

14    I just want you to kind of walk me through

15    step-by-step what you did at a big picture level

16    in this case.  At some point you arrived at a list

17    of approximately 605 articles.  Those are the ones

18    that are on Appendix D, right?

19         A.   Yes, 605 articles.

20         Q.   And you believe they contained

21    information that was relevant to your opinions in

22    this case; is that right?

23         A.   Well, my criteria was that the articles

24    had to contain one or more of the defaming

25    statements.  Yes.

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.   And then once you had this list you went
2   to look to see where these articles had been made
3   available on the internet; is that right?
4        A.   That's the outcome.   What I specifically
5   did was parse out the domain, the website that the
6   article was posted on.
7        Q.   Right.   And -- never mind.
8             And then what you did is you determined
9   that those articles had been made available on a
10  total of 354 websites?
11       A.   That's correct.
12       Q.   And then you set out to determine
13  something you referred to in your report as the
14  potential daily unique visitors for each of those
15  354 websites, correct?
16       A.   That is correct.
17       Q.   And then once you got that data for each
18  of those websites, you added it up to see what
19  that number was, right?
20       A.   Generally.   I mean, I also did some other
21  things, you know.   Like if -- there were some of
22  the sites that I didn't consider the traffic
23  number reliable, so I excluded those.   There were
24  some sites where I couldn't get the traffic
25  numbers.   I excluded those in terms of the traffic

EXHIBIT 1
PAGE 90

BERNARD J.JANSEN, PHD

November 04, 2019

 1   numbers.  So then I -- the traffic numbers include
 2   the sites that -- the sites I did not exclude.
 3        Q.  Your source for the traffic numbers in
 4   your report is SimilarWeb; is that right?
 5        A.  That's correct.
 6        Q.  And so based on information you got from
 7   SimilarWeb, you added up approximately 98 million
 8   potential daily unique visitors.
 9        A.  That's correct.
10        Q.  And if I'm looking -- reading your report
11   correctly, the data that you pulled from
12   SimilarWeb was data that SimilarWeb had gathered
13   during the period May to July 2019.
14        A.  No, the traffic numbers are from
15   September 2018.
16        Q.  Let's take a look your report so maybe
17   you can clarify that for me.  It's Exhibit 132.
18   Go to page 18 -- I'm sorry, page 4, paragraph 18.
19   You say the unique visitor traffic data is
20   presented on Appendix E, correct?
21        A.  I'm sorry, what --
22        Q.  Page 4, paragraph 18.
23        A.  Okay.  Yes, I see that.
24        Q.  And so let's take a look at Appendix E
25   and turn, I think, to page 141.

EXHIBIT 1
PAGE 91

1        A.   Okay.

2        Q.   And I think there begins your complete --

3    well, actually, I don't want to put words in your

4    mouth.   What is this chart that begins on page 141

5    of Exhibit E titled SimilarWeb traffic numbers?

6        A.   Yes, this is the daily unique visitors

7    for each of the domains that I calculated from

8    traffic data from SimilarWeb.

9        Q.   If you turn to page 151, are these --

10   well, are these the 354 websites that you've

11   included in your report?

12       A.   The -- yeah, yes.

13       Q.   Okay.   So the total number -- maybe it

14   isn't -- but there's a number at the top of page

15   151 of 38,378,969.   Is that the total of the daily

16   unique visitors on these --

17       A.   No, that's a typo, yeah.   Should be 98

18   million.

19       Q.   Ah, okay.   Thank you.

20       A.   Yeah.

21       Q.   So did you use -- I'm just wondering

22   about the typo.

23       A.   No, no, it's -- yeah, that's a typo.

24       Q.   This is not -- by "this," I mean the

25   chart on pages 141 and 151, that's not something

EXHIBIT 1
PAGE 92

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    that either Word or Excel added up for you on page
 2    151?
 3         A.  Yeah, no, this is -- I don't know where
 4    the error came from, but --
 5         Q.  All right.
 6         A.  I can correct that.
 7         Q.  Okay.  And then is there something in
 8    either the main body of your report or one of the
 9    appendices that tells us that the SimilarWeb data
10    you were using for the daily unique visitors or
11    potential daily unique visitors was generated by
12    SimilarWeb for the period September 2018 as
13    opposed to some other date?
14         A.  The -- it was a -- the data was
15    originally included on my spreadsheet, and then I
16    provided the actual spreadsheet from SimilarWeb
17    yesterday, because I realized I had not provided
18    that particular spreadsheet specifically.
19         Q.  I see.  So is that something you provided
20    to counsel?
21         A.  Yes.
22         Q.  Okay.  And was that what was uploaded or
23    sent to us last night or over the weekend?
24              MR. GRUNBERG:  It is my understanding the
25    same exact thing you already have in the
```

EXHIBIT 1
PAGE 93

BERNARD J.JANSEN, PHD

November 04, 2019

 1    spreadsheet.  So the spreadsheet that you have

 2    from him contains that spreadsheet.

 3    BY MR. SCHWARTZ:

 4         Q.  So let me back up, then, for a second.

 5    What I'm looking for is is there somewhere in your

 6    report that you can direct us to that tells us

 7    that the SimilarWeb data that you relied on was

 8    data that SimilarWeb was reporting for the period

 9    of September 2018 as opposed to any other period

10    of time?

11         A.  Without going through the report I can't

12    remember -- I can't recall if I specifically

13    stated that.  But it is in the spreadsheets

14    provided.

15         Q.  All right.

16              (Defendant's Exhibit 145 marked)

17              MR. GRUNBERG:  Let's go off the record

18    for a second.

19              MR. SCHWARTZ:  Let's go off the record.

20              THE VIDEOGRAPHER:  Going off the record.

21    The time is now 12:07 p.m.

22              (Off-the-record discussion)

23              (Defendant's Exhibit 146 marked)

24              THE VIDEOGRAPHER:  We are back on the

25    record.  The time is now 12:23 p.m.

EXHIBIT 1
PAGE 94

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   BY MR. SCHWARTZ:
 2       Q.   Okay.  Mr. Jansen, when we were off the
 3   record counsel for Mr. Unsworth provided us a page
 4   that we've now marked as Exhibit 146 from -- it's
 5   a portion of one part of one of your spreadsheets.
 6   Can you explain to us what this is and what this
 7   is telling us.
 8       A.   This particular sheet, yes.  This
 9   SimilarWeb has an API, application program
10   interface, and so I used that particular
11   interface, I submitted the 354 domain websites to
12   the application interface, I set the parameters
13   here for the start month, end month, worldwide,
14   monthly unique visitors, and it returns the
15   monthly unique visitors for each of those
16   websites.  I then took that and copied and pasted
17   it into my spreadsheet to do my calculations.
18       Q.   Got it.  And did you do that for each --
19   by "that," I mean the start and end month of
20   September 2018 for each of the 354 websites you
21   queried SimilarWeb about?
22       A.   Through the API I could see them all
23   simultaneously.
24       Q.   So the answer is yes.
25       A.   I didn't do them individually.  I did
```

EXHIBIT 1
PAGE 95

BERNARD J. JANSEN, PHD

November 04, 2019

```
1   them in bulk, yes.
2        Q.   Okay.  So in bulk the query that you ran
3   on SimilarWeb of the unique daily visitors for the
4   websites you were interested in, the 354 websites,
5   you told SimilarWeb, to use that word loosely, you
6   were interested in data for September 2018?
7        A.   Yes.
8        Q.   So before that we had marked, I think, as
9   Exhibit 145 another document from your production.
10  And it's Jansen 5554 through 58.  Do you have that
11  in front of you?
12       A.   Yes.
13       Q.   What is -- this pertains to the
14  foxnews.com website, and is this -- if you look at
15  the bottom for the URL it tells us that it's
16  coming from the SimilarWeb software website,
17  right?
18       A.   That is correct.
19       Q.   And this is from your document production
20  to counsel, right?
21       A.   I believe this is my document.
22       Q.   So what is -- this says website
23  performance, it's from August 8th, 2019.  Is that
24  the date that you were using SimilarWeb for
25  information about the foxnews.com website?
```

EXHIBIT 1
PAGE 96

BERNARD J.JANSEN, PHD

November 04, 2019

```
1         A.  What date are you referring to?  I'm
2    sorry.
3         Q.  In the upper left corner it says
4    8/11/2019.
5         A.  Yes.  Well, that's the date I printed
6    this particular PDF.
7         Q.  So what is this data about foxnews.com
8    that SimilarWeb gave you?
9         A.  Yes, the -- if you -- in addition to
10   going through the application program interface
11   you can actually just query a particular domain on
12   the SimilarWeb web interface itself, and it
13   provides you this particular report.  And I
14   originally did my calculations using this
15   particular version of SimilarWeb.
16        Q.  Okay.  And so -- and then the --
17        A.  This is not reflected in my report.  This
18   was just documents that I created during the
19   process of --
20        Q.  Okay.
21        A.  -- doing my report.  And so in response
22   to your request for documents I provided
23   everything I had, and these traffic reports were
24   inside of those.
25        Q.  I see.  And so this report looks like the
```

EXHIBIT 1
PAGE 97

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    information SimilarWeb was giving you was

2    information SimilarWeb had gathered for the period

3    May to July 2019; is that right?

4        A.   That is correct.

5        Q.   But you're saying that's not -- this

6    information is not information you put into your

7    report.

8        A.   No, I went to the --

9        Q.   Okay.

10       A.   -- September 2018.

11       Q.   Got it, got it.  Thank you for the

12   clarification.

13            Now, I want to try and understand how

14   your data might reflect the 98 million potential

15   unique daily visitors.

16       A.   Yes.

17       Q.   Might take into account or not take into

18   account human behavior, if you will.  So let me

19   ask you this as a hypothetical question:  If --

20   well, put it a slightly different way.

21            When you say that 98 million -- there are

22   roughly 98 million potential daily unique visitors

23   to the websites you looked at, that doesn't mean

24   that 98 million different people looked at those

25   websites, does it?
```

EXHIBIT 1
PAGE 98

BERNARD J.JANSEN, PHD

November 04, 2019

1      A.   For -- it means for each individual
2   website, those visitors are unique for that
3   particular period.
4      Q.   Right.  But it doesn't tell us -- for
5   example, let's say one of the websites was
6   newyorktimes.com.  And during the period that
7   SimilarWeb was looking at, September 2018, they
8   counted as a -- through however their software
9   works a person as a daily unique visitor to the
10  newyorktimes.com website.  If during that same
11  period of name that SimilarWeb was looking at web
12  traffic that person went to another website that's
13  on your list --
14     A.   Uh-huh.
15     Q.   -- SimilarWeb would -- and that person
16  was counted as a daily unique visitor to that
17  website, that one person would show up, and their
18  web browsing, would show up as two unique daily
19  average users on your report, wouldn't they?
20     A.   Yeah.  That -- the daily unique visitors
21  are calculated by website, and so there could be
22  an overlap between the two, which is -- my purpose
23  of trying to be very conservative in this and
24  limit -- only doing one particular day of website
25  traffic, to try and account for that kind of stuff

EXHIBIT 1
PAGE 99

BERNARD J.JANSEN, PHD

November 04, 2019

1    that could happen.

2         Q.   Right.  So you're an expert on web

3    traffic.  People often visit more than website in

4    a given day, don't they?

5         A.   The -- there are various metrics

6    depending what people do.  On these particular

7    news sites, yeah, people have certain behavioral

8    characteristics, and it is possible, of course,

9    that they could visit two of the 300 -- multiple

10   sites that are on the list.  That can happen.

11        Q.   Right.  Some people could visit more than

12   two of the 354 websites on a given day.  They

13   could visit four, five or six.

14        A.   Yeah.  It's -- if you kind of look at the

15   stuff on how people browse news, most people are

16   kind of occasional users.  So I'd be really

17   surprised if they visited that many particular

18   websites, but it's possible.

19        Q.   Did you do anything in your work in this

20   case to eliminate from your 98 million count

21   people who visited more than one website in your

22   354 websites on a particular day?

23        A.   As far as I know there's no way to do

24   that type of overlap, so I took the approach of

25   trying to be very conservative in the whole

EXHIBIT 1
PAGE 100

BERNARD J.JANSEN, PHD

November 04, 2019

1   calculation of the number itself.

2        Q.  Well, okay, let's unpack what you just

3   said.  One, you said there's no way to do that.

4        A.  I don't know of a way to identify people

5   that go to -- multiple people that go to --

6   individuals that may have went to more than one of

7   these particular websites.

8        Q.  Or put it a slightly different way, you

9   were unable in your work in this case to eliminate

10  from your 98 million count people who visited more

11  than one of those websites on the same day, right?

12       A.  Well, not exactly, because it could be

13  zero.  There could be nobody that went to any of

14  the websites.  What I'm saying is I don't know of

15  a data collection method where you can do that to

16  identify that.

17       Q.  Right.  But here's what you've told me so

18  far.  People do often visit more than one website

19  a day.

20       A.  I said they can visit more than one

21  website a day, yes.

22       Q.  Do you have any knowledge as you sit here

23  today the extent to which people who visit

24  websites of the type you included in your 354

25  websites visit more than one of those in a day?

EXHIBIT 1
PAGE 101

BERNARD J.JANSEN, PHD

November 04, 2019

1        A.  I don't have the number as I sit here.

2        Q.  So there very well may be people who

3   visited more than one of those websites in one day

4   and SimilarWeb counted those, each visit, as a

5   separate visit in your 98 million, right?

6        A.  Based on the way you're asking it, it

7   could be zero.  But yeah, it could also -- could

8   occur.

9        Q.  It may not be zero, it could be zero, it

10  could be in the thousands or millions.  You don't

11  know it one way or the other, do you?

12       A.  I would be shocked if it's that high.

13  But it can occur.

14       Q.  Did you do anything in your work in this

15  case to ascertain how high that number could be,

16  that is to say, the double, triple or additional

17  counting of people in the SimilarWeb data you

18  relied on?

19       A.  As I said, I'd be surprised if it's

20  double or -- if it's triple or that high.  But

21  what I tried to do or what I did was to take a

22  very conservative approach because, again, I don't

23  know the way to calculate that particular overlap.

24  But I acknowledge that it can occur.

25       Q.  Well, why would you characterize what you

EXHIBIT 1
PAGE 102

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   did as conservative as opposed to aggressive if
 2   you didn't eliminate something that you suspect
 3   may have occurred and inflated your number?
 4          MR. GRUNBERG:  Objection, form.
 5      A.  As I outlined in my report, I have 15
 6   different factors where I intentionally -- or I
 7   did not include dissemination of the defaming
 8   statements, including, I'll give you one example,
 9   is that many of these websites posted multiple
10   articles, okay.  I only included one particular
11   count of the daily unique visitors.
12          Also, most of these articles are still
13   available on the web, so there could still get
14   traffic to them.  I also didn't include the folks
15   that could have seen the defaming statements via
16   just through social media.
17          So I did several approaches, you know, 15
18   of them, to ensure I came up with a very
19   conservative number.
20      Q.  When you say 15, you're referring to
21   those subparts of paragraph 22 of your report?
22      A.  That is correct.
23      Q.  But you told me you didn't undertake
24   those steps.
25          MR. GRUNBERG:  Objection, form, misstates
```

EXHIBIT 1
PAGE 103

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    prior testimony.
 2    BY MR. SCHWARTZ:
 3        Q.  So those numbers are not -- that activity
 4    is not included in your 98 million, isn't that
 5    right?
 6            MR. GRUNBERG:  Objection, form, misstates
 7    prior testimony.
 8        A.  As I said in my report, I did not
 9    include -- those are reasons that the 98 million
10    is a conservative number of the dissemination of
11    defaming statements.
12    BY MR. SCHWARTZ:
13        Q.  Okay.  Just answer my question.  You did
14    not include in your 98 million any viewers or
15    visitors that you might have found out about had
16    you done those steps in paragraph 22 and its
17    subparts, right?  That 98 million doesn't include
18    that, correct?
19        A.  That is correct, the 98 million does not
20    include those.  That's why the 98 million is
21    conservative, right.  And as I explained several
22    times in my report that I took into account the --
23    because there may be people that either returned
24    to a site or, as you bring up, may have visited
25    multiple sites.  So that's why I only included one
```

BERNARD J.JANSEN, PHD

November 04, 2019

1   day of traffic, even though those sites -- you

2   know, those articles are still available on the

3   web, and the -- and there are other ways that

4   those information could have been dissemination

5   that are not included in the 98 million.

6          Q.  I don't understand the last part of your

7   answer.  You said that's why I included only one

8   day of traffic.  If you're measuring daily viewers

9   then unless you're averaging the daily viewers of

10  multiple days why would there be any reason to

11  look at more than one day of traffic if you're

12  trying to report on a daily basis?

13         A.  Well, in terms of dissem -- the purpose

14  was to report the dissemination of these

15  particular defaming statements.  Those articles

16  are still up.  Those websites are still getting

17  daily unique visitors to those websites.  People

18  could still be reading those particular websites

19  right now while we're here.

20             But to keep a conservative estimate,

21  conservative number, I only used one day of

22  website traffic.

23         Q.  As you sit here today you don't know

24  whether anybody is reading any of the articles in

25  your list, do you?

EXHIBIT 1
PAGE 105

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        A.   That was not my assignment.  I was to
 2    look at the dissemination of the defaming
 3    statements.
 4        Q.  So the answer to my question is no, you
 5    don't know whether anybody is reading any of the
 6    articles on your list, do you?
 7        A.   I didn't investigate that.
 8        Q.   I know you didn't investigate it.  My
 9    question is what you know.  So I'm not -- I didn't
10    ask you whether you investigated.  So let me just
11    ask you to answer my question which was:  As you
12    sit here today, you don't know whether anyone is
13    reading any of the articles on your Appendix D, do
14    you?
15        A.   I think the question is unrealistic,
16    because other than if you're sitting over
17    someone's shoulder, these 98 million, how could
18    you tell whether they're reading an article?
19        Q.   And you don't know that, do you?
20        A.   I did not investigate that, so no, I
21    don't know that.
22        Q.   Okay.  The -- when I was asking you about
23    the use of the word conservative, though, I wasn't
24    talking -- I was talking about your use of the
25    SimilarWeb data, okay.  So let's just focus on you
```

EXHIBIT 1
PAGE 106

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   used the SimilarWeb data to arrive at a number of
 2   98 million, correct?
 3        A.   That's correct.
 4        Q.   That's the only source of data you have
 5   that gets you to 98 million, correct?
 6        A.   That is the number I -- SimilarWeb is the
 7   traffic estimation tool I used in my report.  So
 8   yes, that's the data I used to generate the 98
 9   million.
10        Q.   It's the only source of data that you
11   used, correct?  For 98 million.
12        A.   For the traffic data, yes.
13        Q.   Yes.  So knowing, as you sit here today,
14   that there may be instances where people went in
15   September 2018 to more than one of the 354
16   websites on your list, knowing further that each
17   of those visits would be counted as a separate
18   unique daily visitor, what makes you say that your
19   use of the SimilarWeb data to arrive at 98 million
20   is conservative?
21        A.   Well, again, you know, I presented
22   several reasons in my report and gave several
23   examples of the measures I took to ensure that it
24   was conservative.  And that's one avenue.  I also
25   compared it to the Comscore data.  Comscore data
```

BERNARD J.JANSEN, PHD
November 04, 2019

```
 1    was much higher for the major websites that I

 2    compared it to.

 3             Also, we do have a particular datapoint,

 4    it's only one, but from the BuzzFeed article, the

 5    original article.  They do report the number of

 6    views of that particular article.  And it matches

 7    almost exactly with the SimilarWeb data for the

 8    daily unique visitors.

 9        Q.   Okay.  So just so we can move on from

10    this, you don't know the extent to which the

11    SimilarWeb data you used includes in its 98

12    million total in your report people who visited

13    more than one of those websites during the period

14    SimilarWeb analyzed the data, correct?  You don't

15    know that.

16        A.   I don't know a way to calculate that, so

17    no, I don't know what the overlap is.

18        Q.   And so you are assuming that the 98

19    million, at least in terms of adding up the

20    SimilarWeb data and knowing whether SimilarWeb is

21    telling you that the number is 98 million, you're

22    assuming that nobody, not one single person, went

23    to more than one of those 354 websites on the same

24    day that SimilarWeb was measuring the traffic,

25    aren't you?
```

EXHIBIT 1
PAGE 108

BERNARD J.JANSEN, PHD

November 04, 2019

1           MR. GRUNBERG:  Objection, misstates prior

2    testimony.

3           A.   The -- one of the predictive points you

4    bring up, I realize that there could be, from a

5    VIN diagram, an overlap between the visitors.

6    Given the fact I only did one day of traffic,

7    given the other factors that I didn't include such

8    as traffic to multiple articles from the same

9    site, okay, I think the 98 million is a very

10   conservative number.  But I acknowledge there

11   could be an overlap.  It could be zero.

12          Q.   Okay.  Wasn't my question, though.  My

13   question is for purposes of using the 98 million

14   figure, you are assuming that nobody went to more

15   than one of the 354 websites you looked at on the

16   same day during the period SimilarWeb was

17   measuring that traffic, aren't you?  Yes or no.

18          MR. GRUNBERG:  Hold on one second.

19   Objection, misstates prior testimony, as well as

20   misrepresents the report of record.

21          Go ahead.

22          A.   The -- in addition to the additional

23   measure to address the issue you bring up is why I

24   state that there -- you know, I forget the exact

25   term I use, 98 million, even though I give the

EXHIBIT 1
PAGE 109

BERNARD J.JANSEN, PHD

November 04, 2019

1  exact number, I don't know the exact number that

2  is the 98 million count.  But I -- I did not

3  deduplicate across multiple sites, and instead

4  relied on a conservative estimation of the traffic

5  count to begin with to take into account those

6  potential overlap.

7  BY MR. SCHWARTZ:

8      Q.   So when you say you did not deduplicate

9  the overlapping sites, is that another way of

10  saying yes to the question I asked you, which is:

11  You're assuming, at least insofar as aggregating,

12  adding up the SimilarWeb data --

13     A.   Yeah.

14     Q.   -- that nobody went to more than one

15  website of the 354 you studied during the period

16  of time SimilarWeb was analyzing that traffic.

17         MR. GRUNBERG:  Objection, misstates prior

18  testimony, and the expert report.

19     A.   The -- I think what you're asking is, you

20  know, this is not like you're standing over

21  someone's shoulder counting individual people.

22  It's 98 million.  And yes, it is the traffic, it's

23  an estimation service.  And that's why I presented

24  98 million and not 98,365,052, because it's --

25  there is -- there could be some overlap there,

EXHIBIT 1
PAGE 110

BERNARD J.JANSEN, PHD

November 04, 2019

 1   there could be none.  But I did not include the

 2   overlap -- or did not discount for an overlap

 3   factor in the 98 million.

 4   BY MR. SCHWARTZ:

 5       Q.  Okay.  And as you sit here today, you

 6   have no way of knowing what that overlap factor

 7   is.  And just so someone reading this transcript

 8   will understand what we're talking about, the

 9   overlap factor is the possibility that somebody

10   went to visit more than one of the websites on

11   your 354 listed websites on the same day that

12   SimilarWeb was studying the traffic that you

13   relied on to get to 98 million.

14       A.  I acknowledge, yes, that could happen.

15   But I -- yes.

16       Q.  Well, not only are you acknowledging that

17   it could have happened, you don't know how much of

18   that, the extent to which that could have

19   happened, do you, or the extent to which it did

20   happen.  As you sit here today you just don't know

21   one way or the other, correct?

22       A.  The -- I did not calculate that.  Again,

23   I don't know any way to calculate that.  And so

24   that's why I took the aspect of coming up with a

25   very conservative traffic number.  I don't know --

EXHIBIT 1
PAGE 111

1    I did not analyze what the visits to multiple

2    sites are, so yes, it could be zero, it could be

3    more.

4         Q.  And you just don't know one way or the

5    other as you sit here today.

6         A.  I wouldn't phrase it like that, no.

7         Q.  Then give me your best estimate of the

8    number of overlaps that are found within the 98

9    million number in your report.  And by overlaps, I

10   mean where a person visited at least -- one person

11   visited at least -- at least more than one of the

12   354 websites on the same day that SimilarWeb was

13   studying that traffic to get to your 98 million.

14        A.  As I said, I didn't calculate that so I

15   cannot give you a number.

16        Q.  Okay.

17             MR. GRUNBERG:  The food is here, if you

18   want to --

19             MR. SCHWARTZ:  All right.  Let's go off

20   the record.

21             THE VIDEOGRAPHER:  Going off the record.

22   The time is now 12:44 p.m.

23             (Recess)

24             THE VIDEOGRAPHER:  We are back on the

25   record.  The time is now 1:16 p.m.

EXHIBIT 1
PAGE 112

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   BY MR. SCHWARTZ:
 2        Q.  Good afternoon, Mr. Jansen.  When we left
 3   off we were talking about the issue of potential
 4   duplicates or duplicate people being counted
 5   within the SimilarWeb data that you used on to get
 6   to your 98 million number.  That's not part of my
 7   question, it was just to reorient us because we've
 8   been off the record for a little while.
 9          My question is this:  Did you look at any
10   data to tell you in evaluating the SimilarWeb
11   information the extent to which they might -- that
12   data might overcount or overrepresent the number
13   of daily unique visitors to the websites under
14   your study?
15        A.  What I looked at was the -- of course,
16   reviewed the methodology that they used to ensure
17   that they have accurate count, and then looked at
18   some studies other people had done on the accuracy
19   of SimilarWeb and then what the impression of
20   SimilarWeb was in the industry.
21        Q.  Does any of that bear on whether the
22   SimilarWeb data would count as more than one
23   unique daily visitor someone who visited more than
24   one of your websites during the same day that
25   SimilarWeb was looking at it?
```

EXHIBIT 1
PAGE 113

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        A.   Well, yeah, again, I didn't investigate
 2   that.
 3        Q.   I'm sorry?
 4        A.   I didn't investigate that.
 5        Q.   Okay, that's fine.
 6        A.   As I state in my report, my purpose was
 7   the dissemination.  So I took it from -- they were
 8   posted on that particular website, they had that
 9   particular dissemination.  I didn't look at the
10   overlap.
11        Q.   You did not look --
12        A.   I didn't look at the overlap.
13        Q.   Okay.  And then you also said that you
14   looked at some numerical information concerning
15   the BuzzFeed story, and I just want to follow up
16   on that so that the record is clear as to what
17   we're talking about.  By the BuzzFeed story I
18   think you mean September 4 or early September 2018
19   story in which BuzzFeed first reported the
20   accusations that Mr. Musk had made to a BuzzFeed
21   reporter about Mr. Unsworth.  Is that what you
22   meant by the BuzzFeed article?
23        A.   Yes.  I was provided some visit counts
24   directly from BuzzFeed I included in my report.
25        Q.   Right.  So the BuzzFeed visit count,
```

EXHIBIT 1
PAGE 114

BERNARD J. JANSEN, PHD

November 04, 2019

1  whatever number it was, that tells us the number

2  of web browsers that navigated to the page where

3  BuzzFeed was hosting that article; is that right?

4      A.  Yeah, they didn't provide any

5  documentation on the metrics, and this is always

6  kind of an issue, but -- so my understanding of

7  what they reported in the kind of standard

8  definition of what a visit is, yes, it would be a

9  browser opening that particular article on the web

10  site.

11      Q.  So that number, whatever the number is

12  from the BuzzFeed article that we've been

13  discussing, doesn't tell us how many people

14  actually read the article, does it?

15      A.  As I said earlier, other than standing

16  over and watching someone read it, I don't know if

17  there's a number -- way to calculate that.  That

18  is a number that represents the people that opened

19  that particular article.

20      Q.  Right.  So it doesn't tell us, whatever

21  the BuzzFeed number is, BuzzFeed isn't purporting

22  to tell us the number of people who actually read

23  the article, correct?

24      A.  That's -- as far as -- that, no, that

25  number is the visits to that particular article.

EXHIBIT 1
PAGE 115

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.   And it doesn't tell us -- the BuzzFeed

2    number, whatever it is, doesn't tell us the number

3    of people who read far enough into the article to

4    learn whatever it was BuzzFeed was reporting that

5    Mr. Musk was saying about Mr. Unsworth.  That

6    information BuzzFeed doesn't report either, does

7    it?

8             MR. GRUNBERG:  Objection, form.

9        A.   The number is -- is a count of the

10   browsers, the people that have opened that

11   particular article.  There's no -- there was no

12   number provided about how far they scrolled down

13   in the article or anything like that.

14   BY MR. SCHWARTZ:

15       Q.   Okay.  The -- okay.

16            So let's go back to SimilarWeb.  For a

17   visit to a website to be counted as a unique daily

18   visit in the source you relied on to get to 98

19   million, that is SimilarWeb, those sites don't --

20   those visitors, rather, I should say, don't have

21   to be human beings, do they?

22       A.   Well, certainly there are nonhuman beings

23   on the web that visit websites.  But one of the

24   data collection points from SimilarWeb is their

25   panel data of 4 million actual people that visit

EXHIBIT 1
PAGE 116

BERNARD J.JANSEN, PHD

November 04, 2019

1   websites.  And that's one of the data collection

2   points that they use to calculate the number of

3   unique visitors.

4        Q.  So walk me through it.  Let's pick one of

5   the -- it doesn't matter which one, but I'm just

6   going to look at Appendix D to your report which

7   is Exhibit 136, and you let me know when you have

8   that.

9        A.  Okay.

10       Q.  So the first -- let's just go with the

11  first item here, it's from something called

12  0nion.com.  I don't need to repeat the URL.  You

13  understand which one I'm looking at.

14       A.  That is correct, yeah.

15       Q.  So whatever number SimilarWeb gave you

16  for the daily unique visitors to the 0nion.com

17  website, how does SimilarWeb calculate that

18  number?

19       A.  The process they use, and again whether

20  it's for the 0nion domain or any domain, they

21  have -- their methodology is -- they publish it.

22  They have four different disparate data sources,

23  one of which is their panel, and these are people

24  that have opted in to have their browsing traffic

25  logged, and so those are actual people.  So that's

EXHIBIT 1
PAGE 117

1    one data collection point.

2              The other data collection point they use

3    is data from internet service providers that

4    monitor the traffic.

5              The third data source is publicly

6    available data, typically probably they don't go

7    onto it on a website, but probably scraping of

8    data from search engine result pages.

9              And then the final data source is they

10   have they say hundreds of thousands of actual

11   websites that have opted in for their particular

12   website traffic numbers to be accessible by

13   SimilarWeb.

14             And SimilarWeb takes all those particular

15   four data sources, runs it through its machine

16   learning algorithms, and that's how they generate

17   the traffic estimation numbers for all the sites.

18        Q.   Okay.  And data from ISPs, let's go

19   through these.  The data from ISPs -- ISPs are

20   internet service providers, correct?

21        A.   That's correct.

22        Q.   Does that data include data from only

23   humans or humans as well as whether it's computers

24   or bots or other nonhuman web activity?

25        A.   Yeah, good question.  I can't -- I don't

EXHIBIT 1
PAGE 118

BERNARD J.JANSEN, PHD

November 04, 2019

1    know their particular algorithm at that detail.

2        Q.  Okay.  And then the third source was

3    public data, you said it might be scraping from

4    search engine results or whatnot.  Can you tell us

5    whether that data includes or excludes web

6    activity resulting from nonhuman sources such as

7    bots or programs?

8        A.  For that particular data I wouldn't

9    really see bots as playing a role, because it's

10   typically would be -- they would scrape like

11   results from Google or Bing, and they typically do

12   that because SimilarWeb not only provides traffic

13   services but also advertising or marketing advice

14   in terms of search engine optimization.  So for

15   that particular data I don't think bots would

16   really play much of a role.

17       Q.  As you sit here today can you tell us the

18   extent to which it might or might not play a role

19   as a percentage, a fraction, some other

20   quantification?

21       A.  Well, you know, again, from the whole

22   technique I would say it would be zero.

23       Q.  Okay.

24       A.  Because I just don't see bots playing a

25   role in that particular data collection point.

EXHIBIT 1
PAGE 119

1        Q.   And then you said there are hundreds of

2    thousands of sites that have told SimilarWeb

3    they're willing to share their web traffic

4    numbers; is that right?

5        A.   Yes.   Again, from the documentation that

6    is available, it appears that they give access to

7    Google Analytics, Adobe Analytics, some of the

8    website analytics platforms, and then SimilarWeb

9    can use that to compare their estimations are for

10   those sites.

11       Q.   Did SimilarWeb when you did your work in

12   this case tell you which of the 357 odd sites you

13   looked at --

14       A.   54.

15       Q.   -- 54 websites you were looking at

16   receive data from the websites themselves to allow

17   them to compare it to what their estimations are?

18       A.   I didn't get that information.

19       Q.   So as you sit here now you can't tell us

20   whether any of the websites included in your list

21   share data with SimilarWeb.

22       A.   I didn't investigate that, so no.

23       Q.   Okay.   And let's go to the first one.

24   You said there are some people who have opted into

25   allowing SimilarWeb to track their web browsing.

EXHIBIT 1
PAGE 120

1    Is that what you said?

2         A.   I believe so, yes.

3         Q.   Okay.  How many such people are there?

4         A.   If I remember their documentation, it

5    was -- I can't remember the exact number, but they

6    provide the number, and it's in the millions of

7    people.  They cover 190 plus countries, so it's

8    got to be tens of millions of people to get that

9    level.  But I can't recall the number off the top

10   of my head.

11        Q.   Okay.  When did you your work in this

12   case did SimilarWeb tell you which of the websites

13   you were looking at that they were getting data

14   from people who had opted into allowing SimilarWeb

15   or -- to view their browsing to those websites?

16        A.   Well, just to explain the technology, no,

17   they did not.  But the methodology would be

18   applied to every single website, so it's the same

19   methodology.  It's not like that particular data

20   by itself would be the only data that they would

21   use.  They use data from all four websites and

22   then their machine learning algorithms come up

23   with these estimates, because that's one of the

24   advantages of using this web traffic service is

25   the methodology is the same across all the

EXHIBIT 1
PAGE 121

BERNARD J.JANSEN, PHD

November 04, 2019

 1   websites.  So I would be shocked if they would do

 2   any variations.  And in their documentation they

 3   present that they apply the same methodology for

 4   all the traffic estimations.

 5        Q.  You said something about four websites.

 6   I didn't understand, what --

 7        A.  I'm sorry, four -- the four data

 8   collection processes they use to come up with the

 9   traffic estimations.

10        Q.  I hear the words you're saying, but I've

11   lost the train of thought, so just if we could

12   back up and you could just explain what you meant.

13   In other words, just so we have my question in

14   context.

15        A.  Absolutely.

16        Q.  My question was:  When you pull data from

17   SimilarWeb about a particular website does

18   SimilarWeb tell you whether on that particular

19   website their data includes actual data from

20   people who have opted in to allow them to -- allow

21   SimilarWeb to watch their browsing history?

22        A.  As far as I know, no.

23        Q.  As you sit here now can you tell me which

24   of the websites on your list of 357 websites

25   SimilarWeb has actual user data for, whether it

EXHIBIT 1
PAGE 122

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    was based on people opting in or any other way?
 2          A.  No, I do not have that information.
 3          Q.  Do you know whether that's the case in
 4    any of the 357 websites on your list; that is to
 5    say that it's based in whole or in part by actual
 6    data that SimilarWeb has from web users?
 7          A.  Again, I didn't investigate that, no, so
 8    I don't have that information.
 9          Q.  Do you know the algorithm that SimilarWeb
10    uses to take the four sources of data you've just
11    described and manipulate them through some
12    algorithm to arrive at its estimate for daily
13    unique visitor traffic to a given website?
14          A.  That's proprietary.  They give a -- the
15    overview.  They refer to machine learning
16    algorithms.  But they don't say specifically what
17    they use.
18          Q.  Okay.  Does SimilarWeb state either in
19    the software or its website or anywhere else that
20    they are -- in fact, that their average daily
21    unique visitor counts exclude any visits to the
22    websites that you may choose to ask them about
23    from nonhumans?
24          A.  Again, I don't recall that exact
25    statement in any of their presentations, no.
```

EXHIBIT 1
PAGE 123

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1        Q.  Is there something you've been told by
 2   someone at SimilarWeb or read somewhere that tells
 3   you that the SimilarWeb daily user -- unique daily
 4   user counts exclude traffic to the website from
 5   nonhumans?
 6        A.  I would expect it, that they would
 7   exclude that.  I mean, that's why you do these
 8   traffic estimations.  And I assume their
 9   algorithms take that into account.  But as I'm
10   sitting here, I can't recall the reference or a
11   reference to it.
12        Q.  Okay.  You said that you assume that
13   SimilarWeb's metrics, including for daily unique
14   visitors, takes into account that there's a
15   tremendous amount of traffic on the internet
16   that's nonhuman generated.
17        A.  Sure, absolutely.
18        Q.  How do you know it?  Can you tell me
19   anything as you sit here today that tells you that
20   you know that to be for a fact what they're doing?
21        A.  Well, as I said, I don't have the
22   reference.  I can't point to the exact reference.
23   But the purpose of these traffic estimation tools
24   is to get the estimation of human traffic.  But
25   again, I don't have the exact reference today.
```

EXHIBIT 1
PAGE 124

```
1          Q.   Do you have any reference?

2          A.   As I said, I don't have the reference to

3     it.

4          Q.   Okay.  Do you agree with me that a

5     tremendous percentage -- terrible term.  Do you

6     agree with me that there is a substantial

7     percentage of traffic on the internet that is

8     nonhuman generated?

9          A.   Yes, the bot traffic is a constant issue

10    when you're trying to estimate actual customers

11    and visitors.

12         Q.   And is it also correct that articles have

13    been written that estimate that the amount of

14    traffic on the internet not generated by human

15    activity could be as much as half of the traffic?

16         A.   I don't recall exactly that, but yeah,

17    it's high.  It's in the -- it's high.  I don't

18    recall if it's exactly 50 percent.  But depending

19    on websites and what particular domain you're

20    looking at, yeah, there's quite a bit of bot

21    traffic.

22         Q.   Okay.  What's your best estimate of the

23    percentage of internet traffic to websites that's

24    not generated by human activity?

25         A.   You know, you're kind of just asking me
```

EXHIBIT 1
PAGE 125

BERNARD J.JANSEN, PHD

November 04, 2019

1   off the top of my head.  But, you know, of I've

2   seen reports, you know, the 30 percent, 40

3   percent, you know, a good portion of traffic.

4   Again, it would kind of depend on the website and

5   what particular vertical you're looking at.

6        Q.  When you say vertical, I don't know what

7   that means.

8        A.  Well, like, you know, on certain

9   e-commerce sites or, you know, web scraping sites,

10  search engine sites, some of the -- especially in

11  the e-commerce domain, that has a higher -- that

12  has a potential for some higher bot traffic, so

13  you can come up with a general number, but there's

14  going to be some variation across verticals.

15       Q.  Okay.

16       A.  Yeah, yeah.

17       Q.  So what's your best estimate of the

18  percentage of nonhuman traffic on the websites

19  that you looked at that are in your 357 websites?

20       A.  I didn't look at bot traffic to those

21  particular sites, so I couldn't say for sure.

22       Q.  Okay.

23           (Defendant's Exhibit 147 marked)

24  BY MR. SCHWARTZ:

25       Q.  Okay, Mr. Jansen, we've put before you as

EXHIBIT 1
PAGE 126

```
 1    Exhibit 147 an article from The Atlantic from
 2    January 31, 2017 titled The Internet is Mostly
 3    Bots.
 4             My first question is have you heard of a
 5    publication called The Atlantic?
 6        A.   Yes.
 7        Q.   Do you hold it in reasonable regard as --
 8    they write intelligent, thoughtful,
 9    well-researched articles for the most part?
10        A.   They do nice investigative reporting,
11    yes.
12        Q.   Okay.  By any chance do you know Adrianne
13    Lafrance of the Technology Beat out of The
14    Atlantic?
15        A.   No, I do not.
16        Q.   Have you ever heard of a web security
17    firm called Imperva, I-M-P-E-R-V-A?
18        A.   No, I don't believe I'm familiar with
19    them.
20        Q.   So let me just read this to you, a
21    portion of this.  It's the third paragraph of the
22    article and it says, quote, Overall bots, good and
23    bad, are responsible for 52 percent of web
24    traffic, according to a new report by the security
25    firm Imperva, which issues an annual assessment of
```

EXHIBIT 1
PAGE 127

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    bot activity on line.  The 52 percent stat is
2    significant because it represents a tip of the
3    scales since last year's report which found human
4    activity had overtaken bot activity for the first
5    time since at least 2012 when Imperva began
6    tracking bot activity.  Now the latest survey
7    which is based on an analysis of nearly 17 billion
8    website visits from across 100,000 domains shows
9    bots are back on top.  Not only that, but harmful
10   bots have the edge over helper bots, which are
11   responsible for 29 percent and 23 percent of all
12   web traffic respectively.
13           Do you see that?
14       A.  Yes.
15       Q.  Do you have any reason to doubt the
16   information that The Atlantic reported in this
17   January 31, 2017 from Imperva?
18       A.  Well, you know, based on what they
19   presented here, I mean, they didn't provide the
20   data or how it's collected.  But I -- I have no
21   reason, specific reason to doubt.  But with those
22   qualifications that how the data was collected and
23   the data is not available.
24       Q.  And once you received the data from
25   simple web --
```

EXHIBIT 1
PAGE 128

November 04, 2019

```
 1        A.   SimilarWeb.
 2        Q.   SimilarWeb, sorry, let me start again.
 3    Once you received the data you used from
 4    SimilarWeb to arrive at your 98 million figure did
 5    you do anything to reduce it on account of a
 6    potential that that may have included --
 7        A.   No, no.
 8        Q.   -- may have included nonhuman traffic?
 9        A.   I did not, and the reason I did not is
10    because one of the data collection points are
11    these panel data, and so that -- those are humans,
12    so you know those are humans.  And I -- the -- so
13    I did not discount for bot traffic to those
14    particular sites because of that.
15        Q.   I see.  But you previously testified that
16    you don't know whether SimilarWeb's numbers for
17    any of the websites you've included in your report
18    included data from any of these panels or humans
19    participating in allowing people to collect their
20    data, do you?
21        A.   No, that's not correct.  Because I
22    explained that these panels are part of the
23    SimilarWeb's algorithm for calculating the number
24    of daily unique visitors.  So the panel data we
25    know is human.  We know those are not bots.  And
```

EXHIBIT 1
PAGE 129

BERNARD J. JANSEN, PHD

November 04, 2019

1   so -- and your question earlier was do I have this

2   reference about specifically if SimilarWeb

3   excludes them.  No, I don't have that.  I'd kind

4   of be very surprised if they didn't already do

5   some calculations, the machine learning algorithm,

6   to exclude that.  So I did not --

7        Q.  So if I'm understanding you correctly,

8   what you're saying is that SimilarWeb gets data

9   from humans from websites and does something using

10  its own proprietary algorithm that allows it to

11  exclude nonhuman activity from any website for

12  which SimilarWeb gives you data, even if for that

13  website it doesn't have any human information?

14       A.  As I -- that's not what I said.  As I

15  said, if for -- let's go over their data

16  collection methods again, one of which is the

17  panel, those are humans.  And so there's no bot

18  traffic there.

19            The other is the web scraping.  Again,

20  not affected by bot traffic.

21            So that leaves the ISP data or the data

22  reported by individual websites.  From setting up

23  Google Analytics and Adobe Analytics, those

24  platforms, you typically exclude the bot traffic

25  from the analytics you report, or at least

EXHIBIT 1
PAGE 130

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    separate it out.
 2            But I don't know the internal workings of
 3    the SimilarWeb algorithm, you know, how that's
 4    done, where it's done.
 5        Q.  But just so I understand it, though, the
 6    panel part, that's humans, when you say panel
 7    you're referring to human activity that SimilarWeb
 8    monitors.
 9        A.  Yes.
10        Q.  Okay.  I believe you told me that you
11    don't know whether SimilarWeb has any actual human
12    website visiting numbers for any of the 357
13    websites you looked at.  Am I right so far?
14        A.  Well, again, the question is -- the
15    question doesn't take into account the methodology
16    that SimilarWeb applies.  They don't separate out
17    in their reporting, you know, particular websites
18    that only the panel goes to, for example.
19        Q.  I think we're saying the same thing.  In
20    other words -- but let's just be really clear.
21    I'm going to -- we're going to take this all the
22    way to the end and you're going to get a chance as
23    we go each step to tell me where this panel data
24    becomes relevant.  I just want to understand what
25    the panel data is in the first instance, okay.  So
```

BERNARD J.JANSEN, PHD

November 04, 2019

 1   let me ask the question again.

 2           You don't know whether SimilarWeb has any

 3   panel data for any of the 357 websites specific to

 4   those specific -- those websites, do you?

 5       A.   They don't make that data available as

 6   far as I know.

 7       Q.   So what you're saying is through some

 8   algorithm that you don't know any details on,

 9   SimilarWeb looks at user data that -- for websites

10   that it does have panel data on and processes that

11   in some way that gives it confidence to think that

12   even if it doesn't have that data for a given

13   website you're asking it about, it can be somehow

14   more confident that that represents only human

15   activity?

16       A.   That was too much of a -- I can't follow

17   that.

18       Q.   Well, how does any data from human beings

19   that SimilarWeb has, not for the websites you're

20   interested in but for other websites, tell

21   SimilarWeb that the nonhuman data it's looking at

22   somehow, or the other data it's looking at,

23   excludes nonhuman activity?

24           MR. GRUNBERG:   Objection, form.

25       A.   I don't -- what nonhuman data are you

EXHIBIT 1
PAGE 132

1 talking about?

2 BY MR. SCHWARTZ:

3     Q. Well, like the public data, the --

4     A. As I already mentioned, the public data,

5 I don't see bots having any impact on it.

6     Q. Data from ISPs.

7     A. The data from ISPs, I don't know what

8 ISPs do internally with that particular data,

9 so . . .

10     Q. And the websites that share their data

11 with SimilarWeb, you don't know whether that data

12 includes or excludes bot traffic, do you?

13     A. The specific sites, no, I don't. But I

14 would -- a typical setup of those particular sites

15 is you identify bot traffic and try to exclude it

16 from your actual visitors.

17     Q. You may try to. You have no way of

18 knowing the success rates for any of those

19 websites, do you?

20     MR. GRUNBERG: Objection, form.

21     A. SimilarWeb and their documentation say

22 they have hundreds of thousands of websites. So

23 yes, I don't know on all the websites.

24 BY MR. SCHWARTZ:

25     Q. You don't know it for any of them, do

EXHIBIT 1
PAGE 133

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   you?  Can you tell me what level of confidence the
 2   owners of the websites that furnish data to
 3   SimilarWeb have succeeded in eliminating bot
 4   traffic from their counts of visitors?
 5        A.  As I said, I don't even know -- I don't
 6   know the sites that SimilarWeb is using, and
 7   SimilarWeb doesn't make it available.  I can tell
 8   you the industry standard approach is you separate
 9   the bot traffic from human traffic.  That's what I
10   can tell you.
11        Q.  And can you tell me how the websites that
12   are furnishing data to SimilarWeb do that?
13        A.  As I've said now three times, I don't
14   know the websites they're using.  SimilarWeb
15   doesn't make that available.
16        Q.  Well, even if you don't know the
17   websites, do you know the processes that these
18   websites are using to ensure that the data that
19   they give SimilarWeb excludes nonhuman visits?
20        A.  Again, I don't know the particular
21   websites, and I've already said there are industry
22   standard approaches, people would use what I
23   expect them to use.  Do I know specifically that
24   those sites are doing that, no.
25        Q.  So as you sit here now --
```

EXHIBIT 1
PAGE 134

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1              MR. GRUNBERG:  Just to be clear, because
 2   I want to make sure he answers your question.  Are
 3   you asking him whether he generally understands
 4   what processes websites might use to do this?
 5              MR. SCHWARTZ:  No.
 6              MR. GRUNBERG:  Is that the question?
 7              MR. SCHWARTZ:  No.
 8              MR. GRUNBERG:  I want to make sure.
 9   BY MR. SCHWARTZ:
10      Q.  I want to know if you know what processes
11   these websites actually used, if any, in order to
12   eliminate nonhuman activity or nonhuman visits
13   from their visit web counts that SimilarWeb
14   obtained.  Do you know?
15      A.  For now the fifth time I'm telling you I
16   don't know the particular sites but I can tell you
17   it's the industry standard approaches.  I don't
18   know the specific sites so I obviously don't know
19   specifically what those sites are doing.
20      Q.  And you don't know the extent to which
21   any of these websites that furnish data to
22   SimilarWeb have been successful or unsuccessful in
23   eliminating bot counts from their information they
24   give to SimilarWeb.
25      A.  For now the sixth or seventh time, I
```

EXHIBIT 1
PAGE 135

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    don't know the particular sites so obviously I
 2    can't know what those particular sites are doing.
 3         Q.   I didn't ask you what they were doing.  I
 4    asked you -- you can't tell me whether -- the
 5    extent to which any of them are successful or
 6    unsuccessful using any of the industry standard
 7    tools.
 8         A.   Now the seventh or eighth time, I don't
 9    know the particular sites so I don't know the
10    particular procedures that those sites might or
11    mate not be using to separate visitor or bot
12    traffic.
13         Q.   Fine.  So can you tell us as you sit here
14    today how many of the 98 million daily unique
15    visitors that you included in your count are the
16    result of nonhuman traffic?
17         A.   Again, I did not look at the bot traffic,
18    so I cannot answer that question sitting here now.
19         Q.   If half the internet traffic is bots,
20    according to the security firm Imperva as
21    reflected in The Atlantic magazine article from
22    January 31, 2017 that we were looking at as
23    Exhibit 147, your $98 million number if it
24    includes bot traffic could be a lot higher than
25    the number of humans.
```

EXHIBIT 1
PAGE 136

```
 1              MR. GRUNBERG:  Objection, form.
 2         A.   You know, you're focusing on this bot
 3    traffic when we've already talked about there's --
 4    we know SimilarWeb incorporates nonbot traffic
 5    into their calculations, okay.  You're asking a
 6    specific question do I have a reference on
 7    particular bots.
 8              You know, you know, the purpose of these
 9    traffic estimation tools is to estimate actual
10    unique visitors.  So I'd be shocked if they're not
11    doing some method to being able to identify that
12    particular traffic.
13    BY MR. SCHWARTZ:
14         Q.   Did I ask you whether you would be
15    shocked if they were not doing anything to
16    identify nonhuman traffic?
17              MR. GRUNBERG:  Objection, form.  It's
18    argumentative.
19         A.   My purpose is to explain the technology,
20    okay.  That's -- and to explain the process used
21    in my report.  You're asking a question that I
22    really don't think impacts the unique visitors.
23    Could there be some bot traffic in there?  Yeah,
24    there could be.
25    BY MR. SCHWARTZ:
```

EXHIBIT 1
PAGE 137

BERNARD J.JANSEN, PHD

November 04, 2019

1      Q.  And -- but you don't know.  That was the

2  only question I asked:  You don't know how much

3  there might be in your $98 million, do you?

4           MR. GRUNBERG:  Objection, asked and

5  answered.

6      A.  If you're asking my opinion, the vast

7  majority of that traffic is real people.  Could

8  there be some bot traffic in there?  Yes, there

9  probably could.

10  BY MR. SCHWARTZ:

11      Q.  Did you do anything other than taking the

12  SimilarWeb data to determine what that number of

13  nonhuman traffic would be?

14           MR. GRUNBERG:  Objection, asked and

15  answered.

16      A.  Again, I didn't do any bot analysis.

17  BY MR. SCHWARTZ:

18      Q.  Okay.  All right.  Now, the $98 million

19  number -- let's start again.  The $98 million

20  figure -- that tells us --

21           MR. GRUNBERG:  Objection.

22           MR. SCHWARTZ:  Did I do it again?  I'm

23  sorry.

24           MS. WADE:  Are you trying to tell us

25  something?

EXHIBIT 1
PAGE 138

BERNARD J. JANSEN, PHD

November 04, 2019

```
1              MR. GRUNBERG:  You know, if that's the
2    offer on the table.
3    BY MR. SCHWARTZ:
4         Q.  Let me start again.  The 98 million
5    visitor number, I just want to make sure I
6    understand what that tells us.  That tells us the
7    number of people in the period of time under study
8    went to the website, any page on the website,
9    hosted by those, I believe it is 357 -- 54 --
10        A.  54.
11        Q.  -- websites, right?
12             MR. GRUNBERG:  Objection, form.
13        A.  Could you restate the question.
14   BY MR. SCHWARTZ:
15        Q.  Sure.  In other words, what you figured
16   out was that 98 -- potentially 98 million users on
17   a given day that SimilarWeb looked into went to
18   the websites that hosted the articles on your
19   list.
20        A.  Yeah, to kind of phrase it more
21   directly --
22        Q.  You'll do a better job, I'm sure.
23        A.  -- it is -- that 98 million is a sum of
24   the daily unique traffic to the -- when you sum up
25   the daily unique traffic for one day for each of
```

EXHIBIT 1
PAGE 139

1    the 354 websites.

2         Q.  Right.  But it doesn't tell you where on

3    those websites any of those people went, does it?

4         A.  No, it does not.

5         Q.  So as you sit here today you can't tell

6    us where on those 357 websites any of those 98

7    million people went, can you?

8         A.  That's not what I was asked to do, so I

9    didn't do that.  My purpose was to show the

10   dissemination of those defaming statements, and it

11   was dissemination to 354 websites.

12        Q.  Right.  But in trying to understand how

13   many people the information you were looking at

14   was dissemination to, you don't know how many

15   people actually got to the place on those 354

16   websites where this information was found.

17             MR. GRUNBERG:  Objection, asked and

18   answered.

19        A.  A way to look at it is 98 million people

20   had the potential to see those defaming

21   statements.

22   BY MR. SCHWARTZ:

23        Q.  Because 98 million people went to the

24   websites where those defaming statements could be

25   found.

EXHIBIT 1
PAGE 140

1        A.   Where they were posted, yes.

2        Q.   Okay.  But websites are big things in

3   many cases, aren't they?  Lots of pages, right?

4        A.   They can be.

5        Q.   Well, one of your websites was Fox News.

6   Fox News is a pretty substantial websites with

7   many different pages on it, right?

8        A.   Yes, that is a big website.

9        Q.   Right.  So it's possible that some of the

10  articles in your Appendix D on some of the 354

11  sites few people, if anyone, actually went to the

12  place on those websites where those articles were

13  found.

14       A.   Uh-huh.  Again, I just kind of point out

15  that the -- my purpose was to show the

16  dissemination of those particular articles and who

17  could have had the opportunity to see the defaming

18  statements.  Yeah, we don't have down to the

19  article view other than with the BuzzFeed article,

20  and, you know, the lead article on that particular

21  site matches very closely with the daily unique

22  traffic.

23            MR. SCHWARTZ:  I move to strike as

24  nonresponsive after the yeah.  But let's see if I

25  can follow up.  I'll waive my objection for

EXHIBIT 1
PAGE 141

```
 1    purposes of a followup.
 2            MR. GRUNBERG:  Well, wait, that's not --
 3            MR. SCHWARTZ:  Fine.  Let's just withdraw
 4    the objection.
 5    BY MR. SCHWARTZ:
 6        Q.  I just want to make sure I got a clean
 7    answer to my question.
 8        A.  Sure.
 9        Q.  It's possible that some of the articles
10    in your Appendix D on some of the 354 sites, few
11    people, if anyone, actually went to the place on
12    those websites where those articles were found.
13    Isn't that true?
14        A.  These questions like is it possible.
15    It's really not a question.  Is it possible?
16    Yeah, it's possible.
17        Q.  Okay.  You did nothing whatsoever, other
18    than maybe with BuzzFeed, which we've already
19    talked about, so let's put BuzzFeed aside.  Other
20    than BuzzFeed you did no work to determine the
21    number of people who actually went to the places
22    on these 354 websites where these 605 articles
23    were found, did you?
24            MR. GRUNBERG:  Object to the form.
25        A.  Well, again, I will say again that was
```

EXHIBIT 1
PAGE 142

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    not my purpose specifically because my purpose --
 2    my assignment was to gauge the dissemination of
 3    these particular defaming statements, so the
 4    people had the potential to see the statements.
 5    The article level views, okay, which even then
 6    is -- yeah, you know -- as far as I know the
 7    article level views is not information that's
 8    available where you can compare systematically
 9    across this number of websites.
10    BY MR. SCHWARTZ:
11        Q.  Okay.  Putting aside the BuzzFeed article
12    which we've already talked about -- I'm not trying
13    to replow ground -- But for all of the other
14    articles on your list, you don't have any article
15    level view data, do you?
16        A.  As I just said, I don't have article
17    level view data.
18        Q.  And so that someone reading this
19    transcript will know what we're talking about, in
20    other words, you don't have any data that tells
21    you the number of people who actually got to the
22    place on the 300 -- any one of those 354 websites
23    at which they could see any of the articles on
24    your list, right?
25            MR. GRUNBERG:  Objection.  Now, I'm not
```

EXHIBIT 1
PAGE 143

BERNARD J.JANSEN, PHD

November 04, 2019

1   the best at counting sometimes, but I think that
2   might be up to about three or four of asking that
3   question.
4           Go ahead and answer.
5       A.  The -- again, my purpose was to measure
6   the dissemination.  And, again, I did not have
7   article level data.
8   BY MR. SCHWARTZ:
9       Q.  All right.  Now, SimilarWeb provides
10  estimated traffic to websites.  It doesn't provide
11  user traffic estimates for individual articles on
12  websites; is that right?
13      A.  That's correct, yes.
14      Q.  Okay.  So go back to Exhibit 146, if you
15  could.  It's that one-pager from your files.
16      A.  Yes.
17      Q.  Is this -- you can't tell just from
18  looking at Exhibit 146 which website this pertains
19  to, can you?
20      A.  By just looking at this particular --
21  this is my like access to the API.  So the data,
22  within the visitor engagement category I went to
23  monthly visitors, and then the rest of the
24  spreadsheet gives me all the websites and the
25  traffic.

EXHIBIT 1
PAGE 144

```
 1          Q.  Okay.

 2          A.  So this is kind of like the parameters of

 3     what I told the API to do.

 4          Q.  And so the parameters on Exhibit 146 are

 5     what you told the SimilarWeb API to do for all of

 6     the websites you were studying?

 7          A.  Yes.

 8          Q.  Under step 3 where it asks you to select

 9     the metrics, do you see that?

10          A.  Yes.

11          Q.  And the metrics to me look like monthly

12     as opposed to daily; is that correct?

13          A.  Yes.  They do a monthly unique visitors,

14     and then I divided it by -- to get the daily.

15          Q.  That was going to be my next question.

16     You anticipated.

17          A.  Yeah.

18          Q.  So just so I understand, could you have

19     queried SimilarWeb as to specific days in

20     September 2019 -- '18?

21          A.  I specifically talked to two SimilarWeb

22     reps, and they can't do it by individual day

23     because they do the average for the month and

24     then -- you know, I confirmed oh, this is what I

25     want to do to get the daily, and they confirmed
```

EXHIBIT 1
PAGE 145

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    yeah, that's how to do it.
 2         Q.  In other words, get our monthly data,
 3    divide by some number.  And did you divide by 30
 4    or 31?
 5         A.  Whatever September has, it's --
 6         Q.  30.
 7         A.  -- 30.  And -- nice try.  But whatever
 8    the monthly was, and -- what was I going to say?
 9    Yeah, I lost it there.
10         Q.  Okay.  All right.  Let's look at your
11    report.  Let's go to page 27.  Actually, before we
12    do that, all right.  Well, maybe we can do it this
13    way.  Where was the other exhibit?  Sorry about
14    this.  It was here.  Ah, no, that's not it.  I'm
15    looking for the exhibit that has the Fox data on
16    it.
17              MR. GRUNBERG:  That would probably be 145
18    or so.
19              THE WITNESS:  145.
20              MR. GRUNBERG:  Yeah, 145.  That memory
21    kicking in.
22              MR. SCHWARTZ:  Good for you.  It's on the
23    bottom of the pile.
24    BY MR. SCHWARTZ:
25         Q.  So, now I understand you've clarified
```

EXHIBIT 1
PAGE 146

BERNARD J.JANSEN, PHD

November 04, 2019

1  something that I didn't know coming into this

2  deposition, which was the data on Exhibit 145 was

3  not data that you used in your final report, and

4  this is from a different period of time.

5          But help me out anyway.  So on this it

6  says that, according to SimilarWeb, the -- it

7  reports the number of 373 million on the right

8  side, do you see that?

9      A.  Yes.

10     Q.  What does that -- what does SimilarWeb

11 tell us about that?

12     A.  That is the monthly visits to that

13 particular website, okay.  So that includes

14 perhaps Jim Jansen going back three times to that

15 particular site during that month.

16     Q.  Okay.  They don't report monthly unique

17 visitors -- maybe they do, but I don't see that

18 here.  Do you know why that's not there?

19     A.  Yes, this was generated from the free

20 version, and so if you want that type of data

21 you've got to pay for it.  And that's what I did

22 with the API.

23     Q.  Got it.  Then let's just move on.  We can

24 shorten some stuff here.  Thank you.

25          Now, do you know for any of the articles

```
 1    on your list -- start again.
 2            Do you know for any of the articles on
 3    your list where on the websites that they were
 4    available on they were located?  In other words,
 5    where on that website, home page, some other page,
 6    any of that information, do you have that?
 7        A.  Other than for the BuzzFeed documents
 8    provided I don't have a snapshot of the website on
 9    the day the article was posted, no.
10        Q.  Okay.  I just want to make sure you've
11    answered my question.  I think you have, but just
12    so we're clear.  In other words, you don't --
13    other than for the BuzzFeed article, you don't
14    know where on these websites those particular
15    articles were placed.
16        A.  I did not visit the websites on the day
17    they were posted, so I don't have that
18    information, no.
19        Q.  Even if you didn't visit the websites on
20    the day they were posted, from any other source do
21    you know where the articles on your list in
22    Appendix B other than the BuzzFeed article were
23    posted on the websites on which they were posted?
24        A.  Well, it's -- let me backtrack.  Maybe I
25    misunderstood your question.  If you're talking
```

EXHIBIT 1
PAGE 148

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    about the interface, you know, I certainly do not
2    know that because I didn't visit it.
3         If you look at the URL, that will give
4    you an idea of the structure of where the article
5    was posted and if it was, for example, posted in
6    technology or social media or, you know,
7    international news and things like that.  But I
8    don't have the -- I took your question to mean
9    the -- not the structure, but the interface
10   itself.
11        But from the URL you can get some
12   structural information sometimes.  But I didn't
13   look at that in my analysis.
14       Q.  I see.  So, in other words, you can't
15   tell us how, if somebody landed on the home page
16   of one of the 354 websites in your analysis what a
17   person would have to do to find the actual article
18   from that website that's on your list.
19       A.  I did not -- yeah, I said I didn't have
20   the snapshot of the interface for the particular
21   days those articles were posted, so no, I don't
22   have that information.
23       Q.  You don't have the information I was
24   asking about, which was how if somebody landed on
25   the home page of any of those 354 websites in your
```

EXHIBIT 1
PAGE 149

BERNARD J.JANSEN, PHD

November 04, 2019

1    analysis what a person would have to do to find

2    the actual article from that website on your list.

3              MR. GRUNBERG:  And just so we can make

4    this easier, are you asking him about this moment

5    in time or are you asking about the moment, the

6    day of the article being posted?  That might help

7    get what you're looking for from him.

8    BY MR. SCHWARTZ:

9         Q.   I'm not sure that I am, but let me

10   suggest something maybe I -- what I'm asking you

11   is this.  As you sit here today can you tell us

12   for the articles on your list what a person would

13   have to do from the home page of those websites in

14   order to get to that article?

15        A.   Yeah, I can certainly talk generically.

16        Q.   No.  Let me -- my question wasn't that

17   clear, then.  In other words, the actual effort a

18   person would have to make in order to find the

19   article.

20        A.   Right.  Well, again, generically it could

21   be right on the splash -- the home page when they

22   landed, the article's right there.  Could be in

23   one of the subcategories, technology, you know,

24   investments.  Or they could do a search.  I think

25   those would be the three kind of approaches that a

EXHIBIT 1
PAGE 150

1    person would do.

2         Q.  Right.  But do you know for each of these

3    articles?  Let's start with -- for each of these

4    articles, like whether they were on the home page?

5         A.  No, I did not.

6         Q.  And do you know how much effort a person

7    would have to undertake if they were at the home

8    page of these websites in order to get them to the

9    article on your list?

10        A.  It would be one of kind of the three

11   general approaches that I mentioned, but I don't

12   know for each individual article.

13        Q.  Do you know of any of the articles?

14        A.  As I said, I didn't visit the websites

15   the day they were posted, so I don't know

16   specifically.

17        Q.  All right.  So do you know whether if --

18   as to those articles on your list that were not

19   posted on the home page of the websites or

20   website, in other words, it was on some

21   supplemental or deeper page, the article was

22   mentioned or linked on the home page?

23        A.  The -- as I mentioned, I didn't -- when I

24   did my analysis I didn't visit the websites the

25   day they were posted.  I do some examples where

EXHIBIT 1
PAGE 151

November 04, 2019

1    you can do searches on websites and they -- the

2    articles show up, that's in my report.  But I

3    don't have for all 605 specific articles.

4         Q.  Right.  But your testimony is that these

5    articles were disseminated on 354 websites --

6         A.  Yeah.

7         Q.  -- and here's some data traffic for

8    unique viewers to these websites.  I'm trying to

9    figure out if there's any way of knowing just from

10   the mere fact that they're on the website -- or

11   not knowing from the mere fact they're on the

12   website.

13        I'm trying to ask you if somebody just

14   showed up at the home page of each of these

15   websites whether they would know that the article

16   was to be found somewhere on the website or how

17   much effort they would have to undertake in order

18   to find it.  Sitting here now, that's not the

19   information you were asked to look at or have,

20   right?

21        MR. GRUNBERG:  Object to the form.  There

22   are a lot of different questions there.

23        A.  As I said a couple times, I was not asked

24   to investigate this.  I didn't visit the website.

25   But these articles are still there, so you can go

EXHIBIT 1
PAGE 152

BERNARD J.JANSEN, PHD

November 04, 2019

1    to the website and if you pull up one article it

2    will suggest articles for you that, you know, also

3    contain the defaming statements.  You can search

4    on these websites.

5            You know, the whole Thai cave rescue

6    thing was a very popular story, and Mr. Musk's

7    comments, you know, again, very popular.  But

8    again, I don't know specifics on each individual

9    article.

10       Q.  Do you know them for any article?

11       A.  Again, I didn't investigate this, so I

12   don't know.

13       Q.  Okay.  But if somebody weren't looking --

14   obviously if somebody wanted to find an article on

15   Mr. Unsworth or Mr. Musk or what Mr. Musk said

16   about Mr. Unsworth, one way someone might do that

17   is to actually go to Google and ask Google to do

18   the work, the legwork and find those articles,

19   right?

20       A.  Yes.

21       Q.  All right.  But if somebody wasn't

22   looking to find information about Mr. Unsworth or

23   looking to find what Mr. Musk had said about

24   Mr. Unsworth, they were simply visiting the 354

25   websites you looked at, I'm trying to understand

EXHIBIT 1
PAGE 153

BERNARD J.JANSEN, PHD

November 04, 2019

1    how someone would know there was an article to be

2    found somewhere within that website that --

3         A.   Yeah.

4         Q.   -- had this information in it.  And

5    that's not anything you studied, is it?

6         A.   I didn't look at that for the 605

7    articles.  And I would also want to point out that

8    some of these websites are not news sites but

9    they're blog posts.  So it's not just a single

10   structure for all 354 websites that are in my

11   report.

12        Q.   Right.  As you sit here now, though, you

13   can't tell me how many of the articles were

14   available on the front page of the blog or the

15   website, can you?

16        A.   I didn't look at that, no.

17        Q.   Okay.  So the -- I want to focus on the

18   word visit, okay, as you've used that term, or

19   visitors in your report.  So when you say like

20   there was a visitor, I think that means a web

21   browser landed on or presented to the user of the

22   browser and drew the webpage from that website's

23   domain; is that right?

24             MR. GRUNBERG:  Objection, form.

25        A.   The metric for unique visitors, it does

EXHIBIT 1
PAGE 154

```
 1   have this aspect of being based off a browser and
 2   a certain IP address.  And but they've kind of got
 3   more sophisticated also, and that's why they use
 4   these panel data also to incorporate in their
 5   calculation of these visitors.
 6        Q.  Right.  I guess -- let me ask a different
 7   question, I apologize for the lack of clarity.
 8            The 98 million number of unique daily
 9   visitors means that -- let's just assume it's 98
10   million people, whatever.  Or start again.  The 98
11   million figure, what it's telling us is that 98
12   million web browsers took the user to a page on
13   that website, right?
14        A.  The -- well, the metric is -- as best as
15   possible they try to associate it with people,
16   that each unique visitor is a particular person.
17   But there is this -- but they calculate that
18   through a component of the browser.
19        Q.  Right.  Let's forget about bots.  I
20   didn't mean to be treading back into that.  I just
21   want to understand what's going on here.
22            In other words, in order for -- I have
23   this image in my head of gnomes with little
24   tallies and they're getting to 98 million.  And
25   each time a browser lands on a webpage hosted by
```

EXHIBIT 1
PAGE 155

BERNARD J. JANSEN, PHD

November 04, 2019

1    the website, that counts as a visit or a visitor,

2    right?

3         A.   It counts as a visit.

4         Q.   Okay.  Let's start with that.  Whether --

5    that counts as a visit whether or not the user

6    navigates any further or interacts any further

7    with that website, right?

8         A.   Could be specific how the calculation is

9    made.  But yes, generally once you go to a website

10   and the process of called dropping a cookie on the

11   computer, that counts as a visit.

12   BY MR. SCHWARTZ:

13        Q.   Right.  So the 98 million doesn't tell us

14   whether any of those -- what activity those users

15   engaged in beyond landing on a page on the

16   website, right?

17        A.   Well, this goes back to your earlier

18   question about accessing articles.  No, I didn't

19   have that information.  This is the potential for

20   dissemination of the defaming statements.  So it's

21   traffic to the website.

22        Q.   Right.  But it doesn't tell us whether

23   once the browser arrived at that website there was

24   any further interaction with the website, does it?

25        A.   As I said, we don't go down beyond the

EXHIBIT 1
PAGE 156

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   site level.  So no, it does not.
 2        Q.  So, in other words, give you an example.
 3   Somebody goes to one of the 354 websites or
 4   someone is counted as a visit to one of those 354
 5   websites during the period you studied.  They are
 6   immediately confronted by a banner ad that
 7   captures their eye and they click on it and it
 8   opens up a new webpage.  That counts as a visit
 9   still to the website, doesn't it?  To the first
10   website?
11             MR. GRUNBERG:  Objection.
12        A.  Depended what the ad -- where the ad is
13   at and who's posting the website.  But the initial
14   contact with the website counts as a visit.
15        Q.  Right.  And if in the initial contact
16   with the website somewhere on that webpage they
17   see something that's of interest to them and they
18   go to something that takes them through to another
19   website, the metric doesn't subtract that person
20   out as a visitor from the website you were looking
21   at.  They're still a visitor, aren't they?
22        A.  They would be -- generally they would be
23   calculated as a visitor.
24        Q.  Right.  So it can be the case that even
25   if the only interaction that a user had with a
```

EXHIBIT 1
PAGE 157

BERNARD J.JANSEN, PHD

November 04, 2019

1   website was to land on the website, see an ad of

2   interest to them and click through to that

3   website, to that ad, to wherever it takes it, have

4   no further interaction with the website under

5   study, it's still a visitor or a visit, right?  It

6   still counts towards the 98 million, right?

7        A.  Well, yeah, and -- yes.  And websites

8   want to count that, because especially content

9   websites.  So you go to like a blog post -- you

10  don't have to take any other action with the

11  website, for example.

12       Q.  To be counted.

13       A.  Yeah.  Well, you can't -- you could

14  still -- the website could still accomplish what

15  it wants by -- the content is there, they saw a

16  blog post, and they left.  But they can still see

17  it without taking any other particular action on

18  that website.

19       Q.  Right.  And somebody who lands on one of

20  the 354 websites that you studied would still be

21  counted as a visit or a visitor even if the time

22  they spent on the website was a second, two

23  seconds, and they did nothing else but just look

24  at that home page and then go, I'm bored, or I

25  have to go eat dinner or whatever else, they'd

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1   still count as a visit, wouldn't they?
 2        A.  I would generally say yes, that those
 3   visits count.  They typically have some type of
 4   time limit.  But it would generally count as a
 5   visit.
 6        Q.  What's the minimum amount of time --
 7        A.  That, I don't know.
 8        Q.  -- you understand these websites require
 9   a visitor to remain on the website to be counted
10   as a visitor?
11        A.  Yeah, I don't know.  But -- an
12   interaction with a website and once the cookie's
13   dropped, it's counted as a visit.  So once that
14   happens it's counted as a visit.
15        Q.  So unfortunately SimilarWeb doesn't tell
16   you how many of the daily unique visitors to each
17   of the 354 websites you looked at spent just the
18   minimum amount of time on those websites and then
19   left.
20        A.  It doesn't correlate that with the unique
21   daily visitors, no.
22        Q.  Right.  So some unknown number of those
23   people may have spent an insufficient amount of
24   time on that website to even know that that
25   website had information about Mr. Unsworth,
```

EXHIBIT 1
PAGE 159

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    correct?
 2         A.   Well, I wouldn't take it that far, but
 3    there is -- there is the possibility that yes, in
 4    that 98 million, yeah, people could have had
 5    minimal interaction with the website.
 6         Q.   And SimilarWeb --
 7         A.   It's possible.
 8         Q.   I'm sorry, SimilarWeb doesn't give you
 9    sufficient information for you to determine the
10    extent to which that happened, do they?
11         A.   The -- not for the unique visitors, no.
12         Q.   Okay.  What about people who come to a
13    website and realize they navigated there by
14    mistake, but a cookie got dropped onto their
15    browser from the website.  SimilarWeb's metrics
16    will view that person as a daily unique visitor,
17    right?
18         A.   Well, see, now, you start bringing in
19    SimilarWeb.  But then because they have this panel
20    data, they can do some additional calculations
21    that maybe just a website owner cannot do.  So I
22    can't comment specifically on, you know, what
23    SimilarWeb is doing.  But in terms of interacting
24    with a website, you know, through some type of
25    tagging or something like that, then yes, once the
```

EXHIBIT 1
PAGE 160

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   cookies drop it's counted as a visit.
 2       Q.  Well, does SimilarWeb ask its panel
 3   members or do the people who gather that data for
 4   SimilarWeb ask their panel members when they
 5   report data or when they analyze data to
 6   eliminating visits that occurred by mistake?
 7           MR. GRUNBERG:  Objection, form.
 8       A.  I don't know that -- sorry.  I don't know
 9   that level of detail on the algorithm.
10   BY MR. SCHWARTZ:
11       Q.  And by mistake, I mean either they typed
12   the wrong URL or they clicked the right link but
13   it took them to a place they really didn't mean to
14   go and they just want to hit the go back button
15   and leave.  Do you understand that's what I meant
16   by mistake?
17       A.  Yes.
18       Q.  Have you ever navigated to a website that
19   you didn't intend to go to and click the back
20   button?
21       A.  Yes, I have.
22       Q.  Okay.  And you don't think you're the
23   only person in the world to use the internet who's
24   had that experience.
25       A.  I don't think so, but --
```

EXHIBIT 1
PAGE 161

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        Q.  And as you sit here today you can't tell
 2   us how much or how many of the 98 million users in
 3   your daily unique user count includes users either
 4   who navigated to a website by mistake or they
 5   never really interacted -- they never interacted
 6   with the website beyond, say, clicking on an ad
 7   that took them somewhere else.
 8        A.  Well, again, I kind of go back to my --
 9   the purpose of my analysis.  So my purpose of
10   analysis was the dissemination of these defaming
11   statements.  So let's say someone, take your
12   scenario, someone did accidentally go to the
13   website.  They still could have saw the defaming
14   statements.  Maybe it's not the website they
15   wanted to visit, but they still could have saw the
16   defaming statements, left, and it's still within
17   the numbers of my report of people that were
18   exposed to the defaming statements.
19        Q.  And that would depend on whether the page
20   of the website that they landed on had the
21   defaming statements on them.  As opposed to
22   being --
23        A.  Or it was visible when they landed.
24        Q.  Exactly, it was visible on the webpage
25   when they landed right?
```

EXHIBIT 1
PAGE 162

BERNARD J.JANSEN, PHD

November 04, 2019

1          A.   In the scenario that I just outlined,
2     yes.  If they accidentally went to the website,
3     saw the defaming statements, even then okay, they
4     saw the defaming statements, it got counted as a
5     unique visitor.  Will it be actually a valid
6     count.
7          Q.   Right.
8          A.   Or people that the defaming statements
9     were disseminated to.
10         Q.   So how many people accidentally navigated
11    to websites and saw the defaming statements,
12    realized they got to the website by mistake and
13    left?
14         A.   I did not calculate that number.
15         Q.   How many of the people in your 98 million
16    include people who accidentally wound up at a
17    website that you were looking at, didn't see the
18    content and left, or got to the website, clicked
19    through on an ad or something else without seeing
20    the content containing the statements you were
21    studying?
22         A.   Yeah, this is similar to the aspect of,
23    you know, the people that, you know, read the
24    defaming statements.  It's not something I looked
25    at.  I was interested in dissemination of these

EXHIBIT 1
PAGE 163

BERNARD J.JANSEN, PHD

November 04, 2019

1    statements.

2        Q.  So the answer is you don't know.

3        A.  I don't have that level of data.

4        Q.  Okay.  So is it the case that it's more

5    likely that someone will read an article

6    prominently displayed on the home page of a

7    website than an article buried deep in the

8    website?  If they're not getting there by a search

9    engine, for example.

10       A.  I don't know specifically in terms of

11   giving you a quantifiable number.  But, you know,

12   the Pew internet research, they do these type of

13   publications on behaviors on websites.  But I

14   don't have an exact number.

15       Q.  So let's see, on page 26 of your report,

16   one of the websites you list is cars.com with

17   about 345,000 unique daily visitors, right?

18       A.  Yes.

19       Q.  Okay.  And that 345,000 number, that's

20   included in your 98 million total, right?

21       A.  Yes.

22       Q.  Do you know much about cars.com?

23       A.  No, I do not.

24       Q.  It's a website where people, generally

25   the purpose for going to that website is to look

EXHIBIT 1
PAGE 164

```
 1    to see if they're interested in either buying or
 2    selling a car.  Did you know that?
 3         A.   I said I'm not familiar with the
 4    particular website.
 5         Q.   I see.  How many of the 347 websites
 6    included in your list are you not familiar with?
 7         A.   Many of the small ones I'm not familiar
 8    with, many of the domain-specific ones I'm not
 9    familiar with.
10         Q.   And by -- what are you using to
11    differentiate ones that are small from ones that
12    are not small, in your answer?
13         A.   Well, you know, typically the web traffic
14    like, you know, for example this 0nion spelled
15    with an O, I'm not familiar with, what the first
16    website mentioned here.  I'm not familiar with it.
17         Q.   You mean with a zero as opposed to a
18    capital O?
19         A.   Exactly.
20         Q.   Are you familiar with a website called
21    Onion that uses all letters to spell itself out?
22         A.   Yes.
23         Q.   Okay.  Cars.com, as far as you know it's
24    not a news site, is it?
25         A.   I'm not really familiar with this.
```

EXHIBIT 1
PAGE 165

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1       Q.  All right.  Let me show you -- let's mark
 2   as an exhibit.
 3            (Defendant's Exhibit 148 marked)
 4   BY MR. SCHWARTZ:
 5       Q.  So we put before you as Exhibit 148 a
 6   hard copy printout of the cars.com website from
 7   within the last few days.  Do you have that in
 8   front of you?
 9       A.  Yes.
10       Q.  And looking at it do you agree with me
11   that the principal purpose of this website is to
12   help people looking to buy or sell a car?
13       A.  I'm not familiar with websites, so I
14   don't know what the purpose of the website is.
15       Q.  No, I'm asking you based on looking at
16   the home page of cars.com that you now have in
17   front of you, do you agree with me that the main
18   purpose of this website is to help people who are
19   looking to buy or sell a car?
20       A.  Based on here, it looks like it's buying
21   and selling cars is -- it's one thing the site
22   does, yes.
23       Q.  Okay.  There's lots of things on this
24   website, right?  You can search for reviews, you
25   can look for used cars, you can look for new cars,
```

EXHIBIT 1
PAGE 166

BERNARD J.JANSEN, PHD

November 04, 2019

1  right?

2        A.  I guess.

3        Q.  Well, if you look at the last page where

4  they tell you some popular searches, new cars for

5  sale, used cars for sale, do you see that?

6        A.  Okay.

7        Q.  Right?

8        A.  Uh-huh.

9        Q.  If -- would anyone visiting the cars.com

10  website to look to buy or sell a car be likely to

11  come across the article from cars.com that you

12  included in your report?

13            MR. GRUNBERG:  Objection, form.

14        A.  Yeah, I -- as similar to your other

15  questions about a specific user, I can't answer

16  what a specific user might or might not do.

17  BY MR. SCHWARTZ:

18        Q.  Well, you don't see any link to the

19  article in your list from cars.com on the home

20  page of cars.com, do you?

21        A.  I haven't looked at the entire page,

22  but --

23        Q.  Take as much time as you need, and you

24  let me know if you see a link on there to the

25  article you included on your list from cars.com.

EXHIBIT 1
PAGE 167

BERNARD J.JANSEN, PHD

November 04, 2019

1        A.   I can look at this, but, I mean, I don't

2    know the link to the article and -- and, again,

3    my -- even if someone came here to this particular

4    site and the article containing the defaming

5    statements were posted there, they would have the

6    opportunity of seeing the defaming statements,

7    regardless of what originally motivated them to go

8    to websites.  The defaming statements were there.

9        Q.   Right.  So your testimony isn't that 98

10   million -- well, your testimony is that a certain

11   number of people had the opportunity to go to

12   websites where the defaming statements were found,

13   right?

14       A.   As I've said several times, the --

15   these -- I was to measure the dissemination of

16   these defaming statements and they appeared in 354

17   websites and 605 articles, the daily unique

18   traffic to those websites was about 98 million.

19       Q.   Right.  You're an expert on computer

20   science, you have expertise in websites.  Do you

21   see a link on the home page of cars.com to the

22   article from cars.com that you included on your

23   list?

24       A.   Based on looking at what you provided me,

25   no, I don't see that.

EXHIBIT 1
PAGE 168

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1              MR. GRUNBERG:  Well, I'm going to stop
 2    this right here, because, look, unless you're
 3    going to take out what this website looked like on
 4    July 18th if you navigated to any of the content
 5    posted on there and show him what the must read
 6    stories on the right-hand margin of the website
 7    showed if you navigate to any of this content and
 8    whether that showed a link to the article about
 9    Musk, this is an inherently unfair and incomplete
10    and harassing line of questioning.
11              So do you have any representation as of
12    July 18th with regard to what the must read
13    stories showed when you navigated to virtually any
14    content on this website?
15              MR. SCHWARTZ:  Can I just ask you to
16    clarify what year you're talking about, July 18th
17    2018 or 2019?
18              MR. GRUNBERG:  2018.
19              MR. SCHWARTZ:  Okay.  I can't tell you
20    what the cars.com website looked like in July,
21    but -- 2018.  No, I can't represent that to you.
22              MR. GRUNBERG:  And then July -- and then
23    July 2019?
24              MR. SCHWARTZ:  This is the only
25    information I have about the cars.com website, and
```

EXHIBIT 1
PAGE 169

BERNARD J.JANSEN, PHD
November 04, 2019

```
 1    I believe it is from the last few days.
 2            MR. GRUNBERG:  And I'm just curious,
 3    you've done June, you've done June 2000 -- it's
 4    really hard to read this.  What day are you trying
 5    to represent?  June 18, 2019?
 6            MR. SCHWARTZ:  I take that back.  I think
 7    I stand corrected.
 8            MR. GRUNBERG:  This looks to say June 18,
 9    2019.  You aware that the statements that Musk
10    made in this case were in July of 2018.
11            MR. SCHWARTZ:  Yes, I am.
12            MR. GRUNBERG:  I'm sorry, July of 2018,
13    August of 2018 and September of 2018, and not June
14    of 2019.
15            MR. SCHWARTZ:  Well, I know they weren't
16    in June of 2019, yes, I know.
17            MR. GRUNBERG:  Okay.  So --
18            MR. SCHWARTZ:  I don't know what --
19            MR. GRUNBERG:  In addition -- sorry.  In
20    addition to the objections that I previously
21    stated, I further state that this exhibit that you
22    put in front of him that I think the suggestion
23    was was somehow representative of what was going
24    on when the article that was from cars.com of July
25    18 was posted -- of 2018 was posted.  To the
```

EXHIBIT 1
PAGE 170

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    extent you were representing that, that is a
 2    misleading, misrepresentative question based on
 3    this exhibit.  My objection is done.
 4              MR. SCHWARTZ:  Okay, thanks.  Is the
 5    witness no longer going to be offering any
 6    testimony about the extent to which any of these
 7    articles are currently available on the internet?
 8              MR. GRUNBERG:  Or maybe -- is your
 9    article June of 2019?  I guess that's the
10    question -- the witness isn't going to be
11    testifying to that, but I'm just -- I'm trying to
12    get clarity on what you're representing here.
13              MR. SCHWARTZ:  Yeah.  Let me tell you, I
14    see at the top of the page there is some
15    information about captures and there's some kind
16    of date selection that looks like it is set to
17    June 18th, 2019.
18              MR. GRUNBERG:  Yes.
19              MR. SCHWARTZ:  What that represents, I
20    don't know.
21              MR. GRUNBERG:  Okay.
22              MR. SCHWARTZ:  I just don't know.
23              THE WITNESS:  That's --
24              MR. SCHWARTZ:  But -- and that's why when
25    I started out I said my understanding is this is
```

EXHIBIT 1
PAGE 171

BERNARD J.JANSEN, PHD

1    from cars.com in the last few days.  That's what I

2    was told this is.  That's the information that I

3    have.  Why that says what it says at the top, I

4    don't know.  Maybe there is a way to go onto

5    cars.com and tell it to go to a certain date, or

6    maybe you have to go into the Wayback Machine.

7    But let me just ask one question, though.

8           At various times in the deposition

9    Mr. Jansen has said various articles are still

10   available today.

11           MR. GRUNBERG:  Yes.

12           MR. SCHWARTZ:  And the objection that you

13   just made concerned the time, the date on which

14   this home page was printed.  I assume -- you're

15   not going to exclude him from testifying as to his

16   knowledge about articles that are available today,

17   right?

18           MR. GRUNBERG:  Oh, no, no, I'm certainly

19   not, and that's in his report.  But I'm just

20   telling you that to the extent -- so, one, you

21   represented that this was from the last few days.

22           MR. SCHWARTZ:  Yes, that's my

23   understanding.  None of us knows if this is

24   what's -- if this is or is not from the last few

25   days.

EXHIBIT 1
PAGE 172

BERNARD J.JANSEN, PHD

November 04, 2019

1              THE WITNESS:  I can explain this.

2              MR. SCHWARTZ:  Why don't we allow the

3     witness -- he may know more than we do.

4              THE WITNESS:  This is from the Wayback

5     Machine, internet archive, and this appears to be

6     a snapshot of at least one of the pages on June

7     18th, 2019.

8              MR. SCHWARTZ:  Okay.

9              MR. GRUNBERG:  And so if I -- so just to

10    finish --

11             MR. SCHWARTZ:  Go ahead.

12             MR. GRUNBERG:  -- clearly as part of his

13    report and the testimony that the witness has

14    given today he has testified to the continuing

15    existence of the articles in question on the

16    internet, and clearly we are not going to prevent

17    him from testifying to that.

18             My concern is just to the extent that

19    this was represented to be from a few days ago,

20    this Exhibit 148, that appears not to be the case

21    to the extent there was some confusion and

22    someone -- because we know that the 18th of a

23    month that starts with J is relevant in this case.

24             If someone was confused and did June 18th

25    and thinking July 18th and thinking 2018 and they

EXHIBIT 1
PAGE 173

BERNARD J.JANSEN, PHD
November 04, 2019

1     were trying to represent that this was somehow

2     what occurred on the day that Elon Musk was making

3     his statements defaming Mr. Unsworth, I would just

4     say that that doesn't represent what the home page

5     looked like on that day.

6               MR. SCHWARTZ:  Got it.

7               MR. GRUNBERG:  Would be my understanding.

8               MR. SCHWARTZ:  Great.

9     BY MR. SCHWARTZ:

10         Q.  So let's clear this up for me too.  Let's

11    assume for purposes of my questions that Exhibit

12    48 is what the cars.com home page looked like on

13    June 18th, 2019.  Do you agree with me that if

14    that is correct, there's no link on this page or

15    any mention on this page, home page, of the

16    article in your report from cars.com?

17         A.  I don't see the mention of the article on

18    this page.

19         Q.  Okay.  Okay.

20              MR. SCHWARTZ:  Let's mark this as Exhibit

21    149, please.

22              (Defendant's Exhibit 149 marked)

23    BY MR. SCHWARTZ:

24         Q.  Okay.  Exhibit 149 is an article from

25    cars.com dated June 18th, 2019, which might

EXHIBIT 1
PAGE 174

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    explain why one of my colleagues used the Wayback
 2    Machine to the date they used it to.
 3              MR. GRUNBERG:  I -- yeah, there you go.
 4              MR. SCHWARTZ:  So now we know.
 5    BY MR. SCHWARTZ:
 6         Q.  And if -- the article, if you look in the
 7    lower right, has little numbers-8, starting with
 8    page 1.  Do you see those on the lower right?
 9         A.  Yes.
10         Q.  Okay.  If you go to page 5 of 8, you'll
11    see it says the following, quote, Things only got
12    worse on Musk Twitter account when he got into a
13    heated exchange and called Vernon Unsworth a
14    British cave diver a quote pedo guy, period close
15    quote.  Do you see that?
16         A.  Yes.
17         Q.  And does that -- the inclusion of the
18    word or term pedo guy in here, is that the content
19    from this article that caused you to include it on
20    your list?
21         A.  There may have been others, but that
22    would be -- fall within the defaming statements.
23         Q.  Okay.  So the day this article was
24    published, if we look at as of the Wayback
25    Machine, the home page, that would explain why
```

EXHIBIT 1
PAGE 175

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    somebody gave me that exhibit to show you, I
 2    guess, because that was the day cars.com published
 3    it.  All right.  I think the mystery has been
 4    solved and we can move on.
 5              MR. GRUNBERG:  Do you know which -- just
 6    so we can kind of confirm what we're looking at
 7    here, do you know which of the dates, the time
 8    snapshot this was for Wayback on June 18,
 9    there's --
10              MR. SCHWARTZ:  I don't.
11              MR. GRUNBERG:  -- at least 12 snapshots
12    available on way back.
13              MR. SCHWARTZ:  I don't.
14              MR. GRUNBERG:  Just so we would be able
15    to authenticate or confirm what it is.
16              THE WITNESS:  You may be able to tell by
17    the URL, the last of -- when they give the URL it
18    should tell you the snapshot that they used.
19    Doesn't look like the URL is there.
20              MR. SCHWARTZ:  Thank you.  Okay.  All
21    right.  Okay.  All right.
22    BY MR. SCHWARTZ:
23         Q.  So another one of the websites you've
24    included in your unique daily visitor count was
25    called eurogamer.net on page 27, and that added
```

EXHIBIT 1
PAGE 176

1    369,474 unique daily visitors to your count,

2    correct?

3         A.   Which page, please?

4         Q.   Page 27, it's about the seventh or so

5    from the top, eurogamer.net.

6         A.   Yes.

7         Q.   And that's a website that the focus of

8    that is video games, correct?

9         A.   That would be my guess from the URL.

10        Q.   Would an ordinary visitor to a website

11   that focuses on video games be looking to go to

12   that site to find news stories on Elon Musk and

13   whatever he would have had to say about

14   Mr. Unsworth?

15             MR. GRUNBERG:   Objection, form.

16        A.   That was not really -- that was not my

17   focus.  My focus was the daily traffic on these

18   websites.  So perhaps someone may not have been

19   looking for the article, but they went to the

20   website and then once there they would have the

21   opportunity to see the defaming statements.

22   BY MR. SCHWARTZ:

23        Q.   So if someone who went to the eurogamer

24   website wanted to see if there was anything on

25   that website about Mr. Unsworth to find the

EXHIBIT 1
PAGE 177

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   article that you included in your report, how long
 2   would it take them to find it?
 3        A.   I did not investigate that.
 4        Q.   If visitors to the cars.com website
 5   wanted to find the article about Mr. Musk that you
 6   included in your report, how long would it have
 7   taken them to do that?
 8        A.   I take some objection to the form of the
 9   question, because you can go to the website and
10   that not be your purpose, but you may go to the
11   car website, then just look at the news which is
12   where the article was published, based on the URL,
13   and just read it based on cars.  So it's not like
14   that was maybe their purpose of going there, but
15   once there they could have seen it.
16        Q.   I understand that once there someone
17   could have seen it.  My question to you is how
18   long would it have taken a person to find the
19   article?
20        A.   I didn't analyze each particular website.
21   But looking at that URL it looks like you would
22   click on the cars, click on the news, and so a
23   click.
24        Q.   Do you know how many other news items on
25   cars.com on the date this article was published
```

EXHIBIT 1
PAGE 178

BERNARD J. JANSEN, PHD

November 04, 2019

1    there were?

2        A.  As I said several times, I didn't analyze

3    each website.  I didn't have access to the website

4    interfaces on the days the articles were posted,

5    so I didn't investigate that.

6        Q.  So it follows from that that you can't

7    tell us whether someone clicked on cars.com then

8    said, Oh, I want to see news, whether the article

9    you included in your report would be visible to

10   them on their screen.

11       A.  Once again, I didn't analyze that level

12   of behavior.  It was once they got to the website

13   they had the opportunity to see the defaming

14   statements because the defaming statements were

15   disseminated to that website.

16       Q.  I know.  But my question was:  You can't

17   tell us whether if someone navigated to the news

18   page on cars.com they would see the article you

19   included.

20       A.  As I've --

21          MR. GRUNBERG:  Objection, asked and

22   answered.

23       A.  -- answered several times, I didn't

24   analyze the layout of each website on the day the

25   article was posted.

EXHIBIT 1
PAGE 179

```
 1   BY MR. SCHWARTZ:
 2       Q.  Right.  All you have to do is say no.
 3   You can answer my question.  It's a yes or no
 4   question, you don't want to give yes or no
 5   answers, which is why unfortunately I repeat them
 6   or try to get you to focus on the question I
 7   asked.  I just want to be sure I get answers to my
 8   questions --
 9       A.  Sure.
10       Q.  -- because, as I told you before, this is
11   my only opportunity to ask you questions before
12   you take the stand at trial, and I need some
13   cooperation from you to get the information that
14   I'm looking for.  Is that fair?
15           MR. GRUNBERG:  Objection to the extent
16   that you're insinuating he's not cooperating.  He
17   answering the question.  He's telling you it's not
18   something that he looked at.  That you don't like
19   the answer, you know, is not a reason to sit here
20   and tell this man that he's not cooperating.  So I
21   just want to make that clear on the record.
22           But go ahead and please ask your
23   question.
24           MR. SCHWARTZ:  Thank you.
25   BY MR. SCHWARTZ:
```

EXHIBIT 1
PAGE 180

November 04, 2019

1        Q.   So can you tell us, yes or no, whether if
2   someone navigated to the cars.com website news
3   section they would see on their screen without
4   having to scroll further or navigate further the
5   article you included in your report?
6        A.   I understand you may want a yes/no
7   question -- or a yes/no answer, but it's really
8   not a yes/no answer, because multiple people went
9   to that website.  Some may have seen it very
10  clearly initially, others may have had to scroll,
11  other people may have had to search.  So it's not
12  just a yes/no that that applies to every
13  particular visitor to that website.  So it's not a
14  yes/no response to your question.
15       Q.   Well, do you know anything about any
16  visit that anyone made to the cars.com website in
17  terms of where the article would be seen, what a
18  user would have to do to navigate to find that
19  article?
20       A.   Since I did not analyze the layout of
21  articles on these sites the day the articles were
22  posted, the answer would be no.
23       Q.   All right.  And so you can't tell me,
24  then, whether someone -- I'm just following up on
25  an answer you gave me earlier, which was if

EXHIBIT 1
PAGE 181

1    somebody went to the news section of cars.com they

2    would see this article.  I want to know if you

3    actually know that.  So that's why I asked you:

4    Would they see this article on their screen or

5    would they have to scroll or navigate further to

6    find it, yes or no?

7          MR. GRUNBERG:  Objection, form.

8      A.  And my response is you say "they," like

9    this person.  And I'm saying there's multiple

10   people going to the site.  I don't know the

11   experiences of each of the users that went to the

12   site.  Some may have seen it directly, they may

13   have got there right when the article was posted.

14   Others may have had to search, others may have had

15   to scroll.  I can't answer your question as yes or

16   no for every single visitor that went to that

17   website.

18   BY MR. SCHWARTZ:

19     Q.  Maybe if I state the question differently

20   it will help.  Did cars.com place the link to the

21   story, to the article that you've included from

22   cars.com in your report, on the first page visible

23   to web browsers to the news section?

24     A.  I do not know.

25     Q.  Okay.  Now, the information concerning

EXHIBIT 1
PAGE 182

1   what Mr. Musk said about Mr. Unsworth is on the

2   fifth of eight pages in the cars.com article,

3   correct?

4       A.   It's one of the defaming statements, yes.

5       Q.   And you have no way of knowing the extent

6   to which anybody who saw this article opened it

7   and read it read it far enough -- read far enough

8   into the article to come across those statements,

9   do you?

10       A.   I need to clarify my methodology is my

11   method was whether an article contained the

12   defaming statements or not.  I did not look at

13   individual behavior in that article.  So whether

14   the defaming statements were in the title of the

15   article or on page 5 or at the last sentence, it

16   was -- it was did the article contain the defaming

17   statements.

18       Q.   Okay.

19            MR. GRUNBERG:  And his report is fairly

20   long, and it's pretty clear about what he did look

21   at and what he didn't look at.

22            MR. SCHWARTZ:  Okay.

23            MR. GRUNBERG:  And, you know, we've done

24   at least an hour of questions about things he

25   didn't look at that it's clear as day on his

EXHIBIT 1
PAGE 183

1    report that he didn't look at these things.

2             So, you know, it's getting to the point

3    of harassing to sit here and go through all these

4    things again and again that he's never represented

5    in his report that he did.

6             You know, you could sit here and ask this

7    man if he's ever talked to the pope, you know.

8    It's not going to get us any closer to figuring

9    out what's going on in this case, when you have

10   his report right here and it says what he did.

11            MR. SCHWARTZ:  Okay.

12   BY MR. SCHWARTZ:

13        Q.  You're a scientist, right?

14        A.  Computer scientist, yes.

15        Q.  And the only data that you want to use in

16   your work is reliable data, correct?

17        A.  You always want to use reliable data,

18   sure.

19        Q.  Did you conduct any sensitivity testing

20   or any other type of work to validate that the

21   SimilarWeb data you were receiving was reliable?

22        A.  The -- I did not do a sensitivity test,

23   no.

24        Q.  Did you do -- oh, I'm sorry, I cut you

25   off.

EXHIBIT 1
PAGE 184

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        A.   I -- as I mentioned before, from my own
 2   experience and use in the field, SimilarWeb gives
 3   the most reliable results.  I did a comparison to
 4   ensure that the numbers they gave were not overly
 5   optimistic.  I looked, I did research to see what
 6   the opinions of others in the field were.  I
 7   referenced one of those in my report.  I talked to
 8   two different people at SimilarWeb and looked at
 9   their documentation.
10             Their approach is scientific, it's
11   rigorous.  The methods seem very relevant to me.
12   And so -- and also SimilarWeb is used by many
13   players in this field.  There's billions of
14   dollars of advertising revenue based on it.  So
15   based on those factors, SimilarWeb was appropriate
16   for this particular analysis.
17        Q.   Right.  Did you look for any commentary,
18   papers, articles, any information regarding the
19   reliability or accuracy of the SimilarWeb data?
20        A.   Well, I do provide one reference in the
21   paper.  Also in the documentation from SimilarWeb,
22   they -- they don't phrase it in terms of
23   reliability, but they phrase it in terms of that,
24   you know, the -- comparing the numbers that they
25   generate to what you may get from a particular
```

EXHIBIT 1
PAGE 185

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    website, that there may be a difference based on a
 2    variety of factors.  But I provided one reference,
 3    there's one did analysis of the accuracy of
 4    SimilarWeb compared to what they did in house.
 5         Q.  That was Screaming Frog?
 6         A.  Yes.
 7         Q.  Okay.  We'll come to that shortly.  You
 8    also mentioned in your -- one of your earlier
 9    answers that you reviewed some information from a
10    company called Comscore; is that right?
11         A.  Yes.
12         Q.  And does Comscore -- start again.  Were
13    you able to obtain information from Comscore
14    regarding the viewer count for all of the 354
15    websites in your report?
16         A.  No, I was not.  As I referenced in my
17    report, they provided data for some of the major
18    news, US news sites.  So I used those as
19    comparison for what I was getting from SimilarWeb.
20         Q.  Approximately how many websites numbers
21    did you check against Comscore?
22         A.  I pulled the ones that were on the site
23    that -- what the intersection was between what
24    Comscore had published for their news sites and
25    what I had available with SimilarWeb.
```

EXHIBIT 1
PAGE 186

1     Q.   Right.  I guess what I'm driving at is

2     I'm trying to understand as a percentage or

3     fraction of the 354 websites that you included in

4     your report how many of those did you look --

5     obtain data from Comscore?

6          A.   If I recall, the report reflected that

7     there was six sites that accounted for about 12

8     million of the reported traffic, six out of the

9     354.

10         Q.   And accounted for -- Comscore data that

11    you looked at accounted for six of the 354

12    websites?

13         A.   If I recall correctly.

14         Q.   And approximately 12 of the 98 million

15    total?

16         A.   Again, if I recall the number correctly,

17    it was around 12 million.

18         Q.   That was the visitor count portion.

19         A.   Yes.

20         Q.   Okay.  So as a percentage of the total,

21    it's a little more than 12 percent, right?  12

22    million divided by 98 million is probably around

23    13 percent, right?

24         A.   Yeah, ballpark, yes.

25         Q.   Okay.  So you validated through Comscore

EXHIBIT 1
PAGE 187

BERNARD J.JANSEN, PHD

November 04, 2019

1    approximately 13 percent of your 98 million

2    number, is that right?

3         A.  Ballpark, yes.

4         Q.  And whatever six divided by 354 tells us

5    is a fraction on the websites, right?

6         A.  Yeah, by -- just to clarify, I wasn't

7    trying to get a statistical test.  I wanted to

8    ensure that the Comscore numbers were not -- that

9    they were conservative and not overly optimistic,

10   and so I wanted to compare those with another web

11   traffic service.

12        Q.  You mean the SimilarWeb.

13        A.  SimilarWeb.

14        Q.  So you compared them to Comscore.

15        A.  Yes.

16        Q.  Okay.  And you were able to get Comscore

17   data for six of the 354 websites, approximately.

18        A.  That's correct.

19        Q.  And approximately -- it added up to

20   approximately 12 of the 98 million or 13 percent

21   of the total, approximately, right?

22        A.  Approximately.

23        Q.  By the way, do you agree with me that the

24   fact that there might be any number of unique

25   daily visitors to a website doesn't tell us how

EXHIBIT 1
PAGE 188

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   many people read anything in particular on that
 2   website, correct?
 3            MR. GRUNBERG:  Objection, asked and
 4   answered maybe ten times, but go ahead.
 5       A.  I didn't look at that.  I looked at the
 6   dissemination of the people that could have been
 7   exposed to the defaming statements.
 8   BY MR. SCHWARTZ:
 9       Q.  Okay.  I know you didn't look at it.  I
10   just want you to confirm that way what I said, you
11   either agree or disagree with what I said.  The
12   fact that there may be any number of unique daily
13   visitors to a website doesn't tell us how many
14   people read anything in particular on that
15   website, correct?
16            MR. GRUNBERG:  Objection, asked and
17   answered.
18       A.  It's a different measure.  It does not
19   tell you the number of people that read.
20   BY MR. SCHWARTZ:
21       Q.  So on page 9 of your report, yes, page 9,
22   I think it's footnote 21, we hear about Screaming
23   Frog.  That doesn't look right.  No, there it is.
24   It's footnote 12.  You cite an article from
25   Screaming Frog, do you see that?
```

EXHIBIT 1
PAGE 189

BERNARD J. JANSEN, PHD

November 04, 2019

1          A.   Footnote 12?

2          Q.   Footnote 12 on page 9.

3          A.   Yes.

4          Q.   Okay.  Did you read that article in

5    connection with your work in this case?

6          A.   Yes.

7          Q.   Okay.

8               (Defendant's Exhibit 150 marked)

9    BY MR. SCHWARTZ:

10         Q.   So I put before you as Exhibit 150 what I

11   believe to be the Screaming Frog article you cited

12   on page 9, footnote 12 of your report.  It

13   certainly seemed to have the same title.  Is this

14   the article?

15         A.   It looks like the same article.

16         Q.   And is it correct that to some extent you

17   relied on Screaming Frog to tell you that the data

18   you were getting from SimilarWeb was accurate and

19   reliable?

20         A.   I provided this as a reference of an

21   example of the -- some of the analysis that has

22   been done on SimilarWeb and how it's viewed in the

23   describe.  So in that respect, yes.

24         Q.   Okay.  So if I go to page -- this is 17

25   pages.  So if you go to the numbers on the bottom

EXHIBIT 1
PAGE 190

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   right where it says 6/17, there's a section at the
 2   top called the results.  Let me know when you're
 3   there.
 4        A.   Okay.
 5        Q.   Okay.  So what Screaming Frog article,
 6   Exhibit 150, writes under the results about the
 7   various tools they looked at, quote, Overall, the
 8   most accurate tool applied was SimilarWeb which on
 9   average overestimated organic traffic by 1
10   percent.  It overestimated total visit numbers by
11   17 percent, estimating 15.7 million visits for the
12   25 websites compared to the 13.4 million actual.
13   SimilarWeb was the only tool to generally
14   overestimate traffic, close quote.
15           Do you see that?
16        A.   Uh-huh.
17        Q.   Okay.  So as I understood or understand
18   this article, Screaming Frog looked at 25 websites
19   that SimilarWeb was also analyzing, correct?
20        A.   That's correct.
21        Q.   And then they found that for, I believe
22   it is 10 -- oh, you know what, maybe we need to
23   back up for a second.  Well, we'll keep going.
24           It looks like they said that it
25   overestimated traffic, visitor traffic by 17
```

EXHIBIT 1
PAGE 191

```
 1   percent, right?
 2        A.   What it says is total visits by 17
 3   percent.
 4        Q.   Right.
 5        A.   So difference in visitors, I just want to
 6   highlight that.
 7        Q.   Oh, please do.
 8        A.   So it's actually visits, so it could
 9   be -- it's not unique visitors.  So it's a
10   different metric.  So it could be, you know, Jim
11   Jansen going there three times in an hour or
12   something like that.  So it's different than
13   unique visitors.
14        Q.   I realize it's a different metric.  But
15   the -- there's no question that Screaming Frog
16   says that on the metric they were looking at,
17   total visitors, SimilarWeb was overestimating
18   approximately 17 percent, right?
19        A.   Well, the previous sentence, they
20   overestimated organic traffic by 1 percent.  I
21   mean, that's -- that's pretty accurate.
22        Q.   What do you understand them to be
23   referring to when they say organic traffic?
24        A.   Traffic not pushed by ads.  So, for
25   example, a person going from one website to
```

EXHIBIT 1
PAGE 192

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    another, clicking on organic link and a search
 2    engine result.  Anything that's not done by a paid
 3    advertisement.
 4         Q.  Okay.  If you look on the prior page, 5
 5    of 17, there are some of the results from
 6    SimilarWeb on the chart on the upper half of the
 7    page, correct?
 8         A.  Yes.
 9         Q.  They averaged out to 17 percent, some of
10    them for some of these websites, the SimilarWeb
11    traffic estimators overestimated by 98 and 128
12    percent, correct?
13         A.  Yes, based on this chart here, yes.
14         Q.  And so just so the non math majors among
15    us understand what that means, Screaming Frog is
16    saying that the traffic was overestimated by 98
17    percent, they're saying that whatever number
18    SimilarWeb reported, it was almost twice what the
19    actual number was.  That's what that 98 percent
20    means, right?
21         A.  98 percent more, yes.
22         Q.  Right.
23         A.  Yeah.  You know, and I think what the
24    gist of the article is, what I like about the
25    article is that he actually presents these
```

EXHIBIT 1
PAGE 193

1   averages.  So -- and, you know, when you --
2   there's this kind of -- it is a traffic estimation
3   service.  So I think it's reasonable to expect
4   that there's going to be some maybe fluctuations
5   on an individual website.
6        But at a certain point the kind of law of
7   large numbers takes over and you see it happening
8   here.  That yeah, there were some deviations in a
9   particular site, but overall, you know, the margin
10  was 1 percent.  And so, yeah, you know, I
11  acknowledge there may be some deviations at
12  particular sites.  It's kind of well known for
13  smaller sites, they have trouble estimating,
14  bigger sites a little more accurate, that kind of
15  stuff, so . . .
16       Q.  Well, the 1 percent figure that you were
17  relying on in your answer, that's the average
18  percentage over, correct?
19       A.  It's 1 percent over, yeah, they
20  overestimate.
21       Q.  But that's not the total number for the
22  25 websites that it was over, that's 17 percent,
23  right?  Not 1 percent.  The total traffic number
24  for the 17 -- the 25 websites they looked at was
25  over by 17 percent.  They reported 157 million to

EXHIBIT 1
PAGE 194

BERNARD J.JANSEN, PHD

November 04, 2019

1    SimilarWeb and the actual was 134.

2         A.   Yeah, yeah, he did the average of the

3    sites and then calculated the difference.

4         Q.   Right.

5         A.   Again, you know, I present this as one

6    example.  Could do a search for what's the

7    accuracy of SimilarWeb, you're going to see a lot

8    of these type of studies.  And they all end up or

9    most end up with the same conclusion, SimilarWeb

10   generally gives you the most accurate results.

11        Q.   Okay.  Well, the one-eyed man leads the

12   kingdom of the blind.  The fact that SimilarWeb

13   may be the most accurate doesn't tell us in

14   absolute terms how accurate SimilarWeb is, does

15   it?

16        A.   Well, it's -- you know, I can point, say

17   their methodology is sound.  People rely on it to

18   make business decisions in the advertising and

19   marketing arena.  So a lot of money is placed on

20   these particular numbers.

21        Q.   I understand it.  But the mere fact that

22   people think it's the most accurate estimator

23   doesn't mean -- that alone doesn't tell us that it

24   is, in fact, an accurate estimator.

25        A.   It tells us it's the most accurate

BERNARD J.JANSEN, PHD

November 04, 2019

 1   estimator.

 2        Q.   No, but if everybody is off then what

 3   difference does it make if it's the most accurate?

 4   They're all off.

 5        A.   The --

 6        Q.   Isn't that true?

 7        A.   Well, it's -- the -- as far as I know

 8   there's no other approach other than using traffic

 9   estimation tools for doing this type of analysis

10   across multiple websites.

11        Q.   I'm sure you're right.  What I'm saying

12   is the mere fact that among the pieces of software

13   or companies out there who do this work, they're

14   the least inaccurate, a/k/a the most accurate,

15   doesn't tell us alone that they are, in fact,

16   accurate, does it?  Yes or no?

17        A.   It's not a yes/no question.  I go back to

18   this, you know, at a particular website there may

19   be some deviation.  But as you add more and more

20   websites and take the averages of all those

21   websites, okay, the accuracy is going to improve.

22   That's the concept of the law of large averages.

23   The average will regress to the mean or regress to

24   the expected value as more and more -- as your

25   number, your sample grows larger and larger.

EXHIBIT 1
PAGE 196

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  Well, in this sample of 25 it progresses

2    to a mean of 17 percent overstatement, correct?

3            MR. GRUNBERG:  Objection.  That is a

4    misrepresentation of the document.

5            MR. SCHWARTZ:  He can explain that.

6        A.  The -- as he points out, this is a -- the

7    17 percent was total visit numbers and not total

8    unique visitors to the website.  So again -- and I

9    don't know, he doesn't explain exactly how he

10   calculated that.  But the total visits is

11   different than the total -- than unique visitors.

12   BY MR. SCHWARTZ:

13       Q.  I understand there's a difference.  But

14   the data that SimilarWeb gets to estimate total

15   number of visitors and average unique visitors,

16   it's all from the same sources, isn't it?

17       A.  Well, it's from four different data

18   collection mechanisms.

19       Q.  Right.  Right.  It's not like there's

20   some other body of data for daily unique visitors

21   than there is for total visitors, is there?

22       A.  I'm not understanding what your question

23   is.

24       Q.  Well, you're trying to draw a distinction

25   between the fact that this report represents total

EXHIBIT 1
PAGE 197

BERNARD J.JANSEN, PHD
November 04, 2019

1    traffic and you've relied on SimilarWeb for daily
2    unique visitors, right?
3         A.   Uh-huh.
4         Q.   And you think that's important.
5    Otherwise you wouldn't have said it, right?
6         A.   I just -- I bring it up because of the
7    differences you're pointing out in the 1 percent
8    average versus the 17 percent traffic.
9         Q.   Where does it say that that 1 percent of
10   organic traffic is daily unique visitors?  It
11   doesn't say that.
12        A.   It does not say that.
13        Q.   You made that up just now, didn't you?
14        A.   I did not make that up.  I pointed out
15   that the organic traffic is 1 percent.
16        Q.   Well, that's -- that's interesting to
17   know.  But what you don't seem to want to talk to
18   me about is that the overall number of visitors
19   that they counted, whether it was unique or not
20   unique, is off by 17 percent, isn't it, according
21   to this report?
22             MR. GRUNBERG:  Objection.  Objection,
23   form.
24        A.   On page 17 -- excuse me, page 6 it says
25   overestimated total visit numbers, okay, by 17

EXHIBIT 1
PAGE 198

1   percent.

2   BY MR. SCHWARTZ:

3       Q.  Right.  And that, if you look at the

4   chart on the prior page, they went to 25, they

5   looked at 25 different websites and in 10 of the

6   25 an or 40 percent, SimilarWeb overestimated,

7   right?

8       A.  And as I said --

9       Q.  Right?

10      A.  As I -- they did overestimate on these

11  particular sites, yes.

12      Q.  Right.  And the total overestimation

13  including net of underestimations is 17 percent of

14  the visitor traffic, correct?

15      A.  Of the visits.

16      Q.  Correct?

17      A.  Of the visits, yes.

18      Q.  Right, okay.  And my followup question

19  is:  The data that SimilarWeb uses to provide

20  total visitors comes from the same sources as the

21  data they get for total unique visitors, isn't it?

22          MR. GRUNBERG:  Objection, form.

23      A.  I don't know for sure.

24  BY MR. SCHWARTZ:

25      Q.  Do you have any reason to suspect there

EXHIBIT 1
PAGE 199

BERNARD J.JANSEN, PHD

1   would be one set of data that SimilarWeb scans

2   from the internet from scraping, from everything

3   else, for total traffic versus unique traffic?  Do

4   you have any reason to believe that?

5        A.   I don't -- I'm trying to answer your

6   question.  I don't know for sure, so.

7        Q.   Okay, that's good.  You've answered it.

8   I appreciate that.

9             Did you read any other studies about the

10   reliability of SimilarWeb data besides Screaming

11   Frog in connection with your work in this case?

12        A.   I've done a lot of work with SimilarWeb

13   and I've read a lot of these studies over -- since

14   I've been using traffic estimation services.

15   There are many out there that attempt to evaluate

16   SimilarWeb and other traffic estimation tools.

17        Q.   And if you were aware of any other

18   studies that weighed in on the reliability of

19   SimilarWeb's data, you'd want to disclose that in

20   your report, wouldn't you?

21        A.   There -- I said there are a lot of ones

22   like this.  I provide this as an example of what's

23   available.

24        Q.   Right.  Are you aware of any others that

25   are critical of the reliability and accuracy of

EXHIBIT 1
PAGE 200

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    the user data that SimilarWeb provides?
 2         A.   Off the top of my head I know ones that
 3    are critical of it.
 4              MR. GRUNBERG:  At this point we've been
 5    going almost two hours at this point.
 6              MR. SCHWARTZ:  Sorry.
 7              THE VIDEOGRAPHER:  Going off the record.
 8    The time is now 3:06 p.m.
 9              (Recess)
10              THE VIDEOGRAPHER:  We are now back on the
11    record.  The time is 3:18 p.m.
12    BY MR. SCHWARTZ:
13         Q.   Are you familiar with an analytics
14    company called Ahrefs?  Let me see if I can
15    pronounce it right.  Ahrefs.  Did I pronounce that
16    right?
17         A.   I'm not sure, but I'm going to say yes.
18         Q.   Do you know that in August 2018 they did
19    an analysis of SimilarWeb's traffic estimates?
20         A.   I did not know that.
21         Q.   Let's take a look.  Let's mark as our
22    next exhibit.
23              (Defendant's Exhibit 151 marked)
24    BY MR. SCHWARTZ:
25         Q.   What do you know about Ahrefs?  By the
```

EXHIBIT 1
PAGE 201

```
 1   way, just for the record, it's all lower case
 2   A-R-H-E-F-S.
 3        A.  Yeah, I mean, I've used them before for
 4   different things, but I don't know much about
 5   them.
 6        Q.  Okay.  So if we look at page 7 of 31,
 7   they did an analysis of SimilarWeb for 116
 8   websites and then they looked at a sample of 116
 9   websites from an assessment group called Flippa,
10   F-L-I-P-P-A and then they compare them.  Do you
11   see that on page 7 of 31?
12        MR. GRUNBERG:  And, by the way, let me --
13   not to interrupt the question, but take your time
14   to look through that and familiarize yourself with
15   this article, as you haven't seen it before, so
16   you're allowed to do that.
17        THE WITNESS:  Okay.  Okay, I'm at the
18   page, page 7.
19   BY MR. SCHWARTZ:
20        Q.  Page 7, all right.  And do you see where
21   they say they reported their results, it's under
22   the heading, Here's What We Found?  It's not a
23   heading, it's just text.  It says, Here's What We
24   Found, colon, on page 7.
25        A.  Okay.  Here's what we found.
```

EXHIBIT 1
PAGE 202

BERNARD J.JANSEN, PHD

November 04, 2019

1       Q.   Do you see the words "Here's What We

2   Found"?  Would it be okay if I just reached over

3   to point to you where they are?

4       A.   Please.

5       Q.   Here's what we found, right there.

6       A.   Got it, yes.

7       Q.   Why don't you read along as I'll read it

8   into the record.  Here's what we found.

9   SimilarWeb overestimated total unique visitors for

10  91.67 percent of the websites.  SimilarWeb

11  overestimated total unique visitors by 308 percent

12  on average.  SimilarWeb overestimated total page

13  views for 70 percent of the websites.  SimilarWeb

14  overestimated total page views by 210 percent on

15  average.  To summarize, SimilarWeb tends to

16  drastically overestimate actual unique visitors

17  and page views, according to our testing.

18          Do you see that?

19      A.   Yes, I see that.

20      Q.   Okay.  The -- if the analysis that --

21  Ahrefs, A-H-R-E-F -- you know what, I misspelled

22  it, it's A-H-R-E-F-S.  Ahrefs.

23          MR. GRUNBERG:  I'm going with Ahrefs.

24  BY MR. SCHWARTZ:

25      Q.   If the analysis of Ahrefs did of

EXHIBIT 1
PAGE 203

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   overestimation of total unique visitors by 308
 2   percent were applied to your number of 98 million,
 3   you would need to reduce that 98 million, wouldn't
 4   you?
 5        A.   Based on the assumptions you just spelled
 6   out there and the -- you know, doing math, yes.
 7        Q.   Okay.  All right.  That's all I had on
 8   this.  Let me -- to move this along and get you
 9   out of here, let me talk to you about the counting
10   of the articles that you did.
11        A.   Yes.
12        Q.   I think you described at, in paragraph 59
13   of your report, so why don't we take a look,
14   that's page 19, I believe.  And you let me know
15   when you're on page 19 and you have paragraph 59
16   in front of you.
17        A.   I am there.
18        Q.   Okay.  So you give an example of one of
19   the search page results that you generated from
20   Google on figure 8, on the next page, is that
21   right?
22        A.   Yes.
23        Q.   And did you create the screen grab, that
24   is to say figure 8 as it appears in your report?
25        A.   Yes.
```

EXHIBIT 1
PAGE 204

November 04, 2019

```
 1        Q.  Okay.  And is this, in fact, something
 2   you did yourself?
 3        A.  Yes.
 4        Q.  Okay.  Quite often Google tells you, in
 5   addition to just giving you the results, they tell
 6   you how many results they found given the search
 7   that you asked Google to do, right?
 8        A.  Yes.  You've got to take it with a grain
 9   of salt, but they do give you a number, yes.
10        Q.  What's the grain of salt you have to take
11   it with?
12        A.  Well, when you ask, that is also an
13   estimation, it's not an actual count.  They do a
14   numerical calculation.  So if you get down to page
15   10, 20, you'll see that they're kind of really not
16   results, that they're either stub pages or things
17   like that, so -- but yeah -- yes, they do give you
18   a number.
19        Q.  Is there a reason why that number doesn't
20   show up on figure 8 for the search you ran?
21        A.  I wouldn't know.  Maybe because of the
22   time delimiter I have here.  I don't know.
23        Q.  All right.  And to be clear by the time
24   delimiter, in other words, you looked for Google
25   articles in the time frame June 1 to July 31,
```

EXHIBIT 1
PAGE 205

1    2018.

2         A.   Yeah, in this particular search, yes.

3         Q.   In this particular search.   The searches

4    for articles that you were looking to decide

5    whether or not to include in your report, you ran

6    those Google searches; is that correct?

7         A.   That is correct.

8         Q.   And do you identify in your report the

9    actual -- all of these search queries that you ran

10   as part of your work in this case?

11        A.   The -- not in the report, in page 19,

12   paragraph 59 I outline the process I used, and

13   then my spreadsheet had half a dozen of those

14   queries that I actually kept records of.   But it

15   may not be all-inclusive of every query I ran.

16        Q.   I'm sorry, where did you say those search

17   queries are?

18        A.   I believe it's on the first a tab of the

19   spreadsheet that I submitted with the documents.

20        Q.   All right.   How did you decide what

21   search queries to run?

22        A.   Well, a rational process.   I was

23   interested in the defaming statements so I said

24   well, let's start with the defaming statements.   I

25   started with those.   And then as I explain here, I

EXHIBIT 1
PAGE 206

BERNARD J. JANSEN, PHD

November 04, 2019

1   would typically take some of the titles of the

2   articles that were appearing similar, search on

3   those, and I kept doing that until -- it's called

4   theoretical saturation where you're just not

5   getting new results, and then I would stop and

6   start with the next defaming statement and repeat

7   the process.

8        Q.  Did you run any general search or

9   searches, for example, like the only search words

10  were Vernon Unsworth or Vern Unsworth?

11       A.  I believe I did give an example.  I think

12  I did run just some general things.  But the most

13  productive were the defaming statements, of

14  course, and then the titles of some of the

15  articles.

16       Q.  Okay.  And then eventually or ultimately

17  you determined that 605 articles from 354 websites

18  contained the information you were looking for; is

19  that right?

20       A.  Yes.  There's -- as I mention in the

21  report there's probably more out there, but

22  there's kind of this practical -- I had to -- you

23  know, I have a time limit to submit the report, so

24  I had to stop at some point.

25       Q.  So how much time did you spend running

EXHIBIT 1
PAGE 207

BERNARD J.JANSEN, PHD

November 04, 2019

1   searches and looking for articles and deciding how
2   many articles ultimately to put on your list?
3        A.   I would have to check my spreadsheets to
4   give you an exact number, but that's the bulk of
5   the effort, the data collection part of -- but I
6   don't know the exact number.
7        Q.   Let's -- I don't want to deprive you of
8   the ability to give me the most accurate answer
9   you can, so why don't we go back and just look at
10  your bills from that period.
11       A.   Sure.
12       Q.   And see if there's just some way you
13  could tell me what's going on.  So these are
14  Exhibits 140, 141 and 142.
15       A.   142?
16       Q.   140 and 141.
17       A.   So, I mean, I can calculate this up, but
18  if we looked at the 1 September dated invoice, any
19  of these tasks where it says market research,
20  that's the searching and data collection of the
21  articles, so . . .
22       Q.   In other words, is that just the part of
23  the process sort of throwing out the net to look
24  for articles, or does that also include reviewing
25  the articles to decide whether they met the

EXHIBIT 1
PAGE 208

BERNARD J.JANSEN, PHD

November 04, 2019

 1    criteria you were looking for?

 2         A.   It also includes that time.

 3         Q.   Okay.  So that's -- if one went through

 4    this report and added up -- not the report -- if

 5    one went through all your bills and just added up

 6    all the hours for market research, that would tell

 7    us the total amount of time you spent looking for

 8    the articles, and then reviewing the articles you

 9    found to decide whether they did or did not meet

10    the criteria you were looking for?

11         A.   Along with some other tasks like putting

12    them in the spreadsheet, deduplicating the links,

13    because sometimes, you know, the URL is really the

14    same but it has a couple little identifiers, so I

15    had to go through manually and clean all those up.

16    So yes, all the stuff to get the data together to

17    do the analysis.

18         Q.   So the -- there are a number of time

19    entries in both August and September where that's

20    not the only activity you did work for.  So there

21    isn't any practical way as you sit here today to

22    disaggregate those and tell me just the amount of

23    time you spent on the quote unquote market

24    research?

25         A.   Can you give me an example?

EXHIBIT 1
PAGE 209

BERNARD J.JANSEN, PHD

November 04, 2019

1      Q.  Yeah, sure.  Which exhibit are you

2   looking at?

3      A.  I have both open.

4      Q.  So if you look at Exhibit 140 and you

5   look at 2 August, you have an hour and a half of

6   time, your task -- oh, excuse me, not market

7   research.  Let's go to 11 August.  You have three

8   hours of time, you have market research and worked

9   draft report.  You couldn't tell us how much of

10   that three hours was one versus the other at this

11   point, could you?

12      A.  It's -- not exactly.

13      Q.  Okay.  All right.  I have the information

14   I need, though, thank you.

15         So as I read your testimony -- well,

16   let's start . . .

17         Let me start again.  If we go to page 18

18   and look at paragraph 58, you write, quote,

19   Concerning the procedure employed in determining

20   the dissemination of the statements, I was not

21   interested in articles that just, your emphasis,

22   discussed the story in general or other aspects of

23   the story.  I was specifically interested in only

24   those articles that directly referenced the

25   defaming statements and were not primarily about

EXHIBIT 1
PAGE 210

BERNARD J.JANSEN, PHD

November 04, 2019

 1    this case.  This narrowed the focus to a subset of

 2    news articles and other articles which are less

 3    than the articles addressing the overall story,

 4    close quote.

 5            Do you see that?

 6        A.  Yes.

 7        Q.  All right.  So can you -- so from that

 8    paragraph it looks to me like there were two

 9    criteria that you applied to the stories that your

10    Google searches found in order to decide whether

11    to include them on your list.  One was whether the

12    article contained the defaming statements; is that

13    right?

14        A.  That is correct.

15        Q.  And two was that the article was not

16    primarily about this lawsuit; is that correct?

17        A.  Yes.

18        Q.  And so those are two filters you applied

19    to the articles you found through your Google

20    searches in order to come up with your list, your

21    final list on Appendix D, correct?

22        A.  Yes.  So the defaming statements were to

23    identify the particular articles and then if it

24    was a case-related thing then I would filter that

25    out, so slightly different, but the results were

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    the same.
 2         Q.  Well, is it the case that before
 3    including an article on your list you reviewed it
 4    to confirm that it did contain defaming
 5    statements?
 6         A.  Yes, I did.
 7         Q.  And if an article, even though it came
 8    back from Google from a search query in which you
 9    typed in a defaming statements, you nonetheless
10    would not include it in your list unless you read
11    the article and saw that it did, in fact, have
12    them; is that right?
13         A.  Many of the articles I did read the
14    entire article or I would search for the defaming
15    statements and find one of the defaming statements
16    in the article and maybe not read the entirely
17    thing, yes.
18         Q.  Okay.  And by search, you mean once you
19    had the article pulled up on your screen you could
20    use a search function to let the computer, in
21    effect, do the hard work of finding the defaming
22    statements in the article for you?
23         A.  It could do the search to locate the
24    article so I wouldn't have to read the whole
25    thing, yes.
```

EXHIBIT 1
PAGE 212

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  Exactly.  And -- all right, let's see.

2   So what -- did anyone supply you with any criteria

3   or standards to use in deciding whether an article

4   did or -- was or was not, quote, primarily about

5   this case, close quote?

6        A.  The -- that, I believe that is something

7   I developed the criteria to identify those

8   particular articles.

9        Q.  Okay.  And what criteria did you use in

10  your work in this case in deciding whether an

11  article was or was not, quote, primarily about

12  this case, close quote?

13       A.  Yeah, that, if I recall correctly, one

14  was the content of the article, if it talked about

15  the case or its particular scheduling, specific

16  scheduling about the case.  And also the time

17  aspect, that, you know, I believe it was like the

18  date the lawsuit was filed or something like that,

19  that it was after that I screened it carefully --

20  I screened it more carefully to ensure, see if it

21  met the -- if it was about the case or was just a

22  review article about what had happened.

23       Q.  When you say "what had happened," you

24  mean what had happened --

25       A.  Before.

EXHIBIT 1
PAGE 213

1        Q.  -- apart from anything having to do with

2    the case?

3        A.  No, it's in terms of like this time

4    limit, especially, you know, after the original

5    defaming statements were made, there were some

6    articles that were kind of summary articles, kind

7    of explained all the things that had happened up

8    to that point.  But were not primarily about the

9    case.

10       Q.  If you found such an article did you

11   include it or not include it?

12       A.  If it contained the defaming statements

13   and were primarily not about the case, I included

14   it.

15       Q.  So, again, how much discussion about the

16   case did an article have to have before you

17   concluded that the article was quote primarily

18   about this case, close quote?

19       A.  Yeah, it's -- this -- I mean, there is a

20   certain judgment aspect about it.  But I typically

21   go, like if -- a big indication was the title.  If

22   it mentioned the lawsuit, mentioned the focus on

23   the case, then I would exclude it.

24       Q.  All right.  One thing you described which

25   would be objective about an article is whether it

EXHIBIT 1
PAGE 214

BERNARD J.JANSEN, PHD

November 04, 2019

1    mentioned the case.  I get that, that's either

2    like a zero or a 1, it seems binary, it either

3    mentions it or it doesn't mention it.

4         A.  Yeah.

5         Q.  But the other standard you said you

6    applied was the focus of the article was on the

7    case.  And how would you decide whether an article

8    did or did not focus on the case, or that the

9    focus of the article was or was not on the case?

10        A.  Yeah, the -- some of these articles that

11   maybe a good portion of the content was just going

12   over the timeline of what happened and then the

13   final statement may be something about a lawsuit.

14   That would be one example.

15        Q.  That would be one example of what?

16        A.  Of a case that -- the article that was

17   not primarily about the lawsuit, but maybe

18   mentioned it in some way.

19             The other would be the whole thing was

20   about the lawsuit, a lawsuit got filed and the

21   whole focus was more to alert the reader that the

22   lawsuit had -- a lawsuit had happened.

23        Q.  And if you came across an article that

24   did those things, would you include or exclude the

25   article?

EXHIBIT 1
PAGE 215

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        A.   I would exclude it.

 2        Q.   I'm sorry?

 3        A.   Exclude it.

 4        Q.   So how much content or discussion of the

 5   lawsuit did an article have to have before you

 6   concluded that the article was, quote, primarily

 7   about this case, close quote?

 8        A.   I don't know if I can give an exact

 9   amount, but it's -- yeah, I can't give an exact

10   amount.

11        Q.   Even if you can't give an exact amount,

12   can you tell me any rules or standards you applied

13   in deciding whether there was a certain amount of

14   content in an article that took to the point where

15   you concluded that it was, quote, primarily about

16   this case, close quote?

17        A.   If it -- yeah.  In my report I list a lot

18   of the articles, I think 140 articles that were

19   primarily about the case.  I think an example

20   would be like a single comment about the case --

21   about the lawsuit, although the rest of the

22   article was about the defaming statements, the

23   timeline, I probably would have included that.

24        Q.   You probably, or you know that you would

25   have?
```

EXHIBIT 1
PAGE 216

```
 1        A.  Again, each article is slightly
 2   different.  But I would have included it.
 3        Q.  You would have included the article under
 4   what circumstances?
 5        A.  If it -- if it was primarily about the
 6   sequence of events, for example, that had
 7   happened, or -- you know, an example would be when
 8   Mr. Unsworth got his award from the UK government,
 9   you know, it would contain the defaming statements
10   but it might contain a mention of the lawsuit or
11   something like that, then I would include it
12   because it was primarily about the -- him
13   receiving his award.
14        Q.  Right.  I understand.  But what I'm
15   trying to understand is where you -- or, rather,
16   how you drew the line between an article that was
17   primarily about this case --
18        A.  Yeah.
19        Q.  -- versus an article that was not
20   primarily about this case in making the
21   determinations you made to arrive at your list of
22   articles.
23        A.  The -- for many of the articles it was
24   fairly cut and dry.  So -- but there were a few
25   where I had to make a judgment call.  And, as I
```

EXHIBIT 1
PAGE 217

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   said, if there was an offhand comment about the
 2   case I would probably include it.  But most of the
 3   cases -- most of the articles that were about the
 4   case were fairly cut and dry, that it was -- so it
 5   was easy to exclude them.
 6        Q.  Right.  The focus of my question wasn't
 7   how hard or difficult the decisions were that you
 8   had to make.  The question was:  What standards or
 9   rules or guidelines you applied --
10        A.  Yeah.
11        Q.  -- in order to make those decisions.
12        A.  Yeah.
13        Q.  And I don't believe you've told me.  You
14   just said, the only thing I've heard so far is if
15   the only reference to the case was, quote, an
16   offhand comment, what you said in your last
17   answer, then you -- let me finish -- then you
18   wouldn't exclude it.  But I'm trying to understand
19   what standards you actually used during your work
20   in this case to decide whether an article either
21   was or was not, quote, primarily about this case.
22            MR. GRUNBERG:  Let me object.  Objection,
23   form, to the extent you've said that he hasn't
24   articulated a standard or answered your question.
25   He has articulated standards and he has answered
```

EXHIBIT 1
PAGE 218

BERNARD J.JANSEN, PHD

November 04, 2019

1    your question -- questions, plural.  But go ahead
2    and please answer.
3         A.   In reviewing the article, if it was
4    primarily about the case, again most of the
5    articles were pretty straightforward.  If -- for
6    the few that were not, I used my judgment.
7    BY MR. SCHWARTZ:
8         Q.   Well, what judgment did you use?  In
9    other words, what was the judgment you made?
10        A.   I read the article, and if the majority
11   of the article was not about the case and there
12   may be a single comment referring to the case then
13   I would have included it.  And honestly, I don't
14   know how many articles this applies to.  Most of
15   the article were pretty cut and dry, that they
16   were about the case so I excluded them.  There may
17   be a little bit of overlap or something.
18        MR. GRUNBERG:  Look, if you want to put
19   an article in front of him that you have a
20   question about, maybe that might help you ferret
21   out whether there is a standard or what the
22   standard was, as he's already articulated it.
23   BY MR. SCHWARTZ:
24        Q.   Let me ask you this.  You said one of the
25   ways you made these decisions was if the article

EXHIBIT 1
PAGE 219

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    talked about the case.  How much would an article
 2    have to have talked about the case in order for
 3    you to conclude that it didn't pass your
 4    standard -- or did pass your standard of being,
 5    quote, primarily about this case, close quote?
 6         A.  I'll be honest with you.  It's a lot of
 7    focus on what is probably a very small number of
 8    articles.  But I would read the article and I
 9    would make my judgment as a rational person
10    reading the article whether this was about the
11    case or not.
12         Q.  Okay.  So does your -- you applied what
13    you believe to be a rational person standard, is
14    that what you're saying?
15            MR. GRUNBERG:  Objection, form.
16         A.  I would read the article, okay, and as a
17    reader make a determination if it was about the
18    case or not.  Again, most of them were fairly cut
19    and dry; that it's about the case, or it occurred
20    before the lawsuit was filed so it was obviously
21    going to be about the case.
22    BY MR. SCHWARTZ:
23         Q.  Okay.
24         A.  So maybe -- again, there may be a small
25    number of articles that, you know, we spent the
```

EXHIBIT 1
PAGE 220

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    last few minutes talking about.  But -- and for
 2    those I would read them, I would make a judgment
 3    whether to include them or not.
 4         Q.  I see.  Well, I wasn't asking you whether
 5    you made a judgment to include them or not, I was
 6    asking you whether you made a judgment as to
 7    whether they quote unquote primarily concerned the
 8    case.  Just want to make sure that's what you were
 9    telling me with you you've given me the answer you
10    gave.
11         A.  Right.
12         Q.  Is that what you gave?
13         A.  I would read the article and make a
14    judgment whether the article was primarily about
15    the case or not.  And if it was about the case I
16    would exclude it, and if it was not primarily
17    about the case I would include it.
18         Q.  I know that.  I totally understand that
19    that's the end result you achieved.  Okay.
20              Is there some specialized education,
21    training or experience that you have as a computer
22    scientist that qualifies you to make those
23    judgments about whether an article was, quote,
24    primarily about this case, close quote, versus not
25    primarily about this case?
```

BERNARD J.JANSEN, PHD

November 04, 2019

1          A.   Well, as a researcher and academic, I

2    mean, reading papers is part of my job.  I read

3    hundreds of papers.  So my job is to analyze

4    papers and what the topic is, what the structure

5    is, what the arguments presented.  So if --

6    whether that is part of computer science, no.  Is

7    it part of my job as a scientist to read papers

8    and evaluate what people have written?  Yes.

9          Q.   Is that some talent you have that you

10   believe is -- some expertise you have -- I'll

11   withdraw the question.

12          Did Mr. Unsworth's lawyers give you any

13   guidance in terms of how to decide whether the

14   articles you found on Google should or should not

15   be included in your list?

16          A.   For the specific articles?

17          Q.   Yes.  In other words --

18          A.   No.

19          Q.   -- in culling the articles that Google

20   presented to you, did Mr. Unsworth's lawyers give

21   you any input onto how to decide if a particular

22   article did or didn't qualify to be included on

23   your list?

24          MR. GRUNBERG:  Objection, form.

25          A.   As I outlined in my report, I was

EXHIBIT 1
PAGE 222

BERNARD J.JANSEN, PHD

November 04, 2019

1    provided the defaming statements and I was told

2    these are the statements that occurred, and so

3    that's what I used as the starting point.  But in

4    terms of individual articles, no.

5         Q.  Well, I meant specifically by way of

6    example the second of the two criteria, not just

7    containing the defaming statements, but two,

8    whether the article was or was not primarily about

9    this case.  Did Mr. Unsworth's attorneys give you

10   any guidance as to how you should make those

11   determinations?

12        A.  I don't recall them giving me guidance,

13   no.

14        Q.  Did you look for any external materials,

15   treatises, textbooks, anything, in English

16   language or usage or anything at all to assist you

17   in deciding whether a particular article was or

18   was not, quote, primarily about this case, close

19   quote?

20        A.  I saw no need to, so no.

21        Q.  Did you create a list or a log of the

22   decisions you were making to include or exclude

23   each of the articles on your list?

24        A.  No, I did not keep a log.

25        Q.  So, in other words, if the jury wants to

EXHIBIT 1
PAGE 223

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   see how you did your work, you're not aware of any
 2   record or notes of your work that reflect the
 3   decisions you made or how you made the decisions
 4   you made to include or exclude articles.
 5           MR. GRUNBERG:  Objection, form.
 6       A.   The methodology I used to make the
 7   decisions are outlined in my report.  The articles
 8   that passed the criteria are in my report.  I also
 9   included the dash I believe 140 articles of case
10   articles that I excluded.  So those are part of my
11   report.
12   BY MR. SCHWARTZ:
13       Q.   Right.  But there's no list that we can
14   review in front of the jury that explains, Okay,
15   for article number 3 here are the reasons why I
16   chose to include it.  Article X that's not on my
17   list, here are the reasons why I chose to exclude
18   it.  There's nothing like that, is there?
19           MR. GRUNBERG:  Objection.  I mean, this
20   is just trending into the area of irrelevant,
21   particularly because Mr. Musk twice basically
22   challenged Mr. Unsworth to sue him.  And as you
23   know under the law in California, that makes it
24   reasonably foreseeable that Mr. Unsworth would,
25   indeed, have to sue Mr. Musk in order to challenge
```

EXHIBIT 1
PAGE 224

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    the false defamatory and heinous statements that
 2    Mr. Musk made about Mr. Unsworth.
 3            But go ahead, if you want to continue
 4    going down this road.
 5    By MR. SCHWARTZ:
 6        Q.   Okay.  Can you answer my question?
 7        A.   Could you repeat the question?
 8        Q.   Sure.  There's no list we can review in
 9    front of the jury that explains, for example, for
10    article number 3, Here are the reasons why I chose
11    to include it.  Article X that's not on my list,
12    here are the reasons why I chose to exclude it.
13    There's nothing like that that you created in the
14    course of your work, is there?
15        A.   Well, there is a paragraph that explains
16    the inclusion part in my report, but I did not
17    keep a log of the articles that I did not include.
18        Q.   But even as to the articles that you
19    chose to include, you didn't log as you were
20    making the decisions to include them why you felt
21    a particular article that you were including met
22    the criteria, did you?
23        A.   As I state in my report, the articles
24    either included the defaming statements or not.
25    So it's kind of a binary decision.
```

EXHIBIT 1
PAGE 225

1        Q.  Well, but it's more than that.  You seem

2    to overlook the other criteria about whether or

3    not the article was or was not primarily about the

4    case.  You didn't log the decisions you made or

5    the reasons for the decisions you made on that,

6    did you?

7        A.  Those were articles that I excluded, so,

8    as I already stated, I didn't keep a log of

9    articles that I reviewed but did not include.

10       Q.  But also as to articles that you included

11   as having decided that they were, quote, not

12   primarily about this case, there's no log that

13   explains the basis for your decision as to why you

14   believed that the article was not primarily about

15   the case, is there?

16       A.  They included the defaming statements.

17   So they met the criteria for inclusion.

18       Q.  I'm not asking you about whether they

19   contained the defaming statements.  I'm focusing

20   on whether or not the article was primarily about

21   the case.  Focusing on that --

22       A.  Excuse me, sir, that was not your

23   question.  Your question was did I keep a list of

24   which articles I included.  And yes, if they

25   contained the defaming statements they were

EXHIBIT 1
PAGE 226

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    included in the list.
 2         Q.   That's not what I'm asking you about.
 3    Let me be very clear so you have a new question.
 4    With respect to the decisions you made as to why
 5    an article was not primarily about the case,
 6    therefore if it contained the defaming statements
 7    you would include it, right?  That's the -- your
 8    process, right?  Contains the defaming statements
 9    and it is not primarily about the case, right?
10         A.   I would include it, yes.
11         Q.   Yes.  Is there a log for the articles
12    that you did include that explains how you came to
13    the conclusion that each of those articles was not
14    primarily about the case?
15              MR. GRUNBERG:  Objection, form, asked and
16    answered.
17         A.   For the vast majority of articles there
18    was no mention of the case.  There may have been,
19    again, one or two that have some offhand
20    mentioned.  But, again, this is a small number of
21    articles that I didn't -- would even fit this
22    bill.  Most of the articles that were about the
23    case were obviously about the case, and I excluded
24    them.
25         Q.   Isn't the question I asked you:  Is there
```

EXHIBIT 1
PAGE 227

```
 1    a log that explains the conclusions you made as to
 2    why an article that may have mentioned the case
 3    was, in your judgment, not primarily about the
 4    case?
 5         A.   Is there a log that specifies that, no.
 6         Q.   Now, with respect to whether or not an
 7    article was primarily about the case, was there
 8    some set of objective criteria that you applied,
 9    or did you just make subjective judgments?
10              MR. GRUNBERG:  Objection, asked and
11    answered.
12         A.   Could you repeat the question, please?
13    BY MR. SCHWARTZ:
14         Q.   With respect to the -- whether or not an
15    article was primarily about the case, did you
16    apply a set of objective criteria or subjective
17    criteria?
18         A.   As a thinking person I read the article
19    and if it was primarily about the case, many times
20    it was specifically -- you know, it would be
21    stated in the title or the lead paragraph, I'd
22    make a determination if it was about the case or
23    not.
24         Q.   What if it wasn't that clear?
25              MR. GRUNBERG:  Objection, asked and
```

EXHIBIT 1
PAGE 228

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    answered.
2         A.   Yeah, I've answered this many times.  I'm
3    done.
4    BY MR. SCHWARTZ:
5         Q.   Okay.  How many articles did your Google
6    search tell you that exist that mention Vern
7    Unsworth?
8         A.   I don't recall.  I don't know.
9         Q.   Do you know an approximate number?
10        A.   I don't know approximate, no.
11        Q.   How many articles did your search results
12   generate -- by the way, you did run a, I think you
13   said, a search for just Vern Unsworth or Vernon
14   Unsworth?
15        A.   I'm sure I did.  I can't say for sure but
16   I would assume I did.
17        Q.   Okay.  How many articles in your search
18   results from Google did not contain what you call
19   in your report the defaming statements?
20        A.   That did not, how many?
21        Q.   Yes.
22        A.   I don't know.  I can't recall the number.
23        Q.   Can you give us an approximate number, a
24   ratio or a percentage or a fraction of the total
25   number of articles that you found using the Google
```

EXHIBIT 1
PAGE 229

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    searches that you ran that did not contain what
 2    you call the defaming statements?
 3         A.   I cannot than give a number.  I don't
 4    know.
 5         Q.   Okay.  How does the number, the total
 6    number of articles on the internet that mentioned
 7    Mr. Unsworth but do not contain any of the
 8    defaming statements compare to the number of
 9    articles on your list?
10         A.   I don't know.  I didn't keep a log of
11    this.
12         Q.   So earlier today I went to Google and I
13    ran a search, Vernon Unsworth.  It returned
14    approximately 370,000 articles.
15              MR. GRUNBERG:  Okay.  Go ahead and I'll
16    object once you articulate this.
17              MR. SCHWARTZ:  Okay.
18    BY MR. SCHWARTZ:
19         Q.   If that is, in fact, correct information;
20    in other words, you go to Google today and just
21    type in Vernon Unsworth or Vern Unsworth and it
22    yields approximately 370,000 articles, if you were
23    to express as a fraction the number of articles on
24    your list to 370,000 articles that Google purports
25    to know about that mention Mr. Unsworth, that
```

EXHIBIT 1
PAGE 230

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   would be -- if you were to do that as a decimal,
 2   if you do the math, at least, just understanding
 3   the math here, that would be -- mean that the
 4   number of articles on your list is a fraction of
 5   the total number of articles that mention
 6   Mr. Unsworth would be .0016.  Isn't that
 7   mathematically correct?
 8              MR. GRUNBERG:  Okay, before you answer, I
 9   would be happy, Bobby, to put you -- or Mr.
10   Schwartz, to put you right where he's sitting, put
11   a microphone on you and depose you, if you want to
12   make representations and testify here about what
13   you personally found when you ran a Google search.
14   But I would caution you before you make a
15   representation about that to understand whether
16   what you were talking about is --
17              MR. SCHWARTZ:  Wait, wait, wait.
18              MR. GRUNBERG:  Let me finish.
19              MR. SCHWARTZ:  Please.  I'm going to let
20   you finish, but please do not start suggesting
21   things the witness should say.
22              MR. GRUNBERG:  I'm not suggesting things
23   the witness should say.  But if you are going to
24   represent that there were 374,000 articles which
25   you did, sir, quote, 374,000 articles -- or
```

EXHIBIT 1
PAGE 231

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    370,000 articles as our court reporter said, twice
2    you said it, 370,000 articles, I'm not going to
3    let you misrepresent what Google says to the
4    witness.  Because what you're talking about -- and
5    if you want to pull out your laptop and do this
6    with me, I'm fine to do that.  It says there are,
7    quote, about 374,000 results.  It doesn't say
8    they're actually articles.
9              Now, if you were to take the time and go
10   through --
11             MR. SCHWARTZ:  Now you're testifying.
12   You've got to stop that.
13             MR. GRUNBERG:  No, I'm not going to stop
14   that because unless you're going to withdraw the
15   question or acknowledge the fact that there are
16   not 370,000 articles.
17             MR. SCHWARTZ:  Okay.  I'll withdraw the
18   question.  I'll withdraw the question.
19             MR. GRUNBERG:  If you use common sense,
20   obviously there are 374,000 articles, I can't
21   imagine that much -- with 370,000 articles, think
22   about that number.  It makes no sense.  But go
23   ahead.
24             MR. SCHWARTZ:  I object to what you just
25   did.  There may be no point to my saying, that but
```

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    I think you've gone beyond the bounds of simply
 2    saying object to the form.  We'll let the judge
 3    deal with that.
 4    BY MR. SCHWARTZ:
 5        Q.  Let me ask you this question:  If the
 6    total results that a Google search turns up, the
 7    results is 370,000, you can't tell me how many
 8    articles there actually are, can you?  Counsel is
 9    trying to draw some distinction between results
10    and articles, isn't he?
11        A.  Results may or may not be articles.
12    There may be an overlap.
13        Q.  Right.  Can you tell us how much overlap
14    there is here?
15        A.  You just told me -- you just gave me this
16    number a few minutes ago, so no.
17            MR. GRUNBERG:  And objection to form.  If
18    you -- again, if you want to make representations,
19    first you said 370,000 articles, which appears not
20    to be true.  But if you want to make
21    representations and testify here as to whether you
22    can tell us there's, in fact, 370,000 articles or
23    not, I'm happy to get into that colloquy with you.
24            MR. SCHWARTZ:  Okay.  We can move along.
25            MR. GRUNBERG:  But it's not a fair
```

EXHIBIT 1
PAGE 233

1    question.

2          MR. SCHWARTZ:  You've made your point.

3    I'm using the word results, so let's stick with

4    that.

5    BY MR. SCHWARTZ:

6          Q.  When Google tells us results or tells you

7    results in response to a search page, do you

8    differentiate between results and -- well, by the

9    way, when Google says there are X number of

10   results in response to a search, if you were to

11   keep clicking next, next, next page, next page,

12   next page, is it possible to see all of the

13   results that Google tells you it has found?

14         A.  You can see all the results displayed.

15   And as I mentioned earlier, that number is an

16   algorithmic calculation.  So when you actually

17   look at all the results it may not match the

18   number that is -- Google estimates that there are.

19         Q.  Right, right.  Could be smaller, expected

20   to be smaller.

21         A.  It's typically smaller, and the last few

22   results pages you will typically find are not

23   really results of any content or value, they're

24   either -- yeah, you can -- when you go to page 10

25   and 20, they're not really valid good results.

EXHIBIT 1
PAGE 234

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  Not valid or good results in the sense

2   that if you click on them you won't come to an

3   article about the topic you were looking for?

4        A.  It will be -- yeah, it could be a lot of

5   things, a lot of things that happen.  You'll get a

6   frame page on a particular website that doesn't

7   really have content but it's kind of indexed under

8   that particular search term.  You'll get kind of

9   the low quality sites that may have Vern on one

10  portion and Unsworth somewhere else.  It's just

11  not the --

12           MR. SCHWARTZ:  Okay.

13           MR. GRUNBERG:  And, by the way, and if

14  you -- you know, in all fairness, if you want to

15  be --

16           MR. SCHWARTZ:  Don't start testifying.

17           MR. GRUNBERG:  But if you want to be fair

18  to this man, did you go through and look and click

19  through so you could tell him, you could give him

20  the full hypothetical so it would be fair to him?

21           MR. SCHWARTZ:  Okay.  Let's just try and

22  stay on topic here.

23  BY MR. SCHWARTZ:

24        Q.  Is there a way to determine the number of

25  articles that have been -- that are available to

BERNARD J. JANSEN, PHD

November 04, 2019

1    be seen on Google that mention Vernon Unsworth?

2    Is there a way to know what that number of

3    articles is?

4        A.  That's available on the web?

5        Q.  Yeah.

6        A.  Well, the primary portal would be -- the

7    primary approach would be to go to one of the

8    search engines because they would have the

9    majority of articles indexed.  That would probably

10   be a -- there might be all the articles, it might

11   be a subset of the articles that are actually

12   out -- results that are actually out there.

13       Q.  Right.  But if you wanted to -- if one

14   wanted to know how many articles have been written

15   about Vernon Unsworth, regardless of the subject

16   matter of those articles, not the number of

17   results, quote unquote, that a search would

18   generate, how do you do that?

19       A.  The number of articles?

20       Q.  Yeah.

21       A.  Like newspaper articles?

22       Q.  Whatever they are.  Yeah, it could be

23   newspapers, blogs, whatever.  In other words, if

24   you want to eliminate from the results all the

25   chaff of stuff that has Vernon on one page and

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   Unsworth three pages down, is there a way to do
 2   that?
 3        A.  Well, you could start -- again, I'm just
 4   speaking as a technical person, if I was asked to
 5   do this task, you know, I'd probably start with a
 6   search engine, search the results, so using an
 7   algorithmic approach trying to narrow it down.
 8   And this then it would be some kind of manual
 9   process to have to review the results to see if
10   they match the Vernon Unsworth that you were
11   interested in.
12        Q.  Okay.  But is it correct, as you sit here
13   today you don't know how many articles have been
14   written on Vernon Unsworth on the -- that are
15   available on the internet that do not mention the
16   defaming statements.
17        A.  No, I do not know the number of results
18   that do not mention the defaming statements.
19        Q.  Can you tell me how many articles out
20   there -- that are out there that do contain the
21   defaming statements but which were written after
22   Mr. Unsworth filed this lawsuit?
23        A.  I don't have that number because I
24   stopped doing the analysis at a certain point to
25   do the report, so I'm sure there have been other
```

EXHIBIT 1
PAGE 237

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    articles that have been written since that time,
2    so I don't know the number.
3         Q.  That's not -- in other words, you
4    didn't -- you haven't undertaken any effort to
5    determine the number of articles written about
6    Mr. Unsworth after this lawsuit was filed that may
7    mention the defaming statements.  Excuse me --
8    yes.
9         A.  Well, I -- up to the date I filed my
10   report, you know, I collected 605 articles, so
11   some of those are going to meet your criteria, but
12   I would assume that there's going to be -- that
13   other articles have been written since I submitted
14   the report that contain the defaming statements.
15   As I mentioned in the report, I would assume those
16   are out there.
17        Q.  Okay.  But I'm trying to get a sense of
18   the body of articles -- let's do it one step at a
19   time -- that exist that are primarily about this
20   lawsuit, whether they contain or not the defaming
21   statements or not, I'm not that interested in.
22   Because as I understand it, if an article was
23   primarily about this lawsuit, even if it did
24   include the defaming statements, it's not on your
25   list, right?
```

EXHIBIT 1
PAGE 238

November 04, 2019

1        A.   I did not -- that is correct.

2        Q.   Okay.

3        A.   I do -- I stated I located, this is a

4    sample of 140 articles that were primarily about

5    the lawsuit, contained the defaming statements,

6    but not included it into my count.

7        Q.   So you can't tell us the number of

8    articles that have been written that are primarily

9    about this lawsuit, can you?  Regardless of

10   whether they contain the defaming statements.

11            MR. GRUNBERG:  Objection, form.

12       A.   I --

13            MR. GRUNBERG:  By the way, are you asking

14   if he, as a general principle, can tell you or

15   whether as he sits here today he has a number for

16   you.

17   BY MR. SCHWARTZ:

18       Q.   As you sit here today do you have a

19   number for me of the articles that have been

20   written about Mr. Unsworth that are primarily

21   about the lawsuit?

22       A.   Since I didn't do that analysis I don't

23   have the number, no.

24       Q.   And I take it, then, since you don't know

25   what these articles are, you couldn't possibly

EXHIBIT 1
PAGE 239

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    tell me what the daily unique viewers count would
 2    be for the websites on which those articles were
 3    available.  That's not information you have
 4    either.
 5            MR. GRUNBERG:  Again, objection.  Are you
 6    asking if he could as a general matter or as he
 7    sits here today?
 8    BY MR. SCHWARTZ:
 9        Q.  As he sits here today.
10        A.  Since I didn't do the analysis, no, I
11    could not give you that number.
12        Q.  Okay.  And do you know, as you sit here
13    today, whether someone Googling Vern Unsworth is
14    more likely to see stories about the lawsuit that
15    aren't on your list than they are to see any of
16    the articles that are on your list?
17        A.  You're speaking specifically?
18        Q.  I am.
19        A.  Okay.  I don't know.
20        Q.  Okay.  How many of the articles that are
21    on your list contain information that's critical
22    of Mr. Musk?
23        A.  Critical of Mr. Musk?  I didn't
24    specifically look at that.  I can give you my
25    general impression of most of the articles were
```

1   critical of the action rather than critical of

2   Mr. Musk.  But I didn't specifically look at that,

3   so I don't know.

4        Q.  Okay.  And just to clarify what you said,

5   in other words, most of the articles were critical

6   of Mr. Musk for saying what he said about

7   Mr. Unsworth?  Is that what you mean?

8        A.  From reading the articles, yeah, that's

9   my impression.

10       Q.  How many articles on your list say that

11   what Mr. Musk said about Mr. Unsworth was untrue?

12       A.  Untrue?

13       Q.  Untrue.

14       A.  Again, I didn't specifically look at

15   that.  But I've read a lot of the articles.  If I

16   had to kind of sum it up it would be more of

17   rather than accusations of untrue as, you know, no

18   evidence provided, would be the general gist of --

19   you know, in that vein.  But again, I was not

20   asked to investigate that.

21       Q.  I understand.  So using that version of

22   what we're asking about, how many of the articles

23   on your list report that Mr. Musk had no evidence

24   to support his statements about Mr. Unsworth?

25       A.  Again, I don't have an exact count.  I'm

EXHIBIT 1
PAGE 241

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   just giving you my impressions from reading the
 2   articles.  You know, there were some of those.
 3   But most of them were just reporting the actions
 4   of the defaming statements and what happened and
 5   the reactions.  But -- so I didn't specifically
 6   look at this aspect of true or untrue.
 7        Q.  Okay.  Some of the articles on your list
 8   state that Mr. Musk was wrong to have said what he
 9   said about Mr. Unsworth, right?
10            MR. GRUNBERG:  I'm just going to object
11   to form, by the way, in terms of you're now
12   getting into areas that are far afield from what
13   his report says he's going to give an opinion on.
14   It's not clear what the relevance is.  And if you
15   want him to now become an expert about whether or
16   not these articles were critical of Mr. Musk or
17   not, certainly his report doesn't purport to be
18   giving an expert opinion on that field.  But go
19   ahead.
20   BY MR. SCHWARTZ:
21        Q.  Please answer my question.
22        A.  Could I get the question again.
23        Q.  Sure.  Some of the articles on your list
24   state that Mr. Musk was wrong to have said what he
25   said about Mr. Unsworth, correct?
```

EXHIBIT 1
PAGE 242

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1         A.  Again, I was not asked to investigate
 2    this.  But from reading the articles, yeah, I
 3    assume there are some that said that.
 4              (Defendant's Exhibit 152 marked)
 5    BY MR. SCHWARTZ:
 6         Q.  So Exhibit 152 is from feedimo.com, and
 7    it's one of the articles on your list, correct?
 8         A.  I believe so.
 9         Q.  Okay.  And it's headlined, says that what
10    Mr. Musk said about Mr. Unsworth was baseless,
11    right?
12              MR. GRUNBERG:  Objection, form.
13         A.  Well, as I'm -- as a rational person
14    reading this, it says -- actually baseless would
15    qualify feud.
16    BY MR. SCHWARTZ:
17         Q.  Sorry.  Let me direct your attention to
18    the first line.  It says, Tech entrepreneur Elon
19    Musk has intensified his baseless attacks against
20    a British driver who helped coordinate --
21         A.  Okay.
22         Q.  That's the first line of the article,
23    right?
24              MR. GRUNBERG:  Just to be clear, I think
25    you said British driver but you meant British
```

EXHIBIT 1
PAGE 243

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1   diver.
 2            MR. SCHWARTZ:  I am so sorry.  Let me try
 3   that again.
 4   BY MR. SCHWARTZ:
 5       Q.  Tech entrepreneur Elon Musk has
 6   intensified his baseless attacks against a British
 7   diver who helped coordinate the rescue of 12 boys
 8   and their football coach, correct?
 9       A.  Yes, I see that statement.
10       Q.  And so -- okay.  The -- let's see.
11            MR. SCHWARTZ:  Let's mark this, please.
12            (Defendant's Exhibit 153 marked)
13   BY MR. SCHWARTZ:
14       Q.  Okay.  This is 153.  This is an article
15   from Ink.  This is on your list of articles,
16   correct?
17       A.  I'm going to believe you and say that it
18   is.
19       Q.  Well, let's just make sure.
20       A.  I'm really fine with believing you.
21       Q.  Okay.  And this article, you'd agree with
22   me, is critical of Mr. Musk for saying what he
23   said about Mr. Unsworth?
24       A.  As reading the article, yes.  You know,
25   I'll be glad to answer this, but I didn't evaluate
```

EXHIBIT 1
PAGE 244

BERNARD J.JANSEN, PHD

November 04, 2019

1   these articles on their content or their pro Musk,

2   pro Unsworth.  I just saw did they contain the

3   defaming statements or not.

4        Q.  I understand.  Let me ask you a question.

5   Would anybody this reading the articles that we've

6   looked at, Exhibit 153 and Exhibit 152, believe

7   that what Mr. Musk was saying about Mr. Unsworth

8   was true?

9            MR. GRUNBERG:  Objection, form.  I mean,

10  again, you're asking someone who has not been

11  disclosed to give opinions about what people

12  believe about what these two articles say, to now

13  start going far afield and taking everyone's time

14  to do this.  This is irrelevant in terms of what

15  this man's been retained to do in terms of an

16  opinion, but go ahead.

17  BY MR. SCHWARTZ:

18       Q.  You can answer the question.

19       A.  Could I have the question again, please?

20       Q.  Yes.  Would anybody reading the articles

21  that we've marked as Exhibit 152 and 153 believe

22  what Mr. Musk was saying about Mr. Unsworth was

23  true, from these articles?

24           MR. GRUNBERG:  Objection, form.  Same

25  objection.

EXHIBIT 1
PAGE 245

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        A.  Well, sir, you know, I really can't
 2   comment on everybody.  When I have read -- if I
 3   look at these articles, you know, I take it that,
 4   you know, baseless attacks, where's the evidence.
 5   That would be my take there.
 6            This Ink article, you know, it almost
 7   seems like in a way helpful, that, Hey, you know,
 8   don't be calling someone a pedophile on Twitter.
 9   You know, I wouldn't necessarily say these
10   articles are actually critical against Mr. Musk,
11   from my own just reaction to it.
12   BY MR. SCHWARTZ:
13        Q.  So if you look at the second page of the
14   article, let me just make sure that's really what
15   you think, in other words, that you don't think
16   this is critical against Mr. Musk.
17            It says, quote, Today, however, it's Musk
18   who's blatantly flagrantly in the wrong.  I have
19   the same advice for him:  Take a long hard look of
20   your life.
21            You don't think that's critical of
22   Mr. Musk?  You think it's favorable to Mr. Musk?
23        A.  Again, this was not what I was asked to
24   do, so I can only give my just reaction from a
25   personal reading of this.  It kind of comes across
```

EXHIBIT 1
PAGE 246

```
 1    to me as a little tough love kind of thing.  But I
 2    was not asked to analyze the sentiment or polarity
 3    of these articles.  It's something I was not asked
 4    to do.
 5         Q.  Uh-huh.  And that's not something you
 6    feel qualified to do?
 7         A.  It could be done.  I mean, sentiment
 8    analysis is a field in computer science, so you --
 9         Q.  I meant by you.
10         A.  Oh, yeah, if for some reason it was --
11    you know, I wanted to algorithmically do this, it
12    could be done.
13         Q.  Can you just clarify what you meant by
14    the "it?"
15         A.  If for some reason somebody wanted to
16    take all 605 articles and do some sentiment
17    analysis or polarity analysis, there's algorithmic
18    approaches that can do that within some degree of
19    probability.
20         Q.  But that's not work you've done.
21         A.  I've not been asked to do that, no.
22         Q.  And you haven't done it.
23         A.  No, I've not been asked to do that, so
24    no.
25         Q.  Okay.  Just want to be clear.  Even
```

EXHIBIT 1
PAGE 247

```
 1   though you weren't asked to do it, you didn't do
 2   it on your spare time as well and haven't told me
 3   about it, have you?
 4        A.   I don't have any spare time so I did not
 5   do it.
 6             MR. GRUNBERG:  Objection, asked and
 7   answered.
 8   BY MR. SCHWARTZ:
 9        Q.   So, of the articles on your list how many
10   said in their headlines that Mr. Musk accused
11   Mr. Unsworth of being something as opposed to
12   that -- let me just stop there.  Let me ask it
13   again, I mangled the question.
14             The articles on your list, how many said
15   in their headlines that Mr. Musk accused, in other
16   words, how many of them used the word accused with
17   reference to whatever it was Mr. Musk was saying
18   about Mr. Unsworth?
19        A.   I didn't do that count, so I don't have
20   the number.
21             MR. GRUNBERG:  I mean, do you want him to
22   really go through that whole list and count?
23             MR. SCHWARTZ:  I'm just asking if he
24   knows.
25   BY MR. SCHWARTZ:
```

EXHIBIT 1
PAGE 248

BERNARD J.JANSEN, PHD

```
 1        Q.  How many of the articles on your list
 2   said not that Mr. Musk accused Mr. Unsworth of
 3   something, but simply called or Tweeted the
 4   defaming words in the material that was being
 5   quoted in the article?
 6             MR. GRUNBERG:  Objection, form.
 7        A.  The -- I did not do that count.  And I
 8   just want to point out in my expert report what I
 9   was asked to do, is whether an article contained
10   the defaming statements or not.  And that was the
11   boundary of my task.
12        Q.  Would it surprise you to learn that only
13   40 of the headlines in the articles on your list
14   use the term or word accused?
15             MR. GRUNBERG:  Objection, form.
16        A.  Again, I don't have a reaction of
17   surprise or unsurprise.
18   BY MR. SCHWARTZ:
19        Q.  All right.  Let's look at your report, if
20   we could, in paragraph -- page 17, paragraph 55.
21   And in paragraph 55.a. you say that 77 percent or
22   465 of the articles primarily contained the
23   defaming statement by Mr. Musk about Mr. Unsworth
24   being a pedophile, do you see that?
25        A.  Yes.
```

EXHIBIT 1
PAGE 249

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.   Okay.  And then just skip down to

2   paragraph 55.c. for a second.  You write 47 or 8

3   percent of the articles primarily concern the

4   defaming statement by Mr. Musk of Mr. Unsworth

5   being a child rapist slash having a child bride,

6   correct?

7        A.   That is correct.

8        Q.   Okay.  Which of the articles on your list

9   primarily contain the defaming statement by

10   Mr. Musk about Mr. Unsworth being a pedophile?

11       A.   Which of the particular articles?

12   They're annotated in the spreadsheet you have.  I

13   don't have it off the top of my head.

14       Q.   So in other words, if I look at the

15   spreadsheet it will tell me which of the ones you

16   believe contain the statement by Mr. Musk about

17   Mr. Unsworth being a pedophile?

18       A.   Yes, they're tagged in the spreadsheet.

19       Q.   They're tagged, okay.  Now, when you say

20   these articles concern the defaming statement of

21   Mr. Unsworth being a pedophile, is that a

22   reference to Mr. Musk's July 2018 pedo guy Tweet?

23       A.   Yeah, primarily the pedo Tweet.

24       Q.   Are you aware of any statement where

25   Mr. Musk -- other than the pedo guy term, where

EXHIBIT 1
PAGE 250

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   Mr. Musk used the term pedophile, the actual word
 2   pedophile, to describe Mr. Unsworth?
 3        A.   I am not aware of any other -- any
 4   particular defaming statement like that.  As I
 5   said in my report, I was provided these are the
 6   defaming statements.
 7        Q.   Right.  Just to be clear, in other words,
 8   when it references -- or at least the reference in
 9   paragraph 55.a. of Mr. Unsworth being a pedophile,
10   that references statements where Mr. Musk referred
11   to Mr. Unsworth as pedo guy?
12        A.   Pedo guy, yes.
13        Q.   Is that right?
14        A.   Yes.
15        Q.   Okay.  And -- okay.  Now, are you
16   expressing an opinion in this case that the term
17   pedo guy -- start again.
18             Are you expressing an opinion in this
19   case that when Mr. Musk used the term pedo guy, it
20   was synonymous with the term pedophile, or are
21   you --
22             MR. GRUNBERG:  Objection --
23             MR. SCHWARTZ:  Let me finish.
24   BY MR. SCHWARTZ:
25        Q.   -- or are you simply reporting on the
```

EXHIBIT 1
PAGE 251

1    extent to which Mr. Musk used the term pedo guy?

2            MR. GRUNBERG:  Objection, form.

3        A.  As I stated in my report, I was provided

4    that these are the defaming statements, and so I'm

5    not making a determination about the terminology

6    or language.  I was told these are the things

7    that -- find the dissemination.

8        Q.  In other words, your job is to report

9    numerical information, not to decide whether

10   pedophile and pedo guy mean the same thing, is

11   that right?

12       A.  I was not asked to do that, no.

13       Q.  Okay.  And when you write in paragraph

14   55.a. that whatever number of articles and

15   whatever percentage of articles, quote, primarily

16   contain, close quote, the defaming statement, what

17   do you mean by primarily?

18       A.  That as the saga wore on, there became

19   more and more kind of summary articles.  So there

20   were -- there were many articles that just

21   addressed pedo guy and nothing else.  But as,

22   again, the saga went on there were a few articles

23   that were kind of summary articles that devoted

24   most of the content to the pedo guy defaming

25   statement but may have talked about something

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   else.
 2        Q.  All right.  Let's go to the next page and
 3   look at paragraph 55.b.  There you write that 95
 4   articles or 15 percent of the articles primarily
 5   concern a Tweet from Mr. Musk where he apologized
 6   for his defaming statements against Mr. Unsworth,
 7   although all of these articles mentioned one or
 8   more of the defaming statements.  Do you see that?
 9        A.  Yes.
10        Q.  Okay.  The apology, you say a Tweet from
11   Mr. Musk where he apologized.  Is that the July
12   18th -- are those the July 18th Tweets from
13   Mr. Musk that you're referring to here that are
14   being mentioned in these articles?
15        A.  Yes, I mention in my report and give the
16   Tweet that he responded to, somebody else's
17   article about, yes.
18        Q.  Okay.  And I can assume those are also
19   annotated, which articles you're referring to here
20   is also annotated in your spreadsheet?
21        A.  Yes, sir.
22        Q.  So I could look at those articles and
23   then add up the daily unique visitors for the
24   websites on which those articles appeared to
25   determine the unique visitors to websites who
```

EXHIBIT 1
PAGE 253

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1   saw -- on which the content of those 93 articles
 2   was made available?
 3        A.   It's not that simple.
 4        Q.   Oh, all right.
 5        A.   Because a lot of these sites published
 6   multiple articles.  So they may have published the
 7   apology but also the pedo guy comment.  So you
 8   can't just disambiguate, oh, everything that --
 9   because I only included one article from a site,
10   no matter -- even if they published six, I only
11   included one day of traffic.  So they could have
12   did an apology article but also did a pedo file
13   article.
14        Q.   Totally fair, let me try and rephrase the
15   question.  If I wanted to know how many of the 98
16   million people in your daily average viewer total
17   saw one of the 93 articles in paragraph 55.c., I
18   could figure that out by adding up the daily
19   average traffic to the websites for those
20   articles, because you've tagged them in your
21   spreadsheet, right?
22           MR. GRUNBERG:  Objection, misstates prior
23   testimony.
24        A.   As you have mentioned several times, the
25   traffic for this particular article is not there.
```

EXHIBIT 1
PAGE 254

BERNARD J.JANSEN, PHD

November 04, 2019

1    What is reported is the traffic dissemination to

2    the website.

3    BY MR. SCHWARTZ:

4        Q.  Yes, all right.  And I understand that's

5    a recurring theme in the deposition.  Trying to

6    put that aside and just say, Look, if I want to

7    know how many of your -- how many articles -- how

8    many daily average viewers were there on the

9    websites to which these 93 articles were

10   dissemination, I could figure that out by -- from

11   your spreadsheet because your spreadsheet is going

12   to tell me where those articles ran.

13           MR. GRUNBERG:  Objection, form.

14       A.  Close.

15   BY MR. SCHWARTZ:

16       Q.  All right, help me out.

17       A.  You could tell the number of websites and

18   articles and the daily unique visitors to which

19   the apology was possibly dissemination, yes.

20       Q.  Correct.  Got it.  Thank you.

21           All right, next, in paragraph 55.c.

22   the -- this is that 47 of your articles primarily

23   concern the statement by Mr. Musk of Mr. Unsworth

24   being a child rapist, having a child bride.  And

25   my first question is:  The statement about child

EXHIBIT 1
PAGE 255

```
 1    rapist, child bride, those -- those are the
 2    statements that first appeared in the BuzzFeed
 3    article of September 4, 2018.
 4         A.   Can you clarify which --
 5         Q.   Oh, paragraph 55.c.
 6         A.   Yes.  Yes, I believe if you go back in
 7    the report I clue the reference to BuzzFeed emails
 8    that talk about the child rapist, child bride,
 9    that sort of thing.
10         Q.   That was the source of the public
11    reporting about Mr. Musk saying those things about
12    Mr. Unsworth, right?
13         A.   Yes, I believe those were the sources
14    that then got disseminated through BuzzFeed and
15    other outlets.
16         Q.   Okay.  So about 8 percent of your
17    articles primarily concerned the statements
18    Mr. Musk reportedly made about Mr. Unsworth to
19    BuzzFeed that then got republished, et cetera,
20    correct?
21              MR. GRUNBERG:  Objection, form.
22         A.   That -- I don't know specifically about
23    the emails, but they reference the BuzzFeed
24    article or the defaming statements that were made.
25         Q.   All right.  And so just to be clear,
```

EXHIBIT 1
PAGE 256

1  these 47 articles are different articles from the

2  465 articles you discuss in paragraph 55.a. of

3  your report?

4      A.  Yes, those -- I put them each in these

5  separate buckets to separate them out, yes.

6      Q.  Okay.  And if I go to your spreadsheet it

7  will tell me which articles contain -- which

8  articles are these 47 articles, correct?

9      A.  Yes, these articles are tagged in the

10  spreadsheet.

11      Q.  And then I can find the average daily

12  viewer -- visitors to those websites by looking at

13  your other chart, correct?

14      A.  Yes, from those domains that those sites

15  were published on, you can get the dissemination

16  of these particular defaming statements.

17      Q.  Okay.  So have you looked to see what the

18  dissemination is, in other words, the daily

19  average viewer dissemination metric is, for these

20  47 articles?

21          MR. GRUNBERG:  Objection, form.  And, by

22  the way, you keep on saying daily average viewer,

23  but I think you mean daily average visitor.

24          MR. SCHWARTZ:  Thank you, Counsel, so

25  much.  Let me back up and start again.

EXHIBIT 1
PAGE 257

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    BY MR. SCHWARTZ:
 2         Q.   Have you done any analysis to determine
 3    what the daily average visitor metric is for the
 4    websites that hosted the 47 articles in paragraph
 5    55.c.?
 6         A.   As I mentioned, it's not as cut and dry
 7    as that, because it's -- when you get to the
 8    traffic, or the unique visitors, there's overlap
 9    because, again, these sites may have published an
10    article that's in all three of these buckets, you
11    know.  So --
12         Q.   I see, okay.
13         A.   It's not as cleancut as saying, Oh,
14    this -- only these 47 articles had this
15    dissemination, because if a website occurred at
16    all three buckets I only counted it once, so . . .
17         Q.   I see.  Okay, okay, thank you.  All
18    right.
19              Page 15, paragraph 48, in paragraph 48
20    you write, the second sentence, From Mr. Musk's
21    Twitter account millions of people could have seen
22    the defaming statements, and we know based on
23    screen shots above of Tweets containing the
24    defaming statements that will thousands of people
25    directly interacted with the Tweets.  I wanted to
```

EXHIBIT 1
PAGE 258

```
 1    ask you some questions about that.

 2         A.   Sure.

 3         Q.   First of all, you don't know how many

 4    people actually did see, on Twitter, that is to

 5    say, Mr. Musk's Tweets concerning Mr. Unsworth, do

 6    you?

 7         A.   I did not analyze that, so no, I do not.

 8         Q.   And you don't know how many people -- how

 9    many of his Twitter followers actually read any of

10    his Tweets concerning Mr. Unsworth, do you?

11         A.   I didn't analyze that, so no.

12         Q.   And are you generally with how the

13    Twitter app works?

14         A.   Yes, I use -- I did one of the original

15    Twitter research papers, had a Twitter account for

16    many years, so yes.

17         Q.   Okay.  So the fact that Mr. Musk may have

18    had 20 million plus followers in July 2018 doesn't

19    mean that when he Tweeted about Mr. Unsworth 20

20    million people saw it or even knew about it,

21    right?

22         A.   You don't know that for sure, yes.

23         Q.   So for one of Mr. Musk's followers to

24    have -- all right, let me back up for a second.

25              The -- I'm trying to come up with a
```

EXHIBIT 1
PAGE 259

```
 1   concept here of what I call automatic or passive
 2   receipt of the Tweet.  There are some
 3   circumstances under which somebody who follows
 4   somebody else on Twitter passively or
 5   automatically gets all their Tweets, and there are
 6   some circumstances where that doesn't happen,
 7   right?
 8        A.   Yeah, there's different approaches, yes.
 9        Q.   Right.  So for somebody in July 2018 who
10   was following, one of the 20 million followers of
11   Mr. Musk's Twitter account, to have automatically
12   gotten his Tweets regarding Mr. Unsworth or
13   passively receive them without doing anything,
14   that person first would have had to set up a
15   notification to receive any Tweet from Mr. Musk,
16   right?
17             MR. GRUNBERG:  Objection, form.
18        A.   I mean, if they're following -- yeah, if
19   a person's following they can see their Tweets.
20   But this number of followers, it's more kind of
21   akin to what I did with the traffic, the website
22   traffic.  It's the number of people that it
23   possibly could have been disseminated to.  It's --
24   don't know, can't say for sure whether a
25   particular person saw a particular Tweet.
```

EXHIBIT 1
PAGE 260

BERNARD J.JANSEN, PHD

November 04, 2019

1            MR. GRUNBERG:  And are you trying to

2    represent -- just so I make sure it's clear, are

3    you trying to represent that in order for a user

4    on Twitter to receive a notification of Mr. Musk's

5    Tweet that the user has to go and select some

6    button or something to receive a notification of

7    Mr. Musk's Tweets specifically, not just you're

8    allowing your phone to receive notifications from

9    Twitter in general?  That's not clear to me.

10            MR. SCHWARTZ:  I think that's a slightly

11    different question.

12            MR. GRUNBERG:  Because it's different.

13            MR. SCHWARTZ:  Let me clarify if there's

14    any ambiguity in the record.

15    BY MR. SCHWARTZ:

16       Q.  The fact that somebody, just some

17    hypothetical person out there is a follower of

18    Mr. Musk, what does that mean as a function or a

19    practical consequence when Mr. Musk issues a

20    Tweet?

21       A.  Well, if you are following someone on

22    most of these social media platforms like Twitter

23    then those people that post or Tweet, that comes

24    up in your social media feed.  And so as you

25    scroll through your feed you can see the post that

EXHIBIT 1
PAGE 261

BERNARD J.JANSEN, PHD

November 04, 2019

1   the people you're following are making.

2       Q.  But in order to see those Tweets you have

3   to go to your timeline or chronology to see what's

4   been posted there, right?

5           MR. GRUNBERG:  By the way, objection,

6   form.  I mean, I can take him out of the room and

7   tell you -- and tell you all the things that are

8   incorrect about that, and I don't think it's fair

9   to make those types of representations about

10  Twitter that just don't grasp what the app is

11  doing.  But go ahead.

12  BY MR. SCHWARTZ:

13      Q.  That's why I'm asking the questions.

14      A.  A way to view it is, you know, typically

15  called a stream.  So you can, when you go to your

16  Twitter app or your Twitter page you can see the

17  flow of social media comments that have been

18  posted or re-Tweeted or shared by the people that

19  you've followed.

20      Q.  So if you're an Elon Musk Twitter

21  follower in July 2018, in order to see -- unless

22  you've done something in Twitter to cause

23  Mr. Musk's Tweets to show up on your home screen

24  or to alert you, send you an alert to the fact

25  that he's Tweeted, you'd have to go to your

BERNARD J.JANSEN, PHD

November 04, 2019

1  Twitter screen and see if Elon Musk had Tweeted,

2  right?

3            MR. GRUNBERG:  Objection, form.  And

4  again, are you saying that you generally allow

5  notifications on the Twitter app on your phone?

6            MR. SCHWARTZ:  That's why I'm trying to

7  ask him to tell me what's going on with Twitter.

8  That's why I'm asking these questions.

9      A.  Okay.  Again, you know, I didn't even

10  include these numbers in my count.  But typically,

11  yeah, it just flows through your stream and a

12  typical -- I can say myself when I'm on a social

13  media site, again I jumped off Twitter, but yeah,

14  you scroll through your stream and see what people

15  have posted and sometimes you read, just read,

16  sometimes you interact with.  So it's once you

17  kind of set up that connection, you don't need to

18  do anything.

19      Q.  But is it true, though, that unless

20  someone looks at their stream they're not seeing

21  the Tweet from the person they're following?

22            MR. GRUNBERG:  Objection, form.

23            MR. SCHWARTZ:  He can say no, he can say

24  yes.

25            MR. GRUNBERG:  This case has hundreds of

EXHIBIT 1
PAGE 263

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    articles with Elon Musk's Tweets posted in the
 2    articles themselves outside of Twitter.
 3              MR. SCHWARTZ:  I'm very well aware of
 4    that, yes.  I'm aware of that.
 5              MR. GRUNBERG:  So the question you're
 6    asking is unfair.
 7              MR. SCHWARTZ:  I don't think it's the --
 8              MR. GRUNBERG:  It misrepresents the
 9    evidence.  But go ahead.
10              MR. SCHWARTZ:  I'm just talking about
11    within the world of Twitter.
12    BY MR. SCHWARTZ:
13         Q.  Within the world of Twitter if it -- was
14    there some way for Mr. Musk's 20 odd million
15    Twitter followers to know that he had posted or
16    Tweeted about Mr. Unsworth without checking their
17    Twitter stream?
18              MR. GRUNBERG:  Objection, form.
19         A.  Well, within the confines of Twitter, I
20    mean, you have to look at -- you have to look at
21    the app, you have to look at the website to see
22    the Tweets.  If I'm understanding --
23    BY MR. SCHWARTZ:
24         Q.  No, you're right.  You are answering my
25    question, you're right.
```

EXHIBIT 1
PAGE 264

BERNARD J.JANSEN, PHD

November 04, 2019

1       A.   Okay.

2       Q.   So, but to put it slightly differently,

3    the mere fact that I'm -- I was -- I'm not, but if

4    I were, a follower of Elon Musk on Twitter doesn't

5    mean that I'm going to get some notification on my

6    device or when I log onto Twitter that immediately

7    says, Hey, Elon Musk has issued the following

8    Tweets, and here they are.  Is that right?

9            MR. GRUNBERG:  Objection, form.  And you

10   know what, I'll let you answer and then we're

11   going to take a break.

12      A.   The -- in that particular scenario

13   someone could either see the entire stream that --

14   not only Mr. Musk, but everybody they were

15   following, his Tweets would be with -- meshed with

16   other people.  Or if people could go directly to

17   his Twitter page and see all his Tweets.  I mean,

18   those would be two -- the two primary ways of

19   seeing what he has Tweeted.  Either something that

20   is just passive where you don't have to do

21   anything, or something you'd go and actively seek

22   something else.

23           MR. SCHWARTZ:  Okay.  Counsel wants to

24   take a break, so let's go off the record.

25           THE VIDEOGRAPHER:  Going off the record.

EXHIBIT 1
PAGE 265

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    The time is now 4:39 p.m.
 2            (Recess)
 3            THE VIDEOGRAPHER:  We are back on the
 4    record.  The time is now 4:49 p.m.
 5    BY MR. SCHWARTZ:
 6        Q.  Okay.  I want to finish this up quickly,
 7    and I think I can ask you one question now that
 8    might close this up very quickly.  You're not
 9    offering any opinion testimony or any testimony in
10    this case as to the number of Twitter followers of
11    Mr. Musk who actually read any of his Tweets about
12    Mr. Unsworth, correct?
13        A.  I've not been asked to do that, no.
14        Q.  And I think in your report you report on
15    the number of people who interacted with his
16    Tweets, right?
17        A.  I mention that in the report, yes.
18        Q.  And that's about 3362 people?
19        A.  Without looking at the report, I -- is
20    there a particular paragraph is?
21        Q.  No, I don't have that.
22        A.  I don't know that number.
23        Q.  My last topic -- and I really do want to
24    get you out of here -- is just to understand what
25    you can tell me about how Google arranges
```

EXHIBIT 1
PAGE 266

```
 1   searches.  So when you were doing the searches you
 2   ran, can you tell me, for example, one thing:
 3   Does Google place more recently published stories
 4   ahead of older stories?
 5        A.   The -- it's a proprietary algorithm so I
 6   don't know for sure, but the general analysis that
 7   has been done, especially in news articles that
 8   the most recent ones will be -- that's one of the
 9   factors they use in ranking the results.
10        Q.   Do you know any other factors that Google
11   takes into account in ranking or prioritizing
12   which links or stories come up ahead of others?
13        A.   Yes.
14        Q.   What are they?
15        A.   I've been told there's 201, so I will
16   cancel my flight.
17        Q.   No, I don't want you to do that.  Just
18   maybe one or two of the more significant ones.
19        A.   Sure.  The credibility of the site, so --
20        Q.   Okay.  And the other?
21        A.   Another one would be the number of
22   perhaps links that point to that particular
23   article or that particular site.  They use those
24   as anchor texts.
25        Q.   And is it correct that the results that
```

EXHIBIT 1
PAGE 267

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    Google provides in response to a given search will
2    change over time?
3         A.   They can change over time, yes.
4         Q.   And one of the things that influences
5    whether Google search results change is whether
6    there's content, new content available on the
7    internet that meets the criteria of the search
8    request that a user makes, right?
9         A.   New content that then has the outranking
10   factors that outrank the current content.  So yes,
11   I mean, that can happen.
12        Q.   So the results of a Google search for
13   Vernon Unsworth done today may look very different
14   than a result -- search results of a search done
15   for Vernon Unsworth before the cave -- the kids
16   got lost in the cave, right?
17        A.   Assuming you don't do any time parameters
18   on it, yes, it could change over time.
19        Q.   In other words, if somebody did a search
20   of Vern Unsworth before those kids ever got lost
21   in the cave and compare that to a search of Vern
22   Unsworth today, those results you'd expect to look
23   very different, wouldn't you?
24        A.   I would expect those results to look
25   different.
```

EXHIBIT 1
PAGE 268

BERNARD J.JANSEN, PHD

November 04, 2019

1        Q.  And even if you did a search -- the
2    search you ran of -- you asked for pedo guy, I
3    think you tried to figure out what that search
4    result would look like back at the time Mr. Musk
5    made that Tweet in July 2018; is that right?  Or
6    were you looking to see what it looked like more
7    currently?
8        A.  The -- I set a time parameter on it just
9    to make sure I didn't get anything before he
10   actually said it, because sometimes, you know, you
11   just don't know how the algorithm works.  And then
12   in the screen shot I did have the time period up.
13   But for most of my searches I just didn't put
14   any -- I just searched on Google.
15       Q.  Does that mean then the search results
16   would reflect Google's current results for those
17   searches?
18       A.  That would -- well, yes, if there's no
19   delimiting parameters, yes, it would be at the
20   point of time you did the search.
21       Q.  If Mr. Unsworth wins this case at trial
22   would you expect to see a lot of stories written
23   about that?
24           MR. GRUNBERG:  Objection, form.
25       A.  It's not my -- if we've covered

November 04, 2019

1    journalism is not my area, but as a rational

2    person I would expect there would be articles

3    about the case.

4    BY MR. SCHWARTZ:

5        Q.  And would you expect some of those

6    articles or many of those articles to show up in

7    Google search results with searches were run after

8    the trial outcome for Mr. Unsworth?

9        A.  I would expect them to show up in Google

10   results and it would, of course, vary by the query

11   that was ran, but if -- yeah, you would expect

12   there would be some search results of the outcome

13   of the case.

14       Q.  Right.  So let's say the search query is

15   simply Vernon or Vern Unsworth.  If Mr. Unsworth

16   wins this case, even if he's awarded just a dollar

17   and there are stories written about that, would

18   you expect to see those stories be returned by

19   Google if you ran a search for Vernon Unsworth?

20       A.  I would have to test that out, so his

21   contributions to the Thai cave got a lot of press

22   also.  So I would have to -- if it was just his

23   name I would have to -- I would expect there to be

24   probably some case articles, but I couldn't -- I

25   would have to test that if something like that

EXHIBIT 1
PAGE 270

BERNARD J.JANSEN, PHD

November 04, 2019

1   happened.

2        Q.  And would you also have to test to

3   determine whether if Mr. Unsworth wins this case,

4   even if it's just a dollar, and articles are

5   written about that in leading publications or the

6   same kinds of publications that have written about

7   this matter so far, that if you at that point did

8   a search on Google for Vernon Unsworth you would

9   not necessarily see the articles on your list on

10  the first couple of search page results from

11  Google if you were, say, 10 articles per page?

12       A.  Again, we're talking kind of hypothetical

13  here.  But if -- especially if it was on the news

14  domain, I think you would see the news articles be

15  in those -- be in the top search results.  Some of

16  those may contain the defaming statements also, so

17  it's kind of hypothetical.  I can't say for sure.

18       Q.  Right.  So if those stories were written

19  about the outcome of this case, they were

20  primarily about the lawsuit, those were stories --

21  those stories aren't on your list of -- you

22  omitted those, right?

23            MR. GRUNBERG:  Objection, form.

24       A.  Well, those stories don't exist, so --

25  those stories don't exist.  The stories you're

EXHIBIT 1
PAGE 271

BERNARD J.JANSEN, PHD

November 04, 2019

```
1    talking about don't exist yet, so yes, they're not
2    on my list.
3    BY MR. SCHWARTZ:
4        Q.  No, no, no, no, no.  I'm saying stories
5    that have been written to date that were primarily
6    about the lawsuit aren't on this list.  That was
7    one of the filters you applied to decide whether
8    something would be on your list, right?
9            MR. GRUNBERG:  When you said outcome of
10   this lawsuit, you weren't trying to mean final.
11   Look at your question you asked.  You said outcome
12   of this lawsuit.
13           MR. SCHWARTZ:  All right.  If that's what
14   I said, I withdraw the question.
15           We're so close to being done.  I really
16   want to get you out of here.
17   BY MR. SCHWARTZ:
18       Q.  With respect to the articles that are on
19   your list, one of the filters you applied to keep
20   an article from appearing on your list is if the
21   article was primarily about this lawsuit, right?
22       A.  Yes.
23       Q.  Okay.  So now let's come forward in time,
24   going into the future.  This case is over.  The
25   jury has come back.  They have ruled in favor of
```

EXHIBIT 1
PAGE 272

BERNARD J. JANSEN, PHD

November 04, 2019

```
 1    Mr. Unsworth, even if they've only awarded him a
 2    dollar.  Stories have been written by some of
 3    the -- or have been posted on some of the websites
 4    that your articles were posted on.  Now you run a
 5    new search of Vernon Unsworth.
 6            Sitting here today, you can't tell us
 7    where in the ranking of search results stories
 8    about the outcome of this lawsuit will be in
 9    relation to stories that are on your list, can
10    you?  You can't know that now, can you?
11            MR. GRUNBERG:  Objection, form.  I mean,
12    you're asking him to talk about articles that
13    don't even exist.  But if you can answer, go
14    ahead.
15    BY MR. SCHWARTZ:
16        Q.  Well, what I'm really asking about is
17    your knowledge of how Google ranks search results.
18        A.  Yeah, yeah.
19        Q.  You would expect, would you not, that
20    some of the stories that might appear that are on
21    your list that would appear on a Google search
22    right now today of just Vern Unsworth might no
23    longer appear on the first few pages of a search
24    on Google, right?
25        A.  Yeah, given all those hypotheticals --
```

EXHIBIT 1
PAGE 273

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1            MR. GRUNBERG:  Objection, form.
 2       A.  Given all those hypotheticals, that is a
 3  possibility.  New articles that might get ranked
 4  higher than existing articles.  Yes, that can
 5  happen.
 6  BY MR. SCHWARTZ:
 7       Q.  And all of the articles that are on your
 8  report could be pushed off the first few pages,
 9  assuming they are wherever, but all of them could
10  be pushed off the first few pages of Vernon
11  Unsworth search results, right?
12            MR. GRUNBERG:  Objection, form.
13       A.  Again, it's one of these is it possible
14  questions.  But, again, it's something we'd have
15  to test out because I don't know the number of
16  articles, I don't know -- it's something in the
17  future.  I haven't looked into it.
18  BY MR. SCHWARTZ:
19       Q.  Right.  Well, assume -- the only
20  assumption I can ask you to make is that whatever
21  level of interest there has been in writing
22  stories about what Mr. Musk has said about
23  Mr. Unsworth in the past that you've studied
24  continues to exist, and that the websites that
25  have hosted the stories that are in your
```

EXHIBIT 1
PAGE 274

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1    collection of articles continue to host stories
 2    about the controversy.  That's the only thing we
 3    can assume would be constant, otherwise, given
 4    that fact it's quite possible that the stories
 5    that merely contain, if you will, the defaming
 6    statements that are on your list, I guess all of
 7    them on your list, would be pushed below the first
 8    few pages of search results?
 9         A.   I think the key thing you're leaving out
10    here is when the search occurs.  And, again, this
11    hypothetical that let's say, you know, that the
12    lawsuit gets -- is decided and that's -- the
13    search, this hypothetical search occurs that day.
14         Q.   Or in the next few weeks.
15         A.   Or then this occurs a month later, or six
16    months later or a year later.
17         Q.   Just assume one month.
18         A.   I definitely don't know that.
19              MR. SCHWARTZ:  Okay.  I want to thank you
20    for your time.  I know you need to get to the
21    airport so let me say I have no further questions,
22    but thank you very much.
23              THE WITNESS:  Thank you.
24                        EXAMINATION
25    BY MR. GRUNBERG:
```

EXHIBIT 1
PAGE 275

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1        Q.  And quickly, just to be clear,
 2  Mr. Jansen, you -- do you have opinions beyond the
 3  opinions in your summary of opinions with regard
 4  to this case?
 5        A.  My opinions are -- what the summary of my
 6  opinions are the summary of my report and then, of
 7  course, all the supporting data and the content I
 8  used to get that summary that's contained in my
 9  report.
10        Q.  Do you have an opinion with regard to
11  whether or not Mr. Unsworth has an on-line
12  presence, had an on-line presence before the CNN
13  story?
14            MR. SCHWARTZ:  Before the -- what was it?
15  Oh, the CNN story.
16  BY MR. GRUNBERG:
17        Q.  Whether Mr. Unsworth had little to no
18  on-line presence before the appearance on the CNN
19  report.  Do you have an opinion about that?
20        A.  I do mention in my report I did searching
21  for him and I found next to no on-line presence
22  prior to the cave rescue event.
23        Q.  You would testify to that at trial.
24  Would you testify to that at trial?
25        A.  Yes, it's in my report.
```

EXHIBIT 1
PAGE 276

BERNARD J.JANSEN, PHD

November 04, 2019

```
1          Q.  Do you have an opinion as to whether --
2    do you have an opinion as to whether there were
3    articles mentioning the lawsuit regarding the
4    defaming statements of Elon Musk but also
5    mentioning the lawsuit?
6          MR. SCHWARTZ:  Objection, vague and
7    ambiguous.  Sorry, object as to form.
8          A.  Well, as I mention in the report, there
9    were articles that address the caves but also
10   contained the defaming statements.  I believe I
11   list 140 of those from a sample search.
12         Q.  And you would be able to testify to that
13   at trial?
14         A.  It's in my report, so yes.
15         Q.  And do you have an opinion as to whether
16   or not there were articles published in the U.K.
17   about Mr. Unsworth and the defaming statements of
18   Mr. Musk?
19         A.  That is also in my report.  I believe
20   there was 31 different countries, including the
21   United Kingdom.
22         Q.  And would you be prepared to testify to
23   that opinion at trial?
24         A.  Yes, it's in my report.
25         MR. GRUNBERG:  That's all I have.
```

EXHIBIT 1
PAGE 277

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1                    FURTHER EXAMINATION

 2   BY MR. SCHWARTZ:

 3        Q.   Just to clarify.  Counsel for

 4   Mr. Unsworth just asked you about whether you

 5   would be prepared to give certain opinions at

 6   trial, right?  You remember that just a second

 7   ago?

 8        A.   As I reflect on it, yes, I recall it.

 9        Q.   Okay.  Are all of those opinions

10   contained within your report?

11        A.   Every question the counsel asked me was,

12   yes, somehow addressed in my report.

13        Q.   There aren't any opinions even including

14   whatever counsel just asked you about that you're

15   going to be giving at trial that aren't already in

16   your report, are there?

17        A.   As I sit here I'm only going to testify

18   what's in my report.  I do have, of course, the

19   paragraph if some new analysis comes up or

20   something like that.  But right now these are my

21   opinions as contained my in my report.

22        Q.   If you were to show up at trial with

23   anything different I would object to it, just so

24   I've made that for the record.  But I thank you

25   very much.
```

EXHIBIT 1
PAGE 278

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1              THE WITNESS:  Thank you.
 2              THE VIDEOGRAPHER:  This concludes the
 3     videotaped deposition.  The time is approximately
 4     5:03 p.m.  We are off the record.
 5              (Off-the-record discussion)
 6              (Off video)
 7              MR. SCHWARTZ:  So why don't we say, look,
 8     we'll give him till like -- I'm happy to say close
 9     of business on Tuesday for him to tell you whether
10     he needs to make any changes, you'll promptly let
11     us know.
12              MS. WADE:  That's fine.
13              MR. SCHWARTZ:  And if there's some
14     correction to the filing we've made you will allow
15     us to make the filing to fix the pages we've
16     attached.  But -- let me make a call and make sure
17     Mike is okay with this.  He can go.
18              (Off-the-record discussion)
19              MR. SCHWARTZ:  So reporter thinks we'll
20     have the transcript Thursday afternoon, you'll
21     send it electronically to him, and by 5:00 p.m.
22     Monday your time you'll let us know if there are
23     any changes?
24              MS. WADE:  Yes.
25              MR. SCHWARTZ:  And if we haven't heard
```

EXHIBIT 1
PAGE 279

```
1    from you the unsigned original can be used, blah,
2    blah, blah.
3            (Deposition concluded at 5:13 p.m.)
4            (Signature reserved)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 1
PAGE 280

BERNARD J.JANSEN, PHD

November 04, 2019

```
 1                    CERTIFICATE

 2

 3   STATE OF GEORGIA:

 4   COUNTY OF FULTON:

 5

 6        I hereby certify that the foregoing

 7   transcript was taken down, as stated in the

 8   caption, and the colloquies, questions, and

 9   answers were reduced to typewriting under my

10   direction; that the transcript is a true and

11   correct record of the evidence given upon said

12   proceeding.

13        I further certify that I am not a

14   relative or employee or attorney of any party, nor

15   am I financially interested in the outcome of this

16   action.

17        This the 6th day of November 2019.

18

19

20

21        Valerie N. Almand

22   _____

23   VALERIE N. ALMAND, RPR, CRR, CCR, CSR-B-531

24

25
```

EXHIBIT 1
PAGE 281