L. LIN WOOD, P.C.
L. Lin Wood (*pro hac vice*)
lwood@linwoodlaw.com
Nicole J. Wade (*pro hac vice*)
nwade@linwoodlaw.com
Jonathan D. Grunberg (*pro hac vice*)
jgrunberg@linwoodlaw.com
G. Taylor Wilson (*pro hac vice*)
twilson@linwoodlaw.com
1180 West Peachtree Street, Ste. 2040
Atlanta, Georgia 30309
404-891-1402
404-506-9111 (fax)

WEISBART SPRINGER HAYES, LLP
Matt C. Wood (*pro hac vice*)
mwood@wshllp.com
212 Lavaca Street, Ste. 200
Austin, TX 78701
512-652-5780
512-682-2074 (fax)

CHATHAM LAW GROUP
Robert Christopher Chatham
chris@chathamfirm.com
CA State Bar No. 240972
3109 W. Temple St.
Los Angeles, CA 90026
213-277-1800

Attorneys for Plaintiff VERNON UNSWORTH

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON UNSWORTH,<br><br>    Plaintiff,<br><br>v.<br><br>ELON MUSK,<br><br>    Defendant. | Case No. 2:18-cv-08048-SVW (JCx)<br>Judge: Hon. Stephen V. Wilson<br><br>**PLAINTIFF VERNON UNSWORTH'S OPPOSITION TO DEFENDANT ELON MUSK'S MOTION TO QUASH TRIAL SUBPOENA DUCES TECUM TO ELON MUSK**<br><br>Pretrial Conference:  Nov. 25, 2019<br>Time:                        3:00 p.m.<br>Courtroom:              10A |

1

## **TABLE OF CONTENTS**

2

3

TABLE OF CONTENTS ..........................................................................................i

4

TABLE OF AUTHORITIES ...................................................................................ii

5

6

INTRODUCTION.................................................................................................. 1

7

ARGUMENT ........................................................................................................ 3

8

9

I.      Unsworth's trial subpoena is not a discovery subpoena in disguise. ......... 3

10

11

II.     Musk's financial information is highly probative and not prejudicial....... 6

12

III.    Musk's attempt to put a constitutional cap on punitive damages is wrong,

13

        beside the point, and at the very least premature. ...................................... 8

14

15

CONCLUSION .................................................................................................... 12

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# **TABLE OF AUTHORITIES**

2

3

**Cases**

4

*Bankhead v. ArvinMeritor, Inc.*, 205 Cal. App. 4th 68 (2012) ................................. 6

5

*Beckway v. DeShong*, 2012 U.S. Dist. LEXIS 5219, at *2 (N.D. Cal. Jan. 27,

6

2012) ................................................................................................................... 4

7

*Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172 (11th Cir. 2002) ............................ 7

8

9

*Dawe v. Corr. USA*, 506 F. App'x 657 (9th Cir. 2013) ................................. 9, 10, 11

10

*Finjan v. Sophos, Inc.*, 2016 U.S. Dist. LEXIS 189272, at *47 (N.D. Cal.

11

Aug. 22, 2016) ................................................................................................... 7

12

*Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, 2013 U.S. Dist. LEXIS 71364, at

13

*22 (E.D. Cal. May 20, 2013) ........................................................................... 7

14

*Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338 (6th Cir. 1984) ................. 4

15

16

*Hatcher v. Precoat Metals*, 271 F.R.D. 674 (N.D. Ala. 2010) ................................. 4

17

*Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556  (S.D. Cal. 1999)......... 4

18

*Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191 (2005)............................................. 11

19

*Kaffaga v. Estate of Steinbeck*, 938 F.3d 1006, 2019 U.S. App. LEXIS 27106,

20

at *26 (9th Cir. Sept. 9, 2019)........................................................................... 6

21

22

*Nat'l Integrated Techs., Inc. v. Gustavson*, 76 F. App'x 774 (9th Cir. 2003) ........... 3

23

*nSight, Inc. v. PeopleSoft, Inc.*, 2006 U.S. Dist. LEXIS 22383, at *6 (N.D.

24

Cal. Apr. 13, 2006)............................................................................................ 4

25

*Peterson v. Stewart*, 2012 WL 541521 (Cal. Ct. App. Feb. 17, 2012) ................ 9, 10

26

*Puritan Inv. Corp. v. ASLL Corp.*, 1997 U.S. Dist. LEXIS 19559, at *1 (E.D.

27

Pa. Dec. 9, 1997)............................................................................................... 4

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Salisbury v. Hickman*, 2013 U.S. Dist. LEXIS 115024, at *15  (E.D. Cal. Aug. 14, 2013) ................................................................................................................ 7

*Simon v. San Paolo U.S. Holding Co., Inc.*, 35 Cal. 4th 1159 (2005) ...................... 11

*Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165 (2015)................. 3, 5, 6

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............... 9, 10, 11

*Todd v. AT&T Corp.*, 2017 U.S. Dist. LEXIS 60000, at *4 (N.D. Cal. Apr. 19, 2017) .................................................................................................................. 7

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ........................................ 7

*Western Air Charter, Inc. v. Schembari*, 2019 U.S. Dist. LEXIS 125147, at *29 (C.D. Cal. July 25, 2019) ................................................................................ 5

**<u>Rules</u>**

FED. R. EVID. 403 ........................................................................................................ 8

# INTRODUCTION

Despite Elon Musk's claim to great wealth, he is not above the law.  At every opportunity, he has used his claimed wealth in an effort to destroy Plaintiff Vernon Unsworth's reputation, both before and during this lawsuit, with knowing and outright lies that Unsworth is a pedophile.  Now he seeks to dictate how Unsworth can present his case to the jury by attempting to conceal relevant and admissible evidence of his claimed wealth and to impermissibly curtail the factual record in this case on the issue of punitive damages.

Musk's Motion to Quash ("Motion") is premised on the baseless notion that Unsworth is seeking to harass Musk by seeking relevant documentary evidence of his net worth because Musk proffered a woefully misleading stipulation that his net worth exceeds $1 billion, which he claims renders additional evidence of his finances irrelevant and prejudicial.  On the contrary, Unsworth's burden on the issue of punitive damages is to present evidence of Musk's financial condition *at the time of trial*.  Far from harassment, Unsworth elected not to force Musk's production of his financial records during discovery and chose instead to wait until that time when the evidence was both required and probative of the issue:  trial.

Musk is not permitted to dictate the presentation of Unsworth's case by agreeing to selectively testify to his alleged net worth while preventing Unsworth from verifying that testimony with documentary evidence.  The authority relied on by Musk regarding the use of trial subpoenas does not address the issue of seeking financial documentation necessary for an award of punitive damages.  And for good reason:  it is Musk's net worth at the time of trial that matters, which net worth is in daily fluctuation due to a significant portion of his claimed net worth being made up of his holdings of Tesla and SpaceX stock.[1]  Nor does any of the authority relied

---

[1] Musk's Motion references the fact that "Musk also answered questions at his deposition regarding his net worth and stated that it was several times higher" than $1 billion.  (Mot. at 2.)  But Musk, according to his deposition, also intends to offer

1  upon by Musk stand for the proposition that a defendant can limit a plaintiff's right
2  to tender admissible and probative evidence of a defendant's net worth because the
3  defendant offers a unilateral and untested stipulation as to his net worth.  There are
4  two sides to this case, and Musk cannot tell this Court that its subpoena power is
5  limited because he is willing to stipulate to a certain net worth.

6       Musk's attempt to pre-emptively provide this Court with a post-trial brief on
7  his inevitable position that the jury's punitive damage award is too high is not
8  remotely probative of the issue at hand: Unsworth's entitlement to prove Musk's
9  financial condition and ability to pay at the time of trial with competent evidence,
10 which evidence may be used to test, correct, and/or corroborate Musk's as-yet
11 untested proffer of his testimony and liquidity.  And while not probative of the issue
12 to be decided in this Motion, it must be noted that Musk's two-paragraph argument
13 that punitive damages will, as a matter of law, be limited to a one-to-one ratio –
14 which implicitly recognizes the likelihood that the jury will award a substantial sum
15 for compensatory damages – is a distortion of Supreme Court and California
16 precedent.  There is no bright line rule governing the appropriate ratio of punitive
17 damages to compensatory damages, as that ratio rightfully hinges on the specific
18 facts of the case, most significantly in this case the degree of reprehensibility of
19 Musk's conduct and the amount of punitive damages necessary to appropriately
20 punish and deter in light of Musk's claim of significant wealth.  Whether Musk can
21 successfully or unsuccessfully raise his position after the jury verdict, it has no
22 bearing on the issue before the Court on this Motion.

23      Finally, Musk's assertion of prejudice is not credible on its face and runs
24 contrary to settled law.  Musk is, again, confusing "prejudicial" evidence – which
25 nearly all opposing relevant evidence is – with "unfairly" prejudicial evidence.

26 testimony that would encourage a jury to discount his net worth.  Because Musk
27 has designated that testimony confidential, Unsworth will be prepared to discuss it
28 with the Court at the hearing of this matter.

Evidence of Musk's financial condition is not just probative but essential. Because a greater net worth necessarily suggests the need for a greater punitive damages award, Musk's effort to limit the evidence of his net worth is simply a backdoor effort to reduce his exposure to punitive damages. Any punitive damages award in this case should be determined not by a game of hide-the-ball with evidence, but by a jury's careful deliberation upon a complete record.

## ARGUMENT

### I.     Unsworth's trial subpoena is not a discovery subpoena in disguise.

The first incorrect premise asserted by Musk is that Unsworth is trying to obtain discovery after the close of the discovery period. This argument ignores the fact that, under California law, determining a proper punitive damage award requires evidence of the defendant's ability to pay *as of the trial date*. *See Nat'l Integrated Techs., Inc. v. Gustavson*, 76 F. App'x 774, 778-79 (9th Cir. 2003) (reversing punitive damage award based on outdated financial information); *Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165, 194 (2015) ("The evidence should reflect the named defendant's financial condition at the time of trial."). Information about Musk's financial condition on the trial date was not available during the discovery period, which ended on September 13, 2019, more than two months ago, which is especially true given Musk's testimony that his claimed net worth is largely comprised of his holdings in one publicly traded company in an ever-changing stock market and one privately held company in the speculative business of space exploration. Any product failures or successes by these companies could have an immediate impact on Musk's net worth.[2]

[2] For instance, Tesla's stock reportedly fell approximately 6% just today, and according to Musk's testimony, an increase or decrease of this kind is not unusual. *See, e.g., "*Shattered Glass: Futuristic Design Questioned After Tesla Cybertruck Launch," *avail. at* https://money.usnews.com/investing/news/articles/2019-11-22/teslas-cybertruck-launch-takes-hit-as-shatterproof-windows-crack. Similarly, just two days ago, a SpaceX rocket "literally blew its top" and "blasted what

1    In this circumstance, the Court is authorized to enforce Unsworth's trial

2    subpoena.  For example, a judge in the Northern District of California upheld "trial

3    subpoenas seeking the appearance of Defendants at trial, as well as requesting

4    production of ten categories of Defendants' personal financial records." *Beckway*

5    *v. DeShong*, 2012 U.S. Dist. LEXIS 5219, at *2-3 (N.D. Cal. Jan. 27, 2012).  The

6    court recognized that "[f]inancial records are properly subject to disclosure for the

7    purpose of evaluating the amount of punitive damages that should be awarded," and

8    the court ordered the defendants to bring the ten categories of financial records with

9    them to trial.  *Id.* at *2.

10    The cases cited by Musk do not hold otherwise.  (Mot. at 3-4.)  None of the

11    cases are on point because none involved a request for financial records related to

12    punitive damages.3  Moreover, the cases cited by Musk lay a legal foundation that

13    *supports* Unsworth's trial subpoena.  "In California, federal courts interpret Rule

14    45 as setting forth two types of subpoenas: pre-trial discovery subpoenas and trial

15    subpoenas." *nSight, Inc. v. PeopleSoft, Inc*., 2006 U.S. Dist. LEXIS 22383, at *6

16    (N.D. Cal. Apr. 13, 2006).  One purpose of a trial subpoena is to obtain documents

17

18    appeared to be an upper bulkhead high into the air. . . ." *See* "SpaceX Starship
      prototype blows its top during test at Texas launch site," *avail. at*
19    https://www.cbsnews.com/news/spacex-explosion-today-starship-prototype-
      exploded-during-test-at-boca-chica-texas-launch-site-wednesday/   (last  visited
20    Nov. 22, 2019).  It is unknown what impact this explosion has had on the value of
21    Musk's stock in the privately-owned SpaceX.

22    3 *See Puritan Inv. Corp. v. ASLL Corp.*, 1997 U.S. Dist. LEXIS 19559, at *1 (E.D.
23    Pa. Dec. 9, 1997) (subpoena for business, tax, and financial records for purpose of
      proving alter ego liability); *nSight*, 2006 U.S. Dist. LEXIS 22383, at *1 (subpoena
24    for business records in antitrust and contract case); *Hatcher v. Precoat Metals*, 271
      F.R.D. 674, 675-76 (N.D. Ala. 2010) (subpoena with "basic bare bones requests"
25    that should have been sought in discovery); *Integra Lifesciences I, Ltd. v. Merck
26    KGaA*, 190 F.R.D. 556, 562 (S.D. Cal. 1999) (subpoena for FDA filing); *Ghandi
      v. Police Dept. of City of Detroit*, 747 F.2d 338, 354-55 (6th Cir. 1984) (subpoena
27    to FBI in civil rights case).
28

1    "for permissible use at trial." *Id.* at *10.  That is exactly the purpose of Unsworth's

2    trial subpoena to Musk.

3         One irony of Musk's Motion is that he served a trial subpoena on Unsworth

4    seeking production of documents at trial, and he has even filed a Motion to Enforce

5    that subpoena – without even inquiring as to whether Unsworth would object to that

6    subpoena.  (Doc. 118.)  In his Motion to Enforce, Musk goes to great lengths to

7    explain that a trial subpoena can be used to obtain documents under certain

8    circumstances, without acknowledging that he, himself, is actively seeking a

9    production of documents that he allegedly sought in discovery, later met and

10   conferred on, failed to move to compel, and which bear no resemblance to the "time

11   of trial" standard used to assess financial documents on the issue of punitive

12   damages. *Id.* at 11-12.  Unsworth will address Musk's Motion to Enforce at the

13   Pre-Trial Conference if necessary, but for now it suffices to say that Musk's own

14   effort to obtain documents through a trial subpoena badly undermines his

15   opposition to Unsworth's trial subpoena.[4]

16        California law also contradicts Musk's argument that he can hide his true net

17   worth by stipulating that the amount is "at least $1 billion." (Mot. at 7.)  "Because

18

19   [4] Musk challenges Unsworth's trial subpoena as a whole rather than its scope.  To
20   avoid any doubt, however, it should be noted that Unsworth requested various
     items of financial information in addition to net worth for reasons well-supported
21   in California law.  While evidence of net worth is the most important indicator of
     a defendant's ability to pay at the time of trial, *Western Air Charter, Inc. v.*
22   *Schembari*, 2019 U.S. Dist. LEXIS 125147, at *29 (C.D. Cal. July 25, 2019), "that
23   metric is too susceptible to manipulation to be the sole standard for measuring a
     defendant's ability to pay." *Soto*, 239 Cal. App. 4th at 194.  As a result, California
24   courts take a holistic approach and consider other evidence of ability to pay, such
25   as the defendant's income, expenses, cash on hand, and available credit.  *See*
     *Bankhead v. ArvinMeritor, Inc*., 205 Cal. App. 4th 68, 79-84 (2012).  This other
26   evidence could be important if, for example, Musk testifies at trial that his wealth
27   is illiquid or testifies that he is forced to finance his billionaire lifestyle by
     borrowing against his stocks.
28

the purposes of punitive damages are to punish the wrongdoer and to make an example of him, the wealthier the wrongdoer, the larger the award of punitive damages." *Bankhead v. ArvinMeritor, Inc*., 205 Cal. App. 4th 68, 79-84 (2012). Publicly-available sources speculate that Musk's net worth is ***over $20 billion***— which means that Musk's proposed stipulation could actually be less than 5% of his true net worth. *See, e.g.*, Forbes, Elon Musk, https://www.forbes.com/profile/ elon-musk/#3cc4c2397999 (last visited Nov. 22, 2019) (showing estimated net worth of $23.6 billion). Indeed, in reporting on Musk's Motion, Bloomberg reported that Musk has an estimated net worth of $27.3 billion. *See* "Elon Musk Scorns Caver for Prying Into His Finances as Trial Looms," *avail. at* https://www.bloomberg.com/news/articles/2019-11-22/musk-scorns-caver-for-prying-into-his-finances-as-trial-looms (last visited Nov. 22, 2019). Musk's effort to limit evidence of his financial condition is clearly a roundabout and legally proscribed strategy to limit his exposure to punitive damages. This is particularly true given that Musk may attempt to understate his financial condition at trial by claiming his ability to pay is diminished by the illiquidity of his net worth.

## II.   Musk's financial information is highly probative and not prejudicial.

Musk takes the position that evidence of his finances is not only irrelevant but prejudicial. (Mot. at 6.) This argument flies in the face of controlling California law, which holds that evidence of the defendant's financial condition is *required* to impose punitive damages. *See Kaffaga v. Estate of Steinbeck*, 938 F.3d 1006, 2019 U.S. App. LEXIS 27106, at *26-27 (9th Cir. Sept. 9, 2019) ("It is the plaintiff's burden to place into the record meaningful evidence of the defendant's financial condition to support a defendant's ability to pay."). Such evidence is the only way to determine "[t]he ultimately proper level of punitive damages," which "is an amount not so low that defendant can absorb it with little or no discomfort, nor so high that it destroys, annihilates, or cripples the defendant." *Soto*, 239 Cal. App. 4th at 192. "Relevant evidence is inherently prejudicial; but it is only unfair

1   prejudice, substantially outweighing probative value, which permits exclusion of

2   relevant matter under Rule 403." *United States v. Hankey*, 203 F.3d 1160, 1172

3   (9th Cir. 2000).

4        None of the cases cited by Musk to support his claim of prejudice are

5   applicable. (Mot. at 8.)  Most involve exclusion of financial information in entirely

6   different contexts where punitive damages were not an issue.  *See Brough v.*

7   *Imperial Sterling Ltd.*, 297 F.3d 1172, 1178-80 (11th Cir. 2002) (wealth irrelevant

8   to breach of contract); *Finjan v. Sophos, Inc.*, 2016 U.S. Dist. LEXIS 189272, at

9   *47-48 (N.D. Cal. Aug. 22, 2016) (wealth irrelevant to patent validity).  One case

10  involved punitive damages, but the court excluded evidence of a *parent company's*

11  finances because it was irrelevant to the *subsidiary defendant's* wealth.  *Fresno*

12  *Rock Taco, LLC v. Nat'l Sur. Corp.*, 2013 U.S. Dist. LEXIS 71364, at *22 (E.D.

13  Cal. May 20, 2013).  Because the defendant's net worth is so intertwined with the

14  proper amount of punitive damages, courts routinely reject efforts to conceal net

15  worth based on arguments of prejudice.  *See Todd v. AT&T Corp.*, 2017 U.S. Dist.

16  LEXIS 60000, at *4-5 (N.D. Cal. Apr. 19, 2017) (collecting cases); *Salisbury v.*

17  *Hickman*, 2013 U.S. Dist. LEXIS 115024, at *15-16 (E.D. Cal. Aug. 14, 2013)

18  (rejecting effort to prevent discovery of defendant's net worth for purpose of

19  punitive damages based on alleged privacy rights).

20       Musk struggles to come up with a plausible example of prejudice, arguing

21  only that "if the jury hears such evidence, it may believe that it is entitled to award

22  an amount up to Mr. Musk's net worth, in punitive damages." (Mot. at 6.)  The

23  suggestion that the jury verdict in this case might literally be the sole factor which

24  bankrupts Musk is dubious in the extreme, especially given Musk's representations

25  in his Motion that his net worth is irrelevant because a jury cannot award up to $1

26  Billion and in light of the history of fluctuations in Tesla stock.  In any event, the

27  Court's jury instructions will prevent that implausible scenario from ever occurring.

28  This risk, barely even a theoretical possibility, does not come close to "substantially

1   outweigh[ing]" the essential probative value of Musk's net worth.  FED. R. EVID.
2   403.

3        Indeed, this case presents less opportunity for potential prejudice than most
4   cases.  As set forth *supra*, Musk's net worth is a matter of public record and is
5   widely followed and reported on by the media.  *See, e.g.,* "Elon Musk's Net Worth
6   Falls $770 Million After Tesla's Botched Cybertruck Debut," *avail. at*
7   https://www.forbes.com/sites/hayleycuccinello/2019/11/22/elon-musk-net-worth-
8   cybertruck/#f9699ef73aa7 (last visited Nov. 22, 2019).  Given Musk's large stake
9   in Tesla, a publicly traded company, and his large stake in SpaceX, which can be
10  valued based on a recent fundraising round, Musk's net worth has been calculated
11  with some confidence and disclosed publicly.  *See, e.g.,* Bloomberg Billionaires
12  Index:  Elon Musk, Net Worth Summary, confidence rating, *avail. at*
13  https://www.bloomberg.com/billionaires/profiles/elon-r-musk/ (last visited Nov.
14  22, 2019).  Musk has not demonstrated any undue prejudice that would occur by
15  proper disclosure of his net worth for the legally permissible purpose of assessing
16  the appropriate amount of punitive damages in this case.

**III.   Musk's attempt to put a constitutional cap on punitive damages is
         wrong, beside the point, and at the very least premature.**

19       Musk's argument that punitive damages are somehow capped at a one-to-one
20  ratio as a matter of law is not only a misrepresentation of the law and the very cases
21  cited by Musk, but also a red herring that has no bearing on the resolution of whether
22  documents concerning Musk's financial condition are properly subject to this
23  Court's subpoena power.  Despite not bearing on whether the jury should receive
24  documentary evidence of Musk's financial condition or be forced to rely on his
25  uncorroborated testimony in which he may misrepresent his financial condition and
26  ability to pay, there is simply no such hard cap on punitive damages; and that is
27  especially true under the circumstances of this case, where Musk's conduct was
28  exceptionally reprehensible.  And in any case, the appropriate amount of punitive

damages to award is in the sound discretion of the jury, and any request to cap those damages now is grossly premature before the jury and the Court have heard the evidence at trial and the jury's damage award is rendered.

Musk cites three cases, all of which he misrepresents and none of which supports the wholesale proposition for which they are cited: *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), *Dawe v. Corr. USA*, 506 F. App'x 657 (9th Cir. 2013), and the unpublished and noncitable opinion in *Peterson v. Stewart*, 2012 WL 541521 (Cal. Ct. App. Feb. 17, 2012).  At no point does Musk make any attempt to actually assert that any of *State Farm's* three guideposts, as faithfully interpreted by the Supreme Court, the Ninth Circuit, or the California Supreme Court, place a hard cap on punitive damages.  Nor can he.

Beginning with the Supreme Court of the United States' overarching conclusions demonstrates that Musk's statement that "Unsworth's punitive damages in this case … will be capped at a one-to-one (or similar) ratio to any award of compensatory damages" is plain wrong, as a matter of law. The Court in *State Farm* explicitly held: "We decline again to impose a bright line ratio which a punitive damages award cannot exceed."  538 U.S. at 425.  Instead, the Court held that "its jurisprudence and the principles it has now established demonstrate, however, that in practice, *few awards exceeding a single digit ratio* between punitive and compensatory damages, *to a significant degree*, will satisfy due process. … Single-digit multipliers *are more likely* to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the rage of 500 to 1, or, in this case, of 145 to 1."  *Id.* (emphasis added) (internal citations omitted).  Indeed, while the Court indicated that "[w]hen compensatory damages are substantial, then a lesser ratio, *perhaps* only equal to compensatory damages, can reach the outermost limit of the due process guarantee," the Court immediately clarified that "[t]he precise award in any case, of course, must be based upon the *facts and circumstances of the defendant's*

1    *conduct and the harm to the plaintiff*." *Id.* (emphasis added).

2        The Court in *State Farm* reiterated that there are three guideposts courts

3 should use to assess the appropriate ratio: "(1) the degree of reprehensibility of the

4 defendant's misconduct, (2) the disparity between the actual or potential harm

5 suffered by the plaintiff and the punitive damages award, and (3) the difference

6 between the punitive damages awarded by the jury and the civil penalties authorized

7 or imposed in comparable cases." *Id.* at 409 (internal citations omitted). "The most

8 important indicium of the reasonableness of a punitive damages award is the degree

9 of reprehensibility of the defendant's conduct." *Id.* at 419 (internal citations

10 omitted). While Musk fails altogether to address these guideposts, and irrespective

11 of the extent of reprehensibility already demonstrated to this Court by Plaintiff, the

12 evidence necessary to evaluate these factors has not yet been submitted at trial, and

13 Musk's attempt to pre-emptively cap punitive damages is inappropriate.

14        *State Farm's* clear enunciation that awards of punitive damages must be

15 assessed on a case-by-case basis is, for Musk's purposes, the only proposition

16 supported by his citations to *Peterson* and *Dawe*. In *Peterson*, after recognizing

17 that "a defendant's ability to pay a punitive damage award must be based on

18 meaningful and substantial evidence of his or her financial condition" and that

19 "there is no rigid formula and other factors may be dispositive especially when net

20 worth is manipulated and fails to reflect actual wealth," 2012 WL 541521, at *12,

21 the Court merely assessed the facts of the case, which bore no resemblance to those

22 here. In *Peterson*, the defamatory statements at issue were not made by a malicious,

23 bullying paper billionaire who is recognized as one of the most influential people

24 in the world. Nor were the *Peterson* statements an all-out worldwide assault on

25 another's reputation with accusations of pedophilia broadcast internationally and

26 other significant invasions of privacy, but instead were statements "sent in letters"

27 and "spreading false rumors" accusing the plaintiff of such things as being "a liar

28 … and promoting false gossip," "having an affair," and of "embezzle[ment]." *Id.*

1   at *11.  Similarly, in *Dawe*, the Court merely held that, "the overall degree of
2   reprehensibility suggests that, under the circumstances, a 1:1 ratio was proper."  506
3   Fed. App'x at 660.

4       Far more instructive than those two cases on the appropriate, and by necessity
5   shifting, ratio of punitive damages are the California Supreme Court's decisions in
6   *Simon v. San Paolo U.S. Holding Co., Inc.*, 35 Cal. 4th 1159 (2005) and *Johnson v.*
7   *Ford Motor Co.*, 35 Cal. 4th 1191 (2005), both of which faithfully interpret and
8   apply *State Farm*.  "We understand the court's statement in *State Farm* that 'few
9   awards' significantly exceeding a single-digit ratio will satisfy due process to
10  establish a type of presumption: ratios between the punitive damages award and the
11  plaintiff's actual or potential compensatory damages *significantly greater* than 9 or
12  10 to 1 are suspect and, absent special justification (by, for example, extreme
13  reprehensibility   or   unusually   small,   hard-to-detect   or   hard-to-measure
14  compensatory damages), cannot survive appellate scrutiny under the due process
15  clause."  35 Cal. 4th at 1182 (holding that a "penalty of $50,000, though just
16  exceeding the largest single-digit ratio amount, is in absolute size not extraordinary
17  for fraudulent conduct.").  The Court in *Johnson* similarly recognized that the facts
18  of the particular case control, with emphasis on the reprehensibility of the
19  defendant's conduct: "To be sure, *State Farm* requires reasonable proportionality
20  between punitive damages and actual or potential harm to the plaintiff.  But what
21  ratio is reasonable necessarily depends on the reprehensibility of the conduct, 'the
22  most important indicium of the reasonableness of the award …'" 25 Cal. 4th at 1207
23  (citing *State Farm*, 538 U.S. at 419).

24      An appropriate ratio of punitive to compensatory damages cannot be
25  determined in this case until the facts are in evidence and the jury has rendered its
26  verdict.  In the event that Musk's worst fears come true as expressed in his Motion,
27  and the jury renders a punitive damage verdict in close proximity to Musk's claimed
28  net worth, both the Court and Unsworth may consider a reduction in punitive

1  damages on remittitur.  And, as set forth in the very cases relied upon by Musk,

2  documentary evidence of his financial condition is highly probative of the issue.

3  **CONCLUSION**

4  For all these reasons, Plaintiff Vernon Unsworth respectfully requests that

5  the Court deny Defendant Elon Musk's Motion to Quash Trial Subpoena.

6

7  Dated:  November 22, 2019          L. LIN WOOD, P.C.

8

9  By: */s/L. Lin Wood*
                                                        L. Lin Wood
10                                              ***Attorneys for Plaintiff Vernon Unsworth***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28